HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9    IN THE UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF WASHINGTON
10                AT SEATTLE

11
WILD FISH CONSERVANCY,                    Case No. 2:17-cv-01708-JCC
12
                                          DECLARATION OF BRIAN A. KNUTSEN
13        Plaintiff,

14 v.

15 COOKE AQUACULTURE PACIFIC, LLC,

16        Defendant.

17

18

19        I, Brian A. Knutsen, declare the following on the basis of personal knowledge to which I

20 am competent to testify:

21        1.      I am co-counsel for Plaintiff Wild Fish Conservancy in this litigation;

22        2.      Attached hereto as Exhibit 1 are true and accurate copies of the National Pollutant

23

24 Discharge Elimination System ("NPDES") permits (excerpts) for Defendant Cooke Aquaculture

25 Pacific, LLC's ("Cooke") Puget Sound net pens that I downloaded from the following website

26 maintained by the Washington Department of Ecology ("Ecology"):

27 https://fortress.wa.gov/ecy/paris/DocumentSearch.aspx;

28
29        3.      Attached hereto as Exhibit 2 is a true and accurate copy of Plaintiff's First Set of

KNUTSEN DECLARATION - 1
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC     EARTHRISE LAW CENTER
221 S.E. 11th Ave., Suite 217   10015 SW Terwilliger Blvd.
Portland, Oregon 97214          Portland, Oregon 97219
(503) 841-6515                  (503) 768-6825

1  Interrogatories, Requests for Production, and Requests for Admission to Defendant Cooke

2  Aquaculture, LLC that I served on March 28, 2018 (excerpts);

3        4.      Attached hereto as Exhibit 3 is a true and accurate copy of Defendant's Responses

4  to Plaintiff's First Set of Interrogatories, Requests for Production, and Requests for Admission to

5  Defendant Cooke Aquaculture, LLC that was served on me on April 27, 2018 (excerpts);

6        5.      Plaintiff's Second Set of Interrogatories, Requests for Production, and Requests

7  for Admission to Defendant Cooke Aquaculture, LLC were served on Cooke on August 3, 2018;

8        6.      Attached hereto as Exhibit 4 is a true and accurate copy of Plaintiff's Second Set

9  of Interrogatories, Requests for Production, and Requests for Admission to Defendant Cooke

10  Aquaculture, LLC and Answers Thereto that was served on me on August 31, 2018 (excerpts);

11        7.      The following exhibits attached hereto are true and accurate copies of documents

12  provided to me in response to discovery requests issued to Cooke:

13             a.      Exhibit 5: Cooke's Pollution Prevent Plan (updated April 2012)

14  (excerpts);

15             b.      Exhibit 6: Cooke's Pollution Prevent Plan (updated January 2015)

16  (excerpts);

17             c.      Exhibit 7: Cooke's Pollution Prevent Plan (updated April 2017)

18  (excerpts);

19             d.      Exhibit 8: Cooke's Pollution Prevent Plan (updated October 2017)

20  (excerpts);

21             e.      Exhibit 9: Cooke's Fish Escape Prevention Plan (updated August 2012)

22  (excerpts);

23             f.      Exhibit 10: Cooke's Fish Escape Prevention Plan (updated June 2014)

KNUTSEN DECLARATION - 2
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

(excerpts);

g.    Exhibit 11: Cooke's Fish Escape Prevention Plan (updated January 2017 2012) (excerpts);

h.    Exhibit 12: Cooke's Fish Escape Prevention Plan (updated October 2018) (excerpts);

8.    Attached hereto as Exhibit 13 is a true and accurate copy of a letter dated August 6, 2018 that I received from Cooke's counsel;

9.    Attached hereto as Exhibit 14 is a true and accurate copy of a letter dated August 16, 108 issued by my co-counsel Kevin Cassidy to counsel for Cooke;

10.    Attached hereto as Exhibit 15 is a true and accurate copy of a letter dated August 22, 2018 that I received from Cooke's counsel;

11.    Attached hereto as Exhibit 16 is a true and accurate copy of Plaintiff's Second Set of Requests for Admission to Defendant Cooke Aquaculture, LLC and Answers Thereto that was served on me on October 31, 2018 (excerpts);

12.    Attached hereto as Exhibit 17 is a true and accurate copy of letter dated November 19, 2018 that I issued to counsel for Cooke;

13.    Attached hereto as Exhibit 18 is a true and accurate copy of a letter dated November 30, 2018 that I received from counsel for Cooke;

14.    Attached hereto as Exhibit 19 is a true and accurate copy of a letter dated December 5, 2018 issued by my co-counsel to counsel for Cooke;

15.    Counsel for the Conservancy conferred with Cooke in a good faith effort to resolve the issues raised in Plaintiff's Motion to Determine Insufficient Defendant's Answers to Requests for Admission prior to seeking relief from the Court. In addition to the written

KNUTSEN DECLARATION - 3
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6

communications documented in Exhibits 17 through 19 attached to this declaration, counsel for

the parties held a telephonic conference on December 3, 2018 to confer on several discovery

disputes, including those addressed in the motion. The participants to that conferral were Brian

Knutsen (myself), Emma Bruden, Kevin Cassidy, and Lia Comerford for the Conservancy and

Douglas Steding, Diane Meyers, David Bechtold, and Kristine Williams for Cooke;

7
8
9

16.    Attached hereto as Exhibit 20 is a true and accurate copy of Plaintiff's Notice of

Rule 30(b)(6) Deposition of Defendant Cooke Aquaculture Pacific, LLC and Rule 34 Request

for Production of Documents that I served on Cooke on December 13, 2018 (excerpts);

10
11
12

17.    Attached hereto as Exhibit 21 is a true and accurate copy of a letter dated January

9, 2019 that I received from counsel for Cooke;

13
14

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

15
16

Executed this 17th day of January, 2019.

17
18
19

 s/ Brian A. Knutsen
Brian A. Knutsen, WSBA No. 38806

20
21
22
23
24
25
26
27
28
29

KNUTSEN DECLARATION - 4
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

# EXHIBIT 1

Page 1 of 30
Permit No. **WA-003156-9**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**SITE 1—DEEPWATER BAY**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")

Facility Name and Location:
Site 1 – Deepwater Bay
Deepwater Bay, Bellingham Channel
Skagit County

Receiving Water:
Deepwater Bay, Bellingham Channel
Puget Sound

Discharge Location:
Latitude:     48° 33' 15.6" N
Longitude: 122° 41' 01" W

Industry Type:
Marine Salmon Net Pen

Waterbody I.D. Number:
WA-PS-0010

    is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.    POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.    How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.    How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.    How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.    Practices for the storage and, if necessary, disposal of disease control chemicals.

E.    How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

1.    Any fish mortalities under normal operation.

2.    Fish mortalities due to a fish kill involving more than five percent of the fish.

3.    Blood from harvesting operations.

F.    The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.    Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.  FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan.  Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates.  For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters.  At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement.  The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year.  The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state.  The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8).  The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA-003157-7**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**SITE 2 – DEEPWATER BAY**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")

Facility Name and Location:
Site 2 – Deepwater Bay
Deepwater Bay, Bellingham Channel
Skagit County

Receiving Water:
Deepwater Bay, Bellingham Channel
Puget Sound

Discharge Location:
Latitude:    48° 33' 25.6" N
Longitude: 122° 41' 05" W

Industry Type:
Marine Salmon Net Pen

Waterbody I.D. Number:
WA-PS-0010

is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.    POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.    How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.    How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.    How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.    Practices for the storage and, if necessary, disposal of disease control chemicals.

E.    How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

1.    Any fish mortalities under normal operation.

2.    Fish mortalities due to a fish kill involving more than five percent of the fish.

3.    Blood from harvesting operations.

F.    The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.    Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1.  A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2.  A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3.  A description of the spill response procedures and equipment which will be used.

4.  A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H.  Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.    FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan.  Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates.  For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1.  Identification and implementation of technology that will minimize fish escapements.

2.  Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3.  Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters.  At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4.  Procedures to minimize escapements in the event emergency conditions require pen movement.  The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5.  Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6.  Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year.  The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state.  The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8).  The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA-003158-5**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**SITE 3 – DEEPWATER BAY**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")

Facility Name and Location:
Site 3 – Deepwater Bay
Deepwater Bay, Bellingham Channel
Skagit County

Receiving Water:
Deepwater Bay, Bellingham Channel
Puget Sound

Industry Type:
Marine Salmon Net Pen

Discharge Location:
Latitude:     48° 33' 39.8" N
Longitude: 122° 40' 46" W

Waterbody I.D. Number:
WA-PS-0010

is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.   POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.   How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.   How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.   How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.   Practices for the storage and, if necessary, disposal of disease control chemicals.

E.   How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

   1.   Any fish mortalities under normal operation.

   2.   Fish mortalities due to a fish kill involving more than five percent of the fish.

   3.   Blood from harvesting operations.

F.   The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

   The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.   Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.   FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan.  Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates.  For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters.  At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement.  The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year.  The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state.  The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8).  The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA-003159-3**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**SITE 4 – HOPE ISLAND, DEEPWATER BAY**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")


Facility Name and Location:                    Receiving Water:
Site 4 – Hope Island                           Skagit Bay, North of Hope Island
Skagit County                                  Puget Sound


Industry Type:                                 Discharge Location:
Marine Salmon Net Pen                          Latitude:    48° 33' 15.6" N
                                               Longitude: 122° 41' 01" W

Waterbody I.D. Number:
WA-PS-0010

is authorized to discharge in accordance with the special and general conditions which follow.


_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.    POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.    How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.    How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.    How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.    Practices for the storage and, if necessary, disposal of disease control chemicals.

E.    How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

1.    Any fish mortalities under normal operation.

2.    Fish mortalities due to a fish kill involving more than five percent of the fish.

3.    Blood from harvesting operations.

F.    The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.    Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.    FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan.  Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates.  For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters.  At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement.  The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year.  The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state.  The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8).  The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA-004089-4**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**PORT ANGELES – EDIZ HOOK SITE**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")

Facility Name and Location:
Port Angeles – Ediz Hook
Kitsap County

Receiving Water:
Port Angeles Harbor
Puget Sound

Industry Type:
Marine Salmon Net Pen

Discharge Location:
Latitude:     48° 08' 23" N
Longitude: 123° 25' 07" W

Waterbody I.D. Number:
WA-18-0020

is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.    POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.    How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.    How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.    How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.    Practices for the storage and, if necessary, disposal of disease control chemicals.

E.    How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

    1.    Any fish mortalities under normal operation.

    2.    Fish mortalities due to a fish kill involving more than five percent of the fish.

    3.    Blood from harvesting operations.

F.    The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

    The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.    Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.  FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan.  Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates.  For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters.  At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement.  The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year.  The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state.  The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8).  The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA0031526**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008
2nd Modification Date: January 14, 2011

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC
DBA AMERICAN GOLD SEAFOODS
CLAM BAY – SALTWATER 1**
1201 11th Street
P.O. Box 669
Anacortes, WA  98221
(hereinafter "Permittee")

| Facility Name and Location: | Receiving Water: |
|---|---|
| Clam Bay – Saltwater 1 | Rich Passage |
| Rich Passage near Manchester | Puget Sound |
| Kitsap County | |
| | Discharge Location: |
| Industry Type: | Latitude:     47° 34' 17" N |
| Marine Salmon Net Pen | Longitude: 122° 32' 24" W |
| | |
| Waterbody I.D. Number: | |
| WA-15-0030 | |

is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.    POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.    How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.    How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.    How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.    Practices for the storage and, if necessary, disposal of disease control chemicals.

E.    How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

1.    Any fish mortalities under normal operation.

2.    Fish mortalities due to a fish kill involving more than five percent of the fish.

3.    Blood from harvesting operations.

F.    The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.    Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

**S7.    FISH RELEASE PREVENTION AND MONITORING PLAN**

The Permittee must maintain a Fish Release Prevention and Monitoring Plan.  Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates.  For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters.  At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement.  The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year.  The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state.  The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8).  The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA-003153-4**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**FORT WARD - SALTWATER II**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")

Facility Name and Location:
Fort Ward – Saltwater II
Rich Passage NW of Beans Point
Kitsap County

Receiving Water:
Rich Passage
Puget Sound

Industry Type:
Marine Salmon Net Pen

Discharge Location:
Latitude:     47° 34' 30" N
Longitude: 122° 31' 30" W

Waterbody I.D. Number:
WA-15-0030

is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.    POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008.  The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires.  The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit.  This plan must address:  operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.    How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.    How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.    How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control.  The concentration of disease control chemicals in the facility's discharge must be minimized.

D.    Practices for the storage and, if necessary, disposal of disease control chemicals.

E.    How solid and biological wastes are collected, stored, and ultimately disposed.  Among the solid wastes of concern are:

1.    Any fish mortalities under normal operation.

2.    Fish mortalities due to a fish kill involving more than five percent of the fish.

3.    Blood from harvesting operations.

F.    The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points.  Any defective components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.    Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials.  These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.    FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan. Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates. For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters. At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement. The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year. The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state. The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8). The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

Page 1 of 30
Permit No. **WA-003154-2**
Issuance Date: October 26, 2007
Expiration Date: October 26, 2012
Minor Modification Date: May 30, 2008

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
WASTE DISCHARGE PERMIT

State of Washington
DEPARTMENT OF ECOLOGY
Northwest Regional Office
3190 160th Avenue SE
Bellevue, WA  98008-5452
(hereinafter "Department")

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act (The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

**ICICLE ACQUISITION SUBSIDIARY, LLC**
**ORCHARD ROCKS – SALTWATER IV**
4019 – 21st Avenue West
Seattle, WA  98199
(hereinafter "Permittee")

Facility Name and Location:
Orchard Rocks – Saltwater IV
Rich Passage NW of Beans Point
Kitsap County

Receiving Water:
Rich Passage
Puget Sound

Industry Type:
Marine Salmon Net Pen

Discharge Location:
Latitude:     47° 34' 30" N
Longitude: 122° 31' 50" W

Waterbody I.D. Number:
WA-15-0030

is authorized to discharge in accordance with the special and general conditions which follow.

_____
Kevin C. Fitzpatrick
Water Quality Section Manager
Northwest Regional Office
Washington State Department of Ecology

**S6.     POLLUTION PREVENTION PLAN**

The Permittee must prepare and submit an update of the Pollution Prevention Plan to Ecology by January 30, 2008. The Permittee must maintain a copy of the most current version of the Pollution Prevention Plan at the facility and assure that the operations staff for the facility is familiar with the plan and have been adequately trained in the specific procedures which it requires. The Pollution Prevention Plan must specify operating conditions which do not violate other conditions of this permit. This plan must address: operations, spill prevention, spill response, solid waste, and stormwater discharge practices which will prevent or minimize the release of pollutants from the facility to the waters of the state.

The Permittee must operate the facility in accordance with this plan along with any subsequent amendments or revisions.

The Permittee must address the following in the plan:

A.  How fish feeding will be conducted to minimize the discharge of unconsumed food.

B.  How net cleaning will be conducted in order to minimize the discharge of accumulated solids and attached marine growth.

C.  How disease control chemicals are used within the facility to ensure that the amounts and frequency of application are the minimum necessary for effective disease treatment and control. The concentration of disease control chemicals in the facility's discharge must be minimized.

D.  Practices for the storage and, if necessary, disposal of disease control chemicals.

E.  How solid and biological wastes are collected, stored, and ultimately disposed. Among the solid wastes of concern are:

    1.  Any fish mortalities under normal operation.

    2.  Fish mortalities due to a fish kill involving more than five percent of the fish.

    3.  Blood from harvesting operations.

F.  The Permittee shall routinely, at least weekly, conduct visual inspections of exposed surface lines, shackles, and mooring points. Any defective components are to be repaired or replaced promptly. At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line. Document any problems and maintain all components to prevent failure that could lead to fish escapements.

    The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary.

G.  Procedures to prevent or respond to spills and unplanned discharges of oil and hazardous materials. These procedures must address the following:

1. A description of the reporting system, which will be used to alert responsible facility management and appropriate legal authorities.

2. A description of facilities (including an overall facility site plan) which prevents, controls, or treats spills and unplanned discharges and a compliance schedule to install any necessary facilities in accordance with the approved plan.

3. A description of the spill response procedures and equipment which will be used.

4. A list of all hazardous materials used, processed, or stored at the facility which may be spilled directly or indirectly into state waters.

H. Procedures to identify and prevent existing and potential sources of stormwater pollution.

## S7.   FISH RELEASE PREVENTION AND MONITORING PLAN

The Permittee must maintain a Fish Release Prevention and Monitoring Plan. Any updates to the existing plan must be submitted to Ecology for review January 30, 2008, or as needed. Ecology will consult with the WDFW as part of reviewing plan updates. For purposes of meeting this requirement, plans developed for the WDFW that comply with chapter 220-76 WAC may be submitted if the conditions of S6 are addressed in the plan.

The Fish Release Prevention and Monitoring Plan must include, but not be limited to, the following elements:

1. Identification and implementation of technology that will minimize fish escapements.

2. Routine procedures and best management procedures used to minimize the risk of escapement from the pens during normal daily operations.

3. Procedures to minimize escapements in the event that the net pens need to be moved, repaired, or manipulated in any manner, or during stocking or harvesting operations, which could result in a release of fish to state waters. At a minimum, prior to the net pens being moved, a bathymetric analysis should be made along the intended travel route(s) to ensure adequate depth and the absence of underwater hazards or obstructions.

4. Procedures to minimize escapements in the event emergency conditions require pen movement. The procedures should include, as appropriate, actions to maximize the amount of time available to plan and execute the movement of the pens.

5. Procedures for routine training of all employees, contractors, and subcontractors involved in the movement or manipulation of the pens.

6. Procedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement.

The Permittee must submit an **Annual Fish Release Report** to Ecology by January 30th of each year covering the previous calendar year. The report must summarize, by month and pen site, the number, age class, disease and medication history, and cause of all fish releases to waters of the state. The Annual Fish Release Report must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8). The Permittee must summarize the actions taken over the previous year to minimize the release of fish to state waters.

# EXHIBIT 2

HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

10

11

WILD FISH CONSERVANCY,

12

      Plaintiff,

13

v.

14

COOKE AQUACULTURE PACIFIC, LLC,

15

16

      Defendant.

17

Case No. 2:17-cv-01708-JCC

PLAINTIFF'S FIRST SET OF
INTERROGATORIES, REQUESTS FOR
PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC

18

19

      TO:    DEFENDANT COOKE AQUACULTURE PACIFIC, LLC AND COUNSEL OF

20

RECORD:

21

      Pursuant to Federal Rule of Civil Procedure 33 and the following instructions, you are

22

hereby requested to answer, under oath, the interrogatories set forth herein within 30 days after

23

the date of service of this request. Pursuant to Federal Rule of Civil Procedure 34 and the

24

following instructions, you are hereby requested to produce, within 30 days after the date of

25

service of this request, the documents requested herein at the office of Kampmeier & Knutsen,

26

PLLC, either by courier to 221 S.E. 11th Ave., Suite 217, Portland, Oregon 97214, or by U.S.

27

28

Postal Service to P.O. Box 15099, Portland, Oregon 97293. Pursuant to Federal Rule of Civil

29

PLAINTIFF'S FIRST SET OF
DISCOVERY REQUESTS TO
DEFENDANT - 1
KNUTSEN DECLARATION - 31
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
P.O. Box 15099
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

The terms "any," "and," and "or" shall be construed conjunctively and disjunctively so as to have the broadest meaning possible.

The terms "regarding," "relate to," "relates to," "relating to," "related to," "refer to," "refers to," "referring to," and "concerning" mean, without limitation, concerning, referring to, alluding to, responding to, relating to, connected with, commenting upon, in respect of, about, establishing, analyzing, criticizing, touching upon, constituting, comprising, composing, containing, mentioning, embodying, identifying, stating, pertaining directly to, pertaining indirectly to, supporting, refuting, reflecting, is in any way relevant to, and/or being.

The terms "person" and "persons" shall be understood to encompass, unless otherwise specified, any natural person, firm, entity, corporation, partnership, proprietorship, association, joint venture, other form of organization or arrangement, and government and government agency of every nature and type.

The term "communication" means every manner of transmitting or receiving information, opinions or thoughts, whether orally, in writing, or otherwise.

The terms "describe" and "state" mean to specify in detail and to particularize the content of the answer to the question by providing, as applicable, relevant dates, numbers, locations, frequencies, individuals involved, materials involved and their amounts and constituents, documents, and equipment involved, and not just to state the reply in summary or outline fashion.

The term "factual basis" means a complete and detailed description of all alleged facts, including the identification of the source or sources of such alleged facts, which support an argument or legal position.

PLAINTIFF'S FIRST SET OF
DISCOVERY REQUESTS TO
DEFENDANT - 6
KNUTSEN DECLARATION - 32
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
P.O. Box 15099
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

parasites that has occurred since January 1, 2010, including: (a) the diseases, viruses, and/or

parasites for which monitoring has occurred; (b) the dates and frequency(ies) of the monitoring;

(c) the location(s) of the monitoring; (d) the monitoring method(s); (e) the number of salmonids

monitored; and (f) the results of the monitoring.

