HONORABLE JOHN C. COUGHENOUR

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

       Plaintiff,

v.

COOKE AQUACULTURE PACIFIC, LLC,

       Defendant.

Case No. 2:17-cv-01708-JCC

THIRD DECLARATION OF BRIAN A. KNUTSEN

I, Brian A. Knutsen, declare the following on the basis of personal knowledge to which I am competent to testify:

    1.      I am co-counsel for Plaintiff Wild Fish Conservancy in this litigation;

    2.      Attached hereto as Exhibit 1 is a true and accurate copy of Plaintiff's Notice of Rule 30(b)(6) Deposition of Defendant Cooke Aquaculture Pacific, LLC and Rule 34 Request for Production of Documents that I served in this matter on December 13, 2018;

    3.      Attached hereto as Exhibit 2 is a true and accurate copy of the transcript of the 30(b)(6) Deposition Upon Oral Examination of Cooke Aquaculture Pacific, LLC in the Person of James Parsons Volume 1 taken on February 28, 2019 (excerpts) and the documents marked

**THIRD KNUTSEN DECLARATION - 1**

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

exhibit 1, exhibit 2, exhibit 12, exhibit 14, and exhibit 16 at that deposition;

4.      Attached hereto as Exhibit 3 is a true and accurate copy of Defendant's Objections and Responses to Plaintiff's Rule 34 Requests for Production of Documents that was served upon my office in this matter on January 14, 2019;

5.      Attached hereto as Exhibit 4 is a true and accurate copy of Defendant's Supplemental Responses to Plaintiff's Rule 34 Request for Production of Documents, along with Exhibit A to that document, that was served upon my office in this matter on February 27, 2019;

6.      The following exhibits are true and accurate copies of documents produced to me on behalf of Defendant Cooke Aquaculture Pacific, LLC through formal discovery in this litigation:

        a.      Exhibit 5: Daily Logs for Hope Island Net Pens for June 2015;

        b.      Exhibit 6: Dive Logs for Hope Island Net Pens for June 2015;

        c.      Exhibit 7: Vessel Logs for June 2015;

7.      Attached hereto as Exhibit 8 is a true and accurate copy of Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories to Defendant Cooke Aquaculture, LLC that was served upon my office in this matter on February 27, 2019;

8.      Attached hereto as Exhibit 9 is a true and accurate copy of the transcript of the 30(b)(6) Deposition Upon Oral Examination of Cooke Aquaculture Pacific, LLC in the Person of James Parsons Volume 2 taken on March 1, 2019 (excerpts);

9.      On February 23, 2019, Defendant Cooke Aquaculture Pacific, LLC produced to my office the documents that are Bates Numbered COOKE_CWA_00207593 through COOKE_CWA_00239553. On February 26, 2019, Defendant Cooke Aquaculture Pacific, LLC produced to my office the documents that are Bates Numbered COOKE_CWA_00239554

THIRD KNUTSEN DECLARATION - 2

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1

through COOKE_CWA_00239961;

2

      10.    Prior to seeking relief from the Court, counsel for the Conservancy conferred with

3

Cooke in an effort to resolve the Conservancy's request for Cooke to produce a new Rule

4

30(b)(6) witness in a reconvened deposition on topics 8 and 10 and on the Conservancy's request

5

for Cooke to pay the Conservancy's expenses incurred in taking the reconvened deposition.

6

Counsel for the parties held a telephonic conference on March 12, 2019, during which they

7

conferred on these issues. The participants to that conferral were Brian Knutsen (myself), Emma

8

Bruden, Kevin Cassidy, and Lia Comerford for the Conservancy and Diane Meyers, Douglas

9

10

Steding, and David Bechtold for Cooke. During that conferral, the parties stipulated to extend the

11

deadline for Rule 26(a)(2) disclosures to April 10, 2019 and the deadline for Rule 26(a)(2)

12

13

rebuttal disclosures to May 8, 2019;

14

      I declare under penalty of perjury under the laws of the United States of America that the

15

foregoing is true and correct.

16

17

      Executed this 14th day of March, 2019.

18

                 s/ Brian A. Knutsen

19

                 Brian A. Knutsen, WSBA No. 38806

20

21

22

23

24

25

26

27

28

29

**THIRD KNUTSEN DECLARATION - 3**

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

# EXHIBIT 1

HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

WILD FISH CONSERVANCY,

12          Plaintiff,

13
14    v.

15    COOKE AQUACULTURE PACIFIC, LLC,

16          Defendant.

17

Case No. 2:17-cv-01708-JCC

PLAINTIFF'S NOTICE OF RULE 30(B)(6)
DEPOSITION OF DEFENDANT COOKE
AQUACULTURE PACIFIC, LLC AND
RULE 34 REQUEST FOR PRODUCTION
OF DOCUMENTS

18

19    TO:    DEFENDANT COOKE AQUACULTURE PACIFIC, LLC, AND COUNSEL OF

20    RECORD:

21          PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 30(b)(6),

22    Plaintiff Wild Fish Conservancy ("Conservancy"), by and through its undersigned counsel,

23    hereby notifies you that it requires Cooke Aquaculture Pacific, LLC ("Cooke"), to attend and

24    testify under oath at a deposition. The deposition will take place on Friday, January 18, 2019,

25    beginning at 9:00 am at the offices of Kampmeier & Knutsen, PLLC, 615 Second Avenue, Suite

26    360, Seattle, Washington 98104. The deposition will be recorded by audio, audiovisual, and/or

27
28
29

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 1
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 5**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

stenographic means. This oral examination will be subject to continuance or adjournment from time to time or place to place until completed.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Cooke must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on Cooke's behalf, and may set out the matters on which each person designated will testify. The designated person or persons must testify about information known or reasonably available to Cooke. The matters for inquiry at the deposition are set forth below.

Further, pursuant to Federal Rule of Civil Procedure 34, you are requested to bring to the deposition the documents requested below.

**DEFINITIONS**

The following definitions apply to the foregoing list of topics on which examination is requested:

1.    The terms "you," "your," "Defendant" and "Cooke" refer to, as appropriate for the applicable time period, Cooke Aquaculture Pacific, LLC, and/or Icicle Acquisition Subsidiary, LLC, including (i) their present and former officers, employees, consultants, agents, representatives, attorneys, and affiliated entities that were in existence during the applicable period of time covered by these requests; (ii) any other person or entity acting on Defendant's behalf or on whose behalf the Defendant acted; or (iii) any other person or entity otherwise subject to the Defendant's control or which controls the Defendant or with which the Defendant is under common control.

2.    The term "Puget Sound net pens" means the salmonid net pen facilities currently and/or formerly owned and/or operated by Defendant in Puget Sound and/or the Strait of Juan de Fuca including, as appropriate, the operations and/or maintenance of those facilities and/or the

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 2
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 6**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

salmonids reared therein.

3.    The term "Cypress Site 2" refers to the net pen facilities located, or formerly located, in or near Deepwater Bay of Cypress Island and that are commonly referred to as "Cypress Site 2" and/or "Site 2 — Deepwater Bay."

4.    The term "Puget Sound" refers to Puget Sound, including the Strait of Juan de Fuca, and all freshwater bodies flowing into those waters.

5.    The term "Ecology" refers to the Washington State Department of Ecology.

6.    The term "Permits" refers, collectively, to the current and former (as appropriate) National Pollutant Discharge Elimination System ("NPDES") permits issue by Ecology for discharges from the Puget Sound net pens, which are currently assigned NPDES permit numbers WA-003153-4, WA-003154-2, WA-003152-6, WA-003156-9, WA-003157-7, WA-003158-5, WA-003159-3, and WA-004089-4.

7.    The term "Pollution Prevention Plan" has the same meaning as that term used in the Permits, i.e., a Pollution Prevention Plan prepared under the requirements of Condition S6 of the current Permits.

8.    The term "Fish Release Prevention and Monitoring Plan" has the same meaning as that term used in the Permits, i.e., a Fish Release Prevention and Monitoring Plan prepared under the requirements of Condition S7 of the current Permits.

9.    The term "costs" means all monetary and non-monetary costs, including those associated with labor and personnel time.

10.    "FishTalk" refers to the proprietary software program that Cooke uses to track the number of fish within its net pens as described by Cooke in its Supplemental Response to Interrogatory 8.

NOTICE OF DEPOSITION OF COOKE AND REQUEST FOR PRODUCTION OF DOCUMENTS - 3
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 7**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**MATTERS FOR INQUIRY**

1.      With respect to the collapse of the Cypress Site 2 facility during the summer of 2017:

        a.      Cooke's understanding as to the reasons for and causes of the collapse, and the bases for that understanding;

        b.      The inspections, maintenance and/or repairs, and any failures of any structures, equipment, or components at Cypress Site 2 during the twelve months preceding the collapse;

        c.      Cooke's response to the collapse, including notifications given to regulatory agencies, efforts to recover Atlantic salmon from Cypress Site 2 and/or Puget Sound, communications with and/or payments to those that recovered escaped Atlantic salmon, efforts to recover and/or remove materials associated with the collapse (structures, equipment, supplies, etc.), efforts to investigate the cause(s) of the collapse (including the results of those investigations), and efforts to remediate any environmental and/or ecological impacts from the collapse;

        d.      Identification and observations of materials that were or that may have been released into Puget Sound as a result of the collapse (e.g., fuels, lubricants, feed, chemicals, pharmaceuticals, equipment, machines, metals, netting, and any other supplies or materials that were present at or on Cypress Site 2 at the time of the collapse);

        e.      The number of Atlantic salmon that died as a result of the collapse, the number of carcasses recovered, and the procedures employed to remove and dispose of carcasses and associated wastes;

        f.      The number of Atlantic salmon that escaped as a result of the collapse, the

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 4
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 8**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

number that were recovered, the number that were not recovered, and Cooke's efforts to

ascertain these numbers of fish that escaped, were recovered, and were not recovered;

     g.     The development of a Sediment Sampling and Analysis Plan for Cypress

Site 2 in light of the collapse, the submission of such a plan to Ecology, the review and/or

approval of the plan by Ecology, and any closure monitoring conducted by Cooke

following the collapse;

     h.     Communications with state and federal regulators, including Ecology and

the United States Environmental Protection Agency about the collapse;

     i.     Any efforts taken by Cooke following the collapse of Cypress Site 2 to

prevent a similar failure from occurring at any of Cooke's Puget Sound net pens,

including what efforts Cooke took, where these efforts were implemented, how these

efforts were implemented, when these efforts were implemented, who implemented these

efforts, and how these efforts may prevent a similar collapse event from occurring;

2.     The July 2017 incident at Cypress Site 2 (*see, e.g.*, COOKE_CWA_00016041-16042 (Cooke's response to Administrative Order 15422, describing July incident)), including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response to the incident;

3.     The May 2017 incident at Clam Bay, in which the mooring attachments that connect the feed barge to the cage facilities failed (*see, e.g.*, COOKE_CWA_00003508 (Jan. 19, 2018 letter from Diane Meyer to the Department of Ecology describing Clam Bay incident)), including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response to the incident;

4.     Structural assessments or inspections of the Puget Sound net pens that Cooke has

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 5
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 9**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1

2    performed, commissioned, or otherwise arranged for or considered arranging for since August 1,

3    2017 (*see, e.g.*, COOKE_CWA_00026741 (Sept. 20, 2017 letter from Cooke to the Washington

4    Department of Fish and Wildlife mentioning that Cooke "commissioned an independent

5    structural assessment of all its net pens by International Inspections")), including costs associated

6    with such structural assessments or inspections;

7        5.    The Pollution Prevention Plans that you have prepared, modified, and/or

8    implemented for the Puget Sound net pens pursuant to the requirements of the Permits since

9    September 1, 2012, including your implementation of the plans and costs associated with

10   preparation, modification, and/or implementation of the plans;

11       6.    Inspections that you have conducted at the Puget Sound net pens of the exposed

12   surface lines, shackles, and/or mooring points under the provisions of the Permits—including

13   Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish

14   Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and

15   when the inspections were conducted, who conducted the inspections, what training and/or

16   instructions were provided to those conducting the inspections, how the inspections were

17   documented, what documentation of the inspections exists, how any inspection documentation is

18   maintained, who generates and/or generated the inspection documentation, who maintains and/or

19   maintained the inspection documentation, and what costs were associated with the inspections;

20       7.    Inspections that you have conducted at the Puget Sound net pens of the main cage

21   structures under the provisions of the Permits—including Conditions S6 and/or S7 of the

22   Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring

23   Plans since September 1, 2012—including how and where the inspections were conducted, what

24   dates the inspections were conducted, who conducted the inspections, what training and/or

25

26

27

28

29

NOTICE OF DEPOSITION OF COOKE          KAMPMEIER & KNUTSEN PLLC          EARTHRISE LAW CENTER
AND REQUEST FOR PRODUCTION             221 SW 11th Ave., Suite 217       10015 SW Terwilliger Blvd.
OF DOCUMENTS - 6                       Portland, Oregon 97293            Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC            (503) 841-6515                     (503) 768-6825
**THIRD KNUTSEN DECLARATION - 10**

instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation , and what costs were associated with the inspections;

8.      Inspections that you have conducted at the Puget Sound net pens of the anchoring components above and below the water line under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how and where the inspections were conducted, what dates the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation , and what costs were associated with the inspections; with respect to inspections of components at a depth of 100 feet or more, in addition to the aforementioned topics, identification of all anchoring components at the Puget Sound net pens that are at a depth of 100 feet or more, your efforts to respond to Plaintiff's Second Set of Requests for Admission pertaining to inspections of such components, and any other efforts you have undertaken since the initiation of this lawsuit to determine whether such inspections occurred;

9.      Inspections that you have conducted at the Puget Sound net pens of netting, including fish containment netting and predator exclusion netting and including inspections for biofouling, under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 7
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 11**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1
2
3
4
5
6
7

Plans since September 1, 2012—including how, where, and when the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what inspection documentation exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections;

8
9
10
11
12
13
14
15
16

10.    Maintenance (including repairs and/or replacements) you have conducted of the Puget Sound net pens, including any such efforts made under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how maintenance decisions are made, what standards/criteria you employ when deciding whether to undertake maintenance, who makes maintenance decisions, and what costs are associated with such maintenance;

17
18
19
20
21

11.    Your efforts since September 1, 2012 to comply with the requirement of Condition S6 of the Permits that you "assure that the operations staff for the facility is familiar with the [Pollution Prevention Plan] and have been adequately trained in the specific procedures which it requires," and costs associated with these efforts;

22
23
24
25
26
27

12.    The Fish Release Prevention and Monitoring Plans and/or Fish Escape Prevention Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens pursuant to the requirements of the Permits since September 1, 2012, including your implementation of the plans, and costs associated with preparation, modification and/or implementation of the plans;

28
29

13.    Your efforts since September 1, 2012 to comply with the provisions of Condition

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 8
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 12**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement, including the results of your efforts to track the number of fish lost due to escapement;

14.     Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases," and the results of such efforts;

15.     Cooke's FishTalk database, including the data that is recorded in FishTalk regarding opening and closing counts, harvest counts, predation counts, mortality counts and reasons for mortality, and deviation counts of fish; how such data is gathered, calculated, and/or entered into FishTalk; how reports are generated from FishTalk; and how the reports and/or data are used to comply with the provisions of Condition S7 of the Permits requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement and requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases;"

16.     Your efforts to clean netting at the Puget Sound net pens since September 1, 2012, including procedures and intervals for cleaning mussels and other marine growth from the netting and the equipment or other tools used to clean netting;

17.     Your identification and implementation since September 1, 2012 of best practices to maintain the Puget Sound net pen cages/structures, mooring systems, and nets, including how you identify such practices, decide which practices should or should not be implemented, and/or

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 9
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 13**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

determine how select practices are implemented; what persons are influential in making these decisions; and what practices were considered but not implemented;

18. Logs, spreadsheets, reports and/or other tools that you use to track inspections and/or maintenance of the Puget Sound net pens since September 1, 2012, including Anchoring or Mooring Diagrams, Daily Activity Logs, Monthly Audit Sheets, Monthly Compliance Checklists, Annual Below Surface Inspection Sheets, Weekly Surface Inspection Sheets, Daily Checklists, or other similar records or tools;

19. Logs, spreadsheets, or reports and/or other tools that you use to track the purchase, cleaning, repair, maintenance, inspection, and replacement of nets at the Puget Sound net pens since September 1, 2012, including NET Rosta or Rosters (*see, e.g.*, COOKE_CWA_00000096), Cage Husbandry History records (*see, e.g.*, COOKE_CWA_00000277), Debris Logs for Washed Nets (*see, e.g.*, COOKE_CWA_00000184), Net Inventories (*see, e.g.*, COOKE_CWA_00020289, Weekly Net Washing Reports (*see, e.g.*, COOKE_CWA_00051552, 00051553), or other similar records/tools;

20. Cooke's use of pressure or power washers at the Puget Sound net pens, including the Fort Ward pier, since September 1, 2012;

21. Costs you have incurred since September 1, 2012 in your efforts to comply with the Permits;

22. Proposals, bids, invoices, budgets, and/or estimates for inspections, maintenance, repairs, and/or replacements at the Puget Sound net pens generated, received, and/or paid since September 1, 2012;

23. For you and Cooke Aquaculture, Inc., the annual profits and/or losses, operational

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 10
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 14**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

and capital expenses, revenues, budgets, income, cash flow, and assets for each year from 2012 through the present;

24.    Insurance policies providing coverage or potential coverage (defense or indemnity) for any claim or allegation in this lawsuit, including commercial general liability policies, excess policies, environmental pollution policies, or any other policies of insurance;

25.    Notices or tenders of claims related to this litigation from you to any agent, broker, or insurer and any responses and/or follow-up documents or correspondence from you or any agent, broker, or insurer;

26.    The identity of all your employees that have had any responsibility for ensuring compliance with the Permits since September 1, 2012, including each such employee's name, date(s) of employment, job title, and responsibilities with respect to Permit compliance;

27.    The identity of any consultants or contractors hired or contracted by you since September 1, 2012 for purposes related to compliance with the Permits, the August 2017 Cypress Site 2 collapse, and/or the July 2017 incident at Cypress Site 2 (*see, e.g.*, COOKE_CWA_00016041-16042 (Cooke's response to Administrative Order 15422, describing July incident)), including each such name of the consultant/contractor, the date(s) of the hire and/or work performed, and the services performed;

28.    Your procedures since January 1, 2010 for characterizing environmental conditions at the sites of the Puget Sound net pens, including methods used to characterize maximum currents, maximum wind speeds, maximum significant wave heights, maximum boat wake amplitudes, and sediment types for anchor holding capacity;

29.    The identification of any domestic and/or international standards for finfish facilities that you have recognized as authoritative and/or sought to comply with at the Puget

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 11
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 15**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

Sound net pens since September 1, 2012;

30.    With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the identity of those that designed and/or approved the structural and/or mooring designs (including whether those individuals are licensed professional engineers), any deviations at those Puget Sound net pens from the mooring plans or arrangements—including mooring components or configurations—recommended or prescribed by the pen manufactures or by engineers employed or retained by you, the procedures you employed to determine whether to permit any such deviations, the identity and qualifications of those that selected the anchors, an explanation of how and why the anchors were selected and/or sized, and the procedures used to determine whether anchors were installed and/or embedded properly;

31.    Your procedures for selection and/or acquisition of the pens/cages for the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist;

32.    With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the degree of biofouling of the nets that you consider to pose acceptable levels of risks and the bases for those levels; and

33.    Your efforts to prepare to testify on the topics identified herein at deposition.

## REQUEST FOR PRODUCTION OF DOCUMENTS

You are requested under Federal Rule of Civil Procedure 34 to bring the following documents with you to the deposition noticed herein:

1.    Any documentation (e.g., reports/logs/checklists) generated for any inspections that you have conducted since September 1, 2012 under the requirements of Condition S6.F of

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 12
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 16**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

the Permits which requires that you, "[a]t least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line";

2.     Any inspection documentation (e.g., reports/logs/checklists) generated since September 1, 2012 under the requirements of your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans; and

3.     All documents related to inspections since September 1, 2012 of components of the Puget Sound net pens at a depth of 100 feet or more, including inspection reports, communications with employees and/or contractors performing the inspections, bills and/or invoices for such inspections, videos and/or photographs from such inspections, and any other documents relied upon in preparing your responses to Plaintiff's Second Set of Requests for Admission pertaining to such inspections.

4.     All documents reviewed by or created by you to prepare for this deposition that you have not already produced to Plaintiff through discovery in this matter.

DATED this December 13, 2018.

KAMPMEIER & KNUTSEN, PLLC

By: _____
     Brian Knutsen, WSBA No. 38806
     221 S.E. 11th Avenue, Suite 217
     Portland, Oregon 97214
     Tel, Email: (503) 841-6515, brian@kampmeierknutsen.com

     Paul A. Kampmeier, WSBA No. 31560
     615 Second Ave., Suite 360
     Seattle Washington 98104
     Tel, Email: (206) 223-4088, paul@kampmeierknutsen.com

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 13
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**THIRD KNUTSEN DECLARATION - 17**

1

EARTHRISE LAW CENTER

2

Kevin Cassidy (OSB #025296), *admitted pro hac vice*
Lia Comerford (OSB #141513), *admitted pro hac vice*

3

Lewis & Clark Law School

4

10015 S.W. Terwilliger Blvd.
Portland, Oregon 97219

5

Tel, Email: (781) 659-1696, cassidy@lclark.edu
(503) 768-6823, comerfordl@lclark.edu

6

7

*Attorneys for Plaintiff Wild Fish Conservancy*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 14
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 18**

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**CERTIFICATE OF SERVICE**

I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that I am co-counsel for Plaintiff Wild Fish Conservancy and that on December 13, 2018, I caused the foregoing to be served on the following by electronic mail per written agreement with counsel:

Douglas J. Steding
Diane M. Meyers
Madeline Engel
Northwest Resource Law, PLLC
101 Yesler Way, Suite 205
Seattle, Washington 98104
Email: dsteding@nwresourcelaw.com
dmeyers@nwresourcelaw.com
mengel@nwresourcelaw.com
kcouden@nwresourcelaw.com
ehinkes@nwresourcelaw.com
dbechtold@nwresourcelaw.com

*Attorneys for Defendant Cooke
Aquaculture Pacific, LLC*

Brian A. Knutsen, WSBA No. 38806

NOTICE OF DEPOSITION OF COOKE
AND REQUEST FOR PRODUCTION
OF DOCUMENTS - 15
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**THIRD KNUTSEN DECLARATION - 19**

# EXHIBIT 2

```
                    IN THE UNITED STATES DISTRICT COURT
 2              FOR THE WESTERN DISTRICT OF WASHINGTON
                             AT SEATTLE
 3    _____

 4                                )
      WILD FISH CONSERVANCY,      )
 5                                )
                   Plaintiffs,    )
 6                                )
                     vs.          )      No. 2:17-cv-01708-JCC
 7                                )
      COOKE AQUACULTURE PACIFIC, LLC,)   SOME OF THE EXHIBITS AND
 8                                )      THE TESTIMONY REGARDING
                   Defendant.     )      THEM HAVE BEEN DESIGNATED
 9                                )      AS CONFIDENTIAL.
      _____
10

11         30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

12              COOKE AQUACULTURE PACIFIC, LLC

13                    IN THE PERSON OF

14                     JAMES PARSONS

15                       Volume I

16    _____

17

18                       9:00 a.m.
                      February 28, 2019

19              101 Yesler Way, Suite 202
                Seattle, Washington 98104
20

21

22

23

24    REPORTED BY: JACQUELINE L. BELLOWS, CCR 2297

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 21**

```
 1                        APPEARANCES

 2
       For the Plaintiff:
 3
       BRIAN KNUTSEN
 4     Kampmeier & Knutsen PLLC
       221 Southeast 11th Avenue 217
 5     Portland, Oregon 97214
       503.841.6515
 6     brian@kampmeierknutsen.com

 7     LISA COMERFORD
       Earthrise Law Center
 8     Lewis & Clark Law School
       10015 Southwest Terwilliger Boulevard
 9     Portland, Oregon 97219
       503.768.6823
10     comerfordl@lclark.edu

11

12     For the Defendant:

13
       DIANE M. MEYERS
14     DOUGLAS STEDING, Ph.D.
       Northwest Resource Law PLLC
15     101 Yesler Way, Suite 205
       Seattle, Washington 98104
16     206.971.1564
       dmeyers@northwestresourcelaw.com
17     dsteding@northwestresourcelaw.com

18

19

20

21

22

23

24

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 22**

```
 1               I N D E X

 2   EXAMINATION BY:                                    PAGE

 3   Mr. Knutsen -------------------------------     5

 4   Ms. Comerford ----------------------------    105

 5

 6

 7
     EXHIBITS FOR IDENTIFICATION                       PAGE
 8
     Exhibit 1    Plaintiff's Amended Notice of Rule     6
 9                30(B)(6) Deposition of Defendant Cooke
                  Aquaculture Pacific, LLC, and Rule 34
10                Request for Production of Documents,
                  2-14-19
11
     Exhibit 2    Spreadsheet of Deposition Topics,      7
12                COOKE_CWA_00239962 - 00239966

13   Exhibit 3    2012 Icicle Acquisitions Subsidiary,  17
                  LLC, Fish Escape Prevention Plans,
14                August 2012, COOKE_CWA_00144447 -
                  00144453
15
     Exhibit 4    AGS Finfish Permit Plans, 2014,       24
16                COOKE_CWA_00027288 - 00027325

17   Exhibit 5    2017 Cooke Aquaculture Pacific, LLC,  28
                  Fish Escape Prevention Plan,
18                COOKE_CWA_00027279 - 00027287

19   Exhibit 6    Net Pen Schematic, Orchard Rocks      44
                  North and South and Fort Ward
20
     Exhibit 7    Defendant's Supplemental Responses to 47
21                Plaintiff's Second Set of Requests for
                  Admission to Defendant Cooke
22                Aquaculture, LLC, 1-28-19

23   Exhibit 8    Clam Bay Mooring Schematic            89

24   Exhibit 9    Hope Island Anchor Diagram           105

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 23**

| | EXHIBITS FOR IDENTIFICATION | PAGE |
|---|---|---|
| Exhibit 10 | Schematics, Port Angeles Sea Site, COOKE004723 - 4725 | 115 |
| Exhibit 11 | Schematic, Cypress Site 1 | 126 |
| Exhibit 12 | Spreadsheet, Condition rating, Site 1 | 139 |
| Exhibit 13 | Schematic, Cypress Site 2 | 143 |
| Exhibit 14 | Spreadsheet, Condition rating, Site 2 | 149 |
| Exhibit 15 | Schematic, Cypress Site 3 | 152 |
| Exhibit 16 | Spreadsheet, Condition rating, Site 3 | 160 |
| Exhibit 17 | Letter with attachments, 12-1-17, COOKE_CWA_00000364 - 00000417 | 165 |
| Exhibit 18 | Cypress Island Debris Recovery Project, December 2017 - February 2018, COOKE_CWA_00047601 - 00047618 | 170 |
| Exhibit 19 | Invoices, 1-5-18, COOKE_CWA_00239137 - 00239152 | 174 |
| Exhibit 20 | Spill Prevention Control and Response Plan, April 2017, COOKE_CWA_00052162 - 00052166 | 188 |
| Exhibit 21 | Letter, 9-1-17, COOKE_CWA_00013122 - 00013124 | 194 |
| Exhibit 22 | 2017 Cypress Island Atlantic Salmon Net Pen Failure, 1-30-18 | 201 |
| Exhibit 23 | Letter, 1-29-18, COOKE_CWA_00026318 - 00026329 | 208 |
| Exhibit 24 | Spreadsheet, Cypress Site 2, Insurance Claim, CAP_DOE_0004666 - 0004667 | 216 |
| Exhibit 25 | Letter, 9-20-17, COOKE_CWA_00026740 - 00026743 | 222 |
| Exhibit 26 | Escaped Fish Recovery Response Report, 11-9-17, COOKE_CWA_00026665 - 00026674 | 226 |



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 24

```
 1              Seattle, Washington; February 28, 2019

 2                          9:01 a.m.

 3                          --oOo--

 4

 5                      JAMES PARSONS

 6    sworn as a witness by the certified court reporter,

 7                   testified as follows:

 8

 9              E X A M I N A T I O N

10    BY MR. KNUTSEN:

11        Q.    Good morning.

12        A.    Good morning.

13        Q.    My name's Brian Knutsen.  I represent

14    plaintiff, Wild Fish Conservancy.  Please state your

15    name and address for the record.

16        A.    My name is Jim Parsons; and I currently live

17    in Gig Harbor, Washington.

18        Q.    Mr. Parsons, have you ever been deposed

19    before?

20        A.    Only as part of a divorce proceeding.

21        Q.    When was that?

22        A.    In 2007.

23        Q.    I'm going to -- I know you've done this

24    before.  I'm going to go over the format for today.

25        A.    Okay.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 25

1       Q.   So I will ask questions, and you should

2   provide an answer.  Your attorney may object.  You

3   should nonetheless provide an answer unless your

4   attorney instructs you not to answer.

5       A.   Okay.

6       Q.   Please answer verbally and not with gestures

7   and in words not "uh-huh" so that Jackie can create an

8   accurate record.

9       A.   Okay.

10      Q.   If any of my questions are confusing or

11  unclear, please let me know and I'll do my best to

12  clarify them.

13      A.   Very good.

14      Q.   And we can take breaks today whenever you need

15  them.  The only thing that I ask is that, if there's a

16  question posed, you answer the question before we take a

17  break.

18      A.   Very good.

19           (Deposition Exhibit No. 1 marked for

20           identification.)

21      Q    (By Mr. Knutsen) Mr. Parsons, you've been

22  handed a document labeled Exhibit 1.  Have you seen this

23  document before?

24      A.   Yes, I have.

25      Q.   Do you understand that you've been designated

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 26

1    to testify on behalf of Cooke on the issues identified

2    in this deposition notice labeled Exhibit 1?

3         A.   Yes, I do.

4         Q.   Are you prepared to testify on the issues

5    identified in this Exhibit 1 Deposition Notice?

6         A.   Yes.

7         Q.   What did you do to prepare for this deposition

8    today?

9         A.   There were numerous reviews of records of the

10   company, interviews with site managers and other

11   employees, review of documents and discussions with

12   counsel.

13        Q.   Are all the documents -- so excuse me.  You've

14   provided a -- you brought with you today the documents.

15   Is that correct?

16        A.   Yes.

17             MR. KNUTSEN:  Can we label that document

18   Exhibit 2.

19             (Deposition Exhibit No. 2 marked for

20             identification.)

21        Q    (By Mr. Knutsen) This document that you

22   brought with you today that's labeled Exhibit 2, does

23   this identify all the documents that you reviewed in

24   preparing for today's deposition?

25        A.   I'm not certain that it identifies every

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

*THIRD KNUTSEN DECLARATION - 27*

1    single one.  But it should be -- I mean there were

2    thousands and thousands of records that were reviewed.

3    So the majority that are responsive to the topics are

4    identified.

5        Q.   Are you able to identify any documents that

6    you reviewed that aren't listed on this Exhibit 2?

7        A.    Not specifically.

8        Q.    You said -- besides counsel, you said you

9    spoke with some other individuals.  Can you tell me who

10   those people are?

11       A.    They are identified under your "Persons

12   Interviewed" on this particular sheet.  So Kevin Bright,

13   that is the permit coordinator; Jack Rensel, who does a

14   lot of the environmental work for Cooke Aquaculture

15   Pacific; James Trask, who is the financial employee for

16   Cooke Aquaculture.  And let's see.  Bill Clark is in

17   charge of maintenance for Cooke Aquaculture.

18       Q.    Okay.  I can stop you.  I apologize.  I didn't

19   see that you had identified the people you had spoken

20   with.  Is everybody besides your counsel that you spoke

21   with in preparing for today's deposition identified on

22   this Exhibit 2?

23       A.    Yes, they are.  And counsel is identified as

24   well.

25       Q.    Mr. Parsons, what is your current position at

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 28

1  Cooke Aquaculture Pacific, the defendant in this case?

2      A.   I'm currently the general manager for the

3  company.

4      Q.   How long have you held that position?

5      A.   Since mid September of 2018.

6      Q.   What are your responsibilities in that

7  position?

8      A.   Oversight of general operations for the

9  company, interaction with the site managers for

10 production and compliance issues, and overseeing

11 expenditures.

12     Q.   What were your responsibilities with respect

13 to compliance matters?

14     A.   Just reviewing the permits and similar

15 documents with the site managers and employees and

16 reviewing them periodically.

17     Q.   Reviewing the permits?

18     A.   Yes.

19     Q.   What about compliance documents prepared or

20 submitted under the permits?

21     A.   Yes.

22     Q.   What permits are you referring to?

23     A.   It would be primarily the NPDES permit.  So

24 sections S-6 and S-7-of pollution prevention plans and

25 fish escapement plans.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 29**

1     Q.   Any other permits that you have
2   responsibilities with respect to?
3     A.   We deal with the safety and environmental
4   managers of Icicle Seafoods to ensure OSHA compliance
5   with worker safety.  I think that's probably the most
6   important ones.
7     Q.   Who do you report to?
8     A.   I report to Michael Szemerda, who is the salt
9   water -- vice president for salt water with Cooke
10  Aquaculture located in New Brunswick.
11    Q.   Were are you located?  Where is your office?
12    A.   My office is at the Icicle Seafoods office
13  which is in Fisherman's Terminal here in Seattle.
14    Q.   How many commercial Atlantic Salmon net pens
15  are there in Puget Sound right now?
16    A.   The actual pens themselves or the floating
17  rafts?
18    Q.   What's the distinction?
19    A.   Each raft might contain several or more net
20  pens themselves.  So the structure typically can contain
21  10 to 12, each one.
22    Q.   How many floating rafts are the net pen
23  complexes in?
24    A.   So there are two in Port Angeles.  There is
25  one at Hope Island.  There is one at Fort Ward that

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 30

 1  currently has no nets, two at Orchard Rocks, that is

 2  also near Bainbridge island, and then two rafts, one

 3  site at Clam Bay.

 4      Q.   There are no longer any rafts at Deep Water

 5  Bay, Cypress Island?

 6      A.   Cypress 1 and 3, the structure, the

 7  superstructures still remain.  But there are no nets in

 8  the water.

 9      Q.   Does Cooke Aquaculture Pacific -- I'll refer

10  to Cooke Aquaculture Pacific today as just "Cooke" if

11  that's okay.

12      A.   Sure.

13      Q.   Does Cooke own all of the net-pen complexes

14  that you just mentioned?

15      A.   Yes.

16      Q.   And you said that, I believe, three of them

17  were not operating:  Two in Cypress Island and one

18  additional one?

19      A.   Yes.

20      Q.   Where was the additional one?  Fort Ward?

21      A.   Fort Ward.

22      Q.   Is that not operating because it's going

23  through a fallow period?

24      A.   Yes.  Fort Ward is going through a fallow

25  period.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 31

1      Q.    So it will be restocked?

2      A.    Yes.

3      Q.    And are all of these net-pen complexes that

4  you just mentioned located on state submerged lands

5  under leases with the state?

6      A.    Yes.

7      Q.    And the Department of Natural Resources has

8  canceled some of the leases; is that correct?

9      A.    Yes.

10      Q.    Which ones have been canceled?

11      A.    The two remaining leases in Deep Water Bay.

12  And we have requested that the NPDES permit be expired

13  or ended for Site 2.  And the lease continues for Port

14  Angeles through the current harvest period to finish

15  removal of stock from those nets.  And I believe at this

16  point, then, this one is actually tied up in

17  negotiations with the Department of Natural Resources.

18      Q.    Let me be clear on that.  So the Department of

19  Natural Resources intends to cancel the lease for the

20  Port Angeles facility once it's harvested?

21      A.    That's my understanding, yes.

22      Q.    So then which net pens currently have fish in

23  them?

24      A.    Both Clam Bay facilities, the Port Angeles

25  facility, Hope Island, and Orchard Rocks.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 32

1        Q.    Can you describe the primary components of

2    Cooke's net pens in Puget Sound?

3        A.    Sure.    The nets, themselves, stock nets, are

4    used to contain the stock.    Outside of the complex of

5    stock nets is a predator net that's separated from the

6    stock net usually by a distance of at least of a meter

7    or so.    And then the floating rafts that support the

8    stock net, there are a variety of designs based on the

9    various manufacturers.

10            A weighting system to hold the predator net

11    away from the stock nets, mooring systems that attach to

12    the floating system and either directly to an anchoring

13    system or through a buoy to an anchoring system, and the

14    mooring attachment points are all based on the design

15    the manufacturer.    Each manufacturer is a little

16    different -- and then typically bird netting over the

17    top of the floating system to prevent predation from

18    birds, then any support equipment that's needed as --

19    such as generators or compressors, feeding systems.

20        Q.    Can you describe a little more the weighting

21    system that you mentioned.    Is there a frame in the

22    nets?

23        A.    There's a pipe frame, so typically 6-inch

24    metal pipe that is suspended and encompasses the entire

25    facility and is designed to both hold the predator net

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 33

1   down and away from the stock nets.

2       Q.   Are there weights at the bottom of the nets as

3   well?

4       A.   No.

5       Q.   Not separate apart from the casing?

6       A.   No.  It depends on the facility.  Sometimes

7   there are suspended weights that spread the cage out but

8   typically not.

9       Q.   Can you describe the floatation devices on the

10  cages.

11      A.   It varies by system.  So which type of

12  systems?

13      Q.   We can go through them all.  What are the ones

14  at Cypress, Cypress 1 and 3 that remain?

15      A.   Cypress 1 and 3 are enclosed floatation,

16  enclosed with HDPE, that then supply the floatation for

17  the support of the cages.  The raft systems at Clam Bay,

18  Fort Ward, and Orchard Rocks are metal-tube floatation

19  that then has structures up to support the cage systems.

20  And Hope Island is also a contained floatation.

21      Q.   What about Port Angeles?

22      A.   Port Angeles is also contained floatation.

23      Q.   Can you describe the different components of

24  the mooring or anchoring system?

25      A.   Sure.  Beginning with the side of the cage,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 34

1    there is usually a manufactured eye that is used to

2    attach the mooring lines, then, to a shackle, again a

3    manufactured, outside-made shackle that attaches to

4    usually chain or rope, depending on the system.  The

5    ropes then proceed down, again shackled to a shot of

6    chain towards the anchor system that keeps the anchor on

7    the bottom and then again shackled to an actual anchor

8    system.

9        Q.   You said that some of the facilities use chain

10   and others use rope for the anchoring system?

11       A.   At the attachment to the cages themselves.

12   But there's always rope involved in it.

13       Q.   Is there, with respect to the predator

14   exclusion net, does it also have a weighting system or a

15   frame?

16       A.   Yes.  That's the pipe frame that I described.

17       Q.   There's a similar system on the containment

18   net as well?

19       A.   Yes.

20       Q.   Cooke conducts inspections of its mooring

21   system; correct?

22       A.   Yes.

23       Q.   What is the purpose of those inspections?

24       A.   Just to be certain that the mooring is

25   adequate and that it hasn't moved and that the component

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 35

1    are all safe and secure.

2         Q.   What components are inspected for the mooring

3    system?

4         A.   It depends on the depth of the mooring.

5         Q.   What do you mean by that?

6         A.   So anything that's shallower than 100 feet,

7    the entire system can be inspected by a diver.  So

8    beginning with again at the top, the current, current

9    inspection protocols involve daily inspection of the

10   attachment points and anything above water that can be

11   viewed, so shackles and attachment to the ropes or chain

12   at that point plus condition of those.

13         Then divers can routinely inspect, then, as

14   they can go down the, down the attachment points on the

15   ropes all the way to where the anchors are embedded or

16   the mooring system is attached to a pin.

17        Q.   What is Cooke looking for when it inspects the

18   mooring system?

19        A.   Again, just to be certain that everything is

20   secure and that the components are in good shape.

21        Q.   Who makes those decisions?  The divers or

22   somebody else?

23        A.   Typically the divers, particularly lead

24   divers, all have at least 10 years of experience in

25   inspecting the systems at Cooke and are well trained in

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 36

1   what to look for.  They can also make decisions to take

2   a picture and bring it up for the site manager to

3   review.  Certainly on the above, above-surface mooring

4   points, the -- that call can be made by the site

5   manager.

6        Q.   When there are problems identified with

7   respect to these mooring components that we've been

8   discussing, does that usually require replacement?  Or

9   can some of these components be repaired?

10       A.   It depends upon the nature of what's found.

11  But yes, the general attitude, particularly leading up

12  to the incident in 2017, was We just fix it.  You know,

13  it's identified and fixed or replaced as needed.

14            MR. KNUTSEN:  Can I see the 2012 plan?

15            (Deposition Exhibit No. 3 marked for

16            identification.)

17       Q.   (By Mr. Knutsen) Mr. Parsons, you've been

18  handed a document labeled Exhibit 3.  Are you familiar

19  with this document?

20       A.   Yes.

21       Q.   What is this document?

22       A.   This document is the Fish Escape Prevention

23  Plan that was developed in response to item S-7 in the

24  NPDES permit.  It's dated August of 2012.

25       Q.   Do you know who prepared this document?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 37**

1    A.    I do not know for certain who did.  It most

2  likely was Kevin Bright.  But he had a bit of a

3  short-term leave somewhere around that time.  So I'm not

4  certain.  But it was by somebody at that time in

5  American Gold Seafoods.

6    Q.    It is your understanding that Mr. Bright

7  likely prepared this entire document?

8    A.    Yes.  With help from -- most likely input from

9  the site managers and the general manager at the time.

10    Q.    Can you describe how -- I want to focus on

11  the -- let's see.  It's Bates stamp number, it looks

12  like, 144449.  It's the section on the moorage system.

13  Do you see that page?

14    A.    Yes.

15    Q.    Take a minute to read it if you'd like.

16    A.    Sure.

17    Q.    But what I'd like to know is how Cooke's

18  predecessor implemented the mooring inspections

19  described here in the third bullet under "The Mooring

20  System."

21    A.    My understanding of -- and I think the bullet

22  that you're referring to is the high-current end-mooring

23  points being visually inspected under water?

24    Q.    Correct.

25    A.    By divers or remotely operated underwater

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 38

1    cameras.  So there are -- this occurred at least twice a

2    year, in discussions with the current site managers,

3    that they dove the mooring lines, particularly the

4    high-current end-mooring lines.  And you can find the

5    results of their reports in a number of documents,

6    particularly the dive logs, vessel logs, and even at

7    times in our manager meeting notes.

8        Q.   What is meant by "high-current end moorings"?

9        A.   So typically the way that, that stations are

10   situated, they will have ends that, depending upon the

11   tide, will be receiving the bulk of the current.

12       Q.   My question is, when Cooke completed this fish

13   plan dated 2012, how did Cooke ensure that these mooring

14   inspections were implemented?  Did Cooke provide

15   training on this section for these mooring inspections?

16       A.   Well, actually Cooke did not because Cooke did

17   not own the company at that time, in 2012.  But it's my

18   understanding in discussions with the managers, many of

19   whom were employed by the predecessor at that point,

20   that they maintained records through just their general

21   dive records, dive logs, and daily records.

22       Q.   So will it be too confusing if I just refer to

23   Cooke when I'm talking about Cooke's predecessors in

24   interest today?

25            MS. MEYERS:  I'm going to object as being --

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 39

1   it impacts the extent to which he's been able to

2   prepare.  So if he needs to clarify on that point, then

3   he should.

4        Q    (By Mr. Knutsen) Feel free to clarify.  My

5   question is:  Do you know how Cooke, after they prepared

6   this plan in 2012, ensured that these mooring inspection

7   requirements described in the plan were implemented?

8   Did Cooke provided training on these mooring

9   inspections, on what's required by this plan?

10       A.   Yes.  Training was always ongoing.  Many of

11  these are long-term employees that have a lot of

12  experience in dealing with how mooring systems should

13  look if they're operating correctly and what to do if

14  they're not.

15            So training occurred by most of the site

16  managers, by all of the site managers from the records

17  that I've seen, of the divers, the dive masters.  Lead

18  divers are well trained in what to look for, and they

19  provide training to the other divers.  As well as review

20  of the permit requirements on a regular basis with all

21  employees.

22       Q.   So your it's statement that the site managers

23  provided training on how to implement these visual

24  inspections when this 2012 plan was completed?

25            MS. MEYERS:  Object to the form.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 40

```
 1        A.    Can you restate that, please.

 2        Q     (By Mr. Knutsen) Is it your statement that

 3   the -- that upon completion of this 2012 plan that we've

 4   labeled Exhibit 3, when this plan was completed, the

 5   site managers provided training on how to implement the

 6   mooring inspection requirements under this plan?

 7             MS. MEYERS:  Same objection.

 8        A.    I believe what I said was that it was the site

 9   managers, among others, that were able to provide

10   knowledge to those that might be diving those lines on

11   what to look for.

12        Q     (By Mr. Knutsen) So what I'm asking is, when

13   this plan was completed in 2012, I'm trying to figure

14   out what happened in order to ensure that the

15   requirements of the plan were implemented.  So I'm

16   inquiring into whether when this plan was completed

17   there was training provided on how to comply with this

18   mooring inspection requirement.

19             MS. MEYERS:  Object to the form.

20        A.    I believe that the training of relevance here

21   is what constitutes an adequate mooring system.  And the

22   divers as well as the site managers are aware of what

23   components need to be checked and what a proper mooring

24   system needs to look like.

25        Q     (By Mr. Knutsen) Can you testify today as to
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 41

1    whether or not training was provided when this plan was

2    completed in 2012 on how to implement these mooring

3    inspections?

4            MS. MEYERS:  Object to the form.

5        A.    The way that I read the plan and the

6    requirements of S-7, in this case in the 2012 permits,

7    is that these underwater mooring points should be

8    inspected every three years.  And I do believe, based on

9    my discussions with employees that were part of Icicle,

10   the predecessor to Cooke at the time, that adequate

11   training of what the mooring points needed to be

12   composed of and look like and what intact components

13   needed to be was made.

14       Q    (By Mr. Knutsen) My question is really focused

15   on how, when this plan was completed, it was

16   implemented.  So my question is whether or not training

17   was provided when this plan was completed on how to

18   implement these inspection requirements described under

19   the heading "Mooring System."  Do you know if training

20   was provided when this plan was completed on how to

21   implement the training requirements?

22       A.    "How to implement the training requirements"?

23       Q.    I'm sorry.  How to implement the inspection

24   requirements.

25       A.    I believe I've answered that.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 42

1      Q.    Was the answer yes or no?  Training was

2    provided in 2012 in how to implement this?  Or, no, it

3    was not provided?

4      A.    I believe I've answered that, yes, there was

5    training made on what proper mooring systems look like

6    so that the divers would adequately assess that.

7      Q.    And that occurred upon the completion of this

8    plan?

9      A.    The plan basically is living document that

10   will change as conditions change.  You see a number of

11   new plans that were evolving from 2012 forward.

12     Q.    You don't know if, when this plan -- this

13   update was completed, whether there was training

14   provided on this updated plan?

15         MS. MEYERS:  Object to the form.

16     A.    Everything that I've reviewed suggests that

17   the answer is, yes, that training was conducted.

18     Q     (By Mr. Knutsen) What suggests that to you?

19     A.    Discussions with site managers.

20     Q.    Who were those site managers that you spoke

21   with that indicated that the training occurred?

22     A.    The site managers that are listed in your

23   "persons interviewed."

24     Q.    Okay.  Did Cooke maintain any logs of training

25   provided under the 2012 fish escape plan?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 43

1          A.    There were some mentions in meeting notes.

2     But no, there were no formal maintenance of records

3     regarding the training at that time.

4          Q.    Were any written materials used for the

5     training that was provided?

6          A.    I'm unaware of that.

7          Q.    Do you know how long this plan was in effect?

8          A.    I would have to look at when the next Fish

9     Escape Prevention Plan is dated.  I've looked at them.

10    I just cannot remember when the next one was.

11              (Deposition Exhibit No. 4 marked for

12               identification.)

13         Q.    (By Mr. Knutsen) Mr. Parsons, you've been

14    handed a document labeled Exhibit 4.  Are you familiar

15    with this document?

16         A.    (Reviewing document.)  I have not seen this

17    particular packet of documents put together like this

18    previously.  But I am familiar with the fish escape

19    prevention plans as are in this document labeled

20    June 2014.

21         Q.    We can focus on the Fish Escape Prevention

22    Plan, which looks like it begins on page 7.  I think the

23    Bates No. is 27294 in the bottom right.

24         A.    Yes.

25         Q.    Do you know who prepared this 2015 Fish Escape

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 44

```
 1   Prevention Plan?
 2        A.   Again it was most likely originally developed
 3   by the permit coordinator and reviewed by the general
 4   manager as well as the site managers.
 5        Q.   Who would those people have been at the time
 6   of this plan?
 7        A.   In 2014 Mr. Kevin Bright was the permit
 8   coordinator.  Timewise I believe it was Innes Weir was
 9   the general manager for Icicle.  Or it possibly could
10   have been Al Cook at that time.  Datewise I'm not
11   particularly certain.
12        Q.   Excuse me.  What was Mr. Bright's position in
13   2014?
14        A.   Permit coordinator.
15        Q.   Does he still hold that position?
16        A.   Yes.
17        Q.   And you mentioned Innes Weir.  What was his
18   position in 2014?
19        A.   Timingwise, that's where I'm not certain at
20   this point.  Either he was general manager; or it was
21   Alan Cook, who was actually vice president of
22   aquaculture for Icicle.
23        Q.   Is Alan Cook employed currently with Cooke
24   Aquaculture?
25        A.   No.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

*THIRD KNUTSEN DECLARATION - 45*

 1        Q.    Is Innes Weir?

 2        A.    No.

 3        Q.    Do you know why this 2014 update was prepared?

 4        A.    Typically, as components of it changed, the

 5   updates were made.  Often it was for the emergency

 6   contact lists.  So that answers the previous question as

 7   well.  So both Alan Cook, who was the vice president of

 8   aquaculture, and Innes Weir, who had become general

 9   manager by that time, and the contacts within all of the

10   different departments probably had changed.  And so

11   that's typically one of the reasons is just to make sure

12   the emergency contact list is up to date.

13        Q.    Turning to page 9 of this document, the Bates

14   stamp number is 27296.  Again there's a description of

15   inspections for the mooring system.  Do you see that?

16        A.    Yes.

17        Q.    And take a minute to read that.  But does this

18   essentially describe the -- describe the same

19   requirements for inspections of the underwater mooring

20   system as the 2012 plan we looked at a minute ago?

21        A.    (Reviewing document.)  Yes.  Although there

22   was an additional line about refitting the anchors with

23   new hardware, line, and chain constitutes a visual

24   inspection since the gear will be pulled to the surface

25   to perform this type of work.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 46**

1      Q.    Who was responsible for implementing this

2    section of the Fish Escape Prevention Plan and

3    specifically the section on underwater mooring component

4    inspections?

5      A.    Ultimately the person responsible would have

6    been the vice president for aquaculture, Alan Cook.

7    Through his direction, the general manager would ensure

8    that each of the sites undertook the inspections.  Most

9    likely, then, it would fall to the responsibility of the

10   site manager of each site.

11     Q.    The site manager would do the inspections

12   themselves, or they would ensure that employees did

13   them?

14     A.    Most likely they would ensure that the

15   employees did them.  In many cases the site manager was

16   actually involved, I am sure.

17     Q.    Did Cooke provide any training on how to

18   implement the underwater inspections at the time of this

19   update, the 2014 update?

20     A.    Again the employees that would have been

21   involved are regularly trained of what proper mooring

22   systems look like and should look like and how to fix

23   them or ask for -- note that maintenance is needed.  So

24   yes.

25     Q.    Were there any logs created for training while

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    this fish plan was in the place, the 2014 fish plan, any

2    logs created for training with respect to underwater

3    inspections?

4         A.   Again many of -- many of those types of

5    activities would be recorded in daily logs, vessel logs,

6    managers' notes, monthly compliance checklists, and even

7    at the point of weekly production reports that came from

8    each of the sites.

9         Q.   You've identified in those documents notes

10   indicating that training was provided for underwater

11   inspections?

12        A.   I'd have to go back through all of the notes

13   to specifically pick those out.

14        Q.   But it's your belief, sitting here today, that

15   those notes do exist?

16        A.   Yes.

17             (Deposition Exhibit No. 5 marked for

18             identification.)

19        Q    (By Mr. Knutsen) Mr. Parsons, you've been

20   handed a document labeled Exhibit 5.  Are you familiar

21   with this document?

22        A.   Yes.

23        Q.   What is this document?

24        A.   This document is the Fish Escape Prevention

25   Plan dated January of 2017.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 48**

 1          Q.    Do you know who prepared this document?

 2          A.    Again probably the same set of people.  The

 3    permit coordinator at the time was Kevin Bright.  By

 4    then, according to the contact on here, the general

 5    manager was Innes Weir.  There was an additional input

 6    from Armin Ramirez who was the fish health manager and,

 7    I'm sure, input from all of the site managers.

 8          Q.    On Page 1 of this document, it describes

 9    underwater inspections again.  Do you see that?

10          A.    Yes.

11          Q.    It describes inspections of high-current

12    end-moorings to be done every three years either by

13    divers or by remotely operated underwater cameras.  Do

14    you see that?

15          A.    Yes.

16          Q.    Do you know why this update in January 2017

17    the provision for inspections of other underwater

18    components was dropped out?

19          A.    I'm not certain why.  But I do see that, after

20    any major storm event or pen being struck by a vessel,

21    they're still looking at structural components and

22    mooring connections.

23          Q.    So you don't know why that provision was

24    dropped out?

25          A.    No.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 49

1      Q.   When this plan went into effect, this

2  January 2017 plan, do you know whether training was

3  provided on how to implement these provisions for

4  underwater inspections?

5      A.   Typically, I know by this point in time and I

6  believe with the previous ones as well.  But whenever

7  new plans are developed, the permit coordinator takes

8  the plans to each site and discusses with the site

9  managers what has changed, either at a management

10 meeting or directly on-site.

11          The managers have all indicated to me that

12 they go over the plan, both these and the pollution

13 prevention plans, with the staff multiple times during

14 the year.  Then they're posted on a bulletin board where

15 the staff have access to them at any time and can ask

16 questions if they don't understand.

17     Q.   Were there logs created for those sessions

18 where the managers go over the new plan with staff?

19     A.   Again those would likely be the daily logs or

20 the weekly production reports, manager meeting notes at

21 some point.

22     Q.   Do you know whether there are such notes in

23 those documents?

24     A.   I believe there are.

25     Q.   Do you know how long this plan was in effect,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 50

 1   this January 2017 Fish Escape Plan?

 2       A.    Again, I'd have to look at the next one.  But

 3   I believe this was changed after the Cypress 2 incident.

 4   It was updated with much more information.

 5       Q.    I want to talk about the underwater

 6   inspections and how they're done currently.  So I

 7   believe you said underwater inspections are currently

 8   done by divers that are Cooke employees.  Is that

 9   correct?

10            MS. MEYERS:  Object to the form.

11            Go ahead.

12       A.    I did say that, that it's part of the

13   inspection.

14       Q    (By Mr. Knutsen) What do you mean by "it's

15   part" of it?  It's the inspections of components

16   100 feet or less depth; correct?

17       A.    Less, yes.  But they're also reviewed now,

18   currently, by ROV as well, either contractor.

19       Q.    What do you mean by that?  "They are

20   reviewed," what do you mean by "they"?

21       A.    The ROVs -- the ROV dive the mooring lines and

22   record visually or on camera the components that can be

23   reviewed later.

24       Q.    I'm sorry.  The ROVs are currently being used

25   for the entire mooring system or just for components

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 51

 1    greater than a 100 feet deep?

 2        A.   In particular for components more than

 3    100 feet deep.  But they record the entire length.

 4        Q.   Going back to the divers, are all the divers

 5    that do the mooring inspections Cooke employees?

 6        A.   Yes.  Unless they're with a contracted company

 7    like Global Diving & Salvage.

 8        Q.   And all of the divers have a diving depth

 9    limit of 100 feet?

10        A.   Yes.  Unless they are trained technical

11    divers.

12        Q.   Does Cooke have any trained technical divers?

13        A.   I believe there is one person that is trained.

14        Q.   Who is that?

15        A.   That would be one of the site managers.

16        Q.   What's his name or her name?

17        A.   Tom Glaspie.

18        Q.   And does Tom -- Mr. Glas -- I'm sorry.  Is it

19    Glaspie?

20        A.   Yes.

21        Q.   Does he conduct inspections of mooring

22    components greater than 100 feet deep?

23        A.   My understanding is, no.  Tom is the site

24    manager for Hope Island.  And all of those components

25    are less than 100 feet when they are dove.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 52

```
1         Q.   Has Cooke ever used its own employees to
2    conduct inspections of mooring components more than 100
3    feet?  By "ever," let's say since January 1st, 2012.
4              MS. MEYERS:  Object to the form.
5         A.   I don't know that.
6         Q    (By Mr. Knutsen) You don't whether Cooke has
7    had employees that were able to dive below 100 feet
8    since 2012?
9              MS. MEYERS:  Object to the form.
10        A.   Again, you know, whether or not employees dove
11   that prior to Cooke's ownership of the company, I would
12   have no knowledge of that.
13        Q    (By Mr. Knutsen) When did Cooke become the
14   owner?
15        A.   It was in 2016.
16        Q.   You don't have any information with respect to
17   whether -- how inspections were conducted prior to 2016?
18        A.   Yes, I do.
19             MS. MEYERS:  Object to the form.
20        Q    (By Mr. Knutsen) But you're unable, sitting
21   here today, to answer whether or not Cooke or Cooke's
22   predecessor had employees that conducted inspections at
23   a depth of more than 100 feet since 2012?
24             MS. MEYERS:  Object to the form.
25        A.   Are you meaning that they dove greater than
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    100 feet or they were able to inspect moorings systems

2    that were greater than 100 feet?

3        Q    (By Mr. Knutsen) My question is specific to

4    inspections of mooring components at a depth greater

5    than 100 feet and whether or not Cooke had done those

6    inspections with its employees diving at a depth greater

7    than 100 feet since 2012.

8            MS. MEYERS:  Object to the form of the

9    question.

10       A.    The diving that can occur, an employee could

11   probably simply dive 40 feet and understand whether or

12   not the mooring system was adequate.  So often when

13   divers dive lines that might end at an anchor that's

14   greater than 100 feet, they can still assess the

15   adequacy of that mooring system simply by the tensioning

16   and the components that are above 100 feet.

17       Q    (By Mr. Knutsen) My question is with respect

18   to whether or not divers had dove below 100 feet as part

19   of the mooring system inspections since 2012.

20           MS. MEYERS:  Object to the form.

21       A.    In order to understand that, I think we would

22   have to go through the dive logs.  I'm not aware of any.

23       Q    (By Mr. Knutsen) You're not aware of any?

24       A.    I have not looked at every dive log.

25       Q.    Do you know whether or not there have been any

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 54

```
 1   employees at the facilities that -- beside mister -- was
 2   it Glitzby?
 3        A.   Glaspie.
 4        Q.   That were certified to dive below 100 feet
 5   since January 1, 2012?
 6        A.   I do not know that.
 7        Q.   You don't know the answer?
 8        A.   Right.
 9        Q.   With respect to the Cooke employees that do
10   conduct inspections of components that are less than 100
11   feet deep, are those employees, are their jobs
12   specifically just to conduct dive and inspections?  Or
13   do these people typically hold other responsibilities?
14        A.   They typically hold other responsibilities in
15   addition to those responsibilities.
16        Q.   And does each facility have special, certain
17   employees that are the divers of that facility?  Or do
18   the divers circulate from facility to facility?
19        A.   Each facility has a lead diver that then
20   trains his dive crew.
21        Q.   When you're saying "each facility," are you
22   saying -- for example, with respect to Cypress, would
23   that mean that each of the three facilities at Cypress
24   have their own lead diver?
25        A.   The Cypress complex would have been one dive
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 55

```
 1   crew.

 2        Q.   Who are the lead divers currently for each of

 3   the net pen facilities?

 4        A.   I'd have to look at employee records.

 5        Q.   Did you look at those before today to prepare

 6   for this deposition?

 7        A.   Not specifically.  The one lead diver that we

 8   did talk to, I believe, is listed.  I'd have to get that

 9   information.  I don't recall at the moment.

10        Q.   Let's see.  I think you said currently the

11   only diver that is employed by Cooke that can conduct

12   inspections more than 100 feet is the site manager for

13   Hope Island and there are no others at this moment?

14            MS. MEYERS:  Object to the form.

15        A.   I don't know what the individual

16   certifications of the divers are.

17        Q    (By Mr. Knutsen) Does Cooke use any employees

18   currently to conduct inspections more 100 feet deep?

19            MS. MEYERS:  Object to the form of the

20   question.

21        A.   The -- again, as I answered before, the

22   inspection of the mooring systems that might terminate

23   in an anchor below 100 feet are often made with divers

24   that can stay above 100 feet and simply assess the

25   components.  Anything below 100 feet, the review that's
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   now made annually using video is sufficient because
 2   there's so little activity that occurs in terms of
 3   oxidation at those areas.  And simply, by reviewing the
 4   way that the mooring systems sit in the water, the
 5   employees are able to determine whether they are
 6   enough -- whether they are functioning properly.
 7       Q.   Does Cooke use divers currently to actually
 8   conduct inspections below 100 feet?
 9       A.   Not our own employees.
10       Q.   Does Cooke currently own a remotely operated
11   vehicle for conducting inspections?
12       A.   Yes.
13       Q.   How many does it own?
14       A.   Currently we own one.  And any other work
15   that's done is contracted with Global Diving.
16       Q.   Where is the one that's currently owned by
17   Cooke located?
18       A.   It resides with the -- one of the maintenance
19   managers that can be mobile-ly sent to whatever site we
20   need it.
21       Q.   And Cooke uses that to conduct inspections of
22   mooring components?
23       A.   It has.  But we found that, in strong current
24   areas, it wasn't adequate.  So that's why we use a
25   contracted service.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 57

    1        Q.    How long has Cooke owned that ROV?

    2        A.    I'm unsure of that.  I believe it was

    3    purchased prior to that acquisition by Cooke.

    4        Q.    So prior to 2016?

    5        A.    Yes.

    6        Q.    What facilities does Cooke use the ROV at for

    7    mooring inspections?

    8        A.    The facilities that I've been present at while

    9    that particular ROV was utilized is at Port Angeles and

   10    Orchard Rocks.  But again, the -- in order to meet the

   11    permit requirements, we use an outside contractor.

   12        Q.    By that, what do you mean by that?  Use an

   13    outside contractor to conduct inspections greater than

   14    100-foot depth?

   15            MS. MEYERS:  Object to the form.

   16        A.    Yes.

   17        Q     (By Mr. Knutsen) What contractors has Cooke

   18    used for those mooring inspections since 2012?

   19            MS. MEYERS:  Object to the form.

   20        A.    I'm aware of the use of Global Diving &

   21    Salvage and of course the Mott MacDonald surveys that

   22    were done.

   23        Q.    Are you aware of any other contractors used to

   24    conduct underwater inspections at Cooke's facilities

   25    since 2012?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 58

 1          A.   No.
 2               I do take that back.  So Jack Rensel is
 3     contracted to do the environmental work.  And I know
 4     that he does underwater surveillance as well but not
 5     necessarily mooring components.
 6          Q.   Is that for permit-compliance purposes?
 7          A.   Yes.
 8          Q.   What compliance issues is Dr. Rensel looking
 9     at?
10          A.   Well, the primary use of his services is for
11     determining compliance with the sediment-impact-zone
12     requirements.
13          Q.   You say that Dr. Rensel is not doing mooring
14     inspections?
15          A.   Not specifically.
16          Q.   Do you know how long Cooke has used and
17     Cooke's predecessor has used Global Diving?
18          A.   I do not.
19          Q.   Have they used them as far back as 2012?
20          A.   I'm unaware of that.  We would have to look at
21     the records.
22          Q.   And you said that Mott MacDonald was also a
23     contractor used?
24          A.   They contracted with the state.  But they
25     inspected the facilities with our assistance.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 59

```
 1        Q.    And I'm sorry.  You said they were contracted
 2    by the state.  Was that the Department of Natural
 3    Resources?
 4        A.    I believe it was DNR.
 5        Q.    Do you know when those inspections occurred?
 6        A.    I'd have to look at the reports.  Each
 7    facility was a little bit different.  But I believe it
 8    was around October of 2017.
 9        Q.    Has Cooke made any changes in the way it
10    conducts its inspection of underwater anchoring
11    components since January 2012?
12        A.    Yes.  You can see by following the -- up to
13    the current one, particularly the Fish Escape Prevention
14    Plans, the amount of recordkeeping is the primary
15    difference.  In discussions with, again, with site
16    managers and the permit coordinator, all of these things
17    were done regularly previously.  It's just that now we
18    record it.  And Cooke his brought a different -- a new
19    standard of what they want to see for components to
20    play.
21        Q.    What do you mean a "new standard"?
22        A.    Cooke has a specific set of mooring conditions
23    that they want to see that are generally being met.  But
24    it's probably the first time that those things were
25    standardized.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 60

1        Q.    I'm still not clear on what you mean by "new

2   standards."  Are you talking about how inspections are

3   conducted or the condition of the components that are

4   being inspected?

5        A.    Primarily the condition of the components

6   being inspected.

7        Q.    Has there been any change in the way the

8   inspections are actually conducted since January 2012,

9   aside from recordkeeping?

10       A.    Not that I'm aware of, other than I will say

11  now the diving -- or the use of ROVs to record mooring

12  conditions below 100 feet is now done annually by ROV.

13       Q.    When did that change go into effect?

14       A.    In 2017.

15       Q.    Do you know when exactly?

16       A.    It would be later in the year after the

17  Cypress event.

18       Q.    How was that conducted prior to that?

19             MS. MEYERS:  Object to the form.

20       A.    The components are inspected, as I have

21  explained, where, if it's over 100 feet, the performance

22  of that mooring system can be assessed simply by divers'

23  and managers' understanding of how the facility is

24  working in the system.

25       Q    (By Mr. Knutsen) So I just want to be clear on

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 61

1    this.  So prior to late 2017 when the company began

2    utilizing ROVs to conduct inspections of components

3    greater than 100 feet, you're saying that the

4    inspections were conducted, of mooring systems where

5    there were components greater than 100 feet deep, by

6    inspecting the components that were above 100 feet deep

7    and understanding how the components would look if

8    something needed to be repaired or replaced?

9           MS. MEYERS:  Object to the form.

10    A.    That was one of the methodologies.  The other

11    one that you saw in the 2014 Fish Escape Prevention Plan

12    was that the mooring system could be brought to the

13    surface by a tender boat and all the components

14    inspected during anchor replacement and retention.

15    Q    (By Mr. Knutsen) How -- I see the term "cage

16    structures."  How is that term used?  What does that

17    describe, the main cage structures?  Is that a lay

18    person's term that you folks in the industry don't

19    really use?

20    A.    The way I would interpret "cage structure" to

21    be would be all of the components of the floating system

22    and the net.  That, to me, would be the cage structure.

23    Q.    Does Cooke inspect those components, the main

24    cage structure components?

25    A.    Yes.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 62

1      Q.    What is purpose of those inspections?

2      A.    Just to be sure that all of the different

3  components that comprise the cage system are adequate

4  for maintaining fish health and position.

5      Q.    How are those inspections conducted?

6      A.    A variety of ways.  Divers are in the water

7  within the cage systems every day, usually to ascertain

8  whether there's mortality events in the fish and collect

9  those and remove them but also to inspect the nets

10 themselves to determine both whether there's any breach

11 of the net system and/or the cleanliness of the net

12 system.

13           Then the surface components of the system,

14 again, tell us a lot about how the cage system is

15 functioning.  Now there's a daily check and a weekly

16 checklist that's done of all the surface components.

17     Q.    Are the divers that are doing the inspections

18 that you just mentioned, are those all employees as

19 well?

20     A.    Yes.

21     Q.    Cooke employees?

22     A.    Cooke employees.

23     Q.    Have the inspection procedures for the main

24 cage structures changed since 2012?

25     A.    The procedures themselves have not.  The

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   recording of the findings have.

 2        Q.   There's better recordkeeping now?

 3        A.   Yes.

 4             MR. KNUTSEN:  Mr. Parsons, we've been going

 5   for about an hour.  Are you doing okay?

 6             THE WITNESS:  I could use a break.

 7             (Recess taken.)

 8        Q    (By Mr. Knutsen) I want to talk about the

 9   Orchard Rocks facility.

10        A.   Yes.

11        Q.   I believe you referred to them as two separate

12   complexes, a north and a south set of cages?

13        A.   Yes.

14        Q.   How many cages are on the north section of the

15   Orchard Rocks complex?

16        A.   I'd have to look at a map.  But one site is

17   12, and one site is 10.  Without looking at a

18   record . . .

19             (Deposition Exhibit No. 6 marked for

20             identification.)

21        Q    (By Mr. Knutsen) Mr. Parsons, you've been

22   handed a document labeled Exhibit 6.  Are you familiar

23   with this document?

24        A.   Yes.

25        Q.   What is this document?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   This document shows a general schematic of
 2   both Orchard Rocks North and South and the Fort Ward
 3   sites.
 4        Q.   Does this document help you recall how many
 5   separate cages there are on the north section of the
 6   Orchard Rocks facility?
 7        A.   Yes.  There are 10.
 8        Q.   How many on the south?
 9        A.   Ten as well.
10        Q.   Who currently manages the Orchard Rocks
11   facility?
12        A.   Randy Hodgin is in charge of both Port Angeles
13   and the Bainbridge Island sites.  We call Orchard Rocks
14   and Fort Ward "the Bainbridge Island sites."
15        Q.   How many anchors are there on the north side
16   of the Orchard Rocks facility?
17             MS. MEYERS:  Object to the form.
18             Do you mean the north facility or the north
19   side of the facility?
20        Q    (By Mr. Knutsen) Well, you referred to them as
21   "Orchard Rocks South" and "Orchard Rocks North";
22   correct?
23        A.   Yes.
24        Q.   How many anchors are there on the Orchard
25   Rocks North?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 65

1          A.    Direct attachments to the Orchard Rocks North,

2    you see from the mooring design system that there are

3    16.   However, they operate in conjunction with mooring

4    systems on Orchard Rocks South as well.

5          Q.    And how many anchors are connected --

6    anchoring lines are connected to Orchard Rocks South?

7          A.    The same number.

8          Q.    Sixteen?

9          A.    Yes.

10          Q.    Are there components of any of the anchors on

11    the Orchard Rocks North system that are at a

12    greater-than-100-feet depth?

13          A.    I'd have to look at the specifics of this

14    system.   I've got to get my glasses to read this.

15    Sorry.   Aging eyes.

16          Actually, I believe that there's a description

17    of the anchoring systems and how many are below 100 feet

18    in the recent document of the anchoring systems that was

19    just sent out where I've seen it in a documents that I

20    reviewed that described the anchoring components.   So I

21    can't answer that directly without looking at that.

22          Q.    You don't know whether or not there are

23    anchoring components on Orchard Rocks North that are at

24    a depth of greater than 100 feet?

25          MS. MEYERS:   Object to the form.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 66

```
 1        A.    Again, I believe that there are.  But I would
 2   have to look at the specifics of the site.
 3        Q    (By Mr. Knutsen) What about Orchard Rocks
 4   South?  Are there components of the anchors on Orchard
 5   Rocks South that are at a depth of greater than
 6   100 feet?
 7        A.    Again, same answer.  I don't have the number
 8   of anchor systems or where they are memorized.  Sorry.
 9             (Deposition Exhibit No. 7 marked for
10             identification.)
11        Q    (By Mr. Knutsen) Mr. Parsons, you've been
12   handed a document labeled Exhibit 7.  Are you familiar
13   with this document?
14        A.    Yes.
15        Q.    What is this document?
16        A.    This document is the "Response to the Second
17   Set of Requests for Admission."
18        Q.    Did you provide information in preparing this
19   document?
20        A.    Cooke actually did, yes.
21        Q.    Did you personally provide information?
22        A.    No.
23        Q.    The very first discovery response on this
24   document, Exhibit 7 . . .
25        A.    Yes.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 67

```
 1        Q.    -- starting on the bottom of page 1 states

 2   that:  "Three of the anchors at the Orchard Rocks

 3   facility are more than 100 feet below the surface."  Do

 4   you see that?

 5        A.    Yes.

 6              MS. MEYERS:  Object to the form.

 7        Q    (By Mr. Knutsen) Is that information accurate

 8   to the best of your knowledge?

 9        A.    To the best of my knowledge, yes.

10        Q.    It goes on to state that:  "There are no

11   anchoring components at a depth of more than 100 feet

12   for Orchard Rocks North."  Do you see that?

13        A.    Yes.

14        Q.    Is that accurate?

15        A.    Yes.

16        Q.    Okay.  I want to talk about the inspections of

17   the mooring components at Orchard Rocks in 2018.  Did

18   Cooke inspect all of the below-water mooring components

19   at Orchard Rocks North in 2018?

20        A.    Yes.

21        Q.    Were they done all at once or in several at a

22   time?

23        A.    Basically, they're done every day, just by

24   inspection of how the facility is sitting.

25        Q.    I'm talking about a complete inspection of all
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 68

1    the mooring components down to the anchors.

2              MS. MEYERS:  Object to the form.

3         A.   Again, it does not have to be a diver involved

4    with the inspection.  Just knowing how the facility sits

5    and its anchoring position, tension on the mooring

6    lines, et cetera, tells us whether the mooring system is

7    functioning properly.

8         Q    (By Mr. Knutsen) So I understand that.  My

9    question, though, is specifically whether or not divers

10   went into the water and inspected the mooring components

11   down to the anchor for Orchard Rocks North in 2018.

12        A.   Yes.

13        Q.   Did that occur all at once?  Were all the

14   anchors inspected at one time in 2018 for Orchard Rocks

15   North?

16        A.   Most likely not.  We'd have to go back to the

17   daily dive logs and the facility report, the weekly

18   reports.  However most of the time they are in the water

19   for other reasons as well.  So they're limited on time.

20   It may just be several components of the mooring system

21   or several lines that are dove on any particular day.

22        Q.   Are you able to testify today as to when the

23   anchoring components were inspected down to the bottom

24   at Orchard Rocks North in 2018?

25        A.   Again, inspection doesn't necessarily mean


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 69

```
 1    diving inspection.  And so yes.  Again, it's my

 2    contention and Cooke's contention that just the daily

 3    operation of the facility and line tension and

 4    components that can be seen are adequate inspections.

 5         Q.   Again I understand that.  That's not what I'm

 6    asking about.  What I'm asking is whether or not divers

 7    dove the mooring lines all the way to the anchor in

 8    2018.  And if so, what I'd like to know is what date

 9    that occurred.

10              MS. MEYERS:  Objection to form.  Show him the

11    document.

12         Q    (By Mr. Knutsen) In front of you is you a

13    document labeled Exhibit 1.  I'd like you to look at

14    No. 8 on page 7.  So this document identified the

15    subjects that we were planning on deposing you on today.

16         A.   Yes.

17         Q.   One of them is inspections of the anchoring

18    components including who conducted them, what dates they

19    were conducted, how they were documented.  Are you

20    prepared to testify with respect to that issue today?

21         A.   Yes, I am.

22         Q.   Great.  Can you tell me in 2018 who conducted

23    the anchoring -- the inspections of the anchoring

24    components down to the anchor?

25              MS. MEYERS:  Show him the document, counsel.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 70**

```
 1   He's not Cooke.  He's prepared to testify on company
 2   records.  And there are company records that will give
 3   you the date you want.
 4        Q    (By Mr. Knutsen) Are you prepared to testify
 5   today as to the date or individuals that conducted the
 6   inspections?
 7        A.   Again, to be specific, I would need to see the
 8   documents.  They -- all of the documents that document
 9   the dive records where this would have been logged have
10   been given to you.  So those dates are all on those.
11   They've been produced as well as the diver's name that
12   conducted those dives.
13        Q.   So you're not prepared to testify today with
14   respect to the people that conducted the inspections or
15   the dates that the inspections occurred?
16             MS. MEYERS:  Object to the form.
17        A.   I believe I just did.
18        Q    (By Mr. Knutsen) In 2018 did Cooke conduct an
19   inspection all of the anchoring components with divers
20   down to the anchors?
21        A.   Many times.
22        Q.   Who did those inspections down to the anchors?
23             MS. MEYERS:  Object to the form.
24        A.   Your conclusion by that question is that you
25   have to dive in order to inspect the anchor.  And that's
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 71

```
 1   not what happens.  The inspections can occur in many
 2   different ways.  That's Cooke's knowledge and
 3   understanding of how net pen systems work.
 4        Q    (By Mr. Knutsen) I understand that.  But my
 5   question is specifically as to the inspections of divers
 6   that went down to the anchors.  Regardless of whether or
 7   not Cooke considers those necessary, I'm trying to
 8   figure out whether or not those occurred and, if they
 9   did occur, who did them and on what dates.
10             MS. MEYERS:  Object to the form.
11        A.   Again, they would be in the dive logs that
12   were provided to you.  I cannot remember specific dates
13   of every page of dive logs that have been produced.
14   There's thousands of pages of those records.
15        Q    (By Mr. Knutsen) You're not prepared to
16   testify with respect to those issues today?
17        A.   I am.
18             MS. MEYERS:  Object to the form.
19        Q    (By Mr. Knutsen) What dates did the
20   inspections at Orchard Rocks North occur down to the
21   anchors?
22        A.   Sometime in 2018.
23        Q.   You don't know the date?
24             MS. MEYERS:  Object to the form.
25        A.   If you give me a document that shows the dive
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 72

1  logs, I can tell you precisely.

2      Q    (By Mr. Knutsen) We requested that you be

3  prepared to testify on those issues today.  Do you

4  understand that?

5      A.   I am, yes.  I do understand.  And I have

6  provided testimony to that effect.

7      Q.   With respect to the anchoring components at

8  Orchard Rocks South, did Cooke conduct an inspection

9  down to the anchors at each of the anchoring lines on

10  Orchard Rocks South in 2018?  And again, I understand

11  that Cooke thinks it doesn't need to go down to the

12  anchor.  But my question is specific to whether or not

13  divers went down to the anchors and conducted

14  inspections.

15      MS. MEYERS:  Object to the form.

16      A.   Again, just diving the line and inspection can

17  be two separate things.  I know for certain that there

18  were ROV records of the anchors deeper than 100 feet on

19  Orchard Rocks South and that -- and again, we'd have to

20  look through the record to find those exact dates.  But

21  they were done.  That's what's required in the permit,

22  that they're done once a year.  And that's what we did.

23      Q    (By Mr. Knutsen) Do you know who dove the

24  anchoring lines in 2018 at Orchard Rocks South?

25      A.   One of Cooke's divers.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 73

```
 1          Q.    You don't know who that is?
 2                MS. MEYERS:  Object to the form.
 3          A.    I do know who the divers are.
 4          Q    (By Mr. Knutsen) Who conducted the inspections
 5    at Orchard Rocks South in 2018 down to the anchors?
 6                MS. MEYERS:  Object to the form.
 7          A.    Again, inspection and diving, it's our
 8    contention that you do not need to dive in order to
 9    fully inspect the system.
10          Q    (By Mr. Knutsen) I understand that.  But
11    that's not my question.
12          A.    To me, it is.  Could you clarify what you
13    mean.
14          Q.    I'm asking whether or not divers dove down to
15    the termination of the anchor lines at Orchard Rocks
16    South in 2018.
17          A.    Yes.
18          Q.    Who did those?
19          A.    One of the divers as recorded in the dive
20    logs.
21          Q.    Do you know who that person is?
22          A.    Not without looking at the dive logs.
23          Q.    Do you know what date that occurred?
24          A.    In 2018.
25          Q.    Do you know, with any more specificity than
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 74

1    365 days, when that occurred?

2          A.    I do.  It's recorded in the dive logs.

3          Q.    You're not prepared to testify on that today?

4                MS. MEYERS:  Objection to the form.

5          A.    I'm testifying to that today.  It's in the

6    record.  You have it.

7          Q     (By Mr. Knutsen) Do you understand we asked

8    you to come prepared today to testify as to these

9    details?

10         A.    I am prepared.  That's what I'm telling you.

11   I do not have every record memorized.  It's impossible.

12   There are thousands and thousands of pages that have

13   been provided to you.

14         Q.    With respect to the components at Orchard

15   Rocks South that are more than 100 feet deep, did Cooke

16   inspect those components by sending either a diver or an

17   ROV to the end of those mooring lines that are greater

18   than 100 feet deep in 2018?

19         A.    Yes.  I did just testify to that, that the

20   deeper components had an ROV dove on them.

21         Q.    In 2018?

22         A.    In 2018.

23         Q.    Who conducted that?

24         A.    I believe it was Kyl Wood, who is the manager,

25   our maintenance manager, for the sites -- I can't

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 75

1   remember his specific title off the top of my head --

2   that's in charge of cage systems.  And it was an ROV

3   manufacturer that was showing us their ability to

4   provide what we need.

5       Q.   Do you know what date that occurred on?

6       A.   I know approximately.  It was either November

7   or December.  Again, we'd have to look at specific daily

8   logs.

9       Q.   November or December of 2018?

10      A.   Yes.

11      Q.   What records were generated if any with

12  respect to the inspection that was done with the ROV?

13      A.   Video recording.  And then any records

14  regarding those probably would have been also logged in

15  daily logs.

16      Q.   Anything else?

17      A.   No, not unless there was maintenance required.

18      Q.   Was there maintenance required?

19      A.   Not that I'm aware of, no.

20      Q.   Were there any records created with respect to

21  the need for maintenance?

22      A.   No.

23      Q.   With respect to the video inspections that

24  you're testifying occurred in 2018 at Orchard Rocks

25  South, the documents that were generated for that

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 76

1  inspection consist of video recordings and notes in a

2  daily log?

3      A.   Yes.  As well as -- again inspections occurred

4  throughout the year.  So they would be on vessel logs,

5  on weekly production logs, manager meeting notes.  The

6  entirety of the inspections occur more than just by

7  diving them.

8      Q.   So I want to make sure I understand exactly

9  what records that you contend document these

10 inspections.  It's vessel logs.  You said production

11 notes?

12     A.   Weekly production notes.

13     Q.   Anything else?

14     A.   Dive logs, daily site logs, manager meeting

15 notes.

16     Q.   Anything else?

17     A.   Not for Orchard Rocks South, no.

18     Q.   With respect to Cooke's inspections of the

19 anchoring components, what records were created in 2018

20 for Cooke's inspections of the Orchard Rocks South

21 anchoring components?

22          MS. MEYERS:  Object to the form.

23     A.   I believe we just answered that.  There is a

24 weekly -- there's a weekly checklist that's done for all

25 surface -- above-surface mooring components.  And then

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 77

1    typically the daily logs would, if there's any problems

2    that are noted or suspicion that would trigger someone

3    actually diving the lines, then those are noted in the

4    daily logs.

5              And dive logs would reflect anything that was

6    done in that regard in terms of diving on the specific

7    lines that might have been noted in the daily logs.  It

8    would have been discussed at manager meetings, so

9    manager meeting notes and weekly production reports.

10      Q    (By Mr. Knutsen) Can you describe what the

11   manager meeting notes are?

12      A    Manager meeting notes is typically a summary

13   of meetings that occur of the management group,

14   typically monthly, sometimes less frequently.

15      Q.   Who generates those notes, the manager meeting

16   notes?

17      A    It's typically recorded by the permit

18   compliance manager and then sent around to the managers

19   for correction, for review and corrections.

20      Q.   Then you mentioned -- you said production

21   meetings or production notes?

22      A.   Weekly production reports.

23      Q.   Who creates those?

24      A.   Each site manager.

25      Q.   What are the purpose of those?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 78

1      A.   To keep management updated on what's going on
2  at each site.
3      Q.   Was there anything else that may include
4  information with respect to Cooke's inspections of the
5  anchoring components in 2018 at Orchard Rocks South?
6          MS. MEYERS:  Form.
7      A.   Again, you know, I mean the records that I've
8  explained to you would include all of that information.
9      Q.   Okay.  I just want to make sure we're not
10 leaving anything out.
11         MS. MEYERS:  Form.
12     A.   The only other thing that could be responsive
13 in there is -- but in 2018, no.  The Global reports but
14 again not on Orchard Rocks South.  So I think we have
15 them all.
16     Q    (By Mr. Knutsen) Well, with respect to Cooke's
17 inspections of underwater anchoring components at
18 Orchard Rocks North in 2018, what records exist
19 documenting those inspections?
20     A.   Again the three that are below 100 feet at --
21 is it north?
22     Q.   I think the South one we decided had the --
23     A.   Right.  All 16 are above 100 on the north
24 side.  Again, if you're speaking specifically of -- are
25 you speaking specifically of diving of those lines?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 79

1      Q.    Here I'm talking more broadly.    If I wanted to

2    look for documentation of Cooke's inspections of

3    underwater anchoring components at Orchard Rocks North

4    in 2018, where would I go?    What would I look for.

5      A.    Any number of records that would show that.

6    Again, by 2018 there were weekly updates on the surface

7    lines.    And anything that seemed out of place would have

8    been noted on there because, as we've discussed, you can

9    ascertain a lot about the mooring system just by how

10   it's holding in current.    And that's always visible from

11   the surface.    Daily logs would note those.    The dive

12   logs would describe anything that the divers had done in

13   terms of inspecting and/or replacing small components on

14   those lines.

15           Vessel logs, if the components were lifted up

16   off the floor and reset, they would have noted whether

17   or not they inspected those at that time, whether they

18   did that, a, and whether they inspected it and what they

19   found.    And the weekly production reports would usually

20   summarize what was done on that site for the week.

21     Q.    I believe you testified earlier that, at some

22   point during 2018, Cooke did have divers go to the

23   bottom of each anchor line on Orchard Rocks North.

24     A.    Yes.

25     Q.    What is that based upon?



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 80

```
 1          A.    Again based upon discussions with the site

 2    manager, discussions with the compliance manager, the

 3    permit compliance manager.  The dive logs have the

 4    records of those being done as well as the daily logs

 5    noting any problems.

 6          Q.    I'm going to go to 2017.  Did Cooke send

 7    divers to look at all of the underwater anchoring

 8    components at Orchard Rocks North in 2017?

 9          A.    Yes.

10          Q.    And who conducted those inspections?

11          A.    If you mean the diving inspections, that would

12    have been done by Cooke's divers.

13          Q.    Were those done at once, or were they done in

14    segments?

15          A.    I would assume they were not all done at once,

16    that they were as time allowed.  And as bottom time

17    allowed, they were dove and recorded in the dive logs.

18          Q.    Do you know who conducted those inspections?

19          A.    The divers are the only ones that conduct the

20    diving.

21          Q.    Do you know specifically who conducted those

22    inspections?

23          A.    One of Cooke's divers.

24          Q.    By name?

25          A.    I can list the divers for you if I can look at
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 81

 1   the employee records.  But . . .

 2       Q.   So you're not able testify here who did those

 3   inspections?

 4            MS. MEYERS:  Object to the form.

 5       A.   I think I just did.

 6       Q    (By Mr. Knutsen) Are you able to identify the

 7   person by name?

 8       A.   If I saw a list, I could.

 9       Q.   Sitting here now, you're not able to?

10            MS. MEYERS:  Object to the form.

11       A.   I think I have.

12       Q    (By Mr. Knutsen) I missed the name.  What was

13   the name?

14       A.   The name was one of Cooke's divers that is

15   listed in our employee list.

16       Q.   Do you know the dates that those inspections

17   occurred?

18       A.   In 2017.

19       Q.   With any more specificity?

20       A.   It's all recorded in the dive logs that have

21   been produced for you.

22       Q.   So, no, you're not able to provide more

23   specificity right now?

24            MS. MEYERS:  Object to the form.

25       A.   Yes, I am.  I just did.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 82

```
 1        Q    (By Mr. Knutsen) Anything beyond 2017 you
 2   could provide?  I can go look through dive logs and
 3   figure it out is your answer?
 4        A.   Yes.
 5        Q.   With respect to Orchard Rocks South in 2017,
 6   did Cooke inspect all the way down to the bottom of each
 7   of the anchoring components at Orchard Rocks South in
 8   2017?
 9        A.   Yes.  Cooke, through the Mott MacDonald survey
10   in 2017, there were video and photographic records that
11   were done as part of the Mott MacDonald survey at each
12   site.
13        Q.   At Orchard Rocks South?
14        A.   At Orchard Rocks South, all of the Cooke
15   sites.
16        Q.   So Cooke conducted its inspection of the
17   underwater mooring components at Orchard Rocks South
18   through the Mott MacDonald work?
19        A.   The underwater survey of Mott MacDonald
20   actually was part of what was used.  The inspections --
21   again, we keep coming back to this.  The inspections are
22   more than just underwater surveillance of the system.
23             Divers are in the water every week, every day.
24   And they're able to, if there's any noted problem with
25   the mooring systems, they're able to follow the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    lines down and find out what the problem is.  And

2    frequently, particularly at a site like Orchard Rocks

3    South, even though the components might be below 100

4    feet, visibility is often such that, if they dove to

5    99 feet, they can see the bottom from that point.

6         Q.    Did Cooke send divers to the bottom of the

7    anchoring components at Orchard Rocks South in 2017, all

8    them except for those three that were greater than 100

9    feet deep?

10         MS. MEYERS:  Object to the form.

11         A.    Could you restate that, please.

12         Q    (By Mr. Knutsen) I'm trying to figure out

13   whether or not Cooke sent divers to visually look at all

14   of the anchoring components down to the anchors at

15   Orchard Rocks South in 2017 other than the three that

16   are more than 100 feet deep.

17         A.    Yes.

18         Q.    Do you know who conducted those inspections?

19         A.    Again, it would be one of the dive team.  It

20   would be noted in the dive logs and the daily logs.

21         Q.    Do you know when those occurred?

22         A.    In 2017, probably very regularly.

23         Q.    With respect to the three anchors that were

24   greater than 100 feet deep, those were inspected through

25   the Mott MacDonald work; is that correct?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 84

```
 1         A.    The Mott MacDonald work and as well as, I
 2  believe, Global Diving & Salvage also inspected all of
 3  the anchors that were deeper than 100 feet.
 4         Q     (By Mr. Knutsen) Global Diving inspected
 5  anchors in 2017 at Orchard Rocks South?
 6         A.    I'd have to go look back and look at records.
 7  But yes, I believe so.
 8         Q.    Do you know when that occurred?
 9         A.    It would have been after September of 2017.
10         Q.    Do you know which anchoring components Global
11  Diving inspected in 2017 at Orchard Rocks South?
12         A.    It would have been components deeper than 100
13  feet.
14         Q.    Anything else?
15         A.    No, I don't believe so.
16         Q.    With respect to the documentation that was
17  generated from the underwater inspections of mooring
18  components in 2017 at Orchard Rocks, would that
19  documentation be the same items you mentioned earlier,
20  which I believe included weekly checklists, daily logs,
21  dive logs, manager meeting notes, and weekly production
22  reports?
23             MS. MEYERS:  Object to the form.
24         A.    I think we have also stated that in '17 there
25  is photographic and video evidence from the Mott
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 85

```
 1   MacDonald surveys.
 2       Q    (By Mr. Knutsen) Any other documentation?
 3       A    Not that I'm aware of.  And, by the way, Mott
 4   MacDonald did publish a report that contains a lot of
 5   their conclusions about that.
 6       Q    With respect to underwater inspections of
 7   mooring components at Orchard Rocks, predating -- let's
 8   go through 2016.  Did Cooke conduct an inspection of the
 9   underwater anchoring components?  And again I'm talking
10   about did they send divers down into the water to look
11   all the way down the anchoring lines to the anchor in
12   2016 at Orchard Rocks North for each of the anchoring
13   lines?
14            MS. MEYERS:  Objection to the form.
15       A    If you mean did they dive those lines, yes.
16       Q    (By Mr. Knutsen) To the bottom of the lines,
17   the anchors, in 2016?
18       A    I would assume so.
19       Q    You would assume so, but you are not sure?
20            MS. MEYERS:  Object to the form.
21       A    If they're diving the line specifically for
22   assessing the components, as we've talked about, it
23   isn't necessarily -- it isn't necessary to dive all the
24   way to the bottom in order to visualize whether the
25   anchor is embedded or not and whether the components are
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 86**

```
1   working as they should.
2        Q    (By Mr. Knutsen) Did Cooke Aquaculture send
3   divers down to the bottom of each of the lines at
4   Orchard Rocks North to visually look at them in 2016?
5        A.   Again, they dove the lines to be able to
6   ascertain whether or not the mooring lines were
7   adequately working.  They may not have sat on the bottom
8   to visualize it.  But they don't need to.
9        Q.   Do you know whether or not they sent divers to
10  the bottom in 2016 at Orchard Rocks North for each of
11  the anchor lines?
12       A.   We would have to look at the dive logs.  The
13  dive logs also recorded the depth that they went to.
14  Those would be -- those depths would be recorded there.
15       Q.   Are you able to identify the specific
16  individuals that conducted those dives?
17       A.   Again, particularly for 2016, I'd have to look
18  at the list of employees that were listed as divers.
19       Q.   Are you able to identify any days where those
20  inspections occurred?
21       A.   In 2016, multiple days.
22       Q.   With any more specificity?
23       A.   We'd have to refer to the dive logs.
24       Q.   Did you bring those dive logs today?
25       A.   I don't believe we have them here.  They are,
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 87

1   again, a large volume of work that I'm happy to go

2   through with you.

3       Q.   In 2016, did Cooke visually look at, via

4   divers, all of the anchoring lines at Orchard Rocks

5   South other than the three that are more than one 100

6   feet deep?

7       A.   Yes.  Including the ones that are more than

8   100 feet deep, they looked at the lines.

9       Q.   All the way down to the anchors?

10      A.   Again, often you can see -- particularly at

11  Orchard Rocks South, you can see whether or not -- where

12  the anchor is sitting on the bottom without diving below

13  100 feet.  And the commercial diving standard

14  certification allows them to go to 130 feed if need be.

15  The 100-foot limit is a Cooke safety measure.

16      Q.   And for 2016, is the -- with respect to the

17  components that are more than 100 feet deep at Orchard

18  Rocks South, you said Cooke did inspect those in 2016

19  down to the anchors?

20          MS. MEYERS:  Object to the form.

21      A.   I believe I've answered that.

22      Q   (By Mr. Knutsen) Can you answer it again.

23      A.   Yes.

24      Q.   How did they conduct those inspections?

25      A.   Inspections, again, occur in many different

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 88

1    forms.  A diver can often tell within the first few feet

2    of a dive whether or not the line is functioning

3    properly.  The requirements for 2016, if we look back at

4    the permits, we were well in compliance of what was

5    required to inspect the lines.

6         Q.   In 2016 did Cooke send either an ROV or a

7    diver to the actual anchors, the three anchors that were

8    below 100 feet?

9         A.   I don't believe that was necessary.

10        Q.   That wasn't my question.

11        A.   No.

12        Q.   They didn't?

13        A.   They did not have anybody sit on the bottom.

14   But again, the diver does not have to descend to the

15   bottom in order to see whether the anchoring system is

16   adequate or not.  You can often see or not see the

17   anchor that's embedded in the sediment.

18        Q.   And with respect to the inspections of the

19   anchoring components in 2016, is the documentation of

20   those inspections the same as what we've discussed

21   earlier?  Again, I think the categories are the dive

22   logs, the daily logs, the manager meeting notes, and

23   weekly production reports?

24        A.   And vessel logs.

25        Q.   Vessel logs?



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 89

1      A.   The only difference being that, since the

2   latest Fish Escape Prevention Plan was out in late 2017,

3   we also include a weekly mooring inspection log.  But --

4      Q.   We're talking about --

5      A.   -- in 2016 that did not occur.

6      Q.   And with respect to 2015, is it your

7   understanding that Cooke inspected all the underwater

8   anchoring components at Orchard Rocks?

9      A.   Again, this would be based on history prior to

10  Cooke's ownership.  But by Icicle and by the managers --

11  discussions with the managers, nothing really has

12  changed other than how we record the information.  So

13  yes.

14     Q.   And are you able to identify who conducted

15  those inspections?

16     A.   Again, particularly as we go back in time, I'd

17  have to look at an employee list and probably discuss

18  those, actually, with the managers.  Personnel has

19  changed.

20     Q.   Are you able to testify as to the specific

21  dates of when those inspections occurred?

22     A.   Again, sometime in 2015.

23     Q.   With any more specificity?

24     A.   Weekly, daily, depending on when the divers

25  were in the water.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 90

1      Q.    What documentation exists of the underwater
2  anchoring inspections for 2015?
3      A.    It would be the same list.
4      Q.    And I assume the further we go back, it's
5  going to be very similar responses.
6      A.    Yes.
7      Q.    So for 2014, the inspections occurred at
8  Orchard Rocks North and South --
9      A.    Yes.
10      Q.    -- of anchoring components?
11      A.    Yes.
12      Q.    But for 2014, again, you wouldn't be able to
13  identify the specific individuals that did the
14  inspections?
15      A.    No.  Well, yes.  It was a member of the dive
16  team.
17      Q.    But you can't give a specific individual to
18  me, though?
19      A.    I understand that.  But it is to Cooke's
20  company knowledge.  It can vary depending on who happens
21  to be diving that day.
22      Q.    Are you able to identify the specific dates on
23  which those inspections occurred in 2014?
24      A.    Again, I'd have to look at the dive records.
25      Q.    Again, the records of those inspections would

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 91

1    be the same list we've been talking about:  Dive logs,

2    manager meeting notes, weekly production reports, and

3    vessel logs?

4         A.   Yes.

5         Q.   In 2017 did the inspections of the anchoring

6    components at Orchard Rocks North and South ever

7    indicate that repairs or replacements were needed?

8         A.   You'd have to go back to the individual logs

9    to look.

10        Q.   You don't know the answer to that question

11   sitting here today?

12             MS. MEYERS:  Form.

13        A.   Yes.  I believe I just answered it, and I

14   could tell you if we looked at the records.

15        Q    (By Mr. Knutsen) Do you know whether or not

16   repairs or replacements were done to any anchoring

17   component at Orchard Rocks in 2016?

18        A.   Repairs and maintenance are often done and

19   recorded without much fanfare, particularly for a small

20   component.  I would have to refer to the daily logs.

21        Q.   In 2016 did any of the underwater inspections

22   of anchoring components at Orchard Rocks indicate that

23   repairs or replacements were needed?

24        A.   If it did, the -- I'm unaware of any from

25   looking at the records.  Again, we'd have to look at

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 92

```
 1   specific records.  If you have them, I'd be happy to
 2   explain them to you.  I'm assuming that because that's
 3   what happens:  If something is found, it's fixed.
 4        Q.   The question, I think, was whether or not the
 5   underwater dive inspections of the anchoring components
 6   in 2016 at Orchard Rocks indicated that components
 7   needed to be repaired or replaced.
 8        A.   Not that I'm aware of.
 9        Q.   What about in 2017?
10        A.   The Mott MacDonald report, if you look at it,
11   describes several conditions.  Actually, at all sites,
12   things were found that were repaired and replaced
13   immediately.
14        Q.   As a result of the Mott MacDonald reports?
15        A.   Yes.
16        Q.   With respect to the same question in 2015, did
17   any of the underwater inspections of mooring components
18   at Orchard Rocks in 2015 indicate that repairs or
19   replacements were needed?
20        A.   Again, it would be recorded on the dive log
21   including what was done for the repair.
22        Q.   Would it be recorded anywhere else?
23        A.   Probably on the daily record, then, and again
24   on the weekly reports.
25        Q.   Has that practice been -- is that practice
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 93

1   still in place?  Are repair or replacement needs that

2   are identified as part of underwater inspections

3   documented in dive logs, weekly reports, and daily

4   records -- I'm sorry.  Daily what?

5       A.   Daily dive logs, daily records, and weekly

6   production reports.

7            Yes, as well as vessel logs, 'cause typically

8   a vessel would be involved in replacement or repair.  If

9   it's small, it just gets done.

10      Q.   What did you do to prepare to testify today

11  with respect to underwater inspections of anchoring

12  components at Orchard Rocks?

13      A.   Orchard Rocks?  I would have met with the site

14  manager for Orchard Rocks.  I toured the facility with

15  him, asking how the components were regularly inspected

16  and what was looked for.  I reviewed the general use of

17  dive logs and daily records.

18      Q.   What do you mean by you "reviewed  the general

19  use"?

20      A.   What's included in the dive logs and the daily

21  records and assured myself that, if something was done,

22  it would be in those records.

23      Q.   Did you go through those records to determine

24  whether inspections had in fact occurred?

25      A.   Again, inspections don't necessarily have to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 94

1  be recorded because they occur daily.  At that point in

2  time, they weren't required to be recorded.  Since the

3  latest version, we do record them on a weekly record.

4      Q.   I'm sorry.  What wasn't required to be

5  recorded?

6      A.   Inspections in general.

7      Q.   Inspections of anchoring components weren't

8  required to be recorded?

9      A.   No.  Inspections as we do them, just based on

10  how the facility is operating, they may or may not have

11  been noted if nothing was found.

12      Q.   When did Cooke -- so Cooke began recording its

13  results of underwater inspections in 2017, at the end of

14  2017?

15          MS. MEYERS:  Object to the form.

16      A.   Cooke began recording its diving operations.

17  It's always recorded what it does during dives as part

18  of the dive record.  And that continues to this date.

19  The only thing that changed at the end of 2017 was a

20  more general record of what was actually done weekly.

21      Q    (By Mr. Knutsen) Was there anything else you

22  did that you didn't just mention to prepare to testify

23  today on inspections of underwater anchoring components

24  at Orchard Rocks?

25      A.   In -- further than discussions with the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 95

1    managers and with employees and discussions with counsel

2    and review of the existing records, no.

3        Q.    And the existing records, you said, was the

4    daily logs?

5        A.    Daily logs, dive records, vessel records.

6        Q.    Where is the Fort Ward facility?

7        A.    The Fort Ward facility is shoreward of the

8    Orchard Rocks facility.

9        Q.    Shoreward towards Bainbridge?

10       A.    Yes.

11       Q.    Who manages the Fort Ward facility?

12       A.    Again Randy Hodgin.

13       Q.    I'm sorry.  Did you say how long he had been

14   the site manager?

15       A.    Randy has been a manager for Cooke and its

16   former owners for 35 years.  Beginning, I believe, in

17   2016, he also became manager of not only Port Angeles

18   but the Bainbridge Island facilities.

19       Q.    How many anchors are there at the Fort Ward

20   facility?

21       A.    This particular diagram shows 20.  And I'm

22   looking for the supplemental answers.  Yes.

23       Q.    Twenty?

24       A.    Twenty.

25       Q.    Are any of the anchoring components at the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1   Fort Ward facility at a depth of more than 100 feet?

 2        A.   No.

 3        Q.   Did Cooke send divers to each of the anchors

 4   at the Fort Ward facility in 2018?

 5        A.   Yes.

 6        Q.   Was it all done at once?  Or was that done in

 7   batches?

 8        A.   Done in batches again.

 9        Q.   Do you know who conducted those inspections?

10        A.   It would be one of the dive crew.

11        Q.   You're not able to identify that individual's

12   name?

13        A.   I just have:  It would vary depending on the

14   day.

15        Q.   Do you know the dates those inspections

16   occurred?

17        A.   Again, throughout the year.

18        Q.   You're not able identify the dates they

19   occurred?

20             MS. MEYERS:  Object to the form.

21        A.   I just did:  Throughout the year.

22        Q    (By Mr. Knutsen) With any more specificity,

23   are you able --

24        A.   They'd be identified in the dive records.

25        Q.   And what records were generated for Cooke's

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 97

```
 1    inspections of the anchoring components at Fort Ward in

 2    2018?

 3         A.   It would be the weekly record of mooring

 4    components as well as the daily logs, the dive logs,

 5    vessel logs if any work was done on specific components

 6    that were brought up, and weekly production reports.

 7         Q.   Anything else?

 8         A.   I don't believe so.

 9         Q.   And did Cooke inspect all of the underwater

10    anchoring components at Fort Ward in 2017?

11         A.   Yes.

12         Q.   And who conducted those underwater

13    inspections?

14         A.   Your question was whether or not we inspected

15    them.  And they are inspected daily, just by operation.

16    Underwater inspections, again, would be a member of the

17    dive team if they had reason to dive the anchoring

18    lines.

19         Q.   You're not able to provide a name of the diver

20    that conducted those inspections?

21         A.   Those names would be recorded in the dive

22    logs.

23         Q.   Are you able to provide the dates that those

24    inspections occurred?

25         A.   Those dates would be provided in the dive
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 98**

1    logs.

2        Q.    You're not able to provide that information?

3            MS. MEYERS:  Object to the form.

4        A.    I think we have.  We have provided you with

5    the dive logs.

6        Q    (By Mr. Knutsen) As far as documentation, is

7    it the same documentation of those underwater

8    inspections that you just identified for the Fort Ward

9    inspections in 2018?

10        A.    With the exception of, earlier in 2017, those

11    weekly component logs weren't part of the record.

12        Q.    I think you said those went into effect with

13    the 2017 Pollution Prevention Plan, maybe in October --

14        A.    Yes.  The October.

15            MR. KNUTSEN:  Let me take a five-minute break.

16            (Recess taken.)

17        Q    (By Mr. Knutsen) I believe we were talking

18    about the Fort Ward facility.  Does that sound familiar?

19        A.    Yes.

20        Q.    Mr. Parsons, I believe we discussed the 2017

21    inspections.  I'd like to go back to 2016.  Did Cooke

22    inspect all the underwater anchoring components at the

23    Fort Ward facility in 2016?

24        A.    Yes.

25        Q.    Did Cooke send divers to each of the anchors

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 99

1    at the end of those anchoring components in 2016?

2         A.    The divers went -- if not to the bottom, they

3    were able to inspect the bottom mooring from where they

4    dove to.

5         Q.    Do you know who conducted those inspections?

6         A.    In '16, it would be a member of the dive team

7    of record at that time.

8         Q.    You are not able to provide that name?

9         A.    I'd have to look at the personnel list for

10   '16.

11        Q.    Are you able to identify the dates that those

12   inspections occurred?

13        A.    Regularly throughout the year.

14        Q.    So they regularly sent divers to the end of

15   the anchoring components in 2016 at Fort Ward?

16        A.    Again, they were able to send divers down the

17   lines as necessary.  And whether or not they actually

18   went to the bottom, they were able to the inspect the

19   entire underwater mooring components.

20        Q.    What records exist documenting the inspections

21   in 2016 of the underwater anchoring components at Fort

22   Ward?

23        A.    The same as we've discussed for the other

24   sites, Orchard Rocks North and South.  So the daily

25   logs, dive logs, vessel logs if any components were

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 100

```
 1   pulled, weekly production records.
 2       Q.    Anything else?
 3       A.    I believe that there have been a number of
 4   other records that were produced for you that also speak
 5   to diving for mooring components.
 6       Q.    What are those?
 7       A.    The list is long and varied.
 8       Q.    Are you able to identify any of them?
 9       A.    If you showed them to me, I could.
10       Q.    You're not able to identify what other
11   documents exist that would document underwater
12   inspections at Fort Ward in 2016?
13             MS. MEYERS:  Form.
14       A.    I believe I just did.  If you show them to me,
15   I could tell whether or not the documents were produced
16   for you.
17       Q    (By Mr. Knutsen) How would I go about
18   determining what documents there are?
19       A.    Look in your pile.
20       Q.    Any particular --
21       A.    I am sure the list has been produced for you,
22   too, by counsel.
23       Q.    So I can look through the pile or look through
24   a list that may exist?
25       A.    Yes.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 101**

```
 1       Q.    2015, did Cooke's predecessor inspect all the
 2   all underwater anchoring components in 2017 at Fort
 3   Ward?
 4       A.    Yes.
 5       Q.    And did it send divers to the bottom of each
 6   of the anchoring components at Fort Ward in 2015?
 7       A.    Yes.
 8       Q.    Who conducted those inspections?
 9       A.    It would be a member of the dive team.
10       Q.    Can you provide a name?
11       A.    I'd have look at a personnel record for 2015.
12       Q.    Can you identify the dates that those
13   inspections occurred?
14       A.    Again, throughout the year as --
15       Q.    Can you identify the dates?
16       A.    With the right records, I certainly could.
17       Q.    Can you identify the records that exist
18   documenting the inspections of the underwater anchoring
19   components at Fort Ward in 2015?
20       A.    It would the same list again.
21       Q.    So daily logs?  Dive logs?
22       A.    Vessel logs.
23       Q.    Vessel logs?
24       A.    Production reports.
25       Q.    Production reports?  Manager --
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 102**

```
 1          A.    Manager meeting notes possibly.

 2          Q.    Anything else?

 3          A.    No.

 4          Q.    Did Cooke's inspections of the underwear

 5   anchoring components at Fort Ward in 2018 indicate a

 6   need for any components to be replaced or repaired?

 7          A.    No.   Not that I'm aware of.   And for 2018 we

 8   actually began to produce an anchoring log that shows

 9   for each site the inspections that occur on every single

10   anchor line, the date that they were last inspected

11   prior to that, and what was done.

12          Q.    That was in 2018?

13          A.    Yeah.   It began after the incident at Cypress

14   based on the new escape prevention plan.

15          Q.    What is that document you're describing?

16          A.    It's called -- it's an Excel spreadsheet that

17   documents each anchor system at each facility.

18          Q.    An Excel spreadsheet that documents the

19   anchors?

20          A.    Yes.   The anchoring and mooring systems.

21   That's been produced for you as well.

22          Q.    Is it identified on your list here, on

23   Exhibit 2, that you provided this morning?

24          A.    I don't think so.   Maybe it has.   Yeah, the

25   anchor inspection log.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 103

1      Q.    Can you show me what you're looking at?

2      A.    Under No. 8, "Responsive Documents."  If you

3   go down you see "anchor inspection."

4      Q.    So I'm just going -- I'm trying to figure out.

5   I don't know if I've seen this.  I'm trying to figure

6   out what they are.  You said an Excel spreadsheet.  What

7   does it look like if I'm looking at the document?

8      A.    It would simply list the anchors.  Then

9   various columns suggest what components are involved,

10  when they were last inspected, and what was done on that

11  particular date.

12     Q.    Have you seen those documents?

13     A.    Yes.

14     Q.    Have you produced those document?

15     A.    Yes.

16     Q.    And for what facilities have those documents

17  been produced?

18     A.    All facilities.  So Port Angeles, Cypress 1,

19  Cypress 3, Hope Island, the Bainbridge Island

20  facilities, and Clam Bay.

21     Q.    I don't think I've seen those documents.  But

22  you believe they've been produced?

23     A.    Yes.

24     Q.    So it's an Excel spreadsheet with rows for

25  anchors and columns for components?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 104**

```
 1        A.    Yes.
 2        Q.    And is there anything else on the document?
 3   Does it identify the facility?
 4        A.    Yes.
 5        Q.    Does it identify the year?
 6        A.    The tabs are the facility, and the dates are
 7   the full date of any work done.
 8        Q.    Who completes those documents?
 9        A.    The -- currently the maintenance manager in
10   cooperation with the site managers.
11        Q.    Are those documents printed hard copy or
12   signed?  Or are they just maintained as an Excel
13   spreadsheet?
14        A.    Currently they are just maintained as an Excel
15   spreadsheet and printed out as needed to review.
16        Q.    You said that those were generated at what
17   time?
18        A.    After the October 2017 new Fish Escape
19   Prevention Plan, we began to work on them.
20        Q.    You began to work on them -- I'm sorry.  The
21   what plan?
22        A.    The Fish Escape Prevention Plan that was part
23   of the new NPDES permit and the response in 2017.
24        Q.    There's a -- I believe we looked earlier at a
25   2017 fish plan; correct?
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 105

1      A.    We looked at the January one.    There was

2   another one that came out in October.

3      Q.    2017?

4      A.    Yes.

5            MR. STEDING:  Can we go off the record for a

6   minute?

7            MR. KNUTSEN:  Sure.

8            (Discussion off the record.)

9            MR. KNUTSEN:  Back on the record.

10     Q     (By Mr. Knutsen) So we were discussing these

11  what you've referred to as to anchor inspection forms.

12     A.    Yes.

13     Q.    It's your understanding that those have been

14  generated by each of the facilities starting in October

15  2017?

16     A.    In 2018.

17     Q.    Okay.  Cooke began using those inspection --

18  anchor inspection forms in 2018?

19     A.    Yes.

20     Q.    What time in 2018?

21     A.    We'd have to look at the actual record.

22     Q.    What actual record?

23     A.    The record that that's referring to, the

24  inspection record.

25     Q.    Cooke did not start using the anchor

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 106

1    inspection forms in 2017?

2         A.    I'd have to look at the actual document.

3         Q.    What actual document?

4         A.    The anchor inspection record.

5         Q.    Okay.   In order to figure out when Cooke began

6    using these anchor inspection forms, we would need to

7    look at each of the inspection forms?

8         A.    Yes.

9         Q.    But those records exist for each of the

10   facilities at least beginning in 2018?

11        A.    Yes.

12        Q.    And I believe you said there are not hard

13   signed; they're just Excel spreadsheets?

14        A.    Yes.   They are designed to keep a log of our

15   maintenance and a record of what's going on on each

16   line.

17        Q.    Do you know when you provided those documents

18   in this litigation?

19        A.    I believe with the recent supplemental

20   information that was provided on anchoring systems.

21        Q.    Do you know when that was provided?

22        A.    I'd have to look at the date of the

23   supplemental response.

24        Q.    In the last three days?

25        A.    Probably within the last week, yes.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 107**

 1          Q.    I'm going to ask you about just one more year

 2    of Fort Ward.

 3          A.    Okay.

 4          Q.    In 2014, did Cooke's predecessor have divers

 5    dive to visually look at each of the anchors at Fort

 6    Ward in 2014?

 7          A.    Yes.

 8          Q.    And are you able to identify who conducted

 9    those dives?

10          A.    Again, I would have to look at a list of

11    employees that were listed as divers for the site

12    because it could vary.

13          Q.    Are you able to provide the exact dates when

14    those inspections occurred?

15          A.    There were multiple dates during the year that

16    they occurred.  That would be on the dive records.

17          Q.    What records would exist for these

18    inspections?

19          A.    The same type of records, the daily logs, the

20    dive logs, any vessel logs if the components were

21    brought to the surface, weekly production records.

22          Q.    Where is the Clam Bay facility located?

23          A.    In Clam Bay.

24          Q.    Where is that?

25          A.    Near Manchester, Washington, just off of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 108**

1    EPA facility, EPA laboratory facility, and next to their

2    dock or out from their dock.

3        Q.    Is that an EPA facility, or is that a NOAA

4    facility?

5        A.    It's both, actually.  It was a superfund site

6    for the navy.  So . . .

7        Q.    And how many net pen cages are there at the

8    Clam Bay facility?

9        A.    I think, given my recollection on the last

10    one, I would like to look at a diagram of the facility.

11    I believe it's 22.

12        Q.    Good guess.

13            (Deposition Exhibit No. 8 marked for

14            identification.)

15        Q    (By Mr. Knutsen) Mr. Parsons, you've been

16    handed an exhibit labeled Exhibit 8.  Are you familiar

17    with this document?

18        A.    Yes.

19        Q.    What is this document?

20        A.    This document is a mooring diagram for the

21    Clam Bay facility.

22        Q.    And looking at this document, are you able to

23    identify the number of containment nets at the Clam Bay

24    facility?

25        A.    Yes.  There are 22.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 109

1          Q.    And similar to the Orchard Rocks, are they
2    broken up into north and south halves?
3          A.    Yes.  The halves being there's 12 in one raft
4    and 10 in the other.
5          Q.    Who manages the Clam Bay facility?
6          A.    The Clam Blay facility is managed by Derek
7    Adkisson and overseen by Randy Hodgin.
8          Q.    What do you mean by "overseen"?  So there's a
9    site manager who's mister --
10         A.    Adkisson.
11         Q.    Adkisson?  What do you mean by it's "overseen
12   by Randy Hodgin"?
13         A.    Randy Hodgin, because of his tenure with the
14   company, assists Derek to manage the facility if needed.
15         Q.    And do you know how many anchor lines there
16   are on the Clam Bay North?
17         A.    There are 18 on the diagram, and I believe
18   that is correct.
19         Q.    Do you know whether any of the anchors on Clam
20   Bay North are at a depth of greater than 100 feet?
21         A.    Yes.  There are some that are deeper than 100
22   feet.
23         Q.    Do you know how many?
24         A.    There are five anchors at Clam Bay North and
25   10 anchors at Clam Bay South that are more than 100

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 110

1   feet.

2         Q.    Are you able to identify which anchors at Clam

3   Bay North are greater than 100 feet depth?

4         A.    Not without a diagram, no.

5         Q.    Is the same true for Clam Bay South?

6         A.    Yes.  Typically it would be on the anchors to

7   the west on this diagram.  But I would have to look

8   specifically at an anchoring diagram.

9         Q.    Did Cooke visually inspect the anchoring

10  components at Clam Bay North in 2018 down to the

11  anchors?

12        A.    All anchoring components above -- that are

13  less than 100 feet were viewed by Cooke's divers, again

14  perhaps not diving and being actually on the bottom but

15  visually inspected, given the clarity of the water.  And

16  the components below 100 feet were also inspected by

17  ROV.  The inspections again occur regularly without

18  diving.

19        Q.    So with respect to the anchoring components

20  that were at a depth of more than 100 feet, you've

21  indicated that Cooke inspected those using an ROV in

22  2018?

23        A.    Yes.

24        Q.    Whose ROV was it?

25        A.    Again, it was the same as at the Orchard Rocks

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 111

 1    facility.  Kyl Wood did the inspection along with the

 2    assistance of the manufacturer of the particular ROV.

 3         Q.   Did you say Kyl Wood was an employee of Cooke?

 4         A.   Yes.

 5         Q.   And is that true for Clam Bay South as well?

 6         A.   Yes.

 7         Q.   Kyl Wood, using the ROV, inspected the

 8    underwater mooring components at Clam Bay South in 2018

 9    using an ROV?

10         A.   Yes.  That were deeper than 100 feet.

11         Q.   Do you know when those inspections occurred?

12         A.   Those, I believe, were again in November or

13    December.

14         Q.   November or December of 2018?

15         A.   Yes.

16         Q.   For both Clam Bay North and South?

17         A.   Yes.

18         Q.   And were any needs for repair or replacement

19    identified through underwater inspections of anchoring

20    components in 2018 --

21         A.   No.

22         Q.   -- at the Clam Bay facility?

23         A.   No.  Neither North or South.

24         Q.   And what documentation exists for the

25    inspections of the underwater anchoring components at

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Clam Bay in 2018?

2        A.    For those above 100 feet, again it would be

3    daily record, dive logs, the mooring component

4    checklist, weekly production reports, the same that

5    we've discussed, plus the anchoring reports.

6        Q.    Anything else?

7        A.    Ones below 100 feet would also have video

8    records.

9        Q.    And in 2017, did Cooke inspect all of the

10   underwater anchoring components to the actual anchors in

11   2017 at Clam Bay?

12       A.    Yes.  That was, again, done by Mott MacDonald.

13       Q.    So Mott MacDonald did the inspections for the

14   entire facility or just those components greater than

15   100 feet?

16       A.    They did the entire facility.  Then regular

17   inspections were also done as described for the other

18   facilities by the dive team and the daily monitoring

19   done by staff.

20       Q.    So with respect to the components that are at

21   a depth of greater than 100 feet, those were inspected

22   in 2017 by Mott MacDonald?

23       A.    Yes.  And the Cooke divers.

24       Q.    Cooke divers went below 100 feet in 2017?

25       A.    No.  They were able to inspect the lines up to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 113

1   100 feet and determine whether or not the mooring system

2   was operating correctly.

3        Q.   And can you describe Mott MacDonald's

4   inspection in 2017 of the Clam Bay facility.

5        A.   I think the best way to do that would be to

6   look at the Mott MacDonald report for the Clam Bay

7   facility.

8        Q.   What was purpose of that inspection?

9        A.   It was to look at the engineering of the

10  overall facility.  And it was under contract with

11  Department of Natural Resources.

12       Q.   How did Cooke utilize that work by Mott

13  MacDonald?

14       A.   Any deficiencies that were identified by Mott

15  MacDonald were immediately repaired or replaced.  The

16  deficiency lists were supplied to each site manager

17  based on their site.  And then they undertook the

18  repairs and replacements.

19       Q.   And what documentation exists for

20  underwater -- inspections of underwater anchoring

21  components at the Clam Bay facility in 2017?

22       A.   In 2017, it would be the Mott MacDonald

23  report.

24       Q.   Can I stop you for a second?  Do you know when

25  Mott MacDonald conducted their underwater inspections at

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 114**

1    Clam Bay in 2017?

2         A.   We'd have to look the record to get the exact

3    date.  But I believe it was also in October of 2017.

4         Q.   The end of 2017?

5         A.   Yes.

6         Q.   The documentation that would exist for the

7    underwater inspections that occurred at Clam Bay in

8    2017 -- I said "underwater inspections."  I'm talking

9    specifically about underwater inspections of the mooring

10   or anchoring components, the documentation would include

11   the Mott MacDonald report.  What else?

12        A.   That would again be any daily records that

13   were produced, the dive records, vessel logs, the same

14   list that we've been describing for each facility.

15        Q.   So the daily logs, the dive records, the

16   production --

17        A.   Weekly production reports.

18        Q.   Then the manager meeting notes?

19        A.   Yes.

20        Q.   Anything else?

21        A.   Again, there's been a variety of documents

22   that speak to this that have been produced.

23        Q.   Can you identify any of those documents?

24        A.   I'm sure, given time, I'd be happy to supply

25   you the names of those documents.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 115

 1        Q.    What can we do to facilitate that effort?

 2        A.    I believe counsel has identified them for you

 3   when they were produced.

 4        Q.    So the documents that you're able to identify

 5   today for underwater inspections in 2017 at Clam Bay are

 6   the Mott MacDonald report, the daily records, the dive

 7   logs, the manager meeting notes, and the production

 8   reports?

 9        A.    Yes.

10        Q.    Are you able to identify any other records?

11        A.    If you show me the records, I will be able to

12   identify them.

13        Q.    So you're not able, without me knowing what

14   records exist and showing them to you, to identify them?

15             MS. MEYERS:  Form.

16        A.    The record are numerous.  They've been

17   produced.

18        Q    (By Mr. Knutsen) I've looked the records.  I'm

19   not sure what other documents exist with respect to

20   underwater inspections in 2017 at Clam Bay.  Are you

21   able to identify any more?

22             MS. MEYERS:  Form.

23        A.    I believe I have.

24        Q    (By Mr. Knutsen) What are the documents?

25        A.    The documents are the ones that we've

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 116

```
 1    identified.
 2         Q.    So I've looked through the documents.   And
 3    there's nothing that says Here's the documents for
 4    underwater anchoring inspections that occurred at Clam
 5    Bay in 2017.   There's nothing that you produced that
 6    tell me that information which is why we're doing this
 7    deposition today so we can identify what records exist
 8    for these inspections.   Are you able to identify them?
 9              MS. MEYERS:   Form.
10         A.    They may be not labeled as such, but they're
11    in the record.
12         Q    (By Mr. Knutsen) You are not able to identify
13    them?
14              MS. MEYERS:   Form.
15         A.    They were provided to you.
16         Q    (By Mr. Knutsen) Do you understand my
17    question?
18         A.    I guess not.
19         Q.    Are you able to identify the documents that
20    would exist for the inspections in 2017 of the anchoring
21    components at Clam Bay?
22              MS. MEYERS:   Form.
23         A.    If you showed them to me, I could.   Anchoring
24    inspections, again, are beyond just dive records or ROV
25    surveillance.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 117

```
 1        Q    (By Mr. Knutsen) So you are not able to
 2   identify them?
 3             MS. MEYERS:  Form.
 4        A.   I did.
 5             MS. MEYERS:  Counsel, we provided you a list
 6   with the exact documents.  If you want to help
 7   facilitate, if you want to show him that list, it would
 8   be -- it would probably shortcut that.
 9             MR. KNUTSEN:  Counsel, if you have a list that
10   identifies the documents for underwater anchoring
11   inspection components at Clam Bay in 2017, I would love
12   to see that.
13             MS. MEYERS:  Exhibit A to our Supplemental
14   Response to this Request for Production lists all the
15   inspection documents that would exist for each site.
16             MR. KNUTSEN:  When was that provided?
17             MS. MEYERS:  Yesterday.  I believe yesterday.
18   You wanted everything that he used to prepare.  He's
19   been preparing up until the moment of the deposition.
20   So, to have a complete list, it had to have been late --
21   not late, had to have been current.
22             MR. KNUTSEN:  Can we go off the record for a
23   minute?
24             MS. MEYERS:  Sure.
25             (Discussion off the record.)
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 118

```
 1        Q     (By Mr. Knutsen) We are still talking about
 2   the Clam Bay facility.  Let's talk about what happened
 3   in 2016.  Did Cooke inspect the underwater anchoring
 4   components at Clam Bay in 2016?
 5        A.    Yes.
 6        Q.    And did Cooke visually inspect all the way
 7   down to the anchors for each anchor at Clam Bay in 2016?
 8        A.    Yes.
 9        Q.    Can you identify who conducted those
10   inspections?
11        A.    It would have been a member of the dive team.
12        Q.    Can you provide a name?
13        A.    I'd have to look at an employee list for 2016.
14        Q.    Can you provide dates where those inspections
15   occurred?
16        A.    There were numerous dates throughout the year.
17        Q.    Can you identify those?
18        A.    If I could look at the dive logs, I'm certain
19   I could, as well as the daily logs.
20        Q.    What documents, what records exist documenting
21   the inspections of the underwater anchoring components
22   at Clam Bay for 2016?
23        A.    It would be the same list.  So we're talking
24   daily logs for the site, dive logs for the site, vessel
25   logs if work was done on the components, weekly
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 119**

1    production reports, manager meeting notes.  For '16, I
2    believe there was also an additional survey -- I may be
3    getting the year wrong -- that was done by Sunderland
4    Insurance, the insurance company for Cooke.
5        Q.    What is that document you're referencing?
6        A.    An insurance farm survey report that
7    documented the condition of the farms.
8        Q.    And did Cooke send either divers or an ROV to
9    each of the underwater anchoring components in 2016 at
10   Clam Bay that are at a depth of more than 100 feet?
11       A.    Divers would not have gone below 100 feet.
12   But the anchor lines, as we've discussed, were inspected
13   based on visual and observational performance of the
14   site.
15       Q.    Any other records documenting the inspections
16   of underwater anchoring components in 2016 at the Clam
17   Bay facility that you didn't just mention?
18       A.    If there were, they would be on the list that
19   were produced in the supplemental request.
20       Q.    What list are you referring to?
21       A.    The list that was provided to you yesterday
22   for the anchoring components inspections.
23       Q.    In 2015 did Cooke inspect the underwater
24   anchoring components at Clam Bay in 2015?
25       A.    Yes.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 120

1      Q.    And can you identify who conducted those

2  inspections?

3      A.    Again, if it was the diving inspections, it

4  would have been members of the dive team and daily

5  inspections by both the site manager and employees.

6      Q.    With respect to the anchoring components that

7  are not below 100 feet, did Cooke send divers down to

8  the very anchors for each of those anchors in Clam Bay

9  in 2015?

10     A.    Yes.

11     Q.    Do you know who conducted those inspections?

12     A.    A member of the dive team.  It would have been

13 varied.

14     Q.    Do you know when those inspections occurred?

15     A.    Throughout the year.

16     Q.    With respect to the anchoring components that

17 are more than 100 feet, did Cooke visually inspect those

18 by sending a diver below 100 feet or using an ROV?

19     A.    The components were inspected by divers to a

20 safe depth of above 100 feet.  Again, at Clam Bay the

21 anchors can generally be visualized, given the correct

22 visibility.

23     Q.    So Cooke didn't send divers below 100 feet or

24 use an ROV below 100 feet?

25     A.    The anchor lines were inspected by divers that

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  were able to ascertain that the anchoring systems were

2  functioning correctly.  It's not necessary to have them

3  be on the bottom.

4      Q.   I understand.  Did you understand the

5  question?

6      A.   Yes.

7      Q.   The question was:  Did Cooke or Cooke's

8  predecessor send divers or ROVs below 100 feet in 2015

9  at the Clam Bay facility?

10     A.   No.

11     Q.   What documentation exists recording the

12 underwater inspections of the anchoring components at

13 Clam Bay in 2015?

14     A.   It would the same set of documents:  The daily

15 logs for the site, the dive logs for the site, vessel

16 logs if the components were raised to the surface, the

17 weekly production reports, possibly manager meeting

18 notes if they were discussed there.

19     Q.   Let's do just one more year if you'll be

20 patient with me.  In 2014 did Cooke inspect the

21 underwater anchoring components at the Clam Bay

22 facility?

23     A.   Cooke's predecessor did, yes.

24     Q.   With respect to the anchoring components at

25 Clam Bay that are not deeper than 100 feet, did Cooke's

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    predecessor send divers to visually inspect those

 2    components down to the very anchor?

 3         A.   Yes.

 4         Q.   Can you identify who conducted those

 5    inspections?

 6         A.   Again, it would have been a member of the dive

 7    team of record for 2014.

 8         Q.   Can you identify the dates that those

 9    inspections occurred?

10         A.   Various dates throughout the year.

11         Q.   And with respect to the anchoring components

12    that are deeper than 100 feet at Clam Bay, did Cooke

13    send divers or an ROV to visually inspect down to the

14    anchors in 2014?

15              MS. MEYERS:  Form.

16         A.   The anchor inspections can occur above the

17    100-foot depth.  That was typically the way that they

18    were done, just based on actual visualization from above

19    100 feet or performance or both.

20         Q    (By Mr. Knutsen) Did Cooke send divers or an

21    ROV to depths of below 100 feet for inspections at Clam

22    Bay in 2014?

23         A.   It would have been Cooke's predecessor,

24    Icicle.  But I believe they had the same safety

25    requirements for divers that they don't descend below

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 123

1    100 feet.  So, no, a diver wouldn't have gone down that

2    far.  They still could have inspected the anchor.  The

3    ROV was not used.

4        Q.   And what records exist, what documentation

5    exists, for inspections of the underwater anchoring

6    components at Clam Bay for 2014?

7        A.   Again, these inspections would be reflected in

8    daily logs, the dive logs, the vessel logs if the

9    components were lifted up for inspection, weekly

10   production reports, and possibly manager meeting notes.

11       Q.   Anything else?

12       A.   No, other than those that were identified in

13   addition in the supplemental response yesterday.

14            MR. KNUTSEN:  This is a good breaking point.

15   Should we take an hour for lunch?

16            MS. MEYERS:  Sure.

17

18            (Deposition recessed at 11:52 a.m. to be

19            reconvened at 12:50 p.m..)

20

21

22

23

24

25

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 124

```
 1                    AFTERNOON SESSION

 2                       1:08 p.m.

 3

 4                        --oOo--

 5

 6                  EXAMINATION RESUMED

 7   BY MR. KNUTSEN:

 8        Q.   Mr. Parsons, I believe we left off talking

 9   about the Clam Bay facilities.  Is that right?

10        A.   Yes.

11        Q.   I think we had just finished with the 2014

12   inspections.  Does that sound right?

13        A.   Yes.

14        Q.   Mr. Parsons, where is the hope bay facility

15   located?

16        A.   The Hope Island facility is located just off

17   of Hope Island and in the Skagit Bay.

18        Q.   And who is the site manager of the Hope Island

19   facility?

20        A.   The site manager is Tom Glaspie.

21        Q.   And how many containment nets or cages are

22   there at the Hope Island facility?

23        A.   Ten.

24             (Deposition Exhibit No. 9 marked for

25             identification.)
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 125**

1        Q.     (By Mr. Knutsen) Mr. Parsons, you've been

2    handed an exhibit labeled Exhibit 9.  Are you familiar

3    with this document?

4        A.     Yes.

5        Q.     What is this document?

6        A.     This document is a diagrammatic representation

7    of Hope Island and its anchor design.

8        Q.     And can you -- do you know how many anchor

9    lines there are at the Hope Island facility?

10       A.     On the net cage system itself, it looks like

11   there are 19.  And then there are additional anchor

12   systems that come off of the office and the feed storage

13   area for a total of 25 anchors.

14       Q.     Do you know if any of the anchoring components

15   at the Hope Island facility are at a depth of below

16   100 feet?

17       A.     No.  I don't believe so.  Let me look quickly.

18              It depends actually on the tide.  And so

19   during low tide, we are able to inspect anchors all the

20   way to the bottom above 100 feet.

21       Q.     In 2018, did Cooke inspect all of the

22   anchoring components at Hope Island?

23       A.     Yes.

24       Q.     Did Cooke visually inspect those anchoring

25   components in 2018 all the way down to the anchors?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       A.   Yes.

2       Q.   Are you able to identify who conducted those

3   inspections?

4       A.   Again, they would be members of the dive crew

5   at Hope Island.  Those names would be reflected in the

6   dive logs.

7       Q.   Can you provide those names today?

8       A.   Those names are on company personnel lists and

9   in the dive records.

10      Q.   Can you provide the dates that those

11  inspections occurred?

12      A.   Again, the same answer, those are on daily

13  logs and dive records and part of Cooke's knowledge.

14      Q.   You're unable to provide the days when those

15  inspections occurred today?

16          MS. MEYERS:  Form.

17      A.   I believe that I have.  They are part of the

18  record.

19      Q   (By Mr. Knutsen) Your answer is they are part

20  of the record?

21      A.   Yes.

22      Q.   You are not able to provide dates beyond that?

23          MS. MEYERS:  Form.

24      A.   I believe I have.

25      Q   (By Mr. Knutsen) What records exist

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 127**

1  documenting the underwater mooring component inspections

2  at Hope Island for 2018?

3      A.   So inspections of the entire mooring systems

4  in 2018 involve visual inspections at the surface and

5  below the surface from the facility itself and then any

6  diving records that occurred down below to the anchor

7  systems themselves.  Those would be reflected in the

8  daily logs, in the dive logs for the Hope Island

9  facility.

10          If a problem was suspected, they would be --

11  they would be recorded in the vessel log for the Clam

12  Digger, which is the support vessel that operates at

13  Hope Island that would raise the anchors to the surface

14  and inspected them and then re-anchored in any weekly

15  production reports and management -- manager meeting

16  reports.

17      Q.   Anything else?

18      A.   I believe the full list was supplied in the

19  supplemental response.

20      Q.   Are you able to identify any other documents?

21      A.   For 2018, there would be the anchor inspection

22  document that's developed by the marine maintenance

23  person.

24      Q.   That would be that Excel spreadsheet we talked

25  about earlier?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1        A.    Yes.

2        Q.    Anything else?

3        A.    Not specifically.

4        Q.    And in 2017, did Cooke conduct inspection of

5   all of the underwater anchoring components at Hope

6   Island?

7        A.    Yes.

8        Q.    And did Cooke visually inspect those anchoring

9   components in 2017 all the way down to the anchors?

10       A.    Yes.

11       Q.    Are you able to provide the names of the

12  individuals that conducted those inspections?

13       A.    Part of the inspection would have been the

14  Mott MacDonald reports would be reflected in those

15  reports and then the on-site dive team as well.

16       Q.    Do you know when the Mott MacDonald inspection

17  occurred in 2017 at the Hope Island facility?

18       A.    That one, I don't recall whether it actually

19  went into 2018 or not.  It would have been either

20  December 2017 or January 2018.  But I'd have to look at

21  their records.

22       Q.    Are you able to identify the individuals

23  employed by Cooke that conducted the dive inspections of

24  the anchoring components at Hope Island in 2017?

25       A.    That would listed on the personnel files for
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 129

1    the employees of Hope Island that are responsible for

2    diving.

3         Q.    Personnel files?

4         A.    The personnel list.

5         Q.    Personnel list?

6               Are you able to identify the dates when those

7    inspections occurred?

8         A.    That would be various dates that were

9    reflected in the dive logs and daily records.

10         Q.    Can you identify the documents that exist

11    documenting the underwater inspections of anchoring

12    components at Hope Island in 2017?

13         A.    If indeed the Mott MacDonald survey did occur

14    in '17 and not early '18, that would be reflected in

15    those reports.  All other records would be included in

16    the same documents we've talked about:  The daily logs,

17    the dive logs, any vessel logs if anchors were brought

18    up, weekly production reports, manager meeting notes.

19         Q.    And with respect to 2016, did Cooke inspect

20    the underwater anchoring components at Hope Island?

21         A.    Yes.

22         Q.    And did Cooke visually inspect those anchoring

23    components in 2016 down to the anchors?

24         A.    Yes.

25         Q.    And I assume the individuals that conducted



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 130

1   those would be identified in the personnel files.  But

2   you are unable to identify them today?

3       A.   They would be part of the personnel record for

4   2016 and identified as dive personnel.

5            Again, I need to clarify that inspections that

6   occurred daily, the entire facility personnel are part

7   of that inspection process that would note if anything

8   unusual seems to be occurring with the anchoring system

9   and would generate a dive on those particular anchor

10  lines.

11           MS. MEYERS:  I'll insert an objection to the

12  form of that question.

13      Q    (By Mr. Knutsen) Are you able to provide the

14  dates that inspections occurred of the underwater

15  mooring components at Hope Island in 2016?

16      A.   They would be various and reflected in the

17  dive logs and the daily logs.

18      Q.   And can you identify the documents that would

19  exist documenting the underwater inspections of

20  anchoring components at Hope Island in 2016?

21      A.   It would be the same set of document.  It

22  would be recorded in the daily logs, in dive logs for

23  the site, in vessel logs if the anchors were brought to

24  the surface, weekly production records, manager meeting

25  notes.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 131

 1          Q.    Then, with respect to underwater inspections

 2     at Hope Island of anchoring components, underwater

 3     anchoring components, in 2014 and '15, would that same

 4     set of documents be the universe of documents that would

 5     document those inspections that occurred in those years?

 6          A.    Yes.

 7          Q.    And did underwater inspections occur of all

 8     the anchoring components at Hope Island in 2015?

 9          A.    Yes.

10          Q.    And in 2014?

11          A.    Yes.

12          Q.    And are you able to identify the individuals

13     that conducted those inspections in 2015?

14          A.    In 2015, again, would have been the entire

15     crew that was employed at Hope Island in terms of daily

16     inspections.

17          Q.    I'm talking about underwater inspections.

18          A.    They also inspect underwater as I mentioned.

19     They look -- they're able to do near-surface inspections

20     on the daily inspections.  And then, anything deeper

21     than that, would have been by the dive crew.

22          Q.    Are you able to identify who on the dive crew

23     conducted the inspections in 2015 at Hope Island?

24          A.    It would have been various members of the dive

25     team as reflected in the dive logs.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 132**

```
 1        Q.    Are you able to provide the dates that those
 2   inspections occurred in 2015?
 3        A.    It would have been various throughout 2015.
 4        Q.    Do you know whether underwater inspections of
 5   underwater anchoring components at Hope Island in 2015
 6   indicated a need to replace or repair anchoring
 7   components?
 8        A.    Again, that company knowledge would be
 9   reflected in the vessel repair logs.  If indeed a
10   problem was found, those anchors are then brought to the
11   surface and repaired.  If a problem isn't noted, the
12   inspection is simply noted on the dive logs.
13        Q.    So you are not able to answer whether or not
14   any notes indicated a need for repairs or replacements
15   in 2015 of the anchoring components?
16             MS. MEYERS:  Form.
17        A.    The company knowledge would reflect that and
18   would have been provided to you.
19        Q    (By Mr. Knutsen) You're not able to testify as
20   to that today?
21        A.    I'm not testifying personally.  I'm testifying
22   on behalf of Cooke Aquaculture Pacific.  And the full
23   company knowledge is reflected in the record.
24        Q.    It's your position that that would be --
25   whether or not repairs or replacements were identified
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 133

```
 1   as being needed in 2015 would be discerned in some way

 2   from the vessel repair logs?

 3       A.   The vessel logs themselves or the dive records

 4   and probably daily notes, weekly production reports as

 5   well.

 6       Q.   Did you review those documents before today's

 7   deposition?

 8       A.   Not every single document, no.

 9       Q.   Are you able to testify as to whether or not

10   underwater inspections of anchoring components at Hope

11   Island for any year between 2015 and 2018 indicated a

12   need for repairs or replacements?

13       A.   I would provide the same answer.

14       Q.   You're unable to testify as to whether or not

15   those inspections required any -- indicated any need for

16   repairs or replacements?

17           MS. MEYERS:  Form.

18       A.   I think I just did.  The company knowledge

19   would be reflected in documents that you already have

20   been provided by Cooke.

21       Q.   (By Mr. Knutsen) So you're not able to testify

22   today as to that?

23           MS. MEYERS:  Form.

24       A.   I believe I just did.

25       Q.   (By Mr. Knutsen) You testified that you're not
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 134**

1    able to testify to it.

2            MS. MEYERS:  Form.

3        A.    No, actually I have testified that they have

4    been inspected.

5        Q.    (By Mr. Knutsen) That wasn't the question.

6        A.    And that they're part of the record.

7        Q.    That wasn't the question.  The question was

8    whether or not the inspections indicated any need for

9    repairs or replacements.

10       A.    That would be reflected in the record.

11       Q.    Mr. Parsons, can you tell me where the Port

12   Angeles facility is located?

13       A.    The Port Angeles is located in Port Angeles

14   Bay near Port Angeles, Washington.

15       Q.    Who is the site manager of that facility?

16       A.    The site manager of that facility, again, is

17   overseen by Randy Hodgin.  And Brett Raemer,

18   R-A-E-M-E-R, is the site manager when Randy is not

19   present.

20       Q.    And do you know how many cages there are or

21   containment nets there are at the Port Angeles facility?

22       A.    There are 20 that are split into sections of

23   14 and 6.

24            (Deposition Exhibit No. 10 marked for

25            identification.)

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q    (By Mr. Knutsen) Mr. Parsons, you've been
2  handed a document labeled Exhibit 10.  Are you familiar
3  with this document?
4      A.   I haven't seen this specific document before.
5  But yes, it is a diagrammatic representation of the cage
6  systems at Port Angeles.
7      Q.   And how many anchor lines are there at the
8  Port Angeles facility?
9      A.   So on the system that includes the 14 cages,
10  25.  And on the 6-cage system, there are 16.
11     Q.   And do you know if any of the anchoring
12  components at the Port Angeles facility are located at a
13  depth of more than 100 feet?
14     A.   Yes, they are.
15     Q.   Which ones?
16     A.   Again, I'd have to look at a diagram that
17  outlines the individual depths of each one.  But they
18  represent our deepest anchors.
19     Q.   Do you know how many?
20     A.   I will look at that.  That's contained in the
21  record somewhere.  I don't have that information right
22  at hand.  And I don't recall it exactly.  But at least
23  some of the anchors are deeper than 100 feet.
24     Q.   You're not able to testify how many anchors
25  are below 100 feet?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 136**

```
 1        A.    That would be contained in the records of the

 2   site.

 3        Q.    Where would those be contained?

 4        A.    That be would currently in the anchor

 5   inspection logs would tell how deep they are and on-site

 6   documents that show the configuration of the mooring

 7   systems.

 8        Q.    Did Cooke inspect all of the underwater

 9   anchoring components at Port Angeles in 2018?

10        A.    Yes.

11        Q.    With respect to components that are not below

12   100 feet depth, did Cooke inspect those anchors all the

13   way down to the final anchoring component?

14        A.    Yes.

15        Q.    Can you identify who conducted those

16   inspections?

17        A.    That would have been the dive team.

18        Q.    Can you identify them by name?

19        A.    That would be reflected in the personnel files

20   or records.

21        Q.    Can you provide the date that those

22   inspections occurred?

23        A.    For the -- the entire system was actually

24   done -- I know for sure the Mott MacDonald site of PA

25   was actually done in 2018.  And Global as well
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    participated, I believe, in 2017 in the -- sorry.  We're

2    just talking 2018 -- in the inspection.  So it would

3    have been the Mott MacDonald.

4        Q.    So Mott MacDonald inspected the entire

5    anchoring components in 2018 at the Port Angeles

6    facility?

7        A.    Yes.

8        Q.    That was under contract with the state again?

9        A.    Yes.

10       Q.    And I'm sorry.  They inspected all the

11   anchoring --

12       A.    Yes.

13       Q.    Those below and above 100 feet?

14       A.    Yes.

15       Q.    With respect to Cooke's inspections, Cooke's

16   employee inspections, can you identify the dates that

17   those inspections occurred at Port Angeles in 2018 of

18   the underwater anchoring components?

19       A.    They would have been throughout the year for

20   any diving that occurred on the anchoring system and

21   daily, at least weekly, for the anchoring systems below

22   water that could be inspected from the surface.

23       Q.    And what documents exist documenting the

24   inspections of underwater anchoring components at Port

25   Angeles in 018?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 138

```
 1        A.    The Mott MacDonald report would reflect the

 2   components that were observed by their dive contractor.

 3   Daily logs for the Port Angeles site, dive logs for the

 4   Port Angeles site, vessel records of the Elsie M. would

 5   be the boat doing any work at Port Angeles, weekly

 6   production reports, and possibly reflected in management

 7   meeting notes.

 8        Q.    Anything else?

 9        A.    No.

10        Q.    In 2017 did Cooke inspect the underwater

11   anchoring components at Port Angeles?

12        A.    The Port Angeles facility was inspected by

13   Global Diving in 2017.

14        Q.    When did that occur?

15        A.    Late in the year.

16        Q.    After the collapse of Cypress Site 2?

17        A.    Yes.  Other inspections occurred throughout

18   the year by the dive team.

19        Q.    And do you know?  Can you testify as to which

20   components Global Diving inspected?

21        A.    All components.

22        Q.    And what records exist documenting the

23   inspection of the underwater anchoring components at

24   Port Angeles in 2017?

25        A.    The -- it would be reflected in the report
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 139**

1    from Global Diving & Salvage as well as daily logs for

2    those components that were inspected by the dive team,

3    dive records for the dive team, vessel logs if

4    repositioning or inspection were needed on the anchoring

5    systems, weekly production reports, and possibly in

6    manager meeting minutes.

7        Q.    Anything else?

8        A.    Just those that are reflected in the

9    supplemental response.

10        Q.    And in 2016, did Cooke inspect the underwater

11    anchoring components at Port Angeles?

12        A.    Yes.

13        Q.    And with respect to the anchoring components

14    that are at a depth of less than 100 feet, did Cooke

15    inspect those down to the last anchoring component?

16        A.    Yes.

17        Q.    In 2016?

18        A.    Yes.

19        Q.    Can you identify the name of the individuals

20    that conducted those inspections?

21        A.    It would be, again, on the basis of the dive

22    team.

23        Q.    Can you identify the dates that those

24    inspections occurred?

25        A.    As we've indicated, based on the business

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 140

```
1    records, there was actually a more formal review
2    inspection of anchors that was conducted in November of
3    2016.
4         Q.   Can you describe that.
5         A.   Just again, diving the anchoring systems and
6    using best judgment to understand whether the anchors
7    were in compliance or not based on how they were
8    performing.
9         Q.   So Cooke inspected the underwater anchoring
10   components at Port Angeles in November of 2016?
11        A.   Yes.
12        Q.   Who conducted that inspection?
13        A.   It would have been the dive team.
14        Q.   And did they dive to inspect components below
15   100 feet?
16        A.   They did not.  The safety of the dive crew
17   precluded them from diving below 100 feet.  They
18   observed components that they could that far.  And then
19   based on the performance of the anchoring system,
20   they're able to ascertain whether it's functioning
21   properly.
22        Q.   Did Cooke send divers or an ROV to depths
23   below 100 feet to inspect the components at the Port
24   Angeles facility in 2016?
25        A.   Not that I'm aware of.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.   And what documents exist documenting the

2   inspections of the underwater anchoring components at

3   Port Angeles in 2016?

4      A.   That would, again, be on the daily logs, any

5   dive records that the crew generated, weekly production

6   reports, and possibly captured in the manager meeting

7   notes as well vessel logs if the anchors were brought

8   up.

9      Q.   Was there any document created, any unique

10  document created, with respect to the November 2016

11  inspection?

12     A.   I don't believe so.

13     Q.   What was the moving factor for that November

14  2016?  I think you mentioned that there was something

15  that distinguished it from different underwater

16  inspections.

17     A.   No.  Just that it was specifically mentioned

18  in company records where before, you know, it's just

19  part of the daily record and ongoing normal maintenance.

20     Q.   It's unique in that there was a record of it?

21     A.   No, it's unique in --

22          MS. MEYERS:  Object to the form.

23     A.   -- as I explained, it was specifically

24  outlined as a -- there are plenty of records that

25  indicate that we do those types of work.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1     Q.   In 2015 did Cooke's predecessor inspect the

2  underwater anchoring components at Port Angeles?

3     A.   Yes.

4     Q.   And with respect to the underwater anchoring

5  components that are not deeper than 100 feet, did Cooke

6  inspect those, Cooke's predecessor inspect those, down

7  to the deepest component?

8     A.   Again, you know, the daily inspections of the

9  site tells us whether or not the anchors are functioning

10  properly.  If a problem is suspected, those anchors then

11  are brought to the surface via a vessel.  That would be

12  recorded in the vessel logs.  And divers descended the

13  lines at least twice during 2015.

14     Q.   To the final anchoring component for anchors

15  that were below 100 feet deep?

16     A.   Yes.

17     Q.   With respect to the anchoring components that

18  are deeper than 100 feet at Port Angeles, did Cooke send

19  divers or ROVs below 100 feet to inspect those

20  components in 2015 at Port Angeles?

21     A.   Divers were sent as far as safe on those

22  components.  And then, based on the performance of the

23  mooring lines, were able to make a call whether they're

24  functioning properly.  If any suspicion arose over how

25  they were performing, those anchors would be brought up



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 143**

```
 1    to the surface.
 2         Q.   What records exist that would document
 3    underwater mooring inspections at Port Angeles in 2015?
 4         A.   In 2015 it would be reflected in daily site
 5    logs, in dive logs that are put together by the dive
 6    crew, vessel logs if those anchors were raised, weekly
 7    production reports that are generated by the site
 8    manager, and possibly in manager meeting notes.
 9         Q.   Would those same records document all
10    inspections of underwater anchoring components at Port
11    Angeles in 2014?
12         A.   Yes.
13         Q.   Would there be any additional documents from
14    2014?
15         A.   Not that I'm aware of.
16         Q.   Did inspections of underwater anchoring
17    components at Port Angeles in 2015 indicate that any
18    components needed to be repaired or replaced?
19         A.   If they did, that would be reflected on the
20    dive logs.  And they would have been immediately taken
21    care of as recorded on vessel logs.
22         Q.   Can you testify today as to whether or not
23    they did need -- there was a need for any repairs or
24    replacements?
25         A.   I would have to look at the record.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 144**

| | | |
|---|---|---|
| 1 | Q. | What about for 2016? |
| 2 | A. | The same for that. |
| 3 | Q. | You'd have to look at the record? |
| 4 | A. | Yes. |
| 5 | Q. | What about for 2017? |
| 6 | A. | Same. |
| 7 | Q. | What about for 2018? |

8    A.    I really -- I don't have them memorized.  But

9    the company knowledge is very clear in terms of the

10   record.

11        Q.    Mr. Parsons, where is Cypress Site 1 located?

12        A.    Site 1 is in Deepwater Bay near Cypress

13   Island, Washington.

14        Q.    Who is the site manager of that facility?

15        A.    Currently the site manager is Tom Glaspie.

16        Q.    How long has he held that position?

17        A.    Since, I believe, late 2017.

18        Q.    And how many containment cages are there at

19   Cypress Site 1?

20        A.    There are none currently.

21        Q.    How many were there?

22        A.    I believe there were 10.

23        Q.    And is Cypress Site 2 no longer in Deepwater

24   Bay of Cypress Island?

25        A.    Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1               MS. MEYERS:  Site 2 or Site 1?
 2        Q.   (By Mr. Knutsen) I'm sorry.  Site 1.
 3        A.   Site 1, the superstructure is still there.
 4   There are no components other than mooring that are
 5   below the surface.
 6        Q.   So what is left of Cypress Site 1 today?
 7        A.   The superstructure of the cage systems and the
 8   associated housing and feed storage areas.
 9        Q.   So by the "superstructure," are you referring
10   to the walkways?
11        A.   Walkways and floats.
12        Q.   And the mooring system is still in place?
13        A.   Yes.
14        Q.   When were the containment nets removed?
15        A.   I believe it was in early 2018 after harvest.
16        Q.   When was the facility last harvested out?
17        A.   In 2018.
18        Q.   Do you know when?
19        A.   I'd have to look at the record again.
20             (Deposition Exhibit No. 11 marked for
21             identification.)
22        Q    (By Mr. Knutsen) Mr. Parsons, you've been
23   handed an exhibit labeled Exhibit 11.  Are you familiar
24   with this document?
25        A.   Again, I have not seen this exact document.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 146

```
 1              (Ringing phone.)
 2              THE WITNESS:  Sorry.
 3         A.   But I'm assuming that this is a schematic
 4    representation of Cypress Site 1, given that that's what
 5    we're talking about.  It's not labeled as such.
 6         Q    (By Mr. Knutsen) It is labeled "Site 1" at the
 7    top, I believe.  It's not labeled Cypress Site 1.  But
 8    it is labeled "Site 1."
 9         A.   Site 1, yes.
10         Q.   How many anchors are there at Cypress Site 1?
11         A.   So there are 21 actual anchors and 4 shore
12    pins that are listed on here.
13         Q.   Are any of the anchoring components at Cypress
14    Site 1 located at a depth of more than 100 feet?
15         A.   Yes.
16         Q.   Do you know how many?
17         A.   There are five that are below 100 feet.
18         Q.   And did Cooke inspect all of the underwater
19    anchoring components at Cypress Site 1 in 2018?
20         A.   Yes.
21         Q.   And with respect to the anchoring components
22    that are at a depth of less than 100 feet, did Cooke
23    inspect those anchoring components all the way down to
24    the last anchor component in 2018?
25         A.   Yes.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 147

1    Q.    And can you provide the names of the

2    individuals that conducted those inspections?

3    A.    It would have been the dive team at Cypress.

4    Q.    Can you provide the date that those

5    inspections occurred?

6    A.    It would have been prior to the removal of the

7    nets and the closure of the facilities.

8    Q.    Are you able to provide any more specificity?

9    A.    It would be various dates reflected in the

10   record.

11   Q.    With respect to the anchoring components at a

12   depth of more than 100 feet, did Cooke send an ROV or

13   divers to the final anchoring components to inspect

14   those in 2018?

15   A.    Yes.

16   Q.    And who conducted those inspections?

17   A.    Again, we have to look at the Mott MacDonald

18   record.  I believe those occurred in 2017.  But it was

19   either the end of '17 or the beginning of '18.  So we'd

20   have to look at the record to see if those were actually

21   in 2018.  Otherwise, it was divers.  And additionally,

22   it was divers from the dive crew.

23   Q.    Are you able to testify as to who conducted

24   the inspection of the underwater anchoring components in

25   2018 at Cypress Site 1 for components below 100 feet?



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 148**

```
1         A.   If you can provide me with the Mott MacDonald

2    report, I can tell you if that occurred in '18 or '17.

3    I don't recall.

4         Q.   Aside from maybe Mott MacDonald inspecting

5    those, did Cooke use an ROV or divers to inspect

6    components at Cypress Site 1 that were below 100 feet in

7    2018?

8         A.   Yes.

9         Q.   By sending the divers or the remotely operated

10   vehicle to below 100 feet?

11        A.   The divers would not have gone below 100 feet.

12   Again, as previously, the inspections could occur to

13   100 feet by the divers.  And components could be

14   assessed from their -- whether or not they were working

15   functionally.

16        Q.   Did Cooke use ROVs in 2018 to go below

17   100 feet at Cypress Site 1 to inspect components at

18   those depths?

19        A.   If the Mott MacDonald survey occurred in 2018,

20   it was with Mott MacDonald.  If it was 2017, Global

21   Diving conducted it in 2018.  I'd have look at the

22   records.

23        Q.   I'm sorry.  So Global Diving was retained by

24   Cooke to conduct underwater inspections at Cypress

25   Site 1?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          A.    In either 2017 or '18, depending on which one

2     the Mott MacDonald actually occurred at.

3          Q.    So it's your testimony that either Mott

4     MacDonald or Global Diving inspected components below

5     100 feet at Cypress Site 1 in 2018?

6          A.    Yes.

7          Q.    And the other one conducted those inspections

8     in 2017?

9          A.    Yes.

10         Q.    You're not able to identify which year which

11    company did the inspections?

12              MS. MEYERS:   Form.

13         A.    Cooke's knowledge has actually supplied that

14    information.  And if you show me a document, I can tell

15    you exactly when.

16         Q    (By Mr. Knutsen) I assume you're not able to

17    testify as to when the inspections of the underwater

18    components that are deeper than 100 feet occurred in

19    2018.

20              MS. MEYERS:   Form.

21         A.    I believe that I have.  That's throughout the

22    year.

23         Q    (By Mr. Knutsen) I'm talking specifically

24    about sending divers or ROVs below 100 feet to inspect

25    the anchoring components at that depth in 2018.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 150

 1        A.    You were talking about inspecting mooring

 2   components below 100 feet.  That inspection occurs every

 3   day based on how those lines are holding.  If a diver

 4   dives it, he will dive to 100 feet and can ascertain

 5   whether or not they're functioning properly.  If there's

 6   something that is suspected, then the vessel, support

 7   vessel, will pull the anchor up and inspect it.

 8        Q.    Can you identify the dates that Cooke or

 9   Cooke's contractors sent divers or ROVs below 100 feet

10   at Cypress Site 1 in 2018 to conduct inspections of

11   anchoring components at those depths?

12        A.    That would be reflected in the records.

13        Q.    You're not able to provide that?

14        MS. MEYERS:  Form.

15        A.    I just did.

16        Q    (By Mr. Knutsen) And what documents would

17   exist documenting underwater inspections of anchoring

18   components in 2018?

19        A.    Again, depending upon when the inspection

20   occurred by Mott MacDonald, it possibly is reflected in

21   the Mott MacDonald report.  And then inspections done

22   within the company, our daily records, the dive logs by

23   company divers --

24        Q.    What do you mean by "daily" --

25        A.    Excuse me.  I'm going to finish my answer.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 151**

1          There is a daily record that's made, the dive

2    logs, the weekly production reports.  In 2018 there was

3    also a weekly above-water moorage check that was done,

4    checking all the components down into water as far as

5    could be seen.  Any vessel logs for the Clam Digger that

6    would exist showing work on those sites and possibly in

7    the management meeting records.

8          I need a break.

9          MR. KNUTSEN:  Sure.  Ten minutes okay?

10          (Recess taken.)

11    Q    (By Mr. Knutsen) So I believe, Mr. Parsons, we

12    were talking about Cypress Site 1.

13    A.    Yes.

14    Q.    Do you know whether inspections of underwater

15    anchoring components at Cypress Site 1 in 2018 indicated

16    a need for any of the underwater anchoring components to

17    be replaced or repaired?

18    A.    That would be reflected in the record.

19    Q.    Did Cooke inspect the underwater anchoring

20    components at Cypress Site 1 in 2017?

21    A.    Yes.

22    Q.    With respect to the anchoring components that

23    are not below 100 feet, did Cooke inspect those

24    components in 2017 down to the last anchoring component?

25    A.    Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 152

```
 1         Q.    Can you identify who conducted those
 2    inspections?
 3         A.    It would be members of the dive crew.
 4         Q.    Can you identify the dates those inspections
 5    occurred?
 6         A.    It would have been various times throughout
 7    the year.
 8         Q.    And with respect to the components that are at
 9    a depth of greater than 100 feet, did Cooke inspect
10    those by sending divers or an ROV in 2017 to depths
11    below 100 feet?
12         A.    The divers would have descended to depths
13    above 100 feet and been able to assess the condition of
14    the remaining components based on the performance at
15    that point.
16         Q.    Did Cooke send divers or ROVs below 100 feet
17    at Cypress Site 1 in 2017 to inspect anchoring
18    components?
19         A.    Not below 100 feet.
20         Q.    And what records exist documenting the
21    underwater inspection of anchoring components at Cypress
22    Site 1 in 2017?
23         A.    The records that would reflect what had
24    occurred would be the daily logs for Cypress Site 1, any
25    dive logs for Cypress Island sites, any vessel records
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 153

 1   for the Clam Digger, weekly production reports that were

 2   generated for Cypress Site 1, and any manager meeting

 3   notes.

 4        Q.   Would that same set of document also

 5   constitute the records that would document inspections

 6   of underwater anchoring components at Cypress Site 1 in

 7   2016?

 8        A.   Yes.

 9        Q.   Would there be any additional documents for

10   those inspections in 2016?

11        A.   Not that I'm aware of.

12        Q.   What about with respect to underwater

13   inspections of anchoring components in 2015?  Would that

14   set of documents also constitute the records of

15   underwater inspections?

16        A.   Yes.

17        Q.   Any additional documents for 2015?

18        A.   Not that I'm aware of.

19        Q.   And with respect to underwater inspections of

20   anchoring components in 2014, would that same set of

21   documents constitute the records of underwater

22   inspection of anchoring components at Cypress Site 1?

23        A.   Yes.

24        Q.   Would there be any additional documents for

25   those inspections in 2014?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 154

```
 1        A.   Not that I'm aware of.

 2             I should also go back to the 2016 record.

 3   That was also when Sunderland Marine Insurance also

 4   looked at the sites and would have had a partial

 5   inspection of the moorage -- mooring components.

 6        Q.   Can you describe that inspection.

 7        A.   Just basically looking at all of the

 8   components of a particular site and determining whether

 9   it was -- they were able to provide insurance for the

10   facility.

11        Q.   And did they inspect all of the underwater

12   anchoring components in 2016 at Cypress Site 1?

13        A.   Again, they inspect underwater mooring through

14   a variety of ways, including visual observations from

15   above surface.

16        Q.   They did create some sort of documentation of

17   their inspection?

18        A.   Yes.  I believe those have been provided to

19   you as well.

20        Q.   Did they inspect underwater anchoring

21   components at depths below 100 feet?

22        A.   Yes.

23        Q.   How did they do those inspections?

24        A.   Those, again, would have been based on

25   performance of the system.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       Q.    So they did not send divers or ROVs to depths

2   below 100 feet?

3       A.    That would be reflected in their record.

4       Q.    You don't know whether or not they went below

5   100 feet with divers or ROVs?

6       A.    If they did, it would be reflected in the

7   record from Sunderland Marine Insurance.

8       Q.    And in 2016 did Cooke inspect the underwater

9   anchoring components at Cypress Site 1?

10      A.    I think we answered that one.

11      Q.    I think we were on 2017, weren't we?

12      A.    '14 actually.

13      Q.    Those questions, I believe, are specific to

14  the documentation.  The question is:  Did Cooke inspect

15  all of its underwater anchoring components in 2016 at

16  Cypress Site 1?

17      A.    Yes.

18      Q.    And with respect to the anchoring components

19  that are at a depth of less than 100 feet, did Cooke

20  inspect those anchoring components down to the last

21  anchoring component in 2016?

22      A.    Yes.

23      Q.    And can you identify the divers that conducted

24  those inspections?

25      A.    It would have been any member of the dive

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 156**

1    team.

2        Q.   Can you provide the dates when those

3    inspections occurred?

4        A.   They would be available in the dive logs and

5    daily records.

6        Q.   With respect to the anchoring components that

7    are at a depth of more than 100 feet, did Cooke send

8    divers or an ROV to depths of below 100 feet for

9    inspections in 2016 at Cypress Site 1?

10       A.   The divers would not have descended below

11   100 feet.  But they are able to ascertain performance of

12   the mooring system from above 100 feet.  And there were

13   no ROVs deployed.

14       Q.   And with respect to 2015, did Cooke inspect

15   the underwater anchoring components at Cypress Site 1?

16       A.   Yes.

17       Q.   And for components at a depth of less than

18   100 feet, did Cooke inspect those components at Cypress

19   Site 1 in 2015 down to the lowest anchoring component?

20       A.   Yes.

21       Q.   Can you provide the identification of the

22   people that conducted those inspections?

23       A.   They're members of the Cypress dive team.

24       Q.   Can you provide the dates that those

25   inspections occurred?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 157

```
 1        A.   It would be reflected in the daily log and the
 2   dive logs.
 3        Q.   Did Cooke send divers or ROVs to inspect
 4   components below 100 feet at Cypress Site 1 in 2015?
 5        A.   For purposes of inspecting the mooring lines,
 6   the divers would have descended to no more than 100 feet
 7   but can ascertain the performance of the system from
 8   there.  And there were no ROVs deployed.
 9        Q.   In 2015?
10        A.   Yes.
11        Q.   Were ROVs used in 2014 at Cypress Site 1?
12        A.   No.
13        Q.   Did divers dive to depths below 100 feet in
14   2014 to inspect anchoring components at Cypress Site 1?
15        A.   Divers would never dive below 100 feet, for
16   safety reasons.
17        Q.   Did Cooke inspect all of the underwater
18   anchoring components at Cypress Site 1 in 2013?
19        A.   Yes.
20        Q.   What documents would exist documenting
21   inspections of underwater anchoring components at
22   Cypress Site 1 for 2013?
23        A.   For 2013 it would basically be the same:
24   Underwater anchoring systems can be assessed from the
25   surface or slightly below the surface.  Those would be
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   reflected in daily logs.  If divers went farther down
 2   the mooring systems, those would be reflected in dive
 3   logs.  If any work was needed, those would be reflected
 4   in the vessel logs for the Clam Digger.  Weekly
 5   production reports for the Cypress sites would reflect
 6   any work that was done.  And the manager meeting notes
 7   would possibly reflect those as well.
 8       Q.   Were any other documents used to document
 9   inspections of the underwater anchoring components at
10   Cypress Site 1 in 2013?
11       A.   The supplemental report indicates that
12   business records show anchors 18 through 22 were
13   inspected in December 2013.  I have not seen those
14   records.  But they would be part of the record and were
15   provided to you.
16            (Deposition Exhibit No. 12 marked for
17            identification.)
18       Q    (By Mr. Knutsen) Mr. Parsons, you've been
19   handed a document labeled Exhibit 2.  Are you familiar
20   with this document?
21       A.   I have not seen this document before.
22       Q.   You're not aware of what this document is
23   representing?
24       A.   I can understand what it represents.  I just
25   have not seen this before.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 159

1       Q.    What is it your understanding that this

2   document represents?

3       A.    I assume, since it doesn't say Cypress Site 1,

4   that it refers to the mooring conditions at Cypress

5   Site 1.  It simply states "Site 1" and then lists the

6   dates for each anchor of the last inspection date and

7   the condition of surface hardware, surface chain,

8   mooring line, anchor chain, and anchor condition as well

9   as who they were inspected by.

10      Q.    Do you know whether Cooke was maintaining logs

11  of inspections of anchoring components for Cypress

12  Site 1 in 2012, '13, and '14?

13      A.    Again, those logs would be potentially in many

14  places, including daily logs, the dive records, any

15  vessel logs for work that was done on any of the

16  anchoring systems, weekly production reports that were

17  generated, and possibly the manager meeting notes.

18      Q.    Specific to this document, Exhibit 12, you're

19  not familiar with logs of inspections for Cypress Site 1

20  that is represented by Exhibit 12?

21      A.    This particular document could have been put

22  together from any number of sources.

23      Q.    You're not aware of where this information

24  came from?

25      A.    I couldn't say just from looking at this part


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 160**

1    of the document.

2        Q.    Do you know who "SH" might be?

3        A.    I'd have to look back to the personnel records

4    in 2013.  This was before Cooke's ownership of the

5    company.

6        Q.    Do you know who "CS" is?

7        A.    It would be before Cooke's ownership and would

8    be reflected in the personnel records from Icicle

9    Seafoods in 2013 or '12 in that case.

10        Q.    Do you know where these dates come from that

11    are in the column that's headed "Last Inspection Date"?

12        A.    My assumption would be those dates are

13    reflected as a summary from other records.  But I don't

14    know.  Again, this is the first time I've seen this

15    document.  And there's no supporting documentation to go

16    with this that I've been given or seen before.

17        Q.    You didn't review this document, obviously, in

18    preparing for your deposition?

19        A.    No.  I wasn't aware that this document

20    existed.

21        Q.    Mr. Parsons, where was the Cypress Site 2

22    facility located?

23        A.    The Cypress Site 2 facility was also in

24    Deepwater Bay, adjacent to Cypress Island.

25        Q.    Who was the last site manager of Cypress

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 161

```
 1   Site 2?
 2        A.   The last site manager is actually still Tom
 3   Glaspie.  He is the current site manager.  Prior to his
 4   being appointed, it was Sky Guthrie, from my
 5   understanding.  I've never met the person.
 6        Q.   Is Sky Guthrie still employed by Cooke?
 7        A.   No.
 8        Q.   When was Sky Guthrie's position terminated?
 9             MS. MEYERS:  Object to the form.
10        A.   That, I'm not certain.  I'm not certain of
11   that information.  You'd have to look at personnel
12   records.
13        Q    (By Mr. Knutsen) Have you ever met Sky
14   Guthrie?
15        A.   No.
16        Q.   I'm sorry.  Did you say you didn't know when
17   Sky Guthrie left Cooke?
18        A.   The company knowledge would be contained in
19   the personal records.
20        Q.   Was it in 2018?
21        A.   I don't know.  I just explained to you that
22   I'd have to look at personnel records in order to know
23   that.  Since I've been employed by Cooke Aquaculture
24   beginning in September of 2018, Sky Guthrie has not been
25   employed by Cooke.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 162

```
 1          Q.    How many cages or containment cages were there
 2     at Cypress Site 2?
 3          A.    At this point they're all running together.
 4     So I'd have to look at a diagrammatic description.
 5               (Deposition Exhibit No. 13 marked for
 6                identification.)
 7          Q    (By Mr. Knutsen) Mr. Parsons, you've been
 8     handed a document labeled Exhibit 13.  Are you familiar
 9     with this document?
10          A.    This is the first time I've seen this
11     particular document.  This doesn't seem to have the name
12     of a site on it that I can find.  I'm assuming, since
13     we're talking about the Cypress Site 2 as updated on
14     August 3rd of 2017, this is a graphic representation of
15     the cage system at Cypress Island on that date.
16          Q.    And I'm sorry.  Did you state that there were
17     10 containment nets at Cypress Site 2?
18          A.    Yes.
19          Q.    Do you know how many anchors there were,
20     anchoring lines, there were at Cypress Site 2?
21          A.    There were 16 actual anchors and 3 additional
22     systems that were either to a pin or a shoreline.
23          Q.    And were any of the anchoring components at
24     Cypress Site 2 located at a depth of more than 100 feet?
25          A.    Yes.  There are some of the anchoring
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 163**

```
 1    components that are below 100 feet.

 2         Q.   Do you know how many?

 3         A.   I do not based on the documents that I have in

 4    front of me.

 5         Q.   I believe you testified at the beginning of

 6    today that Cypress Site 2 has been completely removed.

 7    Is that correct?

 8         A.   Yes.

 9         Q.   Do you know the approximate date that that

10    site was removed?

11         A.   The final cleanup would have occurred -- the

12    Global Diving & Salvage was contracted, I believe, in

13    October of 2017 to do a complete sweep of the bottom

14    area to remove any remaining debris, some of which

15    clearly, as in tennis shoes and zip ties and the like,

16    were not from Cooke.  But they cleaned the entire bottom

17    surface of the area where Site 2 was.

18         Q.   So it's your understanding -- do you know when

19    Global Diving went out there to conduct that recovery

20    work?

21         A.   As I said, I believe it was in October 2017.

22    But they have a very thorough report that documents

23    every piece of detritus that they removed from the

24    bottom.

25         Q.   Did Cooke Aquaculture conduct an inspection of
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 164**

1    its underwater anchoring components in 2017 prior to the

2    collapse of the facility?

3        A.   Yes.  There were numerous opportunities to do

4    so including the last one that occurred in July of 2017

5    when all anchors were brought to the surface after the

6    mooring line failures that occurred in July of 2017.

7    All components were brought to the surface.  New pad

8    eyes were put on the structure itself, reattached.  And

9    anchors were reset several times to make sure that the

10   facility was secure.

11       Q.   That work was done by Cooke?

12       A.   That work was done by Cooke with the

13   additional assistance from other boats in terms of tugs

14   that helped hold things in position while the remoorage

15   was happening.

16       Q.   What documents exist documenting the anchoring

17   inspection work just you mentioned that occurred at

18   Cypress Site 2 in 2017?

19       A.   I believe those are fully explained in the

20   response generated by counsel to the administrative

21   order.

22       Q.   So you're referring to some sort of legal

23   filing?

24       A.   Yes.  That's the best summary of everything

25   that happened.  There are also internal company records

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    as well that have been provided.

 2        Q.    What are those, internal company records?

 3        A.    That would be a number of logs:  Daily

 4    updates, reports to the Unified Incident Command that

 5    occurred every day after the collapse and in

 6    explanations that were given to DNR regarding the July

 7    2017 incident.

 8        Q.    So again we're talking about records that

 9    document the anchor work in 2017 following the July

10    incident?

11        A.    Yes.

12        Q.    And did Cooke inspect all the underwater

13    anchoring components at Cypress Site 2 in 2016?

14        A.    Yes.

15        Q.    With respect to components that are not at a

16    depth of below 100 feet, did Cooke send divers to the

17    last anchoring component in 2016 at Cypress Site 2?

18        A.    Yes.

19        Q.    Can you identify who conducted those

20    inspections?

21        A.    That would have been members of the Cypress

22    Island dive team.

23        Q.    Can you identify the dates that those

24    inspections occurred?

25        A.    It would have been throughout the year as

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    reflected in their dive logs.

 2        Q.   With respect to anchoring components 100 feet

 3    or deeper, did Cooke send ROVs or divers to those

 4    anchoring components below 100 feet in Cypress Site 2 in

 5    2016?

 6        A.   Those inspections were not dove below 100 feet

 7    because of safety concerns of the divers.  They're still

 8    able to inspect and ascertain whether the mooring

 9    structures are adequately being deployed.  And ROVs were

10    not deployed in 2016.

11        Q.   What records exist documenting the underwater

12    anchoring inspections at Cypress Site 2 for 2018?

13        A.   These would be the same set of documents that

14    we have been discussing.  It would be daily site logs

15    for Cypress 2, dive logs for the dive crew at Cypress

16    Island, any vessel logs that included checking mooring

17    lines and anchoring systems.  Of course in 2000 -- in

18    2016, anything would also have been reflected in the

19    monthly reports, monthly production reports, as well as

20    management meetings.

21        Q.   Would that same set of documents constitute

22    the documentation of underwater inspections of anchoring

23    components at Cypress Site 2 for each year from 2012

24    through 2015?

25        A.   Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 167

```
 1         Q.    Would there be any additional documents for
 2    any one of those given years?
 3         A.    Not that I'm aware of.
 4         Q.    And did Cooke conduct the underwater anchoring
 5    inspections of Cypress Site 2 in 2015?
 6         A.    Yes.
 7         Q.    And did Cooke inspect the underwater anchoring
 8    components down to the lowest anchors for those anchors
 9    that are below 100 feet in 2015?
10         A.    Yes.
11         Q.    Can you identify who conducted those
12    inspections?
13         A.    It would have been members of the entire crew
14    that worked on Cypress Site 2 for ascertaining
15    performance of the moorage system as well as members of
16    the dive team if they dove -- if and when they dove the
17    anchor lines.
18         Q.    Can you identify the dates that the divers
19    dove the anchor lines at Cypress Site 2 in 2015?
20         A.    That information would be contained in the
21    dive logs.
22         Q.    And did Cooke send divers or ROVs below
23    100 feet at Cypress Site 2 in 2015 to inspect anchoring
24    components?
25         A.    The divers would not deploy below 100 feet due
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    to safety concerns.  They can inspect the function of

2    the anchoring system even if it's deployed below

3    100 feet from that depth.  And no ROVs were deployed

4    below 100 feet either.

5         Q.   Is that same answer true for Cypress Site 2

6    for 2014?

7         A.   Yes.

8         Q.   And for 2013?

9         A.   Yes.

10        Q.   For 2012?

11        A.   Yes.

12        Q.   Did Cooke send divers down to the anchor lines

13   at -- for each of the anchoring components that are not

14   below 100 feet at Cypress Site 2 in 2014?

15        A.   Yes.

16        Q.   In 2013?

17        A.   Yes.

18        Q.   2012?

19        A.   Yes.

20             (Deposition Exhibit No. 14 marked for

21             identification.)

22        Q    (By Mr. Knutsen) Mr. Parsons, you've been

23   handed a document that's been labeled Exhibit 14.  Are

24   you familiar with this document?

25        A.   This is, again, the first time that I've seen


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 169

1    this document.  I'm assuming, given what we're

2    discussing currently, that it is a summary of the

3    condition of the mooring systems at Cypress Site 2,

4    although the document simply says "Site 2."

5        Q.   You've never seen this document before?

6        A.   I have not seen this document before.

7        Q.   Do you know who "SH" is?

8        A.   I do not.  I would have to look at the

9    personnel records for, in that case, January of 2014 by

10   Cooke's predecessor, Icicle Seafoods.

11       Q.   Do you know who "CS" is?

12       A.   I do not know.  But I'm sure it's contained in

13   personnel records from the previous ownership.

14       Q.   Do you know where the data contained in

15   Exhibit 14 came from?

16       A.   Again, it's a variety of data that could have

17   been used to compile this summary, anything from daily

18   logs for Cypress Site 2 documenting the condition of the

19   moorage systems to dive inspection logs to vessel

20   records and the variety of other documents that we've

21   discussed to this point.

22       Q.   Are you speculating?  Or do you know where the

23   data came from for this Exhibit 14?

24       A.   It's the only place that that could have come

25   from.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.    So the documents for this data could have come
 2   from were the same set of documents we've been talking
 3   about?
 4        A.    Yes.
 5        Q.    Could it have come from anywhere else?
 6        A.    Not that I'm aware of.
 7        Q.    Mr. Parsons, where is Cypress Site 3 located?
 8        A.    Cypress Site 3 is also located in Deepwater
 9   Bay adjacent to Cypress Island.
10        Q.    Who is the site manager of Cypress Site 3?
11        A.    The current manager of Cypress Site 3,
12   although it's inactive, is Tom Glaspie.
13        Q.    How long has he held that position?
14        A.    Since 2017, I believe.
15        Q.    I'm sorry.  You said Cypress Site 3 is
16   inactive; is that right?
17        A.    Yes.
18        Q.    Do you know when it was last harvested out?
19        A.    I believe in early 2018.  Again, records would
20   reflect that to be accurate.
21        Q.    Does Cooke have any intent to restock Cypress
22   Site 3?
23        A.    Currently not at this time.  We've been
24   approached to consider partnerships with chinook salmon.
25   But Cooke has no direct plans to do so.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 171**

1    Q.    "Chinook salmon," are you talking about the
2  species?  Or is that a company you're referring to?
3    A.    No.  The species to aid in the recovery of the
4  orcas in Washington state.
5    Q.    And did you already identify how many cages
6  there were at Site 3?
7    A.    No.  Again I would have to look that up.
8          (Deposition Exhibit No. 15 marked for
9          identification.)
10   Q    (By Mr. Knutsen) Mr. Parsons, you've been
11 handed a document labeled Exhibit 15.  Are you familiar
12 with this document?
13   A.    I have not seen this particular document
14 before.
15   Q.    Does this document appear to be a diagram of
16 Cypress Site 3?
17   A.    Yes.  With 12 cages, I would assume it's
18 Cypress Site 3 as it existed on December 14 of 2014.  It
19 only is identified as "Site 3" on the top of the
20 document.  But we're assuming that it's Cypress.  That
21 would be, again, prior to the ownership by Cooke
22 Aquaculture.
23   Q.    Were changes made to the layout of Cypress
24 Site 3 following that date, the date of December 14,
25 2014?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 172**

```
 1              (Mr. Steding leaves the deposition.)
 2       A.   Not that I'm aware of.
 3       Q.   (By Mr. Knutsen) Are you able to identify how
 4  many cages there were at Cypress Site 3?
 5       A.   There were 12.
 6       Q.   And what components of Cypress Site 3 remain
 7  in Deepwater Bay of Cypress Island?
 8       A.   The superstructure and the mooring lines.
 9       Q.   And how many anchoring lines are there at
10  Cypress Site 3?
11       A.   There are 27 on this document.
12       Q.   Is it your understanding that that is
13  accurate?
14       A.   In other documents I have seen notation of 30.
15       Q.   Do you know if any anchoring components at
16  Cypress Site 3 are at a depth of greater than 100 feet?
17       A.   Yes.
18       Q.   Do you know how many?
19       A.   I believe 10 based on the supplemental
20  response in front of me.
21       Q.   Did Cooke inspect the underwater anchoring
22  components of Cypress Site 3 in 2018?
23       A.   Yes.
24       Q.   And with respect to the components that are at
25  a depth of less than 100 feet, did Cooke inspect those
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 173**

1    down to the anchor?

2         A.    All of the anchoring components in Cypress

3    Site 3 were inspected by Mott MacDonald's diving

4    contractor during June of 2018.  Additional inspections

5    occurred as part of the routine inspections that occur

6    daily and/or periodically at the site.

7         Q.    Mott MacDonald inspected all of the anchoring

8    components in January of 2018 for Cypress Site 3?

9         A.    Yes.

10        Q.    And leaving the Mott MacDonald inspection

11   aside, did Cooke conduct inspections of the anchoring

12   components at Cypress Site 3 in 2018 down to the anchors

13   for those anchors that are not at a depth of more than

14   100 feet?

15        A.    Yes.

16        Q.    Can you identify who conducted those

17   inspections?

18        A.    It would have been -- by 2018, it still would

19   have been the dive team at Cypress until those sites

20   were closed.  After that, it would have occurred by the

21   dive team at Hope Island.

22        Q.    Can you identify the dates that those

23   inspections occurred?

24        A.    They would be reflected in the dive logs and

25   daily logs.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 174**

```
 1          Q.    With respect to the anchoring components at

 2    Cypress Site 3 that are at a depth of greater than

 3    100 feet, did Cooke send divers or an ROV to inspect

 4    those components in 2018, leaving aside the Mott

 5    MacDonald inspections?

 6          A.    Other than the Mott MacDonald, there were no

 7    ROVs that were deployed.  But their ROV was deployed and

 8    a photographic record obtained.  The divers would have

 9    descended to not below 100 feet on those lines and

10    looked at components that were available to them there

11    and ascertained whether the system was functioning

12    properly but not -- did not dive below 100 feet.

13          Q.    What records does Cooke have documenting the

14    inspection of underwater anchoring components at Cypress

15    Site 3 for 2018?

16          A.    Those would be reflected in 2018 daily logs

17    for the facility.  Daily inspections would still have

18    been occurring until the site was harvested.  Then it

19    would probably be weekly inspections of the moorage

20    components after the pens were removed.  And all the

21    daily logs, the dive records, again the weekly

22    production reports, possibly monthly manager meeting

23    reports.  And, if anchors were removed to the surface

24    for inspection, that will be noted in the vessel logs

25    for the Clam Digger.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 175

```
 1        Q.   Then there's also the Mott MacDonald report;
 2   right?
 3        A.   Yes.
 4        Q.   Anything else?
 5        A.   Not that I'm aware of.
 6        Q.   And in 2017, did Cooke inspect the underwater
 7   anchoring components at Cypress Site 3?
 8        A.   Yes.
 9        Q.   And with respect to those components that are
10   below 100 feet in depth, did Cooke inspect those down to
11   the anchors in 2017?
12        A.   Yes.
13        Q.   Can you identify who conducted those
14   inspections?
15        A.   That would have been members of the dive team
16   to 100 feet.
17        Q.   Can you identify the dates that those
18   inspections occurred?
19        A.   It would be reflected in the company dive
20   records.
21        Q.   For those components that are at a depth of
22   more than 100 feet, can -- did Cooke inspect those
23   components in 2017 by sending either divers or ROVs to
24   below 100 feet to do those inspections?
25        A.   I think that's what you just asked me.  You
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 176

1   said "more" in the last one.

2        Q.    I misspoke.  I apologize.

3              Did Cooke send divers or ROVs below 100 feet

4   at Cypress Site 3 in 2017 to inspect those components?

5        A.    No.  As I said, the divers would have

6   descended no more than 100 feet.  No ROV's were

7   deployed.

8        Q.    And what records or documentation does Cooke

9   have documenting the inspection of the underwater

10  anchoring components at Cypress Site 3 for 2017?

11       A.    Those would be reflected in the daily logs for

12  Cypress Site 3, the dive logs for the Cypress crew, the

13  vessel logs should the anchoring components have been

14  moved to the surface to check, weekly production reports

15  by the site manager, and possibly in manager meeting

16  notes.

17       Q.    And would that same set of documents

18  constitute the records that Cooke has for the

19  inspections of underwater anchoring components at

20  Cypress Site 3 for each year from 2012 through 2016?

21       A.    Yes.  With the exception that 2016 would have

22  also included an inspection and survey by Sunderland

23  Marine Insurance.

24       Q.    Any other exceptions?

25       A.    I think for moorage components, yes.  There


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 177

```
1    were also best aquaculture practice certifications in

2    this time frame.  But they didn't specifically look at

3    moorage.

4        Q.    Aside from the addition of the Sunderland

5    documentation for inspections in 2016, that set of

6    documents that we just went over would constitute the

7    records that Cooke has for its inspections of underwater

8    anchoring components for each year from 2012 through

9    2016?

10       A.    Yes.

11       Q.    Okay.  And did Cooke inspect all of its

12   underwater anchoring components at Cypress Site 3 in

13   2016?

14       A.    Yes.

15       Q.    And for those components that are at a depth

16   of less than 100 feet, did it inspect those components

17   down to the anchor?

18       A.    Yes.

19       Q.    Can you identify who conducted those

20   inspections?

21       A.    The members of Cypress dive team.

22       Q.    Can you provide the dates that those

23   inspections occurred.

24       A.    It would have been at various dates throughout

25   the year reflected in the dive log and daily logs.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 178**

1      Q.    And are these the same answers we're going to

2    get for each year from 2012 through 2015, that

3    underwater inspections of anchoring components occurred?

4      A.    Yes.

5      Q.    Down to the components that are at a depth of

6    less than 100 feet?

7      A.    Yes.

8      Q.    But you're unable to provide names of the

9    divers, but they are identified in some documents?

10      A.    I have provided the names of the divers.

11    They're reflected in company records that Cooke

12    maintains on personnel.

13      Q.    Excuse me.  I mean you're unable to testify

14    today as to those names.

15      A.    I just did.

16      Q.    You're unable to testify today as to the dates

17    that those inspections occurred?

18      A.    I just did.

19      Q.    What are the dates?

20      A.    The dates are various times throughout the

21    year reflected in the dive logs and daily records.

22      Q.    Okay.  For each year from 2012 to 2016, Cooke

23    did not use an ROV or send divers to depths of below 100

24    feet at Cypress Site 2 to conduct inspections of

25    anchoring components?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              MS. MEYERS:  You mean --
 2         A.   Cypress Site 2 or 3?
 3         Q    (By Mr. Knutsen) Excuse me.  Cypress Site 3.
 4         A.   No ROVs were used in that time frame.  Divers
 5    would have descended the line to no deeper than 100 feet
 6    and were able as ascertain the performance of the
 7    mooring system from that point.  But they did not
 8    descend below 100 feet.
 9              (Deposition Exhibit No. 16 marked for
10              identification.)
11         Q    (By Mr. Knutsen) Mr. Parsons, you've been
12    handed a document labeled Exhibit 3.  Have you seen this
13    document before?
14         A.   I have not seen this document before.
15         Q.   And are you able to discern who "CS" is?
16         A.   Not without delving into the personnel record
17    for 2014 that would have been held by Icicle Seafood.
18         Q.   Are you able to identify who "KW" might be?
19         A.   I have a good idea who "KW" is.  But without
20    looking at personnel records, not specifically, no.
21         Q.   Who would you have a good idea that it may be?
22         A.   I don't know for sure.
23         Q.   Who do you suspect it could be?
24         A.   One of the current members of the team.  But
25    again I'm not -- I don't know based on the fact that his
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 180

```
 1   entire name isn't there.

 2        Q.   What is that person now?

 3        A.   He's member of our staff.

 4        Q.   What's his name?

 5        A.   Again, I can't identify it since the full name

 6   isn't there and it's not reflected in this particular

 7   record.

 8        Q.   What's his name?

 9        A.   Whose name?

10        Q.   The person that could or could not be "KW."

11        A.   That's really irrelevant since I don't know

12   for sure.

13        Q.   My question was whether or not there is

14   somebody at Cooke that has those initials, "KW," that

15   you're aware of.

16        A.   In January of 2014 I believe so.  But that was

17   prior to the Cooke's ownership of the company.

18        Q.   Is it Kyl Wood that you think it may be?

19        A.   It's possible.  But there are other

20   possibilities as well.

21        Q.   Do you know who has worked for Cooke or

22   Cooke's predecessor that has the initials KW?

23        A.   I would have to look at a list of all

24   personnel.

25        Q.   Can you explain to me why you're unwilling to
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 181**

 1   provide who you think KW might be?

 2       A.   I simply don't know for sure who it is.  So

 3   I'm not about to speculate.  This isn't about

 4   speculation, is it?

 5       Q.   I'd like for you to speculate.

 6       A.   I don't want to speculate.  I am not willing

 7   to speculate.  Company knowledge would be reflected in

 8   the dive records that were most likely used to produce

 9   this summary.  And then we would know for sure.  If you

10   can supply me with the dive records that you've been

11   supplied with for those time frames, we could ascertain

12   who KW actually was.

13       Q.   Mr. Parsons, do you understand that, unless

14   there's a privilege, you're required to testify and

15   answer questions?

16       A.   I am.  I don't know.

17       Q.   You indicated earlier that you have a

18   suspicion as to who it may be.  And my question is:  Who

19   do you suspect it could be?

20       A.   I won't speculate.

21       Q.   So let the record reflect that you're refusing

22   to answer the question.

23       A.   I'm not refusing to answer the question.  I am

24   not willing to speculate.  This is Cooke's testimony,

25   the company Cooke.  And I'm not prepared personally to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 182**

1   speculate as to anything I don't know.

2       Q.   We'll let the record reflect that you're not

3   answering the question.

4       A.   I am answering the question.  I answered the

5   question that I'm not prepared to speculate as to who KW

6   is.

7       Q.   I appreciate that you're not willing to answer

8   the question.

9            Going back to Exhibit 16, do you know where

10  the data in this exhibit came from?  You were certainly

11  willing to speculate earlier as to where the data may

12  have come from in one of these inspection sheets.

13      A.   Those aren't speculations.  Those are the

14  records that contain information that would have been

15  used to summarize these.

16      Q.   So you're speculating that this data in here

17  came from those records?

18           MS. MEYERS:  Object to the form.

19      A.   If you want to argue semantics the rest of the

20  day, I'm more than happy to do that with you, Brian.

21  But the only documents that could contain the

22  information that were used to put this summary together

23  were the ones that we've gone over.  So you have daily

24  logs.  You have dive records by the dive teams.  If the

25  anchors were brought to the surface and inspected, it

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 183

```
 1   would be vessel logs.  It could be monthly production
 2   records, weekly production records, and perhaps
 3   reflected in monthly management meetings.
 4       Q    (By Mr. Knutsen) So it's your understanding
 5   that this document is summarizing data available to
 6   Cooke or Cooke's predecessor?
 7       A.   Yes.
 8            MR. KNUTSEN:  This is probably a good time to
 9   take a break.  I think we're done with mooring
10   inspections.
11            (Recess taken.)
12
13                E X A M I N A T I O N
14   BY MS. COMERFORD:
15       Q.   My name is Lia Comerford.  We met earlier
16   also.  I represent the Wild Fish Conservancy in this
17   litigation.  I'm going to be asking you some questions
18   more specifically related to Cypress Site 2 right now.
19       A.   Okay.
20       Q.   So first I'd like to talk a little bit about
21   the debris recovery efforts at Cypress Site 2.
22       A.   Yes.
23       Q.   Can you tell me a little bit about what
24   Cooke's first -- Cooke's first efforts to remove it.
25   I'm talking about the debris that fell to the floor
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE

 2            I, JACQUELINE L. BELLOWS, the undersigned

 3   Certified Court Reporter pursuant to RCW 5.28.010 authorized

 4   to administer oaths and affirmations in and for the State of

 5   Washington, do hereby certify that the sworn testimony

 6   and/or proceedings, a transcript of which is attached, was

 7   given before me at the time and place stated therein; that

 8   any and/or all witness(es)were duly sworn to testify to the

 9   truth; that the sworn testimony and/or proceedings were by

10   me stenographically recorded and transcribed under my

11   supervision, to the best of my ability; that the foregoing

12   transcript contains a full, true, and accurate record of all

13   the sworn testimony and/or proceedings given and occurring

14   at the time and place stated in the transcript; that a

15   review of which was requested; that I am in no way related

16   to any party to the matter, nor to any counsel, nor do I

17   have any financial interest in the event of the cause.

18                    WITNESS MY HAND AND DIGITAL SIGNATURE this 9th

19   day of March, 2019.

20

21

22   _____

23   Jacqueline L. Bellows
     Washington State Certified Court Reporter, No. 2297
24   jbellows@yomreporting.com

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 185**

EXHIBIT 1
WIT: Parsons
DATE: 2-28-19
J.L. Bellows, CCR 2297

HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7

8

9          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF WASHINGTON
10                        AT SEATTLE

11

12    WILD FISH CONSERVANCY,                    Case No. 2:17-cv-01708-JCC

13          Plaintiff,                          PLAINTIFF'S AMENDED NOTICE OF
                                                RULE 30(B)(6) DEPOSITION OF
14    v.                                        DEFENDANT COOKE AQUACULTURE
                                                PACIFIC, LLC AND RULE 34 REQUEST
15    COOKE AQUACULTURE PACIFIC, LLC,           FOR PRODUCTION OF DOCUMENTS

16          Defendant.

17

18

19          TO:    DEFENDANT COOKE AQUACULTURE PACIFIC, LLC, AND COUNSEL OF

20    RECORD:

21          PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 30(b)(6),

22

23    Plaintiff Wild Fish Conservancy ("Conservancy"), by and through its undersigned counsel,

24    hereby notifies you that it requires Cooke Aquaculture Pacific, LLC ("Cooke"), to attend and

25    testify under oath at a deposition. The deposition will take place on Thursday, February 28,

26    2019, beginning at 9:00 am, and on Friday, March 1, 2019, beginning at 9:00 am, at the offices

27    of Northwest Resource Law, PLLC, 101 Yesler Way, Suite 205, Seattle, Washington 98104. The

28

29    deposition will be recorded by audio, audiovisual, and/or stenographic means. This oral

AMENDED NOTICE OF DEPOSITION          KAMPMEIER & KNUTSEN PLLC    EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR              221 SW 11th Ave., Suite 217  10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 1           Portland, Oregon 97293       Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC                (503) 841-6515               (503) 768-6825

**THIRD KNUTSEN DECLARATION - 186**

examination will be subject to continuance or adjournment from time to time or place to place until completed.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Cooke must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on Cooke's behalf, and may set out the matters on which each person designated will testify. The designated person or persons must testify about information known or reasonably available to Cooke. The matters for inquiry at the deposition are set forth below.

Further, pursuant to Federal Rule of Civil Procedure 34, you are requested to bring to the deposition the documents requested below.

## DEFINITIONS

The following definitions apply to the foregoing list of topics on which examination is requested:

1.      The terms "you," "your," "Defendant" and "Cooke" refer to, as appropriate for the applicable time period, Cooke Aquaculture Pacific, LLC, and/or Icicle Acquisition Subsidiary, LLC, including (i) their present and former officers, employees, consultants, agents, representatives, attorneys, and affiliated entities that were in existence during the applicable period of time covered by these requests; (ii) any other person or entity acting on Defendant's behalf or on whose behalf the Defendant acted; or (iii) any other person or entity otherwise subject to the Defendant's control or which controls the Defendant or with which the Defendant is under common control.

2.      The term "Puget Sound net pens" means the salmonid net pen facilities currently and/or formerly owned and/or operated by Defendant in Puget Sound and/or the Strait of Juan de Fuca including, as appropriate, the operations and/or maintenance of those facilities and/or the

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 2
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

salmonids reared therein.

3.     The term "Cypress Site 2" refers to the net pen facilities located, or formerly located, in or near Deepwater Bay of Cypress Island and that are commonly referred to as "Cypress Site 2" and/or "Site 2 — Deepwater Bay."

4.     The term "Puget Sound" refers to Puget Sound, including the Strait of Juan de Fuca, and all freshwater bodies flowing into those waters.

5.     The term "Ecology" refers to the Washington State Department of Ecology.

6.     The term "Permits" refers, collectively, to the current and former (as appropriate) National Pollutant Discharge Elimination System ("NPDES") permits issue by Ecology for discharges from the Puget Sound net pens, which are currently assigned NPDES permit numbers WA-003153-4, WA-003154-2, WA-003152-6, WA-003156-9, WA-003157-7, WA-003158-5, WA-003159-3, and WA-004089-4.

7.     The term "Pollution Prevention Plan" has the same meaning as that term used in the Permits, i.e., a Pollution Prevention Plan prepared under the requirements of Condition S6 of the current Permits.

8.     The term "Fish Release Prevention and Monitoring Plan" has the same meaning as that term used in the Permits, i.e., a Fish Release Prevention and Monitoring Plan prepared under the requirements of Condition S7 of the current Permits.

9.     The term "costs" means all monetary and non-monetary costs, including those associated with labor and personnel time.

10.     "FishTalk" refers to the proprietary software program that Cooke uses to track the number of fish within its net pens as described by Cooke in its Supplemental Response to Interrogatory 8.

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 3
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**THIRD KNUTSEN DECLARATION - 188**

1

**MATTERS FOR INQUIRY**

2      1.      With respect to the collapse of the Cypress Site 2 facility during the summer of

3   2017:

4           a.      Cooke's understanding as to the reasons for and causes of the collapse,

5

6   and the bases for that understanding;

7           b.      The inspections, maintenance and/or repairs, and any failures of any

8   structures, equipment, or components at Cypress Site 2 during the twelve months

9   preceding the collapse;

10

11          c.      Cooke's response to the collapse, including notifications given to

12  regulatory agencies, efforts to recover Atlantic salmon from Cypress Site 2 and/or Puget

13  Sound, communications with and/or payments to those that recovered escaped Atlantic

14  salmon, efforts to recover and/or remove materials associated with the collapse

15  (structures, equipment, supplies, etc.), efforts to investigate the cause(s) of the collapse

16
    (including the results of those investigations), and efforts to remediate any environmental
17

18  and/or ecological impacts from the collapse;

19          d.      Identification and observations of materials that were or that may have

20  been released into Puget Sound as a result of the collapse (e.g., fuels, lubricants, feed,

21  chemicals, pharmaceuticals, equipment, machines, metals, netting, and any other supplies
22

23  or materials that were present at or on Cypress Site 2 at the time of the collapse);

24          e.      The number of Atlantic salmon that died as a result of the collapse, the

25  number of carcasses recovered, and the procedures employed to remove and dispose of
26

27  carcasses and associated wastes;

28          f.      The number of Atlantic salmon that escaped as a result of the collapse, the

29

AMENDED NOTICE OF DEPOSITION           KAMPMEIER & KNUTSEN PLLC        EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR               221 SW 11th Ave., Suite 217    10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 4            Portland, Oregon 97293         Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC             (503) 841-6515                 (503) 768-6825

**THIRD KNUTSEN DECLARATION - 189**

1  number that were recovered, the number that were not recovered, and Cooke's efforts to

2  ascertain these numbers of fish that escaped, were recovered, and were not recovered;

3         g.     The development of a Sediment Sampling and Analysis Plan for Cypress

4  Site 2 in light of the collapse, the submission of such a plan to Ecology, the review and/or

5
6  approval of the plan by Ecology, and any closure monitoring conducted by Cooke

7  following the collapse;

8         h.     Any efforts taken by Cooke following the collapse of Cypress Site 2 to

9  prevent a similar failure from occurring at any of Cooke's Puget Sound net pens,

10
11  including what efforts Cooke took, where these efforts were implemented, how these

12  efforts were implemented, when these efforts were implemented, who implemented these

13  efforts, and how these efforts may prevent a similar collapse event from occurring;

14      2.     The July 2017 incident at Cypress Site 2 (*see, e.g.*, COOKE_CWA_00016041-

15
16  16042 (Cooke's response to Administrative Order 15422, describing July incident)), including

17  Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response

18  to the incident;

19      3.     The May 2017 incident at Clam Bay, in which the mooring attachments that

20  connect the feed barge to the cage facilities failed (*see, e.g.*, COOKE_CWA_00003508 (Jan. 19,

21
22  2018 letter from Diane Meyer to the Department of Ecology describing Clam Bay incident)),

23  including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in

24  response to the incident;

25      4.     Structural assessments or inspections of the Puget Sound net pens that Cooke has

26
27  performed, commissioned, or otherwise arranged for or considered arranging for since August 1,

28  2017 (*see, e.g.*, COOKE_CWA_00026741 (Sept. 20, 2017 letter from Cooke to the Washington

29

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 5
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1   Department of Fish and Wildlife mentioning that Cooke "commissioned an independent

2   structural assessment of all its net pens by International Inspections")), including costs associated

3   with such structural assessments or inspections;

4        5.    The Pollution Prevention Plans that you have prepared, modified, and/or

5   implemented for the Puget Sound net pens pursuant to the requirements of the Permits since

6

7   September 1, 2012, including your implementation of the plans and costs associated with

8   preparation, modification, and/or implementation of the plans;

9        6.    Inspections that you have conducted at the Puget Sound net pens of the exposed

10  surface lines, shackles, and/or mooring points under the provisions of the Permits—including

11

12  Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish

13  Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and

14  when the inspections were conducted, who conducted the inspections, what training and/or

15

16  instructions were provided to those conducting the inspections, how the inspections were

17  documented, what documentation of the inspections exists, how any inspection documentation is

18  maintained, who generates and/or generated the inspection documentation, who maintains and/or

19  maintained the inspection documentation, and what costs were associated with the inspections;

20

21       7.    Inspections that you have conducted at the Puget Sound net pens of the main cage

22  structures under the provisions of the Permits—including Conditions S6 and/or S7 of the

23  Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring

24  Plans since September 1, 2012—including how and where the inspections were conducted, what

25  dates the inspections were conducted, who conducted the inspections, what training and/or

26

27  instructions were provided to those conducting the inspections, how the inspections were

28  documented, what documentation of the inspections exists, how any inspection documentation is

29

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 6
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**THIRD KNUTSEN DECLARATION - 191**

1 maintained, who generates and/or generated the inspection documentation, who maintains and/or

2 maintained the inspection documentation , and what costs were associated with the inspections;

3       8.     Inspections that you have conducted at the Puget Sound net pens of the anchoring

4 components above and below the water line under the provisions of the Permits—including

5 Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish

6 Release Prevention and Monitoring Plans since September 1, 2012—including how (e.g., by

7 divers, remotely operated vehicles, etc.) and where the inspections were conducted, what dates

8 the inspections were conducted, who conducted the inspections, what training and/or instructions

9 were provided to those conducting the inspections, how the inspections were documented, what

10 documentation of the inspections exists, how any inspection documentation is maintained, who

11 generates and/or generated the inspection documentation, who maintains and/or maintained the

12 inspection documentation, and what costs were associated with the inspections; with respect to

13 inspections of components at a depth of 100 feet or more, in addition to the aforementioned

14 topics, identification of all anchoring components at the Puget Sound net pens that are at a depth

15 of 100 feet or more, your efforts to respond to Plaintiff's Second Set of Requests for Admission

16 pertaining to inspections of such components, and any other efforts you have undertaken since

17 the initiation of this lawsuit to determine whether such inspections occurred;

18       9.     Inspections that you have conducted at the Puget Sound net pens of netting,

19 including fish containment netting and predator exclusion netting and including inspections for

20 biofouling, under the provisions of the Permits—including Conditions S6 and/or S7 of the

21 Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring

22 Plans since September 1, 2012—including how, where, and when the inspections were

23 conducted, who conducted the inspections, what training and/or instructions were provided to

---

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 7
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

those conducting the inspections, how the inspections were documented, what inspection documentation exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections;

10.     Maintenance (including repairs and/or replacements) you have conducted of the Puget Sound net pens, including any such efforts made under the provisions of the Permits— including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how maintenance decisions are made, what standards/criteria you employ when deciding whether to undertake maintenance, who makes maintenance decisions, what costs are associated with such maintenance, how the maintenance is documented, what documentation of the maintenance exists, how any maintenance documentation is maintained, who generates and/or generated the maintenance documentation, and who maintains and/or maintained the maintenance documentation;

11.     Your efforts since September 1, 2012 to comply with the requirement of Condition S6 of the Permits that you "assure that the operations staff for the facility is familiar with the [Pollution Prevention Plan] and have been adequately trained in the specific procedures which it requires," and costs associated with these efforts;

12.     The Fish Release Prevention and Monitoring Plans and/or Fish Escape Prevention Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens pursuant to the requirements of the Permits since September 1, 2012, including your implementation of the plans, and costs associated with preparation, modification and/or implementation of the plans;

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 8
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

13.     Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement, including the results of your efforts to track the number of fish lost due to escapement;

14.     Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases," and the results of such efforts;

15.     Cooke's FishTalk database, including the data that is recorded in FishTalk regarding opening and closing counts, harvest counts, predation counts, mortality counts and reasons for mortality, and deviation counts of fish; how such data is gathered, calculated, and/or entered into FishTalk; how reports are generated from FishTalk; and how the reports and/or data are used to comply with the provisions of Condition S7 of the Permits requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement and requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases;"

16.     Your efforts to purchase, clean, repair, maintain, and replace netting at the Puget Sound net pens since September 1, 2012, including procedures and intervals for cleaning mussels and other marine growth from the netting and the equipment or other tools used to clean netting, how these efforts were documented, what documentation of these efforts exists, how documentation of these efforts is maintained, who generates and/or generated documentation of

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 9
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

THIRD KNUTSEN DECLARATION - 194

these efforts, and who maintains and/or maintained documentation of these efforts;

17.    Your identification and implementation since September 1, 2012 of best practices to maintain the Puget Sound net pen cages/structures, mooring systems, and nets, including how you identify such practices, decide which practices should or should not be implemented, and/or determine how select practices are implemented; what persons are influential in making these decisions; and what practices were considered but not implemented;

18.    Cooke's use of pressure or power washers at the Puget Sound net pens, including the Fort Ward pier, since September 1, 2012;

19.    Costs you have incurred since September 1, 2012 in your efforts to comply with the Permits;

20.    Proposals, bids, invoices, budgets, and/or estimates for inspections, maintenance, repairs, and/or replacements at the Puget Sound net pens generated, received, and/or paid since September 1, 2012;

21.    Your procedures since January 1, 2010 for characterizing environmental conditions at the sites of the Puget Sound net pens, including methods used to characterize maximum currents, maximum wind speeds, maximum significant wave heights, maximum boat wake amplitudes, and sediment types for anchor holding capacity;

22.    The identification of any domestic and/or international standards for finfish facilities that you have recognized as authoritative and/or sought to comply with at the Puget Sound net pens since September 1, 2012;

23.    With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the identity of those that designed and/or approved the structural and/or mooring designs (including whether those individuals are licensed

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 10
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**THIRD KNUTSEN DECLARATION - 195**

professional engineers), any deviations at those Puget Sound net pens from the mooring plans or arrangements—including mooring components or configurations—recommended or prescribed by the pen manufactures or by engineers employed or retained by you, the procedures you employed to determine whether to permit any such deviations, the identity and qualifications of those that selected the anchors, an explanation of how and why the anchors were selected and/or sized, and the procedures used to determine whether anchors were installed and/or embedded properly;

24.      Your procedures for selection and/or acquisition of the pens/cages for the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist;

25.      With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the degree of biofouling of the nets that you consider to pose acceptable levels of risks and the bases for those levels;

26.      Your efforts to prepare to testify on the topics identified herein at deposition; and

27.      Your efforts to respond to Plaintiff's Requests for Production and Interrogatories (collectively "Plaintiff's discovery requests"). Topics will include any instructions given to the persons who conducted the searches for information responsive to Plaintiff's discovery requests, how employees who might possess or know relevant information were identified and the identity of such employees, and how the searches were conducted, including for electronically stored information and what specific search terms were used to conduct searches of pertinent email records.

AMENDED NOTICE OF DEPOSITION OF COOKE AND REQUEST FOR PRODUCTION OF DOCUMENTS - 11 Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

THIRD KNUTSEN DECLARATION - 196

1

**REQUEST FOR PRODUCTION OF DOCUMENTS**

2      You are requested under Federal Rule of Civil Procedure 34 to bring the following

3  documents with you to the deposition noticed herein:

4      1.      Any documentation (e.g., reports/logs/checklists) generated for any inspections

5
6  that you have conducted since September 1, 2012 under the requirements of Condition S6.F of

7  the Permits which requires that you, "[a]t least once per year, conduct an inspection of the main

8  cage structure and anchoring components above and below the water line";

9      2.      Any inspection documentation (e.g., reports/logs/checklists) generated since

10
11  September 1, 2012 under the requirements of your Pollution Prevention Plans, and/or your Fish

12  Release Prevention and Monitoring Plans; and

13      3.      All documents related to inspections since September 1, 2012 of components of

14  the Puget Sound net pens at a depth of 100 feet or more, including inspection reports,

15
16  communications with employees and/or contractors performing the inspections, bills and/or

17  invoices for such inspections, videos and/or photographs from such inspections, and any other

18  documents relied upon in preparing your responses to Plaintiff's Second Set of Requests for

19  Admission pertaining to such inspections.

20      4.      All documents reviewed by or created by you to prepare for this deposition that

21
22  you have not already produced to Plaintiff through discovery in this matter.

23      DATED this February 14, 2019.

24

25

26

27

28

29

AMENDED NOTICE OF DEPOSITION        KAMPMEIER & KNUTSEN PLLC    EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR            221 SW 11th Ave., Suite 217    10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 12        Portland, Oregon 97293        Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC          (503) 841-6515                (503) 768-6825

1

KAMPMEIER & KNUTSEN, PLLC

2

By: _____

3

    Brian Knutsen, WSBA No. 38806

4

    221 S.E. 11th Avenue, Suite 217
    Portland, Oregon 97214

5

    Tel, Email: (503) 841-6515, brian@kampmeierknutsen.com

6

    Paul A. Kampmeier, WSBA No. 31560

7

    615 Second Ave., Suite 360
    Seattle Washington 98104

8

    Tel, Email: (206) 223-4088, paul@kampmeierknutsen.com

9

10

EARTHRISE LAW CENTER

11

12

    Kevin Cassidy (OSB #025296), *admitted pro hac vice*
    Lia Comerford (OSB #141513), *admitted pro hac vice*

13

    Lewis & Clark Law School
    10015 S.W. Terwilliger Blvd.

14

    Portland, Oregon 97219

15

    Tel. Email: (781) 659-1696, cassidy@lclark.edu
    (503) 768-6823, comerfordl@lclark.edu

16

17

    *Attorneys for Plaintiff Wild Fish Conservancy*

18

19

20

21

22

23

24

25

26

27

28

29

| | | |
|---|---|---|
| AMENDED NOTICE OF DEPOSITION OF COOKE AND REQUEST FOR PRODUCTION OF DOCUMENTS - 13 Case No. 2:17-cv-01708-JCC | KAMPMEIER & KNUTSEN PLLC 221 SW 11th Ave., Suite 217 Portland, Oregon 97293 (503) 841-6515 | EARTHRISE LAW CENTER 10015 SW Terwilliger Blvd. Portland, Oregon 97219 (503) 768-6825 |

**THIRD KNUTSEN DECLARATION - 198**

1

## CERTIFICATE OF SERVICE

2    I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that

3    I am co-counsel for Plaintiff Wild Fish Conservancy and that on February 14, 2019, I caused the

4    foregoing to be served on the following by electronic mail per written agreement with counsel:

5

6    Douglas J. Steding
     Diane M. Meyers
7    Madeline Engel
8    Northwest Resource Law, PLLC
     101 Yesler Way, Suite 205
9    Seattle, Washington 98104
     Email: dsteding@nwresourcelaw.com
10   dmeyers@nwresourcelaw.com
     mengel@nwresourcelaw.com
11   kcouden@nwresourcelaw.com
12   ehinkes@nwresourcelaw.com
     dbechtold@nwresourcelaw.com
13

14   *Attorneys for Defendant Cooke*
15   *Aquaculture Pacific, LLC*

16

17

18

19   Brian A. Knutsen, WSBA No. 38806

20

21

22

23

24

25

26

27

28

29

AMENDED NOTICE OF DEPOSITION         KAMPMEIER & KNUTSEN PLLC      EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR             221 SW 11th Ave., Suite 217   10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 14         Portland, Oregon 97293        Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC          (503) 841-6515                (503) 768-6825

**THIRD KNUTSEN DECLARATION - 199**

| Topic No. | Topic | Persons Interviewed | Responsive Documents |
|---|---|---|---|
| 1(a) | With respect to the collapse of the Cypress Site 2 facility during the summer of 2017:<br><br>a. Cooke's understanding as to the reasons for and causes of the collapse, and the bases for that understanding; | Kevin Bright (2/12/19)<br>Doug Steding (2/20/19) | October 30, 2017 Response to Administrative Order 15422 |
| 1(b) | b. The inspections, maintenance and/or repairs, and any failures of any structures, equipment, or components at Cypress Site 2 during the twelve months preceding the collapse; | Doug Steding (2/20/19) | Daily Logs - Site 2<br>Dive Logs - Site 2<br>Vessel Logs<br>Monthly Compliance Checklists - Cypress<br>Weekly Production Reports - Cypress<br>Manager Meeting Notes<br>Sunderland Marine Insurance Farm Survey |
| 1(c) | c. Cooke's response to the collapse, including notifications given to regulatory agencies, efforts to recover Atlantic salmon from Cypress Site 2 and/or Puget Sound, communications with and/or payments to those that recovered escaped Atlantic salmon, efforts to recover and/or remove materials associated with the collapse (structures, equipment, supplies, etc.), efforts to investigate the cause(s) of the collapse (including the results of those investigations), and efforts to remediate any environmental and/or ecological impacts from the collapse; | Doug Steding (2/20/19)<br>James Trask (2/20/19)<br>Jack Rensel (2/20/19) | Situation Updates<br>October 30, 2017 Response to Administrative Order 15422<br>Global Diving Reports<br>Response to IRB Report<br>Site Closure Monitoring<br>List of Invoices and Invoices |
| 1(d) | d. Identification and observations of materials that were or that may have been released into Puget Sound as a result of the collapse (e.g., fuels, lubricants, feed, chemicals, pharmaceuticals, equipment, machines, metals, netting, and any other supplies or materials that were present at or on Cypress Site 2 at the time of the collapse); | Doug Steding (2/20/19)<br>James Trask (2/20/19) | Situation Updates<br>October 30, 2017 Response to Administrative Order 15422<br>Global Diving Reports<br>Response to IRB Report<br>Site Closure Monitoring |
| 1(e) | e. The number of Atlantic salmon that died as a result of the collapse, the number of carcasses recovered, and the procedures employed to remove and dispose of carcasses and associated wastes; | Doug Steding (2/20/19) | Situation Updates<br>Fish Escape Report<br>Correspondence with Agencies |
| 1(f) | f. The number of Atlantic salmon that escaped as a result of the collapse, the number that were recovered, the number that were not recovered, and Cooke's efforts to ascertain these numbers of fish that escaped, were recovered, and were not recovered. | Doug Steding (2/20/19) | Situation Updates<br>Fish Escape Report<br>Correspondence with Agencies |
| 1(g) | g. The development of a Sediment Sampling and Analysis Plan for Cypress Site 2 in light of the collapse, the submission of such a plan to Ecology, the review and/or approval of the plan by Ecology, and any closure monitoring conducted by Cooke following the collapse; | Jack Rensel (2/20/19) | Sediment Sampling and Analysis Plan<br>Email discussions with Ecology |
| 1(h) | Any efforts taken by Cooke following the collapse of Cypress Site 2 to prevent a similar failure from occurring at any of Cooke's Puget Sound net pens, including what efforts Cooke took, where these efforts were implemented, how these efforts were implemented, when these efforts were implemented, who implemented these efforts, and how these efforts may prevent a similar collapse event from occurring. | Doug Steding (2/20/19)<br>James Trask (2/20/19) | Mott MacDonald Reports<br>Correspondence with Agencies<br>October 2017 Pollution Prevention Plan<br>November 2018 Fish Escape Plan<br>Global Report |
| 2 | The July 2017 incident at Cypress Site 2 (see, e.g., COOKE_CWA_00016041- 16042 (Cooke's response to Administrative Order 15422, describing July incident)), including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response to the incident. | Kevin Bright (2/12/19)<br>Doug Steding (2/20/19) | October 30, 2017 Response to Administrative Order 15422 |
| 3 | The May 2017 incident at Clam Bay, in which the mooring attachments that connect the feed barge to the cage facilities failed (see, e.g., COOKE_CWA_00003508 (Jan. 19, 2018 letter from Diane Meyer to the Department of Ecology describing Clam Bay incident)), including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response to the incident. | Diane Meyers (2/12/19) | Jan 19, 2018 Response to Ecology<br>Vessel Log Excerpt May 2017 |



EXHIBIT 2
WIT: Parsons
DATE: 2-15-19
J.L. Bellows, CCR 2297

COOKE_CWA_0239963

| Topic No. | Topic | Persons Interviewed | Responsive Documents |
|---|---|---|---|
| 4 | Structural assessments or inspections of the Puget Sound net pens that Cooke has performed, commissioned, or otherwise arranged for or considered arranging for since August 1, 2017 (see, e.g., COOKE_CWA_00026741 (Sept. 20, 2017 letter from Cooke to the Washington Department of Fish and Wildlife mentioning that Cooke "commissioned an independent structural assessment of all its net pens by International Inspections")), including costs associated with such structural assessments or inspections. | James Trask (2/20/19)<br>Bill Clark (2/21/19)<br>Michael Szermerda (2/21/19) | Mott MacDonald Reports<br>International Inspection Reports<br>Global Diving Report |
| 5 | The Pollution Prevention Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens pursuant to the requirements of the Permits since September 1, 2012, including your implementation of the plans and costs associated with preparation, modification, and/or implementation of the plans. | Kevin Bright (2/12/19) | Pollution Prevention Plans |
| 6 | Inspections that you have conducted at the Puget Sound net pens of the exposed surface lines, shackles, and/or mooring points under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and when the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections. | Randy Hodgin (1/30/19, 1/31/19, 2/1/19)<br>Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19)<br>Margaret deGravelle (2/20/19)<br>James Trask (2/20/19) | Daily Logs<br>Dive Logs<br>Vessel Logs<br>Monthly Compliance Checklists<br>Weekly Production Reports<br>Manager Meeting Notes<br>Employee Training Logs and Checklists<br>Anchor Inspection<br>Weekly Inspection Logs |
| 7 | Inspections that you have conducted at the Puget Sound net pens of the main cage structures under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how and where the inspections were conducted, what dates the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections. | Randy Hodgin (1/30/19, 1/31/19, 2/1/19)<br>Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19)<br>Margaret deGravelle (2/20/19)<br>James Trask (2/20/19) | Daily Logs<br>Dive Logs<br>Vessel Logs<br>Monthly Compliance Checklists<br>Weekly Production Reports<br>Manager Meeting Notes<br>Employee Training Logs and Checklists<br>Anchor Inspection<br>Weekly Inspection Logs |
| 8 | Inspections that you have conducted at the Puget Sound net pens of the anchoring components above and below the water line under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how and where the inspections were conducted, what dates the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections; with respect to inspections of components at a depth of 100 feet or more, in addition to the aforementioned topics, identification of all anchoring components at the Puget Sound net pens that are at a depth of 100 feet or more, your efforts to respond to Plaintiff's Second Set of Requests for Admission pertaining to inspections of such components, and any other efforts you have undertaken since the initiation of this lawsuit to determine whether such inspections occurred; | Randy Hodgin (1/30/19, 1/31/19, 2/1/19)<br>Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19)<br>Margaret deGravelle (2/20/19)<br>James Trask (2/20/19) | Daily Logs<br>Dive Logs<br>Vessel Logs<br>Monthly Compliance Checklists<br>Weekly Production Reports<br>Manager Meeting Notes<br>Employee Training Logs and Checklists<br>Anchor Inspection<br>Weekly Inspection Logs |

Working Copy

| Topic No. | Topic | Persons Interviewed | Responsive Documents |
|---|---|---|---|
| 9 | Inspections that you have conducted at the Puget Sound net pens of netting, including fish containment netting and predator exclusion netting and including inspections for biofouling, under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and when the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what inspection documentation exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections. | Randy Hodgin (1/30/19, 1/31/19, 2/1/19) Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19) Margaret deGravelle (2/20/19) James Trask (2/20/19) | Daily Logs Dive Logs Vessel Logs Monthly Compliance Checklists Weekly Production Reports Manager Meeting Notes Employee Training Logs and Checklists Anchor Inspection Weekly Inspection Logs Net Inspection Protocol BAP Audits |
| 10 | Maintenance (including repairs and/or replacements) you have conducted of the Puget Sound net pens, including any such efforts made under the provisions of the Permits— including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how maintenance decisions are made, what standards/criteria you employ when deciding whether to undertake maintenance, who makes maintenance decisions, and what costs are associated with such maintenance. | Randy Hodgin (1/30/19, 1/31/19, 2/1/19) Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19) Margaret deGravelle (2/20/19) James Trask (2/20/19) Michael Szermerda (2/21/19) Kevin Bright (2/21/19) | Daily Logs Dive Logs Vessel Logs Monthly Compliance Checklists Weekly Production Reports Manager Meeting Notes Employee Training Logs and Checklists Anchor Inspection Weekly Inspection Logs |
| 11 | Your efforts since September 1, 2012 to comply with the requirement of Condition S6 of the Permits that you "assure that the operations staff for the facility is familiar with the [Pollution Prevention Plan] and have been adequately trained in the specific procedures which it requires," and costs associated with these efforts. | Kevin Bright (2/12/19, 2/21/19) Tom Glaspie (2/19/19) Margaret deGravelle (2/20/19) | Employee Training Checklists & Logs BAP Audits |
| 12 | The Fish Release Prevention and Monitoring Plans and/or Fish Escape Prevention Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens pursuant to the requirements of the Permits since September 1, 2012, including your implementation of the plans, and costs associated with preparation, modification and/or implementation of the plans. | Kevin Bright (2/12/19) | Fish Release Prevention and Monitoring Plans |
| 13 | Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement, including the results of your efforts to track the number of fish lost due to escapement. | Kevin Bright (2/12/19) | Annual Fish Release Reports Fish Talk Manual Fish Talk Production Fish Release Report (11/9/17) Letter to WDFW (12/14/17) |
| 14 | Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases," and the results of such efforts. | Kevin Bright (2/12/19) | Annual Fish Release Reports Fish Talk Manual Fish Talk Production Fish Release Report (11/9/17) Letter to WDFW (12/14/17) |
| 15 | Cooke's FishTalk database, including the data that is recorded in FishTalk regarding opening and closing counts, harvest counts, predation counts, mortality counts and reasons for mortality, and deviation counts of fish; how such data is gathered, calculated, and/or entered into FishTalk; how reports are generated from FishTalk; and how the reports and/or data are used to comply with the provisions of Condition S7 of the Permits requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement and requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases." | Kevin Bright (2/12/19) | Fish Talk Manual Fish Talk Production Annual Fish Release Reports |

COOKE_CWA_00239964

Working Copy

COOKE_CWA_00239965

| Topic No. | Topic | Persons Interviewed | Responsive Documents |
|---|---|---|---|
| 16 | Your efforts to clean netting at the Puget Sound net pens since September 1, 2012, including procedures and intervals for cleaning mussels and other marine growth from the netting and the equipment or other tools used to clean netting. | Randy Hodgin (1/30/19, 1/31/19, 2/1/19)<br>Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19) | Daily Logs<br>Dive Logs<br>Vessel Logs<br>Monthly Compliance Checklists<br>Weekly Production Reports<br>Manager Meeting Notes<br>Employee Training Logs and Checklists<br>Anchor Inspection<br>Weekly Inspection Logs<br>Net Score Reports<br>Net Logs<br>Net Maintenance<br>Net Inspection Protocol |
| 17 | Your identification and implementation since September 1, 2012 of best practices to maintain the Puget Sound net pen cages/structures, mooring systems, and nets, including how you identify such practices, decide which practices should or should not be implemented, and/or determine how select practices are implemented; what persons are influential in making these decisions; and what practices were considered but not implemented. | Michael Szermerda (2/21/19)<br>Kevin Bright (2/21/19) | |
| 18 | Cooke's use of pressure or power washers at the Puget Sound net pens, including the Fort Ward pier, since September 1, 2012. | | Daily Logs<br>Ecology Notice of Violation 14303<br>Correspondence dated October 4, 2017 from Doug Steding to Rich Doenges |
| 19 | Costs you have incurred since September 1, 2012 in your efforts to comply with the Permits. | Kevin Bright (2/12/19)<br>James Trask (2/20/19) | |
| 20 | Proposals, bids, invoices, budgets, and/or estimates for inspections, maintenance, repairs, and/or replacements at the Puget Sound net pens generated, received, and/or paid since September 1, 2012. | Michael Szermerda (2/21/19)<br>Kevin Bright (2/21/19) | |
| 21 | Your procedures since January 1, 2010 for characterizing environmental conditions at the sites of the Puget Sound net pens, including methods used to characterize maximum currents, maximum wind speeds, maximum significant wave heights, maximum boat wake amplitudes, and sediment types for anchor holding capacity. | Michael Szemerda (2/21/19)<br>Kevin Bright (2/21/19) | |
| 22 | The identification of any domestic and/or international standards for finfish facilities that you have recognized as authoritative and/or sought to comply with at the Puget Sound net pens since September 1, 2012. | Michael Szemerda (2/21/19) | |
| 23 | With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the identity of those that designed and/or approved the structural and/or mooring designs (including whether those individuals are licensed professional engineers), any deviations at those Puget Sound net pens from the mooring plans or arrangements—including mooring components or configurations—recommended or prescribed by the pen manufactures or by engineers employed or retained by you, the procedures you employed to determine whether to permit any such deviations, the identity and qualifications of those that selected the anchors, an explanation of how and why the anchors were selected and/or sized, and the procedures used to determine whether anchors were installed and/or embedded properly. | Michael Szemerda (2/21/19)<br>Kevin Bright (2/21/19) | Email discussions |
| 24 | Your procedures for selection and/or acquisition of the pens/cages for the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist. | Michael Szemerda (2/21/19)<br>Kevin Bright (2/21/19) | |

Working Copy

| Topic No. | Topic | Persons Interviewed | Responsive Documents |
|---|---|---|---|
| 25 | With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the degree of biofouling of the nets that you consider to pose acceptable levels of risks and the bases for those levels. | Randy Hodgin (1/30/19, 1/31/19, 2/1/19) Tom Glaspie (1/30/19, 1/31/19, 2/1/19, 2/19/19) | Daily Logs<br>Dive Logs<br>Vessel Logs<br>Monthly Compliance Checklists<br>Weekly Production Reports<br>Manager Meeting Notes<br>Employee Training Logs and Checklists<br>Anchor Inspection<br>Weekly Inspection Logs<br>Net Score Reports<br>Net Logs<br>Net Maintenance<br>Net Inspection Protocol |
| 26 | Your efforts to prepare to testify on the topics identified herein at deposition. | | |
| 27 | Your efforts to respond to Plaintiff's Requests for Production and Interrogatories. Topics will include any instructions given to the persons who conducted the searches for information responsive to Plaintiff's discovery requests, how employees who might possess or know relevant information were identified and the identity of such employees, and how the searches were conducted, including for electronically stored information and what specific search terms were used to conduct searches of pertinent email records. | | |

COOKE_CWA_00239966



Site 1

| Condition Rating | Good | Fair | Poor |
|---|---|---|---|
|  |  |  |  |

| Anchor # | Last Inspection Date | Surface hardware | Surface Chain | Mooring line | Anchor Chain | Anchor Condition | Inspected By | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | Jan-14 | good | good | good | good | good | SH |  |
| 2 | Jan-14 | good | good | good | good | good | SH |  |
| 3 | Jan-14 | good | good | good | good | good | SH |  |
| 4 | Jan-14 | good | good | good | good | good | SH |  |
| 5 | Jan-14 | good | good | good | good | good | SH |  |
| 6 | Jan-14 | good | good | good | good | good | SH |  |
| 7 | Jan-14 | good | good | good | good | good | SH |  |
| 8 | Jan-14 | good | good | good | good | good | SH |  |
| 9 | Jan-14 | good | good | good | good | good | SH |  |
| 10 | Jan-14 | good | good | good | good | good | SH |  |
| 11 | Jan-14 | good | good | good | good | good | SH |  |
| 12 | Oct-12 | good | good | good | good | good | CS |  |
| 13 | Oct-12 | good | good | good | good | good | CS |  |
| 14 | Oct-12 | good | good | good | good | good | CS |  |
| 15 | Oct-12 | good | good | good | good | good | CS |  |
| 16 | Oct-12 | good | good | good | good | good | CS |  |
| 17 | Oct-12 | good | good | good | good | good | CS |  |
| 18 | Dec-13 | good | good | good | good | good | SH |  |
| 19 | Dec-13 | good | good | good | good | good | SH |  |
| 20 | Dec-13 | good | good | good | good | good | SH |  |
| 21 | Dec-13 | good | good | good | good | good | SH |  |
| 22 | Dec-13 | good | good | good | good | good | SH |  |
| 23 |  |  |  |  |  |  |  |  |
| 24 |  |  |  |  |  |  |  |  |

**THIRD KNUTSEN DECLARATION - 205**



Site 2

| Condition Rating | Good | Fair | Poor |
|---|---|---|---|

| Anchor # | Last Inspection Date | Surface hardware | Surface Chain | Mooring line | Anchor Chain | Anchor Condition | Inspected By | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | Jan-14 | good | good | good | good | good | SH | |
| 2 | Jan-14 | good | good | good | good | good | SH | |
| 3 | Jan-14 | good | good | good | good | good | SH | |
| 4 | Jan-14 | good | good | good | good | good | SH | |
| 5 | Jan-14 | good | good | good | good | good | SH | |
| 6 | Jan-14 | good | good | good | good | good | SH | |
| 7 | Nov-13 | good | good | good | good | good | SH | |
| 8 | Nov-13 | good | good | good | good | good | CS | |
| 9 | Nov-13 | good | good | good | good | good | CS | |
| 10 | Nov-13 | good | good | good | good | good | CS | |
| 11 | Nov-13 | good | good | good | good | good | CS | |
| 12 | Nov-13 | good | good | good | good | good | CS | |
| 13 | Nov-13 | good | good | good | good | good | CS | |
| 14 | Oct-12 | good | good | good | good | good | CS | |
| 15 | Oct-12 | good | good | good | good | good | CS | |
| 16 | Oct-12 | good | good | good | good | good | CS | |
| 17 | Oct-12 | good | good | good | good | good | CS | |
| 18 | Oct-12 | good | good | good | good | good | CS | |
| 19 | Oct-12 | good | good | good | good | good | CS | |
| 20 | Oct-12 | good | good | good | good | good | CS | |
| 21 | Oct-12 | good | good | good | good | good | CS | |
| 22 | Oct-12 | good | good | good | good | good | CS | |

**THIRD KNUTSEN DECLARATION - 206**



Site 3

| Condition Rating | Good | Fair | Poor |
|---|---|---|---|

| Anchor # | Last Inspection Date | Surface hardware | Surface Chain | Mooring line | Anchor Chain | Anchor Condition | Inspected By | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | Jan-14 | good | good | good | good | good | CS | |
| 2 | Jan-14 | good | good | good | good | good | CS | |
| 3 | Jan-14 | good | good | good | good | good | CS | |
| 4 | Jan-14 | good | good | good | good | good | CS | |
| 5 | Jan-14 | good | good | good | good | good | CS | |
| 6 | Jan-14 | good | good | good | good | good | CS | |
| 7 | Jan-14 | good | good | good | good | good | KW | |
| 8 | Nov-13 | good | good | good | good | good | KW | |
| 9 | Nov-13 | good | good | good | good | good | KW | |
| 10 | Nov-13 | good | good | good | good | good | KW | |
| 11 | Nov-13 | good | good | good | good | good | KW | |
| 12 | Nov-13 | good | good | good | good | good | KW | |
| 13 | Nov-13 | good | good | good | good | good | KW | |
| 14 | Oct-12 | good | good | good | good | good | CS | |
| 15 | Oct-12 | good | good | good | good | good | CS | |
| 16 | Oct-12 | good | good | good | good | good | CS | |
| 17 | Oct-12 | good | good | good | good | good | CS | |
| 18 | Oct-12 | good | good | good | good | good | CS | |
| 19 | Oct-12 | good | good | good | good | good | CS | |
| 20 | Oct-12 | good | good | good | good | good | CS | |
| 21 | Jan-14 | good | good | good | good | good | SH | |
| 22 | Jan-14 | good | good | good | good | good | SH | |
| 23 | Jan-14 | good | good | good | good | good | SH | |
| 24 | Jan-14 | good | good | good | good | good | SH | |
| 25 | Jan-14 | good | good | good | good | good | SH | |
| 26 | Jan-14 | good | good | good | good | good | SH | |
| 27 | Jan-14 | good | good | good | good | good | SH | |

**THIRD KNUTSEN DECLARATION - 207**

# EXHIBIT 3

HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

Plaintiff,

v.

COOKE AQUACULTURE PACIFIC,
LLC,

Defendant.

Case No. 2:17-cv-01708-JCC

DEFENDANT'S OBJECTIONS AND
RESPONSES TO PLAINTIFF'S
RULE 34 REQUEST FOR PRODUCTION
OF DOCUMENTS

Defendant Cooke Aquaculture Pacific, LLC ("Cooke") by and through its undersigned counsel, and pursuant to Federal Rules of Civil Procedure, hereby makes the following Objections and Responses to Plaintiff's Wild Fish Conservancy's Rule 34 Requests for Production of Documents ("Notice") dated December 13, 2018.

## GENERAL OBJECTIONS AND RESPONSES

1. Cooke objects to the Discovery Requests to the extent they seek information that is subject to attorney-client, work-product, or other privileges. Such information will not be provided or produced.

2. Cooke also objects to the Requests as overly burdensome to the extent they seek to force Cooke to physically present voluminous documentary evidence at deposition that the

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF DEFENDANT COOKE
AQUACULTURE PACIFIC, LLC AND RULE 34 REQUEST
FOR PRODUCTIONOF DOCUMENTS -- 1

Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 209**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  company complied with various term of each permits over the course of approximately five

2  years.

3         3.     These objections are incorporated into each answer and response provided below.

4  Discovery in this matter is ongoing. Cooke reserves its right to modify or supplement its

5  answers, responses, and objections as additional information becomes available through

6  discovery.

7         4.     Cooke objects to the Requests to extent that each individual request seeks

8  documents that have already been formally sought in this case, and that those documents have

9  been produced or are in the process of being produced.

10  **SPECIFIC OBJECTIONS AND RESPONSES TO SUBJECT MATTER OF INQUIRY**

11      **Request No. 1:** Any documentation (e.g., reports/logs/checklists) generated for any

12  inspections that you have conducted since September 1, 2012 under the requirements of

13  Condition S6.F of the Permits which require that you, '[a]t least once per year, conduct an

14  inspection of the main cage structure and anchoring components above and below the water

15  line."

16      **Response:** Cooke objects to the Request No. 1 to the extent it seeks documents protected

17  by the attorney client and work product privileges.  Cooke further objects to the Request as

18  overly burdensome because the volume of documentation requested to be produced in person at

19  deposition is extremely vast, including but not limited to daily logs, weekly reports, and monthly

20  safety checklists.  Cooke further objects to the extent all of the information sought by the

21  Request has been already been sought through formal discovery requests and has been or is in

22  the process of being produced.  Without waiving any the forgoing objections, to the extent that it

23  has not already done so, Cooke will produce all non-privileged and responsive documents as part

24  of its ongoing production of documents.

25

26

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF DEFENDANT COOKE
AQUACULTURE PACIFIC, LLC AND RULE 34 REQUEST
FOR PRODUCTIONOF DOCUMENTS -- 2

Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 210**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Request No. 2:** Any inspection documentation (e.g., reports/logs/checklists) generated since September 1, 2012 under the requirements of your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans.

**Response:** Cooke objects to the Request No. 2 to the extent it seeks documents protected by the attorney client and work product privileges. Cooke further objects to the Request as overly burdensome because volume of documentation request to be produced at deposition is extremely vast, including but not limited to daily logs, weekly reports, and monthly safety checklists. Cooke further objects to the extent all of the information sought by the Request has been already been sought through formal discovery requests and has been or is in the process of being produced. Without waiving any the forgoing objections, to the extent that it has not already done so, Cooke will produce all non-privileged and responsive documents as part of its ongoing production of documents.

**Request No. 3:** All documents related to inspections since September 1, 2012 of components of the Puget Sound net pens at a depth of 100 feet or more, including inspection reports, communications with employees and/or contractors performing the inspections, bills and/or invoices for such inspections, videos and/or photographs from such inspections, and any other documents relied upon in preparing your responses to Plaintiff's Second Set of Requests for Admission pertaining to such inspections.

**Response:** Cooke objects to the Request No. 3 to the extent it seeks documents protected by the attorney client and work product privileges. Cooke further objects to the Request as overly burdensome because volume of documentation request to be produced at deposition is extremely vast, including but not limited to daily logs, weekly reports, and monthly safety checklists. Cooke further objects to the extent all of the information sought by the Request has been already been sought through formal discovery requests and has been or is in the process of being produced. Without waiving any the forgoing objections, to the extent that it has not

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF DEFENDANT COOKE
AQUACULTURE PACIFIC, LLC AND RULE 34 REQUEST
FOR PRODUCTIONOF DOCUMENTS -- 3

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 211**

1   already done so, Cooke will produce all non-privileged and responsive documents as part of its

2   ongoing production of documents.

3

4       **Request No. 4:** All documents reviewed or created by you to prepare for this deposition

5   that you have not already produced to Plaintiff through discovery in this matter.

6       **Response:** Cooke objects to the Request No. 4 to the extent it seeks documents protected

7   by the attorney client and work product privileges.  Cooke objects to the Request No. 4 to the

8   extent it seeks documents protected by the attorney client and work product privileges.  Cooke

9   further objects to the Request as overly burdensome because volume of documentation request to

10  be produced at deposition is extremely vast, including but not limited to daily logs, weekly

11  reports, and monthly safety checklists.  Cooke further objects to the extent all of the information

12  sought by the Request has been already been sought through formal discovery requests and has

13  been or is in the process of being produced.  Without waiving any the forgoing objections, to the

14  extent that it has not already done so, Cooke will produce all non-privileged and responsive

15  documents as part of its ongoing production of documents.

16      DATED this 14th day of January, 2019.

        NORTHWEST RESOURCE LAW PLLC

17

18

19      */s Douglas J. Steding*
        Douglas J. Steding, WSBA #37020

20      dsteding@nwresourcelaw.com
        206.971.1567

21      Diane M. Meyers, WSBA #40729
        dmeyers@nwresourcelaw.com

22      206.971.1568
        Madeline Engel, WSBA #43884

23      mengel@nwresourcelaw.com
        206.971.1569

24

25      *Attorneys for Defendant Cooke Aquaculture*
        *Pacific, LLC*

26

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S NOTICE OF          **NORTHWEST RESOURCE LAW PLLC**
RULE 30(B)(6) DEPOSITION OF DEFENDANT COOKE                      101 Yesler Way, Suite 205
AQUACULTURE PACIFIC, LLC AND RULE 34 REQUEST                      Seattle, WA 98104
FOR PRODUCTIONOF DOCUMENTS -- 4                                     206.971.1564

Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 212**

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on January 14, 2019, I served DEFENDANT'S OBJECTIONS TO

3

PLAINTIFF'S NOTICE OF RULE 30(B)(6) DEPOSITION OF DEFENDANT COOKE

4

AQUACULTURE PACIFIC, LLC AND RULE 34 REQUEST FOR PRODUCTIONOF

5

DOCUMENTS on the following via email:

6

| *Attorneys for Plaintiff Wild Fish Conservancy* | |
|---|---|
| Brian A. Knutsen<br>Kampmeier & Knutsen, PLLC<br>*Postal Delivery Address:*<br>P.O. Box 15099<br>Portland, OR 97293<br>*FedEx, UPS, Couriers Delivery Address:*<br>221 SE 11th Avenue, Suite 217<br>Portland, OR 97214<br>503.719.5641 | brian@kampmeierknutsen.com |
| Paul A. Kampmeier<br>Emma Bruden<br>Kampmeier & Knutsen, PLLC<br>615 Second Avenue, Suite 360<br>Seattle, WA 98104<br>206.223.4088 | paul@kampmeierknutsen.com<br>emma@kampmeierknutsen.com |
| Lia Comerford<br>Kevin M. Cassidy<br>Earthrise Law Center<br>Lewis & Clark Law School<br>10015 SW Terwilliger Blvd., MSC 51<br>Portland, OR 97219<br>503.768.6736 | comerfordl@lclark.edu<br>cassidy@lclark.edu |

19

I declare under penalty of perjury under the laws of the United States of America, that the

20

foregoing is true and correct to the best of my knowledge.

21

DATED 14th day of January, 2019, in Seattle, Washington.

22

23

*/s Eliza Hinkes*_____
Eliza Hinkes, Paralegal

24

25

26

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF DEFENDANT COOKE
AQUACULTURE PACIFIC, LLC AND RULE 34 REQUEST
FOR PRODUCTIONOF DOCUMENTS -- 5

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 213**

# EXHIBIT 4

1

2                                                          HONORABLE JOHN C. COUGHENOUR

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
9                                      AT SEATTLE

10   WILD FISH CONSERVANCY,
                                                    Case No. 2:17-cv-01708-JCC
11                    Plaintiff,
                                                    DEFENDANT'S SUPPLEMENTAL
12         v.                                       RESPONSES TO PLAINTIFF'S
                                                    RULE 34 REQUEST FOR PRODUCTION
13                                                  OF DOCUMENTS
     COOKE AQUACULTURE PACIFIC,
14   LLC,

15                    Defendant.

16         Defendant Cooke Aquaculture Pacific, LLC ("Cooke"), by and through its undersigned

17   counsel, and pursuant to Federal Rules of Civil Procedure, and without waiving any prior

18   objections, hereby makes the following Supplemental Responses to Plaintiff Wild Fish

19   Conservancy's Amended Rule 34 Requests for Production of Documents ("Notice") dated

20   February 14, 2019.

21         **Request No. 4:** All documents reviewed or created by you to prepare for this deposition

22   that you have not already produced to Plaintiff through discovery in this matter.

23         **Supplemental Response:** Identified in the attached **Exhibits A and B** are documents

24   reviewed in preparation for the Rule 30(b)(6) deposition of Cooke.  They are organized by topic

25

26

DEFENDANT'S SUPPLEMENTAL RESPONSES TO                    **NORTHWEST RESOURCE LAW PLLC**
PLAINTIFF'S RULE 34 REQUEST FOR PRODUCTION                    101 Yesler Way, Suite 205
OF DOCUMENTS -- 1                                                Seattle, WA 98104
                                                                  206.971.1564
Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 215**

1    number corresponding to topics in the Amended Notice of Deposition of Cooke served on

2    February 14, 2019.

3        DATED this 27th day of February, 2019.

4                                        NORTHWEST RESOURCE LAW PLLC

5

6                                        */s Diane M. Meyers*
7                                        Douglas J. Steding, WSBA #37020
                                         dsteding@nwresourcelaw.com
8                                        206.971.1567
                                         Diane M. Meyers, WSBA #40729
9                                        dmeyers@nwresourcelaw.com
                                         206.971.1568
10                                       Madeline Engel, WSBA #43884
                                         mengel@nwresourcelaw.com
11                                       206.971.1569

12                                       *Attorneys for Defendant Cooke Aquaculture*
                                         *Pacific, LLC*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S SUPPLEMENTAL RESPONSES TO          **NORTHWEST RESOURCE LAW PLLC**
PLAINTIFF'S RULE 34 REQUEST FOR PRODUCTION          101 Yesler Way, Suite 205
OF DOCUMENTS -- 2                                       Seattle, WA 98104
                                                         206.971.1564
Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 216**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2019, I served DEFENDANT'S SUPPLEMENTAL

RESPONSES TO PLAINTIFF'S RULE 34 REQUEST FOR PRODUCTION OF

DOCUMENTS on the following via email:

| *Attorneys for Plaintiff Wild Fish Conservancy* | |
|---|---|
| Brian A. Knutsen<br>Kampmeier & Knutsen, PLLC<br>*Postal Delivery Address:*<br>P.O. Box 15099<br>Portland, OR 97293<br>*FedEx, UPS, Couriers Delivery Address:*<br>221 SE 11th Avenue, Suite 217<br>Portland, OR 97214<br>503.719.5641 | brian@kampmeierknutsen.com |
| Paul A. Kampmeier<br>Emma Bruden<br>Kampmeier & Knutsen, PLLC<br>615 Second Avenue, Suite 360<br>Seattle, WA 98104<br>206.223.4088 | paul@kampmeierknutsen.com<br>emma@kampmeierknutsen.com |
| Lia Comerford<br>Kevin M. Cassidy<br>Earthrise Law Center<br>Lewis & Clark Law School<br>10015 SW Terwilliger Blvd., MSC 51<br>Portland, OR 97219<br>503.768.6736 | comerfordl@lclark.edu<br>cassidy@lclark.edu |

I declare under penalty of perjury under the laws of the United States of America, that the

foregoing is true and correct to the best of my knowledge.

DATED 27 day of February, 2019, in Seattle, Washington.

*/s Kristine Williams*
Kristine Williams, Paralegal

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S RULE 34 REQUEST FOR PRODUCTION
OF DOCUMENTS -- 3

Case No. 2:17-cv-01708-JCC

**THIRD KNUTSEN DECLARATION - 217**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

| Topic No. | Topic | Category of Responsive Documents | Bates Numbers |
|---|---|---|---|
| 1(a) | With respect to the collapse of the Cypress Site 2 facility during the summer of 2017<br>a. Cooke's understanding as to the reasons for and causes of the collapse, and the bases for that understanding; | Cooke's Response to Administrative Order No. 15422, dated October 30, 2017 and included responsive materials | COOKE_CWA_00016040-16046;<br>COOKE_CWA_00118294-120788 |
| 1(b) | b. The inspections, maintenance and/or repairs, and any failures of any structures, equipment, or components at Cypress Site 2 during the twelve months preceding the collapse; | Cypress Site 2 Daily Logs (Aug. 2016 – Aug. 2017) | COOKE_CWA_00057161-75998 |
| | | Cypress Site 2 Dive Logs (Aug. 2016 – Aug. 2017) | COOKE_CWA_00213713-213787;<br>COOKE_CWA_00214114-214225;<br>COOKE_CWA_00214238-214281;<br>COOKE_CWA_00214290-<br>COOKE_CWA_00214576 |
| | | Clamdigger Vessel Logs (Aug. 2016 – Aug. 2017) | COOKE_CWA_00232921-233818 |
| | | Cypress Monthly Compliance Checklists (Aug. 2016 – Aug. 2017) | COOKE_CWA_00225409-225440<br>COOKE_CWA_00225573-225604<br>COOKE_CWA_00225605-225636<br>COOKE_CWA_00225977-226008<br>COOKE_CWA_00226141-226172<br>COOKE_CWA_00226437-226468<br>COOKE_CWA_00226633-226696<br>COOKE_CWA_00227005-227036<br>COOKE_CWA_00227201-227232<br>COOKE_CWA_00227549-227912<br>COOKE_CWA_00227957-227988 |
| | | Weekly Production Reports (Aug. 2016 – Aug. 2017) | See Exhibit B |
| | | Manager Meeting Notes (Aug. 2016 – Aug. 2017) | COOKE_CWA_00222927-222934;<br>COOKE_CWA_00222939-222962;<br>COOKE_CWA_00222966-222968 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136<br>COOKE_CWA_00026585<br>COOKE_CWA_00026582<br>COOKE_CWA_00239928-239961 |
| | | Cooke's Response to Administrative Order No. 15422, dated October 30, 2017 and included responsive materials | COOKE_CWA_00016040-16046;<br>COOKE_CWA_00118294-120788 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 1(c) | Cooke's response to the collapse, including notifications given to regulatory agencies, efforts to recover Atlantic salmon from Cypress Site 2 and/or Puget Sound, communications with and/or payments to those that recovered escaped Atlantic salmon, efforts to recover and/or remove materials associated with the collapse (structures equipment, supplies, etc.), efforts to investigate the cause(s) of the collapse (including the results of those investigations), and efforts to remediate any environmental and/or ecological impacts from the collapse; | Situation Updates | COOKE_CWA_00207593,<br>COOKE_CWA_00207603,<br>COOKE_CWA_00207594,<br>COOKE_CWA_00207604,<br>COOKE_CWA_00207595,<br>COOKE_CWA_00207605,<br>COOKE_CWA_00207596,<br>COOKE_CWA_00207606,<br>COOKE_CWA_00207597,<br>COOKE_CWA_00207598,<br>COOKE_CWA_00207599-207600,<br>COOKE_CWA_00207601,<br>COOKE_CWA_00207602 |
| | | Cooke's Response to Administrative Order No. 15422, dated October 30, 2017 and included responsive materials | COOKE_CWA_00016040-16046;<br>COOKE_CWA_00118294-120788 |
| | | Global Diving Debris Recovery Project Report | COOKE_CWA_00047601-49032 |
| | | January 29, 2018 Letter from D. Steding to Kyle Murphy at DNR, Kessina Lee at Ecology, and Amy Windrope at WDFW | COOKE_CWA_00026260-26271 |
| | | Email discussions and attachments with Ecology regarding sediment sampling and analysis plan and site closure | COOKE_CWA_00051556-51576<br>COOKE_CWA_00134170-134171<br>COOKE_CWA_00239607-239688 |
| | | December 14, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026807-26825 |
| | | Correspondence with Tribes regarding Site 2 | COOKE_CWA_00239571-239606 |

| | | List of Invoices and Corresponding Invoices | COOKE_CWA_00239076-239356 |
|---|---|---|---|
| | | Correspondence with Agencies | COOKE_CWA_00000341-342, COOKE_CWA_00000364-465, COOKE_CWA_00013134-13135, COOKE_CWA_00026782-26802, COOKE_CWA_00026803-26804, COOKE_CWA_00026805-26806, COOKE_CWA_00026807-26825 |
| 1(d) | d. Identification and observations of materials that were or that may have been released into Puget Sound as a result of the collapse (e.g., fuels, lubricants, feed, chemicals pharmaceuticals, equipment, machines, metals, netting, and any other supplies or materials that were present at or on Cypress Site 2 at the time of the collapse); | Situation Updates | COOKE_CWA_00207593, COOKE_CWA_00207603, COOKE_CWA_00207594, COOKE_CWA_00207604, COOKE_CWA_00207595, COOKE_CWA_00207605, COOKE_CWA_00207596, COOKE_CWA_00207606, COOKE_CWA_00207597, COOKE_CWA_00207598, COOKE_CWA_00207599-207600, COOKE_CWA_00207601, COOKE_CWA_00207602 |
| | | Cooke's Response to Administrative Order No. 15422, dated October 30, 2017 and included responsive materials | COOKE_CWA_00016040-16046; COOKE_CWA_00118294-120788 |
| | | Global Diving Debris Recovery Project Report | COOKE_CWA_00047601-49032 |
| | | January 29, 2018 Letter from D. Steding to Kyle Murphy at DNR, Kessina Lee at Ecology, and Amy Windrope at WDFW | COOKE_CWA_00026260-26271 |
| | | Email discussions and attachments with Ecology regarding sediment sampling and analysis plan and site closure | COOKE_CWA_00051556-51576 COOKE_CWA_00134170-134171 COOKE_CWA_00239607-239688 |
| | | December 14, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026807-26825 |
| | | List of Invoices and Corresponding Invoices | COOKE_CWA_00239076-239356 |
| 1(e) | e. The number of Atlantic salmon that died as a result of the collapse, the number of carcasses recovered, and the procedures employed to remove and dispose of carcasses and associated wastes; | Situation Updates | COOKE_CWA_00207593, COOKE_CWA_00207603, COOKE_CWA_00207594, COOKE_CWA_00207604, COOKE_CWA_00207595, COOKE_CWA_00207605, COOKE_CWA_00207596, COOKE_CWA_00207606, COOKE_CWA_00207597, COOKE_CWA_00207598, COOKE_CWA_00207599-207600, COOKE_CWA_00207601, COOKE_CWA_00207602 |
| | | Fish Escape Report | COOKE_CWA_00026653-26662 |
| | | December 14, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026807-26825 |
| | | Correspondence with Agencies | COOKE_CWA_00000341-342 COOKE_CWA_00000364-465 COOKE_CWA_00013134-13135 COOKE_CWA_00026782-26802 COOKE_CWA_00026803-26804 COOKE_CWA_00026805-26806 COOKE_CWA_00026807-26825 |

| 1(f) | f. The number of Atlantic salmon that escaped as a result of the collapse, the number that were recovered, the number that were not recovered, and Cooke's efforts to ascertain these numbers of fish that escaped, were recovered, and were not recovered. | Situation Updates | COOKE_CWA_00207593, COOKE_CWA_00207603, COOKE_CWA_00207594, COOKE_CWA_00207604, COOKE_CWA_00207595, COOKE_CWA_00207605, COOKE_CWA_00207596, COOKE_CWA_00207606, COOKE_CWA_00207597, COOKE_CWA_00207598, COOKE_CWA_00207599-207600, COOKE_CWA_00207601, COOKE_CWA_00207602 |
| | | Fish Escape Report | COOKE_CWA_00026653-26662 |
| | | December 14, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026807-26825 |
| | | Correspondence with Agencies | COOKE_CWA_00000341-342 COOKE_CWA_00000364-465 COOKE_CWA_00013134-13135 COOKE_CWA_00026782-26802 COOKE_CWA_00026803-26804 COOKE_CWA_00026805-26806 COOKE_CWA_00026807-26825 |
| 1(g) | g. The development of a Sediment Sampling and Analysis Plan for Cypress Site 2 in light of the collapse, the submission of such a plan to Ecology, the review and/or approval of the plan by Ecology, and any closure monitoring conducted by Cooke following the collapse; | Email discussions and attachments with Ecology regarding sediment sampling and analysis plan and site closure | COOKE_CWA_00051556-51576 COOKE_CWA_00134170-134171 COOKE_CWA_00239607-239688 |
| 1(h) | Any efforts taken by Cooke following the collapse of Cypress Site 2 to  prevent a similar failure from occurring at any of Cooke's Puget Sound net pens,  including what efforts Cooke took, where these efforts were implemented, how these  efforts were implemented, when these efforts were implemented, who implemented these  efforts, and how these efforts may prevent a similar collapse event from occurring | Mott MacDonald Reports | COOKE_CWA_00131985-132904 |
| | | Correspondence with Agencies | COOKE_CWA_00000341-342 COOKE_CWA_00000364-465 COOKE_CWA_00013134-13135 COOKE_CWA_00026782-26802 COOKE_CWA_00026803-26804 COOKE_CWA_00026805-26806 COOKE_CWA_00026807-26825 |
| | | October 2017 Pollution Prevention Plan | COOKE_CWA_00027240-27243 |
| | | October 2018 Fish Escape Prevention Plan | COOKE_CWA_00207607-207625 |
| | | DNR Net Scoring Protocol | COOKE_CWA_00051553-51555 |
| | | Net Hygiene Videos | COOKE_CWA_00132905-132927, COOKE_CWA_00133822-133828, COOKE_CWA_00147864-147865, COOKE_CWA_00206697-206707, COOKE_CWA_00239561-239570 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Net Cleanliness Scoring Reports | COOKE_CWA_00051552-51553 COOKE_CWA_00237518-239075 |
| | | Weekly Net Hygiene Summary Report | COOKE_CWA_00237697-239074 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995 COOKE_CWA_00234664-237351 |
| 2 | The July 2017 incident at Cypress Site 2 (see, e.g., COOKE_CWA_00016041- 16042 (Cooke's response to Administrative Order 15422, describing July incident)), including  Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response  to the incident. | Cooke's Response to Administrative Order No. 15422, dated October 30, 2017 and included responsive materials | COOKE_CWA_00016040-16046; COOKE_CWA_00118294-120788 COOKE_CWA_00018115 COOKE_CWA_00020195 COOKE_CWA_00025282 COOKE_CWA_00025438 |

**THIRD KNUTSEN DECLARATION - 220**

| | | | |
|---|---|---|---|
| 3 | The May 2017 incident at Clam Bay, in which the mooring attachments that connect the feed barge to the cage facilities failed (see, e.g., COOKE_CWA_0003508 (Jan. 19, 2018 letter from Diane Meyer to the Department of Ecology describing Clam Bay incident)), including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response to the incident. | January 19, 2018 Letter from Diane Meyers to Kessina Lee (Ecology) | COOKE_CWA_0003508-3510 |
| | | Vessel Log Excerpt - Elsie M May 2017 | COOKE_CWA_00233222 |
| 4 | Structural assessments or inspections of the Puget Sound net pens that Cooke has performed, commissioned, or otherwise arranged for or considered arranging for since August 1, 2017 (see, e.g., COOKE_CWA_00026741 (Sept. 20, 2017 letter from Cooke to the Washington Department of Fish and Wildlife mentioning that Cooke "commissioned an independent structural assessment of all its net pens by International Inspections")), including costs associated with such structural assessments or inspections. | International Inspection Reports | COOKE_CWA_00000308-338 COOKE_CWA_00026593-26618 |
| | | September 20, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026740-26773 |
| | | September 27, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026647-26648 |
| | | Mott MacDonald Reports | COOKE_CWA_00131985-132904 |
| | | Global Diving Records | COOKE_CWA_00132928-132942 COOKE_CWA_00132943-133197 COOKE_CWA_00133198-133230 COOKE_CWA_00133231-133256 COOKE_CWA_00133257-133821 |
| 5 | The Pollution Prevention Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens pursuant to the requirements of the Permits since September 1, 2012, including your implementation of the plans and costs associated with preparation, modification, and/or implementation of the plans. | Pollution Prevention Plans | COOKE_CWA_00027221-27250 COOKE_CWA_00144462-144476 |
| 6 | Inspections that you have conducted at the Puget Sound net pens of the exposed surface lines, shackles, and/or mooring points under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and when the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00233033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995 COOKE_CWA_00234664-237351 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 COOKE_CWA_00026585 COOKE_CWA_00026582 COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 7 | Inspections that you have conducted at the Puget Sound net pens of the main cage structures under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how and where the inspections were conducted, what dates the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00233033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |

**THIRD KNUTSEN DECLARATION - 221**

| # | Description | Document Type | Bates |
|---|---|---|---|
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995 / COOKE_CWA_00234664-237351 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 / COOKE_CWA_00026585 / COOKE_CWA_00026582 / COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_0239695-239795 |
| 8 | Inspections that you have conducted at the Puget Sound net pens of the anchoring components above and below the water line under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how and where the inspections were conducted, what dates the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what documentation of the inspections exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections; with respect to inspections of components at a depth of 100 feet or more, in addition to the aforementioned topics, identification of all anchoring components at the Puget Sound net pens that are at a depth of 100 feet or more, your efforts to respond to Plaintiff's Second Set of Requests for Admission pertaining to inspections of such components, and any other efforts you have undertaken since the initiation of this lawsuit to determine whether such inspections occurred; | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00232033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995 / COOKE_CWA_00234664-237351 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 / COOKE_CWA_00026585 / COOKE_CWA_00026582 / COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_0239695-239795 |
| | | Global Diving Records | COOKE_CWA_00132928-132942 / COOKE_CWA_00132943-133197 / COOKE_CWA_00133198-133230 / COOKE_CWA_00133231-133256 / COOKE_CWA_00133257-133821 |
| 9 | Inspections that you have conducted at the Puget Sound net pens of netting, including fish containment netting and predator exclusion netting and including inspections for biofouling, under the provisions of the Permits—including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and when the inspections were conducted, who conducted the inspections, what training and/or instructions were provided to those conducting the inspections, how the inspections were documented, what inspection documentation exists, how any inspection documentation is maintained, who generates and/or generated the inspection documentation, who maintains and/or maintained the inspection documentation, and what costs were associated with the inspections. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00232033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995 / COOKE_CWA_00234664-237351 |

| | | | |
|---|---|---|---|
| | | Net Logs and Service Records | COOKE_CWA_0206768-207117<br>COOKE_CWA_00237352-237517 |
| | | Net Cleanliness Scoring Reports | COOKE_CWA_00051552-51553<br>COOKE_CWA_00237518-239075 |
| | | Net Hygiene Videos | COOKE_CWA_00132905-132927,<br>COOKE_CWA_00133822-133828,<br>COOKE_CWA_00147864-147865,<br>COOKE_CWA_00206697-206707,<br>COOKE_CWA_00239561-239570 |
| | | Weekly Net Hygiene Summary Report | COOKE_CWA_00237697-239074 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136<br>COOKE_CWA_00026585<br>COOKE_CWA_00026582<br>COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 10 | Maintenance (including repairs and/or replacements) you have conducted of the Puget Sound net pens, including any such efforts made under the provisions of the Permits— including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring Plans since September 1, 2012—including how maintenance decisions are made, what standards/criteria you employ when deciding whether to undertake maintenance, who makes maintenance decisions, and what costs are associated with such maintenance. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00232033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995<br>COOKE_CWA_00234664-237351 |
| | | Net Logs and Service Records | COOKE_CWA_0206768-207117<br>COOKE_CWA_00237352-237517 |
| | | Net Cleanliness Scoring Reports | COOKE_CWA_00051552-51553<br>COOKE_CWA_00237518-239075 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136<br>COOKE_CWA_00026585<br>COOKE_CWA_00026582<br>COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 11 | Your efforts since September 1, 2012 to comply with the requirement of Condition S6 of the Permits that you "assure that the operations staff for the facility is familiar with the [Pollution Prevention Plan] and have been adequately trained in the specific procedures which it requires," and costs associated with these efforts. | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 12 | The Fish Release Prevention and Monitoring Plans and/or Fish Escape Prevention Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens pursuant to the requirements of the Permits since September 1, 2012, including your implementation of the plans, and costs associated with preparation, modification and/or implementation of the plans. | Fish Escape Prevention Plan | COOKE_CWA_00027224-27271<br>COOKE_CWA_00027279-27287<br>COOKE_CWA_00027288-27325<br>COOKE_CWA_00144455-144461<br>COOKE_CWA_00207607-207625 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00232033-234663 |
| | | Net Logs and Service Records | COOKE_CWA_0206768-207117<br>COOKE_CWA_00237352-237517 |
| | | Net Cleanliness Scoring Reports | COOKE_CWA_00051552-51553<br>COOKE_CWA_00237518-239075 |
| | | Net Hygiene Videos | COOKE_CWA_00132905-132927,<br>COOKE_CWA_00133822-133828,<br>COOKE_CWA_00147864-147865,<br>COOKE_CWA_00206697-206707,<br>COOKE_CWA_00239561-239570 |

| # | Request | Document | Bates |
|---|---------|----------|-------|
| | | Weekly Net Hygiene Summary Report | COOKE_CWA_00237697-239074 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136<br>COOKE_CWA_00026585<br>COOKE_CWA_00026582<br>COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 13 | Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement, including the results of your efforts to track the number of fish lost due to escapement. | Annual Fish Release Reports | COOKE_CWA_00239796-239925 |
| | | Fishtalk documents | COOKE_CWA_00147406-147857<br>COOKE_CWA_00189272-189287 |
| | | Fish Escape Report | COOKE_CWA_00026653-26662 |
| | | December 14, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026807-26825 |
| 14 | Your efforts since September 1, 2012 to comply with the provisions of Condition S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases," and the results of such efforts. | Annual Fish Release Reports | COOKE_CWA_00239796-239925 |
| | | Fishtalk documents | COOKE_CWA_00147406-147857<br>COOKE_CWA_00189272-189287 |
| | | Fish Escape Report | COOKE_CWA_00026653-26662 |
| | | December 14, 2017 Letter to Washington Department of Fish and Wildlife and attachments | COOKE_CWA_00026807-26825 |
| 15 | Cooke's FishTalk database, including the data that is recorded in FishTalk regarding opening and closing counts, harvest counts, predation counts, mortality counts and reasons for mortality, and deviation counts of fish; how such data is gathered, calculated, and/or entered into FishTalk; how reports are generated from FishTalk; and how the reports and/or data are used to comply with the provisions of Condition S7 of the Permits requiring you to track the number of fish within the Puget Sound net pens, the number of fish lost to predation and mortality, and the number of fish lost due to escapement and requiring you to include in your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters, including all Significant Fish Releases." | Fishtalk documents | COOKE_CWA_00147406-147857<br>COOKE_CWA_00189272-189287 |
| | | Annual Fish Release Reports | COOKE_CWA_00239796-239925 |
| 16 | Your efforts to clean netting at the Puget Sound net pens since September 1, 2012, including procedures and intervals for cleaning mussels and other marine growth from the netting and the equipment or other tools used to clean netting. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00232033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995<br>COOKE_CWA_00234664-237351 |
| | | Net Logs and Service Records | COOKE_CWA_00206768-207117<br>COOKE_CWA_00237352-237517 |
| | | Net Cleanliness Scoring Reports | COOKE_CWA_00051552-51553<br>COOKE_CWA_00237518-239075 |
| | | Net Hygiene Videos | COOKE_CWA_00132905-132927,<br>COOKE_CWA_00133822-133828,<br>COOKE_CWA_00147864-147865,<br>COOKE_CWA_00206697-206707,<br>COOKE_CWA_00239561-239570 |
| | | Weekly Net Hygiene Summary Report | COOKE_CWA_00237697-239074 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136<br>COOKE_CWA_00026585<br>COOKE_CWA_00026582<br>COOKE_CWA_00239928-239961 |
| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |

**THIRD KNUTSEN DECLARATION - 224**

| 17 | Your identification and implementation since September 1, 2012 of best practices to maintain the Puget Sound net pen cages/structures, mooring systems, and nets, including how you identify such practices, decide which practices should or should not be implemented, and/or determine how select practices are implemented; what persons are influential in making these decisions; and what practices were considered but not implemented | | |
| 18 | Cooke's use of pressure or power washers at the Puget Sound net pens, including the Fort Ward pier, since September 1, 2012. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Notice of Violation 14303 | COOKE_CWA_00026214-26215 |
| 19 | Costs you have incurred since September 1, 2012 in your efforts to comply with the Permits. | List of Invoices and Corresponding Invoices | COOKE_CWA_00239076-239356 |
| 20 | Proposals, bids, invoices, budgets, and/or estimates for inspections, maintenance, repairs, and/or replacements at the Puget Sound net pens generated, received, and/or paid since September 1, 2012. | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 COOKE_CWA_00026585 COOKE_CWA_00026582 COOKE_CWA_00239928-239961 |
| 21 | Your procedures since January 1, 2010 for characterizing environmental conditions at the sites of the Puget Sound net pens, including methods used to characterize maximum currents, maximum wind speeds, maximum significant wave heights, maximum boat wake amplitudes, and sediment types for anchor holding capacity. | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 COOKE_CWA_00026585 COOKE_CWA_00026582 COOKE_CWA_00239928-239961 |
| 22 | The identification of any domestic and/or international standards for finfish facilities that you have recognized as authoritative and/or sought to comply with at the Puget Sound net pens since September 1, 2012. | BAP Audit Documents | COOKE_CWA_00239695-239795 |
| 23 | With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the identity of those that designed and/or approved the structural and/or mooring designs (including whether those individuals are licensed professional engineers), any deviations at those Puget Sound net pens from the mooring plans or arrangements—including mooring components or configurations—recommended or prescribed by the pen manufactures or by engineers employed or retained by you, the procedures you employed to determine whether to permit any such deviations, the identity and qualifications of those that selected the anchors, an explanation of how and why the anchors were selected and/or sized, and the procedures used to determine whether anchors were installed and/or embedded properly. | Cooke's Response to Administrative Order No. 15422, dated October 30, 2017 and included responsive materials | COOKE_CWA_00016040-16046; COOKE_CWA_00118294-120788 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 COOKE_CWA_00026585 COOKE_CWA_00026582 COOKE_CWA_00239695-239961 |
| 24 | Your procedures for selection and/or acquisition of the pens/cages for the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist. | | |
| 25 | With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the degree of biofouling of the nets that you consider to pose acceptable levels of risks and the bases for those levels. | Daily Logs | COOKE_CWA_00057161-75998 |
| | | Dive Logs | COOKE_CWA_00207849-222743 |
| | | Vessel Logs | COOKE_CWA_00232033-234663 |
| | | Monthly Compliance Checklists | COOKE_CWA_00223025-232024 |
| | | Weekly Production Reports | See Exhibit B |
| | | Manager Meeting Notes | COOKE_CWA_00222744-223024 |
| | | Employee Training Logs and Checklists | COOKE_CWA_00026846-27145 |
| | | Anchor Inspections | COOKE_CWA_00207626-207848 |
| | | Weekly Surface Inspection Sheet | COOKE_CWA_00049033-50995 COOKE_CWA_00234664-237351 |
| | | Net Logs and Service Records | COOKE_CWA_00206768-207117 COOKE_CWA_00237352-237517 |
| | | Net Cleanliness Scoring Reports | COOKE_CWA_00051552-51553 COOKE_CWA_00237518-239075 |
| | | Net Hygiene Videos | COOKE_CWA_00132905-132927, COOKE_CWA_00133822-133828, COOKE_CWA_00147864-147865, COOKE_CWA_00206697-206707, COOKE_CWA_00239561-239570 |
| | | Weekly Net Hygiene Summary Report | COOKE_CWA_00237697-239074 |
| | | Sunderland Marine Fish Farm Survey Reports | COOKE_CWA_00021136 COOKE_CWA_00026585 COOKE_CWA_00026582 COOKE_CWA_00239928-239961 |

| | | BAP Audit Documents | COOKE_CWA_00239695-239795 |
|---|---|---|---|
| 26 | Your efforts to prepare to testify on the topics identified herein at deposition. | | |
| 27 | Your efforts to respond to Plaintiff's Requests for Production and Interrogatories.  Topics will include any instructions given to the persons who conducted the searches for information responsive to Plaintiff's discovery requests, how employees who might possess or know relevant information were identified and the identity of such employees, and how the searches were conducted, including for electronically stored information and what specific search terms were used to conduct searches of pertinent email records. | | |

# EXHIBIT 5



# American Gold Seafood's

# Daily Activity Log

JUNE 2015



Daily Site Log for: 6 / 1 / 15 **Mon** Tue Wed Thurs Fri Sat Sun (circle day)

**Weather AM** (circle) | **Weather PM** (circle)

**Weather AM** (circle)
Sun (Cloud) Rain
Wind: (Light) Moderate Strong
Current: Light (Moderate) Strong
Sea State Calm (Ripple) Rough

**Weather PM** (circle)
Sun Cloud (Rain)
Wind: (Light) Moderate Strong
Current: Light (Moderate) Strong
Sea State Calm (Ripple) Rough

**Feed Quality Issues** ✓ No ____ Yes          Feed Quality Claim Submitted ✓ No ____ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
✓ No ____ Yes  Actions (if any): _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | |
| Chain, bridles, and shackles | | |
| Cage Integrity | | |
| Nets at waterline | | |
| Waterline ties | | |
| Birdnets | | |
| Debris removal | | |
| Mooring concerns? ✓ No ___ Yes | | |
| Marine Engineer Contacted? ✓ No ____ Yes | | |

**General Checklist Items:**
- ☐ VHF Working
- ☐ Marine Lights all Functionable
- ☐ Workboats Check Complete
- ☐ Outboard Check Complete
- ☐ Generator Check Complete
- ☐ Feed Systems Check Complete
- ☐ Internet Access Functionable
- ☐ Vessel moorings Checked
- ☑ Aeration on in all Cages Morning Check
- ☑ Aeration on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day: (5) 4 3 2 1 0      Observation: _____
End of day: 5 (4) 3 2 1 0      Observation: _____

**Fish Health Concerns?** ✓ No ____ Yes      Comment: _____
Fish Health Contacted? ____ Yes
Contact Made Via: ____ Phone ____ Email ____ In person

**Marine Mammal Predation?** ✓ No ____ Yes      Type: ____ Seal ____ Sealion ____ Other
Observation of Activity: _____

**Visitors to Site**
____ Yes
✓ No
Site Orientation Completed? ___ Yes ___ No ___ On File
Comment _____

**List all Visitors**
____ AGS Staff: _____
____ Contractor: _____
____ Other: _____

**Bi-Catch Removed?** ____ No ____ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

COOKE_CWA_00064340

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|

| Name: | Kyl | Jesse | Jeff | | Start of Day | | End of Day | |
|---|---|---|---|---|---|---|---|---|
| Priorities: | 1 | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| | 2 | 2 | 2 | 2 | 6·7 | | | |
| | 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | | | | |
| | | | | | 7.2 | | 7.0 | |
| 7:00 AM | | | | | | | | |
| | | | | | 7.4 | | | |
| 8:00 AM | | equipment | prep Morts | | | | | |
| | | | | | 7.4 | | 7.2 | |
| 9:00 AM | Morts | Morts | Morts | | | | | |
| 10:00 AM | | | | | | | | |
| 11:00 AM | | Prep feeding | | | | | 8.2 | |
| 12:00 PM | Pressure Wash Pen #10 | Feed | | | | | | |
| 1:00 PM | | | Wash net | | | | | |
| 2:00 PM | | | | | | | | |
| 3:00 PM | | | | | | | | |
| 4:00 PM | | Break | | | | | | |
| 5:00 PM | | Feed | | | | | | |
| 6:00 PM | | | | | | | | |

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2 M | 6·7 | | 12.5 | 30 |
| PM | 2 M | 8.2 | | 12.3 | 26 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/3 | 2/3 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 3/4 | 3/4 | — | MA |

**Daily Site Log for:** 6 / 2 / ___  Mon  (Tue)  Wed  Thurs  Fri  Sat  Sun (circle day)

**Weather AM** (circle)    (Sun)  Cloud  Rain
Wind:    (Light)  Moderate  Strong
Current:  Light  (Moderate)  Strong
Sea State  (Calm)  Ripple  Rough

**Weather PM** (circle)    Sun  (Cloud)  Rain
Wind:    (Light)  Moderate  Strong
Current:  (Light)  Moderate  Strong
Sea State  Calm  Ripple  Rough

**Feed Quality Issues**    X No  ___Yes          Feed Quality Claim Submitted  √ No  ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No  ___Yes  Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? | ✗ No ___Yes | |
| Marine Engineer Contacted? | ✗ No ___Yes | |

**General Checklist Items:**
☑ VHF Working
☑ Marine Lights all Functionable
☑ Workboats Check Complete
☑ Outboard Check Complete
☑ Generator Check Complete
☑ Feed Systems Check Complete
☑ Internet Access Functionable
☐ Vessel moorings Checked
☑ Areation on in all Cages Morning Check
☑ Areation on in All Cages Evening Check
☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** –circle one (S=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  5 (4) 3 2 1 0      Observation: _____
End of day:    5 4 3 2 1 0        Observation: _____

**Fish Health Concerns?**  X No  ___Yes        Comment: _____
Fish Health Contacted? ___Yes                  _____
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?**    X No  ___Yes      Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

**Visitors to Site**
___Yes
X No
Site Orientation Completed? ___Yes ___No ___On File
Comment_____

**List all Visitors**
___ AGS Staff: _____
___ Contractor: _____
___ Other: _____

**Bi-Catch Removed?**  X No  ___Yes
If yes, number & species_____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

COOKE_CWA_00064342

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED | DIESEL | WASH | | | **Start of Day** | | **End of Day** | |
| **Priorities:** ① | 1 | 1 | 1 | | Outside | In Cage | Outside | In Cage |
| | 2 | 2 | 2 | 2 | 7.2 | | 7.3 | |
| | 3 | 3 | 3 | 3 | | | 7.7 | |
| 6:00 AM | | | | | | | | |
| 7:00 AM | | | | | 7.4 | | | |
| 8:00 AM | | | | | | | 8.0 | |
| 9:00 AM | | | | | 7.9 | | | |
| 10:00 AM | | | | | 7.6 | | 8.2 | |
| 11:00 AM | | | | | | | | |
| 12:00 PM | | | | | | | | |
| 1:00 PM | | | | | | | | |
| 2:00 PM | | | | | | | | |
| 3:00 PM | | | | | | | | |
| 4:00 PM | | | | | | | | |
| 5:00 PM | | | | | | | | |
| 6:00 PM | | | | | | | | |
| FEED PARK | | | | | | | | |

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.0 | 7.3 | | 12.2 | 30 |
| PM | 2.5 | 8.2 | | 12.0 | 26 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 170 | JP |
| Compressor 2 | | | | |
| Generator 1 | 3/4 | 1/2 | — | JP |

COOKE_CWA_00064343

**Daily Site Log for:** 6 / 3 / 15    Mon    Tue    (Wed)    Thurs    Fri    Sat    Sun (circle day)

**Weather AM (circle)**    (Sun)    Cloud    Rain
Wind:    (Light)    Moderate    Strong
Current:    Light    (Moderate)    Strong
Sea State    Calm    (Ripple)    Rough

**Weather PM (circle)**    Sun    (Cloud)    Rain
Wind:    (Light)    Moderate    Strong
Current:    Light    (Moderate)    Strong
Sea State    (Calm)    Ripple    Rough

**Feed Quality Issues**    X No    ____ Yes          Feed Quality Claim Submitted    X No    ____ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No    ____ Yes    Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | | |
| Mooring concerns? X No ____ Yes | | |
| Marine Engineer Contacted? X No ____ Yes | | |

**General Checklist Items:**
☑ VHF Working          ☑ Generator Check Complete          ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable          ☑ Feed Systems Check Complete          ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete          ☑ Internet Access Functionable          ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete          ☑ Vessel moorings Checked

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:    (5) 4 3 2 1 0          Observation: _____
End of day:    5 (4) 3 2 1 0          Observation: _____

**Fish Health Concerns?**    X No    ____ Yes          Comment: _____
Fish Health Contacted? ____ Yes
Contact Made Via: ____ Phone ____ Email ____ In person

**Marine Mammal Predation?**    X No    ____ Yes          Type: ____ Seal ____ Sealion ____ Other
Observation of Activity: _____

**Visitors to Site**
____ Yes
X No
Site Orientation Completed? ____ Yes ____ No ____ On File
Comment _____

**List all Visitors**
____ AGS Staff: _____
____ Contractor: _____
____ Other: _____

**Bi-Catch Removed?**    X No    ____ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | DIESEL | WASH | | **Start of Day** | | **End of Day** | |
| **Priorities:** (1) | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | 2 | (2) | 2 | | | | |
| 3 | (3) | 3 | 3 | | | | |
| 6:00 AM | | | | 7.2 | | | |
| 7:00 AM | | | | | | 8.0 | |
| 8:00 AM | | | | 7.6 | | | |
| 9:00 AM | | | | | | 8.1 | |
| 10:00 AM | | | | 7.9 | | | |
| 11:00 AM | | | | | | | |
| 12:00 PM | | | | | | | |
| 1:00 PM | | | | **Additional Tasks Completed Today:** | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM | | | | | | | |
| 4:00 PM | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM | | | | | | | |
| TIL DARK | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Environmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.2 | | 11.8 | 25 |
| PM | 2.5 | 8.1 | | 12.3 | 28 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 1/2 | — | MA |

**Daily Site Log for:** 6 / 4 / 15   Mon   Tue   Wed   (Thurs)   Fri   Sat   Sun (circle day)

**Weather AM** (circle)   Sun   (Cloud)   Rain
Wind:   (Light)   Moderate   Strong
Current:   Light   (Moderate)   Strong
Sea State   Calm   (Ripple)   Rough

**Weather PM** (circle)   (Sun)   Cloud   Rain
Wind:   (Light)   Moderate   Strong
Current:   (Light)   Moderate   Strong
Sea State   Calm   (Ripple)   Rough

**Feed Quality Issues**   ___X No   ___Yes          Feed Quality Claim Submitted   _X_No   ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
_X_No   ___Yes   *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? _X_No ___Yes | | |
| Marine Engineer Contacted? _X_No ___Yes | | |

**General Checklist Items:**
☑ VHF Working                    ☑ Generator Check Complete          ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable  ☑ Feed Systems Check Complete       ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete        ☑ Internet Access Functionable      ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete         ☑ Vessel moorings Checked

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:* (5) 4 3 2 1 0     Observation: _____
*End of day:* 5 (4) 3 2 1 0       Observation: _____

**Fish Health Concerns?** _X_No   ___Yes          Comment: _____
Fish Health Contacted? ___Yes
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?**   _X_No   ___Yes          Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

**Visitors to Site**
___Yes
_X_No
Site Orientation Completed? ___Yes ___No ___On File
Comment _____

**List all Visitors**
___ AGS Staff: _____
___ Contractor: _____
___ Other: _____

**Bi-Catch Removed?** ___No ___Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

COOKE_CWA_00064346

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED WASH DIESEL | | | | | **Start of Day** | | **End of Day** |
| **Priorities:** ①  | ①  | 1 | 1 | | | | |
| 2 | 2 | ②  | 2 | Outside | In Cage | Outside | In Cage |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | 7.2 | | | |
| 7:00 AM | | | | | | 7.9 | |
| 8:00 AM | | | | | | | |
| 9:00 AM | | | | 7.6 | | 8.0 | |
| 10:00 AM | | | | | | | |
| 11:00 AM | | | | | | | |
| 12:00 PM | | | | **Additional Tasks Completed Today:** | | | |
| 1:00 PM | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM | | | | | | | |
| 4:00 PM | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM | | | | | | | |
| TIL DARK | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2M | 7.2 | | 11.8 | 21 |
| PM | 2m | 8.0 | | 12 | 24 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 1/0 | MA |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 1/4 | — | MA |

**THIRD KNUTSEN DECLARATION - 236**

COOKE_CWA_00064347

**Daily Site Log for:** 6 / 5 / 15   Mon   Tue   Wed   Thurs   (Fri)   Sat   Sun (circle day)

| **Weather AM** (circle) | | | | **Weather PM** (circle) | | | |
|---|---|---|---|---|---|---|---|
| | (Sun) | Cloud | Rain | | (Sun) | Cloud | Rain |
| Wind: | (Light) | Moderate | Strong | Wind: | (Light) | Moderate | Strong |
| Current: | Light | (Moderate) | Strong | Current: | (Light) | Moderate | Strong |
| Sea State | Calm | (Ripple) | Rough | Sea State | (Calm) | Ripple | Rough |

**Feed Quality Issues**   X No ____Yes                    Feed Quality Claim Submitted   X No ____Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ____Yes  Actions (if any): _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |

Mooring concerns? X No ____Yes
Marine Engineer Contacted? X No ____Yes

**General Checklist Items:**

- ☑ VHF Working
- ☑ Marine Lights all Functionable
- ☑ Workboats Check Complete
- ☑ Outboard Check Complete
- ☑ Generator Check Complete
- ☑ Feed Systems Check Complete
- ☑ Internet Access Functionable
- ☑ Vessel moorings Checked
- ☑ Areation on in all Cages Morning Check
- ☑ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)

Start of day:  5 (4) 3 2 1 0       Observation: _____
End of day:  5 4 (3) 2 1 0         Observation: _____

**Fish Health Concerns?**  X No ____Yes        Comment: _____

Fish Health Contacted? ____No ____Yes
Contact Made Via: ____Phone ____Email ____In person

**Marine Mammal Predation?**   X No ____Yes        Type: ____Seal ____Sealion ____Other
Observation of Activity: _____

**Visitors to Site**                          **List all Visitors**
____Yes                                        ____ AGS Staff: _____
X No                                           ____ Contractor: _____
Site Orientation Completed? ____Yes ____No ____On File   ____ Other: _____
Comment _____

**Bi-Catch Removed?**  X No ____Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| Name: | FEED | MORTS | WASH | DIESEL | Start of Day | | End of Day | |
| Priorities: | 1 | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| | 2 | 2 | 2 | 2 | | | | |
| | 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | 7.0 | | | |
| 7:00 AM | | | | | | | 7.6 | |
| 8:00 AM | | | | | 7.4 | | | |
| 9:00 AM | | | | | | | 7.9 | |
| 10:00 AM | | | | | 7.7 | | 8.1 | |
| 11:00 AM | | | | | 7.3 | | | |
| 12:00 PM | | | | | | | | |
| 1:00 PM | | | | | | | | |
| 2:00 PM | | | | | | | | |
| 3:00 PM | | | | | | | | |
| 4:00 PM | | | | | | | | |
| 5:00 PM | | | | | | | | |
| 6:00 PM | | | | | | | | |

Additional Tasks Completed Today:

In Dark

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2m | 7.0 | | 11.7 | 21 |
| PM | 2m | 8.1 | | 12 | 24 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 2/3 | 55 | MA |
| Compressor 2 | | | | |
| Generator 1 | 2/3 | 7/8 | 55 | MA |

COOKE_CWA_00064349

**Daily Site Log for:** _6_ / _6_ / _15_   Mon   Tue   Wed   Thurs   Fri   (Sat)   Sun   (circle day)

| **Weather AM** (circle) | | | **Weather PM** (circle) | | |
|---|---|---|---|---|---|
| Sun | (Cloud) | Rain | (Sun) | Cloud | Rain |
| Wind: | Light | (Moderate) Strong | Wind: | (Light) | Moderate   Strong |
| Current: | (Light) | Moderate   Strong | Current: | (Light) | Moderate   Strong |
| Sea State | Calm | (Ripple) Rough | Sea State | (Calm) | Ripple   Rough |

**Feed Quality Issues**   _X_ No   ___ Yes        Feed Quality Claim Submitted  _X_ No  ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
_X_ No   ___ Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | | |
| Debris removal | ✓ | |
| Mooring concerns? _X_ No ___ Yes | | |
| Marine Engineer Contacted? _X_ No ___ Yes | | |

**General Checklist Items:**

- ☑ VHF Working
- ☑ Marine Lights all Functionable
- ☑ Workboats Check Complete
- ☑ Outboard Check Complete
- ☑ Generator Check Complete
- ☑ Feed Systems Check Complete
- ☑ Internet Access Functionable
- ☑ Vessel moorings Checked
- ☑ Aeration on in all Cages Morning Check
- ☑ Aeration on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:* (5) 4 3 2 1 0   Observation: _____
*End of day:*  5 (4) 3 2 1 0   Observation: _____

**Fish Health Concerns?**  _X_ No  ___ Yes        Comment: _____
Fish Health Contacted? ___ Yes        _____
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**  ___ No  ___ Yes      Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| ___ Yes | ___ AGS Staff: _____ |
| _X_ No | ___ Contractor: _____ |
| Site Orientation Completed? ___ Yes ___ No ___ On File | ___ Other: _____ |
| Comment _____ | |

**Bi-Catch Removed?** _X_ No ___ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

COOKE_CWA_00064350

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| Name: FEED WASH DIESEL | | | | Start of Day | | End of Day | |
| Priorities: 1 | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | (2) | 2 | 2 | | | | |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | | | |
| 7:00 AM | | | | 7.6 | | 8.0 | |
| 8:00 AM | | | | | | | |
| 9:00 AM | | | | 7.9 | | 8.2 | |
| 10:00 AM | | | | | | | |
| 11:00 AM | | | | | | | |
| 12:00 PM | | | | Additional Tasks Completed Today: | | | |
| 1:00 PM | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM | | | | | | | |
| 4:00 PM | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM | TIL DARK | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2M | 7.6 | | 11.9 | 27 |
| PM | 2M | 8.2 | | 12.1 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 1/4 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 7/8 | 7/8 | — | MA |

**Daily Site Log for:** 6 / 7 / 18    Mon  Tue  Wed  Thurs  Fri  Sat  (Sun) (circle day)

| **Weather AM (circle)** | | | | **Weather PM (circle)** | | | |
|---|---|---|---|---|---|---|---|
| | (Sun) | Cloud | Rain | | (Sun) | Cloud | Rain |
| Wind: | (Light) | Moderate | Strong | Wind: | Light | (Moderate) | Strong |
| Current: | (Light) | Moderate | Strong | Current: | Light | (Moderate) | Strong |
| Sea State | (Calm) | Ripple | Rough | Sea State | Calm | (Ripple) | Rough |

**Feed Quality Issues**  X No ___ Yes          Feed Quality Claim Submitted  X No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes  Actions (if any): _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**

☑ VHF Working                ☑ Generator Check Complete        ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable    ☑ Feed Systems Check Complete     ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete      ☑ Internet Access Functionable    ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete      ☑ Vessel moorings Checked

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  5 (4) 3 2 1 0    Observation: _____
End of day:   5 (4) 3 2 1 0    Observation: _____

**Fish Health Concerns?**  X No ___ Yes    Comment: _____
Fish Health Contacted? ___ Yes
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**  X No ___ Yes    Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**              **List all Visitors**
___ Yes                  ___ AGS Staff: _____
X No                    ___ Contractor: _____
Site Orientation Completed? ___ Yes ___ No ___ On File    ___ Other: _____
Comment _____

**Bi-Catch Removed?**  X No ___ Yes    **Supervisor Daily Log Book Check:**
If yes, number & species _____    Print _____
                       Sign _____

COOKE_CWA_00064352

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED  WASH | | | | | **Start of Day** | | **End of Day** | |
| **Priorities:** 1) | 1 | 1 | 1 | | Outside | In Cage | Outside | In Cage |
| 2 | 2) | 2 | 2 | | | | | |
| 3 | 3 | 3 | 3 | | | | | |
| **6:00 AM** | | | | | 7.7 | | | |
| **7:00 AM** | | | | | 7.6 | | 8.2 | |
| **8:00 AM** | | | | | | | | |
| **9:00 AM** | | | | | 7.9 | | | |
| **10:00 AM** | | | | | | | | |
| **11:00 AM** | | | | | | | | |
| **12:00 PM** | | | | | | | | |
| **1:00 PM** | | | | | | | | |
| **2:00 PM** | | | | | | | | |
| **3:00 PM** | | | | | | | | |
| **4:00 PM** | | | | | | | | |
| **5:00 PM** | | | | | | | | |
| **6:00 PM** | | | | | | | | |

TIL DARK

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2M | 7.7 | | 12 | 30 |
| PM | 2M | 8.2 | | 12.3 | 27 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 5/8 | 1/2 | — | JT |
| Compressor 2 | | | | |
| Generator 1 | 7/8 | 5/8 | — | JT |

WEEK END

COOKE_CWA_00064354

**Daily Site Log for:** 6/18/ (Mon) Tue Wed Thurs Fri Sat Sun (circle day)

**Weather AM** (circle) — (Sun) Cloud Rain
Wind: (Light) Moderate Strong
Current: Light (Moderate) Strong
Sea State (Calm) Ripple Rough

**Weather PM** (circle) — Sun Cloud Rain
Wind: (Light) Moderate Strong
Current: (Light) Moderate Strong
Sea State (Calm) Ripple Rough

**Feed Quality Issues** ✗ No ___ Yes    Feed Quality Claim Submitted ✓ No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
___ No ✗ Yes  Actions (if any): _____

**Morning Surface Inspection** | **Good** | **Other**
---|---|---
Can Buoys (alignment, condition, height above water) | |
Chain, bridles, and shackles | ✗ |
Cage Integrity | ✗ |
Nets at waterline | ✓ |
Waterline ties | ✗ |
Birdnets | ✗ | a couple walls need inshing
Debris removal | ✓ |
Mooring concerns? ✓ No ___ Yes | |
Marine Engineer Contacted ✗ No ___ Yes | |

**General Checklist Items:**
✓ VHF Working  ✓ Generator Check Complete  ✓ Areation on in all Cages Morning Check
✓ Marine Lights all Functionable  ✓ Feed Systems Check Complete  ✓ Areation on in All Cages Evening Check
✓ Workboats Check Complete  ✓ Internet Access Functionable  ☐ Any Genset Oil Changes Recorded
✓ Outboard Check Complete  ✓ Vessel moorings Checked

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day: 5 (4) 3 2 1 0  Observation: Jeff - aggressive initial surface reaction to feed
End of day: (5) 4 3 2 1 0  Observation: _____

**Fish Health Concerns?** ✗ No ___ Yes  Comment: _____
Fish Health Contacted? ___ Yes
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?** ✗ No ___ Yes  Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**  | **List all Visitors**
___ Yes | ___ AGS Staff:
✗ No | ___ Contractor:
Site Orientation Completed? ___ Yes ___ No ___ On File | ___ Other:
Comment _____ |

**Bi-Catch Removed?** ✗ No ___ Yes  | **Supervisor Daily Log Book Check:**
If yes, number & species _____ | Print Tom Glaspie
 | Sign _____

**THIRD KNUTSEN DECLARATION - 244**

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** | Jeff | Jesse | Kyl | Tom | **Start of Day** | | **End of Day** | |
| **Priorities:** | 1 feed | 1 feed | 1 feed | 1 | | | | |
| | 2 morts | 2 morts | 2 morts | 2 | Outside | In Cage | Outside | In Cage |
| | 3 Iden | 3 | 3 | 3 | 7.3 | | 8.1 | |
| **6:00 AM** | started feed | | | | | | | |
| **7:00 AM** | | | | | 7.7 | | 8.4 | |
| **8:00 AM** | | | | | | | | |
| **9:00 AM** | | | | | 7.6 | | 8.3 | |
| **10:00 AM** | started | mort removal | | | 7.8 | | | |
| **11:00 AM** | | | | | | | 8.0 | |
| **12:00 PM** | | | | | **Additional Tasks Completed Today:** | | | |
| **1:00 PM** | | | | | | | | |
| **2:00 PM** | | | | | | | | |
| **3:00 PM** | | | | | | | | |
| **4:00 PM** | | | | | | | | |
| **5:00 PM** | | | | | | | | |
| **6:00 PM** | | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviormental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2m | 7.3 | | 12 | 30 |
| PM | 2m | 8.3 | | 12.3 | 27 |

**Fuel Use/Levels:**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 110 | |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 1/2 | — | |

COOKE_CWA_00064356

**Daily Site Log for:** _02 9 15_ Mon (Tue) Wed Thurs Fri Sat Sun (circle day)

**Weather AM (circle)** (Sun) Cloud Rain       **Weather PM (circle)** (Sun) Cloud Rain

Wind: (Light) Moderate Strong       Wind: (Light) Moderate Strong

Current: (Light) Moderate Strong       Current: (Light) Moderate Strong

Sea State (Calm) Ripple Rough       Sea State (Calm) Ripple Rough

**Feed Quality Issues** ✓No ___Yes       **Feed Quality Claim Submitted** ___No ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)

___No ✗Yes Actions (if any): Bridge needs fixed/replaced

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | X | need to reinstall |
| Chain, bridles, and shackles | X | |
| Cage Integrity | X | |
| Nets at waterline | X | |
| Waterline ties | X | |
| Birdnets | X | |
| Debris removal | X | none |
| Mooring concerns? ✗No ___Yes | | |
| Marine Engineer Contacted? ✗No ___Yes | | |

**General Checklist Items:**

✗ VHF Working          ✗ Generator Check Complete       ✗ Areation on in all Cages Morning Check
✗ Marine Lights all Functionable    ✗ Feed Systems Check Complete     ✗ Areation on in All Cages Evening Check
✗ Workboats Check Complete     ✗ Internet Access Functionable    ✗ Any Genset Oil Changes Recorded
✗ Outboard Check Complete     ✗ Vessel moorings Checked

**Fish Behaviour Scale** -circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)

Start of day: (5) 4 3 2 1 0       Observation: _____

End of day:  5 (4) 3 2 1 0       Observation: _____

**Fish Health Concerns?** ✗No ___Yes       Comment: _____

Fish Health Contacted? ___Yes

Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?** ✗No ___Yes       Type: ___Seal ___Sealion ___Other

Observation of Activity: _____

**Visitors to Site**          **List all Visitors**
✗ Yes                AGS Staff: Innes
___ No               Contractor: _____
Site Orientation Completed? ✗Yes ___No ___On File   Other: _____
Comment _____

**Bi-Catch Removed?** ✗No ___Yes       **Supervisor Daily Log Book Check:**
If yes, number & species _____       Print _____
                  Sign _____

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED WASH | | | | | | | | |
| **Priorities:** (1) | 1 | 1 | 1 | | **Start of Day** | | **End of Day** | |
| 2 | (2) | 2 | 2 | | Outside | In Cage | Outside | In Cage |
| 3 | 3 | 3 | 3 | | | | | |
| **6:00 AM** | | | | | 7.1 | | | |
| **7:00 AM** | | | | | | | 8.1 | |
| **8:00 AM** | | | | | 7.4 | | | |
| **9:00 AM** | | | | | 7.7 | | 8.3 | |
| **10:00 AM** | | | | | | | 8.6 | |
| **11:00 AM** | | | | | 7.9 | | | |

**Additional Tasks Completed Today:**

| | |
|---|---|
| **12:00 PM** | |
| **1:00 PM** | |
| **2:00 PM** | |
| **3:00 PM** | |
| **4:00 PM** | |
| **5:00 PM** | |
| **6:00 PM** | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.1 | | 12.5 | 22 |
| PM | 2.5 | 8.6 | | 12.7 | 25 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 4/4 | 55 | MA |

COOKE_CWA_00064358

**Daily Site Log for:** _6_/_10_/_ _ Mon  Tue  (Wed)  Thurs  Fri  Sat  Sun (circle day)

| **Weather AM** (circle) | | | **Weather PM** (circle) | | |
|---|---|---|---|---|---|
| | (Sun)  Cloud  Rain | | | Sun  Cloud  Rain | |
| Wind: | (Light)  Moderate  Strong | | Wind: | Light  (Moderate)  Strong | |
| Current: | Light  (Moderate)  Strong | | Current: | (Light)  Moderate  Strong | |
| Sea State | (Calm)  Ripple  Rough | | Sea State | Calm  (Ripple)  Rough | |

**Feed Quality Issues**  X No  ___Yes       Feed Quality Claim Submitted  X No ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___Yes  Actions (if any): _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |

Mooring concerns?  X No ___Yes
Marine Engineer Contacted?  X No ___Yes

**General Checklist Items:**
- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  (5) 4 3 2 1 0      Observation: _____
End of day:  5 (4) 3 2 1 0      Observation: _____

**Fish Health Concerns?**  X No ___Yes      Comment: _____
Fish Health Contacted? ___Yes      _____
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?**  ___No ___Yes      Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| ___Yes | ___ AGS Staff:_____ |
| X No | ___ Contractor:_____ |
| Site Orientation Completed? ___Yes ___No ___On File | ___ Other:_____ |
| Comment_____ | |

**Bi-Catch Removed?**  X No ___Yes       **Supervisor Daily Log Book Check:**
If yes, number & species_____       Print _____
Sign _____

COOKE_CWA_00064359

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED WASH | | | | | | | | |
| **Priorities:** 1) | 1 | 1 | 1 | | **Start of Day** | | **End of Day** | |
| 2 | 2) | 2 | 2 | | Outside | In Cage | Outside | In Cage |
| 3 | 3 | 3 | 3 | | 7.0 | | | |
| 6:00 AM | | | | | | | 5.7 | |
| 7:00 AM | | | | | 6.8 | | | |
| 8:00 AM | | | | | | | 6.6 | |
| 9:00 AM | | | | | 6.2 | | 7.4 | |
| 10:00 AM | | | | | | | 8.1 | |
| 11:00 AM | | | | | 6.0 | | | |

**Additional Tasks Completed Today:**

| | | | | |
|---|---|---|---|---|
| 12:00 PM | | | | |
| 1:00 PM | | | | |
| 2:00 PM | | | | |
| 3:00 PM | | | | |
| 4:00 PM | | | | |
| 5:00 PM | | | | |
| 6:00 PM | | | | |

THE PARK

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2 M | 7.0 | | 12.5 | 25 |
| PM | 2 M | 9.5 | | 13.3 | 28 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 4/4 | 7/8 | — | MA |

COOKE_CWA_00064360

**Daily Site Log for:** 6 / 11 /15   Mon   Tue   Wed   (Thurs)   Fri   Sat   Sun   (circle day)

**Weather AM (circle)**        (Sun)   Cloud   Rain
Wind:        (Light)   Moderate   Strong
Current:     (Light)   Moderate   Strong
Sea State    (Calm)   Ripple   Rough

**Weather PM (circle)**        (Sun)   Cloud   Rain
Wind:        (Light)   Moderate   Strong
Current:     (Light)   Moderate   Strong
Sea State    Calm   Ripple   Rough

**Feed Quality Issues**   X No ____ Yes          Feed Quality Claim Submitted   X No ____ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ____ Yes  Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | | |
| Mooring concerns? ✓ No ____ Yes | | |
| Marine Engineer Contacted? X No ____ Yes | | |

**General Checklist Items:**
- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:   (5) 4 3 2 1 0        Observation: _____
End of day:     5 (4) 3 2 1 0        Observation: _____

**Fish Health Concerns?**   X No ____ Yes        Comment: _____
Fish Health Contacted? ____ Yes                  _____
Contact Made Via: ____ Phone ____ Email ____ In person

**Marine Mammal Predation?**   X No ____ Yes     Type: ____ Seal ____ Sealion ____ Other
Observation of Activity: _____

**Visitors to Site**
____ Yes
X No
Site Orientation Completed? ____ Yes ____ No ____ On File
Comment _____

**List all Visitors**
____ AGS Staff: _____
____ Contractor: _____
____ Other: _____

**Bi-Catch Removed?**   X No ____ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED WASH | | | | | Start of Day | | End of Day |
| **Priorities:** 1 | 1 | 1 | 1 | | Outside | In Cage | Outside | In Cage |
| 2 | 2 | 2 | 2 | | | | | |
| 3 | 3 | 3 | 3 | | | | | |
| **6:00 AM** | | | | | 7.0 | | | |
| | | | | | | | 8.2 | |
| **7:00 AM** | | | | | 7.7 | | | |
| **8:00 AM** | | | | | | | 8.6 | |
| **9:00 AM** | | | | | | | | |
| **10:00 AM** | | | | | 7.3 | | 9.0 | |
| **11:00 AM** | | | | | 8.0 | | 9.5 | |
| **12:00 PM** | | | | **Additional Tasks Completed Today:** | | | | |
| **1:00 PM** | | | | | | | | |
| **2:00 PM** | | | | | | | | |
| **3:00 PM** | | | | | | | | |
| **4:00 PM** | | | | | | | | |
| **5:00 PM** | | | | | | | | |
| **6:00 PM** | TIL DARK | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2m | 7.0 | | 12.5 | 23 |
| PM | 2m | 9.5 | | 13 | 27 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | ½ | ¾ | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 5/8 | 5/8 | — | MA |

COOKE_CWA_00064362

**Daily Site Log for:** 6 / 12 / 15    Mon   Tue   Wed   Thurs   (Fri)   Sat   Sun (circle day)

| **Weather AM** (circle) | | | **Weather PM** (circle) | | |
|---|---|---|---|---|---|
| | (Sun) Cloud Rain | | | (Sun) Cloud Rain | |
| Wind: | (Light) Moderate Strong | | Wind: | (Light) Moderate Strong | |
| Current: | (Light) Moderate Strong | | Current: | Light (Moderate) Strong | |
| Sea State | Calm (Ripple) Rough | | Sea State | Calm (Ripple) Rough | |

**Feed Quality Issues** ___X___ No ___ Yes          Feed Quality Claim Submitted ___X___ No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
___X___ No ___ Yes  *Actions (If any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | | |
| Mooring concerns? __X__ No __ Yes | | |
| Marine Engineer Contacted? __X__ No __ Yes | | |

**General Checklist Items:**
- ☑ VHF Working
- ☑ Marine Lights all Functionable
- ☑ Workboats Check Complete
- ☑ Outboard Check Complete
- ☑ Generator Check Complete
- ☑ Feed Systems Check Complete
- ☑ Internet Access Functionable
- ☑ Vessel moorings Checked
- ☑ Areation on in all Cages Morning Check
- ☑ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:*  5 (4) 3 2 1 0     Observation: _____
*End of day:*  5 (4) 3 2 1 0     Observation: _____

**Fish Health Concerns?** ___X___ No ___ Yes     Comment: _____
Fish Health Contacted? ___ No ___ Yes     _____
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?** ___X___ No ___ Yes     Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| ___ Yes | ___ AGS Staff: _____ |
| ___X___ No | ___ Contractor: _____ |
| Site Orientation Completed? ___ Yes ___ No ___ On File | ___ Other: _____ |
| Comment _____ | |

**Bi-Catch Removed?** ___X___ No ___ Yes          **Supervisor Daily Log Book Check:**
If yes, number & species _____          Print _____
                                                  Sign _____

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | MORTs | WASH | | **Start of Day** | | **End of Day** | |
| **Priorities:** 1 | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | 2 | 2 | 2 | 7.4 | | | |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | | 8.4 | |
| 7:00 AM | | | | | | | |
| 8:00 AM | | | | 7.8 | | 8.8 | |
| 9:00 AM | | | | 7.9 | | | |
| 10:00 AM | | | | | | 9.1 | |
| 11:00 AM | | | | 8.2 | | 9.4 | |

**Additional Tasks Completed Today:**

| | | | | |
|---|---|---|---|---|
| 12:00 PM | | | | |
| 1:00 PM | | | | |
| 2:00 PM | | | | |
| 3:00 PM | | | | |
| 4:00 PM | | | | |
| 5:00 PM | | | | |
| 6:00 PM | | | | |
| | nc DARK | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.4 | | 12.8 | 28 |
| PM | 2.5 | 9.4 | | 13.0 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 3/4 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 5/8 | 1/2 | — | MA |

**Daily Site Log for:** 6 / 13 / 15  Mon  Tue  Wed  Thurs  Fri  (Sat)  Sun (circle day)

**Weather AM (circle)**
| | | | |
|---|---|---|---|
| | (Sun) | Cloud | Rain |
| Wind: | Light | Moderate | Strong |
| Current: | Light | (Moderate) | Strong |
| Sea State | Calm | (Ripple) | Rough |

**Weather PM (circle)**
| | | | |
|---|---|---|---|
| | (Sun) | Cloud | Rain |
| Wind: | (Light) | Moderate | Strong |
| Current: | (Light) | Moderate | Strong |
| Sea State | (Calm) | Ripple | Rough |

**Feed Quality Issues**   X No ____ Yes       Feed Quality Claim Submitted  X No ____ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ____ Yes  Actions (if any): _____

**Morning Surface Inspection**

| | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**
- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  (5) 4 3 2 1 0    Observation: _____
End of day:    5 (4) 3 2 1 0    Observation: _____

**Fish Health Concerns?**  X No ___ Yes      Comment: _____
Fish Health Contacted? ____ Yes       _____
Contact Made Via: ____ Phone ____ Email ____ In person

**Marine Mammal Predation?**   X No ____ Yes      Type: ____ Seal ____ Sealion ____ Other
Observation of Activity: _____

**Visitors to Site**
____ Yes
X No
Site Orientation Completed? ___ Yes ____ No ____ On File
Comment _____

**List all Visitors**
AGS Staff: _____
Contractor: _____
Other: _____

**Bi-Catch Removed?**  X No ____ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

**THIRD KNUTSEN DECLARATION - 254**

COOKE_CWA_00064365

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | WASH | | | **Start of Day** | | **End of Day** | |
| **Priorities:** 1 | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | 2 | 2 | 2 | | | | |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | 7.6 | | | |
| | | | | | | 7.7 | |
| 7:00 AM | | | | | | | |
| | | | | 7.8 | | | |
| 8:00 AM | | | | | | 8.1 | |
| 9:00 AM | | | | 8.0 | | | |
| | | | | | | 8.7 | |
| 10:00 AM | | | | | | | |
| | | | | 8.3 | | | |
| 11:00 AM | | | | | | | |

**Additional Tasks Completed Today:**

| | |
|---|---|
| 12:00 PM | |
| 1:00 PM | |
| 2:00 PM | |
| 3:00 PM | |
| 4:00 PM | |
| 5:00 PM | |
| 6:00 PM | |
| IN PARK | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2m | 7.6 | | 12.5 | 28 |
| PM | 2m | 8.8 | | 12.8 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 4/4 | 220 | MA |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 4/4 | 55 | MA |

COOKE_CWA_00064366

**Daily Site Log for:** 6 / 14 / 15    Mon    Tue    Wed    Thurs    Fri    Sat    (Sun) (circle day)

**Weather AM (circle)**    (Sun)    Cloud    Rain
Wind:    (Light)    Moderate    Strong
Current:    Light    (Moderate)    Strong
Sea State    Calm    (Ripple)    Rough

**Weather PM (circle)**    (Sun)    (Cloud)    Rain
Wind:    (Light)    Moderate    Strong
Current:    (Light)    Moderate    Strong
Sea State    (Calm)    Ripple    Rough

**Feed Quality Issues**    X No    ___Yes        Feed Quality Claim Submitted    X No    ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No    ___Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? X No ___Yes | | |
| Marine Engineer Contacted? X No ___Yes | | |

**General Checklist Items:**
☑ VHF Working        ☑ Generator Check Complete        ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable    ☑ Feed Systems Check Complete    ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete    ☑ Internet Access Functionable    ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete    ☑ Vessel moorings Checked

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:*    (5) 4  3  2  1  0    Observation: _____
*End of day:*    5  (4) 3  2  1  0    Observation: _____

**Fish Health Concerns?**    X No    ___Yes        Comment: _____
Fish Health Contacted? ___Yes
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?**    X No    ___Yes        Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

**Visitors to Site**
___Yes
X No
Site Orientation Completed? ___Yes ___No ___On File
Comment _____

**List all Visitors**
___ AGS Staff: _____
___ Contractor: _____
___ Other: _____

**Bi-Catch Removed?**    X No    ___Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED  WASH | | | | | | Start of Day | | End of Day | |
| **Priorities:** ① | 1 | 1 | 1 | 1 | | | | |
|  | 2 | ② | 2 | 2 | | Outside | In Cage | Outside | In Cage |
|  | 3 | 3 | 3 | 3 | | | | | |
| 6:00 AM | | | | | | | | | |
| 7:00 AM | | | | | | | | | |
| 8:00 AM | | | | | | | | | |
| 9:00 AM | | | | | | | | | |
| 10:00 AM | | | | | | | | | |
| 11:00 AM | | | | | | | | | |
| 12:00 PM | | | | | | | | | |
| 1:00 PM | | | | | | | | | |
| 2:00 PM | | | | | | | | | |
| 3:00 PM | | | | | | | | | |
| 4:00 PM | | | | | | | | | |
| 5:00 PM | | | | | | | | | |
| 6:00 PM | | | | | | | | | |
|  | TIL DARk | | | | | | | | |

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

**Envionmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 m | 7.2 | | 12.6 | 29 |
| PM | 2.5 m | 8.6 | | 12.8 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 3/4 | 1/2 | — | JT |
| Compressor 2 | | | | |
| Generator 1 | 4/4 | 7/8 | — | JT |

COOKE_CWA_00064368

WEEK END

COOKE_CWA_00064369

**Daily Site Log for:** 6 / 15 / 15  (Mon)  Tue  Wed  Thurs  Fri  Sat  Sun  (circle day)

**Weather AM** (circle)  (Sun)  Cloud  Rain
Wind:  (Light)  Moderate  Strong
Current:  Light  (Moderate)  (Strong)
Sea State  (Calm)  Ripple  Rough

**Weather PM** (circle)  (Sun)  Cloud  Rain
Wind:  Light  (Moderate)  Strong
Current:  (Light)  Moderate  Strong
Sea State  (Calm)  Ripple  Rough

**Feed Quality Issues**  ☒ No  ___ Yes    Feed Quality Claim Submitted  ☒ No  ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
☒ No  ___ Yes  Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? ☒ No ___ Yes | ✓ | |
| Marine Engineer Contacted? ☒ No ___ Yes | | |

**General Checklist Items:**
☑ VHF Working    ☑ Generator Check Complete    ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable    ☑ Feed Systems Check Complete    ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete    ☑ Internet Access Functionable    ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete    ☑ Vessel moorings Checked

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  (5) 4 3 2 1 0    Observation:  FISH LOOKING BETTER
End of day:  5 (4) 3 2 1 0    Observation:  WATERS MURKY, FISH EATING GOOD

**Fish Health Concerns?**  ☒ No  ___ Yes    Comment: _____
Fish Health Contacted? ___ Yes    _____
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**  ☒ No  ___ Yes    Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**
___ Yes
☒ No
Site Orientation Completed? ___ Yes ___ No ___ On File
Comment _____

**List all Visitors**
___ AGS Staff: _____
___ Contractor: _____
___ Other: _____

**Bi-Catch Removed?** ___ No ___ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

COOKE_CWA_00064370

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEEDING | NET WASH | MORT DIVE | | **Start of Day** | | **End of Day** | |
| **Priorities:** ① | 1 | ① | 1 | | | | |
| | 2 | ②) | 2 | 2 | Outside | In Cage | Outside | In Cage |
| | 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | FEEDING | | | | | | | |
| 7:00 AM | ↓ | | | | | | | |
| 8:00 AM | | | | | | | | |
| 9:00 AM | | | MORTS | | | | | |
| | FEED | | | | | | | |
| 10:00 AM | | | | | | | | |
| 11:00 AM | ↓ | | ↓ | | | | | |
| 12:00 PM | | | | | **Additional Tasks Completed Today:** | | | |
| 1:00 PM | FEED | | | | | | | |
| 2:00 PM | ↓ | | | | | | | |
| 3:00 PM | | | | | | | | |
| 4:00 PM | | | | | | | | |
| 5:00 PM | | | | | | | | |
| 6:00 PM | FEED Til DARK | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 M | 7.0 | | 12.6 | 23 |
| PM | 2.5 M | 8.1 | | 13.1 | 25 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 3/4 | 3/4 | — | JP |
| Compressor 2 | | | | |
| Generator 1 | 3/4 | 1/2 | — | JP |

**THIRD KNUTSEN DECLARATION - 260**

COOKE_CWA_00064371

**Daily Site Log for:** 6 / 16 / 15   Mon  (Tue)  Wed  Thurs  Fri  Sat  Sun (circle day)

| **Weather AM** (circle) | | | | **Weather PM** (circle) | | | |
|---|---|---|---|---|---|---|---|
| | Sun | Cloud | Rain | | Sun | Cloud | Rain |
| Wind: | (Light) | Moderate | Strong | Wind: | (Light) | Moderate | Strong |
| Current: | (Light) | Moderate | Strong | Current: | Light | (Moderate) | Strong |
| Sea State | (Calm) | Ripple | Rough | Sea State | Calm | (Ripple) | Rough |

**Feed Quality Issues**   X No ___ Yes          Feed Quality Claim Submitted  X No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | NEED REPLACED |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | | |
| Debris removal | ✓ | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**

- ☑ VHF Working
- ☑ Marine Lights all Functionable
- ☑ Workboats Check Complete
- ☑ Outboard Check Complete
- ☑ Generator Check Complete
- ☑ Feed Systems Check Complete
- ☑ Internet Access Functionable
- ☑ Vessel moorings Checked
- ☑ Areation on in all Cages Morning Check
- ☑ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0 = slow swimmers.finning.no feed reaction)
Start of day:  5 (4) 3 2 1 0   Observation: EATING GOOD
End of day:    5 (4) 3 2 1 0   Observation: NET WASHING BOTHERING FEEDING 2ND PM FEEDING BETTER

**Fish Health Concerns?**  X No ___ Yes     Comment: _____
Fish Health Contacted? _____
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**   ✓ No ___ Yes     Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| ___ Yes | ___ AGS Staff: |
| X No | ___ Contractor: |
| Site Orientation Completed? ___ Yes ___ No ___ On File | ___ Other: |
| Comment _____ | |

| **Bi-Catch Removed?** ___ No ___ Yes | **Supervisor Daily Log Book Check:** |
|---|---|
| If yes, number & species _____ | Print _____  Sign _____ |

COOKE_CWA_00064372

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | NETWASH | | | **Start of Day** | | **End of Day** | |
| **Priorities:** (1) | 1 | 1 | 1 | | | | |
| 2 | (2) | 2 | 2 | Outside | In Cage | Outside | In Cage |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM FEED@5 | | | | | | | |
| 7:00 AM | | | | | | | |
| 8:00 AM | | | | | | | |
| 9:00 AM FEED | | | | | | | |
| 10:00 AM ↓ | | | | | | | |
| 11:00 AM | | | | | | | |
| 12:00 PM FEED | | | | **Additional Tasks Completed Today:** | | | |
| 1:00 PM ↓ | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM FEED | | | | | | | |
| 4:00 PM ↓ | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM FEED TIL DARK | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.3 | | 12.5 | 25 |
| PM | 2.5 | 8.6 | | 13.2 | 25 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 3/4 | 1/2 | — | JP |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 1/4 | 110 | JP |

**THIRD KNUTSEN DECLARATION - 262**

**Daily Site Log for:** 6 / 17 / _ Mon   Tue   (Wed)   Thurs   Fri   Sat   Sun (circle day)

| **Weather AM** (circle) | | | | **Weather PM** (circle) | | | |
|---|---|---|---|---|---|---|---|
| | (Sun) | Cloud | Rain | | (Sun) | Cloud | Rain |
| Wind: | (Light) | Moderate | Strong | Wind: | (Light) | Moderate | Strong |
| Current: | (Light) | Moderate | Strong | Current: | (Light) | Moderate | Strong |
| Sea State | (Calm) | Ripple | Rough | Sea State | (Calm) | Ripple | Rough |

**Feed Quality Issues**   X No ____ Yes          Feed Quality Claim Submitted  X No ____ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
____No ____Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | X | |
| Chain, bridles, and shackles | X | |
| Cage Integrity | X | |
| Nets at waterline | X | |
| Waterline ties | X | |
| Birdnets | X | |
| Debris removal | X | |
| Mooring concerns? X No ___Yes | X | |
| Marine Engineer Contacted? X No ___Yes | X | |

**General Checklist Items:**

| | | |
|---|---|---|
| ✓ VHF Working | ☑ Generator Check Complete | ☑ Aeration on in all Cages Morning Check |
| ✓ Marine Lights all Functionable | ☑ Feed Systems Check Complete | ☑ Aeration on in All Cages Evening Check |
| ✓ Workboats Check Complete | ☑ Internet Access Functionable | ☐ Any Genset Oil Changes Recorded |
| ✓ Outboard Check Complete | ☑ Vessel moorings Checked | |

**Fish Behaviour Scale**—circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:* (5) 4 3 2 1 0      Observation: _____
*End of day:*  5 (4) 3 2 1 0      Observation: _____

**Fish Health Concerns?** ____No ____Yes      Comment: _____
Fish Health Contacted? ____Yes          _____
Contact Made Via: ____Phone ____Email ____In person

**Marine Mammal Predation?** X No ____Yes      Type: ____Seal ____Sealion ____Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| ____Yes | ____ AGS Staff: _____ |
| X No | ____ Contractor: _____ |
| Site Orientation Completed? ___Yes ___No ___On File | ____ Other: _____ |
| Comment _____ | |

| **Bi-Catch Removed?** X No ____ Yes | **Supervisor Daily Log Book Check:** |
|---|---|
| If yes, number & species _____ | Print _____ |
| | Sign _____ |

COOKE_CWA_00064374

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|

| Name: | FEED | WASH | DIESEL | | Start of Day | | End of Day | |
|---|---|---|---|---|---|---|---|---|
| Priorities: | 1 | 1 | 1 | 1 | | | | |
| | 2 | 2 | 2 | 2 | Outside | In Cage | Outside | In Cage |
| | 3 | 3 | 3 | 3 | 7.6 | — | | |
| 6:00 AM | | | | | | | | |
| 7:00 AM | | | | | 7.9 | — | | |
| 8:00 AM | | | | | | | | |
| 9:00 AM | | | | | 7.4 | — | | |
| 10:00 AM | | | | | | | | |
| 11:00 AM | | | | | | | | |
| 12:00 PM | | | | | **Additional Tasks Completed Today:** | | | |
| 1:00 PM | | | | | | | | |
| 2:00 PM | | | | | | | | |
| 3:00 PM | | | | | | | | |
| 4:00 PM | | | | | | | | |
| 5:00 PM | | | | | | | | |
| 6:00 PM | | | | | | | | |
| | TIL DARK | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.6 | | 12.6 | 25 |
| PM | 2.5 | 7.9 | | 12.4 | 25 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 1/4 | 110 | BL |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 4/4 | 55 | BL |

COOKE_CWA_00064375

**Daily Site Log for:** 6 / 19 /   Mon   Tue   Wed   (Thurs)   Fri   Sat   Sun   (circle day)

| **Weather AM** (circle) | (Sun) | (Cloud) | Rain | **Weather PM** (circle) | Sun | (Cloud) | Rain |
|---|---|---|---|---|---|---|---|
| Wind: | (Light) | Moderate | Strong | Wind: | (Light) | Moderate | Strong |
| Current: | Light | (Moderate) | Strong | Current: | Light | (Moderate) | Strong |
| Sea State | (Calm) | Ripple | Rough | Sea State | Calm | (Ripple) | Rough |

**Feed Quality Issues**   X No ___Yes          Feed Quality Claim Submitted  X No ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | NEED REPLACING |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? X No ___Yes | NO | |
| Marine Engineer Contacted? X No ___Yes | | |

**General Checklist Items:**

| | | |
|---|---|---|
| ☑ VHF Working | ✓ Generator Check Complete | ✓ Areation on in all Cages Morning Check |
| ☑ Marine Lights all Functionable | ☑ Feed Systems Check Complete | ✓ Areation on in All Cages Evening Check |
| ☑ Workboats Check Complete | ✓ Internet Access Functionable | ☐ Any Genset Oil Changes Recorded |
| ☑ Outboard Check Complete | ✓ Vessel moorings Checked | |

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:   5 (3) 2 1 0   Observation: FEED PLATES NEED READJUSTING
End of day:   5 (4) 3 2 1 0   Observation: WASHED PENS SHUTTING DOWN FASTER

**Fish Health Concerns?** X No ___Yes   Comment: _____
Fish Health Contacted? ___Yes
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?** X No ___Yes   Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

**Visitors to Site**
X Yes
___ No
Site Orientation Completed? ___Yes ___No ___On File
Comment _____

**List all Visitors**
___ AGS Staff: _____
___ Contractor: _____
3 Other: NEIGHBORS INTERESTED IN WALKTHROUGH OF SYSTEM

**Bi-Catch Removed?** X No ___Yes
If yes, number & species_____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

COOKE_CWA_00064376

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|

| Name: | FEED | ADJUST FEED RATE | WALKWAY DUST OFF | NET WASH | Start of Day | | End of Day | |
|---|---|---|---|---|---|---|---|---|
| Priorities: | ① | ③ | 1 | ① | Outside | In Cage | Outside | In Cage |
| | 2 | 2 | ② | 2 | 7.6 | | | |
| | 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | | | | |
| 7:00 AM | | | | | 8.6 | | | |
| 8:00 AM | | ↑↓ | | | 56 | | | |
| 9:00 AM | ↑ | | ↑ | | | | 7.4 | |
| 10:00 AM | ↓ | | | | | | | |
| 11:00 AM | | | | ↑ | | | | |
| 12:00 PM | ↑↓ | | ↓ | | | | | |
| 1:00 PM | ↑ | | | | | | | |
| 2:00 PM | ↓ | | | | | | | |
| 3:00 PM | ↑ | | | ↓ | | | | |
| 4:00 PM | ↓ | | | | | | | |
| 5:00 PM | ↑ | | | | | | | |
| 6:00 PM | ↓ | | | | | | | |

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

FEEDING SURVELANCE

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2m | 7.6 | | 12.6 | 27 |
| PM | 2.5 | 7.4 | | 12.5 | 27 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 3/4 | 1/2 | — | KW |
| Compressor 2 | | | | |
| Generator 1 | 4/4 | 3/4 | — | MA |

COOKE_CWA_00064377

**Daily Site Log for:** 6 / 19 / 15   Mon   Tue   Wed   Thurs   (Fri)   Sat   Sun   (circle day)

| **Weather AM** (circle) | | | | **Weather PM** (circle) | | | |
|---|---|---|---|---|---|---|---|
| (Sun) | Cloud | Rain | | Sun | Cloud | Rain | |
| Wind: | (Light) | Moderate | Strong | Wind: | Light | Moderate | Strong |
| Current: | Light | (Moderate) | Strong | Current: | Light | Moderate | Strong |
| Sea State | (Calm) | Ripple | Rough | Sea State | Calm | Ripple | Rough |

**Feed Quality Issues**   X No ___ Yes          Feed Quality Claim Submitted   X No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | NEED TO BE REPLACED |
| Chain, bridles, and shackles | ✓ | |
| Cage integrity | ✓ | |
| Nets at waterline | ✓✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**

- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:   (5  4) 3  2  1  0      Observation: _____
End of day:   5 (4  3) 2  1  0      Observation: _____

**Fish Health Concerns?**  X No ___ Yes      Comment: _____
Fish Health Contacted? ___ Yes      _____
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**   X No ___ Yes     Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**              **List all Visitors**
___ Yes                     ___ AGS Staff: _____
X No                      ___ Contractor: _____
Site Orientation Completed? ___ Yes ___ No ___ On File      ___ Other: _____
Comment _____

**Bi-Catch Removed?**  X No ___ Yes        **Supervisor Daily Log Book Check:**
If yes, number & species _____    Print _____
                          Sign _____

**THIRD KNUTSEN DECLARATION - 267**

COOKE_CWA_00064378

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | SAMPLE R:8 | MORT DIVE | WASH NET | **Start of Day** | | **End of Day** | |
| **Priorities:** ①1 | 1 | 1 | 1 | | | | |
| 2 | ②2 | ②2 | ②2 | Outside | In Cage | Outside | In Cage |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | | | |
| | | | | 7.2 | | 7.5 | |
| 7:00 AM | | | | | | | |
| 8:00 AM | | | | 6.7 | | 7.4 | |
| 9:00 AM | | | | | | | |
| | | | | 7.0 | | 7.7 | |
| 10:00 AM | | | | | | | |
| 11:00 AM | | | | | | | |
| 12:00 PM | | | | **Additional Tasks Completed Today:** | | | |
| 1:00 PM | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM | | | | | | | |
| 4:00 PM | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM | | | | | | | |

**Daily Meeting Topics Covered Today:**

CORRECT DIP NET OPERATION;
FEEDING PROTOCOL ADJUST

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.2 | | 12.4 | 29 |
| PM | 2.5 | 7.8 | | 12.2 | 25 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/3 | 2/3 | 110 | JP |
| Compressor 2 | | | | |
| Generator 1 | 2/3 | 1/2 | — | MA |

COOKE_CWA_00064379

**Daily Site Log for:** 6 / 2⁰ / 15  Mon   Tue   Wed   Thurs   Fri   (Sat)   Sun  (circle day)

**Weather AM** (circle)           **Weather PM** (circle)
Wind:      Light   (Sun)  Cloud  Rain      Wind:      (Sun)  Cloud  Rain
           Moderate  Strong                  Light   Moderate  Strong
Current:   (Light)  Moderate  Strong        Current:  (Light)  Moderate  Strong
Sea State  (Calm)  Ripple  Rough            Sea State  (Calm)  Ripple  Rough

**Feed Quality Issues**   ☒ No  ___ Yes        Feed Quality Claim Submitted  ___ No  ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
☒ No  ___ Yes  Actions (if any): _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | No | |
| Mooring concerns?  ☒ No ___ Yes | | |
| Marine Engineer Contacted? ☒ No ___ Yes | | |

**General Checklist Items:**
☑ VHF Working                    ☑ Generator Check Complete        ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable ☑ Feed Systems Check Complete     ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete       ☑ Internet Access Functionable    ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete        ☑ Vessel moorings Checked

**Fish Behaviour Scale** – circle one (5=normal swim and breaking water at feeding / 0= slow swimmers finning.no feed reaction)
Start of day:   5 (4) 3 2 1 0    Observation: 1ST EARLY FEEDING OPPROTUNITY, TURNED DOWN QUICK
End of day:     5 (4) 3 2 1 0    Observation: WEREN'T AS AGGRESSIVE DUE TO EARLY FEEDING

**Fish Health Concerns?**  ☒ No ___ Yes    Comment: _____
Fish Health Contacted? ___ Yes
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**   ☒ No ___ Yes    Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**                    **List all Visitors**
___ Yes                                 ___ AGS Staff: _____
☒ No                                    ___ Contractor: _____
Site Orientation Completed? ___ Yes ___ No ___ On File   ___ Other: _____
Comment _____

**Bi-Catch Removed?**  ☒ No ___ Yes      **Supervisor Daily Log Book Check:**
If yes, number & species _____   Print _____
                                            Sign _____

COOKE_CWA_00064380

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED | | | | | | Start of Day | | End of Day | |
| **Priorities:** (1) | 1 | 1 | 1 | | Outside | In Cage | Outside | In Cage |
| 2 | 2 | 2 | 2 | | | | | |
| 3 | 3 | 3 | 3 | | | | | |
| 6:00 AM | FEED ↗ ↓ | | | | | 7.6 | | | |
| 7:00 AM | | | | | | 7.8 | | | |
| 8:00 AM | | | | | | | | | |
| 9:00 AM | | | | | | | | | |
| 10:00 AM | | | | | | 7.2 | | | |
| 11:00 AM | | | | | | | | | |
| 12:00 PM | FEEDING ↗ | | | | **Additional Tasks Completed Today:** | | | | |
| 1:00 PM | ↓ | | | | | | | | |
| 2:00 PM | | | | | | | | | |
| 3:00 PM | ↑ ↓ | | | | | | | | |
| 4:00 PM | ↓ | | | | | | | | |
| 5:00 PM | ↑ ↓ | | | | | | | | |
| 6:00 PM | #FED 7k 8:45 ↓ | | | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.6 | | 12.6 | 30 |
| PM | 2.5 | 8.3 | | 12.4 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | ½ | ½ | — | MA |
| Compressor 2 | | | | |
| Generator 1 | ½ | ½ | — | MA |

COOKE_CWA_00064381

**Daily Site Log for:** _6_ / _21_ / _    Mon   Tue   Wed   Thurs   Fri   Sat   (Sun) (circle day)

| **Weather AM** (circle) | | | **Weather PM** (circle) | | |
|---|---|---|---|---|---|
| Wind: | (Light) Moderate Strong | | Wind: | (Light) Moderate Strong | |
| Current: | (Light) Moderate Strong | | Current: | (Light) Moderate Strong | |
| Sea State | (Calm) Ripple Rough | | Sea State | (Light) Ripple Rough | |

Weather AM: (Sun) Cloud Rain
Weather PM: (Sun) Cloud Rain

**Feed Quality Issues**   X No ___ Yes          Feed Quality Claim Submitted ___ No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | | |
| Debris removal | NO | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**

| | | |
|---|---|---|
| ✓ VHF Working | ✓ Generator Check Complete | ✓ Aeration on in all Cages Morning Check |
| ✓ Marine Lights all Functionable | ✓ Feed Systems Check Complete | ✓ Aeration on in All Cages Evening Check |
| ✓ Workboats Check Complete | ✓ Internet Access Functionable | ☐ Any Genset Oil Changes Recorded |
| ✓ Outboard Check Complete | ✓ Vessel moorings Checked | |

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers,finning,no feed reaction)
Start of day:   5 (4) 3 2 1 0     Observation: _STILL A LITTLE SLOW_
End of day:    5 4 3 2 1 0      Observation: _____

**Fish Health Concerns?**   X No ___ Yes      Comment: _____
Fish Health Contacted? ___ Yes
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**   X No ___ Yes      Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| ___ Yes | ___ AGS Staff: _____ |
| X No | ___ Contractor: _____ |
| Site Orientation Completed? ___ Yes ___ No ___ On File | ___ Other: _____ |
| Comment _____ | |

| **Bi-Catch Removed?** X No ___ Yes | **Supervisor Daily Log Book Check:** |
|---|---|
| If yes, number & species _____ | Print _____ |
| | Sign _____ |

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** | FEED | LOAD Specs | WASH 40 | | **Start of Day** | | **End of Day** | |
| **Priorities:** | 1 ⃝ | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| | 2 | 2 ⃝ | 2 ⃝ | 2 | 7.6 | | | |
| | 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | EARLY FEEDING | | | | | | | |
| 7:00 AM | ↓ | | | | | | 8.1 | |
| 8:00 AM | | | | | | | | |
| 9:00 AM | | ↑ | | | 7.9 | | | |
| 10:00 AM | | ↓ | | | 7.5 | | | |
| 11:00 AM | | | ↑ | | | | | |
| 12:00 PM | FEED | | | | | | | |
| 1:00 PM | ↓ | | | | | | | |
| 2:00 PM | ↑ | | | | | | | |
| 3:00 PM | ↓ | | ↓ | | | | | |
| 4:00 PM | ↑ | | | | | | | |
| 5:00 PM | ↓ | | | | | | | |
| 6:00 PM | ↑ FEED To TANK | | | | | | | |

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 7.6 | | 12.4 | 27 |
| PM | 2.5 | 8.1 | | 12.7 | 27 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 1/4 | — | MA |
| Compressor 2 | | | | |
| Generator 1 | 1/2 | 1/4 | — | MA |

COOKE_CWA_00064383

WEEK END

COOKE_CWA_00064384

Daily Site Log for: 6 / 22 / 15   (Mon)  Tue   Wed   Thurs   Fri   Sat   Sun  (circle day)

**Weather AM (circle)**   (Sun)  Cloud   Rain
Wind:      (Light)   Moderate   Strong
Current:   (Light)   Moderate   Strong
Sea State  (Calm)    Ripple     Rough

**Weather PM (circle)**   (Sun)  Cloud   Rain
Wind:      (Light)   Moderate   Strong
Current:   (Light)   Moderate   Strong
Sea State  (Calm)    Ripple     Rough

**Feed Quality Issues**   X No ___ Yes        Feed Quality Claim Submitted  X No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | NO | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**
☑ VHF Working              ☑ Generator Check Complete      ☑ Areation on in all Cages Morning Check
☑ Marine Lights all Functionable  ☑ Feed Systems Check Complete   ☑ Areation on in All Cages Evening Check
☑ Workboats Check Complete  ☑ Internet Access Functionable  ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete   ☑ Vessel moorings Checked

**Fish Behaviour Scale** - circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:   (5) 4 3 2 1 0    Observation: _____
End of day:    5 (4) 3 2 1 0    Observation: _____

**Fish Health Concerns?**   X No ___ Yes     Comment: _____
Fish Health Contacted? ___ Yes                _____
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**   X No ___ Yes     Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**
___ Yes
X No
Site Orientation Completed? ___ Yes ___ No ___ On File
Comment _____

**List all Visitors**
___ AGS Staff: _____
___ Contractor: _____
___ Other: _____

**Bi-Catch Removed?**  X No ___ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

**THIRD KNUTSEN DECLARATION - 274**

COOKE_CWA_00064385

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | DIVE MORTS | WASH NET | | **Start of Day** | | **End of Day** | |
| **Priorities:** ① | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | ② | 2 | 2 | | | | |
| 3 | 3 | ③ | 3 | | | | |
| 6:00 AM | | | | 7.9 | | | |
| 7:00 AM | | | | 8.4 | | 9.2 | |
| 8:00 AM | | | | | | 8.6 | |
| 9:00 AM | | | | 7.6 | | | |
| 10:00 AM | | | | | | | |
| 11:00 AM | | | | | | | |
| 12:00 PM | | | | **Additional Tasks Completed Today:** | | | |
| 1:00 PM | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM | | | | | | | |
| 4:00 PM | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM | | | | | | | |
| | FED Til DARK | | | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 3 | 8.1 | | 12.6 | 30 |
| PM | 3 | 9.2 | | 12.5 | 27 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/4 | 1/8 | — | JT |
| Compressor 2 | | | | |
| Generator 1 | 1/8 | 4/4 | 110 | JT |

**Daily Site Log for:** 6 / 23 / 15    Mon    (Tue)    Wed    Thurs    Fri    Sat    Sun (circle day)

| **Weather AM** (circle) | | | **Weather PM** (circle) | | |
|---|---|---|---|---|---|
| | (Sun) Cloud Rain | | | Sun (Cloud) Rain | |
| Wind: | (Light) Moderate Strong | | Wind: | (Light) Moderate Strong | |
| Current: | (Light) Moderate Strong | | Current: | Light (Moderate) Strong | |
| Sea State | (Calm) Ripple Rough | | Sea State | Calm (Ripple) Rough | |

**Feed Quality Issues**    X No ____Yes          Feed Quality Claim Submitted  X No ____Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ____Yes  *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | NO | |
| Mooring concerns? X No ____Yes | | |
| Marine Engineer Contacted? ✓ No ____Yes | | |

**General Checklist Items:**

- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale**–circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:* (5) 4 3 2 1 0    Observation: _____
*End of day:* 5 (4) 3 2 1 0    Observation: _____

**Fish Health Concerns?**    X No ____Yes    Comment: _____
Fish Health Contacted? ____Yes  _____
Contact Made Via: ____Phone ____Email ____In person

**Marine Mammal Predation?**    X No ____Yes    Type: ____Seal ____Sealion ____Other
Observation of Activity: _____

| **Visitors to Site** | **List all Visitors** |
|---|---|
| X Yes | X AGS Staff: WILLIAM |
| ____No | ____Contractor: |
| Site Orientation Completed? X Yes ____No ____On File | ____Other: |
| Comment _____ | |

| **Bi-Catch Removed?** X No ____Yes | **Supervisor Daily Log Book Check:** |
|---|---|
| If yes, number & species _____ | Print _____ |
| | Sign _____ |

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|

| Name: | FEED | WASH NET | BAP | | Start of Day | | End of Day | |
|---|---|---|---|---|---|---|---|---|
| Priorities: | ①1 | 1 | ①1 | 1 | Outside | In Cage | Outside | In Cage |
| | 2 | ②2 | 2 | 2 | | | | |
| | 3 | 3 | 3 | 3 | | | | |

| | FEED | WASH NET | BAP | | Outside | In Cage | Outside | In Cage |
|---|---|---|---|---|---|---|---|---|
| 6:00 AM | | | | | 8.0 | | | |
| 7:00 AM | | | | | | | 9.0 | |
| 8:00 AM | | | | | 7.5 | | | |
| 9:00 AM | | | | | | | 9.4 | |
| 10:00 AM | | | | | | | | |
| 11:00 AM | | | | | | | 8.4 | |
| 12:00 PM | | | | | | | | |
| 1:00 PM | | | | | | | | |
| 2:00 PM | | | | | | | | |
| 3:00 PM | | | | | | | | |
| 4:00 PM | | | | | | | | |
| 5:00 PM | | | | | | | | |
| 6:00 PM | FED TIL DARK | | | | | | | |

**Additional Tasks Completed Today:**

BAP MOCK AUDIT
PREP WITH WILL

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 3 | 8.0 | | 12.5 | 22 |
| PM | 3 | 9.0 | | 18.3 | 24 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/8 | 1/4 | 110 | JT |
| Compressor 2 | | | | |
| Generator 1 | 4/4 | 4/4 | — | MA |

COOKE_CWA_00064388

**Daily Site Log for:** 6 / 24 / 15  Mon  Tue  (Wed)  Thurs  Fri  Sat  Sun (circle day)

| **Weather AM** (circle) | Sun (Cloud) Rain | **Weather PM** (circle) | Sun  Cloud  Rain |
|---|---|---|---|
| Wind: | (Light)  Moderate  Strong | Wind: | Light  (Moderate)  Strong |
| Current: | (Light)  Moderate  Strong | Current: | Light  (Moderate)  Strong |
| Sea State | (Calm)  Ripple  Rough | Sea State | Calm  (Ripple)  Rough |

**Feed Quality Issues**  X No ___Yes          Feed Quality Claim Submitted ___No ___Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc))
X No ___Yes *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | No | |
| Mooring concerns? X No ___Yes | | |
| Marine Engineer Contacted? X No ___Yes | | |

**General Checklist Items:**
- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
*Start of day:* (5) 4 3 2 1 0    Observation: _____
*End of day:* 5 4 3 2 1 0    Observation: _____

**Fish Health Concerns?**  X No ___Yes    Comment: _____
Fish Health Contacted? ___Yes
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?**  ✓ No ___Yes    Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

**Visitors to Site**          **List all Visitors**
___Yes                         ___ AGS Staff: _____
X No                           ___ Contractor: _____
Site Orientation Completed? ___Yes ___No ___On File    ___ Other: _____
Comment _____

**Bi-Catch Removed?**  X No ___Yes          **Supervisor Daily Log Book Check:**
If yes, number & species_____    Print _____
                                            Sign _____

COOKE_CWA_00064389

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | SAFETY MEETING | NET WASH | C/o FEED BARGE | **Start of Day** | | **End of Day** | |
| **Priorities:** ① | ① | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | 2 | ② | ② | | | | |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM 1ST LIGHT ↑ | | | | | | 8.9 | |
| 7:00 AM | | | | 8.8 | | | |
| 8:00 AM ↓ | | | | 6.7 | | 9.3 | |
| 9:00 AM | | | | 8.1 | | 9.7 | |
| 10:00 AM ↑ | | | | | | | |
| 11:00 AM ↓ | ↑ | | | | | | |
| 12:00 PM | ↓ | ↑ | | | | | |
| 1:00 PM | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM ↑ | | | ↑ | | | | |
| 4:00 PM ↓ | | | ↓ | | | | |
| 5:00 PM ↑ | | ↓ | | | | | |
| 6:00 PM FED TIL 7 DARK ↓ | | | | | | | |

**Additional Tasks Completed Today:**

BAP AUDIT PREPARE.
MAKING SURE EVERYONE IS DOING
THEIR PART TO SUCCEED COMPLETION

**Daily Meeting Topics Covered Today:**

SAFETY & DIVE SAFETY MEETING ON
FULL FACE MASKS. WATCHED VIDEO
W/ CREW.

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 3M | 8.8 | | 13.1 | 26 |
| PM | 3M | 9.3 | | 13.3 | 27 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/4 | 3/4 | 220 | MA |
| Compressor 2 | | | | |
| Generator 1 | 4/4 | 4/4 | — | MA |

COOKE_CWA_00064390

Daily Site Log for: 10 / 25 / 18  Mon  Tue  Wed  ~~Thurs~~  Fri  Sat  Sun (circle day)

| Weather AM (circle) | | | | Weather PM (circle) | | | |
|---|---|---|---|---|---|---|---|
| | (Sun) | Cloud | Rain | | | (Sun) | Cloud | Rain |
| Wind: | Light | Moderate | Strong | Wind: | Light | Moderate | Strong |
| Current: | Light | Moderate | Strong | Current: | Light | Moderate | Strong |
| Sea State | Calm | Ripple | Rough | Sea State | Calm | Ripple | Rough |

**Feed Quality Issues**   X No ___ Yes          Feed Quality Claim Submitted  X No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes  Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | No | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**
- ✓ VHF Working
- ✓ Marine Lights all Functionable
- ✓ Workboats Check Complete
- ✓ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ✓ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day: (5) 4 3 2 1 0   Observation: _____
End of day:  5 4 3 2 1 0   Observation: _____

**Fish Health Concerns?** X No ___ Yes     Comment: good wgt. Level. Some VN still but
Fish Health Contacted? ✓ Yes → in place     by. No skin lesions found. Most of good looking
Contact Made Via: ___ Phone ___ Email ✓ In person   fish have feed on guts.

**Marine Mammal Predation?** X No ___ Yes   Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

| Visitors to Site | List all Visitors |
|---|---|
| X Yes | ✓ AGS Staff: Armin Racmine |
| ___ No | ___ Contractor: |
| Site Orientation Completed? ___ Yes ___ No X On File | ___ Other: |
| Comment _____ | |

| Bi-Catch Removed? X No ___ Yes | Supervisor Daily Log Book Check: |
|---|---|
| If yes, number & species | Print _____ |
| | Sign _____ |

**THIRD KNUTSEN DECLARATION - 280**

COOKE_CWA_00064391

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED | MORTS | WASH PENS | ADJUST FEEDERS | | **Start of Day** | | **End of Day** | |
| **Priorities:** ① | 1 | 1 | 1 | | | | | |
| 2 | ② | ② | ② | | Outside | In Cage | Outside | In Cage |
| 3 | 3 | 3 | 3 | | 8.0 | | | |
| **6:00 AM** FIRST LIGHT ↑ | | | | | | | | |
| **7:00 AM** | | | | | 7.7 | | | |
| **8:00 AM** ↓ | | | | | 7.5 | | | |
| **9:00 AM** ↑ | | | | | | | | |
| **10:00 AM** ↓ | | | | | | | | |
| **11:00 AM** ↑ | | | | | | | | |
| **12:00 PM** ↓ | | | | | | | | |
| **1:00 PM** | | | | | | | | |
| **2:00 PM** | | | | | | | | |
| **3:00 PM** | | | | | | | | |
| **4:00 PM** ↑ | | | | | | | | |
| **5:00 PM** ↓ | | | | | | | | |
| **6:00 PM** FEED TIL DARK ↑ | | | | | | | | |

**Additional Tasks Completed Today:**

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2 m | 8 | | 12.9 | 25 |
| PM | 2 M | 7.9 | | 12.7 | 23 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 3/8 | 5/8 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 7/8 | 5/8 | — | MA |

**THIRD KNUTSEN DECLARATION - 281**

COOKE_CWA_00064392

**Daily Site Log for:** 6 / 26 / 15  Mon  Tue  Wed  Thurs  (Fri)  Sat  Sun (circle day)

| **Weather AM** (circle) | | | | **Weather PM** (circle) | | | |
|---|---|---|---|---|---|---|---|
| | (Sun) | Cloud | Rain | | (Sun) | Cloud | Rain |
| Wind: | (Light) | Moderate | Strong | Wind: | (Light) | Moderate | Strong |
| Current: | (Light) | Moderate | Strong | Current: | Light | (Moderate) | Strong |
| Sea State | (Calm) | Ripple | Rough | Sea State | (Calm) | Ripple | Rough |

**Feed Quality Issues**  X No ___ Yes        Feed Quality Claim Submitted  X No ___ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ___ Yes *Actions (if any):* _____

| **Morning Surface Inspection** | **Good** | **Other** |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | No | |
| Mooring concerns? X No ___ Yes | | |
| Marine Engineer Contacted? X No ___ Yes | | |

**General Checklist Items:**

| | | |
|---|---|---|
| ☑ VHF Working | ☑ Generator Check Complete | ☑ Areation on in all Cages Morning Check |
| ☑ Marine Lights all Functionable | ☑ Feed Systems Check Complete | ☑ Areation on in All Cages Evening Check |
| ☑ Workboats Check Complete | ☑ Internet Access Functionable | ☐ Any Genset Oil Changes Recorded |
| ☑ Outboard Check Complete | ☑ Vessel moorings Checked | |

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  5  (4)  3  2  1  0        Observation: _____
End of day:    5  (4)(3) 2  1  0        Observation: _____

**Fish Health Concerns?**     X No ___ Yes        Comment: _____
Fish Health Contacted? ___ Yes
Contact Made Via: ___ Phone ___ Email ___ In person

**Marine Mammal Predation?**     X No ___ Yes        Type: ___ Seal ___ Sealion ___ Other
Observation of Activity: _____

**Visitors to Site**                  **List all Visitors**
___ Yes                               ___ AGS Staff: _____
X No                                  ___ Contractor: _____
Site Orientation Completed? ___ Yes ___ No ___ On File   ___ Other: _____
Comment _____

**Bi-Catch Removed?** X No ___ Yes        **Supervisor Daily Log Book Check:**
If yes, number & species _____    Print _____
                                          Sign _____

COOKE_CWA_00064393

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | BAP Review | | | | Start of Day | | End of Day |
| **Priorities:** (1) | (1) | 1 | 1 | | Outside | In Cage | Outside | In Cage |
| 2 | 2 | 2 | 2 | | | | | |
| 3 | 3 | 3 | 3 | | | | | |
| 6:00 AM 1st Light | | | | | | | 8.6 | |
| 7:00 AM | | | | | 9.5 | | 9.2 | |
| 8:00 AM | | | | | 9.7 | | | |
| 9:00 AM | | | | | | | 8.6 | |
| 10:00 AM | | | | | 8.0 | | 10.0 | |
| 11:00 AM | | | | | | | | |
| 12:00 PM | | | | | | | | |

**Additional Tasks Completed Today:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1:00 PM | | | |
| 2:00 PM | | | |
| 3:00 PM | | | |
| 4:00 PM | | | |
| 5:00 PM | | | |
| 6:00 PM Feed To Dark | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 3M | 9.5 | | 13.7 | 22 |
| PM | 2M | 10.0 | | 13.2 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 3/4 | 4/4 | 110 | MA |
| Compressor 2 | | | | |
| Generator 1 | 5/8 | 1/2 | — | MA |

COOKE_CWA_00064394

**Daily Site Log for:** 6 / 27 / 18   Mon   Tue   Wed   Thurs   Fri   (Sat)   Sun   (circle day)

**Weather AM** (circle)   (Sun)   Cloud   Rain
Wind: (Light)   Moderate   Strong
Current: (Light)   Moderate   Strong
Sea State (Calm)   Ripple   Rough

**Weather PM** (circle)   (Sun)   Cloud   Rain
Wind: (Light)   Moderate   Strong
Current: Light   (Moderate)   Strong
Sea State (Calm)   Ripple   Rough

**Feed Quality Issues**   X No ____Yes      Feed Quality Claim Submitted   X No ____Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
X No ____Yes  Actions (if any): _____

| Morning Surface Inspection | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | YES | |
| Mooring concerns? X No ___Yes | | |
| Marine Engineer Contacted? X No ___Yes | | |

**General Checklist Items:**
☑ VHF Working   ☑ Generator Check Complete   ☑ Aeration on in all Cages Morning Check
☑ Marine Lights all Functionable   ☑ Feed Systems Check Complete   ☑ Aeration on in All Cages Evening Check
☑ Workboats Check Complete   ☑ Internet Access Functionable   ☐ Any Genset Oil Changes Recorded
☑ Outboard Check Complete   ☑ Vessel moorings Checked

**Fish Behaviour Scale**-circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:   5 4 (3) 2 1 0   Observation: _____
End of day:   5 (4) 3 2 1 0   Observation: _____

**Fish Health Concerns?** X No ___Yes   Comment: _____
Fish Health Contacted? ___Yes
Contact Made Via: ___Phone ___Email ___In person

**Marine Mammal Predation?** X No ___Yes   Type: ___Seal ___Sealion ___Other
Observation of Activity: _____

**Visitors to Site**
___Yes
X No
Site Orientation Completed? ___Yes ___No ___On File
Comment _____

**List all Visitors**
___AGS Staff: _____
___Contractor: _____
___Other: _____

**Bi-Catch Removed?** X No ___Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print
Sign ___

**THIRD KNUTSEN DECLARATION - 284**

COOKE_CWA_00064395

| Structured Work Day Tasks | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|
| **Name:** FEED | OFFLOAD BOAT | DIESEL X 3 | FIX direction | **Start of Day** | | **End of Day** | |
| **Priorities:** (1) | (1) | 1 Housɛ x 4 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | 2 | (2) | (2) | | | | |
| 3 | 3 | 3 | 3 | | | | |
| 6:00 AM  FIRST LIGHT | | | | 8.4 | | 8.5 | |
| 7:00 AM | | | | 9.7 | | 9.4 | |
| 8:00 AM | | | | | | | |
| 9:00 AM | | | | 9.6 | | 9.5 | |
| 10:00 AM | | | | | | 9.8 | |
| 11:00 AM | | | | | | | |
| 12:00 PM | | | | | | | |
| 1:00 PM | | | | | | | |
| 2:00 PM | | | | | | | |
| 3:00 PM | | | | | | | |
| 4:00 PM | | | | | | | |
| 5:00 PM | | | | | | | |
| 6:00 PM  Til DARK | | | | | | | |

**Additional Tasks Completed Today:**

LASH Un COMPLETED PENS
THROUGHOUT DAY In BETWEEN
FEEDINLS & DURING EBB

one Barrel of GAS unloaded

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 3 | 8.4 | | 13.4 | 25 |
| PM | 3 | 9.4 | | 13.7 | 25 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 7/8 | 3/4 | 55 | MA |
| HOUSE ~~Compressor 2~~ | 55 | 110 | 55 | BL. |
| Generator 1 | 1/2 | 4/4 | 55 | MA |

COOKE_CWA_00064396

**Daily Site Log for:** 6 / 28 / 15    Mon    Tue    Wed    Thurs    Fri    Sat    (Sun) (circle day)

**Weather AM (circle)**
Wind: (Sun) Cloud Rain
Wind: (Light) Moderate Strong
Current: (Light) Moderate Strong
Sea State: Calm Ripple Rough

**Weather PM (circle)**
(Sun) Cloud Rain
Wind: Light Moderate Strong
Current: Light Moderate Strong
Sea State: Calm Ripple Rough

**Feed Quality Issues** ✓ No ____ Yes    Feed Quality Claim Submitted ✗ No ____ Yes

**Workplace Safety** (Perform a visual site/system inspection looking for hazards (eg: slip/trip hazards etc)
✓ No ____ Yes  Actions (if any): _____

**Morning Surface Inspection**

| | Good | Other |
|---|---|---|
| Can Buoys (alignment, condition, height above water) | ✓ | |
| Chain, bridles, and shackles | ✓ | |
| Cage Integrity | ✓ | |
| Nets at waterline | ✓ | |
| Waterline ties | ✓ | |
| Birdnets | ✓ | |
| Debris removal | ✓ | |
| Mooring concerns? ✓ No ___ Yes | | |
| Marine Engineer Contacted? ✓ No ___ Yes | | |

**General Checklist Items:**
- ☑ VHF Working
- ☐ Marine Lights all Functionable
- ☑ Workboats Check Complete
- ☑ Outboard Check Complete
- ✓ Generator Check Complete
- ✓ Feed Systems Check Complete
- ✓ Internet Access Functionable
- ☐ Vessel moorings Checked
- ✓ Areation on in all Cages Morning Check
- ✓ Areation on in All Cages Evening Check
- ☐ Any Genset Oil Changes Recorded

**Fish Behaviour Scale** -circle one (5=normal swim and breaking water at feeding / 0= slow swimmers.finning.no feed reaction)
Start of day:  5 4 3 2 1 0    Observation: _____
End of day:  5 4 3 2 1 0    Observation: _____

**Fish Health Concerns?** ✗ No ____ Yes    Comment: _____
Fish Health Contacted? ____ Yes    _____
Contact Made Via: ____ Phone ____ Email ____ In person

**Marine Mammal Predation?** ✗ No ____ Yes    Type: ____ Seal ____ Sealion ____ Other
Observation of Activity: _____

**Visitors to Site**
____ Yes
✓ No
Site Orientation Completed? ___ Yes ___ No ___ On File
Comment _____

**List all Visitors**
____ AGS Staff: _____
____ Contractor: _____
____ Other: _____

**Bi-Catch Removed?** ✓ No ____ Yes
If yes, number & species _____

**Supervisor Daily Log Book Check:**
Print _____
Sign _____

| Structured Work Day Tasks | | | | | Daily D.O. Log | | | |
|---|---|---|---|---|---|---|---|---|
| **Name:** FEED | | | | | **Start of Day** | | **End of Day** | |
| **Priorities:** 1 | 1 | 1 | 1 | 1 | Outside | In Cage | Outside | In Cage |
| 2 | 2 | 2 | 2 | 2 | 8.0 | | | |
| 3 | 3 | 3 | 3 | 3 | | | | |
| 6:00 AM | | | | | | | | |
| 7:00 AM | | | | | | | | |
| 8:00 AM | Fee ding | | | | 7.0 | | | |
| 9:00 AM | | | | | | | | |
| 10:00 AM | | | | | 8.2 | | | |
| 11:00 AM | | | | | | | | |

**Additional Tasks Completed Today:**

| | | | | |
|---|---|---|---|---|
| 12:00 PM | | | | |
| 1:00 PM | | | | |
| 2:00 PM | | | | |
| 3:00 PM | | | | |
| 4:00 PM | | | | |
| 5:00 PM | | | | |
| 6:00 PM | | | | |

**Daily Meeting Topics Covered Today:**

**Enviornmental Readings:**

| | Visibility | DO (mgrs/lt) | O2 % saturation | Temp | Salinity |
|---|---|---|---|---|---|
| AM | 2.5 | 8.0 | | 13.1 | 27 |
| PM | 2.5 | 8.2 | | 13.3 | 30 |

**Fuel Use/Levels**

| | AM Fuel Level | PM Fuel Level | Daily Fuel Added | Initial |
|---|---|---|---|---|
| Compressor 1 | 1/2 | 1/4 | — | BL |
| Compressor 2 | | | | |
| Generator 1 | 4/4 | 7/8 | — | BL |

COOKE_CWA_00064398

WEEK END

COOKE_CWA_00064399

# EXHIBIT 6

DATE: 6/2/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☐

AMERICAN GOLD SEAFOODS

DIVE MODE USED:   SCUBA ☐   Other • ☐

*Describe other mode:

| NAME: Jeffrey | ROLE: DIVE SUPERVISOR |
| NAME: Kyl | ROLE: DIVER |
| NAME: Jesse | ROLE: STANDY BY DVR |
| NAME: Jeffrey | ROLE: TENDER |
| NAME: | ROLE: |
| NAME: | ROLE: |
| NAME: | ROLE: |

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?
YES ☑ NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?
YES ☑ NO ☐

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑ NO ☐

WATER TEMP: 13.3
CURRENT: Strong ☐   Weak ☑
WATER VISIBILITY: 3 M
AIR TEMP: 58 F
WEATHER: Cloudy

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑ NO ☐

SURFACE WATER CONDITIONS: Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑ NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑ NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?
YES ☑ NO ☐

*IF THE ANSWER IS NO, THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑ NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑ NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑ NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐ NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other: _____

INITIALS: JT
KW

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

_____ Tamura
DIVE SUPERVISOR SIGNATURE

6/2/15
DATE

THIRD KNUTSEN DECLARATION - 290

COOKE_CWA_00215705

| DIVER NAME: | KYl | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |

| TIME IN: | 9:30 | TIME OUT: | 10:05 |
| MAX DEPTH: | 20 | AVG DEPTH: | 16 |
| BOTTOM TIME: | 35 | SAFETY STOP: | V |
| PRESSURE IN: | 3000 | PRESSURE OUT: | 600 |

| DIVER NAME: | KYl | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |

| TIME IN: | 10:21 | TIME OUT: | 10:43 |
| MAX DEPTH: | 30 | AVG DEPTH: | 26 |
| BOTTOM TIME: | 30 | SAFETY STOP: | V |
| PRESSURE IN: | 2900 | PRESSURE OUT: | 1500 |

**DIVER NAME / DIVER #2 sections (blank forms below)**

Remaining form fields blank.

COOKE_CWA_00215706

Case 2:17-cv-01708-JCC    Document 104-1    Filed 06/27/19    Page 292 of 369

DATE: 6/4/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED: SCUBA ☑   Other • ☐
*Describe other mode:

AMERICAN GOLD SEAFOODS

| NAME: | Mike A | ROLE: | DIVE SUPERVISOR |
| NAME: | Kyl W | ROLE: | DIVER |
| NAME: | Jesse P | ROLE: | STANDY BY DVR |
| NAME: | Brad L | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑ NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?
YES ☑ NO ☐
*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?
YES ☑ NO ☐

WATER TEMP: 11.8
CURRENT: Strong ☑   Weak ☐
WATER VISIBILITY: 3M
AIR TEMP: 52°
WEATHER: O/C

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑ NO ☐

SURFACE WATER CONDITIONS: Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑ NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑ NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?
YES ☑ NO ☐
*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:
TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑ NO ☐
WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑ NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑ NO ☐
ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐ NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐
Other:

INITIALS: MA   BL
KW
JP

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

_____          6/4/15
DIVE SUPERVISOR SIGNATURE          DATE

**THIRD KNUTSEN DECLARATION - 292**

COOKE_CWA_00215707

DIVER NAME: Ky I W
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | 9:13 | TIME OUT: | 9:30 |
| MAX DEPTH: | 30 | AVG DEPTH: | 20 |
| BOTTOM TIME: | .5 | SAFETY STOP: | ✓ |
| PRESSURE IN: | 3000 | PRESSURE OUT: | 1,000 |

DIVER NAME: Ky I W
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | 9:45 | TIME OUT: | 10:02 |
| MAX DEPTH: | 30 | AVG DEPTH: | 20 |
| BOTTOM TIME: | 0 | SAFETY STOP: | ✓ |
| PRESSURE IN: | 2700 | PRESSURE OUT: | 1,600 |

DIVER NAME: Ky I W
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | 10:10 | TIME OUT: | 10:20 |
| MAX DEPTH: | 30 | AVG DEPTH: | 20 |
| BOTTOM TIME: | 1.5 | SAFETY STOP: | ✓ |
| PRESSURE IN: | 1,600 | PRESSURE OUT: | 500 |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

|    |   | F |
|----|---|---|
| 5  | 3 | 4 |
| 6  | 3 | 4 |
| 7  | 3 | 3 |
| 8  | 3 | 3 |
| 9  | 1 | 2 |
| 10 | 1 | 2 |

DATE: 6/5/15

DIVE LOCATION:  Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED:   SCUBA ☑   Other ☐
*Describe other mode:

AMERICAN GOLD SEAFOODS

| NAME: | to good | ROLE: | DIVE SUPERVISOR |
| NAME: | JOLSC | ROLE: | DIVER |
| NAME: | KYI | ROLE: | STANDBY DIVER |
| NAME: | good | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑  NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS IT FULLY OPERATIONAL?
YES ☑  NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?
YES ☑  NO ☐

WATER TEMP: 11.7
CURRENT:  Strong ☐  Weak ☑
WATER VISIBILITY:
AIR TEMP:  Good.
WEATHER:

SURFACE WATER CONDITIONS:  Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑  NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑  NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑  NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?
YES ☑  NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑  NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑  NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑  NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐  NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☐
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS: BB
KW

ADDITIONAL COMMENTS

*I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.*

DIVE SUPERVISOR SIGNATURE

6-5-15

DATE

COOKE_CWA_00215709

DIVER NAME: _Jesse P_
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _9.30_ | TIME OUT: _10:00_ |
| MAX DEPTH: _30_ | AVG DEPTH: _25_ |
| BOTTOM TIME: _.5_ | SAFETY STOP: ✓ |
| PRESSURE IN: _3000_ | PRESSURE OUT: _1200_ |

DIVER NAME: _Jesse P_
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _10.07_ | TIME OUT: _10:40_ |
| MAX DEPTH: _36_ | AVG DEPTH: _25_ |
| BOTTOM TIME: _1.0_ | SAFETY STOP: |
| PRESSURE IN: _2950_ | PRESSURE OUT: _500_ |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER NAME: _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

DIVER #2 NAME: _____ DIVER PROFILE
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**THIRD KNUTSEN DECLARATION - 295**

COOKE_CWA_00215710

Case 2:17-cv-01209-JCC   Document 16-1   Filed 02/17/18   Page 296 of 369

DATE: 6/10/15

DIVE LOCATION:   Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED:   SCUBA ☑   Other * ☐

*Describe other mode:

**American Gold SEAFOODS**

| | | |
|---|---|---|
| NAME: Mike A | ROLE: | DIVE SUPERVISOR |
| NAME: Kyl W | ROLE: | DIVER |
| NAME: Tom G | ROLE: | STANDY BY DVR |
| NAME: Bren L | ROLE: | TENDER |
| NAME: | ROLE: | |
| NAME: | ROLE: | |
| NAME: | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?   YES ☑   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?   YES ☑   NO ☐

WATER TEMP: 12.2
CURRENT:   Strong ☐   Weak ☑
WATER VISIBILITY: 2m
AIR TEMP: 60°
WEATHER: Sunny

SURFACE WATER CONDITIONS:   Calm Seas ☑   Chop ☐   White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑   NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐   NO ☑

WORK TO BE PERFORMED:
Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS:   MA   BL
           KW
           TG

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

DIVE SUPERVISOR SIGNATURE

6/10/15

DATE

**THIRD KNUTSEN DECLARATION - 296**

COOKE_CWA_00215711

**DIVER NAME:** KYI (W)
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: 10:07 | TIME OUT: 10:36 |
| MAX DEPTH: 36? | AVG DEPTH: 26 |
| BOTTOM TIME: 25 | SAFETY STOP: |
| PRESSURE IN: 3000 | PRESSURE OUT: 500 |

**DIVER NAME:** KYI
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: 10:47 | TIME OUT: 11:19 |
| MAX DEPTH: 50? | AVG DEPTH: 46 |
| BOTTOM TIME: 40 | SAFETY STOP: 5 |
| PRESSURE IN: 3800 | PRESSURE OUT: 1700 |

**DIVER NAME:** KYI
WORK (morts, maint., net checks) Anchor work

| | |
|---|---|
| TIME IN: 11:30 | TIME OUT: 12:09 |
| MAX DEPTH: 82 | AVG DEPTH: 60 |
| BOTTOM TIME: 35 | SAFETY STOP: 4 |
| PRESSURE IN: 3700 | PRESSURE OUT: 860 |

**DIVER PROFILE IV**
**DIVER NAME:** KYI Anchor
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: 12:30 | TIME OUT: 2:06 |
| MAX DEPTH: 90 | AVG DEPTH: 60 |
| BOTTOM TIME: 36 | SAFETY STOP: 5 |
| PRESSURE IN: 3858 | PRESSURE OUT: 900 |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER PROFILE II**
**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER PROFILE III**
**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT:. _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER PROFILE IV**
**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER PROFILE V**
**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER PROFILE VI**
**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER PROFILE VII**
**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**THIRD KNUTSEN DECLARATION - 297**

DATE: 6/12/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED:   SCUBA ☑   Other * ☐
*Describe other mode:

**American Gold Seafoods**

| | | |
|---|---|---|
| NAME: MiKE A | ROLE: | DIVE SUPERVISOR |
| NAME: KYL W | ROLE: | DIVER |
| NAME: Tom B | ROLE: | STANDY BY DVR |
| NAME: BRAD L | ROLE: | TENDER |
| NAME: | ROLE: | |
| NAME: | ROLE: | |
| NAME: | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?   YES ☑   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?   YES ☑   NO ☐

WATER TEMP: 12.8
CURRENT: Strong ☐   Weak ☑
WATER VISIBILITY: 2m
AIR TEMP: 25
WEATHER: Sunny

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

SURFACE WATER CONDITIONS:   Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑   NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐   NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☐
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS: MA   8L
KW
TG

I ATTEST THAT THIS INFORMATION PROVIDED IS TRUE AND CORRECT.

_____   6/12/15
DIVE SUPERVISOR SIGNATURE   DATE

COOKE_CWA_00215713

Parsing image data

Parsing image data

Parsing image dataParsing image data

Parsing image data

Parsing image dataParsing image data

Parsing image data

Parsing image dataParsing image data

Parsing image data

Parsing image data

DATE: 6/15/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED:   SCUBA ☐   Other* ☐
*Describe other mode:

**AMERICAN GOLD SEAFOODS**

| | | | |
|---|---|---|---|
| NAME: | Jeffrey | ROLE: | DIVE SUPERVISOR |
| NAME: | Jegel | ROLE: | DIVER |
| NAME: | Ky | ROLE: | STAND BY DVR |
| NAME: | Jeffrey | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?   YES ☑   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?   YES ☑   NO ☐

WATER TEMP: 11.5°C
CURRENT:   Strong ☐   Weak ☐
WATER VISIBILITY: 2.5M
AIR TEMP: 55F
WEATHER: Sunny

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

SURFACE WATER CONDITIONS:   Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐
WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑   NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☑   NO ☐

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS:   J Ky

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

_____
DIVE SUPERVISOR SIGNATURE   Tamura

DATE   6/15/15

COOKE_CWA_00215715

**DIVER NAME:** Siccce
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: 12:10 | TIME OUT: 12:35 |
| MAX DEPTH: 30 | AVG DEPTH: 22 |
| BOTTOM TIME: 25 | SAFETY STOP: 1/2 |
| PRESSURE IN: 3100 | PRESSURE OUT: 600 |

**DIVER NAME:** RSea
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: 12:40 | TIME OUT: 1:15 |
| MAX DEPTH: 30 | AVG DEPTH: 1/2 |
| BOTTOM TIME: 160 | SAFETY STOP: 1/2 |
| PRESSURE IN: 3100 | PRESSURE OUT: 500 |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**DIVER #2 NAME:** _____
WORK (morts, maint., net checks) _____

| | |
|---|---|
| TIME IN: _____ | TIME OUT: _____ |
| MAX DEPTH: _____ | AVG DEPTH: _____ |
| BOTTOM TIME: _____ | SAFETY STOP: _____ |
| PRESSURE IN: _____ | PRESSURE OUT: _____ |

**THIRD KNUTSEN DECLARATION - 301**

COOKE_CWA_00215716

DATE: 6/19/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED: SCUBA ☑   Other ☐

*Describe other mode:

AMERICAN GOLD SEAFOODS

| NAME: | Mike A | ROLE: | DIVE SUPERVISOR |
| NAME: | Kil W | ROLE: | DIVER |
| NAME: | Jesse P | ROLE: | STANDY BY DVR |
| NAME: | Bred C | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?   YES ☐   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?   YES ☑   NO ☐

WATER TEMP: 12.9
CURRENT: Strong ☐   Weak ☑
WATER VISIBILITY: 5m
AIR TEMP: 60°
WEATHER: Sunny

SURFACE WATER CONDITIONS: Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑   NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐   NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS:   MA   BL
KW
JP

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

DIVE SUPERVISOR SIGNATURE

6/19/15

DATE

COOKE_CWA_00215717

| DIVER NAME: | KYl W | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | 12 30 | TIME OUT: | 1 00 |
| MAX DEPTH: | 26 | AVG DEPTH: | 20 |
| BOTTOM TIME: | 25 | SAFETY STOP: | |
| PRESSURE IN: | 2200 | PRESSURE OUT: | 400 |

| DIVER NAME: | KYl W | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | 1:05 | TIME OUT: | 135 |
| MAX DEPTH: | 26 | AVG DEPTH: | 20 |
| BOTTOM TIME: | 1.0 | SAFETY STOP: | |
| PRESSURE IN: | 2800 | PRESSURE OUT: | 550 |

| DIVER NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | DIVER PROFILE | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | DIVER PROFILE | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | DIVER PROFILE | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | DIVER PROFILE | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | DIVER PROFILE | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

| DIVER #2 NAME: | | | |
|---|---|---|---|
| WORK (morts, maint., net checks) | | | |
| TIME IN: | | TIME OUT: | |
| MAX DEPTH: | | AVG DEPTH: | |
| BOTTOM TIME: | | SAFETY STOP: | |
| PRESSURE IN: | | PRESSURE OUT: | |

**THIRD KNUTSEN DECLARATION - 303**

COOKE_CWA_00215718

DATE: 6/22/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED: SCUBA ☑   Other * ☐

*Describe other mode:

American Gold SEAFOODS

| NAME: | Jeffrey | ROLE: | DIVE SUPERVISOR |
| NAME: | Jesse | ROLE: | DIVER |
| NAME: | Ky | ROLE: | STANDY BY DVR |
| NAME: | Jeffrey | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?   YES ☑   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?   YES ☑   NO ☐

WATER TEMP: 12.9°C
CURRENT: Strong ☐   Weak ☑
WATER VISIBILITY: 2.5M
AIR TEMP: 75°F
WEATHER: Sunny, light breeze

SURFACE WATER CONDITIONS: Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☐   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☐   NO ☑

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐   NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS:   J
JP
KW

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT

J. Tamura

DIVE SUPERVISOR SIGNATURE

6/22/15

DATE

COOKE_CWA_00215719

| DIVER NAME: _Jeff_ | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: 9:50 | | TIME OUT: 10:22 | TIME IN: | | TIME OUT: |
| MAX DEPTH: 30 | | AVG DEPTH: 26 | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: 2900 | | PRESSURE OUT: 800 | PRESSURE IN: | | PRESSURE OUT: |

| DIVER NAME: _Jeff_ | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: 10:39 | | TIME OUT: 11:05 | TIME IN: | | TIME OUT: |
| MAX DEPTH: 30 | | AVG DEPTH: 26 | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: 4:49 | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: 2900 | | PRESSURE OUT: 800 | PRESSURE IN: | | PRESSURE OUT: |

| DIVER NAME: _Jesse_ | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: 11:25 | | TIME OUT: 11:40 | TIME IN: | | TIME OUT: |
| MAX DEPTH: 30 | | AVG DEPTH: 26 | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: 2900 | | PRESSURE OUT: 800 | PRESSURE IN: | | PRESSURE OUT: |

| DIVER NAME: | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: | | TIME OUT: | TIME IN: | | TIME OUT: |
| MAX DEPTH: | | AVG DEPTH: | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: | | PRESSURE OUT: | PRESSURE IN: | | PRESSURE OUT: |

| DIVER NAME: | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: | | TIME OUT: | TIME IN: | | TIME OUT: |
| MAX DEPTH: | | AVG DEPTH: | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: | | PRESSURE OUT: | PRESSURE IN: | | PRESSURE OUT: |

| DIVER NAME: | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: | | TIME OUT: | TIME IN: | | TIME OUT: |
| MAX DEPTH: | | AVG DEPTH: | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: | | PRESSURE OUT: | PRESSURE IN: | | PRESSURE OUT: |

| DIVER NAME: | | | DIVER #2 NAME: | | |
|---|---|---|---|---|---|
| WORK (morts, maint., net checks) | | | WORK (morts, maint., net checks) | | |
| TIME IN: | | TIME OUT: | TIME IN: | | TIME OUT: |
| MAX DEPTH: | | AVG DEPTH: | MAX DEPTH: | | AVG DEPTH: |
| BOTTOM TIME: | | SAFETY STOP: | BOTTOM TIME: | | SAFETY STOP: |
| PRESSURE IN: | | PRESSURE OUT: | PRESSURE IN: | | PRESSURE OUT: |

**THIRD KNUTSEN DECLARATION - 305**

COOKE_CWA_00215720

DATE: 6/23/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☐

DIVE MODE USED:   SCUBA ☑   Other * ☐

AMERICAN GOLD SEAFOODS

*Describe other mode:

NAME: Jeffrey Tamura    ROLE: DIVE SUPERVISOR
NAME: Jesse Phillips     ROLE: DIVER
NAME: Kyl Wood          ROLE: STANDY BY DVR
NAME: Jeffrey Tamura    ROLE: TENDER
NAME: _____           ROLE: _____
NAME: _____           ROLE: _____
NAME: _____           ROLE: _____

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?
YES ☐   NO ☐

IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATOR AND TAKE CORRECTIVE ACTIONS!

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?
YES ☑   NO ☐

WATER TEMP: 12.3°C
CURRENT:   Strong ☐   Week ☐
WATER VISIBILITY: 2.5M
AIR TEMP: 70°F
WEATHER: Sunny, no clouds,

SURFACE WATER CONDITIONS: Calm Seas ☐   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☐   NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐
POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN.

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐
WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

• Diving Pen 4 to repair connection to
  Soaker hose on net floors
• Check integrity of rib lines 2/4

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑   NO ☐

ARE YETHERS BEING USED FOR THIS OPERATION?   YES ☑   NO ☐

WORK TO BE PERFORMED:   Fish Mort Removal ☐
                        Fish Net Maintenance ☐
                        Pred Net Maintenance ☐
                        Other (Describe Below) ☑

Other: Air hose repair

INITIALS:
JT
JP
KW

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

JC Tamura

DIVE SUPERVISOR SIGNATURE

6/23/15

DATE

**THIRD KNUTSEN DECLARATION - 306**

DIVER NAME: _Jesse_
WORK (morts, maint., net checks) _____

TIME IN: 8:55
MAX DEPTH: 300
BOTTOM TIME: 345
PRESSURE IN: 3400

TIME OUT: 9:10
AVG DEPTH: 24
SAFETY STOP: 7
PRESSURE OUT: 2000

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER NAME: _Jesse_
WORK (morts, maint., net checks) _____

TIME IN: 9:19
MAX DEPTH: 30
BOTTOM TIME: 345
PRESSURE IN: 2900

TIME OUT: 9:41
AVG DEPTH: 45
SAFETY STOP: 7
PRESSURE OUT: 300

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____
MAX DEPTH: _____
BOTTOM TIME: _____
PRESSURE IN: _____

TIME OUT: _____
AVG DEPTH: _____
SAFETY STOP: _____
PRESSURE OUT: _____

**THIRD KNUTSEN DECLARATION - 307**

COOKE_CWA_00215722

DATE: 6/2A/15

DIVE LOCATION: Bainbridge Island ☐  Cypress Is. ☐  Port Angeles ☐  Hope Is. ☑

AMERICAN GOLD SEAFOODS

DIVE MODE USED:  SCUBA ☐  Other * ☐

*Describe other mode:

| NAME: | _Bradley_ | ROLE: | DIVE SUPERVISOR |
| NAME: | | ROLE: | DIVER |
| NAME: | _Jean_ | ROLE: | STANDY BY DVR |
| NAME: | _Jeffrey_ | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?
YES ☑  NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?
YES ☑  NO ☐

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?  YES ☑  NO ☐

WATER TEMP: 12.6°C
CURRENT: Strong ☐ B ☐ Weak ☑
WATER VISIBILITY: 2 M
AIR TEMP: 60°F
WEATHER: Cloudy, some wind

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?  YES ☑  NO ☐

SURFACE WATER CONDITIONS: Calm Seas ☑  Chop ☐
White Caps ☐  Rollers ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?  YES ☑  NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?  YES ☑  NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?
YES ☑  NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?  YES ☑  NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?  YES ☑  NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?  YES ☑  NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?  YES ☐  NO ☑

WORK TO BE PERFORMED:  Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS:  JT  BL
JP
KW

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

DIVE SUPERVISOR SIGNATURE

DATE 6/2A/15

COOKE_CWA_00215723

DIVER NAME: KJ1
WORK (morts, maint., net checks) _____

TIME IN: 11:50          TIME OUT: 12:20
MAX DEPTH: 30          AVG DEPTH: 20
BOTTOM TIME: 25          SAFETY STOP: 825
PRESSURE IN: 3000          PRESSURE OUT: 500

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER NAME: KJ1
WORK (morts, maint., net checks) _____

TIME IN: 12:21          TIME OUT: 12:50
MAX DEPTH: 30          AVG DEPTH: 20
BOTTOM TIME: 1:00          SAFETY STOP: ✓
PRESSURE IN: 3,000          PRESSURE OUT: 1000

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

DIVER #2 NAME: _____
WORK (morts, maint., net checks) _____

TIME IN: _____          TIME OUT: _____
MAX DEPTH: _____          AVG DEPTH: _____
BOTTOM TIME: _____          SAFETY STOP: _____
PRESSURE IN: _____          PRESSURE OUT: _____

**THIRD KNUTSEN DECLARATION - 309**

Case 2:22-cv-01054-RSL   Document 49-5   Filed 07/17/23   Page 310 of 369

DATE: 6/25/15

DIVE LOCATION: Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED: SCUBA ☑   Other * ☐

*Describe other mode:

**AMERICAN GOLD SEAFOODS**

| NAME: | Jeffrey T. | ROLE: | DIVE SUPERVISOR |
| NAME: | Kyl W. | ROLE: | DIVER |
| NAME: | Jesse P. | ROLE: | STANDY BY DVR |
| NAME: | Jeffrey In | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?   YES ☑   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?   YES ☑   NO ☐

WATER TEMP: 12.5°C
CURRENT: Strong ☐   Weak ☑
WATER VISIBILITY: 2.5M
AIR TEMP: 70°F
WEATHER: Sunny

SURFACE WATER CONDITIONS: Calm Seas ☑   Chop ☐   White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?   YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☐   NO ☑

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐   NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☐
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other:

INITIALS: JT   KW

ADDITIONAL COMMENTS

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

DIVE SUPERVISOR SIGNATURE

DATE 6/25/25

**THIRD KNUTSEN DECLARATION - 310**

COOKE_CWA_00215725

**DIVER NAME:** Kyl Wood
**WORK** (morts, maint./net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | 9:35A | TIME OUT: | 9:54 |
| MAX DEPTH: | 30 | AVG DEPTH: | 26 |
| BOTTOM TIME: | 8 | SAFETY STOP: | 4 |
| PRESSURE IN: | 2800 | PRESSURE OUT: | 300 |

**DIVER NAME:** Kyl Wood
**WORK** (morts) maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | 10:05 | TIME OUT: | 10:30 |
| MAX DEPTH: | 30 | AVG DEPTH: | 26 |
| BOTTOM TIME: | 10 | SAFETY STOP: | 4 |
| PRESSURE IN: | 7900 | PRESSURE OUT: | 600 |

**DIVER NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER #2 NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER #2 NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER #2 NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER #2 NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER #2 NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**DIVER #2 NAME:** _____
**WORK** (morts, maint., net checks) _____

| | | | |
|---|---|---|---|
| TIME IN: | _____ | TIME OUT: | _____ |
| MAX DEPTH: | _____ | AVG DEPTH: | _____ |
| BOTTOM TIME: | _____ | SAFETY STOP: | _____ |
| PRESSURE IN: | _____ | PRESSURE OUT: | _____ |

**THIRD KNUTSEN DECLARATION - 311**

DATE: 6/29/16

DIVE LOCATION:  Bainbridge Island ☐   Cypress Is. ☐   Port Angeles ☐   Hope Is. ☑

DIVE MODE USED:   SCUBA ☑   Other * ☐

*Describe other mode:

**AMERICAN GOLD SEAFOODS**

| NAME: | Jeffrey | ROLE: | DIVE SUPERVISOR |
| NAME: | Kyl | ROLE: | DIVER |
| NAME: | Jesse | ROLE: | STANDY BY DVR |
| NAME: | Jeffrey | ROLE: | TENDER |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |
| NAME: | | ROLE: | |

ARE ADEQUATE DIVE TEAM MEMBERS AVAILABLE?   YES ☑   NO ☐

HAS DIVE EQUIPMENT BEEN CHECKED OUT AND IS FULLY OPERATIONAL?
YES ☑   NO ☐

*IF THE ANSWER IS NO IMMEDIATELY STOP DIVE OPERATION AND TAKE CORRECTIVE ACTIONS*

IS EMERGENCY COMMUNICATION AND SAFETY EQUIPMENT AVAILABLE?
YES ☑   NO ☐

WATER TEMP:  15.2 °C
CURRENT:   Strong ☐   Weak ☑
WATER VISIBILITY:  2M
AIR TEMP:  60F
WEATHER:  Cloudy/light breeze

SURFACE WATER CONDITIONS:   Calm Seas ☑   Chop ☐
White Caps ☐   Rollers ☐

PRE-DIVE PLANNING HAS BEEN CARRIED OUT?   YES ☑   NO ☐

PRE-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

POST-DIVE CHECK WAS PERFORMED BY DIVE SUPERVISOR?   YES ☑   NO ☐

ARE DIVERS IN GOOD PHYSICAL HEALTH AFTER COMPLETING THE DIVE?
YES ☑   NO ☐

*IF THE ANSWER IS NO THEN IMMEDIATELY INITIATE EMERGENCY RESPONSE PLAN*

RECORD THE EXACT TIME IF AN EMERGENCY PLAN WAS INITIATED:

TIME:

WAS A DIVE PLAN DISCUSSED WITH ALL TEAM MEMBERS?   YES ☑   NO ☐

WAS THE APPROPRIATE DIVE OPERATION PROTOCOL REVIEWED BY ALL TEAM MEMBERS?   YES ☑   NO ☐

NOTE ALL KEY POINTS OF DIVE PLAN DISCUSSION BELOW AND HAVE TEAM MEMBERS INITIAL.

ARE DIVE COMS OPERATIONAL AND BEING USED?   YES ☑   NO ☐

ARE TETHERS BEING USED FOR THIS OPERATION?   YES ☐   NO ☑

WORK TO BE PERFORMED:   Fish Mort Removal ☑
Fish Net Maintenance ☑
Pred Net Maintenance ☐
Other (Describe Below) ☐

Other: _____

INITIALS:  JB
KW

I ATTEST THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT.

DIVE SUPERVISOR SIGNATURE

DATE  6/29/25

COOKE_CWA_00215727

| DIVER NAME: Kyl | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts) maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: 11°ΦΦ | TIME OUT: 11°3I | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: 30 | AVG DEPTH: 2Φ | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: 5 | SAFETY STOP: 2Φ | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: 2ΦΦΦ | PRESSURE OUT: 1ΦΦΦ | PRESSURE IN: | PRESSURE OUT: |

| DIVER NAME: Kyl | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts) maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: 11:13 | TIME OUT: 17°2I | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: 3Φ | AVG DEPTH: 2Φ | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: 1ΦΦ | SAFETY STOP: 2Φ | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: 24ΦΦ | PRESSURE OUT: 6ΦΦ | PRESSURE IN: | PRESSURE OUT: |

| DIVER NAME: Kyl | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts) maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: 1ΦΦ:34Φ | TIME OUT: 2°12 | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: 3Φ | AVG DEPTH: 2Φ | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: 3Φ | SAFETY STOP: | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: 2Φ9Φ | PRESSURE OUT: 2ΦΦ | PRESSURE IN: | PRESSURE OUT: |

| DIVER NAME: Kyl | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts) maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: 2°2I | TIME OUT: 3°ΦΦ | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: 3Φ | AVG DEPTH: 2I | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: 1ΦΦ | SAFETY STOP: 2I | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: 3ΦΦΦ | PRESSURE OUT: 3ΦΦ | PRESSURE IN: | PRESSURE OUT: |

| DIVER NAME: | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts, maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: | TIME OUT: | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: | AVG DEPTH: | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: | SAFETY STOP: | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: | PRESSURE OUT: | PRESSURE IN: | PRESSURE OUT: |

| DIVER NAME: | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts, maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: | TIME OUT: | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: | AVG DEPTH: | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: | SAFETY STOP: | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: | PRESSURE OUT: | PRESSURE IN: | PRESSURE OUT: |

| DIVER NAME: | | DIVER #2 NAME: |
|---|---|---|
| WORK (morts, maint., net checks) | | WORK (morts, maint., net checks) |

| TIME IN: | TIME OUT: | TIME IN: | TIME OUT: |
|---|---|---|---|
| MAX DEPTH: | AVG DEPTH: | MAX DEPTH: | AVG DEPTH: |
| BOTTOM TIME: | SAFETY STOP: | BOTTOM TIME: | SAFETY STOP: |
| PRESSURE IN: | PRESSURE OUT: | PRESSURE IN: | PRESSURE OUT: |

**THIRD KNUTSEN DECLARATION - 313**

# EXHIBIT 7

COOKE_CWA_00023056

AMERICAN GOLD SEAFOODS

**Vessel Name:** _____

**Date:** June 8, 2015

### Checklist

| Signed by ..... | Assessor: |
|---|---|

| Time: | | 0:700 | |
|---|---|---|---|
| Skipper initials | | DZC | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| | | **Port** | **Starboard** |
| Engine Hours | * | | |
| Engine oil | * | Add 2 QT | |
| Gear box oil | * | ✓ | |
| FW header tank | * | ✓ | |
| Fuel tanks | * | ½ | ½ |
| Main prop shaft | * | ✓ | |
| Any leaks, loose pipes, etc | * | ✓ | |
| Sea cocks - cleaned, checked, supply OK? | | ✓ | |
| Navigation lights | * | | |
| Wheelhouse lights | * | | |
| VHF | * | | |
| GPS and Plotter | | | |
| Radar - must be on if fitted | | | |
| Deck lights | | | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | cable ? | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, operational | | | |
| Hatches Secure and water tight? | * | | |
| Hatch fastenings (dogs) free and operational | * | NO | |

\* If defective report immediately to Site Manager

| Additonal detail |
|---|

### Planned Activity / Unplanned Activity

| Planned Activity | | Unplanned Activity |
|---|---|---|
| Feed run | | Amount | |
| Mooring Work | | | |
| Net exchange | | | |
| Fuel Delivery | | | |
| Fuel decant | | Est Litres | |
| AGD treatment | | | |
| Harvest prep | | | |
| IBC to shore | | | |
| Rubbish to shore | | | |

### Safety Equipment

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board? | | Intact? | |
| Spare PDF(s) in operable condition | | Tested? | |
| Horn / Bell / Whistle onboard | | By pass Valve OK? | |
| Inland Navigation rules posted | NO | | |
| Floating light (SIL) with line | | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | | | |
| Bilge pumps working | | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

| Comments: |
|---|

COOKE_CWA_00023057

**Vessel Name:** Elsie M

AMERICAN GOLD SEAFOODS

**Date :** June 15, 2015

### Checklist

Signed by : DavDly

Assessor:

| | | Port | Starboard |
|---|---|---|---|
| Time: 0700 | | | |
| Skipper initials | | | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| | | **Port** | **Starboard** |
| Engine Hours | * | 8885.6 | 8911.7 |
| Engine oil | * | ✓ | ✓ |
| Gear box oil | * | ✓ | ✓ |
| FW header tank | * | ✓ | ✓ |
| Fuel tanks | * | ½ | ½ |
| Main prop shaft | * | ✓ | ✓ |
| Any leaks, loose pipes, etc | * | ✓ | ✓ |
| Sea cocks - cleaned, checked, supply OK? | | | |
| Navigation lights | * | ✓ | |
| Wheelhouse lights | * | ✓ | |
| VHF | * | ✓ | |
| GPS and Plotter | | ✓ | |
| Radar - must be on if fitted | | | |
| Deck lights | | NO GEN | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | Cable | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, opperational | | | |
| Hatches Secure and water tight? | * | ✓ | |
| Hatch fastenings (dogs) free and operational | * | ✓ | |

\* If defective report immediately to Site Manager

Additonal detail

### Planned Activity / Unplanned Activity

| Planned Activity | | Unplanned Activity | |
|---|---|---|---|
| Feed run | ✓ | Amount 28T | |
| Mooring Work | | 2 Nets For shipping | |
| Net exchange | | | |
| Fuel Delivery | | | |
| Fuel decant | | Est Litres ___ | |
| AGD treatment | | | |
| Harvest prep | ✓ | Mooring reattach - Disconect CB 3-5+7-9 | |
| IBC to shore | | Mort Pickup | |
| Rubbish to shore | ✓ | | |

### Safety Equipment

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board | ✓ | Intact? | |
| Spare PDF(s) in operable condition | ✓ | Tested? | |
| Horn / Bell / Whistle onboard | ✓ | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | ✓ | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 B1 - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | | | |
| Bilge pumps working | | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

Comments:



**Vessel Name:** Elsie M

**Date :** 6/16/15

COOKE_CWA_00232058

| Checklist | | |
|---|---|---|
| Signed by ..... D. Cry | Assessor: | |
| Time: | 0700 | |
| Skipper initials | | |
| Crew initials | | |
| Evidence of unauthorized access | * | |

| | | Port | Starboard |
|---|---|---|---|
| Engine Hours | * | 8917.1 | 8890.4 |
| Engine oil | * | | |
| Gear box oil | * | | |
| FW header tank | * | | |
| Fuel tanks | * | | |
| Main prop shaft | * | | |
| Any leaks, loose pipes, etc | * | | |
| Sea cocks - cleaned, checked, supply OK? | | | |
| Navigation lights | * | | |
| Wheelhouse lights | * | | |
| VHF | * | | |
| GPS and Plotter | | | |
| Radar - must be on if fitted | | | |
| Deck lights | | | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | cable | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, opperational | | | |
| Hatches Secure and water tight? | * | | |
| Hatch fastenings (dogs) free and operational | * | | |

\* If defective report immediately to Site Manager

Additonal detail

| Planned Activity | | Unplanned Activity | |
|---|---|---|---|
| Feed run | | Amount | |
| Mooring Work | | | |
| Net exchange | | 1 Pulled nets out of C11-4 C7 Took to Barge | |
| Fuel Delivery | | | |
| Fuel decant | | Est Litres | |
| AGD treatment | | | |
| Harvest prep | | Off Load Morts and Nets, Pick up 3 Nets for Truck | |
| IBC to shore | | | |
| Rubbish to shore | | | |

| Safety Equipment | | Yes | | Yes / Date |
|---|---|---|---|---|
| Flare kit on board: | | | Intact? | 6/16/15 |
| Spare PDF(s) in operable condition | | | Tested? | 6/16/15 |
| Horn / Bell / Whistle onboard | | | By pass Valve OK? | |
| Inland Navigation rules posted | | | | 6/16/15 |
| Floating light (SIL) with line | | | | in wheel house |
| Life ring with 60' line attached | | | | " " " |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | | Inspected annually? | |
| Bilge alarm | | / | | 6/16/15 |
| Bilge pumps working | | / | Tested? | 6/16/15 |
| Escape signs and routes clear of obstructions? | | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | | 6/16/15 |

Comments:



**Vessel Name:** _Elsie M_

**Date :** 6/17/2015

COOKE_CWA_00232059

### Checklist

Signed by .....

Assessor:

| | | Port | Starboard |
|---|---|---|---|
| Time: | | 0:7:00 | |
| Skipper initials | | | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| Engine Hours | * | 8894.2 | 8921.2 |
| Engine oil | * | ✓ | |
| Gear box oil | * | ✓ | |
| FW header tank | * | ✓ | |
| Fuel tanks | * | | |
| Main prop shaft | * | ✓ | |
| Any leaks, loose pipes, etc | * | | |
| Sea cocks - cleaned, checked, supply OK? | | | |
| Navigation lights | * | | |
| Wheelhouse lights | * | | |
| VHF | * | | |
| GPS and Plotter | | | |
| Radar - must be on if fitted | | | |
| Deck lights | | | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | cable ? | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, opperational | | | |
| Hatches Secure and water tight? | * | | |
| Hatch fastenings (dogs) free and operational | * | | |

\* If defective report immediately to Site Manager

Additonal detail

**Planned Activity** PW to FW    **Unplanned Activity**

| | | |
|---|---|---|
| Feed run | i-2 | Amount FW |
| Mooring Work | | |
| Net exchange | | Pulled 4 nylon nets @ CB |
| Fuel Delivery | | |
| Fuel decant | | Est Litres |
| AGD treatment | | |
| Harvest prep | | |
| IBC to shore | | |
| Rubbish to shore | | |

**Safety Equipment** — Yes / Yes / Date

| | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board? | ✓ | Intact? | |
| Spare PDF(s) in operable condition | ✓ | Tested? | |
| Horn / Bell / Whistle onboard | ✓ | By pass Valve OK? | |
| Inland Navigation rules posted | ✓ | | |
| Floating light (SIL) with line | | | |
| Life ring with 60' line attached | ✓ | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | | | |
| Bilge pumps working | | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

Comments:



**Vessel Name:** _____

Date : 6/18/15

COOKE_CWA_00232060

**Checklist**

| Signed by ..... | Assessor: |
|---|---|

| | | Port | Starboard |
|---|---|---|---|
| Time: | | 07:00 | |
| Skipper initials | | | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| Engine Hours | * | 8927.9 | 8900.6 |
| Engine oil | * | | |
| Gear box oil | * | | |
| FW header tank | * | | |
| Fuel tanks | * | | |
| Main prop shaft | * | | |
| Any leaks, loose pipes, etc | * | | |
| Sea cocks - cleaned, checked, supply OK? | | | |
| Navigation lights | * | | |
| Wheelhouse lights | * | | |
| VHF | * | | |
| GPS and Plotter | | | |
| Radar - must be on if fitted | | | |
| Deck lights | | | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, opperational | | | |
| Hatches Secure and water tight? | * | | |
| Hatch fastenings (dogs) free and operational | * | | |

* If defective report immediately to Site Manager

Additonal detail

**Planned Activity** / **Unplanned Activity**

| Feed run | | Amount | |
|---|---|---|---|
| Mooring Work | | | |
| Net exchange | | 5 Nets to Pier | |
| Fuel Delivery | | Pulled Pred Bottom Panels @ CB. | |
| Fuel decant | | Est Litres | |
| AGD treatment | | | |
| Harvest prep | | | |
| IBC to shore | | | |
| Rubbish to shore | | | |

**Safety Equipment**

| | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board | | Intact? | |
| Spare PDF(s) in operable condition | | Tested? | |
| Horn / Bell / Whistle onboard | | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | | | |
| Bilge pumps working | | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

| Comments: | Line in Stbd Wheel |
|---|---|

COOKE_CWA_00232061



**AMERICAN GOLD SEAFOODS**

Vessel Name: _____

Date : 6/19/15

### Checklist

| Signed by ..... | Assessor: |
|---|---|

| | Time: | 0700 | | | |
|---|---|---|---|---|---|
| | Skipper initials | DSC | | | |
| | Crew initials | | | | |
| * | Evidence of unauthorized access | | | | |
| | | | **Port** | **Starboard** | |
| * | Engine Hours | | 8904.6 | 8932.2 | |
| * | Engine oil | | ✓ | ✓ | |
| * | Gear box oil | | ✓ | ✓ | |
| * | FW header tank | | ✓ | ✓ | |
| * | Fuel tanks | | | | |
| * | Main prop shaft | | | | |
| * | Any leaks, loose pipes, etc | | | | |
| | Sea cocks - cleaned, checked, supply OK? | | | | |
| * | Navigation lights | | | | |
| * | Wheelhouse lights | | | | |
| * | VHF | | | | |
| | GPS and Plotter | | ✓ | | |
| | Radar - must be on if fitted | | | | |
| | Deck lights | | | | |
| | Heater on/off | | | | |
| | Crane - leaks, hoses OK, hook OK? | | Cable ? | | |
| | Winches - leaks, levers OK, bolts tight? | | | | |
| | Bow door rams - leaks, secure, operational | | | | |
| * | Hatches Secure and water tight? | | | | |
| * | Hatch fastenings (dogs) free and operation | | | | |

**\* If defective report immediately to Site Manager**

Additonal detail

### Planned Activity

| Planned Activity | | | Unplanned Activity | |
|---|---|---|---|---|
| Feed run | 16 | Amount | | |
| Mooring Work | | | | |
| Net exchange | | | | |
| Fuel Delivery | | | | |
| Fuel decant | | Est Litres | | |
| AGD treatment | | | | |
| Harvest prep | | | | |
| IBC to shore | | | | |
| Rubbish to shore | ✓ | | | |

### Safety Equipment

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board: | | Intact? | |
| Spare PDF(s) in operable condition | | Tested? | |
| Horn / Bell / Whistle onboard | | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | | | |
| Bilge pumps working | | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

| Comments: |
|---|
| Serveyed by Bowditch Marine |

COOKE_CWA_00232062

**American Gold Seafoods**

Vessel Name: _L < M_

Date: 6/22/15

Checklist

Signed by ..... DAVID Conger

Assessor

| | | Port | Starboard |
|---|---|---|---|
| Time: | 0700 | | |
| Skipper initials | DC | | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| | | **Port** | **Starboard** |
| Engine Hours | * | 8987.1 | 8934.8 |
| Engine oil | * | ✓ | ✓ |
| Gear box oil | * | ✓ | ✓ |
| FW header tank | * | ✓ | ✓ |
| Fuel tanks | * | 1/2 | 1/3 |
| Main prop shaft | * | | |
| Any leaks, loose pipes, etc | * | | |
| Sea cocks - cleaned, checked, supply OK? | | | |
| Navigation lights | * | ✓ | |
| Wheelhouse lights | * | DC ONLY | |
| VHF | * | ✓ | |
| GPS and Plotter | | ✓ | |
| Radar - must be on if fitted | | | |
| Deck lights | | NO GEN | |
| Heater on/off | | OFF | |
| Crane - leaks, hoses OK, hook OK? | | ✓ | |
| Winches - leaks, levers OK, bolts tight? | | ✓ | |
| Bow door rams - leaks, secure, opperational | | ✓ | |
| Hatches Secure and water tight? | * | ✓ | |
| Hatch fastenings (dogs) free and operational | * | ✓ | |

* If defective report immediately to Site Manager

Additonal detail

---

| Planned Activity | | Unplanned Activity |
|---|---|---|

Feed run — Amount 10T NR   6T SR   10T FW
Mooring Work       Pallets to Pier
Net exchange
Fuel Delivery — Est Litres
Fuel decant
AGD treatment
Harvest prep       Move MPI S.R. to FW, Move welding Equip
IBC to shore       Picked up 5 Totes of Morts < B
Rubbish to shore ✓

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board: | ✓ | Intact? | |
| Spare PDF(s) in operable condition | ✓ | Tested? | |
| Horn / Bell / Whistle onboard | ✓ | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | ✓ | | |
| Life ring with 60' line attached | ✓ | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | ✓ | Inspected annually? | |
| Bilge alarm | ✓ | | |
| Bilge pumps working | ✓ | Tested? | |
| Escape signs and routes clear of obstructions? | ✓ | Signs? | |
| Garbage, Oil and Injury Placard's posted? | ✓ | | |

Comments:

---



COOKE_CWA_00232063

Vessel Name: _Elsie M_

Date: June 23, 2015

**Checklist**

Signed by: DAVID CONGER

Assessor: David Ly

| Planned Activity | | Unplanned Activity | |
|---|---|---|---|
| Feed run | | Amount | |
| Mooring Work | | FW 12 -- FW 10 Abort - (12 M Net) | |
| Net exchange | ✔ | | |
| Fuel Delivery | | Est Litres | |
| Fuel decant | | | |
| AGD treatment | | | |
| Harvest prep | | | |
| IBC to shore | | | |
| Rubbish to shore | | | |

| | | | Port | Starboard |
|---|---|---|---|---|
| Time: 6:56 | | | | |
| Skipper initials | | DLC | | |
| Crew initials | | | | |
| Evidence of unauthorized access | * | | | |
| Engine Hours | * | | 8914,3 | 8942,0 |
| Engine oil | * | | ✓ | ✓ |
| Gear box oil | * | | ✓ | ✓ |
| FW header tank | * | | ✓ | ✓ |
| Fuel tanks | * | | | |
| Main prop shaft | * | | | |
| Any leaks, loose pipes, etc | * | | | |
| Sea cocks - cleaned, checked, supply OK? | | | | |
| Navigation lights | * | ✓ | | |
| Wheelhouse lights | * | ✓ | | |
| VHF | * | ✓ | | |
| GPS and Plotter | | ✓ | | |
| Radar - must be on if fitted | | | | |
| Deck lights | | NO | | |
| Heater on/off | | OFF | | |
| Crane - leaks, hoses OK, hook OK? | | | | |
| Winches - leaks, levers OK, bolts tight? | | | | |
| Bow door rams - leaks, secure, operational | | | | |
| Hatches Secure and water tight? | * | ✓ | | |
| Hatch fastenings (dogs) free and operational | * | ✓ | | |

* If defective report immediately to Site Manager

Additonal detail

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board: | ✓ | Intact? | |
| Spare PDF(s) in operable condition | ✓ | Tested? | |
| Horn / Bell / Whistle onboard | ✓ | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | ✓ | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | ✓ | | |
| Bilge pumps working | ✓ | Tested? | |
| Escape signs and routes clear of obstructions? | ✓ | Signs? | |
| Garbage, Oil and Injury Placard's posted? | ✓ | | |

Comments:



COOKE_CWA_00230264

**Vessel Name:** Elsie M

**Date :** June 24, 2015

**Checklist**

Signed by .....
DAViD G. Conger

Assessor
David G ~~~

| Planned Activity | | Unplanned Activity | |
|---|---|---|---|
| Feed run | | Amount | |
| Mooring Work | | | |
| Net exchange | 2 | F9 | |
| Fuel Delivery | | | |
| Fuel decant | | Est Litres | |
| AGD treatment | | | |
| Harvest prep | | | |
| IBC to shore | | | |
| Rubbish to shore | | | |

| | | | Port | Starboard |
|---|---|---|---|---|
| Time: | 7:00 | | | |
| Skipper initials | DGC | | | |
| Crew initials | | | | |
| Evidence of unauthorized access | * | | | |
| Engine Hours | * | | 8920.7 | 8948.4 |
| Engine oil | * | | ✓ | ✓ |
| Gear box oil | * | | ✓ | ✓ |
| FW header tank | * | | ✓ | ✓ |
| Fuel tanks | * | | | |
| Main prop shaft | * | | ✓ | ✓ |
| Any leaks, loose pipes, etc | * | | ✓ | ✓ |
| Sea cocks - cleaned, checked, supply OK? | | | | |
| Navigation lights | * | | ✓ | |
| Wheelhouse lights | * | | ENGiNE rm | Lights Faulty |
| VHF | * | | ✓ | |
| GPS and Plotter | | | ✓ | |
| Radar - must be on if fitted | | | | |
| Deck lights | | | N/A | |
| Heater on/off | | | | |
| Crane - leaks, hoses OK, hook OK? | | | | |
| Winches - leaks, levers OK, bolts tight? | | | | |
| Bow door rams - leaks, secure, operational | | | | |
| Hatches Secure and water tight? | * | | ✓ | |
| Hatch fastenings (dogs) free and operational | * | | ✓ | |

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board? | ✓ | Intact? | |
| Spare PDF(s) in operable condition | ✓ | Tested? | |
| Horn / Bell / Whistle onboard | ✓ | By pass Valve OK? | |
| Inland Navigation rules posted | ✓ | | |
| Floating light (SIL) with line | ✓ | | |
| Life ring with 60' line attached | ✓ | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | APril 2016 |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | ✓ | | |
| Bilge pumps working | ✓ | Tested? | |
| Escape signs and routes clear of obstructions? | ✓ | Signs? | |
| Garbage, Oil and Injury Placard's posted? | ✓ | | |

Comments:

**\* If defective report immediately to Site Manager**

Additonal detail



COOKE_CWA_00232065

Vessel Name: __Elsie M__

**American Gold Seafoods**

Date : __June 25, 2015__

### Checklist

Signed by ..... __David G. Conger__

Assessor __DGG__

| | | Port | Starboard |
|---|---|---|---|
| Time: | | 6:54 | |
| Skipper initials | | DGC | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| Engine Hours | * | 8927.0 | 8954.9 |
| Engine oil | * | ✓ | ✓ |
| Gear box oil | * | ✓ | ✓ |
| FW header tank | * | ✓ | |
| Fuel tanks | * | | |
| Main prop shaft | * | ✓ | ✓ |
| Any leaks, loose pipes, etc | * | ✓ | ✓ |
| Sea cocks - cleaned, checked, supply OK? | | ✓ | ✓ |
| Hyd oil res. | | ✓ | |
| Navigation lights | * | ✓ | |
| Wheelhouse lights | * | DC only | |
| VHF | * | ✓ | |
| GPS and Plotter | | ✓ | |
| Radar - must be on if fitted | | | |
| Deck lights | | NO | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | ✓ | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, operational | | ✓ | |
| Hatches Secure and water tight? | * | ✓ | |
| Hatch fastenings (dogs) free and operational | * | ✓ | |

**If defective report immediately to Site Manager*

Additonal detail

---

### Planned Activity / Unplanned Activity

| Planned Activity | | Unplanned Activity |
|---|---|---|
| Feed run | Amount | |
| Mooring Work | | Decking Replacement N.R. |
| Net exchange | F8 | |
| Fuel Delivery | Est Litres | |
| Fuel decant | | |
| AGD treatment | | |
| Harvest prep | | |
| IBC to shore | | |
| Rubbish to shore | | |

### Safety Equipment

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board: | ✓ | Intact? | |
| Spare PDF(s) in operable condition | ✓ | Tested? | |
| Horn / Bell / Whistle onboard | ✓ | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | ✓ | | |
| Life ring with 60' line attached | ✓ | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | 4/16 |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | ✓ | | |
| Bilge pumps working | ✓ | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | ✓ |
| Garbage, Oil and Injury Placard's posted? | | | ✓ |

Comments:

---

COOKE_CWA_00023066

**AMERICAN GOLD SEAFOODS**

Vessel Name: **Elsie M**

Date : **June 26, 2015**

| Planned Activity | | Unplanned Activity | |
|---|---|---|---|
| Feed run | 32 Amount | ☐ 1ST SR. 1OT NR 7TFW | |
| Mooring Work | | | |
| Net exchange | | | |
| Fuel Delivery | | | |
| Fuel decant | Est Litres | ☐ | |
| AGD treatment | | | |
| Harvest prep | | move MPI, FW to NR, | |
| IBC to shore | | Pulled up C1 | |
| Rubbish to shore | | | |

### Checklist

Signed by ..... **DAVID G. Conger**

Assessor: *[signature]*

| Time: | 6:55 | | | |
|---|---|---|---|---|
| Skipper initials | DSC | | | |
| Crew initials | | | | |
| Evidence of unauthorized access | | * | | |
| | | | **Port** | **Starboard** |
| Engine Hours | | * | 8933.2 | 8961.1 |
| Engine oil | | * | ✓ | ✓ |
| Gear box oil | | * | ✓ | ✓ |
| FW header tank | | * | ✓ | ✓ |
| Fuel tanks | | * | ½ | Added to ⅔ |
| Main prop shaft | | * | ✓ | ✓ |
| Any leaks, loose pipes, etc | | * | ✓ | ✓ |
| Sea cocks - cleaned, checked, supply OK? | | | ✓ | |
| HYD oil | | | ✓ | |
| Navigation lights | | * | ✓ | |
| Wheelhouse lights | | * | ✓ | ENGINE rm → |
| VHF | | * | ✓ | |
| GPS and Plotter | | | ✓ | |
| Radar - must be on if fitted | | | | |
| Deck lights | | | N/A | |
| Heater on/off | | | | |
| Crane - leaks, hoses OK, hook OK? | | | ✓ | |
| Winches - leaks, levers OK, bolts tight? | | | cable ? ordered | |
| Bow door rams - leaks, secure, operational | | | | |
| Hatches Secure and water tight? | | * | ✓ | |
| Hatch fastenings (dogs) free and operational | | * | ✓ | |

### Safety Equipment

| Safety Equipment | Yes | | Yes / Date | |
|---|---|---|---|---|
| Flare kit on board? | | Intact? | | |
| Spare PDF(s) in operable condition | | Tested? | | |
| Horn / Bell / Whistle onboard | | By pass Valve OK? | | |
| Inland Navigation rules posted | | | | |
| Floating light (SIL) with line | | | | |
| Life ring with 60' line attached | | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | | |
| Fixed engine room fire system (if installed): | | Inspected annually? | | |
| Bilge alarm | | | | |
| Bilge pumps working | | Tested? | | |
| Escape signs and routes clear of obstructions? | | Signs? | | |
| Garbage, Oil and Injury Placard's posted? | | | | |

Comments: Changed SWL on crane to read 4500
Added 200 gal. fuel to stbd TANK

\* If defective report immediately to Site Manager

Additonal detail

COOKE_CWA_00232067



**Vessel Name:** Elsie M

**Date :** June 29, 2015

American Gold Seafoods

| Planned Activity | | Unplanned Activity | |
|---|---|---|---|
| Feed run | Amount | | |
| Mooring Work | | | |
| Net exchange | | | |
| Fuel Delivery | | | |
| Fuel decant | Est Litres | | |
| AGD treatment | | | |
| Harvest prep | | Morts to Pier 8 totes | |
| IBC to shore | | | |
| Rubbish to shore | | | |

**Checklist**

Signed by ..... David G. Conger

Assessor: [signature]

| | | Port | Starboard |
|---|---|---|---|
| Time: | 7:00 | | |
| Skipper initials | | DGC | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |
| Engine Hours | * | 8938.9 | 8966.8 |
| Engine oil | * | ✓ | ✓ |
| Gear box oil | * | ✓ | ✓ |
| FW header tank | * | ✓ | ✓ |
| Fuel tanks | * | | |
| Main prop shaft | * | ✓ | ✓ |
| Any leaks, loose pipes, etc | * | ✓ | ✓ |
| Sea cocks - cleaned, checked, supply OK? | | ✓ | ✓ |
| Navigation lights | * | | |
| Wheelhouse lights | * | | |
| VHF | * | | |
| GPS and Plotter | | | |
| Radar - must be on if fitted | | | |
| Deck lights | | | |
| Heater on/off | | ✓ | |
| Crane - leaks, hoses OK, hook OK? | | | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, operational | | | |
| Hatches Secure and water tight? | * | ✓ | |
| Hatch fastenings (dogs) free and operational | * | ✓ | |

* If defective report immediately to Site Manager

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board: | | Intact? | |
| Spare PDF(s) in operable condition | | Tested? | |
| Horn / Bell / Whistle onboard | | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | ✓ | | |
| Bilge pumps working | ✓ | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

**Comments:** Changed Oil!

Henry Spot Painted Crane

Additonal detail

COOKE_CWA_00232068

**Vessel Name:** Elsie M

**Date:** June 30 2015

American Gold Seafoods

### Checklist

Signed by ..... David G. Conger

Assessor: Dav D G

| Time: | 7:00 | | |
|---|---|---|---|
| Skipper initials | DJC | | |
| Crew initials | | | |
| Evidence of unauthorized access | * | | |

| | | Port | Starboard |
|---|---|---|---|
| Engine Hours | * | 8941.9 | 8970.0 |
| Engine oil | * | ✓ | ✓ |
| Gear box oil | * | | |
| FW header tank | * | ✓ | ✓ |
| Fuel tanks | * | | |
| Main prop shaft | * | ✓ | ✓ |
| Any leaks, loose pipes, etc | * | ✓ | ✓ |
| Sea cocks - cleaned, checked, supply OK? | | | |
| | | | |
| Navigation lights | * | | |
| Wheelhouse lights | * | | |
| VHF | * | ✓ | |
| GPS and Plotter | | | |
| Radar - must be on if fitted | | | |
| Deck lights | | | |
| Heater on/off | | | |
| Crane - leaks, hoses OK, hook OK? | | | |
| Winches - leaks, levers OK, bolts tight? | | | |
| Bow door rams - leaks, secure, operational | | | |
| Hatches Secure and water tight? | * | | |
| Hatch fastenings (dogs) free and operational | * | | |

\* If defective report immediately to Site Manager

Additonal detail

### Planned Activity / Unplanned Activity

| Feed run | 14 | Amount S.R. | 15 | FTW |
|---|---|---|---|---|
| Mooring Work | | | | |
| Net exchange | F5 | | | |
| Fuel Delivery | | | | |
| Fuel decant | | Est Litres | | |
| AGD treatment | | | | |
| Harvest prep | | | | |
| IBC to shore | | | | |
| Rubbish to shore | | | | |

### Safety Equipment

| Safety Equipment | Yes | | Yes / Date |
|---|---|---|---|
| Flare kit on board: | | Intact? | |
| Spare PDF(s) in operable condition | | Tested? | |
| Horn / Bell / Whistle onboard | | By pass Valve OK? | |
| Inland Navigation rules posted | | | |
| Floating light (SIL) with line | | | |
| Life ring with 60' line attached | | | |
| Fire Extinguishers - 2 BI - Installed and in service | | Service Date? | |
| Fixed engine room fire system (if installed): | | Inspected annually? | |
| Bilge alarm | | | |
| Bilge pumps working | | Tested? | |
| Escape signs and routes clear of obstructions? | | Signs? | |
| Garbage, Oil and Injury Placard's posted? | | | |

Comments:

# EXHIBIT 8

HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

    Plaintiff,

v.

COOKE AQUACULTURE PACIFIC, LLC,

    Defendant.

Case No. 2:17-cv-01708-JCC

DEFENDANT'S SUPPLEMENTAL
RESPONSES TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES TO DEFENDANT
COOKE AQUACULTURE, LLC

Defendant Cooke Aquaculture Pacific, LLC ("Cooke") responds to Plaintiff's First Set of Interrogatories to Defendant Cooke Aquaculture Pacific, LLC (the "Discovery Requests") as follows:

## INTERROGATORIES

**Interrogatory No. 5**: Describe all inspections you have conducted of the Puget Sound net pens under the provisions of the Permits, including Condition S6 and/or your Pollution Prevention Plans, since January 1, 2010.

**Response (served on April 27, 2018):** Cooke objects to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case. Additionally, Cooke objects to the scope of this interrogatory as it seeks information outside of the five-year statute of limitations applicable to plaintiff's claims, as such, Cooke limits its answer to the five years prior to filing of this lawsuit. Cooke objects to this interrogatory as overly broad and unduly

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
1
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 329**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

burdensome because it covers eight net pen facilities for the entire five-year statute of limitations period, and because the inspections of said facilities occurred on a nearly-daily basis in some form or another.  To the extent this interrogatory seeks detailed descriptions of every inspection made by Cooke at each of its facilities over the course of a five-year period (equivalent of 40 years of inspections) this request is not proportional to the needs of the case.  Cooke also objects to this interrogatory to the extent the answers can be better obtained through review of documents produced in response to Plaintiff's Request for Production No. 5.  To the extent plaintiff may have a good faith reason to believe that Cooke violated its permits' inspection requirements, Plaintiff may identify with specificity the alleged shortcoming and Cooke will provide a more detailed answer.

Without waiving any objections, Cooke responds that inspections included, but were not necessarily limited to:

Exposed mooring system are inspected by staff daily as part of their general staff duties. Beginning in 2015, all mooring concerns were required to be documented on the facility's daily log.  On October 19, 2017 Cooke updated its procedures for weekly exposed mooring system inspections that specify the scope and criteria of inspections, this included an updated inspection form that is customized for each net pen facility.  Staff continue to inspect exposed moorings daily and are to report any concerns.

Below water mooring system components that are less than 100 feet in depth, as well as main cage structures, are inspected annually by divers.  The current Pollution Prevention Plans specify that mooring components greater than 100 feet deep will be inspected by remotely operated underwater vehicles or a contracted dive service, with the last such inspection conducted at Cooke facilities in the later part of 2017 under contract with Global Diving & Salvage.

Additional inspections are performed during the fallow period of a site, between generations of fish. For instance, where appropriate, ultrasound inspections are performed, nets

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
2
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 330**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    are removed, inspected, and repaired, and other maintenance activities are performed at the

2    facilities. And, this fallow period is the time during which anchors are lifted, inspected, and reset

3    as needed. A good example of these activities is documented in the correspondence between

4    Cooke, DNR, WDFW, and Ecology related to the restocking of its Clam Bay facility in 2017.

5    Cooke also recently deployed current meters at all of its sites to allow re-engineering of all of its

6    mooring systems, this will be another opportunity for mooring inspections.

7

8        **Supplemental Request 1:** By letter dated January 31, 2019, counsel for WFC requested

9    that Cooke supplement its response to Interrogatory No. 5 as follows: "provide an amended

10   response that, for each net pen, describes the inspections of below water mooring components

11   since 2012. Consistent with the request, the response should specify: the date of each inspection,

12   the location of each inspection (i.e., the name of the net pen and the specific mooring

13   components/anchors that were inspected), the identity of the individuals involved with the

14   inspection, and the records involved (i.e., identify any inspections reports, logs, videos, photos)."

15       **Supplemental Response 1:** As articulated in a response letter to WFC's counsel dated

16   February 21, 2019, Cooke objects to WFC's requests for supplementation because it includes

17   numerous separate interrogatories that are in excess of the number of interrogatories permitted

18   by Federal Rule of Civil Procedure 33(a)(1).  Cooke also objects to the extent the request for

19   supplementation is overly burdensome as it requires Cooke to recite specific details of hundreds

20   of inspections that occurred at eight facilities over the course of seven years.  Without waiving

21   any objections, and pursuant to Federal Rule of Civil Procedure 33(d), Cooke directs WFC to its

22   business records produced in this case, as described in the below narrative response and

23   identified on various production logs prepared for and provided to WFC, and states that the

24   answer to this interrogatory may be determined by examining those records and the burden of

25   doing so is substantially the same for WFC as it is for Cooke.  Cooke also provides the following

26   supplemental responses to streamline this litigation.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
3
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 331**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Cypress Site 1**:  From 2012 through 2016 Cooke inspected all below water mooring components using several methods.  First, on an approximately daily basis, site staff inspected all mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems were functioning properly.  These inspections also included the inspection of the waterline mooring components including pad-eyes, brackets, and pins.  Since 2014, these daily inspections have also been noted in the site's daily logs.  Generally, any problem with a below water mooring component is plainly apparent from observing how the buoy floats or how the anchor line/chain descends the first several meters of water.  In the event that a problem was suspected, it was immediately investigated.  Suspected problems below the water were investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications.  To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs and the responding vessel's log.  All of the daily site logs, weekly site reports, monthly safety audits, monthly compliance checklists, dive logs, and vessel logs have been produced or are in the final stages of production.  The personnel responsible for these inspections included all staff who worked at Cypress Site 1.  The individual divers or vessel personnel who may have responded to potential problems are noted in the applicable dive and vessel logs.

In addition to the daily inspection of surface-visible, below-waterline mooring components, Cooke also had divers inspect all below water mooring components on an approximately bi-annual basis.  These inspections occurred throughout the year based on water and weather conditions, including water visibility, tide height, and general surface conditions.  These inspections consisted of members of the site's dive team descending each anchor line to check each component to ensure functionality, including checking all nylon ropes, shackles, chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line was

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
4
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 332**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

anchored to a permanent piling instead of an anchor).  Any problems discovered were recorded in the site's daily log, weekly reports, and/or monthly safety audits and compliance checklists.  Anchor dives were also recorded in the dive logs maintained by the dive staff.  The dive logs also include details related to any anchor work performed.  If the divers determined an anchor needed to be reset or brought to the surface for repair, a company vessel was used to pull the anchor, perform necessary repairs/inspections, and reset the anchor.  Records of this work are contained in the relevant vessel logs.  For Cypress Site 1, the vessel performing the anchor work was generally the "Clamdigger."  The personnel responsible for these inspections were primarily the site dive staff and the vessel crew.  The names of these employees can be found in the dive logs and vessel logs accompanying entries related to anchor work.  The dates of these approximately bi-annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the entries related to anchor work.

In addition to these inspections of below water mooring components, staff divers conducted regular, almost daily, dives of the sites for various other purposes, including net washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections and repairs of site nets.  During these dives, if a problem with a mooring component below the water was suspected, it was immediately investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications.

From 2017 to present Cooke continued to inspect all mooring components at Cypress Site 1 in the manner described above for the period of 2012-2016.  Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth.  In 2017, ROV visual inspections of Cypress Site 1 anchors below 100 feet were conducted by Global Diving and

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT COOKE AQUACULTURE, LLC -- 5

Case No. 2:17-cv-01708-JCC
THIRD KNUTSEN DECLARATION - 333

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

Salvage during the month of December.   Global Diving and Salvage records have been produced, and the dates of the inspection and personnel involved are listed in those documents. In 2018, the ROV inspections were conducted by Collins Engineers as part of the Mott MacDonald site inspection.  Mott MacDonald records have been produced, and the dates of the inspection and personnel involved are listed in those documents.

Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new procedures for tracking anchor inspections.  These procedures are overseen by Cooke's Marine Services Manager, Kyl Wood, who tracks anchor inspections and conditions in an Excel spreadsheet and on anchoring maps.  Additionally, Annual Below Surface Visual Inspection sheets are used to record and report all visual inspections, all routine mooring maintenance, and all emergency repairs made on the below surface mooring components.  All such documents have been produced and will be produced as they are continuously generated.

**Cypress Site 2**:  From 2012 through 2017 Cooke inspected all below water mooring components using several methods.  First, on an approximately daily basis, site staff inspected all mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems were functioning properly.   These inspections also included the inspection of the waterline mooring components including pad-eyes, brackets, and pins.  Since 2014, these daily inspections have also been noted in the site's daily logs.  Generally, any problem with a below water mooring component is plainly apparent from observing how the buoy floats or how the anchor line/chain descends the first several meters of water.  In the event that a problem was suspected, it was immediately investigated.  Suspected problems below the water were investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications.  To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs and the

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
6
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 334**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  responding vessel's log.  All of the daily site logs, weekly site reports, monthly safety audits,

2  monthly compliance checklists, dive logs, and vessel logs have been produced or are in the final

3  stages of production.  The personnel responsible for these inspections included all staff who

4  worked at Cypress Site 2.  The individual divers or vessel personnel who may have responded to

5  potential problems are noted in the applicable dive and vessel logs.

6          In addition to the daily inspection of surface-visible, below-waterline mooring

7  components, Cooke also had divers inspect all below water mooring components on an

8  approximately bi-annual basis.  These inspections occurred throughout the year based on water

9  and weather conditions, including water visibility, tide height, and general surface conditions.

10  These inspections consisted of members of the site's dive team descending each anchor line to

11  check each component to ensure functionality, including checking all nylon ropes, shackles,

12  chains, pins, thimbles, hinges, bolts, and anchors.  Any problems discovered were recorded in the

13  site's daily log, weekly reports, and/or monthly safety audits and compliance checklists.  Anchor

14  dives were also recorded in the dive logs maintained by the dive staff.  The dive logs also include

15  details related to any anchor work performed.  If the divers determined an anchor needed to be

16  reset or brought to the surface for repair, a company vessel was used to pull the anchor, perform

17  necessary repairs/inspections, and reset the anchor.  Records of this work are contained in the

18  relevant vessel logs.  For Cypress Site 2, the vessel performing the anchor work was generally

19  the "Clamdigger."  The personnel responsible for these inspections were primarily the site dive

20  staff and the vessel crew.  The names of these employees can be found in the dive logs and

21  vessel logs' accompanying entries related to anchor work.  The dates of these approximately bi-

22  annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the entries

23  related to anchor work.

24          In addition to these inspections of below water mooring components, staff divers

25  conducted regular, almost daily, dives of the sites for various other purposes, including net

26  washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
7
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 335**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    and repairs of site nets.  During these dives, if a problem with a mooring component below the

2    water was suspected, it was immediately investigated by either having staff divers descend the

3    anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems

4    were discovered, those problems were recorded in daily site logs, weekly site reports, and/or

5    monthly safety audits and compliance checklists, in addition to being memorialized in company

6    communications.

7         In July 2017, all of the anchors for Cypress Site 2 were inspected, and reset or replaced as

8    necessary.   In August 2017 Cypress Site 2 was destroyed, and all anchors and mooring

9    components were removed from the leasehold by Cooke.  The leasehold has been terminated and

10   there is no intention of ever rebuilding a facility at the site, nor would operation of such a facility

11   be legally permissible.  Because there is no longer a Cypress Site 2, no Site 2 inspections have

12   occurred since 2017 because no anchors exist.

13        **Cypress Site 3**:   From 2012 through 2016 Cooke inspected all below water mooring

14   components using several methods.  First, on an approximately daily basis site staff inspected all

15   mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems

16   were functioning properly.   These inspections also included the examination of the waterline

17   mooring components including pad-eyes, brackets, and pins.  Since 2014, these daily inspections

18   have also been noted in the site's daily logs.   Generally, any problem with a below water

19   mooring component is plainly apparent from observing how the buoy floats or how the anchor

20   line/chain descends the first several meters of water.  In the event that a problem was suspected,

21   it was immediately investigated by either having staff divers descend the anchor line or by

22   calling in a company vessel to reset the anchor.  In the event that any problems were discovered,

23   those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits

24   and compliance checklists, in addition to being memorialized in company communications.  To

25   the extent that staff divers or vessels became involved, their actions/inspections were recorded in

26   the site's dive logs and the responding vessel's log.  All of the daily site logs, weekly site reports,

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
8
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 336**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    monthly safety audits and compliance checklists, dive logs, and vessel logs have been produced

2    or are in the final stages of production.  The personnel responsible for these inspections included

3    all staff who worked at Cypress Site 3.  The individual divers or vessel personnel who may have

4    responded to potential problems are noted in the applicable dive and vessel logs.

5         In addition to the daily inspection of surface-visible but below-waterline mooring

6    components, Cooke also had divers inspect all below water mooring components on an

7    approximately bi-annual basis.  These inspections occurred throughout the year based on water

8    and weather conditions, including water visibility, tide height, and general surface conditions.

9    These inspections consisted of members of the site's dive team descending each anchor line to

10    check each component to ensure functionality, including checking all nylon ropes, shackles,

11    chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line was

12    anchored to a permanent piling instead of an anchor).  Any problems discovered were recorded

13    in the site's daily logs, weekly reports, and/or monthly safety audits and compliance checklists.

14    Anchor dives were also recorded in the dive logs maintained by the dive staff.  The dive logs

15    also include details related to any anchor work performed.  If the divers determined an anchor

16    needed to be reset or brought to the surface for repair, a company vessel was used to pull the

17    anchor, perform necessary repairs/inspections, and reset the anchor.  Records of this work is

18    contained in the relevant vessel logs.  For Cypress Site 3 the vessel performing the anchor work

19    was generally the "Clamdigger."  The personnel responsible for these inspections were primarily

20    the site dive staff and the vessel crew.  The names of these employees can be found in the dive

21    logs and vessel logs accompanying entries related to anchor work.  The dates of these

22    approximately bi-annual inspections can be found in the daily logs, vessel logs, and dive logs, as

23    part of the entries related to anchor work.

24         In addition to these inspections of below water mooring components, staff divers

25    conducted regular, almost daily, dives of the sites for various other purposes, including net

26    washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
9
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 337**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

and repairs of site nets. During these dives, if a problem with a mooring component below the water was suspected, it was immediately investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor. In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications.

From 2017 to present, Cooke continued to inspect all mooring components at Cypress Site 3 in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. In 2017 the ROV visual inspections were conducted by Global Diving and Salvage during the month of December. Global Diving and Salvage records have been produced, and the dates of the inspection and personnel involved are listed in those documents. In 2018 the ROV inspections were conducted by Collins Engineers as part of the Mott MacDonald site inspection. Mott MacDonald records have been produced, and the dates of the inspection and personnel involved are listed in those documents.

Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new procedures for tracking anchor inspections. These procedures are overseen by Cooke's Marine Services Manager, Kyl Wood, who tracks anchor inspections and conditions in an Excel spreadsheet and also on anchoring maps. Additionally, Annual Below Surface Visual Inspection sheets are used to record and report all visual inspections, all routine mooring maintenance, and all emergency repairs made on the below surface mooring components. All such documents have been produced and will be produced as they are continuously generated.

**Hope Island**:  From 2012 through 2016 Cooke inspected all below water mooring components using several methods. First, on an approximately daily basis site staff inspected all mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
10
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 338**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

were functioning properly.   These inspections also included the inspection of the waterline mooring components including pad-eyes, brackets, and pins.  Since 2014, these daily inspections have also been noted in the site's daily logs.   Generally, any problem with a below water mooring component is plainly apparent from observing how the buoy floats or how the anchor line/chain descends the first several meters of water.   In the event that a problem was suspected, it was immediately investigated.   Suspected problems below the water were investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor.   In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists in addition to being memorialized in company communications.   To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs or the responding vessel's log.  All of the daily site logs, weekly site reports, monthly safety audits and compliance checklists, dive logs, and vessel logs have been produced or are in the final stages of production. The personnel responsible for these inspections included all staff who worked at Hope Island. The individual divers or vessel personnel who may have responded to potential problems are noted in the applicable dive and vessel logs.

In addition to the daily inspection of surface-visible mooring components, Cooke also had divers inspect all below water mooring components on an approximately bi-annual basis. These inspections occurred throughout the year based on water and weather conditions, including water visibility, tide height, and general surface conditions.   These inspections consisted of members of the site's dive team descending each anchor line to check each component to ensure functionality, including checking all nylon ropes, shackles, chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line was anchored to a permanent piling instead of an anchor).   Any problems discovered were recorded in the site's daily logs, weekly reports, and/or monthly safety audits and compliance checklists.   Anchor dives were also recorded in the dive logs maintained by the dive staff.  The dive logs also include

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
11
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 339**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

details related to any anchor work performed.  If the divers determined an anchor needed to be reset or brought to the surface for repair, a company vessel was used to pull the anchor, perform necessary repairs/inspections, and reset the anchor.  Records of this work are contained in the relevant vessel logs.  For Hope Island the vessel performing the anchor work was generally the "Clamdigger."  The personnel responsible for these inspections were primarily the site dive staff and the vessel crew.  The names of these employees can be found in the dive logs and vessel logs accompanying entries related to anchor work.  The dates of these approximately bi-annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the entries related to anchor work.

In addition to these inspections of below water mooring components, staff divers conducted regular, almost daily, dives of the sites for various other purposes, including net washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections and repairs of site nets.  During these dives, if a problem with a mooring component below the water was suspected, it was immediately investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications.

Hope Island also maintained a "living" anchor repair log at the site in Excel format. Historic versions of that log were not retained, and new information was simply written over the top of the old digital document.  This anchor log format was later adopted by other sites (as discussed below).

From 2017 to present, Cooke continued to inspect all mooring components at Hope Island in the manner described above for the period of 2012-2016.  Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
12
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 340**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

and/or ROV" to visually inspect anchoring components below 100 feet in depth. This change did not meaningfully impact Hope Island as there are no anchors below 100 feet at the site.

Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new procedures for tracking anchor inspections. These procedures are overseen by Cooke's Marine Services Manager, Kyl Wood, who tracks anchor inspections and conditions in an Excel spreadsheet and also on anchoring maps. Additionally, Annual Below Surface Visual Inspection sheets are used to record and report all visual inspections, all routine mooring maintenance, and all emergency repairs made on the below surface mooring components. All such documents have been produced and will be produced as they are continuously generated.

**Fort Ward**:  From 2012 through 2016, Cooke inspected all below water mooring components using several methods. First, on an approximately daily basis site staff inspected all mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems were functioning properly. These inspections also included the inspection of the waterline mooring components including pad-eyes, brackets, and pins. Since 2014, these daily inspections have also been noted in the site's daily logs. Generally, any problem with a below water mooring component is plainly apparent from observing how the buoy floats or how the anchor line/chain descends the first several meters of water. In the event that a problem was suspected, it was immediately investigated. Suspected problems below the water were investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor. In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists in addition to being memorialized in company communications. To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs and the responding vessel's log. All of the daily site logs, weekly site reports, monthly safety audits and compliance checklists, dive logs, and vessel logs have been produced or are in the final stages of production. The personnel responsible for these inspections included all staff who worked at

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
13
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 341**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98101
206.971.1564

1  Fort Ward.  The individual divers or vessel personnel who may have responded to potential

2  problems are noted in the applicable dive and vessel logs.

3      In addition to the daily inspection of surface-visible but below-waterline mooring

4  components, Cooke also had divers inspect all below water mooring components on an

5  approximately bi-annual basis.  These inspections occurred throughout the year based on water

6  and weather conditions, including water visibility, tide height, and general surface conditions.

7  These inspections consisted of members of the site's dive team descending each anchor line to

8  check each component to ensure functionality, including checking all nylon ropes, shackles,

9  chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line was

10 anchored to a permanent piling instead of an anchor).  Any problems discovered were recorded

11 in the site's daily logs, weekly reports, and/or monthly safety audits and compliance checklists.

12 Anchor dives were also recorded in the dive logs maintained by the dive staff.  The dive logs

13 also include details related to any anchor work performed.  If the divers determined an anchor

14 needed to be reset or brought to the surface for repair, a company vessel was used to pull the

15 anchor, perform necessary repairs/inspections, and reset the anchor.  Records of this work are

16 contained in the relevant vessel logs.  For Fort Ward the vessel performing the anchor work was

17 generally the "Elsie M."  The personnel responsible for these inspections were primarily the site

18 dive staff and the vessel crew.  The names of these employees can be found in the dive logs and

19 vessel logs accompanying entries related to anchor work.  The dates of these approximately bi-

20 annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the entries

21 related to anchor work.

22      In addition to these inspections of below water mooring components, staff divers

23 conducted regular, almost daily, dives of the sites for various other purposes, including net

24 washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections

25 and repairs of site nets.  During these dives, if a problem with a mooring component below the

26 water was suspected, it was immediately investigated by either having staff divers descend the

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
14
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 342**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1   anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems

2   were discovered, those problems were recorded in daily site logs, weekly site reports, and/or

3   monthly safety audits and compliance checklists, in addition to being memorialized in company

4   communications.

5        From 2017 to present Cooke continued to inspect all mooring components at Fort Ward

6   in the manner described above for the period of 2012-2016.  Beginning in October 2017 the

7   facility's pollution prevention plan began requiring the use of "a contracted dive service and/or

8   ROV" to visually inspect anchoring components below 100 feet in depth.  This change did not

9   meaningfully impact Fort Ward as there are no anchors below 100 feet at the site.

10       Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new

11  procedures for tracking anchor inspections.  These procedures are overseen by Cooke's Marine

12  Services Manager, Kyl Wood, who tracks anchor inspections and condition in an Excel

13  spreadsheet and also on anchoring maps.  Additionally, Annual Below Surface Visual Inspection

14  sheets are used to record and report all visual inspections, all routine mooring maintenance, and

15  all emergency repairs made on the below surface mooring components.  All such documents

16  have been produced and will be produced as they are continuously generated.

17       **Orchard Rocks**:  From 2012 through 2016 Cooke inspected all below water mooring

18  components using several methods.  First, on an approximately daily basis site staff inspected all

19  mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems

20  were functioning properly.  These inspections also included the inspection of the waterline

21  mooring components including pad-eyes, brackets, and pins.  Since 2014, these daily inspections

22  have also been noted in the site's daily logs.  Generally, any problem with a below water

23  mooring component is plainly apparent from observing how the buoy floats or how the anchor

24  line/chain descends the first several meters of water.  In the event that a problem was suspected,

25  it was immediately investigated.  Suspected problems below the water were investigated by

26  either having staff divers descend the anchor line or by calling in a company vessel to reset the

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
15
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 343**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

anchor.  In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists in addition to being memorialized in company communications.  To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs and the responding vessel's log.  All of the daily site logs, weekly site reports, monthly safety audits and compliance checklists, dive logs, and vessel logs have been produced or are in the final stages of production.  The personnel responsible for these inspections included all staff who worked at Orchard Rocks.  The individual divers or vessel personnel who may have responded to potential problems are noted in the applicable dive and vessel logs.

In addition to the daily inspection of surface-visible, below-waterline mooring components, Cooke also had divers inspect all below water mooring components on an approximately bi-annual basis.  These inspections occurred throughout the year based on water and weather conditions, including water visibility, tide height, and general surface conditions.  These inspections consisted of members of the site's dive team descending each anchor line to check each component to ensure functionality, including checking all nylon ropes, shackles, chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line was anchored to a permanent piling instead of an anchor).  Any problems discovered were recorded in the site's daily log, weekly reports, and/or monthly safety audits and compliance checklists.  Anchor dives were also recorded in the dive logs maintained by the dive staff.  The dive logs also include details related to any anchor work performed.  If the divers determined an anchor needed to be reset or brought to the surface for repair, a company vessel was used to pull the anchor, perform necessary repairs/inspections, and reset the anchor.  Records of this work is contained in the relevant vessel logs.  For Orchard Rocks the vessel performing the anchor work was generally the "Elsie M."  The personnel responsible for these inspections were primarily the site dive staff and the vessel crew.  The names of these employees can be found in the dive logs and vessel logs accompanying entries related to anchor work.  The dates of these approximately

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
16
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 344**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

bi-annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the entries related to anchor work.

In addition to these inspections of below water mooring components, staff divers conducted regular, almost daily, dives of the sites for various other purposes, including net washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections and repairs of site nets. During these dives, if a problem with a mooring component below the water was suspected, it was immediately investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor. In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications.

From 2017 to present, Cooke continued to inspect all mooring components at Orchard Rocks in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. Orchard Rocks has three anchors that may at times be below 100 feet. In December 2017, as part of the Mott Macdonald review of the facility (done at the behest of the Washington State Department of Natural Resources), the diving subcontractor Collins Engineers determined that by utilizing low tide windows it could visually inspect all anchors without descending below 100 feet. Cooke's practice has generally been to utilize low tide periods to inspect anchors at depths approaching 100 feet. The details and findings of Collins December 2017 inspection of the Orchard Rocks anchors are detailed in the Mott MacDonald reports that have been produced. In 2018, out of an abundance of caution, Cooke utilized a rental ROV to conduct visual inspections the Orchard Rocks anchors that may at times fall below 100 feet. Records of these 2018 inspections are included in the below discussed anchor inspection tracking documents.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
17
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 345**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new procedures for tracking anchor inspections. These procedures are overseen by Cooke's Marine Services Manager, Kyl Wood, who tracks anchor inspections and condition in an Excel spreadsheet and also on anchoring maps. Additionally, Annual Below Surface Visual Inspection sheets are used to record and report all visual inspections, all routine mooring maintenance, and all emergency repairs made on the below surface mooring components. All such documents have been produced and will be produced as they are continuously generated.

**Clam Bay**: From 2012 through 2016, Cooke inspected all below water mooring components using several methods. First, on an approximately daily basis site staff inspected all mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems were functioning properly. These inspections also included the inspection of the waterline mooring components including pad-eyes, brackets, and pins. Since 2014, these daily inspections have been noted in the site's daily logs. Generally, any problem with a below water mooring component is plainly apparent from observing how the buoy floats or how the anchor line/chain descends the first several meters of water. In the event that a problem was suspected, it was immediately investigated. Suspected problems below the water were investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor. In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists in addition to being memorialized in company communications. To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs and the responding vessel's log. All of the daily site logs, weekly site reports, monthly safety audits and compliance checklists, dive logs, and vessel logs have been produced or are in the final stages of production. The personnel responsible for these inspections included all staff who worked at Clam Bay. The individual divers or vessel personnel who may have responded to potential problems are noted in the applicable dive and vessel logs.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT COOKE AQUACULTURE, LLC -- 18
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 346**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

In addition to the daily inspection of surface-visible, below-waterline mooring components, Cooke also had divers inspect all below water mooring components on an approximately bi-annual basis.  These inspections occurred throughout the year based on water and weather conditions, including water visibility, tide height, and general surface conditions.  These inspections consisted of members of the site's dive team descending each anchor line to check each component to ensure functionality, including checking all nylon ropes, shackles, chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line was anchored to a permanent piling instead of an anchor).  Any problems discovered were recorded in the site's daily log, weekly reports, and/or monthly safety audits and compliance checklists.  Anchor dives were also recorded in the dive logs maintained by the dive staff.  The dive logs also include details related to any anchor work performed.  If the divers determined an anchor needed to be reset or brought to the surface for repair, a company vessel was used to pull the anchor, perform necessary repairs/inspections, and reset the anchor.  Records of this work are contained in the relevant vessel logs.  For Clam Bay the vessel performing the anchor work was generally the "Elsie M."  The personnel responsible for these inspections were primarily the site dive staff and the vessel crew.  The names of these employees can be found in the dive logs and vessel logs accompanying entries related to anchor work.  The dates of these approximately bi-annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the entries related to anchor work.

In addition to these inspections of below water mooring components, staff divers conducted regular, almost daily, dives of the sites for various other purposes, including net washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections and repairs of site nets.  During these dives, if a problem with a mooring component below the water was suspected, it was immediately investigated by either having staff divers descend the anchor line or by calling in a company vessel to reset the anchor.  In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
19
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 347**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1   monthly safety audits and compliance checklists, in addition to being memorialized in company

2   communications.

3       From 2017 to present Cooke continued to inspect all mooring components at Clam Bay in

4   the manner described above for the period of 2012-2016.  Beginning in October 2017 the

5   facility's pollution prevention plan began requiring the use of "a contracted dive service and/or

6   ROV" to visually inspect anchoring components below 100 feet in depth.  According to Cooke's

7   records, Clam Bay has three anchors that may at sometimes be below 100 feet.  In September

8   2017, as part of the Mott Macdonald review of the facility (done at the behest of the Washington

9   State Department of Natural Resources) the diving subcontractor Collins Engineers was hired to

10  inspect Clam Bay's anchors.  The details and findings of Collins September 2017 inspection of

11  the Clam Bay anchors are detailed in the Mott MacDonald reports that have been produced.   In

12  2018, Cooke utilized a rental ROV to conduct visual inspections the Clam Bay anchors that may

13  at times fall below 100 feet.  Records of these 2018 inspections are included in the below

14  discussed anchor inspection tracking documents.

15      Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new

16  procedures for tracking anchor inspections.  These procedures are overseen by Cooke's Marine

17  Services Manager, Kyl Wood, who tracks anchor inspections and condition in an Excel

18  spreadsheet and also on anchoring maps.  Additionally, Annual Below Surface Visual Inspection

19  sheets are used to record and report all visual inspections, all routine mooring maintenance and

20  all emergency repair made on the below surface mooring components.  All such documents have

21  been produced and will be produced as they are continuously generated.

22      **Port Angeles**:  From 2012 through 2016, Cooke inspected all below water mooring

23  components using several methods.  First, on an approximately daily basis site staff inspected all

24  mooring buoys and the upper reaches of anchor lines/chains to ensure that the anchoring systems

25  were functioning properly.  These inspections also included the inspection of the waterline

26  mooring components including pad-eyes, brackets, and pins.  Since 2014, these daily inspections

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
20
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 348**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1   have also been noted in the site's daily logs.  Generally, any problem with a below water

2   mooring component is plainly apparent from observing how the buoy floats or how the anchor

3   line/chain descends the first several meters of water.  In the event that a problem was suspected,

4   it was immediately investigated.  Suspected problems below the water were investigated by

5   either having staff divers descend the anchor line or by calling in a vessel to reset the anchor.  In

6   the event that any problems were discovered, those problems were recorded in daily site logs,

7   weekly site reports, a handwritten site-specific anchor log, and/or monthly safety audits and

8   compliance checklists in addition to being memorialized in company communications.  To the

9   extent that staff divers or vessels became involved, their actions/inspections were recorded in the

10  site's dive logs and the responding vessel's log.  All of the daily site logs, weekly site reports,

11  monthly safety audits and compliance checklists, dive logs, vessel logs, and Port Angeles

12  handwritten anchor log have been produced or are in the final stages of production.  The

13  personnel responsible for these inspections included all staff who worked at Port Angeles.  The

14  individual divers or vessel personnel who may have responded to potential problems are noted in

15  the applicable dive and vessel logs.

16      In addition to the daily inspection of surface-visible, below-waterline mooring

17  components, Cooke also had divers inspect below water mooring components on an

18  approximately bi-annual basis.  These inspections occurred throughout the year based on water

19  and weather conditions, including water visibility, tide height, and general surface conditions.

20  These inspections consisted of members of the site's dive team descending each anchor line to

21  check components to ensure functionality, including ensuring the functionality of nylon ropes,

22  shackles, chains, pins, thimbles, hinges, bolts, and anchors (or "pin" or "can" in the event the line

23  was anchored to a permanent piling instead of an anchor).  Any problems discovered were

24  recorded in the site's daily log, weekly reports, and/or monthly safety audits and compliance

25  checklists.  Anchor dives were also recorded in the dive logs maintained by the dive staff.  The

26  dive logs also include details related to any anchor work performed.  If the divers determined an

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
21
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 349**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  anchor needed to be reset or brought to the surface for repair, a company vessel was used to pull

2  the anchor, perform necessary repairs/inspections, and reset the anchor. Records of this work is

3  contained in the relevant vessel logs. For Port Angeles, the vessel performing the anchor work

4  was usually the "Elsie M." The personnel responsible for these inspections were primarily the

5  site dive staff and the vessel crew. The names of these employees can be found in the dive logs

6  and vessel logs accompanying entries related to anchor work. The dates of these approximately

7  bi-annual inspections can be found in the daily logs, vessel logs, and dive logs, as part of the

8  entries related to anchor work.

9         In addition to these inspections of below water mooring components, staff divers

10 conducting regular, almost daily, dives of the sites for various other purposes, including net

11 washing activities, assessing fish health, retrieving fish mortalities, and conducting inspections

12 and repairs of site nets. During these dives, if a problem with a mooring component below the

13 water was suspected, it was immediately investigated by either having staff divers descend the

14 anchor line or by calling in a company vessel to reset the anchor. In the event that any problems

15 were discovered, those problems were recorded in daily site logs, weekly site reports, and/or

16 monthly safety audits and compliance checklists, in addition to being memorialized in company

17 communications.

18        Due to unusual depth of the Port Angeles anchors, divers did not conduct visual

19 inspections of how anchors held to the bottom from 2012-2016. Instead, Cooke relied on

20 functionality inspections as is typical in the industry and approved by global certifying entities,

21 for instance Best Aquaculture Practices certifications, and approved by global aquaculture

22 insurers, for instance Sunderland Marine Insurance. Given the depth of the Port Angeles

23 anchors, the hardware wears and deteriorates at an extremely slow rate. The purchase and

24 integrity of the anchors can easily be gauged by a diver descending the first 100 feet of the

25 anchor line. Anchoring components nearer the surface deteriorate at a much faster rate due to

26 oxygen levels, sunlight, and various other environmental factors. These shallower, higher risk

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
22
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 350**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1  components were visually inspected at least annually (in additional to being functionally

2  inspected).  In the event any issue with the anchors was suspected based on these inspections,

3  they were pulled for visual inspections.

4  From 2017 to present Cooke continued to inspect all mooring components at Port

5  Angeles in the manner described above for the period of 2012-2016.  Beginning in October 2017

6  the facility's pollution prevention plan began requiring the use of "a contracted dive service

7  and/or ROV" to visually inspect anchoring components below 100 feet in depth.  All of Port

8  Angeles' anchors are below 100 feet.  As part of the Mott Macdonald review of the facility (done

9  at the behest of the Washington State Department of Natural Resources) the diving subcontractor

10  Collins Engineers was hired to inspect the Port Angeles anchors using an ROV.  The details and

11  findings of Collins inspection of the Port Angeles anchors are detailed in the Mott MacDonald

12  reports that have been produced.  In 2018, Cooke utilized a rental ROV to conduct visual

13  inspections of the Port Angeles anchors.  Records of these 2018 inspections are included in the

14  below discussed anchor inspection tracking documents.

15  Following the August 2017 Cypress Site 2 collapse, Cooke implemented several new

16  procedures for tracking anchor inspections.  These procedures are overseen by Cooke's Marine

17  Services Manager, Kyl Wood, who tracks anchor inspections and condition in an Excel

18  spreadsheet and also on anchoring maps.  Additionally, Annual Below Surface Visual Inspection

19  sheets are used to record and report all visual inspections, all routine mooring maintenance and

20  all emergency repair made on the below surface mooring components.  All such documents have

21  been produced and will be produced as they are continuously generated.

22

23  **Supplemental Request 2:** By letter dated January 31, 2019, counsel for WFC requested

24  that Cooke supplement its response to Interrogatory No. 5 as follows: "describe any underwater

25  mooring inspections that have occurred since the Discovery Responses were completed (e.g., any

26  inspections in 2018)."

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
23
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 351**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**Supplemental Response 2:** As articulated in a response letter to WFC's counsel dated February 21, 2019, Cooke objects to WFC's requests for supplementation because it includes numerous separate interrogatories that are in excess of the number of interrogatories permitted by Federal Rule of Civil Procedure 33(a)(1).  Cooke also objects to the extent the request for supplementation is overly burdensome as it requires Cooke to recite specific details of hundreds of inspections that occurred at eight facilities over the course of seven years.  Without waiving any objections, and pursuant to Federal Rule of Civil Procedure 33(d), Cooke directs WFC to its business records produced in this case, as described in the below narrative responses and identified on various production logs prepared for and provided to WFC, and states that the answer to this interrogatory may be determined by examining those records and the burden of doing so is substantially the same for WFC as it is for Cooke.  Cooke also provides the following supplemental responses to streamline this litigation.

**Cypress Site 1**:  Beginning in October 2017, the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth.  In 2017 ROV visual inspections of Cypress Site 1 anchors below 100 feet was conducted by Global Diving and Salvage during the month of December.  Global Diving and Salvage records have been produced, and the dates of the inspection and personnel involved are listed in those documents.  In 2018, the ROV inspections were conducted by Collins Engineers as part of the Mott MacDonald site inspection.  Mott MacDonald records have been produced, and the dates of the inspection and personnel involved are listed in those documents.

**Cypress Site 2**:  In July 2017, all of the anchors for Cypress Site 2 were inspected and reset or replaced as necessary.  In August 2017, Cypress Site 2 was destroyed, and all anchors and mooring components were removed from the leasehold by Cooke.  The leasehold has been terminated and there is no intention of ever rebuilding a facility at the site, nor would operation

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
24
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 352**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

of such a facility be legally permissible. Because there is no longer a Cypress Site 2, no Site 2 inspections have occurred since 2017 because no anchors exist.

**Cypress Site 3**: In 2017, the ROV visual inspections were conducted by Global Diving and Salvage during the month of December. Global Diving and Salvage records have been produced, and the dates of the inspection and personnel involved are listed in those documents. In 2018 the ROV inspections were conducted by Collins Engineers as part of the Mott MacDonald site inspection. Mott MacDonald records have been produced, and the dates of the inspection and personnel involved are listed in those documents.

**Hope Island**: From 2017 to present Cooke continued to inspect all mooring components at Hope Island in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. This change did not meaningfully impact Hope Island as there are no anchors below 100 feet at the site.

**Fort Ward**: From 2017 to present Cooke continued to inspect all mooring components at Fort Ward in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. This change did not meaningfully impact Fort Ward as there are no anchors below 100 feet at the site.

**Orchard Rocks**: From 2017 to present Cooke continued to inspect all mooring components at Orchard Rocks in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. Orchard Rocks has three anchors that may at times be below 100 feet. In December 2017, as part of the Mott Macdonald review of the facility (done at the behest of the Washington State Department of Natural Resources) the diving subcontractor Collins Engineers determined

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
25
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 353**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

that by utilizing low tide windows it could visually inspect all anchors without descending below 100 feet. Cooke's practice has generally been to utilize low tide periods to inspect anchors at depths approaching 100 feet. The details and findings of the Collins December 2017 inspection of the Orchard Rocks anchors are detailed in the Mott MacDonald reports that have been produced. In 2018, out of an abundance of caution, Cooke utilized a rental ROV to conduct visual inspections the Orchard Rocks anchors that may at times fall below 100 feet. Records of these 2018 inspections are included in the below discussed anchor inspection tracking documents.

**Clam Bay**: From 2017 to present Cooke continued to inspect all mooring components at Clam Bay in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. According to Cooke's records, Clam Bay has three anchors that may at sometimes be below 100 feet. In September 2017, as part of the Mott Macdonald review of the facility (done at the behest of the Washington State Department of Natural Resources) the diving subcontractor Collins Engineers was hired to inspect Clam Bay's anchors. The details and findings of the Collins September 2017 inspection of the Clam Bay anchors are detailed in the Mott MacDonald reports that have been produced. In 2018, Cooke utilized a rental ROV to conduct visual inspections the Clam Bay anchors that may at times fall below 100 feet. Records of these 2018 inspections are included in the below discussed anchor inspection tracking documents.

**Port Angeles**: From 2017 to present Cooke continued to inspect all mooring components at Port Angeles in the manner described above for the period of 2012-2016. Beginning in October 2017 the facility's pollution prevention plan began requiring the use of "a contracted dive service and/or ROV" to visually inspect anchoring components below 100 feet in depth. All of Port Angeles' anchors are below 100 feet. As part of the Mott Macdonald review of the facility (done at the behest of the Washington State Department of Natural Resources) the diving

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT COOKE AQUACULTURE, LLC -- 26
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 354**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

subcontractor Collins Engineers was hired to inspect the Port Angeles anchors using an ROV. The details and findings of the Collins inspection of the Port Angeles anchors are detailed in the Mott MacDonald reports that have been produced.  In 2018, Cooke utilized a rental ROV to conduct visual inspections of the Port Angeles anchors.  Records of these 2018 inspections are included in the below discussed anchor inspection tracking documents.

**Supplemental Request 3:** By letter dated January 31, 2019, counsel for WFC requested that Cooke supplement its response to Interrogatory No. 5 as follows: "describe the inspections of the main cage structures since 2012 (including through 2018), specifying the date of the inspection, the location of the inspection, the individuals involved with the inspection, and the records involved (i.e., identify any inspection reports, logs, videos, photos)."

**Supplemental Response 3:** As articulated in a response letter to WFC's counsel dated February 21, 2019, Cooke objects to WFC's requests for supplementation because it includes numerous separate interrogatories that are in excess of the number of interrogatories permitted by Federal Rule of Civil Procedure 33(a)(1).  Cooke also objects to the extent the request for supplementation is overly burdensome as it requires Cooke to recite specific details of hundreds of inspections that occurred at eight facilities over the course of seven years.  Without waiving any objections, and pursuant to Federal Rule of Civil Procedure 33(d), Cooke directs WFC to its business records produced in this case, as described in the below narrative response and identified on various production logs prepared for and provided to WFC, and states that the answer to this interrogatory may be determined by examining those records and the burden of doing so is substantially the same for WFC as it is for Cooke.  Cooke also provides the following supplemental responses to streamline this litigation.

The main cage structures consist of three main systems: the floating walkway skeleton, predator net, and stock net.  The walkway skeleton floats on the surface of the water and supports the walkways, guard rails, feeding systems, framing, mooring attachments, and bird

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT COOKE AQUACULTURE, LLC -- 27
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 355**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

nets. The predator net is a ridged, large-mesh net that is held in place by pipe for the purpose of protecting the facility from predators and floating debris. The stock net is a less rigid, smaller mesh net that serves the principle purpose of entrapping the fish. Since 2012, Cooke has inspected the main cage structures using several methods. First, on an approximately daily basis, site staff inspect all surface structures to ensure that the systems are in good working order. Since 2014, these daily inspections have also been noted in the site's daily logs. In the event that any problem is suspected, it was immediately investigated. Suspected problems below the water were investigated by staff divers. In the event that any problems were discovered, those problems were recorded in daily site logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to being memorialized in company communications. To the extent that staff divers or vessels became involved, their actions/inspections were recorded in the site's dive logs and the responding vessel's log. All of the daily site logs, weekly site reports, monthly safety audits, monthly compliance checklists, dive logs, and vessel logs have been produced or are in the final stages of production. The personnel responsible for these inspections included all staff who worked at Cypress Site 1. The individual divers or vessel personnel who may have responded to potential problems are noted in the applicable dive and vessel logs.

From 2012 to the present, Cooke inspects both its stock nets on a nearly daily basis. Specifically, on a weekly basis, generally a Monday, divers swim the complete area of the stock nets inspecting for maintenance concerns. Beginning in approximately June 2018, these net inspections are also described net cleanliness scoring reports. These reports have been produced. In addition, throughout the week, divers descend into stock nets to remove mortalities. During these dives, each diver inspects for holes in addition to inspecting for mortalities. During net cleaning, which is an ongoing process at each facility, staff operating net cleaning equipment are required to simultaneously inspect for maintenance issues with the nets, principally holes. Since approximately June 2018, net washing activities are recorded in a weekly "net hygiene summary report," which have been produced.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT COOKE AQUACULTURE, LLC -- 28
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 356**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    Divers routinely inspect the predator net for maintenance concerns on a monthly or more

2    frequent basis.  The frequency of these dives increases when any issue is suspected, including

3    floating debris or increased predator activity.  Predator nets are also routinely cleaned by site

4    staff and inspected for maintenance concerns at that time.

5    Records of predator net and stock net inspections can be found in daily logs, site dive

6    logs, weekly site reports, and/or monthly safety audits and compliance checklists, in addition to

7    being memorialized in company communications.

8    Nets are also routinely inspected after being pulled to the surface.  Vessels often become

9    involved in that process and evidence of those inspections can be found in Cooke's vessel logs.

10    Finally, stock nets were routinely sent to a third-party net maintenance company,

11    Badinotti, after each generation of fish was harvested.  As a result, only freshly cleaned and

12    maintained nets were placed into the water. Badinotti maintenance records are the best evidence

13    of the thorough inspection and maintenance performed on each net by Badinotti.

14    DATED this 27th day of February, 2019.

15

16    NORTHWEST RESOURCE LAW PLLC

17

18    */s Douglas J. Steding*
     Diane M. Meyers, WSBA #40729

19    dmeyers@nwresourcelaw.com
     206.971.1568

20    Douglas J. Steding, WSBA #37020
     dsteding@nwresourcelaw.com

21    206.971.1567
     Madeline Engel, WSBA #43884

22    mengel@nwresourcelaw.com
     206.971.1569

23

24    *Attorneys for Defendant Cooke Aquaculture Pacific,*
     *LLC*

25

26

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
29
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 357**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1

**VERIFICATION**

2 Defendant Cooke Aquaculture Pacific, LLC declares that:

3    1.    I am an official of Defendant Cooke Aquaculture Pacific, LLC.

4    2.    I have read the answers to the foregoing Defendant's Supplemental Reponses to

5 Plaintiffs First Set of Interrogatories and Requests for Production Cooke Aquaculture

6 Pacific, LLC and know the contents thereof and believe the same to be true.

7    3.    These responses were drafted from a review of company records and discussions

8 with company personnel because no individual person knows all the information

9 provided.

10    4.    I have answered these interrogatories in good faith and based on information

11 reasonably available to Cooke Aquaculture Pacific, LLC.

12

13    I declare, under penalty of perjury according to the laws of the United States, that the

14 foregoing is true and correct.

15

16    EXECUTED this 27ᵗʰ day of February , 2019, at Seattle, WA .

17

18    Cooke Aquaculture Pacific, LLC

19    By: _James E. Parsons_

20    Its: _General Manager_

21

22

23

24

25

26

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
30
Case No. 2:17-cv-01708-JCC

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**THIRD KNUTSEN DECLARATION - 358**

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2019, I served DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT COOKE AQUACULTURE, LLC to the following by email:

| *Attorneys for Plaintiff Wild Fish Conservancy* | |
|---|---|
| Brian A. Knutsen<br>Kampmeier & Knutsen, PLLC<br>*Postal Delivery Address:*<br>P.O. Box 15099<br>Portland, OR 97293<br>*FedEx, UPS, Couriers Delivery Address:*<br>221 SE 11th Avenue, Suite 217<br>Portland, OR 97214<br>503.719.5641 | brian@kampmeierknutsen.com |
| Paul A. Kampmeier<br>Emma Bruden<br>Kampmeier & Knutsen, PLLC<br>615 Second Avenue, Suite 360<br>Seattle, WA 98104<br>206.223.4088 | paul@kampmeierknutsen.com<br>emma@kampmeierknutsen.com |
| Lia Comerford<br>Kevin M. Cassidy<br>Earthrise Law Center<br>Lewis & Clark Law School<br>10015 SW Terwilliger Blvd., MSC 51<br>Portland, OR 97219<br>503.768.6736 | comerfordl@lclark.edu<br>cassidy@lclark.edu<br>earthrise-docket@lclark.edu |

Dated: February 27, 2019.

*/s Eliza Hinkes*
Paralegal

DEFENDANT'S SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT COOKE AQUACULTURE, LLC --
31
Case No. 2:17-cv-01708-JCC
**THIRD KNUTSEN DECLARATION - 359**

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

# EXHIBIT 9

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2               FOR THE WESTERN DISTRICT OF WASHINGTON
                                AT SEATTLE
 3   _____

 4                                   )
     WILD FISH CONSERVANCY,          )
 5                                   )
                     Plaintiffs,     )
 6                                   )
                   vs.               )      No. 2:17-cv-01708-JCC
 7                                   )
     COOKE AQUACULTURE PACIFIC, LLC,)      SOME OF THE EXHIBITS AND
 8                                   )      THE TESTIMONY REGARDING
                     Defendant.      )      THEM HAVE BEEN DESIGNATED
 9                                   )      AS CONFIDENTIAL.
     _____
10

11          30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

12               COOKE AQUACULTURE PACIFIC, LLC

13                       IN THE PERSON OF

14                       JAMES PARSONS

15                          Volume II
     _____
16

17                         9:05 a.m.
                         March 1, 2016
18
                      101 Yesler Way, Suite 205
19                    Seattle, Washington 98104

20

21

22

23

24   REPORTED BY: JACQUELINE L. BELLOWS, CCR 2297

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 361

```
 1                  Seattle, Washington; March 1, 2016

 2                          9:05 a.m.

 3                          --oOo--

 4

 5             JAMES PARSONS, still under oath,

 6                  testified as follows:

 7

 8             E X A M I N A T I O N

 9             MS. COMERFORD:  On the record.

10             THE WITNESS:  The first clarification was that

11   the daily logs actually began in 2014.  So any time

12   before that, things were often recorded on a wall

13   calendar at the sites that was thrown away.  So the

14   daily records that we have moving forward is from 2014.

15   Then the company that is doing the analysis of the

16   mooring systems, the engineering firm, is Dynamic

17   Systems Analysis out of BC.

18        Q    (By Ms. Comerford) You said Dynamic Systems?

19        A.   Yes, DSA.

20        Q.   An acronym.

21        A.   Yeah.

22        Q.   So can you tell what is Dynamic Systems?  What

23   have they been retained to do specifically?

24        A.   So they deployed acoustic Doppler current

25   measurement equipment for 40 days at each site to
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 362

1      Q.    Do you know whether or not a hole large enough

2    for a seal or a sea lion would be large enough for

3    Atlantic salmon to escape?

4      A.    It would depend on the size of the salmon.  If

5    they were newly introduced smolts, it's possible,

6    although, again, the likelihood of it occurring in that

7    particular way would be very low.

8      Q.    Has Cooke identified a large breach in its

9    containment nets in the last five years?

10     A.    No.  Other than Cypress Site 2.

11           MR. KNUTSEN:  Take a break?

12           (Recess taken.)

13     Q    (By Mr. Knutsen) Let's see.  I think we left

14   off talking about changes to the fish tracking that were

15   implemented with the 2018 update to the plan.  I believe

16   you said there were no changes to those protocols.

17     A.    To the fish-tracking protocols.

18     Q.    Yesterday, we had a bit of discussion about

19   inspections that occurred prior to 2017 of underwater

20   anchoring components --

21     A.    Yes.

22     Q.    -- that were at a depth of greater than 100

23   feet.  You stated that Cooke could conduct those

24   inspections by going down to 100 feet and being able to

25   identify whether work needed to be done or not?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 363

```
 1       A.    Yes.
 2       Q.    How is that done?  How can you identify
 3  whether work needs to be done on components that are
 4  greater than 100 feet by going down to 100 feet?
 5       A.    Typically, if -- I mean the way that a mooring
 6  line responds under load in a current is fairly similar
 7  every day.  So the divers and the site management is
 8  very familiar with how their facilities should be
 9  responding to current.  That can actually be done.
10  Problems can be notified -- or identified from the
11  surface.  So that's why the weekly surface monitoring is
12  so important.
13            That said, as a diver descends and looks at
14  the components that they are able to see, a majority of
15  the components that they can inspect down to 100 feet
16  are the components that are going to have problems with
17  oxidation.  There's so little oxygen in the water below
18  100 feet -- and typically the anchors are submerged in
19  mud anyway -- that there's going to be very little
20  degradation of the components at that point in time.
21            They can be periodically raised for inspection
22  by the vessels.  And now the addition that was made in
23  the October 2017 Pollution Prevention Plan requires that
24  either a contracted dive service dive to that depth or
25  we review them with an ROV.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 364

1       Q.    So my understanding of what you just stated is

2    that items that are below 100 feet degrade at a much

3    slower rate.

4       A.    Yes.

5       Q.    Is Cooke or Cooke's predecessor able to

6    discern whether the extent of degrading that has

7    occurred for components below 100 feet by inspecting

8    components above 100 feet?

9       A.    Assuming, again, that the mooring equipment

10   was all installed new at the same time, which is fairly

11   typical, the components above and below would be the

12   same age.  Again, the majority of the components,

13   anyway, are above 100 feet.  And it's the final anchor

14   shackle and the chain that lies below 100 feet.

15            Most of those actually can be observed with

16   the exception of the Port Angeles facility.  They can

17   observe that under the right clarity conditions of

18   water.

19      Q.    So the way that Cooke determines and Cooke's

20   predecessor, because a lot of those inspections occurred

21   prior to Cooke's acquisition of the facilities, Cooke

22   was -- the predecessor was able to discern whether or

23   not components below 100 feet needed to be repaired or

24   replaced by visually inspecting the extent of

25   degradation of components greater than 100 feet?



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.    And by visually -- greater than 100 feet?

 2        Q.    By visually inspecting components less than

 3   100 feet.

 4        A.    Less than 100 feet?  As you saw in the

 5   May 2017 incident at Clam Bay, they also would

 6   periodically bring all of the anchor components up in

 7   rotation to inspect those anchoring components.  That

 8   was routine inspection of anchors that was ongoing at

 9   that time.

10        Q.    Is one of the primary things that Cooke is

11   inspecting anchor components for, corrosion?

12        A.    Yes, that's one of the components.

13        Q.    Is there any threshold of material loss

14   through corrosion at which Cooke will repair or replace

15   a component, anchoring component specifically?

16        A.    For surface and near-surface components,

17   typically the first red flag occurs at a loss of

18   approximately 20 percent of material.  For deeper

19   components, I'm assuming that it would be the same.

20   I've never seen a standard for that.  Again, those would

21   rarely get that far.

22        Q.    So what your testifying to is that -- you said

23   a "red flag."  By that do you mean at a 20 percent loss

24   due to corrosion of anchoring components, Cooke would

25   replace that component?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 366**

1    information is available certainly.

2              MR. KNUTSEN:  Let me take a five-minute break

3    and hopefully wrap it up pretty quickly.

4              MS. MEYERS:  Sure.

5              (Recess taken.)

6              MR. KNUTSEN:  Mr. Parsons, I don't have any

7    further questions today.  We appreciate your time in the

8    last two days.

9              Ms. Meyers, do you have any questions for the

10   witness?

11             MS. MEYERS:  I don't believe I have any

12   questions for the witness.

13             MR. KNUTSEN:  Again, thank you for your

14   patience the last couple days.

15             We do reserve our right to ask the Court to

16   reopen this deposition due to the witness's inability to

17   answer several questions noticed.

18             But we certainly appreciate your time the last

19   two days.

20             THE WITNESS:  Just for the record, I believe I

21   answered all the questions that were noticed.

22        Q    (By Mr. Knutsen) I'm sorry.  Can we ask one

23   more question before we go off the record?

24        A.   Absolutely.

25        Q.   You were going to look at an ap, I believe.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 367

```
 1        A.   Yes.  It's called Windy, W-I-N-D-Y.

 2             MR. KNUTSEN:  With that, I think we'll be

 3   done.

 4             (Signature was reserved.)

 5             (Deposition concluded at 4:11 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**THIRD KNUTSEN DECLARATION - 368**

```
 1                    REPORTER'S CERTIFICATE

 2           I, JACQUELINE L. BELLOWS, the undersigned

 3  Certified Court Reporter pursuant to RCW 5.28.010 authorized

 4  to administer oaths and affirmations in and for the State of

 5  Washington, do hereby certify that the sworn testimony

 6  and/or proceedings, a transcript of which is attached, was

 7  given before me at the time and place stated therein; that

 8  any and/or all witness(es)were duly sworn to testify to the

 9  truth; that the sworn testimony and/or proceedings were by

10  me stenographically recorded and transcribed under my

11  supervision, to the best of my ability; that the foregoing

12  transcript contains a full, true, and accurate record of all

13  the sworn testimony and/or proceedings given and occurring

14  at the time and place stated in the transcript; that a

15  review of which was requested; that I am in no way related

16  to any party to the matter, nor to any counsel, nor do I

17  have any financial interest in the event of the cause.

18                    WITNESS MY HAND AND DIGITAL SIGNATURE this

19  11th day of March, 2019.

20

21

22

23  Jacqueline L. Bellows
    Washington State Certified Court Reporter, No. 2297
24  jbellows@yomreporting.com

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

THIRD KNUTSEN DECLARATION - 369