**Response:**

**Interrogatory No. 4**

Describe Cooke Aquaculture Pacific, LLC's purchase of, acquisition of, and/or merger

with Icicle Seafoods and/or Icicle Acquisition Subsidiary, LLC.

**Response:**

**Interrogatory No. 5**

Describe all inspections you have conducted of the Puget Sound net pens under the

provisions of the Permits, including Condition S6 and/or your Pollution Prevention Plans, since

January 1, 2010.

**Response:**

PLAINTIFF'S FIRST SET OF
DISCOVERY REQUESTS TO
DEFENDANT - 9
KNUTSEN DECLARATION - 33
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
P.O. Box 15099
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

**Request for Production No. 4**

Produce all documents related to your response to Interrogatory No. 4 and any other documents related to Cooke Aquaculture Pacific, LLC's purchase of, acquisition of, and/or merger with Icicle Seafoods and/or Icicle Acquisition Subsidiary, LLC.

**Response:**

**Request for Production No. 5**

Produce all documents related to your response to Interrogatory No. 5 and any other documents related to inspections you have conducted of the Puget Sound net pens under the provisions of Condition S6 of the Permits and/or your Pollution Prevention Plans since January 1, 2010.

**Response:**

**Request for Production No. 6**

Produce all documents related to your response to Interrogatory No. 6 and any other documents related to maintenance (including repairs and/or replacements) you have conducted of the Puget Sound net pens, including any such maintenance by you made pursuant to provisions of Condition S6 of the Permits and/or your Pollution Prevention Plans, since January 1, 2010.

**Response:**

PLAINTIFF'S FIRST SET OF
DISCOVERY REQUESTS TO
DEFENDANT - 15
KNUTSEN DECLARATION - 34
Case No. 2:17-cv-01708-JCC
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
P.O. Box 15099
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1    DATED this 28th day of March, 2018.

2

3                KAMPMEIER & KNUTSEN, PLLC

4
     By:
5            Brian Knutsen, WSBA No. 38806
6            U.S. Postal Service Address:
             P.O. Box 15099; Portland, Oregon 97293
7            Location (No U.S. Postal Service Delivery; couriers okay):
             221 S.E. 11th Ave., Ste. 217; Portland, Oregon 97214
8            Tel, Email: (503) 841-6515, brian@kampmeierknutsen.com

9
             Paul A. Kampmeier, WSBA No. 31560
10           615 Second Ave., Suite 360
             Seattle Washington 98104
11           Tel, Email: (206) 223-4088 x 4, paul@kampmeierknutsen.com

12
             EARTHRISE LAW CENTER
13
             Doug DeRoy (OSB #170934), *admitted pro hac vice*
14           Kevin Cassidy (OSB #025296), *admitted pro hac vice*
15           Lewis & Clark Law School
             10015 S.W. Terwilliger Blvd.
16           Portland, Oregon 97219
             Tel, Email: (503) 768-6825, dougderoy@lclark.edu
17           Tel, Email: (781) 659-1696, cassidy@lclark.edu

18
             *Attorneys for Plaintiff Wild Fish Conservancy*
19

20

21

22

23

24

25

26

27

28

29
     PLAINTIFF'S FIRST SET OF          KAMPMEIER & KNUTSEN PLLC    EARTHRISE LAW CENTER
     DISCOVERY REQUESTS TO                    P.O. Box 15099       10015 SW Terwilliger Blvd.
     DEFENDANT - 27                      Portland, Oregon 97293    Portland, Oregon 97219
     Case No. 2:17-cv-01708-JCC              (503) 841-6515           (503) 768-6825
     KNUTSEN DECLARATION - 35
     Case No. 2:17-cv-01708-JCC

1

2

## CERTIFICATE OF SERVICE

3      I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that

4  I am co-counsel for Plaintiff Wild Fish Conservancy and that on March 28, 2018, I caused the

5
  foregoing to be served on the following by electronic mail per written agreement with counsel:
6

7      Douglas J. Steding
       Diane M. Meyers
8      Madeline Engel
9      Northwest Resource Law, PLLC
       101 Yesler Way, Suite 205
10     Seattle, Washington 98104
11     Email: dsteding@nwresourcelaw.com
       dmeyers@nwresourcelaw.com
12     mengel@nwresourcelaw.com
       kcouden@nwresourcelaw.com
13     ehinkes@nwresourcelaw.com

14
       *Attorneys for Defendant Cooke*
15     *Aquaculture Pacific, LLC*

16

17

18

19
                              Brian A. Knutsen, WSBA No. 38806
20

21

22

23

24

25

26

27

28

29

PLAINTIFF'S FIRST SET OF          KAMPMEIER & KNUTSEN PLLC       EARTHRISE LAW CENTER
DISCOVERY REQUESTS TO                   P.O. Box 15099           10015 SW Terwilliger Blvd.
DEFENDANT - 29                       Portland, Oregon 97293        Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC             (503) 841-6515               (503) 768-6825
KNUTSEN DECLARATION - 36
Case No. 2:17-cv-01708-JCC

# EXHIBIT 3

HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY, | Case No. 2:17-cv-01708-JCC |
| Plaintiff, | DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO DEFENDANT COOKE AQUACULTURE, LLC |
| v. | |
| COOKE AQUACULTURE PACIFIC, LLC, | |
| Defendant. | |

Defendant Cooke Aquaculture Pacific, LLC ("Cooke") responds to Plaintiff's First Set of

Interrogatories, Requests for Production, and Requests for Admission to Defendant Cooke

Aquaculture Pacific, LLC (the "Discovery Requests") as follows:

## GENERAL OBJECTIONS

1.     Cooke objects to the Discovery Requests to the extent they seek information that

is subject to attorney-client, work-product, or other privileges. Such information will not be

provided or produced.

2.     Cooke objects to the Discovery Requests to the extent they are not relevant to any

party's claim or defense and are not proportional to the needs of the case.  The discovery

responses served upon Cooke are voluminous and not proportional to the needs of this limited

DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC -- 1
KNU NSEN DECLARATION - 38
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1 pathogens prior to egg importation. The eggs are kept in quarantine and the resulting hatched fry
2 are tested again pursuant to state requirements.

3

4 **Interrogatory No. 4**: Describe Cooke Aquaculture Pacific, LLC's purchase of,
5 acquisition of, and/or merger with Icicle Seafoods and/or Icicle Acquisition Subsidiary, LLC.

6 **Response:** Cooke objects to this interrogatory as not relevant.  Without waiving any
7 objection, Cooke responds that Cooke Aquaculture Pacific, LLC, did not acquire or merge with
8 Icicle Seafoods and/or Icicle Acquisition Subsidiary, LLC.  Cooke Aquaculture Pacific, LLC,
9 was a new name given to Icicle Acquisition Subsidiary LLC, after that entity was acquired by
10 Cooke Aquaculture Inc.  The corporate entity operating the permitted farms at issue in this case
11 only changed in name, there was no direct sale of assets or merger.

12

13 **Interrogatory No. 5**: Describe all inspections you have conducted of the Puget Sound
14 net pens under the provisions of the Permits, including Condition S6 and/or your Pollution
15 Prevention Plans, since January 1, 2010.

16 **Response:** Cooke objects to this interrogatory as overbroad, unduly burdensome, and not
17 proportional to the needs of the case.  Additionally, Cooke objects to the scope of this
18 interrogatory as it seeks information outside of the five-year statute of limitations applicable to
19 plaintiff's claims, as such, Cooke limits its answer to the five years prior to filing of this lawsuit.
20 Cooke objects to this interrogatory as overly broad and unduly burdensome because it covers
21 eight net pen facilities for the entire five-year statute of limitations period, and because the
22 inspections of said facilities occurred on a nearly-daily basis in some form or another.  To the
23 extent this interrogatory seeks detailed descriptions of every inspection made by Cooke at each
24 of its facilities over the course of a five-year period (equivalent of 40 years of inspections) this
25 request is not proportional to the needs of the case.  Cooke also objects to this interrogatory to
26 the extent the answers can be better obtained through review of documents produced in response

DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC -- 5
KNUTSEN DECLARATION - 39
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    to Plaintiff's Request for Production No. 5. To the extent plaintiff may have a good faith reason
2    to believe that Cooke violated its permits' inspection requirements, Plaintiff may identify with
3    specificity the alleged shortcoming and Cooke will provide a more detailed answer.

4       Without waiving any objections, Cooke responds that inspections included, but were not
5    necessarily limited to:

6       Exposed mooring system are inspected by staff daily as part of their general staff duties.
7    Beginning in 2015, all mooring concerns were required to be documented on the facility's daily
8    log. On October 19, 2017 Cooke updated its procedures for weekly exposed mooring system
9    inspections that specify the scope and criteria of inspections, this included an updated inspection
10    form that is customized for each net pen facility. Staff continue to inspect exposed moorings
11    daily and are to report any concerns.

12       Below water mooring system components that are less than 100 feet in depth, as well as
13    main cage structures, are inspected annually by divers. The current Pollution Prevention Plans
14    specify that mooring components greater than 100 feet deep will be inspected by remotely
15    operated underwater vehicles or a contracted dive service, with the last such inspection
16    conducted at Cooke facilities in the later part of 2017 under contract with Global Diving &
17    Salvage.

18       Additional inspections are performed during the fallow period of a site, between
19    generations of fish. For instance, where appropriate, ultrasound inspections are performed, nets
20    are removed, inspected, and repaired, and other maintenance activities are performed at the
21    facilities. And, this fallow period is the time during which anchors are lifted, inspected, and reset
22    as needed. A good example of these activities is documented in the correspondence between
23    Cooke, DNR, WDFW, and Ecology related to the restocking of its Clam Bay facility in 2017.
24    Cooke also recently deployed current meters at all of its sites to allow re-engineering of all of its
25    mooring systems, this will be another opportunity for mooring inspections.

26

DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC -- 6
KNUTSEN DECLARATION - 40
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  and/or parasites that has occurred since January 1, 2010, including any documents related to the
2  results of the monitoring.

3  **Response:** Cooke objects to this request as overbroad, unduly burdensome, not
4  proportional to the needs of the case, and not relevant. Additionally, Cooke objects to the scope
5  of this request as it seeks information outside of the five-year statute of limitations applicable to
6  plaintiff's claims, as such, Cooke limits its answer to the five years prior to filing of this lawsuit.
7  None of the NPDES permits identified by plaintiff in its Complaint contain any health
8  monitoring requirements. Plaintiff does not allege any failure to monitor fish health in its
9  Complaint or the corresponding 60-day notice. The steps taken by Cooke to monitor fish health
10  at its Puget Sound facilities are irrelevant to this case, and as such no response is necessary.

11

12  **Request for Production No. 4:** Produce all documents related to your response to
13  Interrogatory No. 4 and any other documents related to Cooke Aquaculture Pacific, LLC's
14  purchase of, acquisition of, and/or merger with Icicle Seafoods and/or Icicle Acquisition
15  Subsidiary, LLC.

16  **Response:** Cooke objects to this request as overbroad, unduly burdensome, not
17  proportionate to the needs of the case, and not relevant. Cooke also objects to the extent
18  documents are protected by the attorney client privilege. Cooke Aquaculture Pacific did not
19  purchase, acquire or merge with Icicle Seafoods and/or Icicle Acquisition Subsidiary, LLC.
20  Without waiving any objections, Cooke will produce documents filed with the Washington
21  Secretary of State showing the change of corporate name.

22

23

24  **Request for Production No. 5:** Produce all documents related to your response to
25  Interrogatory No. 5 and any other documents related to inspections you have conducted of the
26

DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC -- 18
KNUTSEN DECLARATION - 41
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  Puget Sound net pens under the provisions of Condition S6 of the Permits and/or your Pollution
2  Prevention Plans since January 1, 2010.

3      **Response:** Cooke objects to this request as overbroad, unduly burdensome, not
4  proportionate to the needs of the case, and not relevant.  Additionally, Cooke objects to the scope
5  of this request as it seeks information outside of the five-year statute of limitations applicable to
6  plaintiff's claims, as such, Cooke limits its answer to the five years prior to filing of this lawsuit.
7  Cooke also objects to the extent documents are protected by the attorney client or work product
8  privilege.  Daily logs are kept at each site, in a paper format.  Without waiving any objections or
9  privileges, Cooke will produce responsive documents, or make available for inspection for a
10  reasonable period of time each facilities' daily logs at a mutually agreed upon time and place.

11

12      **Request for Production No. 6:** Produce all documents related to your response to
13  Interrogatory No. 6 and any other documents related to maintenance (including repairs and/or
14  replacements) you have conducted of the Puget Sound net pens, including any such maintenance
15  by you made pursuant to provisions of Condition S6 of the Permits and/or your Pollution
16  Prevention Plans, since January 1, 2010.

17      **Response:**  Cooke objects to this request as overbroad, unduly burdensome, not
18  proportionate to the needs of the case, and not relevant.  Additionally, Cooke objects to the scope
19  of this request as it seeks information outside of the five-year statute of limitations applicable to
20  plaintiff's claims, as such, Cooke limits its answer to the five years prior to filing of this lawsuit.
21  Cooke also objects to the extent documents are protected by the attorney client or work product
22  privilege.  Without waiving any objections or privileges, Cooke will produce responsive
23  documents.  Cooke will also make available for inspection for a reasonable period of time each
24  facilities' daily logs at a mutually agreed upon time and place.

25

26

DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC -- 19
KNUTSEN DECLARATION - 42
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1   DATED this 27th day of April, 2018.

2

3                                  NORTHWEST RESOURCE LAW PLLC

4

5                                  Diane M. Meyers, WSBA #40729
                                   dmeyers@nwresourcelaw.com
6                                  206.971.1568
                                   Douglas J. Steding, WSBA #37020
7                                  dsteding@nwresourcelaw.com
                                   206.971.1567
8                                  Madeline Engel, WSBA #43884
                                   mengel@nwresourcelaw.com
9                                  206.971.1569

10
                                   *Attorneys for Defendant Cooke Aquaculture Pacific,*
11                                 *LLC*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S RESPONSES TO PLAINTIFF'S            **NORTHWEST RESOURCE LAW PLLC**
FIRST SET OF INTERROGATORIES, REQUESTS                101 Yesler Way, Suite 205
FOR PRODUCTION, AND REQUESTS FOR                        Seattle, WA 98104
ADMISSION TO DEFENDANT COOKE                              206.971.1564
AQUACULTURE, LLC -- 36
KNUTSEN DECLARATION - 43
Case No. 2:17-cv-01708-JCC

1

**VERIFICATION**

2
Defendant Cooke Aquaculture Pacific LLC declares that:

3
1.      I am an official of Defendant Cooke Aquaculture Pacific LLC;

4
2.      I have read the answers to the foregoing Plaintiffs First Set of Interrogatories,

5
Requests for Production, and Requests for Admission to Defendant Cooke

6
Aquaculture Pacific LLC and know the contents thereof and believe the same to

7
be true;

8
3.      I have answered these interrogatories in good faith in accordance with the

9
definitional section presented in the interrogatories and requests for production;

10

11
I declare, under penalty of perjury according to the laws of the United States, that the

12
foregoing is true and correct.

13

14
EXECUTED this 27th day of April_____, 2018, at Augusta, Maine_____.

15
Cooke Aquaculture Pacific LLC

16
By: _____

17
Its: VP Saltwater Operations_____

18

19

20

21

22

23

24

25

26

DEFENDANT'S RESPONSE TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC
KNUTSEN DECLARATION - 44
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2018, I served DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO DEFENDANT COOKE AQUACULTURE, LLC to the following by email:

| *Attorneys for Plaintiff Wild Fish Conservancy* | |
|---|---|
| Paul A. Kampmeier, WSBA #31560<br>Kampmeier & Knutsen, PLLC<br>615 Second Ave., Ste. 360<br>Seattle, WA 98104<br>206.223.4088 | paul@kampmeierknutsen.com |
| Brian A. Knutsen, WSBA #38806<br>Kampmeier & Knutsen, PLLC<br>*Mailing Address (Postal Delivery Address):*<br>P.O. Box 15099<br>Portland, OR 97293<br>*Location (FedEx, UPS, Couriers Delivery Address):*<br>221 SE 11th Ave., Suite 217<br>Portland, OR 97214<br>503.719.5641 | brian@kampmeierknutsen.com |
| Doug DeRoy<br>Kevin M. Cassidy<br>Earthrise Law Center<br>Lewis & Clark Law School<br>10015 S.W. Terwilliger Boulevard, MSC 51<br>Portland, OR 97219<br>503.768.6736 | dougderoy@lclark.edu<br>cassidy@lclark.edu<br>earthrise-docket@lclark.edu |

Dated: April 27, 2018.

Kristine Couden, Paralegal

DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES, REQUESTS
FOR PRODUCTION, AND REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC -- 38
KNUTSEN DECLARATION - 45
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

# EXHIBIT 4

1

2                                                              HONORABLE JOHN C. COUGHENOUR

3

4

5

6

7

8                                  UNITED STATES DISTRICT COURT
                                   WESTERN DISTRICT OF WASHINGTON
9                                              AT SEATTLE

10   WILD FISH CONSERVANCY,

11                  Plaintiff,                          Case No. 2:17-cv-01708-JCC

12          v.                                          PLAINTIFF'S SECOND SET OF
                                                        INTERROGATORIES, REQUESTS FOR
13                                                      PRODUCTION, AND REQUESTS FOR
     COOKE AQUACULTURE PACIFIC,                         ADMISSION TO DEFENDANT COOKE
14   LLC,                                               AQUACULTURE, LLC **AND ANSWERS
                                                        THERETO**
15                  Defendant.

16

17                              **QUALIFICATION ON RESPONSE**

18          Wild Fish Conservancy's ("WFC") Second Set of Interrogatories, Requests for

19   Production, and Requests for Admission to Defendant Cooke Aquaculture, LLC (the "Request"),

20   included 317 individual requests for admission (collectively "RFAs") in addition to the below

21   interrogatories and requests for production.  Shortly after the Request was served, Cooke

22   objected to the RFAs in a letter dated August 6, 2018.  Counsel for both Cooke and WFC

23   discussed that letter and the RFAs during a telephone conference on August 8, 2018.  During that

24   call an extension to the RFA response deadline was agreed upon between the parties.  WFC

25   formally responded to Cooke's letter on August 16, 2018.  Cooke then responded to that letter on

26   August 22, 2018.  The parties still have several disputes regarding the RFAs that have not been

PLAINTIFF'S SECOND SET OF
INTERROGATORIES, REQUESTS FOR                    **NORTHWEST RESOURCE LAW PLLC**
PRODUCTION, AND REQUESTS FOR ADMISSION                    101 Yesler Way, Suite 205
TO DEFENDANT COOKE AQUACULTURE, LLC                          Seattle, WA 98104
**AND ANSWERS THERETO** -- 1                                    206.971.1564
Case No. 2:17-cv-01708-JCC
KNUTSEN DECLARATION - 47
Case No. 2:17-cv-01708-JCC

resolved, and a telephone conference is scheduled to resolve those issues.  This response does

not relate to the RFAs, nor does it waive any objections Cooke may have to those RFAs.

Additionally, per agreement of the parties no response to the RFAs is required at the time of this

response.

## INTERROGATORIES

**Interrogatory No. 17:** Identify each Pollution Prevention Plan that you implemented

under the requirements of Condition S6 of the Permits since January 1, 2010, including for each

plan the dates the plan was in effect under the requirements of Permits.

**Response:** Cooke maintained Pollution Prevention Plans at each of its net pen facilities

continuously since January 1, 2010.  Given operation similarities, the same Plan was used for

each facility.  The below table lists the plans in chronological order:

| Name | Dates | Bates Number |
|---|---|---|
| American Gold Seafoods - NPDES Pollution Prevention Plan, Updated: January 2010 | January 2010 to November 2011 | To be produced. |
| American Gold Seafoods - NPDES Pollution Prevention Plan, Updated: November 2011 | November 2011 to April 2012 | To be produced. |
| American Gold Seafoods - NPDES Pollution Prevention Plan, Updated: April 2012 | April 2012 to January 2015 | COOKE_CWA_00027221 to COOKE_CWA_00027227 |
| American Gold Seafoods - NPDES Pollution Prevention Plan, Updated: January 2015 | January 2015 to April 2017 | COOKE_CWA_00027228 to COOKE_CWA_00027231 |
| Cooke Aquaculture Pacific – Pollution Prevention Plan, Updated: April 2017 | April 2017 to October 2017 | COOKE_CWA_00027232 to COOKE_CWA_00027234 |
| Cooke Aquaculture Pacific – Pollution Prevention Plan, Updated: October 2017 | October 2017 - Present | COOKE_CWA_00027240 – 00027243, 00027249 - 00027250 |

**Interrogatory No. 18**: Identify each Fish Release Prevention and Monitoring Plan that

you implemented under the requirements of Condition S7 of the Permits since January 1, 2010,

including for each plan the dates the plan was in effect under the requirements of Permits.

PLAINTIFF'S SECOND SET OF
INTERROGATORIES, REQUESTS FOR
PRODUCTION, AND REQUESTS FOR ADMISSION
TO DEFENDANT COOKE AQUACULTURE, LLC
**AND ANSWERS THERETO** -- 2
Case No. 2:17-cv-01708-JCC
KNUTSEN DECLARATION - 48
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1   **Response:** Cooke maintained Fish Release Prevention and Monitoring Plans at each of

2   its net pen facilities continuously since January 1, 2010.  Given operation similarities, the same

3   Plan was used for each facility.  The below table lists the plans in chronological order:

| Name | Dates | Bates Number |
|---|---|---|
| Icicle Acquisition Subsidiary, LLC DBA American Gold Seafoods - Fish Escape Prevention Plans, Updated June 2009<br><br>Icicle Acquisition Subsidiary, LLC DBA American Gold Seafoods - Fish Escape Reporting and Response Plan, Updated June 2009 | June 2009 to August 2012 | COOKE_CWA_00027264 to 00027278 |
| Icicle Acquisition Subsidiary, LLC DBA American Gold Seafoods - Fish Escape Prevention Plans, Reviewed August 2012<br><br>Icicle Acquisition Subsidiary, LLC DBA American Gold Seafoods - Fish Escape Reporting and Response Plan, Reviewed August 2012 | August 2012 to June 2014 | To be produced. |
| 2014 Icicle Acquisition Subsidiary, LLC DBA American Gold Seafoods - Fish Escape Prevention Plans, Updated June 2014<br><br>Icicle Acquisition Subsidiary, LLC DBA American Gold Seafoods- 2014 Fish Escape Reporting and Response Plan - Updated June 2014 | June 2014 to January 2017 | COOKE_CWA_00027288 to 00027325 |
| 2017 Cooke Aquaculture Pacific, LLC - Fish Escape Prevention Plan, Updated January 2017 | January 2017 - Present | COOKE_CWA_00027279 to 00027287 |

23   **REQUESTS FOR PRODUCTION**

24   **Request for Production No. 39**: Produce any document identified in your response to

25   Interrogatory No. 17 that you have not already produced through discovery in this matter.

26   **Response:** Responsive documents will be produced.

PLAINTIFF'S SECOND SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO DEFENDANT COOKE AQUACULTURE, LLC **AND ANSWERS THERETO** -- 3 Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 49 Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC** 101 Yesler Way, Suite 205 Seattle, WA 98104 206.971.1564

1     **Request for Production No. 40**: Produce any document identified in your response to

2  Interrogatory No. 18 that you have not already produced through discovery in this matter.

3     **Response:** Responsive documents will be produced.

4

5     **Request for Production No. 41**: Produce all documents related to communications you

6  have had with Mott MacDonald, including any employee or representative thereof, since August

7  19, 2017, relating to the Puget Sound net pens.

8     **Response:** Responsive documents will be produced.

9

10     DATED this 31st day of August, 2018.

NORTHWEST RESOURCE LAW PLLC

11

12

13     */s Douglas J. Steding*
Diane M. Meyers, WSBA #40729

14     dmeyers@nwresourcelaw.com
206.971.1568

15     Douglas J. Steding, WSBA #37020
dsteding@nwresourcelaw.com

16     206.971.1567
Madeline Engel, WSBA #43884

17     mengel@nwresourcelaw.com
206.971.1569

18

19     *Attorneys for Defendant Cooke Aquaculture*
*Pacific, LLC*

20

21

22

23

24

25

26

PLAINTIFF'S SECOND SET OF
INTERROGATORIES, REQUESTS FOR
PRODUCTION, AND REQUESTS FOR ADMISSION
TO DEFENDANT COOKE AQUACULTURE, LLC
**AND ANSWERS THERETO** -- 4
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

Defendant Cooke Aquaculture Pacific LLC declares that:

1.      I am an official of Defendant Cooke Aquaculture Pacific, LLC;

2.      I have read the answers to the foregoing Plaintiff's Second Set of Interrogatories, Requests for Production, and Requests for Admission to Defendant Cooke Aquaculture Pacific, LLC and know the contents thereof and believe the same to be true;

3.      I have answered these interrogatories, requests for production, and requests for admission in good faith in accordance with the definitional section presented in the interrogatories, requests for production, and requests for admission;

I declare, under penalty of perjury according to the laws of the United States, that the foregoing is true and correct.

EXECUTED this ___30___ day of _August_, 2018, at ___Black's Harbour NB___.

Cooke Aquaculture Pacific LLC

By: _____

Its: ___VP Saltwater Operations___

PLAINTIFF'S SECOND SET OF
INTERROGATORIES, REQUESTS FOR
PRODUCTION, AND REQUESTS FOR ADMISSION
TO DEFENDANT COOKE AQUACULTURE, LLC
**AND ANSWERS THERETO** -- 5
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 51
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

# EXHIBIT 5

# American Gold Seafoods
# NPDES POLLUTION PREVENTION PLAN
### Updated: April 2012

## FISH FEEDING PROCEDURES

1. Properly sized, highly digestible and specially formulated fish feeds with a minimum of fines will be used to feed the fish. Fish feed is manufactured to minimize crumbling and fines and feeding machinery is designed to minimize feed breakage.

2. The fish feeding process will be carried out by experienced technicians. The technician's main duty is to supervise the feeding process, maximum the utilization of the fish feed, and to reduce feed wastage.

3. During periods of conditions of high tidal current, Harmful Algal Blooms, reduced ambient dissolved oxygen, or other conditions the feeding process is managed in order to minimize the occurrence of over feeding.

4. Underwater cameras and/or other types of feed monitoring devices are used as needed to facilitate the feeding process by the technicians and minimize the risks of feed wastage.

5. Feed quantities are recorded per pen, per week and the Feed Conversion Rates (FCR) is closely monitored for signs of over or under feeding.

## NETWASHING PRACTICES

1. Fish containment nets are typically pulled to the surface once per year on average. Net changes are timed with seasonal bio-fouling growth period in unison with the production cycle of the fish. Cultured fish stocks typically take 18 to 22 months in seawater to reach harvest sizes. Containment nets may be changed out 2 times during this growing period. This helps to minimize the amount of marine fouling growth on the netting material.

2. Fouled nets are shipped to a land based net cleaning and net repair facility. Cleaning and repair of the nets is carried out by a contracted net repair facility that is specifically operated for purposes of washing, capturing and disposing of waste materials from the cleaning process.

3. Nets are dipped in a water based copper antifouling paint while they at the upland net washing and repair facility. The antifoulant treatment reduces the amounts of growth on the netting materials which in turn significantly reduces the drag forces exerted on the nets and anchoring systems by strong tidal currents. Nets are removed from the net pen facility for periodic cleaning and retreatment at an upland facility. Waste material from this process is contained and sent to a proper landfill facility. Tributyl tin (TBT) has never been used on nets at any of these facilities.

## DISEASE CONTROL CHEMICALS

1. A Disease Control Chemical Use Operational Log will be maintained for each area by the site manager or other responsible site personnel. The log will record the treatment dates, amount and type of treatment material used, reason for use and other relevant information.

1

COOKE_CWA_00027221

## ROUTINE VISUAL INSPECTIONS OF MOORING POINTS

1. The Site Managers and site personnel are to routinely inspect exposed mooring components for signs of excessive wear. Any defective components are to be replaced promptly.

2. Below water mooring components are to be inspected and/or replaced periodically in order to maintain them in the best condition practical.

## OIL and HAZARDOUS MATERIAL SPILL PREVENTION AND RESPONSE PROCEDURES

Contact names and phone numbers of the facility management and the various State and Federal agencies will be posted in the employee break room or other highly visible location at the site. In the event of a spill of hazardous materials the following personnel and agencies are to be notified immediately.

### Hazardous Chemical Spill Notification List

| | | | |
|---|---|---|---|
| GENERAL MANAGER: | | Hank Poeschl | (360) 298-0397 |
| OFFICE: | Anacortes | Kevin Bright | (360) 293-9448 |
| SITE OFFICES: | Bainbridge | Johnny Watters | (206) 743-6526 |
| | Port Angeles | Randy Hodgin | (360) 457-7437 |
| | Cypress Island | Shaughn Hollcroft | (360) 305-1520 |
| | Hope Island | Shaughn Hollcroft | (360) 305-1520 |

| | |
|---|---|
| WASHINGTON DEPT. OF ECOLOGY | (425) 649-7000 (NW Regional Office 24 hr) |
| | (360) 407-6300 (SW Regional Office 24 hr) |
| WASHINGTON DEPT. OF FISH & WILDLIFE | (360) 902-2200 (Main Office) |
| | (360) 902-2681 (John Kerwin) |
| WASHINGTON DEPT. OF NATURAL RESOURCES | (360) 856-3500 (North Division) |
| | (360) 825-1631 (South Division) |
| UNITED STATES COAST GUARD | (800) 442-8802 (24 hr Spill Reporting Line) |
| NATURAL RESOURCES CORP Environmental Services | (800) 33-SPILL (800) 337-7455 |

### Spill Prevention Plans

1. Where possible, chemicals and petroleum products will be stored on land in storage areas with appropriate safeguards.

2. All petroleum products and other hazardous materials necessary for the efficient day to day operation of the facility will be stored in durable, impervious containers which are clearly labeled as to their contents.

3. Petroleum products and other hazardous materials are stored in leak proof areas which have secondary containment.

4. Petroleum products and other hazardous materials will be handled and transferred from containers to equipment using transfer items designed for use of such materials, and in a manner which prevents any discharge to the waters. Experienced personnel will be used in the transfer of these materials.

3

# EXHIBIT 6

# American Gold Seafoods
# NPDES POLLUTION PREVENTION PLAN

### Updated: January 2015

## FISH FEEDING PROCEDURES

1. Properly sized, highly digestible feeds with a minimum of fines will be used to feed the fish. Feeding equipment is to be designed to minimize the occurrence of feed breakage.

2. The fish feeding process will be carried out by an experienced technician. The technician's main duty is to supervise the feeding process, maximum the ingestion of the fish feed by the farmed stock, and reduce any feed wastage.

3. During periods of poor water quality or excessive tidal currents, the feeding process will be modified with respect to the anticipated reduction of feed consumption by the fish.

4. Underwater cameras and/or other feed monitoring devices are to be used when needed to help facilitate the observation of the feeding process by the technician.

5. Feed quantities are recorded per pen, per week and the Feed Conversion Rates (FCR) will be closely monitored for signs of over, as well as, under feeding.

## NETWASHING PRACTICES

1. During in-situ net cleaning, any substantial amounts of marine fouling growth will be removed and disposed of at land based facilities as possible.

2. Nets will be periodically removed from the site to an upland net washing facility for cleaning, disinfection, inspection and repairs. Waste material collected at the upland net washing facility from this process will be contained and sent to a proper landfill or composting facility.

3. Antifoulant treatments are no longer used on any of the American Gold Seafoods nets.

## DISEASE CONTROL CHEMICALS

1. Disease Control Chemical Usage will be logged and records maintained for each area by the site manager or other duly authorized personnel. The log will record the treatment dates, amount and type of treatment material used, reason for use and other relevant information.

2. It is recognized that the use of vaccines will significantly reduce the use of disease control chemicals, therefore the fish entering a facility are to be vaccinated prior to transport from the hatcheries to the seawater pens. Husbandry techniques which prevent or reduce the chance of disease will be used in order to reduce the need for medicated feeds.

1

## DISEASE CONTROL CHEMICALS (cont.,)

3. Fish medications shall be applied in a manner which minimizes the discharge of treatment substances to State waters.

4. The Site Managers are responsible for the administration of disease control chemicals on their respective sites. Qualified fish health experts will be consulted prior to any inclusion of medication to the feed.

5. Any disinfectants used for footbaths, dive nets, etc., will be kept to a minimum and reused as much as possible.  Waste materials will be disposed of at land based sewage facilities. Minimum amounts of these materials necessary for the efficient operation of the facility will be stored on the facility.

6. Any medicated feed will be marked on the label and stored in leak proof containers while at the facility.

## SOLID AND BIOLOGICAL WASTE COLLECTION, STORAGE AND DISPOSAL

1. Normal fish mortalities (morts) are to be collected from each pen a minimum of once per week. The frequency of mortality removal from each pen will be increased depending upon any increase in mortality rates.

2. Morts are to be brought to the surface by either divers, nets or fish pumps, and then transferred into leak proof plastic cans, plastic totes or other proper containers. Plastic liners are used in the fish totes for sanitary reasons. The containers of morts are then transported to land based collection facilities. Fish mortalities will be disposed of at land based rendering plants and/or at soil composting facilities and the plastic tote liners disposed of at proper waste handling facilities.

3. Mortalities which exceed 5% of the total fish at the facility per week are to be reported to the **Washington State Department of Health Phone # (360) 753-5992**. Records of the contacts are to be kept by the Site Managers or other duly authorized personnel.

4. The above mort removal and disposal procedures will be the same for mortalities in excess of five (5%) percent of the total fish held on the facility during that period unless the volumes become too significant (such as during a catastrophic algae bloom). In this case, alternative methods of storage and disposal may be necessary. Fishing vessels and/or sealed large cargo containers will be used to transport the material to the proper disposal sites.

5. Solid waste generated by the daily operation of the sites such as feed bags, pallets and household type wastes will be transported to a land based facility for proper disposal and/or recycling. Proper handling and storage of waste materials will be carried out by the site personnel to minimize the risk of them accidentally entering the environment.

## ROUTINE VISUAL INSPECTIONS OF MOORING POINTS

1. The Site Managers and site personnel are to routinely inspect exposed mooring components for signs of excessive wear. Any defective components are to be replaced promptly.

2. Below water mooring components are to be periodically inspected and/or replaced in order to maintain them in the best condition practical.

2

# EXHIBIT 7



# Cooke Aquaculture Pacific
# POLLUTION PREVENTION PLAN
### Updated: April 2017

## FISH FEEDING PROCEDURES

1. Properly sized, highly digestible feeds with a minimum of fines will be used to feed the fish. Feeding equipment is to be designed to minimize the occurrence of feed breakage.

2. The fish feeding process will be carried out by an experienced technician. The employee's main duty is to supervise the entire feeding process to ensure the maximize ingestion of feed by the fish stocks and to reduce the occurrence of excess feeding.

3. During periods of poor water quality conditions or other conditions that may affect the appetite of the fish, the feeding process will be modified with respect to the anticipated reduction of feed consumption by the fish.

4. Underwater cameras and/or other types of feed monitoring devices will be used to facilitate the feeding process by the technicians and minimize uneaten fish feed wastage.

5. Feed quantities are recorded for each fish pen every day. The Feed Conversion Rates (FCR's) and Specific Feed Rates (SFR's) are to be closely monitored for signs of over feeding or under feeding.

## NETWASHING PRACTICES

1. No anti-foulant paint will be used on the netting materials at the farm sites.

2. Fish containment nets are typically pulled to the surface once per year. Net rotations or net changes can occur during the production cycle of the fish and clean fish containment nets can be rotated into the farm during the growing period to minimize the amount of marine fouling growth on the nets.

3. Nets will be frequently rinsed in-situ with pressurized seawater to minimize bio-fouling growth. If large amounts of growth begins to occur it will be collected and taken to an upland soil composting facility.

4. At the end of the growing cycle after the fish have been harvested out, the nets are removed from the water and transported to a land based cleaning and repair facility.

5. Cleaning and repair of the nets is to be carried out by an approved net repair facility that is designed for this purpose. Materials washed from the nets will be captured and disposed of properly.

KNUTSEN DECLARATION - 59
Case No. 2:17-cv-01708-JCC

COOKE_CWA_00027232

## SOLID AND BIOLOGICAL WASTE COLLECTION, STORAGE AND DISPOSAL (Cont.,)

5. Solid wastes generated by the daily operation of the sites such as feed bags, wooden pallets and household wastes are to be routinely removed from the sites and transported to the land based support facilities for proper disposal and/or recycling. Proper containment, handling and storage of these waste materials are to be priority of all employees to ensure these materials do not enter the water.

## ROUTINE VISUAL INSPECTIONS OF MOORING POINTS

1. The Site Managers and site personnel are to routinely inspect exposed mooring components for signs of excessive wear. Any defective components are to be replaced promptly.

2. Below water mooring components are to be inspected and/or replaced periodically in order to maintain them in the best condition practical.

# EMERGENCY CONTACT NUMBERS

| | | | |
|---|---|---|---|
| **Cooke Aquaculture- General Manager** | | **Innes Weir** | **(206) 402-2247** |
| **Cooke Permit Coordinator:** | | **Kevin Bright** | **(360) 391-2409** |
| **Cooke Farm Site Offices:** | | | |
| Bainbridge Island – | **FW/OR** | **Scott Ridgeway** | **(206) 595-5684** |
| | **Clam Bay** | **Derek Atkinson** | **(206) 298-8078** |
| | **FW Pier** | **Rick Safford** | **(206) 452-9638** |
| **Port Angeles** | | **Randy Hodgin** | **(360) 457-7437** |
| **Cypress Island** | | **Sky Guthrie** | **(360) 391-2002** |
| **Hope Island** | | **Tom Glaspie** | **(360) 391-9504** |

| | |
|---|---|
| **WASHINGTON DEPT. OF ECOLOGY** | **(425) 649-7000  (NW Regional Office 24 hr.)** |
| | **(360) 407-6300  (SW  Regional Office 24 hr.)** |
| **WASHINGTON DEPT. OF FISH & WILDLIFE** | **(360) 902-2200  (Main)** |
| **WASHINGTON DEPT. OF NATURAL RESOURCES** | **(360) 856-3500  (North Division)** |
| | **(360) 825-1631  (South Division)** |
| **U.S. COAST GUARD National Response Center** | **(800) 442-8802  (24 Hour Oil Spill Reporting Line)** |
| **NATURAL RESOURCES CORP Environmental Services** | **(800) 337-7455   (Oil Spill Cleanup Contractor)** |

3

# EXHIBIT 8



# Cooke Aquaculture Pacific
# POLLUTION PREVENTION PLAN
### Updated: October 2017

## FISH FEEDING PROCEDURES

1. Properly sized, highly digestible feeds with a minimum of fines will be used to feed the fish. Feeding equipment is to be designed to minimize the occurrence of feed breakage.

2. The fish feeding process will be carried out by an experienced technician. The employee's main duty is to supervise the entire feeding process to ensure the maximize ingestion of feed by the fish stocks and to reduce the occurrence of excess feeding.

3. During periods of poor water quality conditions or other conditions that may affect the appetite of the fish, the feeding process will be modified with respect to the anticipated reduction of feed consumption by the fish.

4. Underwater cameras and/or other types of feed monitoring devices will be used to facilitate the feeding process by the technicians and minimize uneaten fish feed wastage.

5. Feed quantities are recorded for each fish pen every day. The Feed Conversion Rates (FCR's) and Specific Feed Rates (SFR's) are to be closely monitored for signs of over feeding or under feeding.

## NETWASHING PRACTICES

1. No anti-foulant paint will be used on the netting materials at the farm sites.

2. Fish containment nets are typically pulled to the surface once per year. Net rotations or net changes can occur during the production cycle of the fish and clean fish containment nets can be rotated into the farm during the growing period to minimize the amount of marine fouling growth on the nets.

3. Fish containment nets and the predator barrier nets will be frequently rinsed in-situ with pressurized seawater to minimize bio-fouling growth. If large amounts of growth begins to occur it will be collected and taken to an upland facility for disposal.

4. At the end of the growing cycle after the fish have been harvested out, fish containment nets and predation barrier nets are to be removed from the water and transported to a land based cleaning and repair facility.

5. Cleaning and repair of the nets is to be carried out by an approved net repair facility that is designed for this purpose. Materials washed from the nets will be captured and disposed of properly.

6. Any net accidentally dropped or lost during a storm event that is not recovered immediately is to be marked by GPS coordinates and a buoy and reported to Ecology within 24 hours. The net is to be recovered within 30 days and Ecology is to be notified on the date it is recovered.

KNUTSEN DECLARATION - 62
Case No. 2:17-cv-01708-JCC

COOKE_CWA_00027240

## SOLID AND BIOLOGICAL WASTE COLLECTION, STORAGE AND DISPOSAL (Cont.,)

5. Solid wastes generated by the daily operation of the sites such as feed bags, wooden pallets and household wastes are to be routinely removed from the sites and transported to the land based support facilities for proper disposal and/or recycling. Proper containment, handling and storage of these waste materials are to be priority of all employees to ensure these materials do not enter the water.

## WEEKLY VISUAL INSPECTIONS OF EXPOSED SURFACE LINES, SHACKLES AND MOORING POINTS

1. The Site Manager, Assistant Site Manager and other experienced personnel at each farm site will receive instructions on performing weekly surface inspections, recognizing problems, scheduling preventative maintenance and the record keeping requirements for repair and maintenance of mooring components. Competent personnel will perform the weekly visual inspections of the exposed surface mooring components using the Weekly Surface Inspection Sheet (Attachment 1).

2. The Weekly Inspection Sheet will be used to routinely log the working condition of the components, identify any maintenance concerns and record when repairs or maintenance occurs on the components. Copies of the completed Weekly Inspection Sheets are to be kept at each farm office by the Site Managers.

3. An electronic copy of the completed Weekly Surface Inspection Sheet is sent by the site Management staff to the Cooke-Marine Services Manager for centralized record keeping. The information will be used to schedule routine or immediate maintenance requirements with the Site Manager.

4. After a major storm event or any physical accident involving the farm site, additional visual inspections of the surface mooring components and cage system are to occur utilizing the same Weekly Inspection sheet and same reporting protocols. Damaged mooring components or main structural components are to be repaired as soon as possible.

## ANNUAL INSPECTIONS OF BELOW WATER MOORING COMPONENTS

1. Below water mooring components are to be visually inspected annually by divers and/or ROV's. The Annual Below Surface Visual Inspection sheets (Attachment 2) is used to record the condition of the mooring components and identify specific maintenance concerns. The Marine Services Manager will coordinate a systematic program for the annual visual inspections with the Site Managers.

   Annual Below Surface Visual Inspection for that calendar year may also be performed when moorings are pulled to the surface and refitted with new mooring components. Moorings that are below the Cooke employee diver depth limit of 100' will be inspected using a contracted dive service and/or ROV. The Annual Below Surface Visual Inspection sheets are to be used to record and report all visual inspections, all routine mooring maintenance and all emergency repair made on the below surface mooring components.

3

COOKE_CWA_00027242

## ANNUAL INSPECTIONS OF BELOW WATER MOORING COMPONENTS (Cont.,)

2. Copies of the completed Annual Below Surface Inspection Sheets are to be kept at each farm office by the Site Managers. An electronic copy of the completed and/or updated Annual Inspection Sheets are to be sent by the Site Management staff to the Cooke-Marine Services Manager for centralized record keeping and scheduling the future maintenance requirements for each site.

## PROCEDURES TO IDENTIFY NEW OR POTENTIAL SOURCES OF STORM WATER POLLUTION

1. Staff will routinely evaluate materials handling locations and procedures to identify new or potential sources of storm water pollution. Sources of storm water pollution include any time liquid, powdered, or loose materials are left exposed to precipitation. Areas where these materials are stored, used, and transferred will be periodically evaluated for spills, leaks, drips and residues that could be washed away by precipitation. Where this is found to occur or probably occur, best management practices will be implemented to prevent it.

## PROCEDURES TO PREVENT OR RESPOND TO SPILLS AND UNPLANNED DISCHARGES OF OIL AND HAZARDOUS MATERIALS

| See- | COOKE- Spill Control and Response Plan (SPRC) |
|------|-----------------------------------------------|

# EMERGENCY CONTACT NUMBERS

| | | | |
|---|---|---|---|
| Cooke Aquaculture- General Manager | | Innes Weir | (206) 402-2247 |
| Cooke Permit Coordinator: | | Kevin Bright | (360) 391-2409 |
| Cooke Marine Services Manager: | | Kyl Wood | (360) 300-7546 |
| Cooke Farm Site Offices: | | | |
| Bainbridge Island – | FW/OR | Scott Ridgeway | (206) 595-5684 |
| | Clam Bay | Derek Adkisson | (206) 298-8078 |
| | FW Pier | Rick Safford | (206) 452-9638 |
| Port Angeles | | Randy Hodgin | (360) 457-7437 |
| Cypress Island | | Sky Guthrie | (360) 391-2002 |
| Hope Island | | Tom Glaspie | (360) 391-9504 |

| | |
|---|---|
| WASHINGTON DEPT. OF ECOLOGY | (425) 649-7000  (NW Regional Office 24 hr.) |
| | (360) 407-6300  (SW  Regional Office 24 hr.) |
| WASHINGTON DEPT. OF FISH & WILDLIFE | (360) 902-2200  (Main) |
| WASHINGTON DEPT. OF NATURAL RESOURCES | (360) 856-3500  (North Division) |
| | (360) 825-1631  (South Division) |
| WASHINGTON DEPT. OF HEALTH | (877) 539-4344   (24 Hour Line) |
| U.S. COAST GUARD National Response Center | (800) 442-8802  (24 Hour Oil Spill Reporting Line) |
| NATURAL RESOURCES CORP Environmental Services | (800) 337-7455   (Oil Spill Cleanup Contractor) |

4

COOKE_CWA_00027250

Attachment 2

## Annual Below Surface Mooring Inspection Sheet

Name of Person Completing Below Surface Mooring Form (full name)

DATE: (month, day, year)

Condition codes:

OK = Good Condition

S = Schedule Annual Routine Maintenance

IR = Immediate Repair Required

| ANCHOR LOCATION ID # | Surface Connections (Shackles, Thimbles, Chain) | Chain to Mooring Line Connection | Mooring Line | Mooring Line to Anchor Chain Connection | Anchor Chain Condition | Are Immediate Repairs Required? (Yes or No) | Write Date When Immediate Repair Was First Identified | Write Date When the Immediate Repair or Routine Maintenance Was Completed | Brief Desription of Component Repairs/Maintenance | Name of Person(s) Completing Immediate Repair/Routine Repair/Maintenance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |
| 11 | | | | | | | | | | |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |

# EXHIBIT 9

# 2012 Icicle Acquisitions Subsidiary, LLC
## DBA American Gold Seafoods
# Fish Escape Prevention Plans
### Updated August 2012

## I.    IDENTIFICATION OF NEW TECHNOLOGIES AND MATERIALS TO MINIMIZE STOCK ESCAPEMENT

The following list represents examples of new technologies and materials that Icicle Acquisitions Subsidiary, LLC will continue to research and develop in the process of reducing the risk of fish stock escapements.  Icicle Acquisitions Subsidiary will continue the commitment of minimizing the risk of accidental fish loss and to improving Best Management Practices that achieve these goals.

- Heavier (210-60 minimum) gauged nylon netting material standards
- Extra chafe netting around the surface perimeter of pens
- "Shark Guards" on bottoms of pens when necessary
- Heavy barrier nets to avoid marine mammal predation
- Weighting systems to separate fish nets from barrier nets
- Underwater camera systems to view fish stocks in the pens
- Semi-Rigid plastic  barrier netting
- Spectra brand netting or Steel wire netting materials
- Alternative cage structures (Ocean Spar, Pro Ocean, Marine Construction)
- Auger style anchoring systems

## II.    SUMMARY OF PAST AND CURRENT IMPROVEMENTS OF EXISTING FACILITIES TO MINIMIZE ESCAPEMENT

During the prior three years (2005-2008) under AGS ownership, the Company made the following improvements toward further safeguarding their operations from accidental fish escape; 1.) Replaced the majority of the fish containment nets at all of the marine sites with new containment nets, 2.) Replaced or improved the perimeter predator netting at 7 of the 8 marine net pen sites, 3.) Replaced the Fort Ward cage system with a new set of steel catamaran style net pens that incorporated significant design improvements from the previous Fort Ward cages, 4.) Continued inspections and/or replacement of the mooring systems components with new mooring components and materials, and 5.) Reviewed and updated all Fish Escape Response and Reporting Plans, and the Spill Prevention and Pollution Prevention Plans for WDOE. These physical and operational improvements were carried out to further reduce the risks of fish escapes and to improve the safety, and working conditions for the Company employees. Icicle Acquisition Subsidiary will build on these past improvements and is committed to further improving the net pen and hatchery operations. The following is a synopsis of what will be Icicle Acquisitions' ongoing practice and future procedures to reduce the risk of fish escapement.

2012 Icicle Fish Escape Prevention Plan

release is assigned the highest priority, and that all employees will routinely receive instruction and training in these measures. Copies of these Plans and Procedures shall be posted at the farm sites and are intended for all employees to review. Section III is to be read in conjunction with the attached **Employee Guidance for Routine Handling Procedures to Minimize the Potential for Escapement.**

A.    **Moorage System**

- On-site personnel are responsible for the visual checking of surface lines, hardware and mooring points. All employees are instructed to be observant and aware of their surroundings, and to look for any potential mooring system problems. Any defective components shall be replaced or repaired immediately. An annual thorough inspection of the main cage structure will be performed by site personnel.

- After any major storm event, or in the event of a pen system being struck by a vessel or large object, all surface mooring connections and structural cage components will be inspected and any damaged components repaired immediately.

- High-current-end mooring points will be visually inspected underwater every three years by divers or by remotely operated underwater cameras. All other moorages are to be visually inspected every six years. Records of these inspections are to be kept on site, along with any records of repairs, replacements and refits. Anchoring maintenance schedules will be established and closely followed.

- Redundancy and over capacity shall be utilized in the moorage system. Accurate drawings and descriptions of the equipment used, dates of deployment and other relevant information shall be kept by site managers.

B.    **Damage Caused by Floating Debris**

- Routine visual inspections for holes in the surface (top 3-5 feet) of netting will be performed by the site personnel on a regular basis. Any breaches or potential problems (logs, debris) shall be immediately resolved.

- Chafe guards will be used on the outside perimeter of fish nets where they are most vulnerable to being damaged by logs, flotsam, or by the fouling organisms located on the cage system itself. The deployment of barrier nets (predator nets) is recognized to reduce the vulnerability of the fish nets being damaged by floating debris, and can be used in place of or in addition to chafe guards. In addition, log booms may be deployed around the outside perimeter to also help deflect any floating debris when necessary.

- Divers are instructed to be observant and visually check for holes in the net surfaces during their routine fish mortality collection dives performed each week.

2012 Icicle Fish Escape Prevention Plan

COOKE_CWA_00169804

# EXHIBIT 10

# AGS FINFISH PERMIT PLANS

- **AGS Finfish Aquaculture Plan of Operation**    Pg.  2

- **AGS Fish Escape Prevention Plan**    Pg.  7

- **AGS Employee Training Manual on Prevention**    Pg. 14

- **AGS Fish Escape Reporting Plan**    Pg. 21

- **AGS Regulated Pathogen Reporting Plan**    Pg. 28

Final: Icicle Acquisition Subsidiary, LLC. Plan of Operation

# 2014 Fin Fish Aquaculture Plan of Operation

## Updated June 2014



# Icicle Acquisition Subsidiary, LLC
# DBA American Gold Seafoods



Final: 2014 Icicle Acquisition Subsidiary, LLC. Plan of Operation

these measures. Copies of these Plans and Procedures are posted at the farm sites and are intended for all employees to review. Section III is to be read in conjunction with the attached **Employee Guidance for Routine Handling Procedures to Minimize the Potential for Escapement.**

### A.    Moorage System

▪    On-site personnel are responsible for the visual checking of surface lines, hardware and mooring points. All employees are instructed to be observant and aware of their surroundings, and to look for any potential mooring system problems. Any defective components shall be replaced or repaired immediately. An annual thorough inspection of the main cage structure will be performed by site personnel.

▪    After any major storm event, or in the event of a pen system being struck by a vessel or large object, all surface mooring connections and structural cage components will be inspected and any damaged components repaired immediately.

▪    High-current-end mooring points will be visually inspected underwater every three years by divers or by remotely operated underwater cameras. All other moorages are to be visually inspected every six years. Refitting the anchors with new hardware, line and chain constitutes a visual inspection, since the gear will be pulled to the surface to perform this type of work. Records of inspections are to be kept on site, along with records of repairs and refits. Anchoring maintenance schedules will be established and closely followed.

▪    Redundancy and over capacity shall be utilized in the moorage system. Accurate drawings and descriptions of the equipment used, dates of deployment and other relevant information shall be kept by site managers.

### B.    Damage Caused by Floating Debris

▪    Routine visual inspections for holes in the surface (top 3-5 feet) of netting will be performed by the site personnel on a regular basis. Any breaches or potential problems (logs, debris) shall be immediately resolved.

▪    Chafe guards will be used on the outside perimeter of fish nets to prevent chaffing as needed. The deployment of predator barrier nets (predator nets) is recognized to reduce the vulnerability of the fish nets being damaged by floating debris, and can be used in place of, or in addition to, chafe guards. In addition, log booms may be deployed around the outside perimeter to also help deflect any floating debris when necessary.

▪    Divers are instructed to be observant and visually check for holes in the net surfaces during their routine fish mortality collection dives performed each week. Routine mortality dives are to be performed at a minimum of

Final: 2014 Icicle Acquisition Subsidiary, LLC. Plan of Operation

9

# EXHIBIT 11

*2017 Cooke Aquaculture Pacific, LLC*

# Fish Escape Prevention Plan
**Updated January 2017**

## IDENTIFICATION OF NEW TECHNOLOGIES AND MATERIALS TO MINIMIZE STOCK ESCAPEMENT

The following are examples of new technologies and materials that Cooke Aquaculture Pacific has implemented that reduce the risk of fish escapements.

- Stronger netting materials and designs
- Extra chafe netting around the surface perimeter of nets
- Improved predation barrier netting and designs
- Weight systems that separate fish containment nets from predation barrier nets
- Underwater camera systems to view fish stocks in the pens
- New and improved designs for net pen structures

## ROUTINE PROCEDURES AND BEST MANAGEMENT PRACTICES TO MINIMIZE THE RISK OF ESCAPEMENT

This section is broken down into subsections, each of which corresponds to an area that has the potential for accidental fish release. Each subsection contains a discussion of **Best Management Practices (BMP's)** and routine procedures that are currently utilized. Prevention of accidental fish release is a priority and employees will routinely receive instruction and training in these measures. Copies of these Plans are to be posted at the farm sites and are intended for all employees to review.

### Moorage System Damage

- On-site personnel are responsible for the visual checking of surface lines, hardware and mooring points. All employees are instructed to be observant and aware of their surroundings and to look for any potential mooring system problems. Any defective components are to be replaced or repaired immediately.

- After any major storm event, or in the event of a pen system being struck by a vessel, surface mooring connections and structural cage components will be inspected and any major damage repaired immediately.

- High-current-end moorings will be visually inspected underwater every three years by divers or by remotely operated underwater cameras.

- Redundancy and over capacity are to be utilized in the moorage system components. Accurate drawings and descriptions of the equipment used, dates of deployment, inspections and other relevant maintenance information will be kept by the Site Managers.

# EXHIBIT 12

*2018 Cooke Aquaculture Pacific, LLC*

# Fish Escape Prevention, Response and Reporting Plan

*Updated –October 2018*

## IDENTIFICATION OF TECHNOLOGIES TO MINIMIZE FISH ESCAPEMENT

The following are examples of technologies Cooke Aquaculture Pacific has implemented to minimize fish escapements.

- Stronger netting materials and fish containment (stock net) designs
- Chafe netting around the surface perimeter of stock nets and predation barrier nets
- Improved predation barrier netting material and design
- Weight systems that separate stock nets from predation barrier net
- Underwater camera systems to view fish stocks in the pens
- Routine repair and maintenance of cage structures and mooring equipment
- Complete replacement of cage systems with newly constructed cage systems

## ROUTINE PROCEDURES AND BEST MANAGEMENT PRACTICES TO MINIMIZE THE RISK OF ESCAPEMENT

This section identifies areas of potential for accidental fish escapement and then lists the preventive measures and routine procedures which help to minimize and control each area of risk. The plan outlines Best Management Practices and standard operating procedures that will be utilized by Cooke to help prevent accidental fish releases. Copies of the plans **must be posted** at the farm sites and are intended for all employees to periodically review.

### Escape Prevention, Response and Reporting Plan Training and Review

These plans and procedures are important. Employees at each location will receive annual instruction and training.

1. The Site Manager, Permit Coordinator and/or the Business Support Analyst will conduct the annual employee training.
2. The general content of training will be:
   - Review of Fish Escape Prevention, Response and Reporting Plans
   - Identify Potential Escape Hazards and Preventative Measures
   - Review Cooke/DNR Net Hygiene Scoring System and Actions
   - Mooring and Cage Inspection Process
   - Emergency Response Procedures
   - Emergency Contact Lists and Notifications
   - Vessel Assist/Emergency Response Support

employee(s) is to perform a Weekly Surface Inspection and follow the same procedures as described above in the Weekly Surface Inspection process for reporting, corrective actions and records retention. Any **Immediate Repairs** are to be scheduled and performed as quickly as possible and documented in the Weekly Surface Inspection report.

- In the event the net pen structure or mooring system has been substantially damaged, Cooke management will notify the state agencies to inform them of the situation. Using the attached **Washington State Agency Emergency Contact** list, Cooke management (General Manager, Site Manager and/or the Permit Coordinator) will make verbal and electronic contact with key contacts at WDOE, WDNR and WDFW. **A written phone log will be maintained by the Cooke person making the contacts.** The phone log will include the following: the agency and contact person called; the date and time of each call; and whether verbal contact was made with the appropriate contact. Email notifications will also be sent to the key agency contacts.

- <u>**Emergency Additional Resources**</u> if needed- The **Cooke Emergency Management Team (consisting of the General Manager, Area Managers, Site Managers, Marine Services Manager, Business Support Analyst and the Permit Coordinator)** will contact and place tug boats and/or other working vessels on standby to assist if the necessary repairs cannot be completed before the next strong tidal cycle or an approaching storm event as a safeguard. Vessels will not be released from standby until the necessary repairs have been completed.

- <u>**Each person in the Cooke Emergency Management Team will have specific responsibilities during an emergency event. These roles are defined later in this document under the section: Incident Command Structure Training and Cooke Staff Responsibilities.**</u>

- An Annual Below Surface Mooring Inspection of each mooring line, chain and the associated hardware will be performed using divers and/or remotely operated underwater cameras. Records of these visual inspections will document the condition of each mooring point and identify if immediate repair or routine maintenance is necessary in the Annual Below Surface Mooring Report.

- The Site Manager will keep copies of the Annual Below Surface Mooring Inspections reports for a period of two (2) years.

- The Marine Services Manager will be responsible for scheduling the Annual Below Surface Mooring Inspections at the farm sites and will review the results of the inspections with the Site Manager and/or General Manager. If the below surface inspection identifies a mooring in need of repair, the repairs are to be scheduled, completed and documented as described above in the mooring maintenance section.

- Any anchor lines that have become accidentally detached are to be repaired as quickly as possible. A broken anchor line is to be given top priority by the Site Manager and is to be quickly addressed (see previous Immediate Repairs and Emergency Additional Resources sections above).

- Copies of the Annual Below Surface Mooring Inspection reports are to be kept by the Site Manager at the farm site. Electronic copies are to be sent to the General Manager, Area

# EXHIBIT 13



Douglas J. Steding, Ph.D.  |  dsteding@nwresourcelaw.com  |  206.971.1567 (d)

August 6, 2018

Via Email

Brian Knutsen
Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104-2245

Kevin Cassidy
Earthrise Law Center
Lewis & Clark Law School

**Re: Wild Fish Conservancy v. Cooke Aquaculture Pacific, LLC, W.D. Wash. No. 2:17-cv-01708-JCC**

Dear Mr. Knutsen and Mr. Cassidy:

This letter provides Cooke Aquaculture Pacific's ("Cooke") initial response to the Wild Fish Conservancy's ("WFC") Second Set of Interrogatories, Requests for Production, and Requests for Admission received last Friday, August 3, 2018. We also received a follow-up letter related to WFC's first discovery requests on Friday; we are responding to that letter separately. The primary purpose of this letter is to object to the 317 requests for admission served on Cooke, and to begin an expedited conferral process before Cooke seeks a protective order from the court, presumably this week. We are available to discuss this in conferral at the end our Wednesday 9 am call.

Given the time sensitive nature of this matter, please respond **within two business days** of receiving this letter as to whether WFC will withdraw its requests for admission, or whether Cooke should proceed with filing its motion for protective order. Nothing in this letter should be interpreted as waiving any objections to WFC's Requests, and the below issues identified should not be relied upon as an exhaustive list of issues to be raised in the motion for protective order.

**WFC is Improperly Using Requests for Admission as a Discovery Tool.**

After reviewing WFC's requests for admissions, it is clear that WFC is misusing and abusing the Rule 36 Request for Admission procedure. Requests for Admission are a tool that a party may use to avoid having to prove a fact that both sides know to be true at trial. Rule 36 is not a

Brian Knutsen and Kevin Cassidy
August 6, 2018
Page **2** of **4**

general discovery tool, and a litigant cannot use it as such. *Workman v. Chinchinian*, 807 F. Supp. 634, 648 (E.D. Wash. 1992) (holding that "Rule 36 is not to be used as a discovery device and if the plaintiffs wish to discover what the facts are they should resort to other discovery rules rather than Rule 36").

As the Western District of Washington has repeatedly noted, "[r]equests for admission are not intended to be used to obtain discovery, but to narrow the issues for trial." *Choquette v. Warner*, No. 3:15-CV-05838-BHS-JRC, 2017 WL 2671263, at *1 (W.D. Wash. June 21, 2017); *Jovanovich v. Redden Marine Supply, Inc.*, No. C10-924-RSM, 2011 WL 4459171, at *2 (W.D. Wash. Sept. 26, 2011).

The principle that requests for admission are not a general discovery tool is firmly recognized by both of the authoritative treatises that courts rely upon when interpreting federal rules:

> Because Rule 36 was not designed to elicit information, to obtain discovery of the existence of facts, or obtain production of documents, requests for admission should not be used as a method of discovery for those purposes.

7 Moore's Federal Practice § 36.02[2] (3d ed. 2000).

> Strictly speaking Rule 36 is not a discovery procedure at all, since it presupposes that the party proceeding under it knows the facts or has the document and merely wishes its opponent to concede their genuineness... A party who desires to discover what facts are should resort to other discovery rules rather than Rule 36.

8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2253, at 324 (3d ed. 2010).

The above principles have been broadly reinforced by courts, both inside Washington (as indicated above) and more broadly. *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir.1986); *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998*); Asarco LLC v. Union Pac. R.R. Co.*, 2016 WL 1755241, at *12 (D. Idaho May 2, 2016); *K.C.R. v. Cty. of Los Angeles*, 2014 WL 3433925, at *3 (C.D. Cal. July 14, 2014); *Equal Employment Opportunity, Comm'n v. Bashas', Inc.*, 2009 WL 5206632, at *3 (D. Ariz. Dec. 24, 2009); *Jefferson v. Perez*, 2012 WL 671917, at *1 (E.D. Cal. Feb. 29, 2012); *Scott v. Keller*, 2010 WL 1267772 at *1 (E.D.Cal. Mar. 31, 2010) (the goal of requests for admissions is to "eliminate from the trial matters as to which there is no genuine dispute").

Given the stage in litigation in which WFC has issued its requests for admission, as well as the breadth and complete lack of specificity of the requests, it is beyond debate that WFC is using the requests as a discovery tool. Notably, the requests are a formulaic recitation of every claim asserted against Cooke by WFC at each facility and for each relevant year. In essence, what WFC

Brian Knutsen and Kevin Cassidy
August 6, 2018
Page **3** of **4**

is doing is shirking its discovery obligations and asking Cooke to simply admit to whether or not it violated its permits. WFC has already denied these allegations in its complaint.

Cooke also must highlight, and will highlight to Judge Coughenour, that WFC has failed to identify a single fact supporting a finding of violation at any of Cooke's facilities (excluding Cypress Site 2), despite Cooke repeatedly asking for WFC to clarify its claims and identify where it believed violations occurred. WFC's requests are nothing more than a fishing expedition undertaken in light of its failure to uncover any evidence tending to show violations. This is improper. If WFC has documents or testimony that tend to show a violation, for example a fish release on a particular day, Cooke will respond to those allegations in a directed fashion. Cooke will not, however, undertake the burden of performing all of WFC's discovery.

**WFC Requests are Overly Burdensome and Oppressive.**

There are cases where hundreds of requests for admission are proper, but generally "hundreds of requests for admission almost raise a presumption of burdensome discovery.**"** *Asarco LLC v. Union Pac. R.R. Co.*, 2016 WL 1755241, at *12 (D. Idaho May 2, 2016). A court must look at the facts surrounding the case, and the requests, to determine whether they are overly burdensome. *Id.* Here, the court will clearly find that WFC has crossed the burdensome line. First, discovery is ongoing and Cooke has produced tens of thousands of documents to WFC, has collected daily logs for WFC to review, and is collecting thousands of emails and other business records for Cooke. Additionally, Cooke has volunteered to produce reports from its FishTalk database for WFC, and Cooke continues to work diligently to respond to WFC's broad discovery requests. All of this information will demonstrate that WFC's claims are without merit.

Instead of waiting to see the actual documents it has requested, WFC has filed 317 requests for admission seeking Cooke to simply admit WFC's entirely unsupported allegations. This is clearly improper. *Stokes v. Interline Brands Inc*, 2013 WL 6056886, at *2 (N.D. Cal. Nov. 14, 2013) (Requests are "not to be used in an effort to harass the other side or in the hope that a party's adversary will simply concede essential elements."); *Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007); *Perez v. Miami–Dade Cnty.*, 297 F.3d 1255, 1268 (11th Cir.2002).

Additionally, it must be noted that in answering a Request for Admission, Rule 36 places various obligations on the answering party. To ensure that Cooke's answers adhere to this requirement, Cooke's attorneys and employees will have to spend hundreds if not thousands of hours reviewing documents to ensure full compliance. Pragmatically speaking, what WFC seeks to do with its requests for admissions is to shift the burden of proof from WFC to Cooke. Again, this is improper.

If WFC has evidence of a permit violation, evidence it has yet to provide to Cooke, Cooke will respond to that evidence. Cooke will not, however, in response to these Requests for Admission expend the resources needed to properly respond—especially when Cooke is expending

Brian Knutsen and Kevin Cassidy
August 6, 2018
Page **4** of **4**

significant resources to provide the same information in response to WFC's voluminous
discovery requests.  Indeed, much of what WFC seeks admissions on is a matter of public record
and WFC should have investigated its claims prior to bringing them.

**Cooke will Respond to WFC's Additional Interrogatories and Requests for**
**Production Separately.**

Cooke will respond to the interrogatories and requests for production in WFC's Second Set of
Interrogatories, Requests for Production, and Requests for Admission separately.

**Conclusion.**

As indicated above, given the time sensitivity of this matter, and the potentially draconian
outcome of failing to respond to WFC's requests within 30 days, Cooke requests WFC respond to
this letter **within two business days**.

Very truly yours,

Douglas J. Steding, Ph. D.

# EXHIBIT 14



Kevin Cassidy
Senior Staff Attorney

Earthrise Law Center
Lewis & Clark Law School
*phone* 781-659-1696
cassidy@lclark.edu
earthriselaw.org

**Via Email Only**
Diane M. Meyers
Douglas J. Steding
Madeline Engel
Northwest Resource Law, PLLC
101 Yesler Way, Suite 205
Seattle, Washington 98104
Email: dmeyers@nwresourcelaw.com
       dsteding@nwresourcelaw.com
       mendel@nwresourcelaw.com

August 16, 2018

*Re:*   *Wild Fish Conservancy v. Cooke Aquaculture Pac., LLC,* **W.D. Wash. No. 2:17-cv-01708-JCC – Plaintiff's Requests for Admission**

Dear Counsel:

    This letter responds to your August 6, 2018 letter providing an initial response to Plaintiff's Second Set of Discovery Requests (dated August 3, 2018), and primarily raising objections to Plaintiff's Requests for Admission ("RFAs"). Pursuant to our conferral call on August 8th, we agreed to a two-week extension for Defendant Cooke to respond to the RFAs in order to attempt to resolve the parties' dispute about them without resorting to motions practice as your August 6th letter stated Cooke intended to do. This letter responds with a proposal for your consideration to address the issues raised in your letter.

    As an initial matter, to the extent that the case law you cited in your August 6th letter suggests that RFAs should come only after other discovery tools are deployed[1], we have made several good faith attempts to discover answers to the questions posed in the RFAs prior to sending the RFAs. By way of just one example, Plaintiff's Interrogatory No. 5 requested the following: "Describe all inspections you have conducted of the Puget Sound net pens under the provisions of the Permits, including Condition S6 and/or your Pollution Prevention Plans, since January 1, 2010." Cooke's response to Interrogatory No. 5 was entirely inadequate, especially with respect to underwater inspections below 100 feet, stating only that pursuant to Cooke's October 2017 Pollution Prevention Plan, such inspections would occur with the use of ROVs and

---

[1] *Cf. Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* No. CIV. A. 88-9752, 1992 WL 394425, at *3 (E.D. Pa. Dec. 28, 1992) ("Thus, although not properly a 'discovery tool,' there is no requirement . . . in Rule 36 . . . that RFAs be used only 'after discovery has been taken.'").

that the last such inspections were conducted in the latter part of 2017. This response says nothing regarding such inspections prior to October 2017, and gives no details (date, facility, inspector, etc.) regarding the inspections that purportedly occurred in "the latter part of 2017." We informed Cooke of the inadequacy of this response in a June 11th letter, and specifically asked Cooke to identify any documents responsive to this Interrogatory. In a July 13th letter, you again provided no information regarding inspections below 100 feet prior to 2017 and no more detail regarding the inspection (or inspections) that purportedly occurred in late 2017. Thus, the Conservancy has made several attempts, without success, through Requests for Production, Interrogatories, and follow-up conferral letters to discover information that it now, appropriately, seeks through RFAs.

Moreover, for almost all of our previous discovery requests, Cooke objected that the Conservancy's requests were too vague or broad. With the RFAs, the Conservancy attempted to be as specific as possible regarding the different facilities and time periods. This, inherently, resulted in a large number of RFAs, to which Cooke objects as being too burdensome. Cooke cannot have it both ways.

Nevertheless, we do not wish to unnecessarily engage in motions practice and involve the Court in a discovery issue the parties should be able to resolve among themselves. To that end, we propose to withdraw RFA Nos. 9–32, 46–69, 83–106, 120–143, 157–180, 194–217, 231–254, and 268–291 without prejudice to re-send them at a later date in this litigation. This reduces the total number of RFAs from 317 to 125.

As for the remaining RFAs, 48 of them relate to fish releases at Cooke's netpen facilities (Nos. 3–8, 40–45, 77–82, 114–119, 151–156, 188–193, 225–230, and 262–267). On our last conferral call, you definitively stated that Cooke's position is that not a single Atlantic salmon escaped from any of its netpens during the relevant statutory time period. Given this, it should be straightforward and pose no burden for your client to deny these RFAs, and the fact that they may present a genuine issue for trial is no basis for objecting to them. *See* Fed. R. Civ. P. 35(a)(5).

Twenty-one RFAs (Nos. 299–319) relate to the 2017 Cypress Site 2 collapse, which involves only one of Cooke's facilities, was recent in time, and presumably has been extensively analyzed by Cooke since its occurrence. These RFAs present no unreasonable burden for Cooke and will help narrow the issues for trial.

Finally, 56 RFAs (Nos. 33–39, 70–76, 107–113, 144–150, 181–187, 218–224, 255–261, and 292–298) relate to underwater inspections at Cooke facilities that occurred at depths below 100 feet. These also present no unreasonable burden for Cooke to answer since such inspections, if they occurred, would have been unique events requiring Cooke to contract and pay for scuba divers and/or Remote Operating Vehicles ("ROVs"). Cooke also is in the best position to know which facilities would have required such inspections (i.e., which facilities have anchoring components below 100 feet water depth).

We believe this proposal is fair and takes into account Cooke's concerns expressed in its August 6th letter, while still moving discovery forward in an expeditious manner. As we stated

on our August 8th conferral call, once Cooke has reviewed this proposal, if you need additional time to respond to the remaining RFAs, we would be amenable to a brief additional extension.


Best regards,

Kevin Cassidy
Earthrise Law Center


CC via email only:    Brian Knutsen
                      Paul Kampmeier
                      Emma Bruden
                      Lia Comerford

3

# EXHIBIT 15



Douglas J. Steding, Ph.D.  |  dsteding@nwresourcelaw.com  |  206.971.1567 (d)

August 22, 2018

Via Email: cassidy@lclark.edu; brian@kampmeierknutsen.com

**Kevin Cassidy**
**Earthrise Law Center**
**Lewis & Clark Law School**
10015 S.W. Terwilliger Boulevard, MSC 51
Portland, OR 97219

Brian Knutsen
Kampmeier & Knutsen PLLC
221 SE 11th Ave., Suite 217
Portland, OR 97214

**Re: Wild Fish Conservancy v. Cooke Aquaculture Pac., LLC, W.D. Wash. No. 2:17-cv-01708-JCC: Requests for Admission**

Dear Kevin and Brian:

Thank you for your letter dated August 16, 2018, related to the Requests for Admissions ("RFA") contained in your client's Second Set of Discovery Requests dated August 3, 2018. While we appreciate your Client's reduction of the number of Requests from 317 to 125, many of the requests remain improper. Additionally, given the now-confused nature of the RFAs, we pragmatically recommend that WFC fully retract the Requests for Admission portion of its Second Set of Discovery Requests, and then re-serve its reduced list as a separate document with sequential numbering.

Again, as previously noted in writing and on the phone, Cooke is very concerned about the timing requirements associated with responding to the RFAs. Based on our telephone conversation, and your letter, we are under the impression that WFC is agreeable to extending the deadlines to responding to the RFAs. Once you have reviewed this letter, we believe it would be worthwhile to set up a call to outline a response timeline to any RFAs that you are unwilling to withdraw at this juncture.

**Fish Release Requests**

As noted in your letter, 48 of the remaining RFAs relate to whether or not fish releases occurred at Cooke facilities. The RFAs are entirely unspecific, but instead create a discovery-grid to cover all of Cooke's operations for all the relevant times. Essentially, it is a 48-part interrogatory asking Cooke to identify where and when fish releases occurred.

KNUTSEN DECLARATION - 88
Case No. 2:17-cv-01708-JCC

Kevin Cassidy and Brian Knutsen
August 22, 2018
Page **2** of **3**

Again, it must be noted that Requests for Admission are not discovery devices, but are limited tools to eliminate uncontested facts from trial. *Choquette v. Warner*, No. 3:15-CV-05838-BHS-JRC, 2017 WL 2671263, at *1 (W.D. Wash. June 21, 2017); *Jovanovich v. Redden Marine Supply, Inc.*, No. C10-924-RSM, 2011 WL 4459171, at *2 (W.D. Wash. Sept. 26, 2011).  WFC is not using its release RFAs to eliminate issues from trial.  Indeed, if Cooke were to deny each admission, WFC surely would continue to push the release issue at trial.  Instead, what WFC is attempting to do is either 1) discover releases that it does not know exists, or 2) box in Cooke by forcing it answer RFAs in the negative that WFC later hopes to discover information to the contrary.  This is improper.

Cooke is not arguing that any request for an admission related to fish releases is improper.  Cooke's position is simply that WFC needs to be specific in identifying a release so that Cooke can investigate the claim and admit or deny it after investigation.  For example, if, after discovery is closer to completion, WFC were to ask for an admission that a release occurred at X facility, on Y day, Cooke would likely be in a position to provide a response.

You highlight in your letter that during last week's telephone conference we asserted that it is Cooke's position that no releases occurred during the identified time periods.  We asserted, in response to your question, that Cooke is <u>unaware of any releases during this time-period</u> and thus would deny the RFAs.  This response has already been memorialized in response to Interrogatory 9.  Thus, WFC has already obtained the information it is requesting.   An Interrogatory is unquestionably the proper discovery tool to discover the information that WFC seeks.  What is improper is serving dozens of RFAs and then engaging in discovery in an attempt to disprove the responses to those RFAs, which is how WFC is now postured.

Also, as discussed during the telephone conference, Cooke is in the process of producing large volumes of documents related to fish tracking.  WFC will have access to each site's daily logs, weekly production reports, and monthly production reports (subject to protective order).  Additionally, WFC will have access to reports detailing FishTalk data tracking the numbers of fish in the pens.  Undoubtedly, if any releases were to be observed or detected by Cooke, they would be noted in those documents.  If, after reviewing those documents, WFC can tailor RFAs to specific events, Cooke will be in a better position to answer WFC's requests.

If WFC's position remains that Cooke needs to respond to broad, untailored release RFAs, and then engage in extensive discovery on the same issues, Cooke will be forced to seek a protective order.

**<u>Inspection Requests</u>**

The 56 inspection RFAs suffer from the same fundamental problem as the fish release RFAs.  In essence, instead of seeking to understand how and when Cooke inspected its anchors through proper discovery channels, WFC created a grid of RFAs in lieu of an interrogatory. *Colony Ins. Co. v. Kuehn*, No. 2:10-CV-01943-KJD, 2011 WL 4402738, at *10 (D. Nev. Sept. 20, 2011); *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998); *People of State of Cal. v. The Jules Fribourg*, 19 F.R.D. 432, 434 (N.D. Cal.1955) ("interrogatories and requests for admissions are not interchangeable procedures designed for the same purpose.").  WFC has ample discovery tools available to it to investigate the anchoring systems of Cooke's facilities, including but not limited to interrogatories, depositions, and targeted discovery requests.

KNUTSEN DECLARATION - 89
Case No. 2:17-cv-01708-JCC

Kevin Cassidy and Brian Knutsen
August 22, 2018
Page **3** of **3**

Indeed, a denial by Cooke will accomplish nothing in this litigation because WFC will continue to pursue discovery in an attempt to disprove Cooke's answers.  No time saving is achieved by these RFAs, nor is anything being resolved prior to trial, and they are undoubtedly interrogatories veiled as Requests for Admissions.  To the contrary, issuing these RFAs when Cooke is expending significant time and money responding to WFC's other discovery requests essentially requires that Cooke pause those responses to refocus on investigating each and every RFA.  Rather than streamlining trial preparation, WFC's RFAs are, at this point, accomplishing the opposite.

If WFC's position remains that Cooke needs to respond to broad, untailored release RFAs, and then engage in extensive discovery on the same issues, Cooke will be forced to seek a protective order.

**Cypress Site 2 Requests**

Cooke acknowledges that the Site 2 Requests are generally in the vein of proper RFAs.  As indicated in our prior letter, Cooke may have individualized objections to these Requests, or may find it necessary to elaborate on its answers given facts on the ground.  To make the process cleaner, Cooke proposes that WFC reissue the Site 2 requests in a separate document, restarting the number of the RFAs so that they can be more easily tracked.  Cooke may also need additional time to respond to these requests, particularly because of the ongoing efforts by Cooke to respond to WFC's voluminous discovery requests.

Very truly yours,

Douglas J. Steding, Ph. D.

KNUTSEN DECLARATION - 90
Case No. 2:17-cv-01708-JCC

# **EXHIBIT 16**

HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY, | |
| Plaintiff, | Case No. 2:17-cv-01708-JCC |
| v. | PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANT COOKE AQUACULTURE, LLC **AND ANSWERS THERETO** |
| COOKE AQUACULTURE PACIFIC, LLC, | |
| Defendant. | |

        Without waiving its prior objections, Cooke provides the following responses to
Plaintiff's Second Set of Requests for Admission. Discovery in this matter is ongoing. Cooke
reserves its right to modify or supplement its answers, responses, and objections as additional
information becomes available through discovery.  Given the nature of WFC's requests,
including that many are premature given that discovery is ongoing and at an early stage, Cooke
expressly reserves the right to modify each response in light of information discovered by
Cooke, WFC, or any other entity at any time prior to trial.

## **GENERAL OBJECTIONS**

        1.        Cooke objects to Wild Fish Conservancy's ("WFC" or "Plaintiff") requests for

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 1
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 92
 Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request for Admission No. 31:**

Cooke did not inspect all of the anchoring components below the water line at the Orchard Rocks facility during calendar year 2016.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 32:**

Cooke did not inspect all of the anchoring components below the water line at the Orchard Rocks facility during calendar year 2017.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 33:**

At least some of the anchoring components at the Orchard Rocks facility are more than 100 feet below the surface of the water.

**Response:**  Admit.

**Request for Admission No. 34:**

During calendar year 2012, Cooke did not inspect the portions of the anchoring components at the Orchard Rocks facility located more than 100 feet below the surface of the water.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 12
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 93
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  **Response:**  Cooke does not have sufficient information to admit or deny this request and on this
2  basis denies this request.

3

4  **Request for Admission No. 35:**

5  During calendar year 2013, Cooke did not inspect the portions of the anchoring components at
6  the Orchard Rocks facility located more than 100 feet below the surface of the water.
7  **Response:** Cooke does not have sufficient information to admit or deny this request and on this
8  basis denies this request.

9

10  **Request for Admission No. 36:**

11  During calendar year 2014, Cooke did not inspect the portions of the anchoring components at
12  the Orchard Rocks facility located more than 100 feet below the surface of the water.
13  **Response:** Cooke does not have sufficient information to admit or deny this request and on this
14  basis denies this request.

15

16  **Request for Admission No. 37:**

17  During calendar year 2015, Cooke did not inspect the portions of the anchoring components at
18  the Orchard Rocks facility located more than 100 feet below the surface of the water.
19  **Response:** Cooke does not have sufficient information to admit or deny this request and on this
20  basis denies this request.

21

22  **Request for Admission No. 38:**

23  During calendar year 2016, Cooke did not inspect the portions of the anchoring components at
24  the Orchard Rocks facility located more than 100 feet below the surface of the water.
25  **Response:** Cooke does not have sufficient information to admit or deny this request and on this
26  basis denies this request.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 13
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

KNUTSEN DECLARATION - 94
Case No. 2:17-cv-01708-JCC

**Request for Admission No. 39:**

During calendar year 2017, Cooke did not inspect the portions of the anchoring components at the Orchard Rocks facility located more than 100 feet below the surface of the water.

**Response:** Deny.


**Request for Admission No. 40:**

At least one Atlantic salmon escaped from your Fort Ward facility and into Puget Sound during calendar year 2012.

**Response:** Deny. Cooke is unaware of any fish escapes occurring at this facility during the identified period of time. As detailed in the *2012 American Gold Seafoods Annual Accidental Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would escape, including implementing best industry practices to ensure accidental releases did not occur while fish were in the pens or being handled.


**Request for Admission No. 41:**

At least one Atlantic salmon escaped from your Fort Ward facility and into Puget Sound during calendar year 2013.

**Response:** Deny. Cooke is unaware of any fish escapes occurring at this facility during the identified period of time. As detailed in the *2013 American Gold Seafoods Annual Accidental Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would escape, including implementing best industry practices to ensure accidental releases did not occur while fish were in the pens or being handled.


**Request for Admission No. 42:**

At least one Atlantic salmon escaped from your Fort Ward facility and into Puget Sound during calendar year 2014.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 14
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 95
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  **Request for Admission No. 69:**

2  Cooke did not inspect all of the anchoring components below the water line at the Fort Ward

3  facility during calendar year 2017.

4  **Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests

5  for Admission were overly burdensome, and that this request for admission was improper

6  because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's

7  discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a

8  letter from counsel dated August 16, 2018.

9

10  **Request for Admission No. 70:**

11  At least some of the anchoring components at the Fort Ward facility are more than 100 feet

12  below the surface of the water.

13  **Response:** Deny.

14

15  **Request for Admission No. 71:**

16  During calendar year 2012, Cooke did not inspect the portions of the anchoring components at

17  the Fort Ward facility located more than 100 feet below the surface of the water.

18  **Response:** There are no anchoring components at the Fort Ward facility located more than 100

19  feet below the surface of the water.

20

21  **Request for Admission No. 72:**

22  During calendar year 2013, Cooke did not inspect the portions of the anchoring components at

23  the Fort Ward facility located more than 100 feet below the surface of the water.

24  **Response:** There are no anchoring components at the Fort Ward facility located more than 100

25  feet below the surface of the water.

26

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 24
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 96
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  **Request for Admission No. 107:**

2  At least some of the anchoring components at the Clam Bay facility are more than 100 feet

3  below the surface of the water.

4  **Response:** Admit.

5

6  **Request for Admission No. 108:**

7  During calendar year 2012, Cooke did not inspect the portions of the anchoring components at

8  the Clam Bay facility located more than 100 feet below the surface of the water.

9  **Response:**  Cooke does not have sufficient information to admit or deny this request and on this

10  basis denies this request.

11

12  **Request for Admission No. 109:**

13  During calendar year 2013, Cooke did not inspect the portions of the anchoring components at

14  the Clam Bay facility located more than 100 feet below the surface of the water.

15  **Response:** Cooke does not have sufficient information to admit or deny this request and on this

16  basis denies this request.

17

18  **Request for Admission No. 110:**

19  During calendar year 2014, Cooke did not inspect the portions of the anchoring components at

20  the Clam Bay facility located more than 100 feet below the surface of the water.

21  **Response:** Cooke does not have sufficient information to admit or deny this request and on this

22  basis denies this request.

23

24  **Request for Admission No. 111:**

25  During calendar year 2015, Cooke did not inspect the portions of the anchoring components at

26  the Clam Bay facility located more than 100 feet below the surface of the water.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 36
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 97
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1   **Response:**  Deny in part.  Based on a review of business records, anchors 21, 23 through 25, 26,

2   28, and 32 through 34 were inspected in October 2015.  Based on information and belief, this

3   inspection included components located more than 100 feet below the surface of the water.

4   Additional anchor components located below 100 feet may have also been inspected at this time.

5

6   **Request for Admission No. 112:**

7   During calendar year 2016, Cooke did not inspect the portions of the anchoring components at

8   the Clam Bay facility located more than 100 feet below the surface of the water.

9   **Response:** Deny in part.  Based on a review of business records, anchors 18 through 21, 23, and

10  25 were inspected in August, October, and December 2016.  Based on information and belief,

11  this inspection included components located more than 100 feet below the surface of the water.

12  Additional anchor components located below 100 feet may have also been inspected at this time.

13

14  **Request for Admission No. 113:**

15  During calendar year 2017, Cooke did not inspect the portions of the anchoring components at

16  the Clam Bay facility located more than 100 feet below the surface of the water.

17  **Response:** Deny.

18

19  **Request for Admission No. 114:**

20  At least one Atlantic salmon escaped from your Hope Island facility and into Puget Sound during

21  calendar year 2012.

22  **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

23  identified period of time.  As detailed in the *2012 American Gold Seafoods Annual Accidental*

24  *Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would

25  escape, including implementing best industry practices to ensure accidental releases did not

26  occur while fish were in the pens or being handled.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 37
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

KNUTSEN DECLARATION - 98
Case No. 2:17-cv-01708-JCC

**Request for Admission No. 142:**

Cooke did not inspect all of the anchoring components below the water line at the Hope Island

facility during calendar year 2016.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests

for Admission were overly burdensome, and that this request for admission was improper

because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's

discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a

letter from counsel dated August 16, 2018.


**Request for Admission No. 143:**

Cooke did not inspect all of the anchoring components below the water line at the Hope Island

facility during calendar year 2017.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests

for Admission were overly burdensome, and that this request for admission was improper

because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's

discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a

letter from counsel dated August 16, 2018.


**Request for Admission No. 144:**

At least some of the anchoring components at the Hope Island facility are more than 100 feet

below the surface of the water.

**Response:** Admit.


**Request for Admission No. 145:**

During calendar year 2012, Cooke did not inspect the portions of the anchoring components at

the Hope Island facility located more than 100 feet below the surface of the water.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 47
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 99
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    **Response:** Cooke does not have sufficient information to admit or deny this request and on this

2    basis denies this request.

3

4    **Request for Admission No. 146:**

5    During calendar year 2013, Cooke did not inspect the portions of the anchoring components at

6    the Hope Island facility located more than 100 feet below the surface of the water.

7    **Response:** Deny in part.  Based on a review of business records, several anchors were inspected

8    in June and July 2013 and determined to be in good order.  Based on information and belief, this

9    inspection included components located more than 100 feet below the surface of the water.

10    Additional anchor components located below 100 feet may have also been inspected at this time.

11

12    **Request for Admission No. 147:**

13    During calendar year 2014, Cooke did not inspect the portions of the anchoring components at

14    the Hope Island facility located more than 100 feet below the surface of the water.

15    **Response:** Cooke does not have sufficient information to admit or deny this request and on this

16    basis denies this request.

17

18    **Request for Admission No. 148:**

19    During calendar year 2015, Cooke did not inspect the portions of the anchoring components at

20    the Hope Island facility located more than 100 feet below the surface of the water.

21    **Response:** Deny in part.  Based on a review of business records, several anchors were inspected

22    in June 2015 and determined to be in good order.  Based on information and belief, this

23    inspection included components located more than 100 feet below the surface of the water.

24    Additional anchor components located below 100 feet may have also been inspected at this time.

25

26

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 48
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 100
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    **Request for Admission No. 149:**

2    During calendar year 2016, Cooke did not inspect the portions of the anchoring components at

3    the Hope Island facility located more than 100 feet below the surface of the water.

4    **Response:** Deny in part.  Based on a review of business records, anchor 25 was inspected in

5    October 2016.  Based on information and belief, this inspection included components located

6    more than 100 feet below the surface of the water.  Additional anchor components located below

7    100 feet may have also been inspected at this time.

8

9    **Request for Admission No. 150:**

10   During calendar year 2017, Cooke did not inspect the portions of the anchoring components at

11   the Hope Island facility located more than 100 feet below the surface of the water.

12   **Response:** Deny.

13

14   **Request for Admission No. 151:**

15   At least one Atlantic salmon escaped from your Port Angeles facility and into Puget Sound

16   during calendar year 2012.

17   **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

18   identified period of time.  As detailed in the *2012 American Gold Seafoods Annual Accidental*

19   *Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would

20   escape, including implementing best industry practices to ensure accidental releases did not

21   occur while fish were in the pens or being handled.

22

23   **Request for Admission No. 152:**

24   At least one Atlantic salmon escaped from your Port Angeles facility and into Puget Sound

25   during calendar year 2013.

26   **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 49
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 101
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request for Admission No. 179:**

Cooke did not inspect all of the anchoring components below the water line at the Port Angeles facility during calendar year 2016.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 180:**

Cooke did not inspect all of the anchoring components below the water line at the Port Angeles facility during calendar year 2017.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 181:**

At least some of the anchoring components at the Port Angeles facility are more than 100 feet below the surface of the water.

**Response**: Admit.

**Request for Admission No. 182:**

During calendar year 2012, Cooke did not inspect the portions of the anchoring components at the Port Angeles facility located more than 100 feet below the surface of the water.

PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANT COOKE AQUACULTURE, LLC AND ANSWERS **THERETO** -- 59
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 102
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    **Response**:  Cooke does not have sufficient information to admit or deny this request and on this

2    basis denies this request.

3

4    **Request for Admission No. 183:**

5    During calendar year 2013, Cooke did not inspect the portions of the anchoring components at

6    the Port Angeles facility located more than 100 feet below the surface of the water.

7    **Response:** Cooke does not have sufficient information to admit or deny this request and on this

8    basis denies this request.

9

10   **Request for Admission No. 184:**

11   During calendar year 2014, Cooke did not inspect the portions of the anchoring components at

12   the Port Angeles facility located more than 100 feet below the surface of the water.

13   **Response:** Deny. Cooke does not have sufficient information to admit or deny this request and

14   on this basis denies this request.

15

16   **Request for Admission No. 185:**

17   During calendar year 2015, Cooke did not inspect the portions of the anchoring components at

18   the Port Angeles facility located more than 100 feet below the surface of the water.

19   **Response:** Deny in part.  Based on a review of business records, a mooring inspection was

20   performed in April 2015.  Based on information and belief, this inspection included components

21   located more than 100 feet below the surface of the water.

22

23   **Request for Admission No. 186:**

24   During calendar year 2016, Cooke did not inspect the portions of the anchoring components at

25   the Port Angeles facility located more than 100 feet below the surface of the water.

26   **Response:** Deny in part.  Based on a review of business records, an inspection of anchors was

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 60
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

KNUTSEN DECLARATION - 103
Case No. 2:17-cv-01708-JCC

1   performed in November 2016.  Based on information and belief, this inspection included

2   components located more than 100 feet below the surface of the water.

3

4   **Request for Admission No. 187:**

5   During calendar year 2017, Cooke did not inspect the portions of the anchoring components at

6   the Port Angeles facility located more than 100 feet below the surface of the water.

7   **Response:** Deny.

8

9   **Request for Admission No. 188:**

10  At least one Atlantic salmon escaped from your Cypress Site 1 facility and into Puget Sound

11  during calendar year 2012.

12  **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

13  identified period of time.  As detailed in the *2012 American Gold Seafoods Annual Accidental*

14  *Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would

15  escape, including implementing best industry practices to ensure accidental releases did not

16  occur while fish were in the pens or being handled.

17

18  **Request for Admission No. 189:**

19  At least one Atlantic salmon escaped from your Cypress Site 1 facility and into Puget Sound

20  during calendar year 2013.

21  **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

22  identified period of time.  As detailed in the *2013 American Gold Seafoods Annual Accidental*

23  *Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would

24  escape, including implementing best industry practices to ensure accidental releases did not

25  occur while fish were in the pens or being handled.

26

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 61
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 104
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request for Admission No. 217:**

Cooke did not inspect all of the anchoring components below the water line at the Cypress Site 1 facility during calendar year 2017.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 218:**

At least some of the anchoring components at the Cypress Site 1 facility are more than 100 feet below the surface of the water.

**Response:** Admit.

**Request for Admission No. 219:**

During calendar year 2012, Cooke did not inspect the portions of the anchoring components at the Cypress Site 1 facility located more than 100 feet below the surface of the water.

**Response:** Deny in part. Based on a review of business records, anchors 12 through 17 were inspected in October 2012. Based on information and belief, this inspection included components located more than 100 feet below the surface of the water. Additional anchor components located below 100 feet may have also been inspected at this time.

**Request for Admission No. 220:**

During calendar year 2013, Cooke did not inspect the portions of the anchoring components at the Cypress Site 1 facility located more than 100 feet below the surface of the water.

**Response**: Deny in part. Based on a review of business records, anchors 18 through 22 were

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 71
Case No. 2:17-cv-01708-JCC

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

KNUTSEN DECLARATION - 105
Case No. 2:17-cv-01708-JCC

1    inspected in December 2013.  Based on information and belief, this inspection included

2    components located more than 100 feet below the surface of the water.  Additional anchor

3    components located below 100 feet may have also been inspected at this time.

4

5    **Request for Admission No. 221:**

6    During calendar year 2014, Cooke did not inspect the portions of the anchoring components at

7    the Cypress Site 1 facility located more than 100 feet below the surface of the water.

8    **Respons**e: Deny in part.  Based on a review of business records, anchors 1 through 11 were

9    inspected in January 2014, and anchors 11 and 12 were inspected in June 2014.  Based on

10   information and belief, this inspection included components located more than 100 feet below

11   the surface of the water.  Additional anchor components located below 100 feet may have also

12   been inspected at this time.

13

14   **Request for Admission No. 222:**

15   During calendar year 2015, Cooke did not inspect the portions of the anchoring components at

16   the Cypress Site 1 facility located more than 100 feet below the surface of the water.

17   **Response:**  Deny in part.  Based on a review of business records, anchors numbered 5 and 6

18   were inspected in January 2015, anchors numbered 23 and 24 was inspected in March 2015, and

19   anchor 21 was inspected in December 2015.  Based on information and belief, this inspection

20   included components located more than 100 feet below the surface of the water.  Additional

21   anchor components located below 100 feet may have also been inspected at this time.

22

23   **Request for Admission No. 223:**

24   During calendar year 2016, Cooke did not inspect the portions of the anchoring components at

25   the Cypress Site 1 facility located more than 100 feet below the surface of the water.

26   **Response:** Deny.  Based on a review of business records, all system to buoy chains and

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 72
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 106
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    hardware were inspected in February and March, 2016.  Based on information and belief, this

2    inspection included components located more than 100 feet below the surface of the water.

3

4    **Request for Admission No. 224:**

5    During calendar year 2017, Cooke did not inspect the portions of the anchoring components at

6    the Cypress Site 1 facility located more than 100 feet below the surface of the water.

7    **Response:** Deny.

8

9    **Request for Admission No. 225:**

10   At least one Atlantic salmon escaped from your Cypress Site 2 facility and into Puget Sound

11   during calendar year 2012.

12   **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

13   identified period of time.  As detailed in the *2012 American Gold Seafoods Annual Accidental*

14   *Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would

15   escape, including implementing best industry practices to ensure accidental releases did not

16   occur while fish were in the pens or being handled.

17

18   **Request for Admission No. 226:**

19   At least one Atlantic salmon escaped from your Cypress Site 2 facility and into Puget Sound

20   during calendar year 2013.

21   **Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the

22   identified period of time.  As detailed in the *2013 American Gold Seafoods Annual Accidental*

23   *Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would

24   escape, including implementing best industry practices to ensure accidental releases did not

25   occur while fish were in the pens or being handled.

26

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 73
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 107
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request for Admission No. 254:**

Cooke did not inspect all of the anchoring components below the water line at the Cypress Site 2 facility during calendar year 2017.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 255:**

At least some of the anchoring components at the Cypress Site 2 facility were more than 100 feet below the surface of the water.

**Response:**  Admit.

**Request for Admission No. 256:**

During calendar year 2012, Cooke did not inspect the portions of the anchoring components at the Cypress Site 2 facility located more than 100 feet below the surface of the water.

**Response:** Deny in part.  Based on a review of business records, anchors 14 through 22 were inspected in October 2012.  Based on information and belief, this inspection included components located more than 100 feet below the surface of the water.  Additional anchor components located below 100 feet may have also been inspected at this time.

**Request for Admission No. 257:**

During calendar year 2013, Cooke did not inspect the portions of the anchoring components at the Cypress Site 2 facility located more than 100 feet below the surface of the water.

**Response:** Deny in part.  Based on a review of business records, anchors 7 through 13 were

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 83
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 108
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    inspected in November 2013.  Based on information and belief, this inspection included

2    components located more than 100 feet below the surface of the water.  Additional anchor

3    components located below 100 feet may have also been inspected at this time.

4

5    **Request for Admission No. 258:**

6    During calendar year 2014, Cooke did not inspect the portions of the anchoring components at

7    the Cypress Site 2 facility located more than 100 feet below the surface of the water.

8    **Response:** Deny in part.  Based on a review of business records, anchors 1 through 6 were

9    inspected in January 2014.  Based on information and belief, this inspection included

10   components located more than 100 feet below the surface of the water.  Additional anchor

11   components located below 100 feet may have also been inspected at this time.

12

13   **Request for Admission No. 259:**

14   During calendar year 2015, Cooke did not inspect the portions of the anchoring components at

15   the Cypress Site 2 facility located more than 100 feet below the surface of the water.

16   **Response:** Cooke does not have sufficient information to admit or deny this request and on this

17   basis denies this request.

18

19   **Request for Admission No. 260:**

20   During calendar year 2016, Cooke did not inspect the portions of the anchoring components at

21   the Cypress Site 2 facility located more than 100 feet below the surface of the water.

22   **Response:** Cooke does not have sufficient information to admit or deny this request and on this

23   basis denies this request.

24

25   **Request for Admission No. 261:**

26   During calendar year 2017, Cooke did not inspect the portions of the anchoring components at

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 84
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 109
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

the Cypress Site 2 facility located more than 100 feet below the surface of the water.

**Response:** Deny.

**Request for Admission No. 262:**

At least one Atlantic salmon escaped from your Cypress Site 3 facility and into Puget Sound during calendar year 2012.

**Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the identified period of time.  As detailed in the *2012 American Gold Seafoods Annual Accidental Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would escape, including implementing best industry practices to ensure accidental releases did not occur while fish were in the pens or being handled.

**Request for Admission No. 263:**

At least one Atlantic salmon escaped from your Cypress Site 3 facility and into Puget Sound during calendar year 2013.

**Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the identified period of time.  As detailed in the *2013 American Gold Seafoods Annual Accidental Fish Release Report*, the pen operators took appropriate steps to ensure that no fish would escape, including implementing best industry practices to ensure accidental releases did not occur while fish were in the pens or being handled.

**Request for Admission No. 264:**

At least one Atlantic salmon escaped from your Cypress Site 3 facility and into Puget Sound during calendar year 2014.

**Response:** Deny.  Cooke is unaware of any fish escapes occurring at this facility during the identified period of time.  As detailed in the *2014 American Gold Seafoods Annual Accidental*

PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANT COOKE AQUACULTURE, LLC AND ANSWERS **THERETO** -- 85
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 110
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request for Admission No. 291:**

Cooke did not inspect all of the anchoring components below the water line at the Cypress Site 3 facility during calendar year 2017.

**Response:** Following objections by Cooke that Wild Fish Conservancy's ("WFC") 319 Requests for Admission were overly burdensome, and that this request for admission was improper because it would not resolve an undisputed fact for trial and would impermissibly shift WFC's discovery and investigative obligations onto Cooke, the request was withdrawn by WFC in a letter from counsel dated August 16, 2018.

**Request for Admission No. 292:**

At least some of the anchoring components at the Cypress Site 3 facility are more than 100 feet below the surface of the water.

**Response:** Admit.

**Request for Admission No. 293:**

During calendar year 2012, Cooke did not inspect the portions of the anchoring components at the Cypress Site 3 facility located more than 100 feet below the surface of the water.

**Response:**  Deny in part.  Based on a review of business records, anchors 14 through 20 were inspected in October 2012 and anchor 2 was inspected in December 2012.  Based on information and belief, this inspection included components located more than 100 feet below the surface of the water.  Additional anchor components located below 100 feet may have also been inspected at this time.

**Request for Admission No. 294:**

During calendar year 2013, Cooke did not inspect the portions of the anchoring components at the Cypress Site 3 facility located more than 100 feet below the surface of the water.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 95
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 111
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  **Response:** Deny in part.  Based on a review of business records, anchors 8 through 13 were

2  inspected in November 2013.  Based on information and belief, this inspection included

3  components located more than 100 feet below the surface of the water.  Additional anchor

4  components located below 100 feet may have also been inspected at this time.

5

6  **Request for Admission No. 295:**

7  During calendar year 2014, Cooke did not inspect the portions of the anchoring components at

8  the Cypress Site 3 facility located more than 100 feet below the surface of the water.

9  **Response:** Deny in part.  Based on a review of business records, anchors 1 through 7 and 21

10  through 27 were inspected in January 2014, anchors 7 through 13 were inspected in April 2014,

11  and all shore side anchors were inspected on December 4, 2014.  Based on information and

12  belief, these inspections included components located more than 100 feet below the surface of

13  the water.  Additional anchor components located below 100 feet may have also been inspected

14  at this time.

15

16  **Request for Admission No. 296:**

17  During calendar year 2015, Cooke did not inspect the portions of the anchoring components at

18  the Cypress Site 3 facility located more than 100 feet below the surface of the water.

19  **Response:** Cooke does not have sufficient information to admit or deny this request and on this

20  basis denies this request.

21

22  **Request for Admission No. 297:**

23  During calendar year 2016, Cooke did not inspect the portions of the anchoring components at

24  the Cypress Site 3 facility located more than 100 feet below the surface of the water.

25  **Response:** Cooke does not have sufficient information to admit or deny this request and on this

26  basis denies this request.

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 96
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 112
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request for Admission No. 298:**

During calendar year 2017, Cooke did not inspect the portions of the anchoring components at the Cypress Site 3 facility located more than 100 feet below the surface of the water.

**Response:** Deny.

**Request for Admission No. 299:**

Debris from the August 2017 Cypress Site 2 net pen collapse remained on the sea floor after November 13, 2017.

**Response:** Admit.

**Request for Admission No. 300:**

Debris from the August 2017 Cypress Site 2 net pen collapse remained on the sea floor until at least on or about December 14, 2017.

**Response:** Admit.

**Request for Admission No. 301:**

Debris from the August 2017 Cypress Site 2 net pen collapse remains on the sea floor as of the date of Cooke's response to this Request for Admission.

**Response:** Based on information presently available to Cooke, Cooke denies this Request.

**Request for Admission No. 302:**

Cooke did not collect and store the carcass of every Atlantic salmon that died as a result of the August 2017 Cypress Site 2 net pen collapse in a leakproof container.

**Response:** Cooke objects to this request because the terms "died as a result of the August 2017 Cypress Site 2 net pen collapse" and "leakproof container" are ambiguous in the context of this request. Condition S5 of the permit lays out various Operating Requirements, including that

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 97
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 113
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    **Request for Admission No. 319:**

2    Cooke did not submit a Sediment and Sampling Analysis Plan to Ecology for approval at least 30

3    days prior to its decision to move, remove, or close Cypress Site 2.

4    **Response:** Deny in part, admit in part.  Cooke did not submit a Sediment and Sampling Analysis

5    Plan to Ecology for review and approval because Cooke did not anticipate or plan to move,

6    remove, or close Site 2.

7

8            DATED this 31st day of October, 2018.

9

10                                NORTHWEST RESOURCE LAW PLLC

11

12                                */s/ Douglas J. Steding*
                                  Diane M. Meyers, WSBA #40729
13                                dmeyers@nwresourcelaw.com
                                  206.971.1568
14                                Douglas J. Steding, WSBA #37020
                                  dsteding@nwresourcelaw.com
15                                206.971.1567
                                  Madeline Engel, WSBA #43884
16                                mengel@nwresourcelaw.com
                                  206.971.1569
17

18                                *Attorneys for Defendant Cooke Aquaculture*
                                  *Pacific, LLC*
19

20

21

22

23

24

25

26

PLAINTIFF'S SECOND SET OF REQUESTS FOR
ADMISSION TO DEFENDANT COOKE
AQUACULTURE, LLC AND ANSWERS **THERETO**
-- 104
Case No. 2:17-cv-01708-JCC

KNUTSEN DECLARATION - 114
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

# EXHIBIT 17

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

BRIAN A. KNUTSEN
Licensed in Oregon & Washington
503.841.6515
brian@kampmeierknutsen.com

November 19, 2018

**Via Email Only**
Diane M. Meyers
Douglas J. Steding
Madeline Engel
Northwest Resource Law, PLLC
101 Yesler Way, Suite 205
Seattle, Washington 98104
Email: dmeyers@nwresourcelaw.com
        dsteding@nwresourcelaw.com
        mendel@nwresourcelaw.com

Re:     ***Wild Fish Conservancy v. Cooke Aquaculture Pac., LLC***, W.D. Wash. No. 2:17-cv-
        01708-JCC; Request for Conferral on Discovery Disputes

Dear Counsel:

This letter is in regards to ongoing discovery disputes in the above-referenced matter. We would like to schedule a conferral with you under LCR 37(a)(1) in an effort to resolve these disputes. Please let us know your availability next week for such a conferral.

**Cooke's Responses to the Requests for Admission**

Wild Fish Conservancy (the "Conservancy") served Plaintiff's Second Set of Interrogatories, Requests for Production, and Requests for Admission to Defendant Cooke Aquaculture Pacific, LLC on August 3, 2018. Following conferral between the parties, the Conservancy agreed to withdraw many of the requests for admission and Cooke Aquaculture Pacific, LLC ("Cooke") agreed to answer those requests that were not withdrawn ("Requests for Admission"). Cooke served responses to the Requests for Admission on October 31, 2018 ("Admission Responses") in accordance with a stipulated extension, which gave Cooke nearly three months to formulate its answers.

As an initial matter, it should be noted that Cooke's Admission Responses appear to be intentionally evasive and disingenuous. Requests for admission are a discovery devise with two functions; to determine the opposing party's contentions and to narrow the scope of the case by removing undisputed issues once and for all. *See* Wagstaffe, et al., Federal Civil Procedure Before Trial § 11:1970 (Rutter Group 2015). As with other discovery tools, their purpose is to enable full development of the facts and thereby advance the quest for truth. *See Trujillo v. Bd.*

*Of Educ. Of the Albuquerque Pub. Sch.*, No. CIV 02-1146 JB/LFG, 2007 U.S. Dist. LEXIS 33923, at *6 (D. N.M. March 12, 2007) (quoting *Taylor v. Illinois*, 484 U.S. 400, 430 (1988)). The Conservancy's Requests for Admission were aimed at identifying disputed issues and eliminating those that are undisputed in a manner that promotes a more "just, speedy, and inexpensive determination" consistent with the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 1. By providing evasive and nonresponsive answers to the Requests for Admission, Cooke is making this case more expensive and burdensome on both parties; for example, more depositions of Cooke personnel and more Court involvement are likely.

Several sets of the Requests for Admission pertained to Cooke's compliance with the requirement of its NPDES permits that it inspect all anchoring components at the net pens at least once per year. *See* NPDES Permits, Condition S6.F. Specifically, the Requests for Admission inquired as to whether Cooke inspected anchoring components located more than 100 feet below the surface of the water at each of the eight net pen facilities during each year from 2012 through 2017. Cooke has noted that the depth limit for its divers is 100 feet and that it therefore must use a contracted dive service or a remotely operated vehicle to inspect components deeper than 100 feet. *E.g.*, COOKE_CWA_00027242.

Cooke's plans indicate that it has not been complying with the requirement to inspect all anchoring components at least once each year. The plans provide that "[h]igh-current-end mooring points will be visually inspected underwater every three years by divers or by remotely operated underwater cameras" and that "other moorages are to be visually inspected every six years." COOKE_CWA_00027296; *see also* COOKE_CWA_00027279. Cooke's plans also require that it maintain records of its inspections. *E.g.*, COOKE_CWA_00027296, 00027243.

Seven of the eight net pens have anchoring components located at a depth of more than 100 feet. For those seven net pens, Cooke stated that it has insufficient knowledge to admit or deny that it conducted seventeen of the required annual inspections. Cooke partially denied that it failed to conduct another seventeen annual inspections, stating the some underwater components were inspected and that other components "may" have also been inspected. Cooke denied that it failed to inspect all underwater components of Cypress Site 1 in 2016, stating that business records indicate that the inspections were done. Finally, Cooke denied that it failed to inspect underwater components for each of the net pens in 2017.

The Admission Responses merely stating that Cooke has insufficient knowledge to admit or deny the requests are inadequate. "If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it…. The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." Fed. R. Civ. P. 36(a)(4). Cooke has failed to comply with these requirements. Further, given that Cooke must retain contract divers to conduct these inspections and the requirement that Cooke retain records of the inspections, Cooke's assertion that it lacks

2

sufficient knowledge to admit or deny that inspections occurred is confounding. *See Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 580 (9th Cir. 1992) ("epistemological doubts speak highly of [a party's] philosophical sophistication, but poorly of its respect for Rule 36(a)").

The Conservancy requests that Cooke provide revised responses that, at a minimum, "state in detail why [Cooke] cannot truthfully admit or deny" the requests and that also confirm that Cooke "made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *See* Fed. R. Civ. P. 36(a)(4).

Cooke's partial denials are also inadequate. For these seventeen Admission Responses, Cooke claims that a review of its records indicates that some anchoring components were inspected and that other components "may" have also been inspected. While Cooke is permitted to partially deny a matter, it must specify the part admitted and deny the rest. Fed. R. Civ. P. 36(a)(4). Cooke's statement that other components may have also been inspected does not comply with the rule because it does not admit or deny whether those components were inspected, nor does it "state in detail why [Cooke] cannot truthfully admit or deny." The Conservancy requests that Cooke provide revised responses that admit or deny that the other components were inspected or "state in detail why [Cooke] cannot truthfully admit or deny" the requests and that also confirm that Cooke "made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *See* Fed. R. Civ. P. 36(a)(4).

Further, the Conservancy requested and Cooke agreed to provide all documents related to any inspections conducted at the Puget Sound net pens under the requirements of the NPDES permits during the limitations period. *See* Cooke's Responses to Req. for Prod. Nos. 5–6. The Conservancy has not seen any records related to inspections of anchoring components located at a depth of more than 100 feet. The Conservancy requests that Cooke provide any such records (or identify where they have been produced) for all of the net pens for each year since 2012. This includes the records relied upon by Cooke in providing the seventeen partial denials to the Requests for Admission. It also includes the records Cooke relied upon in denying that inspections did not occur at each of the net pens in 2017 and at Cypress Site 1 in 2016.

**Cooke's Failure to Satisfy its Commitment to Provide FishTalk Reports**

As described in the November 1, 2018 letter from Lia Comerford, the Conservancy requests that that Cooke provide reports generated through FishTalk as Cooke committed to during our June 28 discovery conferral and in the July 13 letter from Douglas Steding. That agreement resolved a discovery dispute related to the Conservancy's request for more comprehensive data. Following Cooke's apparent reneging of its commitment, Ms. Comerford's November 1 letter requested that Cooke either provide the reports by November 15 or inform us that Cooke will not be producing the materials. Cooke has done neither. And rather than informing us ahead of time that it

3

would not be meeting the November 15 date, we simply received an email from Mr. Steding on November 15 stating no production would be forthcoming on that date.

Cooke's failure to provide requested and agreed upon data is hindering our ability to prosecute this lawsuit under the Court's scheduling order. The Conservancy requests that Cooke inform us as to whether or not it intends to provide these reports and, if so, when and the reasons for the delay.

**Cooke's Failure to Timely Produce Responsive Records**

The Conservancy served its initial set of Requests for Production of Documents almost eight months ago, on March 28, 2018. Cooke has yet to complete its response to these Requests. For example, Cooke has yet to produce the highly responsive FishTalk data, as discussed above, nor has Cooke produced internal company emails. This delay is impeding the Conservancy's ability to litigate this case under the Court's scheduling order. The Conservancy requests that Cooke provide all responsive materials no later than December 7, 2018 or provide an explanation as to why more than eight and a half months is needed for Cooke's production.

Please contact me at your earliest convenience to schedule a telephonic conference to discuss these discovery issues. We look forward to conferring with you in an effort to resolve these disputes. However, if the Parties are not able to informally resolve these disputes, the Conservancy intends to move the Court to compel Cooke to produce the responsive records—including the PRV records on which we have already completed conferral—by a date certain and to adequately respond to the Conservancy's Requests for Admission.

Very truly yours,

KAMPMEIER & KNUTSEN, PLLC

By: _s/ Brian A. Knutsen_
    Brian A. Knutsen

4

# EXHIBIT 18



Douglas J. Steding, Ph.D. | dsteding@nwresourcelaw.com | 206.971.1567 (d)

November 30, 2018

Via Email

Brian Knutsen
Kampmeier & Knutsen PLLC
221 SE 11th Ave., Suite 217
Portland, OR 97214

**Re: *Wild Fish Conservancy v. Cooke Aquaculture Pac., LLC*, W.D. Wash. No. 2:17-cv-01708-JCC: Response to Request for Conferral on Discovery Disputes**

Dear Brian:

This letter responds to your November 19, 2018 letter requesting conferral on discovery disputes. We are providing it in advance of the call scheduled for Monday, December 3, 2018 to better inform that discussion.

    1.  Request for Admissions.

As stated in our prior correspondence to you dated August 22, 2018, and as the parties apparently agree, Requests for Admissions are not discovery devices. They are instead limited tools to eliminate uncontested facts for trial. *See, e.g., Choquette v. Warner*, No. 3:15-CV-05838-BHS-JRC, 2017 WL 2671263, at *1 (W.D. Wash. June 21, 2017); *Jovanovich v. Redden Marine Supply, Inc.*, No. C10-924-RSM, 2011 WL 4459171, at *2 (W.D. Wash. Sept. 26, 2011). While Cooke objected to all 317 RFAs that were served by WFC, we nevertheless responded to 125 RFAs. Responding to these RFAs required an extensive review of records spanning many years and many sites, and interviews of Cooke employees. The answers to RFAs were drafted based on the information we gathered during this process, which took in excess of 30 hours of attorney and paralegal time on the anchor issue alone (not to mention the time of Cooke employees to assist us in this effort and not including other discovery efforts discuss below). As you are aware, the document search and production process are ongoing, and this process may include the identification and production of additional documents that are responsive to the specific issue of anchor inspections that occurred below 100 feet. Your assertions that these responses are not sufficient actually underscore and reinforce our objections these RFAs. You served RFAs early in the case, before document discovery had progressed sufficiently to make the RFAs a useful tool. We endeavored to answer these RFAs based on reasonable inquiry into readily available information as required by Rule 36(a)(4). We believe our responses, at this point in the case, are sufficient. Should they require supplementation, we will undertake that obligation, consistent with our discovery obligations.

KNUTSEN DECLARATION - 121
Case No. 2:17-cv-01708-JCC

Brian Knutsen
November 30, 2018
Page **2** of **3**

2.  <u>FishTalk Reports</u>.

As we confirmed by email dated November 20, 2018, Cooke is preparing reports for the last two generations of fish at each of its sites. Given that WFC's contention in this matter is that Cooke failed to implement a fish inventory and tracking system, the discovery responses that describe Cooke's employment of a state-of-the-art system and protocol, in addition to these detailed reports, more than adequately answer the question of whether Cooke has implemented a fish inventory and tracking system.

As detailed in my letter dated November 20, 2018, older reports are more difficult to generate, but if WFC can pinpoint or otherwise provide any information regarding suspected fish releases at any of Cooke's facilities besides the one that occurred at Cypress Island in 2017, we stand ready to investigate such allegations and generate additional reports.

3.  <u>Failure to Timely Produce Responsive Records</u>.

As an initial matter, we strongly disagree with your accusation of the lack of effort in responding to WFC's discovery requests. As can be the case in any complex litigation, including what has been filed as a single case but one that involves allegations of violations of eight separate permits over a seven-year time period – essentially eight separate cases – discovery is often complex and takes time. To date Cooke has produced almost 150,000 pages of documents, which are the result of the following:

a.  Multiple site visits to gather paper documents. When WFC refused Cooke's offer to review those documents pursuant to Fed. R. Civ. P. 33(d), we then had to coordinate the scanning, processing, and Bates numbering of those documents for WFC.
b.  Ongoing gathering of current agency communications in an effort to, on a rolling basis, provide WFC with supplements to its discovery requests.
c.  Cooperation with WFC on the scoping and generation of custom reports from the FishTalk database and preparing these reports, which are not in the form ordinarily kept by Cooke, because of the inability of WFC to obtain a software license to manage those data.
d.  A significant electronic document gathering effort that involved the collection and imaging of fifty different devices (computers, email accounts and phones), necessitating multiple trips to remote sites. This effort has already cost Cooke hundreds of thousands of dollars in e-discovery vendor fees and has resulted in the collection of more than one million files and terabytes of data that have been processed and must be searched and then reviewed by our office prior to production. While it may not be WFC's practice for its document production, it is our client's expectation (and, we believe, the standard of care) that documents are reviewed before they are produced. Given WFC's repeated lack of willingness to narrow its requests, this effort has taken time. Currently, we are in the process of reviewing another 30,000 potentially responsive documents and will, as we have done in the past, produce those on a rolling basis. Cooke's attorney fees in reviewing these documents alone already exceeds more than $150,000.
e.  Contrary to the assertions in your letter, Cooke has diligently produced documents. You have been receiving documents regularly including: three

KNUTSEN DECLARATION - 122
Case No. 2:17-cv-01708-JCC

Brian Knutsen
November 30, 2018
Page **3** of **3**

   productions in June, two productions in July, three productions in August, one
   production in September, five productions in October, and two in November.
   These productions total approximately 150,000 pages of documents.

  f. Our current document review effort is centered on the supplemental e-document
   gathering efforts conducted by Cooke in September and October as a result of our
   ongoing discovery conferrals.

In sum, Cooke's efforts to comply with WFC's discovery requests are hardly hindering WFC's
ability to litigate its case. We are committed to defending vigorously, on the merits rather than
through obstructive and unnecessary discovery tactics, WFC's baseless allegations against
Cooke. That defense takes time, particularly given that this is essentially eight separate citizen
suits rolled into one action. The needs of this case are compounded by WFC's complete lack of
due diligence prior to bringing this suit and its complete inability to focus its discovery requests
on items such as specific years or specific instances of permit violations is causing Cooke to
incur significant costs. More to your assertions, it also takes time. If you are unsatisfied with
these efforts, you are always welcome to take this issue to Judge Coughenour, but we believe a
better course of action is to continue to work through these issues professionally and consistent
with our obligations under the Federal Rules of Civil Procedure.

        Very truly yours,

        Douglas J. Steding

CC: All counsel of record

# EXHIBIT 19



Lia Comerford
Staff Attorney
Earthrise Law Center
Lewis & Clark Law School
*phone* 503-768-6823
comerfordl@lclark.edu
earthriselaw.org

December 5, 2018

**VIA EMAIL ONLY**
Diane M. Meyers
Douglas J. Steding
Madeline Engel
Northwest Resource Law, PLLC
101 Yesler Way, Suite 205
Seattle, Washington 98104
Email: dmeyers@nwresourcelaw.com
        dsteding@nwresourcelaw.com
        mengel@nwresourcelaw.com

> **Re:** ***Wild Fish Conservancy v. Cooke Aquaculture Pac., LLC.***, W.D. Wash. No. **2:17-cv-01708-JCC; Response to November 30, 2018 Letter and December 3, 2018 Conference Call re: Discovery Conferral**

Dear Counsel:

This letter responds to your November 30, 2018 letter regarding ongoing discovery disputes in the above-referenced matter, and the parties' conference call on December 3, 2018 regarding the same issues.

**Cooke's Responses to the Requests for Admission**

In the Conservancy's November 19, 2018 letter, we explained that Cooke's responses to the Conservancy's Requests for Admission ("RFAs") regarding inspections of net pen anchoring components located more than 100 feet below the surface of the water were inadequate for numerous reasons, including that many of these responses were evasive and nonresponsive. *See* Nov. 19, 2018 letter at 2. In Cooke's November 30, 2018 letter, you responded that it took Cooke numerous hours to respond to the RFAs and stated Cooke's belief that the responses were sufficient. *See* Nov. 30, 2018 letter at 1. You further stated that Cooke would supplement the RFA responses if necessary. *Id.*

As we discussed on our December 3, 2018 conference call, the parties are at an impasse with regard to this issue. The Conservancy intends to file a motion seeking to compel Cooke to provide legally adequate responses to its RFAs.

1

**FishTalk Data**

In the Conservancy's November 19, 2018 letter, we expressed our frustration with Cooke's reneging on its commitment to produce the FishTalk data, as well as our frustration with the significant delay in receiving this data. In its November 30, 2018 letter, Cooke confirmed that it is preparing reports for the last two generations of fish at each of its sites, but that Cooke would not generate older reports unless the Conservancy "can pinpoint or otherwise provide any information regarding suspected fish releases . . . ." Nov. 30, 2018 letter at 2. On our December 3, 2018 telephone call, you stated that Cooke intended to produce the forthcoming FishTalk data to the Conservancy by mid-December.

The FishTalk data for the entirety of the statute of limitations period for this lawsuit (from September 2012 to the present) is relevant to this litigation, which includes all data for fish that have been harvested from the net pens beginning in September 2012. More specifically, this data is relevant to the Conservancy's claim that Cooke has not complied with its legal obligations to track and report the number of fish in the net pens and those lost to escapement. It is one thing for Cooke to have a tracking system in place. The questions of whether that system is adequate to meet Cooke's legal obligations under its Clean Water Act permits and whether Cooke actually, and properly, tracks and reports the fish using that (or another) system, are entirely distinct. These latter questions are central to the Conservancy's claim in this matter and cannot be answered without having Cooke's actual tracking and reporting data, *which you originally suggested would be the most efficient and easiest way for your client to produce the information we sought*.

As we discussed on our telephone call, the data that Cooke has committed to produce for the last two generations of fish raised at each net pen facility may extend back in time close to the beginning of the statute of limitations period—September 2012. Therefore, the Conservancy will evaluate whether it believes it necessary to seek the additional, older data once it receives the mid-December production of FishTalk data from Cooke.

Further, it is our understanding that, for the net pens that currently are stocked with fish, Cooke will produce the FishTalk data for the last two completely harvested generations. Please let us know if that understanding is incorrect. Once we have reviewed this data, the Conservancy may request that Cooke provide data for generations that are currently being raised in the net pens.

**Cooke's Failure to Timely Produce Response Records to the Conservancy**

In the Conservancy's November 19, 2018 letter, we again expressed frustration regarding the significant delay in Cooke's document production to the Conservancy. *See* Nov. 19, 2018 letter at 4. We specifically referred to the FishTalk data, discussed above, but also to internal company emails. *Id.* In Cooke's November 30 letter, you outlined the steps Cooke has taken to gather and produce records to the Conservancy. *See* Nov. 30, 2018 letter at 2–3. On our telephone call, you explained more about the status of Cooke's gathering, review, and production of internal company emails and other electronic records. You stated that your internal goal was to finish reviewing the emails and electronic records by the end of 2018, and that Cooke would produce these records to the Conservancy on a rolling (weekly or bi-weekly) basis. You also stated that

2

Cooke would provide regular updates to the Conservancy regarding the status of its review and production of these records.

In light of Cooke's explanation and these commitments, the Conservancy does not intend at this time to move the Court to compel Cooke to produce these records by a date certain. However, if these records have not been substantially produced by January 10, 2019, the Conservancy will be forced to move the Court for a date by which Cooke must complete its document production to the Conservancy. As we have noted repeatedly, Cooke's delay in fully responding to the Conservancy's RFPs—almost all of which were served more then eight months ago—is prejudicing the Conservancy and impeding its ability to litigate this case under the Court's scheduling order.

Further, the Conservancy must respond to several statements made by Cooke in its November 19, 2018 letter that mischaracterize the discovery process to date.

First, Cooke refers several times to the approximate number of pages it has produced to the Conservancy (150,000). *See* Nov. 30, 2018 letter at 2–3. To the extent Cooke is using this figure to suggest that gathering, reviewing, and producing these pages for this litigation has taken significant time and resources on Cooke's part, we must point out that, out of the 147,885 pages produced by Cooke to date, Cooke had already gathered and produced almost 100,000 of those pages for other litigation or administrative productions, including productions to Washington state agencies. Moreover, Cooke's production is rife with duplicates; for example, approximately 30,000 pages (the "CAP_DOE" production and part of the "COOKE" production) were produced twice. Regardless, the sheer number of pages produced by Cooke, and the number of actual productions made by Cooke, are not the best evidence of whether Cooke is complying its discovery obligations. What matters most is whether Cooke is producing relevant and responsive records in a timely manner. Cooke is not doing so.

Second, Cooke mentions the fact that it has to produce FishTalk reports in a form not ordinarily kept by Cooke because of "the inability of WFC to obtain a software license to manage the data." *See* Nov. 19, 2018 letter at 2. The relevance of this comment is lost on the Conservancy, and the insinuation that the Conservancy is somehow partially responsible for Cooke's failure to produce this data in a timely fashion is unwarranted. The Conservancy has been conferring with Cooke regarding the production of this data since at least June 2018. In your November 20, 2018 letter, you stated that it takes approximately one hour to run each reports—which itself seems like an exaggerated amount of time required to generate a spreadsheet from an existing database. There is no valid excuse for Cooke's eight-month delay in producing these records to the Conservancy.

Third, Cooke's comment that the Conservancy does not exercise the proper standard of care when gathering, reviewing, and producing records in litigation is baseless. The Conservancy and its attorneys carefully reviewed, considered, and are in the process of responding to Cooke's discovery requests in this matter. The Conservancy recognizes the need to efficiently prosecute its cases and does not expect its attorneys to spend unnecessary time reviewing its document productions when those productions are entirely responsive to the opposing parties' discovery requests and comprised entirely of public records.

**Underwater Inspection Documents**

As described in our November 19, 2018 letter and as required under the Conservancy's RFP, Cooke has agreed to produce documents related to any inspections conducted at the Puget Sound net pens. However, we have yet to identify any records related to inspections of anchoring components located at a depth of more than 100 feet. Yet, Cooke has responded to requests for admission related to these inspections supposedly based upon its review of business records. Further, Cooke's plans have required the preparation of inspection reports. *E.g.*, COOKE_CWA_00027296, 00027243. The Conservancy therefore requests that Cooke promptly provide any such records (or identify where they have been produced) for all of the net pens for each year since 2012.

**Verification Pages**

Cooke has not provided a signed verification page for its Supplemental Responses to the Conservancy's first set of discovery requests. Please provide such verification as soon as possible.

**Conclusion**

The Conservancy looks forward to receiving the FishTalk data by mid-December. We also look forward to Cooke's rolling productions of emails and other electronic documents and Cooke's status updates regarding those productions.

The Conservancy has made every effort to confer with Cooke on its responses to the Conservancy's RFAs, in an effort to avoid having to bring a discovery dispute to the Court's attention. However, in light of the parties' inability to resolve this dispute, the Conservancy expects to file a motion to compel Cooke to provide legally adequate responses to the RFAs.

Thank you,

Lia Comerford
Earthrise Law Center

cc via email only:    Brian Knutsen (brian@kampmeierknutsen.com)
                      Emma Bruden (emma@kampmeierknutsen.com)
                      Kevin Cassidy (cassidy@lclark.edu)
                      David Bechtold (dbechtold@nwresourcelaw.com)
                      Kristine Williams (kwilliams@nwresourcelaw.com)
                      Eliza Hinkes (ehinkes@nwresourcelaw.com)

# EXHIBIT 20

1                                            HONORABLE JOHN C. COUGHENOUR

2

3

4

5

6

7

8

9                        IN THE UNITED STATES DISTRICT COURT

                  FOR THE WESTERN DISTRICT OF WASHINGTON

10                             AT SEATTLE

11

12 WILD FISH CONSERVANCY,

                                  Case No. 2:17-cv-01708-JCC

13        Plaintiff,

                                 PLAINTIFF'S NOTICE OF RULE 30(B)(6)

14 v.                                DEPOSITION OF DEFENDANT COOKE

                                AQUACULTURE PACIFIC, LLC AND

15 COOKE AQUACULTURE PACIFIC, LLC,      RULE 34 REQUEST FOR PRODUCTION

                                OF DOCUMENTS

16        Defendant.

17

18

19        TO:     DEFENDANT COOKE AQUACULTURE PACIFIC, LLC, AND COUNSEL OF

20 RECORD:

21        PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 30(b)(6),

22 Plaintiff Wild Fish Conservancy ("Conservancy"), by and through its undersigned counsel,

23 hereby notifies you that it requires Cooke Aquaculture Pacific, LLC ("Cooke"), to attend and

24 testify under oath at a deposition. The deposition will take place on Friday, January 18, 2019,

25 beginning at 9:00 am at the offices of Kampmeier & Knutsen, PLLC, 615 Second Avenue, Suite

26 360, Seattle, Washington 98104. The deposition will be recorded by audio, audiovisual, and/or

27

28

29

NOTICE OF DEPOSITION OF COOKE         KAMPMEIER & KNUTSEN PLLC     EARTHRISE LAW CENTER
AND REQUEST FOR PRODUCTION          221 SW 11th Ave., Suite 217       10015 SW Terwilliger Blvd.
OF DOCUMENTS - 1                           Portland, Oregon 97293         Portland, Oregon 97219
KNUTSEN DECLARATION - 130              (503) 841-6515               (503) 768-6825
Case No. 2:17-cv-01708-JCC

**MATTERS FOR INQUIRY**

1.      With respect to the collapse of the Cypress Site 2 facility during the summer of

2017:

    a.      Cooke's understanding as to the reasons for and causes of the collapse,

and the bases for that understanding;

    b.      The inspections, maintenance and/or repairs, and any failures of any

structures, equipment, or components at Cypress Site 2 during the twelve months

preceding the collapse;

    c.      Cooke's response to the collapse, including notifications given to

regulatory agencies, efforts to recover Atlantic salmon from Cypress Site 2 and/or Puget

Sound, communications with and/or payments to those that recovered escaped Atlantic

salmon, efforts to recover and/or remove materials associated with the collapse

(structures, equipment, supplies, etc.), efforts to investigate the cause(s) of the collapse

(including the results of those investigations), and efforts to remediate any environmental

and/or ecological impacts from the collapse;

    d.      Identification and observations of materials that were or that may have

been released into Puget Sound as a result of the collapse (e.g., fuels, lubricants, feed,

chemicals, pharmaceuticals, equipment, machines, metals, netting, and any other supplies

or materials that were present at or on Cypress Site 2 at the time of the collapse);

    e.      The number of Atlantic salmon that died as a result of the collapse, the

number of carcasses recovered, and the procedures employed to remove and dispose of

carcasses and associated wastes;

    f.      The number of Atlantic salmon that escaped as a result of the collapse, the

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 4
KNUTSEN DECLARATION - 131
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation , and what costs were associated with the inspections;

8.      Inspections that you have conducted at the Puget Sound net pens of the anchoring components above and below the water line under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how and where the inspections were conducted, what dates the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation , and what costs were associated with the inspections; with respect to inspections of components at a depth of 100 feet or more, in addition to the aforementioned topics, identification of all anchoring components at the Puget Sound net pens that are at a depth of 100 feet or more, your efforts to respond to Plaintiff's Second Set of Requests for Admission pertaining to inspections of such components, and any other efforts you have undertaken since the initiation of this lawsuit to determine whether such inspections occurred;

9.      Inspections that you have conducted at the Puget Sound net pens of netting, including fish containment netting and predator exclusion netting and including inspections for biofouling, under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/your Fish Release Prevention and Monitoring

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 7
KNUTSEN DECLARATION - 132
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1   the Permits which requires that you, "[a]t least once per year, conduct an inspection of the main

2   cage structure and anchoring components above and below the water line";

3       2.      Any inspection documentation (e.g., reports/logs/checklists) generated since

4   September 1, 2012 under the requirements of your Pollution Prevention Plans, and/or your Fish

5   Release Prevention and Monitoring Plans; and

6

7       3.      All documents related to inspections since September 1, 2012 of components of

8   the Puget Sound net pens at a depth of 100 feet or more, including inspection reports,

9   communications with employees and/or contractors performing the inspections, bills and/or

10  invoices for such inspections, videos and/or photographs from such inspections, and any other

11

12  documents relied upon in preparing your responses to Plaintiff's Second Set of Requests for

13  Admission pertaining to such inspections.

14      4.      All documents reviewed by or created by you to prepare for this deposition that

15  you have not already produced to Plaintiff through discovery in this matter.

16

17      DATED this December 13, 2018.

18

19                          KAMPMEIER & KNUTSEN, PLLC

20

21  By: _____

22          Brian Knutsen, WSBA No. 38806
        221 S.E. 11th Avenue, Suite 217
23      Portland, Oregon 97214
        Tel, Email: (503) 841-6515, brian@kampmeierknutsen.com
24

25      Paul A. Kampmeier, WSBA No. 31560
        615 Second Ave., Suite 360
26      Seattle Washington 98104
        Tel, Email: (206) 223-4088, paul@kampmeierknutsen.com
27

28

29

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 13
Case No. 2:17-cv-01708-JCC
KNUTSEN DECLARATION - 133
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

EARTHRISE LAW CENTER

Kevin Cassidy (OSB #025296), *admitted pro hac vice*
Lia Comerford (OSB #141513), *admitted pro hac vice*
Lewis & Clark Law School
10015 S.W. Terwilliger Blvd.
Portland, Oregon 97219
Tel, Email: (781) 659-1696, cassidy@lclark.edu
(503) 768-6823, comerfordl@lclark.edu

*Attorneys for Plaintiff Wild Fish Conservancy*

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 14
KNUTSEN DECLARATION - 134
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**CERTIFICATE OF SERVICE**

I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that I am co-counsel for Plaintiff Wild Fish Conservancy and that on December 13, 2018, I caused the foregoing to be served on the following by electronic mail per written agreement with counsel:

Douglas J. Steding
Diane M. Meyers
Madeline Engel
Northwest Resource Law, PLLC
101 Yesler Way, Suite 205
Seattle, Washington 98104
Email: dsteding@nwresourcelaw.com
dmeyers@nwresourcelaw.com
mengel@nwresourcelaw.com
kcouden@nwresourcelaw.com
ehinkes@nwresourcelaw.com
dbechtold@nwresourcelaw.com

*Attorneys for Defendant Cooke
Aquaculture Pacific, LLC*

Brian A. Knutsen, WSBA No. 38806

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 15
Case No. 2:17-cv-01708-JCC
KNUTSEN DECLARATION - 135
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

# EXHIBIT 21



Douglas J. Steding, Ph.D. | dsteding@nwresourcelaw.com | 206.971.1567 (d)

January 9, 2019

Via Email

Brian Knutsen
Kampmeier & Knutsen PLLC
221 SE 11th Ave., Suite 217
Portland, OR 97214

**Re: *Wild Fish Conservancy v. Cooke Aquaculture Pac., LLC*, W.D. Wash. No. 2:17-cv-01708-JCC: Response to December 13, 2018 Rule 30(b)(6) Notice of Deposition**

Dear Brian:

We write in response to your December 13, 2018 email regarding and attaching WFC's Notice of Rule 30(b)(6) Deposition of Defendant Cooke Aquaculture Pacific, LLC and Rule 34 Requests for Production of Documents, and your January 8, 2019 follow-up e-mail.

We acknowledge and take seriously Cooke's obligation to produce persons who can "testify on its behalf as to all matters known or reasonably available" to the organization under Rule 30(b)(6). We share your goal of ensuring that the 30(b)(6) deposition will be a "meaningful" exercise and have no interest in conducting a "half-hearted inquiry" that would defeat the purpose of your request for a deposition. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*, 253 F.R.D. 524, 526 (C.D. Cal. 2008). Because 30(b)(6) witnesses must "testify to the knowledge of the corporation, not the individual," *id.* (internal citations omitted), Cooke is required to "review all matters known or reasonably available to it" and then affirmatively educate a witness or witnesses in advance of the deposition date.

We anticipate that these obligations will be difficult to meet in a timely fashion because the scope of your notice is extremely broad. Your request contains 33 separately numbered topics and eight subtopics. Many topics cover operations at eight separate facilities under eight different permits over the course of more than six years. The specific actions covered by your notice were conducted by dozens of employees. While Cooke has already invested (and continues to invest) substantial resources in collecting, reviewing, and producing documents in response to your discovery requests, the Rule 30(b)(6) effort requires a different, more involved effort. Cooke must identify documents relevant to each noticed topic within the nearly 190,000 pages it has already produced and the thousands of documents still under review. The witnesses must then be affirmatively educated on the contents of that voluminous collection. Cooke must also identify and interview individuals with knowledge that would be considered "known" or "reasonably available" to Cooke and affirmatively educate witnesses about this information. These efforts will take a substantial amount of time and cannot possibly occur by January 19, the date that you have scheduled for this deposition. We estimate that Cooke will need several

KNUTSEN DECLARATION - 137
Case No. 2:17-cv-01708-JCC

Brian Knutsen
January 9, 2019
Page **2** of **4**

months to prepare witnesses who can testify on all matters known or reasonably available to Cooke in response to your notice as served, as required under Rule 30(b)(6).

While January 19 is certainly too soon, we presume you would prefer to conduct this deposition sooner rather than later. To that end, we seek to secure your cooperation in a joint effort to minimize delay. To the extent that you are willing to reduce and prioritize topics for deposition, Cooke can better understand when which of the numerous topics covered by your notice will be addressed, which will in turn ensure we can affirmatively educate our witnesses as efficiently and effectively as possible. The ability to focus our preparation should accelerate the timeframe in which Cooke would be prepared to provide the Rule 30(b)(6) testimony you have requested. Any effort to reduce the scope of your requested deposition would also help ensure that your limited time can be used as efficiently and productively as possible.

We also believe there is significant opportunity to cut down on what must be conveyed through a deposition by instead relying on interrogatories to convey that same information. We anticipate that the number of new interrogatories necessary for this undertaking would be minimal. Many of the topics included in your notice are already covered by earlier discovery requests. Based on our review, at least nine topics listed in your notice are covered by pending Interrogatories that have been answered by Cooke. These include:

- Interrogatory 13, related to materials that were released following the Site 2 failure (corresponding to Topic 1(d)),

- Interrogatory 6, related to maintenance conducted at each of the eight sites since 2010 (corresponding to Topic 10),

- Interrogatory 11, related to training conducted under Condition S6 at each of the eight sites since 2010 (corresponding to Topic 11),

- Interrogatory 8, related to Cooke's compliance with the Fish Prevention and Monitoring Plans at each of the eight sites since 2010 (corresponding to Topic 13),

- Interrogatory 9, related to Cooke's efforts to track the number of fish, including any lost to predation, mortality, and escape, at each of its eight sites since 2010 (corresponding to Topic 14),

- Integratory 7, related to Cooke's net cleaning efforts, policies, procedures, and intervals at each of its eight sites since 2010 (corresponding to Topic 16),

- Interrogatory 5, related to Cooke's inspections conducted under Condition S6 at each of the eight sites since 2010 (corresponding to Topic 18),

- Interrogatory 10, related to Cooke's costs of compliance with each of its eight permits since 2010 (corresponding to Topic 21), and

- Interrogatory 16, related to the identity of Cooke's employees that have been responsible for compliance at each of the eight sites since 2010 (corresponding to Topic 26).

Brian Knutsen
January 9, 2019
Page **3** of **4**

In addition to these interrogatories, at least of seven of your previously served requests for production correspond directly to several of your Rule 30(b)(6) topics. *See* RFP 16, RFP 25, RFP 26, RFP 36, RFP 32, RFP 34, and RFP 35, which correspond to Topic 1(h), Topic 5, Topic 12, Topic 15, Topic 23, Topic 24, and Topic 25, respectively. As you are aware, we have been supplementing and continue to supplement Cooke's production, Cooke's answers to interrogatories, and Cooke's answers to requests for admission. To the extent that you are simply interested in authenticating documents produced through normal discovery, a Rule 30(b)(6) deposition is not an efficient or appropriate forum for that exercise.

Relying on interrogatories to reduce the scope of a Rule 30(b)(6) deposition is consistent with how federal courts tend to address broad 30(b)(6) notices. *See, e.g. Corvello v. New England Gas Co.*, No. CV 05-221S, 2012 WL 12547377, at *4 (D.R.I. Feb. 10, 2012) (recognizing that contention interrogatories under the authority of Rule 33(a)(2) may be more efficient and effective in certain cases for both sides than preparing and examining a Rule 30(b)(6) deponent); *Almendarez v. BNSF Ry. Co.*, No. C13-0086-MAT, 2013 WL 6682415, at *3 (W.D. Wash. Dec. 18, 2013) (directing parties to confer in good faith to determine appropriate limitations on the topics of a Rule 30(b)(6) notice); *Crocs, Inc. v. Effervescent, Inc.*, No. 06-CV-00605-PAB-KMT, 2017 WL 1325344, at *2 (D. Colo. Jan. 3, 2017), objections overruled, No. 06-CV-00605-PAB-KMT, 2017 WL 1325171 (D. Colo. Feb. 24, 2017) (compelling plaintiffs to exercise discretion to appropriately limit and condense a Rule 30(b)(6) deposition notice that covered 33 separate topics, the exact number at issue here).

Even if you are willing to eliminate some of these redundancies from your 30(b)(6) notice, you may still find it challenging to cover every noticed topic during the brief deposition process. Your recent email acknowledges that depositions under Rule 30(b)(6) have a "presumptive seven-hour time limit," *Prasad v. George Washington Univ.*, 323 F.R.D. 88, 98 (D.D.C. 2017). While these rules allow you to seek more time from the court, courts in our district have been reluctant to extend this time simply because of a large number of topics to be discussed. *See, e.g. Shokri v. Boeing Co.*, No. C16-1132 RSM, 2017 WL 4882656, at *4 (W.D. Wash. Oct. 30, 2017) ("The Court [...] expects the parties to rigorously enforce the 7-hour time limit under Federal Rule of Civil Procedure 30. With the amount of topics and subtopics proposed by Plaintiff, such time limit may leave him with only seconds or minutes to inquire into each area"). The rules also state a strong preference for parties to "make reasonable accommodations to avoid the need for resort to the court" and we hope to do so now. If you are willing to reduce and prioritize the topics to be covered by this deposition as outlined above, we would consider agreeing to an additional seven hours of deposition as requested in your January 8, 2019 follow-up e-mail.

Brian Knutsen
January 9, 2019
Page **4** of **4**

Please let us know when you might be available for a discussion about how we can most effectively proceed with this process. Once that discussion has taken place, we will be better prepared to schedule a pair of dates for this Rule 30(b)(6) deposition. If we cannot jointly agree to reduce the scope of the deposition, please propose a new date for the deposition that would provide our witness or witnesses adequate time to prepare.

Very truly yours,

Douglas J. Steding, Ph. D.