HONORABLE JOHN C. COUGHENOUR

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

      Plaintiff,

v.

COOKE AQUACULTURE PACIFIC, LLC,

      Defendant.

Case No. 2:17-cv-01708-JCC

FOURTH DECLARATION OF BRIAN A. KNUTSEN

I, Brian A. Knutsen, declare the following on the basis of personal knowledge to which I am competent to testify:

1.      I am co-counsel for Plaintiff Wild Fish Conservancy in this litigation;

2.      Attached hereto as Exhibit 1 is a true and accurate copy of the Fact Sheet for NPDES Permit WA-003157-7 for Site 2 – Deepwater Bay (excerpts) that I downloaded from the following website maintained by the Washington Department of Ecology ("Ecology"): https://fortress.wa.gov/ecy/paris/DocumentSearch.aspx;

3.      Attached hereto as Exhibit 2 is a true and accurate copy of the Notice of Appeal Under RCW 79.02.030 and Complaint for Declaratory and Injunctive Relief and Damages filed

**FOURTH KNUTSEN DECLARATION - 1**

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

by Cooke Aquaculture Pacific, LLC ("Cooke") (Mar. 1, 2018), including as Exhibit A to that

pleading the lease for Cooke's commercial salmon farms at Cypress Island, that was provided to

me by the Washington State Attorney General's Office;

4.      Attached hereto as Exhibit 3 is a true and accurate copy of the Joint Aquatic

Resources Permit Application Form submitted by Cooke for the Replacement and Reorientation

of Existing Deepwater Bay – Site 2 Floating Salmon Net Pen Aquaculture Structure and

Moorings (Feb. 2, 2017) (excerpts) that I downloaded from the following website maintained by

the Washington State Department of Natural Resources ("DNR"):

https://www.dnr.wa.gov/atlanticsalmon;

5.      Attached hereto as Exhibit 4 is a true and accurate copy of the transcript of the

30(b)(6) Deposition Upon Oral Examination of Cooke Aquaculture Pacific, LLC in the Person of

James Parsons Volume I taken on February 28, 2019 (excerpts) and the documents marked

exhibit 1 and exhibit 21 at that deposition;

6.      Attached hereto as Exhibit 5 is a true and accurate copy of the transcript of the

30(b)(6) Deposition Upon Oral Examination of Cooke Aquaculture Pacific, LLC in the Person of

James Parsons Volume II taken on February 28, 2019 (excerpts);

7.      The following exhibits are true and accurate copies of documents produced to me

on behalf of Defendant Cooke through formal discovery in this litigation:

a.      Exhibit 6: Letter dated December 18, 2017 from Douglas Steding, counsel

for Cooke, to Rich Doenges, Ecology;

b.      Exhibit 7: Letter dated August 25, 2017 from Sean Carlson, DNR, to Innes

Weir, Cooke;

c.      Exhibit 8: Letter dated September 1, 2017 from Douglas Steding, counsel

**FOURTH KNUTSEN DECLARATION - 2**

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

for Cooke, to Sean Carlson, DNR;

d.      Exhibit 12: Email dated February 7, 2019 from Kevin Bright, Cooke, to Kenneth Warheit, Washington State Department of Fish and Wildlife, submitting Plans of Operation for Finish Permit;

e.      Exhibit 13: Cooke's Finfish Aquaculture Permit – Plan of Operation, Atlantic Salmon (Salmo salar) Rearing (Rev. Jan. 18, 2019);

f.      Exhibit 14: Cooke's Finfish Aquaculture Permit – Plan of Operation, All-female Triploid Rainbow Trout (Oncorhynchus mykiss) (Rev. Jan. 18, 2019);

8.      The following exhibits attached hereto are submitted under Federal Rule of Evidence 902(1):

a.      Exhibit 9: Letter dated September 15, 2017 from Richard Doenges, Ecology, to Innis Weir, Cooke, including attached Agreed Order;

b.      Exhibit 10: Letter dated January 30, 2018 from Heather Bartlett, Ecology, to Kevin Bright, Cooke, including attached Notice of Penalty;

c.      Exhibit 11: Letter dated January 15, 2019 from Neil Wise, Presiding Officer of the Washington State Pollution Control Hearings Board, to Douglas Steding, counsel for Cooke, and Ronald Lavigne, counsel for Ecology, including attached Fourth Amended Prehearing Order;

d.      Exhibit 15: Letter dated December 12, 2017 from Richard Doenges, Ecology, to Kevin Bright, Cooke, including attached Administrative Order and Notice of Penalty;

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**FOURTH KNUTSEN DECLARATION - 3**

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

Executed this 1st day of April, 2019.

                   s/ Brian A. Knutsen
                   Brian A. Knutsen, WSBA No. 38806

**FOURTH KNUTSEN DECLARATION – 4**

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

# EXHIBIT 1

# FACT SHEET FOR NPDES PERMIT

# WA-003157-7

American Gold Seafoods, LLC

Site 2 – Deepwater Bay

Page 5 of 25

# FACILITY INFORMATION

| | |
|---|---|
| Facility Name: | Site 2 – Deepwater Bay, WA-003157-7 |
| Operator Name and Mailing Address: | American Gold Seafoods, LLC<br>1201 11th Street<br>P.O. Box 669<br>Anacortes, WA  98221 |
| Owner Name and Address: | Same as above |
| Contact Person: | Mr. Bill Jones, Chief Operating Officer, 206-243-9650<br>Mr. Kevin Bright, Permit Coordinator, 360-293-9448 |
| Type of Facility: | Marine Atlantic Salmon Net Pen |
| Facility Location: | Deepwater Bay, Bellingham Channel near Cypress Island |
| Waterbody ID Number: | WA-PS-0010 |
| SIC Code: | 0273 |

The applicant proposes to continue operation of a marine salmon net pen facility for raising salmon for eventual harvest and market sale.

Facility Location:
Waterway ......................................................................................Bellingham Channel
County................................................................................................................. Skagit
Latitude ............................................................................................. 48° 33'25.6" N
Longitude ......................................................................................... 122° 41' 05" W
Section, Township, Range ....................................................... Sect. 04, T35N, R1E

Facility and Site Information:
Length of aggregate net pen rearing area......................................................440 feet
Width of aggregate net pen rearing area ........................................................190 feet
Minimum distance between bottom of net pens and sea floor at MLLW………….. ......15 feet
Minimum depth at site at MLLW ....................................................................55 feet
Estimated maximum velocity (midway between the bottom of the net pen
   and the sea floor in cm/sec) .................................................................... 27 cm/sec

Facility Operating Information:
Length of yearly operation (months) ....................................................................12
Maximum net pounds of annual fish production .......................................3,000,000
Month of maximum feeding ...........................................................................January
Maximum monthly feed (lbs) ......................................................... 320,000 pounds

Feed additives, disease-control chemicals, and medications that **may** be used at the facility:
Antioxidants, Terramycin TM-100, Romet 30, Canthaxanthin, Astaxanthin

Net cleaning methods, disposal or treatment of net foulants, the frequency of cleaning:
The net cleaning best management practices are described in the Pollution Prevention Plans prepared for the current permit.  This plan is available at the regional offices.  American Gold Seafoods, LLC uses Flexgard XI® net coating to reduce the rate of marine growth on the nets, thus requiring less frequent cleaning and less drag on the net pen systems.

Chemicals used at site:
Occasionally chlorine and iodine are used as disinfectants for dive nets and equipment, typically less than five gallons per site annually.  Finquel® MS222 is rarely used as a fish anesthetic and is disposed of according to label instructions, and not to surface water.

Gasoline, diesel, oil products, and batteries are used at the facilities.  Secondary containment is provided for all chemicals.  Spill kits are located at each site.

Page 9 of 25

*DISCHARGE CHARACTERIZATION*

The wastes discharged from this facility may contain the following potential pollutants: fish feed provided to and not eaten by fish, organic fish wastes (feces), disease control medications (administrated through the feed), and marine fouling organisms displaced during the maintenance of nets.

The primary water quality concerns which may result from this operation are increased nutrient loadings and sediment organic enrichment. Inorganic nutrients (especially nitrates) are a cause of organic enrichment because they are converted to organic matter by phytoplankton which can result in excessive phytoplankton growth (blooms) in nutrient sensitive waters. Ecology's consultants (SAIC, 1986) rated all subareas of Puget Sound and no commercial net pens are located in nutrient-sensitive waters. All pens are located in areas of naturally abundant nutrients and it is the sunlight, not nutrients, that control algal dynamics in these areas (EPA, 1991). Several studies and reports have concluded that no measurable effect on phytoplankton production near salmon farms can be found (NOAA Technical Memorandum, NMFS-MWFSC-53).

The following categories of conventional and nonconventional pollutants are based on federal NPDES regulations (40 CFR 401.16):

Nonconventional pollutants: turbidity, disease control medications (Romet 30 and Oxytetracycline), nutrients (including nitrogen compounds), and settleable solids.

Conventional pollutants: Biochemical oxygen demand (BOD), total suspended solids (TSS), pH, fecal coliform, oil and grease.

*SEPA COMPLIANCE*

Ecology conducted review under the State Environmental Policy Act (SEPA) and issued Determinations of Non-Significance for the net pen permits issued in 1996. Ecology also concluded that the previously permitted facility had complied with SEPA requirements at the local level. Subsequently, the PCHB ruled (and was affirmed by the Thurston County Superior Court) that these marine salmon net pen facilities are categorically exempt from the SEPA alternatives analysis. Ecology has therefore determined that the reissuance of this permit is categorically exempt from SEPA pursuant to RCW 43.21C.0383. In January 1996, Ecology adopted sediment impact standards for marine net pen facilities to specifically address the sediment issues.

*EVALUATION OF TSITIKA RIVER DATA*

The PCHB conditioned renewal of the previous net pen permits on a thorough review and evaluation of the 1998 Tsitika River data regarding Atlantic salmon, together with all other relevant information and a determination whether additional permit conditions were required to regulate the release of Atlantic salmon as a pollutant (Order Granting Reconsideration, PCHB No. 96-257).

Based on the Atlantic Salmon Watch Program, which has been active for over ten years, global attempts at Atlantic salmon introductions have been unsuccessful. A sampling and testing program in place in British Columbia indicates that Atlantic salmon escapements, failed to establish self-sustaining runs outside of their native ranges. Escaped adult Atlantic salmon have spawned in British Columbia rivers. Small populations of juvenile Atlantic salmon that appear to have come from these spawning events have been found, but there is no proof that the progeny from escaped Atlantic salmon are surviving to return as adults.

**FOURTH KNUTSEN DECLARATION - 8**

Page 10 of 25

Washington State Department of Fish and Wildlife was directed in Second Substitute House Bill 1499 to develop rules to implement, administer, and enforce marine finfish aquaculture programs. These rules, codified under WAC 220-76, include provisions for development of best management practices (BMPs), to include use of net pen antifoulants, to prevent escapement, and to allow the recapture of Atlantic salmon from net pens.  These rules, in addition to the Fish Release Prevention and Monitoring Plan, Accidental Fish Release Response Plan, and BMPs required in this permit, are intended to regulate and minimize escapement of Atlantic salmon as pollutants.

**Atlantic Salmon Escapements/Releases**

Attempts have been made by fish and wildlife agencies during the 20th century to introduce and establish Atlantic salmon in Washington without success.

Annual escapes in British Columbia have been documented by the B.C. Atlantic Salmon Watch Program at over 60,000 fish per year in the 1990's.  In 1998-1999, naturally-produced Atlantic salmon were discovered in streams in Vancouver Island, BC (Volpe, 2000).  Annual escapes in Washington in 1996, 1997, and 1999 from catastrophic events resulted in the escape of 107,000, 369,000, and 115,000 Atlantic salmon, respectively.  Scientific evidence prior to 1998 indicated Atlantic salmon were not colonizing local watersheds and were not significantly impacting native fish.  Recent stream surveys and the results of the required Atlantic salmon marking program, show that natural spawning of Atlantic salmon is not occurring in Washington waters.  AGS reported only one escapement event between 2000-2006.  About 24,550 fish escaped in 2005.

New regulations (WAC 220-76) effective July 1, 2003, along with operational changes within the industry, are expected to reduce the risk of future releases of Atlantic salmon into marine waters. WDFW conducts surveys in fresh water areas to quantify and assess the potential impacts of Atlantic salmon escapes from all sources.  The Pacific States Marine Fisheries Commission provides grant money to WDFW to survey selected freshwater streams throughout Washington.  In streams where Atlantic salmon are found, established procedures are followed to estimate abundance and distribution.  Reported sightings in watersheds will be followed up by WDFW staff to confirm their presence and document spawning, rearing, or other elements of colonization.

WDFW currently conducts tagging of all Atlantic juveniles raised at the upland hatchery that feeds all the AGS net pens.  All of the fish in the pens are therefore marked.  WDFW mandates a recovery program for any escaped Atlantic salmon (chapter 220-76 WAC).

## PROPOSED PERMIT LIMITATIONS AND CONDITIONS

Federal and state regulations require that effluent limitations set forth in an NPDES permit must be either technology- or water quality-based.  Technology-based limitations are based upon the treatment methods available to treat specific discharges.  Technology-based limitations are set by regulation or developed on a case-by-case basis (40 CFR 125.3, and chapter 173-220 WAC). Water quality-based limitations are based upon compliance with the Surface Water Quality Standards (chapter 173-201A WAC) or Sediment Management Standards (chapter 173-204 WAC).  The more stringent of these two limits must be chosen for each of the parameters of concern.  Each of these types of limits is described in more detail below.

# EXHIBIT 2

**FILED**

MAR 0 1 2018

Superior Court
Linda Myhre Enlow
Thurston County Clerk

SUPERIOR COURT OF WASHINGTON FOR THURSTON COUNTY

| | |
|---|---|
| COOKE AQUACULTURE PACIFIC, LLC, | 18-2-01245-34 |
| Appellant-Plaintiff, | Case No.   18-2-01239-34 |
| v. | NOTICE OF APPEAL UNDER RCW 79.02.030 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES |
| WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, and HILARY FRANZ, the Washington Commissioner of Public Lands, | |
| Respondents-Defendants. | |

Plaintiff Cooke Aquaculture Pacific, LLC ("Cooke Pacific" or "Cooke"), by and through

its undersigned attorneys, submits this Complaint seeking declaratory and injunctive relief as

well as damages, and avers as follows:

## NATURE OF THE ACTION

1.      Plaintiff Cooke Pacific is part of the Cooke Aquaculture companies, a family-

owned group of businesses based in Canada that is a worldwide leader in both aquaculture and

wild fisheries.  Cooke Aquaculture is a global leader and innovator in aquaculture technology

and practices and has partnered with universities and research organizations around the world in

researching and improving sustainable aquaculture practices.

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 1

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 11

1    2.      In June 2016, Cooke Aquaculture, through a wholly-owned subsidiary, purchased

2    American Gold Seafood ("AGS"), a company that had been operating multiple Atlantic salmon

3    fish farms in the Puget Sound area, including three sites at Deepwater Bay near Cypress Island.

4    Upon purchasing AGS (which was renamed Cooke Aquaculture Pacific, LLC), Cooke

5    immediately began to invest in upgrading and improving the old AGS facilities. In the less than

6    two years since it acquired AGS acquisition, Cooke Aquaculture has already invested over $6

7    million in capital upgrades and has recently committed to spend an additional $1.6 million to

8    continue to upgrade the Cooke Pacific facilities and operations.

9    3.      In contrast to Cooke Aquaculture, which commenced operations in this State less

10   than two years ago in 2016, Washington State Department of Natural Resources ("DNR") and

11   other Washington State agencies have a long history of regulating the Deepwater Bay facilities,

12   which were first installed in 1984. DNR is the state agency through which the State of

13   Washington leases the area in Deepwater Bay to the various companies that have been operating

14   fish farms there over the last 30 years. During that time, DNR has considered numerous

15   applications by prior owners of the Deepwater Bay fish farm to replace or modify their net pen

16   structures and has conducted numerous inspections and site visits to the Deepwater Bay

17   facilities. Indeed, in 2016, DNR approved the transfer of the AGS' Deepwater Bay lease, which

18   expires on December 31, 2023, to Cooke in connection with Cooke's acquisition of AGS.

19   4.      One of the first capital improvement plans that Cooke initiated after the AGS

20   purchase in 2016 was to replace the net pen structure at the Deepwater Bay Site 2 facility. The

21   net pen at Deepwater Bay Site 2 had been installed in 2001, and at the time of the acquisition it

22   was 15 years into an estimated 20-year life span. Because the net pens were stocked with fish at

23   the time, Cooke planned to replace the Deepwater Bay Site 2 net pen facility as soon as the fish

24   in Site 2 were harvested in September 2017. Accordingly, in February 2017, Cooke submitted

25   an application to various state and federal agencies seeking permission to replace the Deepwater

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND               NORTHWEST RESOURCE LAW PLLC
INJUNCTIVE RELIEF AND DAMAGES -- 2          101 Yesler Way, Suite 205
                                            Seattle, WA 98104
                                            206.971.1564

FOURTH KNUTSEN DECLARATION - 12

1   Bay Site 2 structure with newly manufactured pens meeting the current state of the art, once the

2   existing pens were emptied in September.

3       5.      In July 2017, little more than a year after Cooke Aquaculture acquired AGS and

4   mere months prior to its planned replacement, the net pen structure at Deepwater Bay Site 2

5   came unmoored during a period of strong tidal currents. Cooke took immediate corrective action

6   and ultimately saved the net pen structure. Directly following this incident, Cooke re-inspected

7   and replaced mooring hardware, strengthened the net pen structure, and implemented an

8   aggressive and comprehensive program of cleaning the underwater nets that contained the fish at

9   the site.

10      6.      Despite these improvements, Site 2 came unmoored again in August 2017. And

11  despite around-the-clock efforts by Cooke personnel and professionals that Cooke hired to assist

12  in the recovery efforts, including multiple tug boats and professional divers, the net pen structure

13  could not be saved, and Atlantic salmon escaped from the collapsed site into Puget Sound.

14  Following the collapse, Cooke has worked cooperatively and in good faith with various

15  governmental agencies, including DNR, in responding to various requests and taking whatever

16  additional steps may be deemed necessary to respond to this escape.

17      7.      In the months since the August 2017 incident, fish farming has become a political

18  "hot button" issue in the State of Washington. Multiple advocacy groups, including several

19  Native American tribes and sport and commercial fisherman, have spoken out vigorously against

20  fish farming, and legislation is pending that threatens to eliminate the farming of Atlantic salmon

21  altogether in Washington.

22      8.      On February 2, 2018, in the midst of this public sentiment, DNR provided Cooke

23  with a notice of termination of its lease at Deepwater Bay. The Notice lists four specific

24  breaches of the Lease Agreement. DNR, however, has been or should have been aware of each

25  of these alleged defaults for years, if not decades, as the underlying conditions at issue were

26  present long before Cooke acquired the Deepwater Bay facility.

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 3

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 13**

9.      For example, DNR claims that Cooke has breached the Lease by installing an office platform at the Site in violation of Section 7.2, which prohibits new improvements without DNR's written consent.  The office platform, however, was installed by a former owner of the facility and has been in place since at least 1988.  DNR has therefore either been aware of the office platform or has been grossly negligent during its inspections and site visits by failing to notice the office (which is obvious to any observer) for nearly 30 years.

10.     As another example, DNR claims that Cooke has breached the Lease by employing anchor lines at Site 1 that extend past the lease boundaries.  Again, however, Cooke has determined that one of the former owners of the Deepwater Bay facility fully informed DNR that the anchors were located outside of the lease area at least as far back as 2009, when it provided written notice to DNR of the anchor line placements in connection with a reorientation of Site 1.

11.     To the best of Cooke's knowledge, DNR has never raised any concerns or provided any notice of default to any of the prior owners of the Deepwater Bay facility (or to Cooke) regarding the alleged defaults.  As such, DNR has either waived such alleged breaches or they are now time barred.

12.     DNR's termination of the Deepwater Bay Lease is based on conditions that DNR knew, or should have known, existed at the Deepwater Bay facility long before Cooke acquired the facility in 2016.  Since the acquisition, Cooke has consistently worked to improve the conditions at Deepwater Bay and the other facilities that it purchased from AGS, investing millions of dollars in capital improvements.  DNR's termination is not only without legal justification, it is fundamentally unfair and violates Cooke's due process rights.

13.     Accordingly, Cooke submits this appeal of the Washington Commissioner of Public Lands' decision to terminate the Deepwater Bay Lease under RCW 79.02.030.  Cooke respectfully requests that the Court issue a declaration under RCW Ch. 7.24 that Cooke is not in default of the Lease, that DNR's purported termination of the Lease is invalid, null and void, and

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 4

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 14

1    that DNR has no right to terminate the Lease.  Cooke seeks preliminary and injunctive relief as

2    necessary to allow Cooke to continue operating its salmon farms in Deepwater Bay during the

3    pendency of this litigation.  Finally, Cooke seeks invalidation of DNR's purported termination of

4    the Lease as violation of its procedural and substantive due process rights under the United

5    States and Washington constitutions, as well as damages under 42 U.S.C. § 1983.

6                                          **PARTIES**

7           14.     Cooke Aquaculture Pacific, LLC is a Washington limited liability company

8    whose principal place of business is in Seattle, Washington.  Cooke is a wholly owned subsidiary

9    of Glenn Cooke AGS Holdings, Inc. ("Cooke AGS"), a member of a family of companies based

10   in Canada, which through its various subsidiaries is a global seafood leader in both aquaculture

11   and wild fisheries.  Cooke now owns and operates the eight commercial salmon farms in the

12   State of Washington, which in 2016 produced approximately 14.6 million pounds of dressed,

13   head-on salmon.  Three are located in Deepwater Bay near Cypress Island in Skagit County, and

14   are operated on aquatic lands leased from the Washington Department of Natural Resources

15   under Aquatic Lands Lease No. 20-B12517 ("the Lease").  The Lease is attached to this

16   Complaint as **Exhibit A**.

17          15.     The Washington Department of Natural Resources ("DNR") is an agency of the

18   State of Washington.  It manages aquatic lands held in trust by the State of Washington in a

19   proprietary capacity.

20          16.     Hilary Franz is the elected Washington Commissioner of Public Lands

21   ("Commissioner").  Under RCW 43.30.105, Franz is the administrator of DNR.  All decisions by

22   DNR regarding the purported termination of the Lease described below were done at her

23   direction and under her control.

24

25

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 5

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 15**

1

<div align="center">

**VENUE**

</div>

2          17.     Under RCW 4.92.010, an action against the State of Washington may be brought

3   in the county where the cause of action arose, or in which the real property that is the subject of

4   the action is situated, as well as in Thurston County.

5          18.     Section 18.10 of the Lease provides in part that: "Venue for any action arising out

6   of or in connection with this Lease is in the Superior Court for Thurston County, Washington."

7

<div align="center">

**FACTS**

</div>

8      A. **Deepwater Bay**

9          19.     Salmon farms in the State of Washington are subject to intense regulation by

10  multiple agencies, including: the Washington Department of Ecology ("Ecology"), which is

11  responsible for issuing National Pollutant Elimination System ("NPDES") permits for the

12  salmon farms; the Department of Fish & Wildlife ("WDFW"), which is responsible for

13  registering all aquaculture farms in Washington State, including private hatcheries and salmon

14  net pens;  and the U.S. Food and Drug Agency ("FDA"), which has regulatory authority over the

15  type and use of approved aquatic animal disease control chemicals.

16          20.     There are currently eight commercial salmon farms in the State of Washington –

17  three located in Deepwater Bay near Cypress Island in Skagit County, one located near Hope

18  Island in Skagit County, one located in Port Angeles harbor in Clallam County, and three located

19  in Rich Passage off the south end of Bainbridge Island in Kitsap County.  Those farms are each

20  located on aquatic land, which is leased under long-term leases from DNR.  Two of the

21  Deepwater Bay farms were established in 1984 (Site 1 and Site 2).  The third (Site 3) was

22  established in 1987, under different ownership.  All three have been operated for more than 30

23  years, by a series of different owners, under a series of renewed leases from DNR. Cooke

24  currently employs 13 people at Deepwater Bay farms, as well as seven employees in supervision

25  of all eight farms. Employees at the Deepwater Bay farms have from one to twelve years of

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 6

<div align="center">

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

</div>

**FOURTH KNUTSEN DECLARATION - 16**

1    tenure, and managers have up to 30 years of experience interacting with DNR and other

2    regulatory authorities.

3         21.    These farms were initially established by smaller local companies, with limited

4    capital available.  Over time, the ownership of the farms was consolidated under a single owner.

5    In 2007, all eight farms were purchased by Icicle Seafoods, Inc. which at the time was a Seattle-

6    based company engaging in ocean fishing and seafood processing in Alaska.  The salmon farms

7    operated as Icicle Acquisition Subsidiary, LLC, d/b/a American Gold Seafoods ("American

8    Gold").

9         **B.  Cooke's Acquisition of American Gold**

10        22.    In June 2016, Cooke AGS purchased American Gold.  As required by the Lease,

11   DNR approved the acquisition.  The acquisition of American Gold was valued at $70 million.

12   Following the acquisition by Cooke AGS, the name of American Gold was changed to Cooke

13   Aquaculture Pacific, LLC.  At the time of its acquisition, Cooke recognized that certain facilities

14   at the existing farms required additional investment to bring them up to current industry

15   standards, and it purchased the farms fully intending to make those investments.  Cooke has done

16   so in other regions, investing significantly in its Maine operations since acquiring them more

17   than a decade ago, and, more recently, acquiring operations in Scotland and investing in those

18   facilities.

19        23.    At the time Cooke acquired the Washington salmon farms, they were fully

20   operational, meaning that all farms were stocked with fish at various stages of growth.

21   Deepwater Bay Site 1 had fish that were placed in the pens in May and June 2016 and would not

22   be harvested until September through December 2017.  Eggs for the Site 1 fish went into the

23   hatchery in April 2015, where they were grown for twelve to fourteen months, vaccinated, and

24   transferred to the net pens.  Deepwater Bay Site 2 had fish that had been placed in the pens in

25   mid-May 2016 and would not be harvested until September through November of 2017.  The

26   eggs for the Site 2 fish had also been placed in the hatchery in April 2015, where they had been

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 7

**NORTHWEST RESOURCE LAW PLLC**
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 17**

1   grown for approximately 13 months, vaccinated, and transferred to those net pens.  Deepwater

2   Bay Site 3 had fish that had been placed in the pens in mid-March of 2016 and would not be

3   harvested until July through November of 2017.  The eggs for the Site 3 fish had been placed in

4   the hatchery in February 2015, where they had been grown for thirteen months, vaccinated, and

5   transferred to those net pens.

6       24.    At the time Cooke acquired the Washington salmon farms, it knew that

7   Deepwater Bay Site 2 was nearing the end of its useful life.  Accordingly, Cooke made plans to

8   replace it as soon as the fish in the Site 2 net pens were harvested in September 2017.  On

9   February 2, 2017, Cooke submitted a Washington State Joint Aquatic Resources Permit

10  Application ("JARPA") to DNR and other agencies requesting permission to replace the Site 2

11  structure, candidly disclosing that existing fish pen structure was "used and nearing the end

12  of serviceable life," had been "in service for approximately 16 years in the marine

13  environment and [was] due for complete replacement," and that  "corrosion on the metal

14  walkway grating and substructures [was] beginning to accelerate" and "the metal hinge joints in

15  some areas [were] showing signs of excess wear."  Cooke also requested permission to re-orient

16  the new structure in a new position to align the narrow ends of the rectangular-shaped farm with

17  the prevailing currents at the Site to substantially reduce the draft loads exerted on the nets and

18  structure.

19       C.  **July and August 2017 Incidents at Site 2**

20       25.    On July 24, 2017, during a peak flood tide in the early evening, and again on July

21  25, 2017, the cages of Site 2 moved significantly.  Several anchors dragged and the anchor

22  mooring points for ten anchors broke.  Cooke staff responded immediately, called in additional

23  help, including two tug boats, to hold the cages and return them to place, and worked through the

24  night for two nights until the cages were returned to position, anchor points were repaired, and

25  anchors were reset and held.  Cooke checked all the nets to confirm that no nets had been

26  breached and no fish had escaped.

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 8

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 18**

1    26.    After the pens were secured, Cooke took steps to reinforce the structure, including

2  replacing mooring points (pad eyes) and adding chains and shackles to strengthen and reinforce

3  the structure. Cooke also brought additional net washing equipment to the site from other

4  locations within Puget Sound. Cooke implemented an aggressive and comprehensive net

5  cleaning schedule and cleaned all the nets on Site 2 to reduce potential drag on the nets.

6    27.    Cooke took all reasonable steps to secure Site 2 after the July incident, including

7  strengthening and repairing the net pen structure and cleaning the Site 2 nets.

8    28.    Despite these actions, on August 19, 2017 during a flood tide, the moorings on

9  Site 2 failed again. This time, the structure buckled, and the net pens collapsed on themselves.

10  Despite Cooke's best efforts, Site 2 was destroyed. Approximately 160,000 Atlantic salmon

11  escaped. Another 5,166 were removed from the pens and harvested. Approximately 140,000

12  were asphyxiated in the collapsed pens and later removed, counted, and composted.

13    29.    Cooke's response to the August 19 failure was swift, comprehensive, and fully

14  cooperative with state agencies. Cooke promptly retained the assistance of numerous third

15  parties, including Global Diving and Salvage ("Global"), the leading firm in the region for diving

16  and salvage operations, and worked tirelessly to stabilize the site, extract the remaining fish,

17  salvage the collapsed cages and take them to an upland facility where they could be examined, as

18  well as remove debris that had reached the shore or seafloor. Cooke enabled personnel from

19  DNR, WDFW, Ecology, and Native American tribes to be present and observe all its salvage

20  operations. It worked with the tribes to encourage them to attempt to recapture escaped salmon.

21  The tribal fishermen captured approximately 45,000 escaped fish, for which Cooke paid them a

22  total of more than $1.3 million. When the nets were salvaged and the fish within them were

23  removed, Cooke tallied the fish as they were being removed, allowed agency staff access to

24  observe that tally process, and provided daily tallies to the agencies. After Ecology, WDFW,

25  and DNR formed an Interagency Review Panel ("IRP") to review what occurred, Cooke made

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 9

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 19

1   employees available to the IRP to answer questions and produced over five thousand pages of
2   internal documents to the IRP.

3       30.    Of the more than 45,000 Atlantic salmon that were recovered by fishers, more
4   than 500 were autopsied by Cooke, WDFW, and tribal biologists. Not one had any food in its
5   stomach. Farm raised salmon come from domesticated stocks of Atlantic salmon and are
6   accustomed to being fed small brown feed pellets that are delivered to them by feeding
7   machines. When released in the wild, farmed fish have no ability to recognize or forage for
8   natural prey on their own. As a result, they cannot thrive in the wild.

9       31.    A very few of the released salmon made their way into the Skagit River, where
10  they were captured in November 2017 by biologists from the Upper Skagit Tribe. Those salmon
11  were examined by those biologists and WDFW biologists and had no food in their stomachs;
12  they were also emaciated, suggesting that they had not eaten since being released nearly three
13  months earlier.

14      32.    Testing of Atlantic salmon that were captured soon after the August collapse
15  showed them to be in good health, with no diseases that could present a risk to native fish. The
16  fish were all a year from sexual maturity, so that for any Atlantic salmon to attempt to spawn it
17  would first have to survive in the wild for another year. As a result, biologists from WDFW
18  concluded that the escape posed no risk to wild native salmon.

19      33.    These findings are consistent with conclusions made by Washington's Pollution
20  Control Hearings Board ("PCHB") in reviewing the Clean Water Act permits for these facilities,
21  where, after an 18 day trial in 1997, the PCHB concluded that Atlantic salmon farms (1) "do not
22  create a nuisance, or render those waters harmful, detrimental, or injurious to native salmon
23  species;" (2) escapes will not cause or create "a reasonable potential threat of competition,
24  predation, disease transmission, hybridization or colonization to the detriment of native
25  salmonids;" (3) the salmon farms "have not caused, and are not likely to cause impacts on water
26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 10

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 20

1  quality or native fish through the discharge of waste materials, disease organisms, or medications

2  in violation of state sediment standards."

3      34.    Despite those facts, some environmental and tribal groups have engaged in a

4  campaign to use the August failure of Site 2 to force Atlantic salmon net pen farming out of the

5  State of Washington.  Commissioner Franz has joined in that effort and under her direction,

6  DNR has engaged in an unprecedented and unjustified effort to terminate the leases under which

7  the salmon farms operate.

8      35.    DNR required Cooke to remove debris from prior operators and forestry

9  operations at Deepwater Bay, as well as material on the sea floor from the failure of Site 2.

10  Cooke contracted with Global to clean the sea floor not just under Site 2 but in the surrounding

11  areas of Deepwater Bay from which the collapsed cages had been removed.  Because the water

12  at Site 2 is more than 100 feet deep, Global is one of the few local companies with the equipment

13  and experience necessary to safely conduct that operation.  Despite clear direction from Cooke to

14  do a comprehensive job of removing any sea floor debris, Global initially missed some debris.

15  Because of the water's depth, divers have no ability to see debris but must locate it with

16  directional sonar, which can easily miss small items.

17      36.    By letter dated November 17, 2017, DNR declared Cooke to be in default of its

18  lease obligations as a result of the missed debris.  In response, Cooke immediately instructed

19  Global to remove all materials that DNR's survey identified or that Global found, regardless of

20  whether the materials related to the failure of Site 2, the Deepwater Bay sites, or predated Cooke

21  or Icicle Seafood's involvement with the site.  All told, Cooke paid Global more than $2 million

22  to salvage the remains of Site 2 and clean the beach of Cypress Island and the seafloor in the area

23  of the net pens, including more than $1.5 million after the November 17 claimed default.

24      **D. DNR Terminates Lease**

25      37.    Following the August 2017 collapse of Site 2, the press, various Native American

26  tribes, and environmental groups expressed concern that the escape of Atlantic salmon could

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 11

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 21

1    harm native salmon species or occupy native salmon habitats.  But, as has occurred in each prior

2    release of Atlantic salmon from net pens in Washington, subsequent evidence showed that

3    neither has occurred or is likely to occur.

4         38.    Against the backdrop of these political pressures, DNR on February 2, 2018 sent

5    Cooke a notice of termination of the Deepwater Bay Lease.  The notice of termination claimed

6    that under Section 12(e) of the Lease, which provides that "in the event Tenant is in default

7    under the terms of this Lease at the time damage or destruction occurs, State may elect to

8    terminate the Lease," DNR was entitled to terminate the Lease because Cooke had breached the

9    following provisions of the Lease on August 19, 2017, the date that Site 2 collapsed:

10        o    Section 1.1 of the Lease describes the leasehold boundaries.  DNR claims that the

11             anchors securing Site 1 were outside the leasehold boundaries.

12        o    Section 7.2 of the Lease states that "no new improvements shall be placed on the

13             [leasehold] without (a) State's prior written consent, which shall not be

14             unreasonably withheld, and (b) Tenant's acquisition of a performance and

15             payment bond, in an amount equal to 150% of the estimated cost of constructing

16             and installing the new improvements."  DNR claims that Cooke had installed two

17             "new" improvements to the site without DNR's prior written consent – a feed

18             barge and an office platform.

19        o    Section 11.2(a) of the Lease requires Cooke to "keep and maintain the [leasehold]

20             and all improvements . . . in good order and repair, in a clean, attractive, and safe

21             condition."  DNR alleges that Cooke violated this provision by: (1) failing to

22             adequately clean the nets on Site 2 prior to August 19, 2017, and (2) failing to

23             adequately maintain Site 1 of the leasehold, which was allegedly in "poor

24             condition, likely past the end of its service life and in danger of catastrophic

25             failure."

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 12

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    Neither these alleged breaches nor DNR's purported ability to terminate the Lease is legally

2    justified under the terms of the Lease or well-settled law.

3              a.  **Anchors**

4        39.    DNR first raised the issue of the anchors existing outside of the boundaries of Site

5    1 at a meeting on November 29, 2017, when DNR representatives expressed "shock" at having

6    "just learned" of the anchors being outside the leasehold area of Site 1.

7        40.    By letter dated December 1, 2017, Cooke explained that its records reflect that

8    Cooke's predecessor had given DNR notice of its plans to move the Site 1 anchors outside the

9    lease area in 2009, in connection with its application to reorient Site 1 to move it to deeper water,

10   thus enhancing the flow of water around and through the net pens, benefitting the health of the

11   fish. Cooke's predecessor completed the reorientation of Site 1, as described in its application,

12   in 2010 with DNR's full knowledge. DNR has never raised any concern about that reorientation

13   either before, or at the time of, Cooke's acquisition of the improvements and DNR's agreement

14   to that acquisition. Any claim by DNR that the Tenant was in breach of the lease as a result of

15   the reorientation of Site 1 and accompanying movement of the anchors accrued in 2010 and has

16   been time-barred or waived.

17             b.  **Improvements to Property**

18       41.    DNR alleges that Cooke installed two "new improvements" to the leasehold area

19   without its written approval: an office platform and feed barge. The office platform and office

20   building have been on the site since at least 1988. DNR either knew or should have observed the

21   office platform and office building, which are situated in plain sight. Thus, any alleged breach of

22   the lease due to the office platform is time barred or waived as well. The feed barge has also

23   been in place for several years. More significantly, however, it is not an "improvement" to the

24   leasehold. It is a floating barge that is tied to the pen platform and is easily moveable, as would

25

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 13

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 23

1   any barge.  It therefore never became a fixture of the leasehold and thus its presence does not

2   breach the lease.

3               c.  Site 2 Net Cleanliness

4       42.     DNR alleges that Cooke breached by Lease by failing to maintain clean nets at

5   Site 2 on August 19, 2017, when Site 2 collapsed.  This is wrong.  Immediately following the

6   July event, Cooke made net washing at Site 2 a top priority.  By July 31, 2017, all nets had been

7   washed and were being continuously washed until the site ultimately collapsed in August.  When

8   the Site 2 nets were ultimately pulled out of the water after the collapse of the structure, they had

9   been sitting dormant in the water during peak summer growth conditions for around two weeks

10  without having been cleaned and thus exhibited marine growth that had not been there weeks

11  before at the time of the collapse.

12              d.  Maintenance of Site 1

13      43.     DNR finally alleges that Cooke breached its lease by failing to adequately

14  maintain Site 1 because a DNR inspection from January 10-14, 2018 showed the site to be in

15  poor condition and likely beyond its useful life.  But to the extent that is the case, it is a condition

16  of DNR's making—not Cooke's.

17      44.     Cooke recognized that Site 1 was nearing the end of its serviceable life and Cooke

18  informed DNR by letter dated December 1, 2017 that it intended to completely replace Site 1.

19  Cooke planned to replace the cages at Site 1 after its planned harvest in January, and informed

20  DNR of those harvest plans prior to its January inspection.  Cooke completed the harvest of fish

21  from Site 1 in January 2018 and was thus in a position to replace the cages.  Indeed, Cooke has

22  already purchased new cages to completely replace Site 1.  By letter dated February 2, 2018,

23  Cooke formally requested DNR to permit it to "remove and replace the eight existing Site 1

24  floating cages and their associated walkways with new floating cages and associated walkways.

25  Currently installed at Site 1 are 8 Marine Construction, SystemFarm 24 meter X 24 meter cages.

26  Tenant will replace these cages with 8 Viking/Nordic 24 X 24 meter cages."

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND                           **NORTHWEST RESOURCE LAW PLLC**
INJUNCTIVE RELIEF AND DAMAGES -- 14                     101 Yesler Way, Suite 205
                                                        Seattle, WA 98104
                                                        206.971.1564

**FOURTH KNUTSEN DECLARATION - 24**

45.     As opposed to granting Cooke's request to replace the Site 1 cages and allow Cooke to cure the conditions of which DNR complains, however, DNR responded to that request by terminating the Lease.  In other words, DNR knew that Cooke stood ready and willing to entirely replace Site 1 with a brand new and state-of-the art structure that had already been purchased, and DNR knew that Cooke was only waiting for DNR's approval prior to replacing that Site.  By failing to grant that approval, DNR on the one hand precluded Cooke from replacing a worn-down Site 1, and on the other hand, terminated Cooke's lease for failing to replace that very same Site on the grounds that it was worn-down.  DNR's actions violate its own obligations under the Lease not to unreasonably withhold permission for new improvements, and also highlight the pretextual and fundamentally unfair nature of its termination of Cooke's lease.

## INJURY TO COOKE FROM TERMINATION OF THE LEASE

46.     The Lease has a term expiring December 31, 2023.  That means that even if the Lease was not thereafter extended, Cooke would be able to raise at least three additional generations of fish at the Deepwater Bay salmon farm.  Each generation could be expected to yield at least 7.8 million pounds of head-on cleaned fish for market.  Cooke purchased American Gold with the expectation that it would be able to grow those three generations of fish at the Deepwater Bay salmon farm.

47.     The production capability of the Deepwater Bay salmon farms is a critical element of the overall Cooke operation, including keeping Cooke's hatchery fully functioning and maintaining the ability to supply customers with a year-round supply of fresh salmon.  Loss of the Deepwater Bay farm will require the hatchery to operate on a sporadic basis, necessitating the layoff of staff to the hatchery at times.  That risks Cooke losing critical hatchery staff, whom cannot be easily replaced.

48.     Harvest of Site 3 was completed in January 2018, and Site 3 is now ready to be restocked.  Cooke currently has 450,000 juvenile salmon in its hatchery that will be at the smolt

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 15

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

stage (the point at which they are ready to be placed in salt water) starting in April 2018 and need to be transferred to Site 3, or they will lose their ability to adapt to salt water and will need to be destroyed. Cooke currently has approximately 350,000 juvenile salmon in its hatchery that will be at the smolt stage in May and June of 2018 and were intended to be transferred to Site 1. Cooke has acquired the cages to completely replace the cages at Site 1. The replacement needs to occur during the next "in water work window" so that the smolts ready to send to sea in May 2018 can be transferred into Site 1.

49. If Cooke cannot restock the Sites as planned, it will not only be required to destroy the juvenile salmon currently in its Rochester hatchery when those juvenile salmon undergo smoltification but cannot be moved to salt water, but will also be forced to lay off the staff operating the Deepwater Bay salmon farms. Those individuals are highly skilled and cannot easily be replaced. If they are laid off, they will be forced to find alternative jobs, and may not be available for Cooke to rehire at a later time if Cooke is once again permitted to operate the Deepwater Bay salmon farms. It will be faced with an inability to supply its customers during the time when the salmon that should now be placed in the Deepwater Bay farms would otherwise be ready for market. Each of these consequences will cause Cooke severe and irreparable injury.

**FIRST CAUSE OF ACTION**

**APPEAL OF THE DECISION PURPORTING TO TEMINATE THE LEASE**

50. Cooke realleges paragraphs 1-48.

51. RCW 79.02.030 provides that any person whose property rights or interest will be affected by a decision of the commissioner of public lands as to a lease by the Department of Natural Resources may appeal therefrom to the superior court of the county in which such lands are located.

52. On August 19, 2017, when the Deepwater Bay Site 2 pen collapse occurred, Cooke was not in default under the Lease. DNR had given no notice of default or opportunity to

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

cure and no event of default had been declared.  Under the Lease, Cooke is entitled to rebuild Site 2 and is entitled to continue to operate Site 1, Site 2, and Site 3 for the full term of the Lease. It is entitled to replace the cages of Site 1 as part of its obligation to maintain the property in good order and repair.  To the extent that DNR's letter of February 2, 2018 purports to declare to the contrary and purports to terminate the Lease, it is invalid, null, and void.

53.     The Court should direct DNR and Commissioner Franz to certify, under official seal, a transcript of all entries in the records of the Commissioner related to the Lease and any purported defaults and any basis for the purported termination, so that the Court can review it as part of the trial of this matter.

54.     The Court should order the record to be amended and supplemented as necessary so that evidence of the full conduct of the parties can be presented to the Court.

55.     Upon hearing the evidence and reviewing the files and records produced by Defendants as supplemented, the Court should rule that the February 2, 2018 letter purporting to terminate the Lease is arbitrary and capricious, invalid, null, and void, and that DNR has no basis to terminate the Lease.

## SECOND CAUSE OF ACTION

## PETITION FOR DECLARATORY JUDGMENT

56.     Cooke realleges paragraphs 1 through 54 above.

57.     RCW 7.24.020 provides that any person interested under a written contract may have determined any question of construction or validity arising under the contract.

58.     The Lease is such a contract.

59.     Cooke is not in default of the Lease, has received no notice of default and opportunity to cure, and was not in default of the Lease on August 19, 2017, when the collapse of the Site 2 pens occurred.

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 17

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 27

60. DNR's February 2, 2018 letter purporting to terminate the Lease is without basis and null and void.

61. Cooke has been and will be severely prejudiced if DNR's purported termination of the Lease is allowed to stand.

62. Cooke is entitled to a declaratory judgment that the Lease remains in full force and effect, that DNR has no right to terminate the Lease based on the alleged breaches, that DNR is not entitled to withhold its consent to Cooke's reconstruction of Site 2 and its replacement of the cages at Site 1 with cages and improvements that are equal or better to the existing improvements on Site 1, that Cooke is entitled to restock Site 3 when the juvenile salmon now in its hatchery undergo smoltification, that it is entitled to restock Site 1 as soon after the replacement of the cages at Site 1 is completed and the juvenile salmon that have been reared for Site 1 are ready to be placed in salt water, and that it is entitled to restock Site 2 as soon as it has been rebuilt.

## THIRD CAUSE OF ACTION

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

63. Cooke realleges paragraphs 1 through 61.

64. Every contract contains an implied duty of good faith and fair dealing.

65. The duty of good faith and fair dealing requires the parties to a contract to perform in good faith the obligations imposed by their agreement so that each party may obtain the full benefit of performance.

66. The Lease is a contract that contains an implied duty of good faith and fair dealing.

67. DNR's action in purporting to terminate the Lease is part of an effort by Franz to align herself with those who want to eliminate Atlantic salmon farms in Washington for political reasons and is not based on a good faith review of the facts and circumstances of the Lease.

68. DNR failed to perform in good faith when it declared the Lease terminated.

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 18

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 28**

1       69.    Cooke will suffer significant damage if DNR's purported termination of the Lease

2   is allowed to stand.

3   <div align="center">**FOURTH CAUSE OF ACTION**</div>

4   <div align="center">**VIOLATION OF COOKE'S PROCEDURAL DUE PROCESS RIGHTS**</div>
5   <div align="center">**AND CLAIM FOR DAMAGES UNDER 42 U.S.C. § 1983**</div>

6       70.    Cooke realleges paragraphs 1 through 68.

7       71.    The Washington State Constitution mandates that no person may be deprived of

8   life, liberty, or property without both substantive and procedural due process of law.  Wash.

9   Const. art. 1, § 3.

10      72.    The United States Constitution also mandates that no person may be deprived of

11  life, liberty, or property without both substantive and procedural due process of law.  U.S. Const.

12  amends. V, XIV, § 1.

13      73.    The Lease is a property right of Cooke, protected under the due process clauses of

14  the Washington State Constitution and the United States Constitution.

15      74.    42 U.S.C. § 1983 provides a cause of action for damages for violation of a

16  person's right to substantive and/or procedural due process.

17      75.    All of Defendants' acts are as officials of and as representatives of the State of

18  Washington.  Their actions are the actions of the State of Washington.  As such, they cannot

19  deprive Cooke of property without due process of law.

20      76.    Before depriving Cooke of its property, procedural due process requires that

21  Defendants provide Cooke with an opportunity to be heard to guard against erroneous

22  deprivation, and that the opportunity to be heard is at a meaningful time and in a meaningful

23  manner.

24      77.    Defendants violated Cooke's right to procedural due process when it purported to

25  terminate the Lease based on defaults as to which it had never provided notice of default and an

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES – 19

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 29**

1  opportunity to cure, and when it failed to provide Cooke any meaningful opportunity to be heard

2  that would guard against mistaken or unjustified action by the State.

3      78.     Cooke is entitled to have the purported termination of the Lease declared to be

4  invalid, null, and void under the Washington constitution as a result of the violation of its

5  procedural due process rights. In addition, it is entitled under 42 U.S.C. § 1983 to recover its

6  damages and attorneys' fees incurred as a result of Defendants' violation of its federal procedural

7  due process rights.

8                        **FIFTH CAUSE OF ACTION**

9         **VIOLATION OF COOKE'S SUBSTANTIVE DUE PROCESS RIGHTS**

10           **AND CLAIM FOR DAMAGES UNDER 42 U.S.C. § 1983**

11     79.     Cooke realleges paragraphs 1 through 77.

12     80.     Substantive due process requires that the State not deprive Cooke of property in

13  an arbitrary and capricious manner.

14     81.     Defendants violated Cooke's right to substantive due process when it purported to

15  terminate the Lease because their actions were politically motivated, not based on facts, arbitrary

16  and capricious, irrational, and invidious.

17     82.     Cooke is entitled to have the purported termination of the Lease declared to be

18  invalid, null, and void under the Washington constitution as a result of the violation of its

19  substantive due process rights. In addition, it is entitled under 42 U.S.C. § 1983 to recover its

20  damages and attorneys' fees incurred as a result of Defendants' violation of its federal

21  substantive due process rights.

22                        **SIXTH CAUSE OF ACTION**

23     **REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

24     83.     Cooke realleges paragraphs 1 through 81.

25

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 20

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

**FOURTH KNUTSEN DECLARATION - 30**

1    84.    Cooke will suffer irreparable injury unless the Court enters preliminary injunctive

2    relief to allow it to restock Site 3 by April 21, 2018, replace the cages in Site 1 by September 1,

3    2018 and then restock it, and rebuild and then restock Site 2.

4    85.    The Court should enter such preliminary relief as is necessary to prevent Cooke

5    from incurring irreparable injury during the pendency of this litigation.

6    86.    The Court should enter such permanent injunctive relief as is necessary to allow

7    Cooke to fully exercise its right under the Lease.

8                                          **PRAYER**

9          Wherefore, Cooke asks that the Court grant the following relief:

10    1.    Under RCW 79.02.010, that the Court direct DNR within 30 days to return a

11    certified copy of all files and records related to the Lease, and DNR's purported termination of

12    the Lease, so that the Court may review them.

13    2.    That upon trial of the case, the Court determine that DNR was not entitled to

14    terminate the Lease.

15    3.    That upon trial of the case the Court determine that the Lease remains in full force

16    and effect.

17    4.    That upon trial of the case the Court determine that Defendants' purported

18    termination of the Lease and their denial of Cooke's rights under the lease to restock Site 3, and

19    to obtain their consent to replacement of the cages at Site 1 and to rebuild Site 2 violated

20    Cooke's right to procedural and/or substantive due process and were therefore null and void.

21    5.    That upon trial of the case the Court award Cooke such damages under 42 U.S.C.

22    § 1983 for the denial of its constitutional rights as is proven, as well as awarding Cooke its

23    attorneys' fees incurred herein.

24    6.    That the Court enter such preliminary injunctive relief as is needed to prevent

25    Cooke from suffering irreparable injury during the pendency of this litigation.

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 21

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

1    7.    That the Court enter such permanent injunctive relief as may appear necessary in

2  order for Cooke to be able to fully exercise its rights for the remainder of the Lease.

3    8.    That the Court enter such other and further relief as the Court may deem just.

4  DATED this _1ˢᵗ_ day of March, 2018.

5

6                    NORTHWEST RESOURCE LAW PLLC

7

8                    _D. M. Myers_
                     Elaine L. Spencer, WSBA #6963
9                    espencer@nwresourcelaw.com
                     206.971.1566
10                   Douglas J. Steding, WSBA #37020
                     dsteding@nwresourcelaw.com
11                   206.971.1567
                     Diane M. Meyers, WSBA #40729
12                   dmeyers@nwresourcelaw.com
                     206.971.1568
13                   Madeline Engel, WSBA #43884
                     mengel@nwresourcelaw.com
14                   206.971.1569

15

16                   PHILLIPS BURGESS PLLC

17

18                   _Trevor A. Zandell_
19                   Trevor Zandell, WSBA #37210
                     tzandell@phillipsburgesslaw.com
20                   360.742.3500

21                   *Attorneys for Appellant-Plaintiff Cooke*
                     *Aquaculture Pacific, LLC*
22

23

24

25

26

NOTICE OF APPEAL UNDER RCW 79.02.030 AND
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES -- 22

NORTHWEST RESOURCE LAW PLLC
101 Yesler Way, Suite 205
Seattle, WA 98104
206.971.1564

FOURTH KNUTSEN DECLARATION - 32

Exhibit A

STATE OF WASHINGTON
DEPARTMENT OF NATURAL RESOURCES
DOUG SUTHERLAND, Commissioner of Public Lands

AQUATIC LANDS NET PEN LEASE No. 20-B12517

TABLE OF CONTENTS

SECTION                                                                                                PAGE
BACKGROUND..................................................................................................................1
1.    PROPERTY ..............................................................................................................1
   1.1    Property Defined ................................................................................................1
   1.2    Survey, Maps, and Plans ...................................................................................2
   1.3    Inspection ...........................................................................................................2
2.    USE ............................................................................................................................2
   2.1    Permitted Use .....................................................................................................2
   2.2    Restrictions on Use ............................................................................................2
   2.3    Conformance with Laws ....................................................................................3
   2.4    Liens and Encumbrances ...................................................................................3
3.    TERM ........................................................................................................................3
   3.1    Term Defined ......................................................................................................3
   3.2    Renewal of the Lease .........................................................................................3
   3.3    Delay in Delivery of Possession ........................................................................3
   3.4    End of Term ........................................................................................................3
   3.5    Holdover .............................................................................................................3
4.    RENT ........................................................................................................................4
   4.1    Fixed Minimum Annual Payment .....................................................................4
   4.2    Production Payment ...........................................................................................4
   4.3    Reporting and Payment .....................................................................................4
   4.4    Payment Place ....................................................................................................5
   4.5    Audit ....................................................................................................................5
5.    OTHER EXPENSES ................................................................................................5
   5.1    Utilities ...............................................................................................................5
   5.2    Taxes and Assessments ......................................................................................5
   5.3    Right to Contest .................................................................................................5
   5.4    Proof of Payment ...............................................................................................5
   5.5    Failure to Pay .....................................................................................................5
6.    LATE PAYMENTS AND OTHER CHARGES .....................................................5
   6.1    Late Charge ........................................................................................................5
   6.2    Interest Penalty for Past Due Rent and Other Sums Owed ............................5
   6.3    No Accord and Satisfaction ..............................................................................6
   6.4    No Counterclaim, Setoff, or Abatement of Rent .............................................6
7.    IMPROVEMENTS ...................................................................................................6
   7.1    Existing Improvements ......................................................................................6

Form Date: May, 2005                                    i

FOURTH KNUTSEN DECLARATION - 34

| | | |
|---|---|---|
| 7.2 | New Improvements | 6 |
| 7.3 | Unauthorized Improvements | 6 |
| 7.4 | Removal of Improvements | 7 |
| 8. | ENVIRONMENTAL LIABILITY/RISK ALLOCATION | 7 |
| 8.1 | Definition | 7 |
| 8.2 | Use of Hazardous Substances | 7 |
| 8.3 | Current Conditions, Duty of Utmost Care, and Duty to Investigate | 7 |
| 8.4 | Notification and Reporting | 8 |
| 8.5 | Indemnification | 9 |
| 8.6 | Cleanup | 9 |
| 8.7 | Sampling by State, Reimbursement, and Split Samples | 10 |
| 8.8 | Reservation of Rights | 10 |
| 9. | ASSIGNMENT AND SUBLETTING | 11 |
| 9.1 | State Consent Required | 11 |
| 9.2 | Event of Assignment | 11 |
| 9.3 | Rent Payments Following Assignment | 11 |
| 9.4 | Terms of Subleases | 11 |
| 10. | INDEMNITY, FINANCIAL SECURITY, INSURANCE | 12 |
| 10.1 | Indemnity | 12 |
| 10.2 | Financial Security | 12 |
| 10.3 | Insurance | 13 |
| 10.4 | State's Acquisition of Insurance | 15 |
| 11. | MAINTENANCE AND REPAIR | 15 |
| 11.1 | State's Repairs | 15 |
| 11.2 | Tenant's Repairs, Alteration, Maintenance and Replacement | 15 |
| 13. | CONDEMNATION | 16 |
| 13.1 | Definitions | 16 |
| 13.2 | Effect of Taking | 16 |
| 13.3 | Allocation of Award | 16 |
| 14. | DEFAULT AND REMEDIES | 16 |
| 15. | ENTRY BY STATE | 17 |
| 16. | DISCLAIMER OF QUIET ENJOYMENT | 17 |
| 17. | NOTICE | 18 |
| 18. | MISCELLANEOUS | 18 |
| 18.1 | Authority | 18 |
| 18.2 | Successors and Assigns | 18 |
| 18.3 | Headings | 18 |
| 18.4 | Entire Agreement | 19 |
| 18.5 | Waiver | 19 |
| 18.6 | Cumulative Remedies | 19 |
| 18.7 | Time is of the Essence | 19 |
| 18.8 | Language | 19 |
| 18.9 | Invalidity | 19 |
| 18.10 | Applicable Law and Venue | 19 |

200801240076
Skagit County Auditor
1/24/2008 Page   3 of   37 12:58PM

FOURTH KNUTSEN DECLARATION - 35

18.11   Recordation..........................................................................................................19
18.12   Modification..........................................................................................................20

Form Date: May, 2005   iii   Agreement No. 20-B12517



200801240076
Skagit County Auditor
1/24/2008 Page     4 of    37 12:58PM

**FOURTH KNUTSEN DECLARATION - 36**

STATE OF WASHINGTON
DEPARTMENT OF NATURAL RESOURCES
DOUG SUTHERLAND, Commissioner of Public Lands

AQUATIC LANDS NET PEN LEASE

AQUATIC LANDS AQUACULTURE LEASE NO. 20-B12517

THIS LEASE is made by and between the STATE OF WASHINGTON, acting through the Department of Natural Resources ("State"), and AMERICAN GOLD SEAFOODS, LLC, a Washington Corporation ("Tenant").

BACKGROUND

Tenant desires to lease the aquatic lands commonly known as Deep Water Bay, which are bedlands located in Skagit County, Washington, from State, and State desires to lease the property to Tenant pursuant to the terms and conditions of this Lease.

THEREFORE, the parties agree as follows:

SECTION 1   PROPERTY

1.1   **Property Defined.**   State leases to Tenant and Tenant leases from State the real property described in Exhibit A together with all the rights of State, if any, to improvements on and easements benefiting the Property, but subject to the exceptions and restrictions set forth in this Lease (collectively the "Property"). This Lease is subject to all valid interests of third parties noted in the records of Skagit County, or on file in the office of the Commissioner of Public Lands, Olympia, Washington; rights of the public under the Public Trust Doctrine or federal navigation servitude; and treaty rights of Indian Tribes. Except to the extent specifically authorized in Subsection 2.1, below, this Lease does not include any right to harvest, collect or damage any natural resource, including aquatic life or living plants, any water rights, or any mineral rights, including any right to excavate or withdraw sand, gravel, or other valuable

Form Date: May, 2005

||||||||||||||||||||||||||||||
2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page      6 of      37 12:58PM

⊢B12517

materials.  State reserves the right to grant easements and other land uses on the Property to others when the easement or other land uses will not unreasonably interfere with Tenant's Permitted Use.

1.2     **Survey, Maps, and Plans.**  In executing this lease, State is relying on the surveys, plats, diagrams, and/or legal descriptions provided by Tenant.  Tenant is not relying upon and State is not making any representations about any survey, plat, diagram, and/or legal description provided by State.  Before taking possession of the Property, Tenant shall have the Property surveyed by a registered land surveyor.  The survey map shall be signed and certified by the surveyor.  The survey shall be attached to this Lease as Exhibit A.

1.3     **Inspection.**  State makes no representation regarding the condition of the Property, improvements located on the Property, the suitability of the Property for Tenant's Permitted Use, compliance with governmental laws and regulations, availability of utility rights, access to the Property or the existence of hazardous substances on the Property.  Tenant has inspected the Property and accepts it "AS IS."

## SECTION 2   USE

2.1     **Permitted Use.**  Tenant shall use the Property for anchorage, maintenance and operation of Fish rearing pens (the "Permitted Use"), and for no other purpose.  The Permitted Use is described or shown in greater detail in Exhibit B, the terms and conditions of which are incorporated by reference and made a part of this Lease.  If at any time the Property ceases to be used for the Permitted Use, this Lease shall terminate and State may reenter and take possession of the Property.

2.2     **Restrictions on Use.**  Tenant shall not cause or permit any damage to natural resources on the Property.  Tenant shall also not cause or permit any filling activity to occur on the Property.  This prohibition includes any deposit of rock, earth, ballast, refuse, garbage, waste matter (including chemical, biological or toxic wastes), hydrocarbons, any other pollutants, or other matter in or on the Property, except as approved in writing by State.  Tenant shall neither commit nor allow waste to be committed to or on the Property set out in this Subsection 2.2, State shall notify Tenant and provide Tenant a reasonable time to take all steps necessary to remedy the failure.  If Tenant fails to do so in a timely manner, than State may take any steps reasonably necessary to remedy this failure.  Upon demand by State, Tenant shall pay all costs of such remedial action, including but not limited to the costs of removing and disposing of any material deposited improperly on the Property.  This section shall not in any way limit Tenant's liability under Section 8, below.

The prohibitions in this section against damage to natural resources, filling, deposition of any unapproved materials, and waste, shall also apply to protect state-owned aquatic lands adjacent to the Property from any of Tenant's activities related to Tenant's occupation of the Property.  All obligations imposed by this section on Tenant to cure any violation of the prohibited activities in

Form Date: May, 2005                                                                                    l2517

**FOURTH KNUTSEN DECLARATION - 38**

this section shall also extend to state-owned aquatic lands adjacent to the Property when the violation arose from Tenant's activities related to Tenant's occupation of the Property.

**2.3     Conformance with Laws.** Tenant shall, at all times, keep current and comply with all conditions and terms of any permits, licenses, certificates, regulations, ordinances, statutes, and other government rules and regulations regarding its use or occupancy of the Property.

**2.4     Liens and Encumbrances.** Tenant shall keep the Property free and clear of any liens and encumbrances arising out of or relating to its use or occupancy of the Property, unless authorized by State.

## SECTION 3   TERM

**3.1     Term Defined.** The term of this Lease is Fifteen (15) years (the "Term"), beginning on the 1st day of January, 2008 (the "Commencement Date"), and ending on the 31st day of December, 2023 (the "Termination Date"), unless terminated sooner under the terms of this Lease.

**3.2     Renewal of the Lease.** Tenant shall have the option to renew this Lease for Zero (0) additional terms of Zero (0) years each.  The initial Term of this Lease, and all renewal terms, shall not exceed Fifteen (15) years in the aggregate.  Tenant shall exercise this option by providing written notice of its election to renew at least ninety (90) days prior to the Termination Date of the initial Term or any renewal term of this Lease.  Tenant shall not be entitled to renew if it is in default under the terms of this Lease at the time the option to renew is exercised.  The terms and conditions of any renewal term shall be the same as set forth in this Lease, except that rent shall be recalculated, the required amounts of financial security may be revised, and provisions dealing with hazardous waste or impacts to natural resources may be changed at the time of the renewal.

**3.3     Delay in Delivery of Possession.** If State, for any reason whatsoever, cannot deliver possession of the Property to Tenant on the Commencement Date, this Lease shall not be void or voidable, nor shall State be liable to Tenant for any loss or damage resulting from the delay in delivery of possession.  In such event, the date of delivery of possession shall be the Commencement Date for all purposes, including the payment of rent.  In the event Tenant takes possession before the Commencement Date, the date of possession shall be the Commencement Date for all purposes, including the payment of rent.  If the Lease Term commences earlier or later than the scheduled Commencement Date, the Termination Date shall be adjusted accordingly.

**3.4     End of Term.** Upon the expiration or termination of the Term or extended term, as applicable, Tenant shall surrender the Property to State in the same or better condition as on the Commencement Date, reasonable wear and tear excepted.

**3.5     Holdover.** If Tenant remains in possession of the Property after the Termination Date, the occupancy shall not be an extension or renewal of the Term.  The occupancy shall be a

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page      7 of     37 12:58PM

month-to-month tenancy, on terms identical to the terms of this Lease, which may be terminated by either party on thirty (30) days written notice. The monthly rent during the holdover shall be the same rent which would be due if the Lease were still in effect and all adjustments in rent were made in accordance with its terms. If State provides a notice to vacate the Property prior to termination of this Lease or at any time thereafter and Tenant fails to do so within the time set forth in the notice, then Tenant shall be a trespasser and shall owe State all amounts due under RCW 79.01.760 or other applicable law.

## SECTION 4   RENT

**4.1     Fixed Minimum Annual Payment.** Tenant shall pay State a Fixed Minimum Annual Payment of Twenty Five Thousand Dollars ($25,000.00), which shall be due and payable in full on or before the Commencement Date, and on or before the same date of each year thereafter.

     (a)    The Fixed Minimum Annual Payment for any lease year shall be a credit against Production Payments computed under Subsection 4.2 and due for the same lease year.

     (b)    At the end of each quarter Tenant shall compute the Production Payment due under Subsection 4.2 for that quarter. At the end of the quarter in which the aggregate of all the Production Payments thus computed exceeds the Fixed Minimum Annual Payment already paid, Tenant shall pay State an amount equal to the excess. Thereafter, Tenant shall pay in full each quarterly Production Payment computed under Subsection 4.2.

     (c)    In the event that the Fixed Minimum Annual Payment for a particular contract year exceeds the sum of Production Payments for that year, Tenant shall not be entitled to a refund. There shall be no carry-backs or carry-forwards of such excess from one contract year to another.

**4.2     Production Payment.** Tenant shall pay State a Production Payment. The Production Payment shall be computed as follows: the total volume in pounds from the then-current quarterly report, times the average price per pound shown on the quarterly report, times the applicable royalty rate, equals the quarterly Production Payment. The applicable royalty rate shall be determined by reference to Exhibit C, attached, which specifies the royalty rate to be applied against any particular average price.

**4.3     Reporting and Payment.** Tenant shall keep accurate records and accounts of all production of Salmon from or on the Property. Tenant shall provide to State, within thirty (30) days following the end of each quarter and on a form acceptable to State, an itemized account of the production for the preceding quarter. The quarterly report shall be submitted by Tenant to the Washington State Department of Fish and Wildlife listing Tenant's fish production. The fish weight reported shall be "Whole." The price used to calculate the Rental Payment in poundage in Exhibit C of this Lease shall be the "Wholesale Price." The average price per pound reported shall be the average of actual prices received by Tenant during the quarter from Salmon produced from or on the Property. At the time of providing the quarterly report, Tenant shall pay to State the Production Payment due for that quarter in accordance with Subsections 4.1 and 4.2.

200801240076
Skagit County Auditor
1/24/2008 Page    8 of   37 12:58PM

**4.4     Payment Place.**  Payment is to be made to Financial Management Division.  1111 Washington St SE, PO BOX 47041.  Olympia WA 98504-7041.

**4.5     Audit.**  State shall be allowed to inspect and audit the books, contracts, and accounts of Tenant to determine whether or not State is being paid the full amount owed to it under this Lease.  If the audit discloses that Tenant has underpaid the amount due to State by two percent (2%) or more, Tenant shall pay to State, on demand, the cost of the audit.  Any deficiency shall be paid to State within thirty (30) days of delivery of the audit to Tenant.

## SECTION 5   OTHER EXPENSES

During the Term, Tenant shall pay the following additional expenses:

**5.1     Utilities.**  Tenant shall pay all fees charged for utilities in connection with the use and occupancy of the Property, including but not limited to electricity, water, gas, and telephone service.

**5.2     Taxes and Assessments.**  Tenant shall pay all taxes and other governmental charges, of any kind whatsoever, applicable or attributable to the Property, Tenant's leasehold interest, the improvements, or Tenant's use and enjoyment of the Property.

**5.3     Right to Contest.**  Tenant may, in good faith, contest any tax or assessment at its sole cost and expense.  At the request of State, Tenant shall furnish reasonable protection in the form of a bond or other security, satisfactory to State, against any loss or liability by reason of such contest.

**5.4     Proof of Payment.**  Tenant shall, if required by State, furnish to State receipts or other appropriate evidence establishing the payment of any amounts required to be paid under the terms of this Lease.

**5.5     Failure to Pay.**  If Tenant fails to pay any of the amounts due under this Lease, State may pay the amount due, and recover its cost in accordance with the provision of Section 6.

## SECTION 6   LATE PAYMENTS AND OTHER CHARGES

**6.1     Late Charge.**  If any rental payment is not received by State within ten (10) days of the date due, Tenant shall pay to State a late charge equal to four percent (4%) of the amount of the payment or Fifty Dollars ($50), whichever is greater, to defray the overhead expenses of State as a result of the delay.

**6.2     Interest Penalty for Past Due Rent and Other Sums Owed.**  If rent is not received by State within thirty (30) days of the date due, then Tenant shall, in addition to paying the late charges determined under Subsection 6.1, above, pay interest on the amount outstanding at the

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page      9 of    37 12:58PM

rate of one percent (1%) per month until paid.  If State pays or advances any amounts for or on behalf of Tenant, including but not limited to leasehold taxes pursuant to Chapter 82.29A RCW, taxes, assessments, insurance premiums, costs of removal and disposal of unauthorized materials pursuant to Section 2 above, costs of removal and disposal of improvements pursuant to Section 7 below, or other amounts not paid when due, Tenant shall reimburse State for the amount paid or advanced and shall pay interest on that amount at the rate of one percent (1%) per month from the date State notifies Tenant of the payment or advance.

**6.3    No Accord and Satisfaction.**  If Tenant pays, or State otherwise receives, an amount less than the full amount then due, State may apply such payment as it elects.  In the absence of an election, the payment or receipt shall be applied first to accrued taxes which State has advanced or may be obligated to pay, then to other amounts advanced by State, then to late charges and accrued interest, and then to the earliest rent due.  State may accept any payment in any amount without prejudice to State's right to recover the balance of the rent or pursue any other right or remedy.  No endorsement or statement on any check, any payment, or any letter accompanying any check or payment shall constitute or be construed as accord and satisfaction.

**6.4    No Counterclaim, Setoff, or Abatement of Rent.**  Except as expressly set forth elsewhere in this Lease, rent and all other sums payable by Tenant pursuant to this Lease shall be paid without the requirement that State provide prior notice or demand, and shall not be subject to any counterclaim, setoff, deduction, defense or abatement.

## SECTION 7   IMPROVEMENTS

**7.1    Existing Improvements.**  On the Commencement Date, the following improvements are located on the Property:  Each of the net pen sites located in Deepwater Bay consists of a rectangular raft of floating cages and their associated walkways, a mooring system and fish nets that are held by an underwater weighting system. Site 1, contains eight (8) Marine Construction 24 meter by 24 meter square cages; Site 2, contains ten (10) Marine Construction 24 meter by 24 meter square cages; Site 3, contains twelve (12) Marine Construction 24 meter by 24 meter square cages. The associated walkways are made up of a frame work of heavy gauged, galvanized steel box beams with galvanized metal walkway grating welded on top of it. The walkways all have multiple foam filled plastic floats bolted in place underneath the frame work that is used for the floatation of the structure. For further description of the existing improvements refer to Exhibit B. These improvements are the property of Tenant.

**7.2    New Improvements.**  So long as this Lease remains in effect, no new improvements shall be placed on the Property without (a) State's prior written consent, which shall not be unreasonably withheld, and (b) Tenant's acquisition of a performance and payment bond, in an amount equal to 150 % of the estimated cost of constructing and installing the new improvements.

**7.3    Unauthorized Improvements.**  Improvements made on the Property without State's prior written consent or which are not in conformance with the plans submitted to and approved by the State ("Unauthorized Improvements") shall immediately become the property of State, unless

200801240076
Skagit County Auditor
1/24/2008 Page        10 of      37 12:58PM

FOURTH KNUTSEN DECLARATION - 42

State elects otherwise. Regardless of ownership of Unauthorized Improvements, State may, at its option, require Tenant to sever, remove and dispose of them, charge Tenant rent for the use of them, or both.

**7.4    Removal of Improvements.** All Tenant-owned improvements and all Unauthorized Improvements shall be removed by Tenant from the Property on or before the Termination Date unless State consents that the improvements may remain. If such improvements remain on the Property after the Termination Date without State's consent, State may elect to remove the improvements and Tenant shall, upon demand, pay the costs of removing and disposing of them.

## SECTION 8   ENVIRONMENTAL LIABILITY/RISK ALLOCATION

**8.1    Definition.** "Hazardous Substance" means any substance which now or in the future becomes regulated or defined under any federal, state, or local statute, ordinance, rule, regulation, or other law relating to human health, environmental protection, contamination or cleanup, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. 9601 *et seq.*, and Washington's Model Toxics Control Act ("MTCA"), RCW 70.105D.010 *et seq.*

**8.2    Use of Hazardous Substances.** Tenant covenants and agrees that Hazardous Substances will not be used, stored, generated, processed, transported, handled, released, or disposed of in, on, under, or above the Property, except in accordance with all applicable laws.

**8.3    Current Conditions, Duty of Utmost Care, and Duty to Investigate.**
    (a)    State makes no representation about the condition of the Property. Hazardous Substances may exist in, on, under, or above the Property. With regard to any Hazardous Substances that may exist in, on, under, or above the Property, State disclaims any and all responsibility to conduct investigations, to review any State records, documents or files, or to obtain or supply any information to Tenant.
    (b)    Tenant shall exercise the utmost care with respect to both Hazardous Substances in, on, under, or above the Property as of the Commencement Date, and any Hazardous Substances that come to be located in, on, under, or above the Property during the Term of this agreement, along with the foreseeable acts or omissions of third parties affecting those Hazardous Substances, and the foreseeable consequences of those acts or omissions. The obligation to exercise utmost care under this Subsection 8.3 includes, but is not limited to, the following requirements:
        (1)    Tenant shall not undertake activities that will cause, contribute to, or exacerbate contamination of the Property;
        (2)    Tenant shall not undertake activities that damage or interfere with the operation of remedial or restoration activities on the Property or undertake activities that result in human or environmental exposure to contaminated sediments on the Property;

200801240076
Skagit County Auditor
1/24/2008 Page    11 of    37 12:58PM

**FOURTH KNUTSEN DECLARATION - 43**

     (3)     Tenant shall not undertake any activities that result in the mechanical or chemical disturbance of on-site habitat mitigation;

     (4)     If requested, Tenant shall allow reasonable access to the Property by employees and authorized agents of the Environmental Protection Agency, the Washington State Department of Ecology, or other similar environmental agencies; and

     (5)     If requested, Tenant shall allow reasonable access to potentially liable or responsible parties who are the subject of an order or consent decree which requires access to the Property.  Tenant's obligation to provide access to potentially liable or responsible parties may be conditioned upon the negotiation of an access agreement with such parties, provided that such agreement shall not be unreasonably withheld.

   (c)     It shall be Tenant's obligation to gather sufficient information concerning the Property and the existence, scope, and location of any Hazardous Substances on the Property, or adjoining the Property, that allows Tenant to effectively meet its obligations under this lease.

**8.4**    **Notification and Reporting**.

   (a)     Tenant shall immediately notify State if Tenant becomes aware of any of the following:

     (1)     A release or threatened release of Hazardous Substances in, on, under, or above the Property, any adjoining property, or any other property subject to use by Tenant in conjunction with its use of the Property;

     (2)     Any problem or liability related to, or derived from, the presence of any Hazardous Substance in, on, under, or above the Property, any adjoining property, or any other property subject to use by Tenant in conjunction with its use of the Property;

     (3)     Any actual or alleged violation of any federal, state, or local statute, ordinance, rule, regulation, or other law pertaining to Hazardous Substances with respect to the Property, any adjoining property, or any other property subject to use by Tenant in conjunction with its use of the Property;

     (4)     Any lien or action with respect to any of the foregoing; or,

     (5)     Any notification from the US Environmental Protection Agency (EPA) or the Washington State Department of Ecology (DOE) that remediation or removal of Hazardous Substances is or may be required at the Property.

   (b)     Upon request, Tenant shall provide State with copies of any and all reports, studies, or audits which pertain to environmental issues or concerns associated with the Property, and which were prepared for Tenant and submitted to any federal, state or local authorities pursuant to any federal, state or local permit, license or law.  These permits include, but are not limited to, any National Pollution Discharge and Elimination System Permit, any Army Corps of Engineers permit, any State Hydraulics permit, any State Water Quality certification, or any Substantial Development permit.

200801240076
Skagit County Auditor
1/24/2008 Page    12 of    37 12:58PM

**FOURTH KNUTSEN DECLARATION - 44**

8.5    **Indemnification**.

    (a)    Tenant shall fully indemnify, defend, and hold State harmless from and against any and all claims, demands, damages, natural resource damages, response costs, remedial costs, cleanup costs, losses, liens, liabilities, penalties, fines, lawsuits, other proceedings, costs, and expenses (including attorneys' fees and disbursements), that arise out of, or are in any way related to:

        (1)    The use, storage, generation, processing, transportation, handling, or disposal of any Hazardous Substance by Tenant, its subtenants, contractors, agents, employees, guests, invitees, or affiliates in, on, under, or above the Property, any adjoining property, or any other property subject to use by Tenant in conjunction with its use of the Property, during the Term of this Lease or during any time when Tenant occupies or occupied the Property or any such other property;

        (2)    The release or threatened release of any Hazardous Substance, or the exacerbation of any Hazardous Substance contamination, in, on, under, or above the Property, any adjoining property, or any other property subject to use by Tenant in conjunction with its use of the Property, which release, threatened release, or exacerbation occurs or occurred during the Term of this Lease or during any time when Tenant occupies or occupied the Property or any such other property, and as a result of:

            (i)    Any act or omission of Tenant, its subtenants, contractors, agents, employees, guests, invitees, or affiliates; or,

            (ii)    Any foreseeable act or omission of a third party unless Tenant exercised the utmost care with respect to the foreseeable acts or omissions of the third party and the foreseeable consequences of those acts or omissions.

    (b)    In addition to the indemnifications provided in Subsection 8.5(a), Tenant shall fully indemnify State for any and all damages, liabilities, costs or expenses (including attorneys' fees and disbursements) that arise out of or are in any way related to Tenant's breach of the obligations of Subsection 8.3(b). This obligation is not intended to duplicate the indemnity provided in Subsection 8.5(a) and applies only to damages, liabilities, costs, or expenses that are associated with a breach of Subsection 8.3(b) and which are not characterized as a release, threatened release, or exacerbation of Hazardous Substances.

8.6    **Cleanup.**  If a release of Hazardous Substances occurs in, on, under, or above the Property, or other State-owned property, arising out of any action, inaction, or event described or referred to in Subsection 8.5, above, Tenant shall, at its sole expense, promptly take all actions necessary or advisable to clean up the Hazardous Substances. Cleanup actions shall include, without limitation, removal, containment and remedial actions and shall be performed in accordance with all applicable laws, rules, ordinances, and permits. Tenant's obligation to undertake a cleanup under this Subsection 8.6 shall be limited to those instances where the Hazardous Substances exist in amounts that exceed the threshold limits of any applicable regulatory cleanup standards. Tenant shall also be solely responsible for all cleanup,

200801240076
Skagit County Auditor
1/24/2008 Page    13 of    37 12:58PM

administrative, and enforcement costs of governmental agencies, including natural resource damage claims, arising out of any action, inaction, or event described or referred to in Subsection 8.5, above. Tenant may undertake a cleanup pursuant to the Washington State Department of Ecology's Voluntary Cleanup Program, provided that: (1) Any cleanup plans shall be submitted to State (DNR) for review and comment at least thirty (30) days prior to implementation (except in emergency situations), and (2) Tenant must not be in breach of this lease. Nothing in the operation of this provision shall be construed as an agreement by State that the voluntary cleanup complies with any laws or with the provisions of this Lease.

**8.7    Sampling by State, Reimbursement, and Split Samples.**

(a)    State may conduct sampling, tests, audits, surveys, or investigations ("Tests") of the Property at any time to determine the existence, scope, or effects of Hazardous Substances on the Property, any adjoining property, any other property subject to use by Tenant in conjunction with its use of the Property, or any natural resources. If such Tests, along with any other information, demonstrates the existence, release, or threatened release of Hazardous Substances arising out of any action, inaction, or event described or referred to in Subsection 8.5, above, Tenant shall promptly reimburse State for all costs associated with such Tests.

(b)    State's ability to seek reimbursement for any Tests under this Subsection shall be conditioned upon State providing Tenant written notice of its intent to conduct any Tests at least thirty (30) calendar days prior to undertaking such Tests, unless such Tests are performed in response to an emergency situation in which case State shall only be required to give such notice as is reasonably practical.

(c)    Tenant shall be entitled to obtain split samples of any Test samples obtained by State, but only if Tenant provides State with written notice requesting such samples within twenty (20) calendar days of the date Tenant is deemed to have received notice of State's intent to conduct any non-emergency Tests. The additional cost, if any, of split samples shall be borne solely by Tenant. Any additional costs State incurs by virtue of Tenant's split sampling shall be reimbursed to State within thirty (30) calendar days after a bill with documentation for such costs is sent to Tenant.

(d)    Within thirty (30) calendar days of a written request (unless otherwise required pursuant to Subsection 8.4(b), above), either party to this Lease shall provide the other party with validated final data, quality assurance/quality control information, and chain of custody information, associated with any Tests of the Property performed by or on behalf of State or Tenant. There is no obligation to provide any analytical summaries or expert opinion work product.

**8.8    Reservation of Rights.** The parties have agreed to allocate certain environmental risks, liabilities, and responsibilities by the terms of Section 8. With respect to those environmental liabilities covered by the indemnification provisions of Subsection 8.5, that subsection shall exclusively govern the allocation of those liabilities. With respect to any environmental risks, liabilities, or responsibilities not covered by Subsection 8.5, the parties expressly reserve and do not waive or relinquish any rights, claims, immunities, causes of action, or defenses relating to the

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page    14 of    37 12:58PM

presence, release, or threatened release of Hazardous Substances in, on, under, or above the Property, any adjoining property, or any other property subject to use by Tenant in conjunction with its use of the Property, that either party may have against the other under federal, state, or local laws, including but not limited to, CERCLA, MTCA, and the common law. No right, claim, immunity, or defense either party may have against third parties is affected by this Lease and the parties expressly reserve all such rights, claims, immunities, and defenses. The allocations of risks, liabilities, and responsibilities set forth above do not release either party from, or affect either party's liability for, claims or actions by federal, state, or local regulatory agencies concerning Hazardous Substances.

### SECTION 9   ASSIGNMENT AND SUBLETTING

**9.1    State Consent Required.** Tenant shall not sell, convey, mortgage, assign, pledge, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or the Property without State's prior written consent, which shall not be unreasonably conditioned or withheld.

    (a) In determining whether to consent, State may consider, among other items, the proposed transferee's financial condition, business reputation and experience, the nature of the proposed transferee's business, the then-current value of the Property, and such other factors as may reasonably bear upon the suitability of the transferee as a tenant of the Property. Tenant shall submit information regarding any proposed transferee to State at least thirty (30) days prior to the date of the proposed transfer.

    (b) State reserves the right to condition its consent upon (1) changes in the terms and conditions of this Lease, including the Annual Rent and other terms; and/or (2) the agreement of Tenant or transferee to conduct Tests for hazardous substances on the Property or on other property owned or occupied by Tenant or the transferee.

    (c) Each permitted transferee shall assume all obligations under this Lease, including the payment of rent. No assignment, sublet, or transfer shall release, discharge, or otherwise affect the liability of Tenant.

**9.2    Event of Assignment.** If Tenant is a corporation, a dissolution of the corporation or a transfer (by one or more transactions) of a majority of the voting stock of Tenant shall be deemed to be an assignment of this Lease. If Tenant is a partnership, a dissolution of the partnership or a transfer (by one or more transactions) of the controlling interest in Tenant shall be deemed an assignment of this Lease.

**9.3    Rent Payments Following Assignment.** The acceptance by State of the payment of rent following an assignment or other transfer shall not constitute consent to any assignment or transfer.

**9.4    Terms of Subleases.** All subleases shall be submitted to State for approval and shall meet the following requirements:

Form Date: May, 2005                   11                              17

200801240076
Skagit County Auditor
1/24/2008 Page    15 of    37 12:58PM

FOURTH KNUTSEN DECLARATION - 47

(a)   The sublease shall be consistent with and subject to all the terms and conditions of this Lease;

(b)   The sublease shall confirm that if the terms of the sublease conflict with the terms of this Lease, this Lease shall control;

(c)   The term of the sublease (including any period of time covered by a renewal option) shall end before the Termination Date of the initial Term or any renewal term;

(d)   The sublease shall terminate if this Lease terminates, whether upon expiration of the Term, failure to exercise an option to renew, cancellation by State, surrender or for any other reason;

(e)   The subtenant shall receive and acknowledge receipt of a copy of this Lease;

(f)   The sublease shall prohibit the prepayment to Tenant by the subtenant of more than one month's rent;

(g)   The sublease shall identify the rental amount to be paid to Tenant by the subtenant;

(h)   The sublease shall confirm that there is no privity of contract between the subtenant and State;

(i)   The sublease shall require removal of the subtenant's improvements and trade fixtures upon termination of the sublease; and,

(j)   The subtenant's permitted use shall be within the Permitted Use authorized by this Lease.

## SECTION 10   INDEMNITY, FINANCIAL SECURITY, INSURANCE

**10.1   Indemnity.**  Tenant shall indemnify, defend, and hold harmless State, its employees, officers, and agents from any and all liability, damages (including bodily injury, personal injury and damages to land, aquatic life, and other natural resources), expenses, causes of action, suits, claims, costs, fees (including attorneys' fees), penalties, or judgments, of any nature whatsoever, arising out of the use, occupation, or control of the Property by Tenant, its subtenants, invitees, agents, employees, licensees, or permittees, except as may arise solely out of the willful or negligent act of State or State's elected officials, employees, or agents.  To the extent that RCW 4.24.115 applies, Tenant shall not be required to indemnify, defend, and hold State harmless from State's sole or concurrent negligence. Tenant's liability to State for hazardous substances, and its obligation to indemnify, defend, and hold the State harmless for hazardous substances, shall be governed exclusively by Section 8.

**10.2   Financial Security.**

(a)   At its own expense, Tenant shall procure and maintain a corporate surety bond or provide other financial security satisfactory to State (the "Bond") in an amount equal to Fifty Thousand Dollars ($50,000.00), which shall secure Tenant's full performance of its obligations under this Lease, with the exception of the obligations under Section 8 (Environmental Liability/Risk Allocation) above.  The Bond shall be in a form and issued by a surety company acceptable to State.  State may require an adjustment in the amount of the Bond:

200801240076
Skagit County Auditor
1/24/2008 Page     16 of     37 12:58PM

**FOURTH KNUTSEN DECLARATION - 48**

(1)     At the same time as any change in the payment or payments required under Section 4;

(2)     As a condition of approval of assignment or sublease of this Lease; or,

(3)     Upon a change in the Permitted Use.

A new or modified Bond shall be delivered to State within thirty (30) days after adjustment of the amount of the Bond has been required by State.

(b)     Upon any default by Tenant in its obligations under this Lease, State may collect on the Bond to offset the liability of Tenant to State.  Collection on the Bond shall not relieve Tenant of liability, shall not limit any of State's other remedies, and shall not reinstate or cure the default or prevent termination of the Lease because of the default.

**10.3    Insurance.** At its own expense, Tenant shall procure and maintain during the Term of this Lease, the insurance coverages and limits described in Subsections 10.3(a) and (b) below.   This insurance shall be issued by an insurance company or companies admitted and licensed by the Insurance Commissioner to do business in the State of Washington.  Insurers must have a rating of B+ or better by "Best's Insurance Reports," or a comparable rating by another rating company acceptable to State.  If non-admitted or non-rated carriers are used, the policies must comply with Chapter 48.15 RCW.

(a)     Types of Required Insurance.

(1)     Commercial General Liability Insurance.  Tenant shall procure and maintain Commercial General Liability insurance and, if applicable, Marina Operators Legal Liability insurance covering claims for bodily injury, personal injury, or property damage arising on the Property and/or arising out of Tenant's operations.  If necessary, commercial umbrella insurance covering claims for these risks shall be procured and maintained.  Insurance must include liability coverage with limits not less than those specified below:

Description:

| | |
|---|---|
| Each Occurrence | $1,000,000.00 |
| General Aggregate Limit | $2,000,000.00 |

State may impose changes in the limits of liability:

(i)     As a condition of approval of assignment or sublease of this Lease;

(ii)    Upon any breach of Section 8, above;

(iii)   Upon a material change in the condition of the Property or any improvements; or,

(iv)    Upon a change in the Permitted Use.

New or modified insurance coverage shall be in place within thirty (30) days after changes in the limits of liability are required by State.

(2)     Worker's Compensation/Employer's Liability Insurance.  Tenant shall procure and maintain:

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page     17  of     37 12:58PM

B12517

FOURTH KNUTSEN DECLARATION - 49

(i)     State of Washington Worker's Compensation coverage, as applicable, with respect to any work by Tenant's employees on or about the Property and on any improvements;

(ii)    Employers Liability or "Stop Gap" insurance coverage with limits not less than those specified below.  Insurance must include bodily injury coverage with limits not less than those specified below:

| | Each Employee | Policy Limit |
|---|---|---|
| By Accident | By Disease | By Disease |
| $1,000,000 | $1,000,000 | $1,000,000 |

(iii)   Longshore and Harbor Worker's Act and Jones Act coverage, as applicable, with respect to any work by Tenant's employees on or about the Property and on any improvements.

(b)     Terms of Insurance.  The policies required under Subsection 10.3 shall name the State of Washington, Department of Natural Resources as an additional insured (except for State of Washington Worker's Compensation coverage, and Federal Jones' Act and Longshore and Harbor Worker's Act coverages).  Furthermore, all policies of insurance described in Subsection 10.3 shall meet the following requirements:

(1)     Policies shall be written as primary policies not contributing with and not in excess of coverage that State may carry;

(2)     Policies shall expressly provide that such insurance may not be cancelled or non-renewed with respect to State except upon forty-five (45) days prior written notice from the insurance company to State;

(3)     All liability policies must provide coverage on an occurrence basis;

(4)     Liability policies shall not include exclusions for cross liability;

(5)     To the extent of State's insurable interest, property coverage shall expressly provide that all proceeds shall be paid jointly to State and Tenant.

(c)     Proof of Insurance.  Tenant shall furnish evidence of insurance in the form of a Certificate of Insurance satisfactory to the State accompanied by a checklist of coverages provided by State, executed by a duly authorized representative of each insurer showing compliance with the insurance requirements described in section 10, and, if requested, copies of policies to State.  The Certificate of Insurance shall reference the State of Washington, Department of Natural Resources and the lease number.  Receipt of such certificates or policies by State does not constitute approval by State of the terms of such policies.  Tenant acknowledges that the coverage requirements set forth herein are the minimum limits of insurance the Tenant must purchase to enter into this agreement.  These limits may not be sufficient to cover all liability losses and related claim settlement expenses.  Purchase of these limits of coverage does not relieve the Tenant from liability for losses and settlement expenses greater than these amounts.

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page      18 of      37 12:58PM

**FOURTH KNUTSEN DECLARATION - 50**

**10.4   State's Acquisition of Insurance.**  If Tenant fails to procure and maintain the insurance described above within fifteen (15) days after Tenant receives a notice to comply from State, State shall have the right to procure and maintain comparable substitute insurance and to pay the premiums.  Tenant shall pay to State upon demand the full amount paid by State, together with interest at the rate provided in Subsection 6.2 from the date of State's notice of the expenditure until Tenant's repayment.

<div align="center">

**SECTION 11   MAINTENANCE AND REPAIR**

</div>

**11.1   State's Repairs.**  State shall not be required to make any alterations, maintenance, replacements, or repairs in, on, or about the Property, or any part thereof, during the Term.

**11.2   Tenant's Repairs, Alteration, Maintenance and Replacement.**
    (a)    Tenant shall, at its sole cost and expense, keep and maintain the Property and all improvements (regardless of ownership) in good order and repair, in a clean, attractive, and safe condition.
    (b)    Tenant shall, at its sole cost and expense, make any and all additions,  repairs, alterations, maintenance, replacements, or changes to the Property or to any improvements on the Property which may be required by any public authority.
    (c)    All additions, repairs, alterations, replacements or changes to the Property and to any improvements on the Property shall be made in accordance with, and ownership shall be governed by, Section 7, above.

<div align="center">

**SECTION 12   DAMAGE OR DESTRUCTION**

</div>

    (a)    In the event of any damage to or destruction of the Property or any improvements, Tenant shall promptly give written notice to State.  Unless otherwise agreed in writing, Tenant shall promptly reconstruct, repair, or replace the Property and any improvements as nearly as possible to its condition immediately prior to the damage or destruction.
    (b)    Tenant's duty to reconstruct, repair, or replace any damage or destruction of the Property or any improvements on the Property shall not be conditioned upon the availability of any insurance proceeds to Tenant from which the cost of repairs may be paid.
    (c)    Unless this Lease is terminated by mutual agreement, there shall be no abatement or reduction in rent during such reconstruction, repair, and replacement.
    (d)    Any insurance proceeds payable by reason of damage or destruction shall be first used to restore the real property covered by this Lease, then to pay the cost of the reconstruction, then to pay the State any sums in arrears, and then to Tenant.
    (e)    In the event Tenant is in default under the terms of this Lease at the time damage or destruction occurs, State may elect to terminate the Lease and State shall then have the right to retain any and all insurance proceeds payable as a result of the damage or destruction.

200801240076
Skagit County Auditor
1/24/2008 Page   19 of   37 12:58PM

## SECTION 13   CONDEMNATION

13.1   **Definitions.**

(a)   Taking.  The term "taking," as used in this Lease, means the taking of all or any portion of the Property and any improvements thereon under the power of eminent domain, either by judgment or settlement in lieu of judgment.  Taking also means the taking of all or a portion of the Property and any improvements thereon to the extent that the Permitted Use is prevented or, in the judgment of State, the Property is rendered impractical for the Permitted Use.  A total taking occurs when the entire Property is taken.  A partial taking occurs when the taking does not constitute a total taking as defined above.

(b)   Voluntary Conveyance.  The terms "total taking" and "partial taking" shall include a voluntary conveyance, in lieu of formal court proceedings, to any agency, authority, public utility, person, or corporate entity empowered to condemn property.

(c)   Date of Taking.  The term "date of taking" shall mean the date upon which title to the Property or a portion of the Property passes to and vests in the condemnor or the effective date of any order for possession if issued prior to the date title vests in the condemnor.

13.2   **Effect of Taking.**  If during the Term there shall be a total taking, the leasehold estate of Tenant in the Property shall terminate as of the date of taking.  If this Lease is terminated, in whole or in part, all rentals and other charges payable by Tenant to State and attributable to the Property taken shall be paid by Tenant up to the date of taking.  If Tenant has pre-paid rent, Tenant will be entitled to a refund of the pro rata share of the pre-paid rent attributable to the period after the date of taking.  In the event of a partial taking, there shall be a partial abatement of rent from the date of taking in a percentage equal to the percentage of Property taken.

13.3   **Allocation of Award.**  State and Tenant agree that in the event of any condemnation, the award shall be allocated between State and Tenant based upon the ratio of the fair market value of Tenant's leasehold estate and Tenant-owned improvements on the Property and State's interest (a) in the Property, (b) in the reversionary interest in Tenant-owned improvements, and (c) in State-owned improvements.  In the event of a partial taking, this ratio will be computed on the basis of the portion of Property or improvements taken.  If Tenant and State are unable to agree on the allocation, it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association.

## SECTION 14   DEFAULT AND REMEDIES

(a)   Tenant shall be in default of this Lease on the occurrence of any of the following:

(1)   Failure to make any payment or pay any expense when due;

(2)   Failure to comply with any law, regulation, policy, or order of any lawful governmental authority;

(3)   Failure to comply with any other provision of this Lease;

16

200801240076
Skagit County Auditor
1/24/2008 Page   20 of   37 12:58PM

    (4)    Two or more defaults over a period of time, or a single serious default, that demonstrates a reasonable likelihood of future defaults in the absence of corrective action by Tenant; or,

    (5)    Proceedings are commenced by or against Tenant under any bankruptcy act or for the appointment of a trustee or receiver of Tenants' property.

(b)    A default shall become an event of default ("Event of Default") if Tenant fails to cure the default within the applicable cure period after State provides Tenant with written notice of default, which specifies the nature of the default.

(c)    Upon an Event of Default, State may terminate this Lease and remove Tenant by summary proceedings or otherwise.  State may also, without terminating this Lease, relet the Property on any terms and conditions as State in its sole discretion may decide are appropriate.  If State elects to relet, rentals received by it shall be applied to:

    (1)    The payment of any indebtedness other than rent due from Tenant to State;

    (2)    The payment of any cost of such reletting;

    (3)    The payment of the cost of any alterations and repairs to the Property; and,

    (4)    The payment of rent and leasehold excise tax due and unpaid under this Lease.

Any balance shall be held by State and applied to Tenant's future rent as it becomes due.  Tenant shall be responsible for any deficiency created by the reletting during any month and shall pay the deficiency monthly.  State's reentry or repossession of the Property under this Subsection shall not be construed as an election to terminate this Lease or cause a forfeiture of rents or other charges to be paid during the balance of the Term, unless State gives a written notice of termination to Tenant or termination is decreed by legal proceedings.  State may at any time after reletting elect to terminate this Lease for the previous Event of Default.

## SECTION 15  ENTRY BY STATE

State shall have the right to enter the Property at any reasonable hour to inspect for compliance with the terms of this Lease.

## SECTION 16  DISCLAIMER OF QUIET ENJOYMENT

As indicated in Section 1.1, this Lease is subject to all valid recorded interests of third parties, as well as rights of the public under the Public Trust Doctrine or federal navigation servitude, and treaty rights of Indian Tribes.  State believes that its grant of the Lease is consistent with the Public Trust Doctrine and that none of the identified interests of third parties will materially and adversely affect Tenant's right of possession and use of the Property as set forth herein, but makes no guaranty or warranty to that effect.  Tenant and State expressly agree that Tenant shall be responsible for determining the extent of its right to possession and for defending its leasehold interest.  Consequently, State expressly disclaims and Tenant expressly releases State from any claim for breach of any implied covenant of quiet enjoyment with respect to the possession of the Property.  This disclaimer includes, but is not limited to, interference arising from or in connection with access or other use rights of adjacent property owners or the public over the water surface or

·B12517

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page      21  of      37 12:58PM

in or under the water column, including rights under the Public Trust Doctrine; rights held by Indian Tribes; and the general power and authority of State and the United States with respect to aquatic lands, navigable waters, bedlands, tidelands, and shorelands.  In the event Tenant is evicted from the Property by reason of successful assertion of any of these rights, this Lease shall terminate as of the date of the eviction.  In the event of a partial eviction, Tenant's rent obligations shall abate as of the date of the partial eviction, in direct proportion to the extent of the eviction, but in all other respects, this Lease shall remain in full force and effect.

## SECTION 17   NOTICE

Any notices required or permitted under this Lease may be personally delivered, delivered by facsimile machine, or mailed by certified mail, return receipt requested, to the following addresses or to such other places as the parties may direct in writing from time to time:

> State:
> DEPARTMENT OF NATURAL RESOURCES
> Northwest Region
> 919 N. Township St.
> Sedro Woolley, WA 98284
>
> Tenant:
> AMERICAN GOLD SEAFOODS, LLC
> PO Box 669
> Anacortes, WA 98221

A notice shall be deemed given and delivered upon personal delivery, upon receipt of a confirmation report if delivered by facsimile machine, or three (3) days after being mailed as set forth above, whichever is applicable.

## SECTION 18   MISCELLANEOUS

**18.1   Authority.**  Tenant and the person or persons executing this Lease on behalf of Tenant represent that Tenant is qualified to do business in the State of Washington, that Tenant has full right and authority to enter into this Lease, and that each and every person signing on behalf of Tenant is authorized to do so.  Upon State's request, Tenant will provide evidence satisfactory to State confirming these representations.  This Lease is entered into by State pursuant to the authority granted it in Chapter 79.90 RCW and the Constitution of the State of Washington.

**18.2   Successors and Assigns.**  This Lease shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**18.3   Headings.**  The headings used in this Lease are for convenience only and in no way define, limit, or extend the scope of this Lease or the intent of any provision.

Form Date: May, 2005

B12517

200801240076
Skagit County Auditor
1/24/2008 Page   22 of   37 12:58PM

**18.4    Entire Agreement**.  This Lease, including the exhibits and addenda, if any, contains the entire agreement of the parties.  All prior and contemporaneous agreements, promises, representations, and statements relating to this transaction or to the Property, if any, are merged into this Lease.

**18.5    Waiver.**  The waiver by State of any breach or default of any term, covenant, or condition of this Lease shall not be deemed to be a waiver of such term, covenant, or condition; of any subsequent breach or default of the same; or of any other term, covenant, or condition of this Lease.  State's acceptance of a rental payment shall not be construed to be a waiver of any preceding or existing breach other than the failure to pay the particular rental payment that was accepted.

**18.6    Cumulative Remedies.**  The rights and remedies of State under this Lease are cumulative and in addition to all other rights and remedies afforded to State by law or equity or otherwise.

**18.7    Time is of the Essence.**  TIME IS OF THE ESSENCE as to each and every provision of this Lease.

**18.8    Language.**  The word "Tenant" as used in this Lease shall be applicable to one or more persons, as the case may be.  The singular shall include the plural, and the neuter shall include the masculine and feminine.  If there is more than one Tenant, their obligations shall be joint and several.  The word "persons," whenever used, shall include individuals, firms, associations, and corporations.

**18.9    Invalidity.**  If any provision of this Lease shall prove to be invalid, void, or illegal, it shall in no way affect, impair, or invalidate any other provision of this Lease.

**18.10    Applicable Law and Venue.**  This Lease shall be interpreted and construed in accordance with the laws of the State of Washington.  Any reference to a statute shall mean that statute as presently enacted or hereafter amended or superseded.  Venue for any action arising out of or in connection with this Lease shall be in the Superior Court for Thurston County, Washington.

**18.11    Recordation.**  Tenant shall record this Lease or a memorandum documenting the existence of this Lease in the county in which the Property is located, at Tenant's sole expense.  The memorandum shall, at a minimum, contain the Property description, the names of the parties to the Lease, the State's lease number, and the duration of the Lease.  Tenant shall provide State with recording information, including the date of recordation and file number.  Tenant shall have thirty (30) days from the date of delivery of the final executed agreement to comply with the requirements of this Subsection.  If Tenant fails to record this Lease, State may record it and Tenant shall pay the costs of recording upon State's demand.

Form Date: May, 2005                                19                                                    17

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor
1/24/2008 Page    23 of    37 12:58PM

**18.12  Modification.**  Any modification of this Lease must be in writing and signed by the parties.  State shall not be bound by any oral representations or statements.

THIS AGREEMENT requires the signature of all parties and is executed as of the date of the last signature below.

AMERICAN GOLD SEAFOODS, LLC,
a Washington Corporation

Dated: ___11 - 30 - 07___

By: _____   RODGER MAY

Title:      President
Address:   PO Box 669
            Anacortes, WA 98221


STATE OF WASHINGTON
DEPARTMENT OF NATURAL RESOURCES

Dated: ___1 - 14 - 08___

By: _____   DAVID ROBERTS

Title:      Assistant Region Manager
Address:   919 N Township Street
            Sedro Woolley, WA 98284


Standard Aquatic Lands Lease
Approved as to Form on January 19, 2007
By:  Janis Snoey
Assistant Attorney General
State of Washington

SKAGIT COUNTY WASHINGTON
REAL ESTATE EXCISE TAX

JAN 2 4 2008

Amount Paid $ -0-
Skagit Co. Treasurer
By man Deputy

Form Date: May, 2005

20

200801240076
**Skagit County Auditor**
1/24/2008 Page   24  of   37 12:58PM

517

REPRESENTATIVE ACKNOWLEDGMENT

STATE OF WASHINGTON )
                      ) ss
County of             )

I certify that I know or have satisfactory evidence that RODGER MAY is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the President of American Gold Seafoods, LLC to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: 11\30\07

(Seal or stamp)

(Signature)
EFREN A. PASCUA
(Print Name)
Notary Public in and for the State of Washington,
residing at  King County
My appointment expires  10/09/11

STATE ACKNOWLEDGMENT

STATE OF WASHINGTON )
                      ) ss
County of Skagit

I certify that I know or have satisfactory evidence that DAVID ROBERTS is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Aquatic Lands Assistant Region Manager of the Department of Natural Resources, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: 1-14-08

(Seal or stamp)

Tammy R Olson
(Signature)

Tammy R Olson
(Print Name)
Notary Public in and for the State of Washington,
residing at  Sedro Woolley
My appointment expires 2-16-08

Form Date: May, 2005

21

200801240076
Skagit County Auditor
1/24/2008 Page    25 of    37 12:58PM

7

**FOURTH KNUTSEN DECLARATION - 57**

# EXHIBIT A









**Exhibit B**
**American Gold Seafoods, LLC – Deepwater Bay Net Pens Sites 1, 2 and 3**
**Plan of Development and Operation**

There are three distinct net pen structures (Site 1, 2 and 3) that are all incorporated within this same Aquatic Lands Lease (20-A12517) authorized by the Washington Department of Natural Resources. All three net pen structures are currently owned and operated by the same company, American Gold Seafoods, LLC, and the type of equipment, management strategy, and daily aquaculture practices of each site are similar. In order to simplify and reduce the amount of paper work, only one Plan of Development and Operation was completed for all three of these sites. Individual descriptions of the sites are given only when necessary to describe any of the physical differences between the sites or the improvements on each of those sites.

**1.) Cage Descriptions and Useful Life of Improvements**

The three Cypress Island net pen structures were initially permitted and installed between 1983 and 1986. The cages have undergone several structural improvements or complete replacements since this time. The last replacement cycle, beginning in 1999, saw all three cage structures being completely replaced with new cages manufactured by Marine Construction, AS www.marineconstruction.com.

There are currently a total of 30 Marine Construction, SystemFarm 24 Meter cages located within the three (3) site areas under the current Washington Department of Natural Resources (WDNR)Aquatic Lands Lease #20-A12517. Each of the net pen sites located in Deepwater Bay consists of a rectangular raft of floating cages. Site 1 contains eight (8) Marine Construction 24 meter by 24 meter square cages; Site 2 ten contains (10) Marine Construction 24 meter by 24 meter square cages; Site 3 contains twelve (12) Marine Construction 24 meter by 24 meter square cages.

The walkways are made up of a frame work of heavy gauged, galvanized steel box beams with galvanized metal walkway grating welded on top of it. The walkways all have multiple foam filled plastic floats bolted in place underneath the frame work that is used for the floatation of the structure. The walkway sections have hinges welded at junctions through out the system that give it flexibility and the capacity to withstand significant wave heights and energy. Each walkway section has 2 hinge points at each end, and use 1.25" diameter stainless steel hinge pins to couple the walkway sections together. Nylon bushings are used to eliminate metal to metal wear at these hinge points.

The new cages have an average expected service life of approximately 15 years. Life span of a cage structures is variable depending upon exposure to storm energy, wave heights, wave frequencies, the corrosiveness of the marine environment, and operational and maintenance programs of each company. Over the past 25 years, cage manufactures have made significant technological and structural advances in the design and materials utilized to construct net pen structures. These advances have greatly increased the efficiency, durability, safety and life-span of the sea cages. The current cages deployed at these sites are well within the design and engineering capacity for this application.

- Maintenance Schedules

Minor maintenance to the cage structures, anchor lines, and netting occurs through out the year and on a continual basis. The industry standard for major cage maintenance is to

200801240076
Skagit County Auditor
1/24/2008 Page     28 of     37 12:58PM

7

periodically replace the entire cage structures with newer ones. Metal fatigue is a factor because of the constant wave action and flexing. The option of retrofitting older cages that are nearing the end of their life span is logistically problematic and not economically viable. A brand new cage system will achieve a substantially higher level of warranty against catastrophic failure. Because of this there is always the possibility for one or more of the Cypress Island net pen complexes to undergo physical changes with the types of cages currently located at the site. In this event all state, local and federal notifications and permits necessary to complete the project will be carried out prior to any work being performed.

- Mooring System Description

    All three sites (Site 1, 2 and 3) utilize similar anchoring designs, equipment and maintenance schedules that have been developed by the Washington, Canadian and Norwegian aquaculture industries. The net pen structures are held into place using numerous steel Danforth type anchors weighing from 2,000 to 10,000 pounds each. Concrete blocks are also used in some locations. Steel chain, shackles, and 1.5 to 2.5 inch diameter polypropylene lines are also utilized to complete the mooring system. Proper scope ratios are maintained in accordance with internationally known and recognized anchoring techniques. Visual inspections of the below water connection are made periodically by divers, while the surface connections can be checked daily by farm staff. The mooring attachments are completely removed, checked and refitted on average every 5 to 7 years.

- Physical Improvements; Fish Nets and Other Physical Structures

    The fish are contained in nylon nets that are held by an underwater weighting system. The weights help to maintain the shape of each square net in the water, and during strong tidal flows. The nets are suspended at the surface by the floating cage structures themselves. Differing mesh sizes are used throughout the growing cycle. Smaller meshed netting (0.75" to 1.0" diagonal stretch) is used for the smolts and juvenile fish, while a larger mesh netting (2" to 2.5" diagonal stretch) is used for final grow out pens. Larger mesh size increases the transfer of water through the net wall, and improves the growing conditions for the larger fish.

    Some fish nets are treated with approved water based antifoulant paint to reduce the growth of fouling organisms on the net walls. All dipping and net treatments are carried out at an off site land based facility. Nets are inventoried, and log sheets are maintained by farm personnel that record the date of manufacture, type of netting, repairs, and other relevant information. Nets are replaced after approximately 6 years of service.

- Physical Conditions; Wind, Waves, Currents and Substrate

    The Cypress Island net pen sites are located within the protected waters of Deepwater Bay, on the eastern shore of Cypress Island. The net pens experience varying degrees of wind strength and direction through out the year. Over the years of operation, new cages have been installed that better meet the physical stresses experienced during major storm events.

    Due to their relatively protected location, the maximum wave height is typically less than 4 feet, however waves of greater heights are occasionally observed. The greatest exposure to wind generated waves is during south east to easterly winds. During major storm events, winds can be in excess of 50 knots, but are typically in the 20-30 knot range (personal observation of farm staff). South easterly wind directions have the greatest fetch reaching into Deepwater Bay, and can potentially develop the largest wave heights impacting the farms. Site 3, the northern

200801240076
Skagit County Auditor
1/24/2008 Page    29 of    37 12:58PM

most site, has the greatest exposure to wind and fetch from this the southeast direction. The largest wave heights observed over the past twenty years are estimated at 6 feet by farm personnel. The current cage structures located at Cypress Island are designed to withstand maximum wave heights in excess of twelve feet. Sites 1 and 2 are more protected from the prevailing south easterly wind direction, but are more exposed during northerly Fraser River out flows that can occasionally occur in the winter. Wave heights reaching Sites 1 and 2 from this direction are typically no greater than 4 feet.

- Tides, Currents and Substrate
The extreme tidal range for the project location is approximately 13.5 feet (2005 Current and Tide Tables for Puget Sound). The maximum current velocity for the Cypress Island site is 0.45 cm/second and average is approximately 0.35 cm/second (J. Rensel, Current Velocity Study, 1996). The site is orientated in an area where tidal action and deep waters help to minimize the build up of biological waste material. The sites have never failed the sediment sampling standards established under the Washington Department of Ecology (WDE) NPDES permits.

Benthic sampling carried out over the years by a consultant to the farm, Dr. Jack Rensel, show the substrate found around the Cypress Island net pen facilities to vary widely from site to site, but primarily consist of mud, silt, sand and cobble (J. Rensel pers., comm.). Observations by farm staff during anchor inspections, anchor maintenance projects, and sediment sampling; in addition to the benthic descriptions shown on NOAA navigational charts of the area also support this conclusion.

**2.) Schedule of Development.**
The physical structures for the net pens at Cypress Island have all been developed. Normal and routine activities, such as mooring system maintenance and cage maintenance, are performed on a continual basis. There are no plans for a complete cage replacement at the date of this application.

**3.) Work force at the site.**
The Cypress Island farm site employs a total of 8 full time employees. Typically there are between 4-5 people working during the weekdays at the site, and only 2 or 3 people working at the site over the weekends. Daily activities of raising fish include feed transport, feeding, size grading, mort diving, net changing, net cleaning, density adjustments, size sampling, health screening, fish harvesting and fish planting. Other activities occurring on the site would be the normal day to day maintenance work on the existing facilities. Some examples would be net mending, net replacements, replacing steel cage components, anchor line work, boat maintenance, diving and the maintenance of other support equipment. There is some seasonality to the work such as the size grading, harvesting and anchor line work, but in general all of the above activities occur on a year round basis.

**4.) Number, type and size of boats for site operation.**
The farm will utilize several small outboard powered work skiffs that measure from 12' to 25' in length. The smaller boats are used as transportation and support vessels between the three sites. These smaller skiffs are used on a daily basis. The farm also owns a larger work vessel measuring 62' in length which has a large crane on board. The boat is used to transport

200801240076
Skagit County Auditor
1/24/2008 Page    30 of    37 12:58PM

fish feed and equipment from a land based facility in Anacortes to the net pen sites. The vessel is also used for net maintenance, anchor line work and other crane work at the farm. Periodically, the farm employs larger "well boats" measuring from approximately 100 to 160 feet in length. These vessels are used to transfer live fish into and out of the farm site; and to haul the harvest fish to the processing plants. These vessels are used on a more seasonal basis, depending on the operational strategy of the facility (grow out or smolt site) and other timing factors such as market demand.

**5.) Timing of work.**

The work force is spread throughout the week, 7 days per week and twelve months per year. The majority of work is normally performed during normal business hours Monday through Friday, with the bulk of the employees working during those times. A smaller crew works the weekends, and the site has security personnel available overnight. Depending on circumstances the farm may be required to perform increased work during after hours and weekends. Examples would be during an algae bloom, a large mortality event, acceleration in fish harvesting, and/or other emergency situations.

**6.) Use of temporary or short term equipment.**

There is no temporary or short term equipment being used at the site.

**7.) Species to be reared, source of stock and anticipated production levels.**

Atlantic salmon (*Salmo salar*) are currently the only species of fish permitted by the Washington Department of Fish and Wildlife (WDFW) Fin Fish Permits to be raised at the Cypress Island net pen facility. Other species of fish may be raised at these sites in the future, but only after approval by the WDFW and issuance of new WDFW Fin Fish Permits.

Over the past twenty five years with the development of the salmon aquaculture industry, cultured Atlantic salmon stocks have become highly domesticated. Atlantic salmon are the predominant species of salmonid commercially reared in marine aquaculture facilities throughout the world. Atlantic salmon are less aggressive than any of the five Pacific salmon species, a characteristic that makes them well suited for the confined rearing spaces and the intensive culturing practices of an efficient operation.

The brood lines to be used in the net pens originated from Atlantic salmon that were being reared by the National Marine Fisheries Service (NMFS), as part of Federal salmon enhancement projects for the St. Johns, Gaspe and Pennobscott Rivers during the early 1980's. Those three particular stocks of North American Atlantic salmon have subsequently been interbred over the years by Washington's commercial aquaculture industry. The resulting stock of fish used by AGS are genetically different than the original wild strains of Atlantic salmon that NMFS was raising some twenty years ago. Brood selection today, is based primarily on the growth rate, the survival rate and other performance characteristics of the cultured stocks, while maintaining as much genetic diversity in the population as possible.

American Gold's brood stock is reared for four years in the controlled environment of freshwater hatcheries before reaching sexual maturity. After spawning it takes from two and a half to three years to raise the fish from an egg, to a market sized 10-12 pound salmon. Production fish are harvested, processed and shipped out the same day to seafood customers located throughout the United States.

20080124 0076
Skagit County Auditor
1/24/2008 Page    31 of   37 12:58PM

The sites will receive smolts from certified disease free hatcheries throughout the year. Primarily the smolts will come from the American Gold Seafoods (AGS) owned and operated hatchery facilities located near Rochester, Washington. Other privately owned hatcheries may be contracted to grow Atlantic salmon smolts for stocking of the net pens in the future. The smolts receive regular health screenings and are vaccinated against common indigenous bacterial diseases prior to transfer to the net pen site from the hatcheries.

Research has shown that Atlantic salmon are incapable of successfully interbreeding with any of the different Pacific salmon species. Because of this, the risk of escaped Atlantic salmon negatively affecting the gene pool of the Pacific Northwest salmon stocks is considered to be extremely low by most experts. Atlantic salmon aquaculture has been extensively reviewed over the past 20 years. A recent risk analysis performed by the NMFS (Nash, C. E. 2003), and the white paper from WDFW both discuss the relatively low risks associated with escaping Atlantic salmon with regard to impacting Pacific salmon species. Washington State salmon farms operate under regulations that are designed to further reduce the risks of accidental release of cultured fish, and all efforts are carried out in order to minimize the loss of any fish stocks by American Gold.

Anticipated production levels for the three Cypress Island net pen facilities is approximately 2,000,000 Kilograms (4,405,200 pounds) per year. The facilities are presently being used as grow out sites. Juvenile fish from the associated Hope Island net pen facility are entered into the site during the fall and early spring of each year. The juvenile fish weigh approximately 600-800 grams on average when they are transferred from the nursery site into the Cypress sites.

## 8.) Chemicals, antibiotics, etc.., to be introduced into the water.

No chemicals can, or will be directly introduced into the waters at the sites. Antibiotics, as permitted by the State and Federal regulations are occasionally used, and if so, used only to treat a specific disease event. The use of antibiotics has become very infrequent due to new vaccines and to improved husbandry techniques that have been developed over the years. Antibiotics approved for use in aquaculture in the United States include the following: Terramycin, Oxytetracycline, and Amoxycilin. Other therapeutants can be used under an Investigational New Animal Drug permit issued by the U.S. Food and Drug Administration. The use of any INAD disease control chemicals has been rare in the operation of these net pens and in Washington state salmon aquaculture in general.

Use of approved antibiotics is carried out under consultation with a licensed veterinarian and then ordered from the feed manufacture by the site manager. The feed manufacturer only mixes the prescribed amounts into the fish feed under the prescription from the licensed veterinarian. Strict guidelines and record keeping are adhered to during the medicated feeding process to ensure the each fish receives an effective dosage. Disease Control Chemical Use reports are submitted annually to the Washington Department of Ecology in compliance with the NPDES operational permits at each aquaculture facility. These reports compile the total amount, type and frequency of usage of disease control chemicals and medicated feeds. Log sheets are maintained by farm managers and other personnel as part of record keeping requirements of the permits. The use of antibiotics in the fish feed is infrequent, with typically less than 2% of the annual amount of feed used at the sites ever being medicated. It is the goal of AGS to completely eliminate the use of medicated feed.

**9.) Harvest, feeding and tending operations.**
- Growth and Harvesting

The fish take between 16 and 20 months, after saltwater introduction, to reach the market size of approximately 10-12 pounds. At harvest, the fish are pumped from the pens using a vacuum pump and transferred into the hold of a fishing vessel. The fish are then either live-hauled to a processing plant where they are stunned, bled and processed, or they are stunned and bled into the hold of the transfer ship and then later processed at a land based processing facility.

Harvesting is carried out on year round basis depending on the size of fish and fluctuating market conditions. The fish are shipped out fresh from the processing plant to buyers located through out the United States.

- Fish Feed

The feed used at all three sites is an extruded dry pellet. It is fed out mainly by a computerized automatic feeding system using air blowers, and plastic pipes to distribute the feed into the pens. The feed contains fishmeal, fish oils, vegetable proteins, vitamins, minerals, ash, and pigmentation in the form of Canthazanthin and/or Astazanthin.

The fish are fed daily and the amounts supplied to them are closely monitored to prevent either over, or underfeeding, which can both seriously impact the cost of production. The amount and type of feed being administered to each pen is closely monitored and recorded on a daily basis and kept in a data base. Calculated feeding rates and well researched feeding regimes are used to promote the highest efficiency in growth rates for the fish stocks, as well as to minimize any impact to the environment from overfeeding and wasting feed. The water quality is closely monitored at the farm for fluctuations in temperature, dissolved oxygen and harmful plankton, which all play a critical role in the appetite of the fish stocks. Underwater cameras or other devices are used by technicians to monitor the feeding process and the feed response of the fish.

**10.) Maintenance methods and timing.**

Maintenance of the fish containment nets is carried out on a year round basis. Nets are pulled to the surface, and allowed to air dry; or they are cleaned with an underwater disc, using pressurized sea water to remove any marine growth before it accumulates. Nets have a service life expectancy of approximately 6 years. Cage structures require little daily maintenance, however after 10-15 years of service they typically are completely replaced with a new structure. Components in the mooring systems are periodically replaced an average every 6 years of service, however repairs are made as needed.

**11.) Methods of predator control.**

Predator netting is periodically used as a physical barrier to seals, sea lions and river otters. The predator netting encompasses the entire net pen structure and is made of a heavy gauged, large meshed (7" diagonal stretch) nylon material. The net is treated with antifoulant prior to being deployed and is weighted around the perimeter with large diameter steel pipes. Bird netting is used on all pens to deter bird predation on the smaller fish and to keep birds from attempting to consume the fish feed as it is being distributed at the surface of each cage. Bird netting acts as a visual and physical deterrent.

2 0 0 8 0 1 2 4 0 0 7 6
Skagit County Auditor

Exhibit B                                      6          1/24/2008 Page    33 of   37 12:58PM

**FOURTH KNUTSEN DECLARATION - 65**

**12.) Waste discharges.**

- <u>Washington Department of Ecology-NPDES Permits</u>

Each net pen facility is required to have a National Pollution Discharge Elimination System (NPDES) Permit issued by the Washington Department of Ecology (WDOE). The benthic area surrounding each fish pen perimeter is monitored for Total Organic Carbon (TOC) levels according to the requirements of the NPDES permits. The Benthic Monitoring Reports are sent to WDOE during each permit cycle. Annual Disease Control Chemical Use Reports, which document the amounts of chemicals (antibiotics, disinfectants, anesthetics) used at the site during a year are also submitted.

As part of the NPDES permit requirements, Pollution Prevention Plans have been developed and implemented for each facility. These plans address the daily operating procedures at the site including chemical storage, chemical spill prevention and spill response.

In the event of a significant fish release the farm is to notify the Department of Ecology and the Department of Fish and Wildlife within 24 hours of that event. The American Gold Seafood-Fish Escape Reporting and Response Plans, Fish Escape Prevention Plans, and an Employee Procedure Manual to Minimize the Potential for Escapement, have all been submitted to, and approved by WDOE and WDFW. Both the Pollution plans and the Escape plans require emergency situation, and phone contact numbers will be kept posted on the employee bulletin board.

**13.) Hazardous materials.**

Amounts of hazardous materials are kept to a minimum at the sites, and are generally stored in a centralized area. The combined types and estimated quantities for all three sites are listed below.

Gasoline        100 gallons
Diesel Fuel      250 gallons
Motor oil          4 gallons
Paints/solvents  20 gallons

**14.) Location of public sites to be used as a support facility.**

Currently, the farm leases dock space from the Port of Anacortes located on the Anacortes waterfront. This is a yearly lease and is used for mainly loading the fish feed which arrives by truck, onto the supply vessel for the farms. The facility is also used to load and unload nets, dead fish, and support equipment for the Cypress sites.

**15.) Any subleasing plans.**

There are no plans for subleasing the site as of the date of this application.

**16.) Location of associated activities, processing facilities on state owned aquatic lands.**

Currently, the fish are being processed at a facility located in Seattle on the Duwamish waterway. The ownership of the aquatic lands for this processing facility is unknown. American Gold Seafoods owns and operates three additional net pen sites, and one waterfront pier facility that is located on state owned aquatic lands. Those other site names are Hope Island, Port Angeles and Bainbridge Island. The approximate location of those sites is similar to their names, near Hope Island (Skagit County); in Port Angeles Harbor (Clallam County); and in Rich Passage adjacent to Bainbridge Island (Kitsap County).

Exhibit B                                 7

2008012400076
Skagit County Auditor
1/24/2008 Page 34 of 37 12:58PM

FOURTH KNUTSEN DECLARATION - 66

**17.) Additional information on salmon pens proposals:**

a.)    Site 1 = 8 pens; Site 2 = 10 pens; and Site 3 = 12 pens.

b.)    Maximum pen depth is approximately 15 meters.

c.)    Maximum total pen volume is approximately is 8,640 cubic meters.

d.)    Compressed surface area of cage walkways:

        Site 1 = 18,242 sq. ft.

        Site 2 = 21,952 sq. ft.

        Site 3 = 25,851 sq. ft.

g.)    Total surface area covered by surface structures:

        Site 1 = 68,418 sq. ft.

        Site 2 = 84,672 sq. ft.

        Site 3 = 101,115 sq. ft.

h.)    Maximum weight of fish held at any one time.

        Site 1 = 1,600,000 lbs.

        Site 2 = 1,700,000 lbs.

        Site 3 = 2,600,000 lbs.

j.)    Rearing density or pounds per cubic yard, varies with the average size of the fish being held in each pen. Larger fish can be reared at higher densities (biomass/volume) than can the smaller fish. The following are industry standard density levels used for rearing Atlantic salmon in net pens. Fish with an average size of 1.0 kilogram (2.2 pounds) or less, can be reared at densities up to 17 pounds per cubic yard (approximately 10 Kilograms per cubic meter). Fish greater than 1.0 kilogram (2.2 pounds) can be reared in densities that can go up to, and at some times exceed 50 pounds per cubic yard (approximately 30 Kilograms per cubic meter). Typically grow out densities are kept at no more than 20 Kilograms per cubic meter in order to maximize the growth performance and promote the overall health of the fish being reared:

k.)    Anticipated production levels for the three Cypress Island net pen facilities is approximately 2,000,000 kilograms per year (4,405,200 pounds). The facilities are presently being used as grow out sites. Juvenile fish from the Hope Island net pen facility are entered into the site during the fall and early spring of each year. The juvenile fish weigh approximately 600 grams on average when they are transferred into the Cypress sites.

l.)    Antibiotics are periodically used to treat specific disease events and never used as a prophylactic treatment. The amount of feed containing antibiotics is less than 2% of the total feed used at the sites on an annual basis. Some of the sites go the entire year without the use of antibiotics depending upon fish health and environmental factors. Antibiotics approved for use in aquaculture in the United States include the following: Terramycin, Oxytetracycline, and Amoxycilin. Other therapeutants can be used under an Investigational New Animal Drug (INAD) permit issued by the U.S. Food and Drug Administration. The use of any INAD disease control chemicals has been rare in Washington State's salmon aquaculture industry. Antifoulant net treatments are used to keep the nets from becoming heavily fouled with marine fouling organisms. New nets are treated with antifoulant at the net manufacturing facility. Antifoulant treatments last approximately 2 years before needing to be re-treated. Nets are removed from the facility and shipped back to the net manufacture for cleaning and re-dipping with antifoulant. No

antifoulant treatments are carried out at the farm sites. Antifoulant use has been approved by the Washington Department of Ecology and is a copper containing, water based paint.

## Compatibility of Adjacent Land and Water Uses

**1.) Distances from the closest shore at MLLW:**

Site 1 ~ 200 feet; Site 2 ~ 175 feet; Site 3 ~ 300 feet from the nearest shore.

**2) Character and density of development within view of the sites:**

The cages are located in Deepwater Bay adjacent to the eastern shore line of Cypress Island. They are approximately 3.5 miles west of Anacortes. The adjacent upland areas are primarily owned by the State of Washington and are managed by the Washington State Department of Natural Resources.

**3.) Public use and access:**

a.) The marine waters around Cypress Island has been designated an Aquatic Reserve by the Washington Department of Natural Resources (WDNR) and approximately 95% of those tidelands are owned by the State of Washington. Upland areas around Cypress Island also are primarily owned (~85%) by the State of Washington. Most of the Cypress upland areas are designated Natural Area Preserves and Natural Resource Conservation Areas by WDNR. There is some private ownership of uplands scattered throughout the island. The shoreline around Cypress Island is designated Conservancy by the Skagit County Master Plan. There are several parks located on Cypress Island and some of the adjacent smaller islands, such as the Cone Islands and Strawberry Island. None of the parks are located within one-quarter mile of the net pen sites in Deepwater Bay.

b.) The net pen operations in Deepwater Bay do not significantly impact the recreational use of the state owned lands adjacent to the site. The net pen structures are located offshore and do not encumber, or impede the public use of any of the nearby shorelines. The sites are also located a significant distance away from any of the park areas located on or near Cypress Island, and as such these operations do not disturb the quiet enjoyment of those facilities by the public.

**4.) Navigation:**

The net pens are registered with the U.S. Coast Guard Private Aids to Navigation (PATON) Program. PATON is a federally operated program that allows for the private maintenance and operation of navigational lights on private property located in navigable waters. Proper navigational warning lights, as permitted by the USCG- PATON program are maintained by the farm personnel, and are periodically inspected by the Coast Guard Auxiliary. The net pens and their marking lights are also shown on all NOAA Navigational Charts, which are periodically being updated by the agency. The sites were purposely located within Deepwater Bay and away from any designated navigational shipping lanes.

a.) There is recreational navigational use of the waters around Cypress Island and within Deepwater Bay. There is no commercial navigational use of the project site. The net pen facilities are located well inside of Deepwater Bay, and far away from the designated commercial shipping lanes of Rosario Strait, Guemes Channel and Bellingham Channel.

20080124 00076
Skagit County Auditor
1/24/2008 Page    36 of    37 12:58PM

b.)      There is no impact to the commercial navigational use in Deepwater Bay because this area is not used for commercial navigation. There is recreational boating around Cypress Island, and within Deepwater Bay, and because of this there is potential for minimal impact to recreational boating of the area occupied by the net pen structures. There is however, ample area around the net pen structures for the safe passage of recreational boaters, and the sites are well marked with navigational devices to aid in navigation. There is some added benefit to nearby recreational boaters to the presence of the net pen facilities and farm employees because of the resources available (first aid kits, boats, pumps, radios, etc..,). Because the farms are manned 7 days a week, farm personal have been called in, or volunteered to perform numerous vessel rescues over the many years these sites have been operating. The net pen sites and some of the larger farm work boats are equipped with VHF radios which monitor the normal emergency distress channels.

**F. State Environmental Policy Act Compliance**
The facilities have been in existence since approximately 1985. All necessary permits from state and local agencies were acquired for the development. Copies of these various historical permits can be made available upon request.

Exhibit B                                          10

**FOURTH KNUTSEN DECLARATION - 69**

# EXHIBIT 3



**WASHINGTON STATE**
**Joint Aquatic Resources Permit Application (JARPA) Form**[1,2] [help]

US Army Corps
of Engineers ®
Seattle District

USE BLACK OR BLUE INK TO ENTER ANSWERS IN THE WHITE SPACES BELOW.

| AGENCY USE ONLY |
| --- |
| Date received: 02-10-17 |
| Agency reference #: _____ |
| Tax Parcel #(s): _____ |
| _____ |
| _____ |

## Part 1–Project Identification

**1.** Project Name (A name for your project that you create. Examples: Smith's Dock or Seabrook Lane Development)  [help]

Replacement and Reorientation of Existing Deepwater Bay -Site 2 Floating Salmon Net Pen Aquaculture Structure and Moorings

## Part 2–Applicant

The person and/or organization responsible for the project.  [help]

| **2a.** Name (Last, First, Middle) |
| --- |
| Bright, Kevin, J. |

| **2b.** Organization (If applicable) |
| --- |
| Cooke Aquaculture Pacific, LLC |

| **2c.** Mailing Address (Street or PO Box) |
| --- |
| P.O. Box 669 |

| **2d.** City, State, Zip |
| --- |
| Anacortes, WA, 98221 |

| **2e.** Phone (1) | **2f.** Phone (2) | **2g.** Fax | **2h.** E-mail |
| --- | --- | --- | --- |
| 360.391.2409 | 360.293.9448 | 360.293.0558 | Kevin.Bright@Cookeaqua.com |

---

[1]Additional forms may be required for the following permits:
- If your project may qualify for Department of the Army authorization through a Regional General Permit (RGP), contact the U.S. Army Corps of Engineers for application information (206) 764-3495.
- If your project might affect species listed under the Endangered Species Act, you will need to fill out a Specific Project Information Form (SPIF) or prepare a Biological Evaluation.  Forms can be found at
  http://www.nws.usace.army.mil/Missions/CivilWorks/Regulatory/PermitGuidebook/EndangeredSpecies.aspx.
- Not all cities and counties accept the JARPA for their local Shoreline permits. If you need a Shoreline permit, contact the appropriate city or county government to make sure they accept the JARPA.

[2]To access an online JARPA form with [help] screens, go to
http://www.epermitting.wa.gov/site/alias__resourcecenter/jarpa_jarpa_form/9984/jarpa_form.aspx

For other help, contact the Governor's Office for Regulatory Innovation and Assistance at (800) 917-0043 or help@oria.wa.gov.

## Part 3–Authorized Agent or Contact

Person authorized to represent the applicant about the project. (Note: Authorized agent(s) must sign 11b of this application.) [help]

| **3a.** Name (Last, First, Middle) | | | |
|---|---|---|---|
| | | | |
| **3b.** Organization (If applicable) | | | |
| | | | |
| **3c.** Mailing Address (Street or PO Box) | | | |
| | | | |
| **3d.** City, State, Zip | | | |
| | | | |
| **3e.** Phone (1) | **3f.** Phone (2) | **3g.** Fax | **3h.** E-mail |
| | | | |

## Part 4–Property Owner(s)

Contact information for people or organizations owning the property(ies) where the project will occur. Consider both **upland and aquatic** ownership because the upland owners may not own the adjacent aquatic land. [help]

☐ Same as applicant. (Skip to Part 5.)

☐ Repair or maintenance activities on existing rights-of-way or easements. (Skip to Part 5.)

☐ There are multiple upland property owners. Complete the section below and fill out JARPA Attachment A for each additional property owner.

☒ Your project is on Department of Natural Resources (DNR)-managed aquatic lands. If you don't know, contact the DNR at (360) 902-1100 to determine aquatic land ownership. If yes, complete JARPA Attachment E to apply for the Aquatic Use Authorization.

| **4a.** Name (Last, First, Middle) | | | |
|---|---|---|---|
| Josh Peters, DNR District Manager-Straits | | | |
| **4b.** Organization (If applicable) | | | |
| Washington State Department of Natural Resources (see JARPA Attachment E) | | | |
| **4c.** Mailing Address (Street or PO Box) | | | |
| Orca Straits District, 5310 Eaglemount Road | | | |
| **4d.** City, State, Zip | | | |
| Chimacum, WA 98325 | | | |
| **4e.** Phone (1) | **4f.** Phone (2) | **4g.** Fax | **4h.** E-mail |
| (360) 732.0013 | | | Josh.Peters@dnr.wa.gov |

## Part 5–Project Location(s)

Identifying information about the property or properties where the project will occur.  [help]

☐ There are multiple project locations (e.g. linear projects). Complete the section below and use JARPA Attachment B for each additional project location.

| **5a.** Indicate the type of ownership of the property.  (Check all that apply.) [help] |
|---|

☐ Private

☐ Federal

☐ Publicly owned (state, county, city, special districts like schools, ports, etc.)

☐ Tribal

☒ Department of Natural Resources (DNR) – managed aquatic lands (Complete JARPA Attachment E)

| **5b.** Street Address (Cannot be a PO Box. If there is no address, provide other location information in 5p.) [help] |
|---|

The project area is located on the east side of Cypress Island within Deepwater Bay and adjacent to Bellingham Channel in Skagit County. The project property is sub-tidal aquatic lands leased by the Department of Natural Resources (DNR) to Cooke Aquaculture Pacific, LLC under DNR aquatic lands lease #20-B12157.

| **5c.** City, State, Zip (If the project is not in a city or town, provide the name of the nearest city or town.) [help] |
|---|

Near Anacortes, WA 98221

| **5d.** County  [help] |
|---|

Skagit County

| **5e.** Provide the section, township, and range for the project location.  [help] |
|---|

| ¼ Section | Section | Township | Range |
|---|---|---|---|
|  | 4 | 35N | 1E |

| **5f.** Provide the latitude and longitude of the project location.  [help] |
|---|
| • Example: 47.03922 N lat. / -122.89142 W long. (Use decimal degrees - NAD 83) |

48.33256 N lat. / -122.41057 W long.

| **5g.** List the tax parcel number(s) for the project location.  [help] |
|---|
| • The local county assessor's office can provide this information. |

The subtidal aquatic lands are owned by the State of Washington and managed by WDNR. The applicant is unaware of tax parcel numbers for the subject property.

| **5h.** Contact information for all adjoining property owners. (If you need more space, use JARPA Attachment C.)  [help] |
|---|

| Name | Mailing Address | Tax Parcel # (if known) |
|---|---|---|
| There are no other adjoining property owners within 1,000 feet other than DNR. |  |  |
|  |  |  |
|  |  |  |

**5i.** List all wetlands on or adjacent to the project location. [help]

There are no wetlands on or adjacent to the project location. The project is located over subtidal aquatic land.

**5j.** List all waterbodies (other than wetlands) on or adjacent to the project location. [help]

Bellingham Channel, Deepwater Bay.

**5k.** Is any part of the project area within a 100-year floodplain? [help]

☐ Yes    ☒ No    ☐ Don't know

**5l.** Briefly describe the vegetation and habitat conditions on the property. [help]

The surrounding shorelines and uplands of Cypress Island and Deepwater Bay adjacent to the project area are primarily owned by the State of Washington and managed by the Department of Natural Resources (DNR). The adjacent upland forested areas were commercially logged 50 to 75 years ago and left relatively undisturbed since that time. The uplands have regrown into a Pacific NW temperate forest consisting primarily of coniferous trees, mixed deciduous trees and typical undergrowth vegetation on a steeply sloped, rocky terrain.

The nearest shoreline to the offshore project area consists of a large rock wall, boulders and cobble rock. The Deepwater Bay area has a strong tidal gyre which forms a deep water channel running parallel to the shorelines of Deepwater Bay. The existing floating net pen structure and mooring equipment is located in water that ranges from 75 feet to 100 feet deep. There is no marine vegetation in the project location because depths are beyond the photic zone. The benthic environment underneath and adjacent to the net pens varies from cobble and coarse sand, to silt and shell clutter.

**5m.** Describe how the property is currently used. [help]

The facility is used as a commercial marine finfish aquaculture net pen facility that has been in operation since 1985. The existing net pen structure has a surface area of approximately 1.84 acres and consists of a grid of hinged floating steel walkways. There are a total of ten individual fish cages (2 rows of 5 cages) located within the existing Site 2 floating steel net pen structure. Juvenile salmon are transported by boat from the company's private freshwater hatchery and entered into the marine net pens. The juvenile fish weigh an average of 100 grams each when they are entered into the marine fish pens from the hatchery. Each pen is stocked with a distinct number of fish that can be grown to harvest size. The juvenile fish are fed and raised in the net pens for approximately 14 to 18 months until they reach a harvestable size of 10 to 12 pounds on average. The salmon are harvested from the pens, transported to a fish processing plant, cleaned, packaged and distributed to seafood buyers throughout the United States. The facility will harvest the entire generation of fish off the site and the net pen facility will remain empty (fallow) for a minimum of 8 weeks before the next generation of juvenile fish are entered into the pens.

There are three (3) separate net pen facilities located within Deepwater Bay (Sites 1, 2 and 3) that are all owned and operated by Cooke Aquaculture Pacific (see Sheet 1 of attached JARPA drawings). Normal activities at the sites include feeding and caring for the fish stocks; maintenance of equipment, structures and fish containment nets; and re-supplying the site with fish feed and other items necessary for the day to day operations.

**5n.** Describe how the adjacent properties are currently used. [help]

The adjacent properties are undeveloped uplands owned by the State of Washington. Some of the uplands of Cypress Island are designated Natural Resource Lands by Skagit County and are designated a Natural Reserve Area by DNR. The Skagit County shoreline environment designation of adjacent shorelines is Conservancy. The upland property adjacent to the fish pen structure is steeply sloped shoreline, with a rock wall and large boulders. Cypress Island is only accessible by private boat. Public use of the adjacent shoreline is infrequent because the steep, rocky terrains make it difficult to land recreational vessels. Recreational and commercial boating and fishing occur in the adjacent waters of Deepwater Bay and Bellingham Channel area.

**5o.** Describe the structures (above and below ground) on the property, including their purpose(s) and current condition. [help]

Existing structures:

The current net pen structure moored at the Site 2 location is a floating steel raft, containing a total of 10 individual cages (2 rows of 5 cages). Each individual fish containment cage measures approximately 80 feet by 80 feet square at the surface. Each individual fish cage is surrounded by a grated steel walkway measuring approximately 7 feet in width. The walkways are interconnected at hinged joints that form a floating rectangular grid (see attached JARPA drawings). The total structure measures approximately 183 feet wide by 438 feet long around the outside perimeter (approximately 80,154 sq. ft.). The structure is made of a hinged steel frame work of metal walkways with numerous plastic floatation billets (floats) attached to each walkway.

The floating walkways are anchored to the seafloor with large steel Danforth-type anchors that are placed around the perimeter of the cage system and tightly tensioned. The 2 inch diameter polypropylene anchor lines are attached at specific mooring points around the outside perimeter of the cage walkways using steel shackles, chain and mooring hardware. The anchors weigh from 3,000 to 6,000 pounds each.

The floating walkway structure allows fish containment nets to be installed in each of the ten fish pens and enable farm employees to monitor, feed and perform the routine daily activities involved in commercial finfish aquaculture. The cultivated salmon are raised in very heavy gauged fish containment nets that are attached and suspended from the surface by the floating steel net pen structures. The containment nets are held tightly in place below the surface by a heavy steel pipe weighting system. The net weighting system is attached to the bottom of the net wall around the perimeter of each fish pen which maintains the fish containment nets in their square shape.

Current condition:

The current condition of the existing fish pen structure can be described as "used and nearing the end of serviceable life." The existing steel net pen structure has been in service for approximately 16 years in the marine environment and is due for complete replacement. Corrosion on the metal walkway grating and substructures is beginning to accelerate. The metal hinge joints in some areas are showing signs of excess wear. Complete replacement of the floating steel net pen structure with a newly manufactured one is considered a "best management practice" for the safe containment of the cultured fish stocks and a method of routine maintenance by the marine aquaculture industry. The fish containment nets have been replaced several times over the past 16 years. New containment nets were purchased in 2016 and installed for the current generation of fish being raised at the Cypress facilities. The new containment nets have a useful life expectancy of six (6) years before they are retired from service and recycled. New nets are purchased and typically installed during the fallowing period between generations at the fish pens. There are 22 Danforth-type anchors deployed around the perimeter of the net pen structure. The anchors will be reused. The used anchor line, worn chain and steel hardware items will be replaced with new anchoring and mooring materials.

**5p.** Provide driving directions from the closest highway to the project location, and attach a map. [help]

The site is located within Deepwater Bay, adjacent to Bellingham Channel and is only accessible by boat (see attached JARPA drawings). Boat transportation from Anacortes is available.

# Part 6–Project Description

**6a.** Briefly summarize the overall project. You can provide more detail in 6b. [help]

The proposed project involves the repair and maintenance of an existing floating steel net pen structure by complete replacement using a newly manufactured floating steel net pen structure of similar design and size. During the removal of the existing structure and the replacement with a new net pen structure, the new structure will be re-positioned to align it with the prevailing tidal currents at the site (see attached JARPA drawings). The existing anchors and mooring components will be lifted to the surface, refit with new lines and steel hardware, and then redeployed into new positions that correspond with the new orientation.

**6b.** Describe the purpose of the project and why you want or need to perform it.  [help]

Periodic replacement of the existing net pen structure with a newly manufactured structure is necessary in order to maintain a safe working platform for the farm employees and to ensure the safe containment of the cultivated fish stocks at the facility. The existing steel net pen structure has been in service for approximately 16 years in the marine environment and is due for complete replacement. Steel net pen systems located in the marine environment are subject to the corrosive effects of salt water and to metal fatigue from the constant wave energy, storm events and the extreme forces that are exerted on them from tidal currents. The corrosion on the metal walkway grating and substructures is accelerating and some metal hinge joints show signs of excess wear. Repairing the rusted steel walkways and replacing fatigued metal components of the existing cage system structure in place is not cost effective or practical.

At the time of replacement, the new floating net pen structure will be reoriented and re-anchored in a new position within the existing DNR aquatic lands lease area. Repositioning the floating pens is necessary to align the narrow ends of the farm to the prevailing currents at the site. This new orientation will substantially reduce the drag loads exerted on the fish containment nets, the mooring points and the net pen structure, and will improve the overall safety of the operation as well as the improve the cultivation environment for the reared fish stocks.

The project will replace and re-orient an existing net pen aquaculture facility with a new similar designed structure that consists of floating walkways, anchors, mooring lines and mooring buoys. The proposed project will not substantially change the overall dimensions of the existing fish pen structure or the current operations and activities of the facility.

**6c.** Indicate the project category. (Check all that apply)  [help]

☐ Commercial        ☐ Residential        ☐ Institutional        ☐ Transportation        ☐ Recreational

☒ Maintenance        ☐ Environmental Enhancement

**6d.** Indicate the major elements of your project. (Check all that apply)  [help]

| | | | |
|---|---|---|---|
| ☒ Aquaculture | ☐ Culvert | ☐ Float | ☐ Retaining Wall (upland) |
| ☐ Bank Stabilization | ☐ Dam / Weir | ☐ Floating Home | ☐ Road |
| ☐ Boat House | ☐ Dike / Levee / Jetty | ☐ Geotechnical Survey | ☐ Scientific Measurement Device |
| ☐ Boat Launch | ☐ Ditch | ☐ Land Clearing | ☐ Stairs |
| ☐ Boat Lift | ☐ Dock / Pier | ☐ Marina / Moorage | ☐ Stairs |
| ☐ Bridge | ☐ Dredging | ☐ Mining | ☐ Stormwater facility |
| ☐ Bulkhead | ☐ Fence | ☐ Outfall Structure | ☐ Swimming Pool |
| ☐ Buoy | ☐ Ferry Terminal | ☐ Piling/Dolphin | ☐ Utility Line |
| ☐ Channel Modification | ☐ Fishway | ☐ Raft | |

☒ Other: Floating net pen structure and associated mooring equipment

**6e.** Describe how you plan to construct each project element checked in 6d. Include specific construction methods and equipment to be used. [help]

- Identify where each element will occur in relation to the nearest waterbody.
- Indicate which activities are within the 100-year floodplain.

Removal of existing net pens:

The existing net pens at Site 2 will be harvested out and empty of fish as part of the normal production cycle. All of the fish containment nets will be removed from the facility and transported to an upland facility for repair and maintenance. The floating steel net pen structure will then be detached from the surface mooring points and towed away using a tug boat to a local shipyard as a single unit. The steel cage system components will be dismantled at a shipyard by removing the hinge pin connections between each walkway section and lifting the individual walkway sections onto the shore facility using a crane. The walkway sections will be stacked at an appropriate upland facility for further dis-assembly, transportation and eventual disposal or recycling at an appropriate, permitted facility.

Removal of existing moorings:

A crane barge will be towed to the project area by tug boat and work skiffs. The crane barge will be used to remove the existing anchors, mooring lines and associated anchoring hardware. The barge will be positioned above each anchor using a tug boat. Anchors will be lifted vertically from the sea floor and placed on the deck of the barge. The used polypropylene mooring lines will be collected and disposed of at a land-based waste handling facility. Used steel hardware and chain not suitable for re-use will be collected and transported to a metal recycling facility. Anchors will be refit with new mooring line and anchoring hardware for reuse with the new (replacement) cage structure mooring system. Several anchors will be pre-positioned in designated positions around the perimeter of the new site location prior to the arrival of the new net pen structure.

Installation work will be performed using various support vessels and work vessels to position the crane barge and assist in repositioning the anchors. The mooring lines, chains and shackles will all be connected to the anchors prior to re-placement of the anchors into position on the seafloor. Mooring lines will be attached to buoys at the water surface. The new anchors will be lowered to the bottom in designated locations and set into place. The anchors will form a mooring system around the outside perimeter of the net pen structure, and will allow the new replacement net pen structure to be quickly attached at the surface when it is towed into position.

Installation of new net pen structure:

The pre-assembled new net pen structure will be towed into place using a tug boat and attached to the pre-positioned moorings. Once the mooring lines are tensioned and the new structure is in the correct position, any remaining anchors will be deployed according to the mooring specifications of the cage manufacturer.

Primary equipment to be used:

Tug boats, support vessels and work skiffs will be utilized along with a crane barge to reposition anchors and provide a working platform to carry out the necessary repair and maintenance of the anchoring equipment with new hardware and lines. Small hand tools and metal cutting torches or welding tools will also be used during disassembly and anchor equipment maintenance work.

The proposed project area is the current location of the existing Site 2 net pen structure within Deepwater Bay adjacent to Bellingham Channel. None of the above work will be performed within the 100-year flood plain.

**6f.** What are the anticipated start and end dates for project construction? (Month/Year) [help]

- If the project will be constructed in phases or stages, use JARPA Attachment D to list the start and end dates of each phase or stage.

Start Date: September 2017      End Date: January 2017      ☐ See JARPA Attachment D

**6g.** Fair market value of the project, including materials, labor, machine rentals, etc. [help]

Approximately $1,400,000

| FEDERAL GOVERNMENT |
|---|
| **United States Department of the Army permits (U.S. Army Corps of Engineers):** |
| ☐ Section 404 (discharges into waters of the U.S.)   ☒ Section 10 (work in navigable waters) |
| **United States Coast Guard permits:** |
| ☒ Private Aids to Navigation (for non-bridge projects) |

## Part 11–Authorizing Signatures

Signatures are required before submitting the JARPA package. The JARPA package includes the JARPA form, project plans, photos, etc. [help]

**11a.** Applicant Signature (required)  [help]

I certify that to the best of my knowledge and belief, the information provided in this application is true, complete, and accurate. I also certify that I have the authority to carry out the proposed activities, and I agree to start work only after I have received all necessary permits.

I hereby authorize the agent named in Part 3 of this application to act on my behalf in matters related to this application. _____ (initial)

By initialing here, I state that I have the authority to grant access to the property. I also give my consent to the permitting agencies entering the property where the project is located to inspect the project site or any work related to the project. _KB_ (initial)

Kevin J. Bright
Applicant Printed Name          Applicant Signature          2/2/17
                                                              Date

**11b.** Authorized Agent Signature [help]

I certify that to the best of my knowledge and belief, the information provided in this application is true, complete, and accurate. I also certify that I have the authority to carry out the proposed activities and I agree to start work only after all necessary permits have been issued.

_____     _____     _____
Authorized Agent Printed Name     Authorized Agent Signature        Date

**11c.** Property Owner Signature (if not applicant) [help]

    Not required if project is on existing rights-of-way or easements (provide copy of easement with JARPA).

I consent to the permitting agencies entering the property where the project is located to inspect the project site or any work. These inspections shall occur at reasonable times and, if practical, with prior notice to the landowner.

_____     _____     _____
Property Owner Printed Name     Property Owner Signature        Date

18 U.S.C §1001 provides that: Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly falsifies, conceals, or covers up by any trick, scheme, or device a material fact or makes any false, fictitious, or fraudulent statements or representations or makes or uses any false writing or document knowing same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years or both.

# EXHIBIT 4

```
                    IN THE UNITED STATES DISTRICT COURT
  2            FOR THE WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
  3    _____

  4                                     )
       WILD FISH CONSERVANCY,           )
  5                                     )
                      Plaintiffs,       )
  6                                     )
                   vs.                  )    No. 2:17-cv-01708-JCC
  7                                     )
       COOKE AQUACULTURE PACIFIC, LLC,)      SOME OF THE EXHIBITS AND
  8                                     )     THE TESTIMONY REGARDING
                      Defendant.        )     THEM HAVE BEEN DESIGNATED
  9                                     )     AS CONFIDENTIAL.
       _____
 10

 11        30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

 12             COOKE AQUACULTURE PACIFIC, LLC

 13                   IN THE PERSON OF

 14                   JAMES PARSONS

 15                      Volume I

 16    _____

 17

 18                      9:00 a.m.
                    February 28, 2019

 19              101 Yesler Way, Suite 202
                 Seattle, Washington 98104
 20

 21

 22

 23

 24    REPORTED BY: JACQUELINE L. BELLOWS, CCR 2297

 25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                        APPEARANCES

 2
      For the Plaintiff:
 3
      BRIAN KNUTSEN
 4    Kampmeier & Knutsen PLLC
      221 Southeast 11th Avenue 217
 5    Portland, Oregon 97214
      503.841.6515
 6    brian@kampmeierknutsen.com

 7    LISA COMERFORD
      Earthrise Law Center
 8    Lewis & Clark Law School
      10015 Southwest Terwilliger Boulevard
 9    Portland, Oregon 97219
      503.768.6823
10    comerfordl@lclark.edu

11

12    For the Defendant:

13
      DIANE M. MEYERS
14    DOUGLAS STEDING, Ph.D.
      Northwest Resource Law PLLC
15    101 Yesler Way, Suite 205
      Seattle, Washington 98104
16    206.971.1564
      dmeyers@northwestresourcelaw.com
17    dsteding@northwestresourcelaw.com

18

19

20

21

22

23

24

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                Seattle, Washington; February 28, 2019

 2                           9:01 a.m.

 3                           --oOo--

 4

 5                        JAMES PARSONS

 6        sworn as a witness by the certified court reporter,

 7                     testified as follows:

 8

 9                   E X A M I N A T I O N

10     BY MR. KNUTSEN:

11          Q.   Good morning.

12          A.   Good morning.

13          Q.   My name's Brian Knutsen.  I represent

14     plaintiff, Wild Fish Conservancy.  Please state your

15     name and address for the record.

16          A.   My name is Jim Parsons; and I currently live

17     in Gig Harbor, Washington.

18          Q.   Mr. Parsons, have you ever been deposed

19     before?

20          A.   Only as part of a divorce proceeding.

21          Q.   When was that?

22          A.   In 2007.

23          Q.   I'm going to -- I know you've done this

24     before.  I'm going to go over the format for today.

25          A.   Okay.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 82

 1          Q.   So I will ask questions, and you should

 2     provide an answer.  Your attorney may object.  You

 3     should nonetheless provide an answer unless your

 4     attorney instructs you not to answer.

 5          A.   Okay.

 6          Q.   Please answer verbally and not with gestures

 7     and in words not "uh-huh" so that Jackie can create an

 8     accurate record.

 9          A.   Okay.

10          Q.   If any of my questions are confusing or

11     unclear, please let me know and I'll do my best to

12     clarify them.

13          A.   Very good.

14          Q.   And we can take breaks today whenever you need

15     them.  The only thing that I ask is that, if there's a

16     question posed, you answer the question before we take a

17     break.

18          A.   Very good.

19               (Deposition Exhibit No. 1 marked for

20               identification.)

21          Q    (By Mr. Knutsen) Mr. Parsons, you've been

22     handed a document labeled Exhibit 1.  Have you seen this

23     document before?

24          A.   Yes, I have.

25          Q.   Do you understand that you've been designated

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    to testify on behalf of Cooke on the issues identified

2    in this deposition notice labeled Exhibit 1?

3        A.   Yes, I do.

4        Q.   Are you prepared to testify on the issues

5    identified in this Exhibit 1 Deposition Notice?

6        A.   Yes.

7        Q.   What did you do to prepare for this deposition

8    today?

9        A.   There were numerous reviews of records of the

10   company, interviews with site managers and other

11   employees, review of documents and discussions with

12   counsel.

13       Q.   Are all the documents -- so excuse me.  You've

14   provided a -- you brought with you today the documents.

15   Is that correct?

16       A.   Yes.

17           MR. KNUTSEN:  Can we label that document

18   Exhibit 2.

19           (Deposition Exhibit No. 2 marked for

20           identification.)

21       Q    (By Mr. Knutsen) This document that you

22   brought with you today that's labeled Exhibit 2, does

23   this identify all the documents that you reviewed in

24   preparing for today's deposition?

25       A.   I'm not certain that it identifies every


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 84

```
 1    managers and with employees and discussions with counsel

 2    and review of the existing records, no.

 3         Q.   And the existing records, you said, was the

 4    daily logs?

 5         A.   Daily logs, dive records, vessel records.

 6         Q.   Where is the Fort Ward facility?

 7         A.   The Fort Ward facility is shoreward of the

 8    Orchard Rocks facility.

 9         Q.   Shoreward towards Bainbridge?

10         A.   Yes.

11         Q.   Who manages the Fort Ward facility?

12         A.   Again Randy Hodgin.

13         Q.   I'm sorry.  Did you say how long he had been

14    the site manager?

15         A.   Randy has been a manager for Cooke and its

16    former owners for 35 years.  Beginning, I believe, in

17    2016, he also became manager of not only Port Angeles

18    but the Bainbridge Island facilities.

19         Q.   How many anchors are there at the Fort Ward

20    facility?

21         A.   This particular diagram shows 20.  And I'm

22    looking for the supplemental answers.  Yes.

23         Q.   Twenty?

24         A.   Twenty.

25         Q.   Are any of the anchoring components at the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.    So the documents for this data could have come
 2   from were the same set of documents we've been talking
 3   about?
 4        A.    Yes.
 5        Q.    Could it have come from anywhere else?
 6        A.    Not that I'm aware of.
 7        Q.    Mr. Parsons, where is Cypress Site 3 located?
 8        A.    Cypress Site 3 is also located in Deepwater
 9   Bay adjacent to Cypress Island.
10        Q.    Who is the site manager of Cypress Site 3?
11        A.    The current manager of Cypress Site 3,
12   although it's inactive, is Tom Glaspie.
13        Q.    How long has he held that position?
14        A.    Since 2017, I believe.
15        Q.    I'm sorry.  You said Cypress Site 3 is
16   inactive; is that right?
17        A.    Yes.
18        Q.    Do you know when it was last harvested out?
19        A.    I believe in early 2018.  Again, records would
20   reflect that to be accurate.
21        Q.    Does Cooke have any intent to restock Cypress
22   Site 3?
23        A.    Currently not at this time.  We've been
24   approached to consider partnerships with chinook salmon.
25   But Cooke has no direct plans to do so.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 86

1    Q.   "Chinook salmon," are you talking about the

2  species?  Or is that a company you're referring to?

3    A.   No.  The species to aid in the recovery of the

4  orcas in Washington state.

5    Q.   And did you already identify how many cages

6  there were at Site 3?

7    A.   No.  Again I would have to look that up.

8         (Deposition Exhibit No. 15 marked for

9         identification.)

10   Q    (By Mr. Knutsen) Mr. Parsons, you've been

11 handed a document labeled Exhibit 15.  Are you familiar

12 with this document?

13   A.   I have not seen this particular document

14 before.

15   Q.   Does this document appear to be a diagram of

16 Cypress Site 3?

17   A.   Yes.  With 12 cages, I would assume it's

18 Cypress Site 3 as it existed on December 14 of 2014.  It

19 only is identified as "Site 3" on the top of the

20 document.  But we're assuming that it's Cypress.  That

21 would be, again, prior to the ownership by Cooke

22 Aquaculture.

23   Q.   Were changes made to the layout of Cypress

24 Site 3 following that date, the date of December 14,

25 2014?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**FOURTH KNUTSEN DECLARATION - 87**

1        Q.    Is there a record of that?

2        A.    I'd have to look at the records.

3        Q.    Do you know whether any of these -- so I'll

4    read actually, underneath "Description of materials used

5    or stored at Cypress Site 2," in that paragraph of text

6    at the bottom, it says:  "No other significant amounts

7    of other chemicals are stored at this site.  However,

8    some of the chemicals stored on Site 1 may be used here

9    on occasion."

10       A.    Yes.

11       Q.    Do you know whether any of the materials that

12   are listed under Cypress Site 1 at the top there were on

13   Cypress Site 2 at the time of the collapse?

14       A.    At the time of collapse, given that there was

15   sufficient time to move the diesel fuel cell and the

16   remaining materials including feed, they would have been

17   able to remove those as well.  You'll note that the

18   other ones are fairly small in weight and volume.  And

19   the only reason that they would be moved to Site 2 in

20   the first place is if -- in quantities typically that

21   would be used directly on the site for that point in

22   time.

23       Q.    And did Cooke do its own investigation into

24   the cause of the Cypress Site 2 collapse?

25       A.    No causal analysis was ever made by Cooke.  As

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   I've pointed out, at the time we were totally engaged
2   for site recovery, initially in trying to stabilize the
3   site and make sure that it didn't collapse.  When it was
4   apparent that the collapse had started, then at that
5   point, various staff including staff from Canada began
6   working with the agencies to provide them with all the
7   information and materials that they needed, including
8   removal of all component to an off-location site where
9   the agencies could inspect those component.
10          So all of our efforts were pointed at recovery
11  of materials as much as we could; safety of the divers
12  during the times when they were needing to be in the
13  pens to initiate recovery of the fish; fish recovery,
14  working with tribes, working with nontribal members to
15  get fish recovered.  And by the time the incident had
16  finished to the point of all the materials being made
17  available for the agencies, there was no ability for us
18  to do a causal analysis.
19      Q.   So the collapse was more than two years ago;
20  correct?
21      A.   Yes.
22      Q.   So in the two years since the collapse, Cooke
23  hasn't been able to do -- hasn't done any kind of causal
24  analysis?
25      A.   As I said, the components that were part of



1  the collapse, we were unable to do those -- do analysis

2  of those at the time.  And we felt that the time was

3  best spent assisting the agencies, providing personnel,

4  providing folks for them to interact with, and basically

5  being on-site 24/7 to aid in the recovery efforts.

6          So by the time we would have been able to do a

7  causal determination, those materials were already

8  removed to another site.  They were available for the

9  agencies to look at.  And the agencies made -- the

10  independent review panel made their assertions of what

11  happened.  We disagree with those.  But we were unable

12  to do a causal analysis.

13     Q.   So it's Cooke's position that it can't do a

14  causal analysis without actually having the structure

15  to -- the structure to -- the hard structure to analyze

16  and look at?

17     A.   It's Cooke's position that to do a full causal

18  analysis, we would have had to have been able to review

19  the site as it occurred, as the collapse was occurring,

20  and be able to determine that.  That was not our primary

21  effort at the time.  We wanted to make sure things were

22  safe, No. 1, and initiate recovery, No. 2.

23     Q.   I understand that the primary -- immediately

24  after the collapse, the primary goal was to make sure

25  everyone was safe and to remove the structure.  So I'm

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 90

1   talking about since then.

2       A.   There would be nothing to do a causal analysis

3   of.

4       Q.   Does Cooke have any opinion about what caused

5   the collapse?

6       A.   The causality of the collapse, we may never

7   know what caused the collapse.  It's extremely difficult

8   to ascertain at this point.

9       Q.   Have there been any discussions at Cooke

10  regarding what caused the collapse?

11      A.   Specifically the discussions have centered on

12  how to prevent future collapses.

13      Q.   Would you say that the discussions about how

14  to prevent future collapses are informed by what Cooke

15  believed might have contributed to the collapse?

16      A.   In part, yes.

17      Q.   What part of that?

18      A.   Particularly related to mooring components and

19  making certain that they are adequate.  Again, we

20  believe that the incident initiated with the failure of

21  a mooring component.  We don't know that for sure.  And

22  we'll never know that for sure at this point.

23      Q.   Did Cooke hire a consultant to do a causal

24  analysis?

25      A.   No.

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**FOURTH KNUTSEN DECLARATION - 91**

 1          Q.   At the time of the collapse and immediately

 2     thereafter, the agencies asked Cooke to provide a causal

 3     analysis; correct?

 4               MS. MEYERS:   Object to the form and

 5     foundation.

 6          A.   I don't know what the agencies asked for.  If

 7     you can present me with a record, I could answer that

 8     question.

 9               MS. COMERFORD:   So this is Exhibit 21.

10               (Deposition Exhibit No. 21 marked for

11               identification.)

12          Q    (By Ms. Comerford) Have you seen this document

13     before?

14          A.   Yes, I have.

15          Q.   What is this document?

16          A.   This was a letter that was written by counsel

17     in response to a letter from the DNR regarding

18     expectations in response to the failure of Cooke

19     Aquaculture Pacific's Cypress Island Site 2.

20          Q.   And I'll point you to page 3, which is the

21     last page.  It's Bates No. 13124.  And I'll just read

22     this into the record slowly.  This is the second middle

23     paragraph there.  It says, quote:  "Cooke Aquaculture is

24     committed to identifying the root cause of the Site 2

25     failure," comma, "and will provide DNR and other

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 92

```
 1    agencies a report with conclusions along with fish

 2    escapement and recovery efforts.  This report will be

 3    provided once that information has been gathered, the

 4    emergency situation has abated, and a proper analysis of

 5    the incident has been completed."

 6              Did I read that correctly?

 7         A.   Yes, you did.

 8         Q.   So at the time that this letter was written,

 9    September 1, 2017, Cooke was intending to do a causal

10    analysis of the Cypress Site 2 collapse; is that

11    correct?

12         A.   I'm certain that was the intention, yes.

13         Q.   And what changed between then and as you sit

14    here today telling me that they are not able to do a

15    causal analysis?

16         A.   I think if you look at the rest of that

17    document, this was somewhat of a prioritized list of

18    what needed to occur.  So particularly the fact that

19    there were significant efforts still ongoing about

20    removing remaining fish from the cages at Site 2, get

21    the net pens out of the water, get the structures out of

22    the water, that continued well into September, we were

23    working with DNR and WDFW and the tribes to address how

24    to recover the salmon that had escaped into the water.

25    Then we were going to allow DNR and the other agencies,
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 93

```
 1   if they so wished, to inspect our remaining facilities
 2   and then finally to develop a report.
 3            By the time this earlier work and more
 4   prioritized work had been completed, all of the
 5   equipment that had been removed was moved to land.
 6   There was no way at that point to definitively define
 7   what the root cause of the failure was.
 8       Q.   Was there any way to nondefinitively define
 9   what the root cause of the failure was?
10            MS. MEYERS:  Form.
11       A.   I don't know what "nondefinitively" would
12   mean.  We could guess all day long.  But . . .
13       Q    (By Ms. Comerford) Has Cooke made any guesses
14   as to what caused the Cypress Site 2 collapse?
15            MS. MEYERS:  Form.
16       A.   No.  Again, the focus of Cooke has been to be
17   certain that its remaining facilities, no such incident
18   could happen at the remaining facilities.
19            (Recess taken.)
20            (Mr. Steding rejoins the deposition.)
21       Q    (By Ms. Comerford) So Mr. Parsons, what has
22   Cooke's -- does Cooke have any idea what caused the
23   Cypress Site 2 collapse?
24       A.   We have an idea of what caused it, yes.
25       Q.   What are those ideas?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   That it began with the failure of one of the

 2   mooring lines.  Where that failure actually occurred, we

 3   don't know for sure.  The pad eyes were all replaced on

 4   the facility after the July incident.  Many of the

 5   mooring lines were replaced.  All of the anchors were

 6   repositioned.  There was added structure that was put in

 7   to help stabilize the facility.

 8            And so the assumption, after all those things

 9   were done, that the site was stable and would continue

10   to be so.  So I mean, as a company, we wouldn't want

11   to -- certainly it was not in the best interests of our

12   company to have the collapse, both from an economic

13   standpoint and certainly from a political and social

14   fallout that has occurred since then.

15            So we felt that the Site 2 was stable after

16   the July incident and the repairs had been done.  And we

17   believe one of the outside mooring lines collapsed and

18   then started the cascade of events that eventually ended

19   in the collapse of the facility.

20        Q.   So is it fair to describe it as a mooring

21   failure?

22        A.   That's, that's the most likely occurrence that

23   started it.  We don't know for sure.

24        Q.   Does Cooke have any idea what caused the

25   mooring failure?
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.    No, not definitively.  There were -- if you
 2   look in the documentation of the systems that were done
 3   once they were on the docks, there were several broken
 4   pad eyes that were noted on the cage structure.  But
 5   whether that was what led to the mooring failure or
 6   resulted down the cascade of events, we don't know for
 7   sure.
 8        Q.    Does Cooke have any idea what caused the
 9   broken pad eyes?
10        A.    No.  No.  Again, no definitive answer to that
11   other than the pad eyes were replaced.  So it could have
12   been a defective pad eye that was put back on.  Or if
13   those pad eyes did break, it might -- like I said, it
14   might have been down the cascade of events as the site
15   was collapsing.
16        Q.    When you say "not a definitive answer," what
17   do you mean by that?
18        A.    We don't know for sure.
19        Q.    Do you have a guess as to what caused the
20   mooring failure or the pad eye failures?
21        A.    No.
22        Q.    No?  Does Cooke have any idea what they could
23   have done to prevent the mooring failure?
24        A.    Hindsight is always 20-20.  But in this case,
25   without a definitive cause, our best approach, moving
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 96

1    forward, is to ascertain that all of our facilities meet

2    international standards as far mooring the platforms go.

3    So we've begun to undertake those types of assessments.

4        Q.    Could Cooke have prevented the mooring

5    failure?

6            MS. MEYERS:  Object to the form.

7        A.    That's unknown.  I mean the collapse happened.

8    Cooke was convinced, after the July incident and the

9    large amount of work had been accomplished, everything

10   from night-and-day net cleaning to stabilization of the

11   mooring systems and replacement of the mooring lines, we

12   believed that the structure was sound.

13       Q     (By Ms. Comerford) So you mentioned that now

14   Cooke is seeking to meet international standards.  Did

15   the pens not meet international standard prior to the

16   collapse?  And when I say "the pens," I'm talking

17   specifically about Cypress Site 2.

18       A.    It would be -- at this point, it would be

19   impossible to determine that.  Typically it relates to

20   assessment of each mooring anchor to an international

21   standard that takes into account excessive modeling of

22   conditions that could occur.

23       Q.    What international standard are you

24   specifically referring to?

25       A.    There's a number of standards, anything from

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 97

1    the Norwegian standard for in-water net pens to an

2    international ISO standard for stationkeeping of

3    offshore devices.

4         Q.    What international standard are you

5    specifically referring to?

6         A.    At this point the one that we are working on

7    certifying our current sites to is an ISO standard.

8         Q.    Is there a number associated with that?

9         A.    I'd have to go back into the documentation to

10   find that.

11        Q.    Is that different than the Norwegian standard?

12        A.    Yes.

13        Q.    And 9415, I think, is the number.

14        A.    Right.

15        Q.    So the pens did not meet the ISO standard

16   prior to August 20, 2017?

17             MS. MEYERS:  Object to the form.

18        A.    We have no way of knowing whether it did or

19   not.

20        Q    (By Ms. Comerford) I guess I'm talking about

21   the non Cypress Site 2 pens.

22        A.    We have no way of knowing that, either.  We

23   are just beginning the modeling work now.

24        Q.    So you're now beginning the modeling work to

25   determine -- to bring the pens into compliance with

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 98

1   ISO's standard?

2       A.   No.  We are working on the modeling to

3   determine -- to ascertain whether or not they meet the

4   standard.  And all the work that's been done so far

5   suggests that we do.  It's a very complicated process

6   that involves current modeling and a number of other

7   factors.

8       Q.   So other than bringing the pens into

9   compliance with international standards, specifically

10  the ISO standards that you are referring to, is there

11  anything else that Cooke is doing to ensure that the

12  Cypress -- another collapse won't occur at the other

13  pens?

14      A.   Right.  So there's -- I mean there's many

15  things.  We've adopted -- if you look at our -- compare

16  our October 2017 Pollution Prevention Plan and the 2018

17  Fish Escapement Prevention and Reporting format, there's

18  a number of new documentations that have been included.

19          The sites continue to be monitored in the same

20  way that they were always monitored.  But we're paying a

21  lot more attention to recording that information and

22  having a number of eyes look at it.  And then certainly

23  the modeling efforts is a big part of that.

24          (Deposition Exhibit No. 22 marked for

25          identification.)


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 99

```
 1        Q.     (By Ms. Comerford) Have you seen this document

 2   before?

 3        A.    Yes, I have.

 4        Q.    What is this?

 5        A.    This is the report that was generated by the

 6   Investigation and Review Panel that consisted of the

 7   members of the Department of Ecology, Department of Fish

 8   & Wildlife, and Department of Natural Resources,

 9   providing a summary of the occurrences and their

10   assessment of what caused the failures.

11        Q.    And I'll point you specifically -- I don't

12   have to read this whole thing -- to pages 6 and 7.  Let

13   me know when you're there.  So this is an executive

14   summary of the report.  So here, about halfway down on

15   page 6, it says, quote:  "The probable cause of both the

16   July incident and the August failure was the failure of

17   Cooke to adequately clean the net containing the fish."

18             And just to be clear, the August failure is

19   the mooring failure.  That's your understanding about

20   what we've been talking about?

21        A.    It's the collapse of the site.

22        Q.    The collapse of Cypress Site 2.  And what's

23   the July incident?

24        A.    The July incident was when there were -- the

25   July incident is actually quite well described in other
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    documents, the response to the administrative order.

2         Q.   Does Cooke have an opinion about whether the

3    net in the -- whether the biofouling of the nets

4    contributed to the collapse of Cypress Site 2 collapse?

5         A.   Cooke vehemently disagrees with that

6    conclusion.

7         Q.   What is the basis for that?

8         A.   The basis of that is the extensive amount of

9    net cleaning that had occurred between the July incident

10   and the August failure.  It's well within the records.

11   The assistant manager has provided testimony on the

12   amount of cleaning that occurred.  New net-washing

13   equipment was brought on site from other facilities of

14   Cooke.  And that's a, you know, something that's unusual

15   in the summer because the growth rate on nets is high

16   during the summer.  So to remove it from the other sites

17   could increase problems there.  But it was seen as a way

18   to prevent any further collapse of Site 2 after the July

19   incident and deemed a priority for the company.

20        Q.   Then on page 7, there's a bold sentence

21   towards the top that says, quote:  "The following

22   contributing factors played a role in the July incident

23   and August failure."  Then there's several bulleted

24   items.  Does Cooke have an opinion as to whether weak

25   mooring points were a contributing factor to the August

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 101

1    Site 2 collapse?

2       A.   We don't believe that they were a contributing

3    factor in the August failure.  It likely was part of the

4    July incident.

5       Q.   What's the factual basis for that?

6       A.   The fact that the mooring points, based on the

7    internal Cooke communications, were identified as a

8    problem and the entire mooring system on Site 2 was

9    replaced between the July incident and the August

10   incident.

11      Q.   Does Cooke have -- did Cooke investigate why,

12   a month after the mooring system was replaced, there was

13   a mooring failure?

14           MS. MEYERS:  Object to the form.

15      A.   I think, I think we've answered that

16   adequately with company knowledge that no definitive

17   answer could be made.  But it appears that the collapse

18   begat at a mooring point.  We don't know the reason why.

19      Q    (By Ms. Comerford) Is that a mooring point

20   that was just replaced a month previously?

21      A.   All mooring points were replaced a month

22   previously.

23      Q.   The second bullet says:  "The following

24   contributing factors played a role in the July incident

25   and August failure."  Then "The poor condition of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 102

1    net pens' steel floats."  Does Cooke have an opinion as

2    to whether the poor condition of the net pens' steel

3    floats contributed to the August collapse?

4         A.   Floats actually are contained in HDPE, and

5    corrosion was actually on the walkway points.  So that

6    was not a contributing factor.

7         Q.   Does Cooke have an opinion as to whether the

8    corrosion of the walkways contributed to the Cypress

9    Site 2 collapse?

10        A.   It's certainly a possibility once the collapse

11   began.

12        Q.   Has Cooke done any investigation to determine

13   whether or not that poor condition of the corrosion of

14   the walkways or, it says here metal fatigue, contributed

15   to collapse?

16        A.   No, we have not.  As I've mentioned, we've

17   focused on inspection and repair of all of the other

18   facilities to make sure that this wouldn't happen again.

19        Q.   The third bullet says:  "Insufficient

20   attention to engineering."  Does Cooke have an opinion

21   about whether or not insufficient attention to

22   engineering contributed to the August failure?

23        A.   No, we don't believe so.  As I mentioned, the

24   structure, based on Cooke's assessment -- and this was

25   on the basis of people that have had 30-plus years

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 103

1    dealing with net pens in seawater all around the world,

2    not just Puget Sound -- believed that the structure was

3    safe and secure and could continue to rear fish.  If

4    there would have been any doubt, the fish would have

5    been removed prior to the incident.

6          Q.   When you say "Cooke's assessment," are you

7    referring to an assessment prior to the August collapse?

8          A.   Yes.  Upon stabilization, after the July

9    incident, it was Cooke's position that the structure was

10   now safe to continue.

11         Q.   Who made that assessment?

12         A.   It would have been a variety of people from

13   both New Brunswick, so the saltwater manager, as well as

14   the general manager at the time for Cooke Aquaculture

15   Pacific.

16         Q.   Who was the saltwater manager at the time?

17         A.   It would have been Michael Szemerda.

18         Q.   Is he still in that role at Cooke Aquaculture?

19         A.   Yes.

20         Q.   I'm sorry.  Did you say he's at Cooke

21   Aquaculture Pacific or Cooke Aquaculture?

22         A.   He's with Cooke Aquaculture.  He oversees all

23   of the saltwater operations for Cooke Aquaculture and

24   its subsidiaries.

25         Q.   I believe you said the other person would have

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 104

1    been the general manager?

2         A.    Yes.

3         Q.    Of Cooke Aquaculture Pacific?

4         A.    Pacific, yes.

5         Q.    At the time, who was that person?

6         A.    That would have been Innes Weir.

7         Q.    He's no longer -- he's no longer with Cooke

8    Aquaculture Pacific; right?

9         A.    Correct.

10        Q.    That's the role that you now hold?

11        A.    Yes.

12        Q.    In our -- either Mr. Szemerda -- am I saying

13   that correctly?

14        A.    Michael.

15        Q.    Michael or Mr. Weir, are either of them

16   engineers?  Do they have an engineering background?

17        A.    No.  As I mentioned, they have over 35 years

18   in siting and structural performance of net pens in a

19   variety of seawater operational settings.

20        Q.    Did Cooke have an engineer provide an opinion

21   or provide input into the assessment regarding whether

22   or not it was -- that Cypress Site 2 was structurally

23   sound after the July incident?

24        A.    No.

25        Q.    Did Cooke consider having an engineer weigh in

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 105

```
 1    with that kind of assessment?
 2        A.    No, I don't believe so.  I mean when the
 3    system was placed at the site, at Cypress, it was built
 4    specifically for that site by the manufacturing company
 5    that built the pens.  They were actually on-site for the
 6    design work.  And then it was moored based on their
 7    mooring points.  So there was no reason to suspect that
 8    it would fail after it was stabilized.
 9        Q.    That was -- when you were referring to them
10    being on-site, that was back in 2001?
11        A.    Yes.  Again, I'd have to look specifically at
12    the records of when those pens were placed into
13    operation.
14        Q.    Those people didn't weigh in on the structural
15    soundness of the facility after the July incident?
16        A.    No.
17        Q.    No engineer weighed in on the structural
18    soundness of the facility after the July incident?
19        A.    No.
20              (Deposition Exhibit No. 23 marked for
21              identification.)
22        Q     (By Ms. Comerford) Have you seen this document
23    before?
24        A.    Yes.
25        Q.    What is it?
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    request to recapture.  It totally depends on what is

2    going on in the local area for fishery at that time.  So

3    it's up to the agencies.

4         Q.   So Cooke, though, hasn't developed season- and

5    fish-size-specific response plans?

6         A.   Cooke has been working with WDFW to develop

7    those.

8         Q.   What's the status of those?

9         A.   Ongoing.

10             MS. COMERFORD:  This is a good stopping point.

11             MR. KNUTSEN:  Would either of you like to

12   interject some questions before we call it a day?

13             MS. MEYERS:  Definitely not.

14             THE WITNESS:  Oh, no.  Please, I want to

15   continue.

16             (Signature reserved.)

17             (Deposition continued at 4:55 p.m.)

18

19

20

21

22

23

24

25

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                 REPORTER'S CERTIFICATE

 2           I, JACQUELINE L. BELLOWS, the undersigned

 3    Certified Court Reporter pursuant to RCW 5.28.010 authorized

 4    to administer oaths and affirmations in and for the State of

 5    Washington, do hereby certify that the sworn testimony

 6    and/or proceedings, a transcript of which is attached, was

 7    given before me at the time and place stated therein; that

 8    any and/or all witness(es)were duly sworn to testify to the

 9    truth; that the sworn testimony and/or proceedings were by

10    me stenographically recorded and transcribed under my

11    supervision, to the best of my ability; that the foregoing

12    transcript contains a full, true, and accurate record of all

13    the sworn testimony and/or proceedings given and occurring

14    at the time and place stated in the transcript; that a

15    review of which was requested; that I am in no way related

16    to any party to the matter, nor to any counsel, nor do I

17    have any financial interest in the event of the cause.

18                 WITNESS MY HAND AND DIGITAL SIGNATURE this 9th

19    day of March, 2019.

20

21

22    _____

23    Jacqueline L. Bellows
      Washington State Certified Court Reporter, No. 2297
24    jbellows@yomreporting.com

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**FOURTH KNUTSEN DECLARATION - 108**

EXHIBIT 1
WIT: Parsons
DATE: 2-28-19
J.L. Bellows, CCR 2297

HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7

8

9                   IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF WASHINGTON
10                                AT SEATTLE

11

12    WILD FISH CONSERVANCY,

      Case No. 2:17-cv-01708-JCC
13          Plaintiff,

      PLAINTIFF'S AMENDED NOTICE OF
14    v.                                     RULE 30(B)(6) DEPOSITION OF
                                             DEFENDANT COOKE AQUACULTURE
15    COOKE AQUACULTURE PACIFIC, LLC,        PACIFIC, LLC AND RULE 34 REQUEST
                                             FOR PRODUCTION OF DOCUMENTS
16          Defendant.

17

18

19          TO:     DEFENDANT COOKE AQUACULTURE PACIFIC, LLC, AND COUNSEL OF

20    RECORD:

21          PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 30(b)(6),
22
      Plaintiff Wild Fish Conservancy ("Conservancy"), by and through its undersigned counsel,
23
      hereby notifies you that it requires Cooke Aquaculture Pacific, LLC ("Cooke"), to attend and
24
      testify under oath at a deposition. The deposition will take place on Thursday, February 28,
25
26    2019, beginning at 9:00 am, and on Friday, March 1, 2019, beginning at 9:00 am, at the offices
27
      of Northwest Resource Law, PLLC, 101 Yesler Way, Suite 205, Seattle, Washington 98104. The
28
29    deposition will be recorded by audio, audiovisual, and/or stenographic means. This oral

      AMENDED NOTICE OF DEPOSITION        KAMPMEIER & KNUTSEN PLLC    EARTHRISE LAW CENTER
      OF COOKE AND REQUEST FOR            221 SW 11th Ave., Suite 217  10015 SW Terwilliger Blvd.
      PRODUCTION OF DOCUMENTS - 1         Portland, Oregon 97293       Portland, Oregon 97219
      Case No. 2:17-cv-01708-JCC          (503) 841-6515               (503) 768-6825

examination will be subject to continuance or adjournment from time to time or place to place until completed.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Cooke must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on Cooke's behalf, and may set out the matters on which each person designated will testify. The designated person or persons must testify about information known or reasonably available to Cooke. The matters for inquiry at the deposition are set forth below.

Further, pursuant to Federal Rule of Civil Procedure 34, you are requested to bring to the deposition the documents requested below.

## DEFINITIONS

The following definitions apply to the foregoing list of topics on which examination is requested:

1. The terms "you," "your," "Defendant" and "Cooke" refer to, as appropriate for the applicable time period, Cooke Aquaculture Pacific, LLC, and/or Icicle Acquisition Subsidiary, LLC, including (i) their present and former officers, employees, consultants, agents, representatives, attorneys, and affiliated entities that were in existence during the applicable period of time covered by these requests; (ii) any other person or entity acting on Defendant's behalf or on whose behalf the Defendant acted; or (iii) any other person or entity otherwise subject to the Defendant's control or which controls the Defendant or with which the Defendant is under common control.

2. The term "Puget Sound net pens" means the salmonid net pen facilities currently and/or formerly owned and/or operated by Defendant in Puget Sound and/or the Strait of Juan de Fuca including, as appropriate, the operations and/or maintenance of those facilities and/or the

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 2
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

salmonids reared therein.

3.      The term "Cypress Site 2" refers to the net pen facilities located, or formerly located, in or near Deepwater Bay of Cypress Island and that are commonly referred to as "Cypress Site 2" and/or "Site 2 — Deepwater Bay."

4.      The term "Puget Sound" refers to Puget Sound, including the Strait of Juan de Fuca, and all freshwater bodies flowing into those waters.

5.      The term "Ecology" refers to the Washington State Department of Ecology.

6.      The term "Permits" refers, collectively, to the current and former (as appropriate) National Pollutant Discharge Elimination System ("NPDES") permits issue by Ecology for discharges from the Puget Sound net pens, which are currently assigned NPDES permit numbers WA-003153-4, WA-003154-2, WA-003152-6, WA-003156-9, WA-003157-7, WA-003158-5, WA-003159-3, and WA-004089-4.

7.      The term "Pollution Prevention Plan" has the same meaning as that term used in the Permits, i.e., a Pollution Prevention Plan prepared under the requirements of Condition S6 of the current Permits.

8.      The term "Fish Release Prevention and Monitoring Plan" has the same meaning as that term used in the Permits, i.e., a Fish Release Prevention and Monitoring Plan prepared under the requirements of Condition S7 of the current Permits.

9.      The term "costs" means all monetary and non-monetary costs, including those associated with labor and personnel time.

10.     "FishTalk" refers to the proprietary software program that Cooke uses to track the number of fish within its net pens as described by Cooke in its Supplemental Response to Interrogatory 8.

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 3
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1

**MATTERS FOR INQUIRY**

2      1.      With respect to the collapse of the Cypress Site 2 facility during the summer of

3  2017:

4          a.      Cooke's understanding as to the reasons for and causes of the collapse,

5
6  and the bases for that understanding;

7          b.      The inspections, maintenance and/or repairs, and any failures of any

8  structures, equipment, or components at Cypress Site 2 during the twelve months

9
   preceding the collapse;
10
11          c.      Cooke's response to the collapse, including notifications given to

12  regulatory agencies, efforts to recover Atlantic salmon from Cypress Site 2 and/or Puget

13  Sound, communications with and/or payments to those that recovered escaped Atlantic

14  salmon, efforts to recover and/or remove materials associated with the collapse

15
   (structures, equipment, supplies, etc.), efforts to investigate the cause(s) of the collapse
16
17  (including the results of those investigations), and efforts to remediate any environmental

18  and/or ecological impacts from the collapse;

19          d.      Identification and observations of materials that were or that may have

20  been released into Puget Sound as a result of the collapse (e.g., fuels, lubricants, feed,

21
   chemicals, pharmaceuticals, equipment, machines, metals, netting, and any other supplies
22
23  or materials that were present at or on Cypress Site 2 at the time of the collapse);

24          e.      The number of Atlantic salmon that died as a result of the collapse, the

25  number of carcasses recovered, and the procedures employed to remove and dispose of

26
   carcasses and associated wastes;
27
28          f.      The number of Atlantic salmon that escaped as a result of the collapse, the

29

AMENDED NOTICE OF DEPOSITION      KAMPMEIER & KNUTSEN PLLC      EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR          221 SW 11th Ave., Suite 217    10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 4       Portland, Oregon 97293         Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC        (503) 841-6515                 (503) 768-6825

1   number that were recovered, the number that were not recovered, and Cooke's efforts to

2   ascertain these numbers of fish that escaped, were recovered, and were not recovered;

3          g.     The development of a Sediment Sampling and Analysis Plan for Cypress

4   Site 2 in light of the collapse, the submission of such a plan to Ecology, the review and/or

5   approval of the plan by Ecology, and any closure monitoring conducted by Cooke

6   following the collapse;

7          h.     Any efforts taken by Cooke following the collapse of Cypress Site 2 to

8   prevent a similar failure from occurring at any of Cooke's Puget Sound net pens,

9   including what efforts Cooke took, where these efforts were implemented, how these

10  efforts were implemented, when these efforts were implemented, who implemented these

11  efforts, and how these efforts may prevent a similar collapse event from occurring;

12  2.     The July 2017 incident at Cypress Site 2 (*see, e.g.*, COOKE_CWA_00016041-

13  16042 (Cooke's response to Administrative Order 15422, describing July incident)), including

14  Cooke's understanding as to the cause of the incident and all actions taken by Cooke in response

15  to the incident;

16  3.     The May 2017 incident at Clam Bay, in which the mooring attachments that

17  connect the feed barge to the cage facilities failed (*see, e.g.*, COOKE_CWA_00003508 (Jan. 19,

18  2018 letter from Diane Meyer to the Department of Ecology describing Clam Bay incident)),

19  including Cooke's understanding as to the cause of the incident and all actions taken by Cooke in

20  response to the incident;

21  4.     Structural assessments or inspections of the Puget Sound net pens that Cooke has

22  performed, commissioned, or otherwise arranged for or considered arranging for since August 1,

23  2017 (*see, e.g.*, COOKE_CWA_00026741 (Sept. 20, 2017 letter from Cooke to the Washington

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 5
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

FOURTH KNUTSEN DECLARATION - 113

1   Department of Fish and Wildlife mentioning that Cooke "commissioned an independent

2   structural assessment of all its net pens by International Inspections")), including costs associated

3   with such structural assessments or inspections;

4       5.      The Pollution Prevention Plans that you have prepared, modified, and/or

5   implemented for the Puget Sound net pens pursuant to the requirements of the Permits since

6

7   September 1, 2012, including your implementation of the plans and costs associated with

8   preparation, modification, and/or implementation of the plans;

9       6.      Inspections that you have conducted at the Puget Sound net pens of the exposed

10  surface lines, shackles, and/or mooring points under the provisions of the Permits—including

11  Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish

12

13  Release Prevention and Monitoring Plans since September 1, 2012—including how, where, and

14  when the inspections were conducted, who conducted the inspections, what training and/or

15  instructions were provided to those conducting the inspections, how the inspections were

16

17  documented, what documentation of the inspections exists, how any inspection documentation is

18  maintained, who generates and/or generated the inspection documentation, who maintains and/or

19  maintained the inspection documentation, and what costs were associated with the inspections;

20      7.      Inspections that you have conducted at the Puget Sound net pens of the main cage

21

22  structures under the provisions of the Permits—including Conditions S6 and/or S7 of the

23  Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring

24  Plans since September 1, 2012—including how and where the inspections were conducted, what

25  dates the inspections were conducted, who conducted the inspections, what training and/or

26

27  instructions were provided to those conducting the inspections, how the inspections were

28  documented, what documentation of the inspections exists, how any inspection documentation is

29

AMENDED NOTICE OF DEPOSITION          KAMPMEIER & KNUTSEN PLLC      EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR              221 SW 11th Ave., Suite 217   10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 6           Portland, Oregon 97293        Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC            (503) 841-6515                (503) 768-6825

1  maintained, who generates and/or generated the inspection documentation, who maintains and/or

2  maintained the inspection documentation , and what costs were associated with the inspections;

3       8.      Inspections that you have conducted at the Puget Sound net pens of the anchoring

4  components above and below the water line under the provisions of the Permits—including

5
6  Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your Fish

7  Release Prevention and Monitoring Plans since September 1, 2012—including how (e.g., by

8  divers, remotely operated vehicles, etc.) and where the inspections were conducted, what dates

9
10  the inspections were conducted, who conducted the inspections, what training and/or instructions

11  were provided to those conducting the inspections, how the inspections were documented, what

12  documentation of the inspections exists, how any inspection documentation is maintained, who

13  generates and/or generated the inspection documentation, who maintains and/or maintained the

14  inspection documentation, and what costs were associated with the inspections; with respect to

15
16  inspections of components at a depth of 100 feet or more, in addition to the aforementioned

17  topics, identification of all anchoring components at the Puget Sound net pens that are at a depth

18  of 100 feet or more, your efforts to respond to Plaintiff's Second Set of Requests for Admission

19  pertaining to inspections of such components, and any other efforts you have undertaken since

20  the initiation of this lawsuit to determine whether such inspections occurred;

21
22       9.      Inspections that you have conducted at the Puget Sound net pens of netting,

23  including fish containment netting and predator exclusion netting and including inspections for

24  biofouling, under the provisions of the Permits—including Conditions S6 and/or S7 of the

25  Permits, your Pollution Prevention Plans, and/or your Fish Release Prevention and Monitoring

26
27  Plans since September 1, 2012—including how, where, and when the inspections were

28  conducted, who conducted the inspections, what training and/or instructions were provided to

29

AMENDED NOTICE OF DEPOSITION          KAMPMEIER & KNUTSEN PLLC    EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR              221 SW 11th Ave., Suite 217  10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 7           Portland, Oregon 97293       Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC            (503) 841-6515               (503) 768-6825

1  those conducting the inspections, how the inspections were documented, what inspection

2  documentation exists, how any inspection documentation is maintained, who generates and/or

3  generated the inspection documentation, who maintains and/or maintained the inspection

4  documentation, and what costs were associated with the inspections;

5

6        10.      Maintenance (including repairs and/or replacements) you have conducted of the

7  Puget Sound net pens, including any such efforts made under the provisions of the Permits—

8  including Conditions S6 and/or S7 of the Permits, your Pollution Prevention Plans, and/or your

9  Fish Release Prevention and Monitoring Plans since September 1, 2012—including how

10 maintenance decisions are made, what standards/criteria you employ when deciding whether to

11 undertake maintenance, who makes maintenance decisions, what costs are associated with such

12 maintenance, how the maintenance is documented, what documentation of the maintenance

13 exists, how any maintenance documentation is maintained, who generates and/or generated the

14

15 maintenance documentation, and who maintains and/or maintained the maintenance

16 documentation;

17

18        11.      Your efforts since September 1, 2012 to comply with the requirement of

19 Condition S6 of the Permits that you "assure that the operations staff for the facility is familiar

20 with the [Pollution Prevention Plan] and have been adequately trained in the specific procedures

21 which it requires," and costs associated with these efforts;

22

23        12.      The Fish Release Prevention and Monitoring Plans and/or Fish Escape Prevention

24 Plans that you have prepared, modified, and/or implemented for the Puget Sound net pens

25 pursuant to the requirements of the Permits since September 1, 2012, including your

26 implementation of the plans, and costs associated with preparation, modification and/or

27 implementation of the plans;

28

29

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 8
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

1    13.    Your efforts since September 1, 2012 to comply with the provisions of Condition

2  S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to track the

3  number of fish within the Puget Sound net pens, the number of fish lost to predation and

4  mortality, and the number of fish lost due to escapement, including the results of your efforts to

5  track the number of fish lost due to escapement;

6

7    14.    Your efforts since September 1, 2012 to comply with the provisions of Condition

8  S7 of the Permits and/or your Fish Prevention and Monitoring Plans requiring you to include in

9  your Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state

10 waters, including all Significant Fish Releases," and the results of such efforts;

11

12   15.    Cooke's FishTalk database, including the data that is recorded in FishTalk

13 regarding opening and closing counts, harvest counts, predation counts, mortality counts and

14 reasons for mortality, and deviation counts of fish; how such data is gathered, calculated, and/or

15 entered into FishTalk; how reports are generated from FishTalk; and how the reports and/or data

16 are used to comply with the provisions of Condition S7 of the Permits requiring you to track the

17 number of fish within the Puget Sound net pens, the number of fish lost to predation and

18 mortality, and the number of fish lost due to escapement and requiring you to include in your

19 Annual Fish Release Reports, to the extent possible, "all fish released or escaped to state waters,

20 including all Significant Fish Releases;"

21

22   16.    Your efforts to purchase, clean, repair, maintain, and replace netting at the Puget

23 Sound net pens since September 1, 2012, including procedures and intervals for cleaning mussels

24 and other marine growth from the netting and the equipment or other tools used to clean netting,

25 how these efforts were documented, what documentation of these efforts exists, how

26 documentation of these efforts is maintained, who generates and/or generated documentation of

27

28

29

AMENDED NOTICE OF DEPOSITION    KAMPMEIER & KNUTSEN PLLC    EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR         221 SW 11th Ave., Suite 217    10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 9      Portland, Oregon 97293         Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC       (503) 841-6515                 (503) 768-6825

these efforts, and who maintains and/or maintained documentation of these efforts;

17.     Your identification and implementation since September 1, 2012 of best practices to maintain the Puget Sound net pen cages/structures, mooring systems, and nets, including how you identify such practices, decide which practices should or should not be implemented, and/or determine how select practices are implemented; what persons are influential in making these decisions; and what practices were considered but not implemented;

18.     Cooke's use of pressure or power washers at the Puget Sound net pens, including the Fort Ward pier, since September 1, 2012;

19.     Costs you have incurred since September 1, 2012 in your efforts to comply with the Permits;

20.     Proposals, bids, invoices, budgets, and/or estimates for inspections, maintenance, repairs, and/or replacements at the Puget Sound net pens generated, received, and/or paid since September 1, 2012;

21.     Your procedures since January 1, 2010 for characterizing environmental conditions at the sites of the Puget Sound net pens, including methods used to characterize maximum currents, maximum wind speeds, maximum significant wave heights, maximum boat wake amplitudes, and sediment types for anchor holding capacity;

22.     The identification of any domestic and/or international standards for finfish facilities that you have recognized as authoritative and/or sought to comply with at the Puget Sound net pens since September 1, 2012;

23.     With respect to the Puget Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that currently exist, the identity of those that designed and/or approved the structural and/or mooring designs (including whether those individuals are licensed

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 10
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

FOURTH KNUTSEN DECLARATION - 118

1    professional engineers), any deviations at those Puget Sound net pens from the mooring plans or

2    arrangements—including mooring components or configurations—recommended or prescribed

3    by the pen manufactures or by engineers employed or retained by you, the procedures you

4    employed to determine whether to permit any such deviations, the identity and qualifications of

5    those that selected the anchors, an explanation of how and why the anchors were selected and/or

6    sized, and the procedures used to determine whether anchors were installed and/or embedded

7

8    properly;

9        24.    Your procedures for selection and/or acquisition of the pens/cages for the Puget

10   Sound net pens that existed immediately prior to the Cypress Site 2 collapse and those that

11

12   currently exist;

13       25.    With respect to the Puget Sound net pens that existed immediately prior to the

14   Cypress Site 2 collapse and those that currently exist, the degree of biofouling of the nets that

15   you consider to pose acceptable levels of risks and the bases for those levels;

16

17       26.    Your efforts to prepare to testify on the topics identified herein at deposition; and

18       27.    Your efforts to respond to Plaintiff's Requests for Production and Interrogatories

19   (collectively "Plaintiff's discovery requests"). Topics will include any instructions given to the

20   persons who conducted the searches for information responsive to Plaintiff's discovery requests,

21

22   how employees who might possess or know relevant information were identified and the identity

23   of such employees, and how the searches were conducted, including for electronically stored

24   information and what specific search terms were used to conduct searches of pertinent email

25   records.

26

27

28

29

AMENDED NOTICE OF DEPOSITION        KAMPMEIER & KNUTSEN PLLC     EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR             221 SW 11th Ave., Suite 217   10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 11          Portland, Oregon 97293       Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC               (503) 841-6515               (503) 768-6825

**FOURTH KNUTSEN DECLARATION - 119**

1

## REQUEST FOR PRODUCTION OF DOCUMENTS

2

You are requested under Federal Rule of Civil Procedure 34 to bring the following

3

documents with you to the deposition noticed herein:

4

5

1.      Any documentation (e.g., reports/logs/checklists) generated for any inspections

6

that you have conducted since September 1, 2012 under the requirements of Condition S6.F of

7

the Permits which requires that you, "[a]t least once per year, conduct an inspection of the main

8

cage structure and anchoring components above and below the water line";

9

10

2.      Any inspection documentation (e.g., reports/logs/checklists) generated since

11

September 1, 2012 under the requirements of your Pollution Prevention Plans, and/or your Fish

12

Release Prevention and Monitoring Plans; and

13

3.      All documents related to inspections since September 1, 2012 of components of

14

the Puget Sound net pens at a depth of 100 feet or more, including inspection reports,

15

16

communications with employees and/or contractors performing the inspections, bills and/or

17

invoices for such inspections, videos and/or photographs from such inspections, and any other

18

documents relied upon in preparing your responses to Plaintiff's Second Set of Requests for

19

Admission pertaining to such inspections.

20

4.      All documents reviewed by or created by you to prepare for this deposition that

21

22

you have not already produced to Plaintiff through discovery in this matter.

23

DATED this February 14, 2019.

24

25

26

27

28

29

AMENDED NOTICE OF DEPOSITION
OF COOKE AND REQUEST FOR
PRODUCTION OF DOCUMENTS - 12
Case No. 2:17-cv-01708-JCC

KAMPMEIER & KNUTSEN PLLC
221 SW 11th Ave., Suite 217
Portland, Oregon 97293
(503) 841-6515

EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6825

**FOURTH KNUTSEN DECLARATION - 120**

1

2   KAMPMEIER & KNUTSEN, PLLC

3   By: _____
    Brian Knutsen, WSBA No. 38806
4   221 S.E. 11th Avenue, Suite 217
    Portland, Oregon 97214
5   Tel, Email: (503) 841-6515, brian@kampmeierknutsen.com

6   Paul A. Kampmeier, WSBA No. 31560
    615 Second Ave., Suite 360
7   Seattle Washington 98104
    Tel, Email: (206) 223-4088, paul@kampmeierknutsen.com
8

9

10

11  EARTHRISE LAW CENTER

12  Kevin Cassidy (OSB #025296), *admitted pro hac vice*
    Lia Comerford (OSB #141513), *admitted pro hac vice*
13  Lewis & Clark Law School
    10015 S.W. Terwilliger Blvd.
14  Portland, Oregon 97219
    Tel. Email: (781) 659-1696, cassidy@lclark.edu
15  (503) 768-6823, comerfordl@lclark.edu

16
17  *Attorneys for Plaintiff Wild Fish Conservancy*

18

19

20

21

22

23

24

25

26

27

28

29

AMENDED NOTICE OF DEPOSITION          KAMPMEIER & KNUTSEN PLLC      EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR                  221 SW 11th Ave., Suite 217    10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 13                Portland, Oregon 97293         Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC                       (503) 841-6515                (503) 768-6825

1

## CERTIFICATE OF SERVICE

2       I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that

3   I am co-counsel for Plaintiff Wild Fish Conservancy and that on February 14, 2019, I caused the

4   foregoing to be served on the following by electronic mail per written agreement with counsel:

5

6       Douglas J. Steding
        Diane M. Meyers
7       Madeline Engel
        Northwest Resource Law, PLLC
8       101 Yesler Way, Suite 205
        Seattle, Washington 98104
9       Email: dsteding@nwresourcelaw.com
        dmeyers@nwresourcelaw.com
10      mengel@nwresourcelaw.com
        kcouden@nwresourcelaw.com
11      ehinkes@nwresourcelaw.com
        dbechtold@nwresourcelaw.com
12

13      *Attorneys for Defendant Cooke*
        *Aquaculture Pacific, LLC*
14

15

16

17

18

19

20                          _____
                            Brian A. Knutsen, WSBA No. 38806

21

22

23

24

25

26

27

28

29

AMENDED NOTICE OF DEPOSITION          KAMPMEIER & KNUTSEN PLLC        EARTHRISE LAW CENTER
OF COOKE AND REQUEST FOR               221 SW 11th Ave., Suite 217    10015 SW Terwilliger Blvd.
PRODUCTION OF DOCUMENTS - 14              Portland, Oregon 97293         Portland, Oregon 97219
Case No. 2:17-cv-01708-JCC                  (503) 841-6515                 (503) 768-6825



EXHIBIT 2

WIT: Parsons
DATE: 2-28-19
J.L. Bellows, CCR 2297

Pier 70
2801 Alaskan Way, Suite 300
Seattle, Washington 98121

OFFICE 206.624.8300
FAX 206.340.9599

**Douglas J. Steding, Ph.D., P.C.**
doug.steding@millernash.com
206.777.7552 direct line

September 1, 2017

**VIA E-MAIL**
**SEAN.CARLSON@DNR.WA.GOV**
**AND CERTIFIED MAIL**

Sean Carlson, Land Manager
Aquatic Resources Division, Orca-Straits District
Department of Natural Resources
Olympic Region
411 Tillicum Land
Forks, WA 98331

Subject:     Cypress Island Next Actions and Expectations

Dear Mr. Carlson:

This letter is in response to your correspondence dated August 25, 2017 outlining the Department of Natural Resources' ("DNR") expectations in response to the failure of Cooke Aquaculture Pacific's Cypress Island Site 2. In your correspondence, DNR set forth four requirements for Cooke Aquaculture Pacific to implement in response to that failure. Each of those requirements are addressed as follows:

1.     *Eliminate the potential for any further fish escapement at Site 2; remove any remaining fish from the cages at Site 2; completely remove the net pens and structure at Site 2 from the water.*

**Response:** As detailed in the daily briefings provided to the Unified Incident Command ("UIC"), Cooke Aquaculture Pacific has been working over the past week to stabilize the Site 2 facility, contain the remaining fish in the structures and remove the fish from the cages. That work is, at the time of the writing of this letter, is almost complete, and Cooke Aquaculture Pacific will continue to update DNR through the UIC daily briefings. Removal of the net pens and structures has begun, and we received authorization to do so from the Army Corps of Engineers on Wednesday, August 30, 2017.

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA

MILLERNASH.COM

4846-5324-3726.2

COOKE_CWA_00013122



Sean Carlson, Land Manager
September 1, 2017
Page 2

2. *Provide DNR a fish recovery plan that addresses (a) the resources Cooke Aquaculture Pacific is deploying to recover the greatest number of escaped salmon; (b) the efforts to track and locate Atlantic salmon that are not recovered during initial recovery actions; and (c) mitigation measures Cooke Aquaculture Pacific will implement to protect native salmon species, specifically to deter predation of native salmon by Atlantic salmon and to prevent Atlantic salmon from interfering with native salmon spawning, migration, and rearing activities.*

**Response:** On Monday, August 21, 2017, Cooke Aquaculture Pacific implemented the provisions of its Fish Escape Prevention Plan, as required by the Washington State Department of Ecology and the Washington State Department of Fish and Wildlife. WDFW issued Cooke Aquaculture Pacific an emergency permit to allow it to implement beach seines near Cypress Island to recover escaped fish. As detailed in reports to the UIC, those efforts have been ongoing since that date, as allowed by the presence of local fishing boats and other parties gill netting fish. WDFW did not authorize Cooke to hire non-native fishing vessels such as purse seiners or gill netters due to various fisheries' regulatory requirements. Cooke Aquaculture Pacific has been coordinating with the tribes in the area and WDFW to buy back fish and reimburse the tribes for those recovery efforts. In addition, as you are likely aware, native tribes and the general public have responded to the escape by deploying significant resources to recapture fish. Cooke Aquaculture Pacific is coordinating with the UIC and the sovereign tribes involved in those recapture efforts to recover as many salmon as possible. Additional efforts are the subject of ongoing dialogue with the UIC. As DNR is likely aware, those efforts involve coordination with multiple agencies and the sovereign tribes in the area, and Cooke Aquaculture Pacific is committed to working with those stakeholders to address DNR's other concerns regarding fish recovery.

3. *Provide confirmation, in writing, that inspections of Cooke Aquaculture Pacific's other facilities will occur immediately after the emergent situation at Site 2 is under control, and that DNR will be allowed to be present at those inspections.*

**Response:** Cooke Aquaculture Pacific confirms that it is planning to inspect all of its other facilities in Washington State once the Site 2 failure is addressed by removing the failed structure. Cooke Aquaculture Pacific will coordinate those inspections through Dennis Clark at DNR.

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA
**MILLERNASH.COM**

4846-5324-3726.2

COOKE_CWA_00013123

**FOURTH KNUTSEN DECLARATION - 124**



**MILLER NASH** | **GRAHAM & DUNN** LLP
ATTORNEYS AT LAW

Sean Carlson, Land Manager
September 1, 2017
Page 3

4.      *Provide DNR a report summarizing the causes of damage to the net pen at Site 2, the fish escapement and an assessment of recovery efforts.*

**Response:** Cooke Aquaculture Pacific has instructed its contractors to fully document the Site 2 equipment as it is removed from the water, and we are working with the UIC to find a suitable location to preserve that equipment on land. Cooke Aquaculture Pacific is committed to identifying the root cause of the Site 2 failure, and will provide DNR and other agencies a report with its conclusions, along with fish escapement and recovery efforts; this report will be provided once that information has been gathered, the emergency situation is abated, and a proper analysis of the incident has been completed.

Cooke Aquaculture Pacific shares DNR's sense of urgency to abate the emergency situation at Site 2 and recover as many escaped salmon as possible as quickly as possible. Cooke Aquaculture Pacific also shares DNR's desire to ensure that its other facilities are safe for continued operation, and Cooke Aquaculture Pacific is committed to working cooperatively with DNR to demonstrate that those facilities are safe.

Very truly yours,

Douglas J. Steding, Ph.D.

cc:     Kevin Bright

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA
MILLERNASH.COM

4846-5324-3726.2

COOKE_CWA_00013124

# EXHIBIT 5

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF WASHINGTON
 2                          AT SEATTLE

 3   _____

 4                                )
     WILD FISH CONSERVANCY,        )
 5                                 )
                  Plaintiffs,      )
 6                                 )
              vs.                  )    No. 2:17-cv-01708-JCC
 7                                 )
     COOKE AQUACULTURE PACIFIC, LLC,)   SOME OF THE EXHIBITS AND
 8                                 )    THE TESTIMONY REGARDING
                  Defendant.       )    THEM HAVE BEEN DESIGNATED
 9                                 )    AS CONFIDENTIAL.
     _____
10

11        30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

12             COOKE AQUACULTURE PACIFIC, LLC

13                     IN THE PERSON OF

14                      JAMES PARSONS

15                        Volume II
     _____
16

17                        9:05 a.m.
                        March 1, 2016
18
                     101 Yesler Way, Suite 205
19                   Seattle, Washington 98104

20

21

22

23

24   REPORTED BY: JACQUELINE L. BELLOWS, CCR 2297

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 127

```
 1                          APPEARANCES

 2
     For the Plaintiff:
 3
     BRIAN KNUTSEN
 4   Kampmeier & Knutsen PLLC
     221 Southeast 11th Avenue 217
 5   Portland, Oregon 97214
     503.841.6515
 6   brian@kampmeierknutsen.com

 7   LISA COMERFORD
     Earthrise Law Center
 8   Lewis & Clark Law School
     10015 Southwest Terwilliger Boulevard
 9   Portland, Oregon 97219
     503.768.6823
10   comerfordl@lclark.edu

11

12   For the Defendant:

13
     DIANE M. MEYERS
14   DOUGLAS STEDING, Ph.D.
     Northwest Resource Law PLLC
15   101 Yesler Way, Suite 205
     Seattle, Washington 98104
16   206.971.1564
     dmeyers@northwestresourcelaw.com
17   dsteding@northwestresourcelaw.com

18

19

20

21

22

23

24

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                 Seattle, Washington; March 1, 2016

 2                          9:05 a.m.

 3                          --oOo--

 4

 5            JAMES PARSONS, still under oath,

 6                   testified as follows:

 7

 8                  E X A M I N A T I O N

 9            MS. COMERFORD:  On the record.

10            THE WITNESS:  The first clarification was that

11    the daily logs actually began in 2014.  So any time

12    before that, things were often recorded on a wall

13    calendar at the sites that was thrown away.  So the

14    daily records that we have moving forward is from 2014.

15    Then the company that is doing the analysis of the

16    mooring systems, the engineering firm, is Dynamic

17    Systems Analysis out of BC.

18        Q     (By Ms. Comerford) You said Dynamic Systems?

19        A.    Yes, DSA.

20        Q.    An acronym.

21        A.    Yeah.

22        Q.    So can you tell what is Dynamic Systems?  What

23    have they been retained to do specifically?

24        A.    So they deployed acoustic Doppler current

25    measurement equipment for 40 days at each site to
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 129

```
 1        A.    For Hope Island and Cypress sites are Tom
 2   Glaspie.  For Port Angeles, it's Brett Reamer,
 3   R-E-A-M-E-R.  For Clam Bay, it's Derek Adkisson.  Then
 4   Randy Hodgin oversees all of the Bainbridge Island
 5   sites, so the Orchard Rocks and Fort Ward, as well as
 6   overseeing the work that Derek does at Clam Bay and then
 7   oversees Brett Reamer's work at Port Angeles.
 8        Q.    Sorry.  Derek Adkisson is at Clam Bay?
 9        A.    Yes.  Then Doug Sims is the manager of the
10   freshwater facilities.
11        Q.    Does Cooke have someone in a position called
12   "marine services manager"?
13        A.    Yes.
14        Q.    Who is that person?
15        A.    That is KW.  That is Kyl Wood.
16        Q.    Kyl Wood?  Is that the KW that Mr. Knutsen was
17   asking you about yesterday?
18        A.    That's the KW, yes.
19        Q.    Mr. Wood, is the marine service manager
20   position a new position?
21        A.    Yes.
22        Q.    New since when?
23        A.    Oh, I believe it was after the Site 2
24   collapse.  I would have to go back and look at when that
25   transition was made.  That was something done by the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1   previous general manager.

 2        Q.   Why did Cooke think it was worthwhile to

 3   create a marine services manager position?

 4        A.   We just thought it was best to have one person

 5   responsible for coordinating and updating anything

 6   related to structural integrity of the sites, all that

 7   was done for repairs and maintenance, and somebody to

 8   receive the weekly reports.

 9        Q.   And where is Mr. Wood's office located?

10        A.   He's in Port Angeles.  No.  I'm sorry.  Port

11   Townsend and Anacortes.  Anacortes.  Sorry.  I'm getting

12   my ports mixed up.

13        Q.   Prior to him being a marine service manager,

14   do you know what his role was?

15        A.   He was on the dive team at Cypress.

16        Q.   Do you know how long he was there for?

17        A.   I don't.  I'd have to look at personnel

18   records.

19        Q.   So yesterday afternoon we talked a little bit

20   about the Cypress Site 2 collapse.  And I believe you

21   said -- and I'm sure you'll correct me if I'm wrong --

22   that Cooke is unable to say what the cause of the

23   mooring failure was.  Is that correct?

24        A.   For definitively, yes.

25        Q.   Definitively.  Can Cooke say for certain that

  206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 131

1    a collapse will not occur again?

2        A.   It's our contention that we're taking every

3    possible precaution to prevent a collapse from occurring

4    again.

5        Q.   So is that a yes, that it's possible, even

6    that . . .

7             MS. MEYERS:   Object to the form.

8             Go ahead.

9        A.   That was -- the statement that I made was that

10   we're taking every precaution that we can think of and

11   that aquaculture practices, good aquaculture practices,

12   would rely upon to prevent collapse from occurring

13   again.

14           We worked -- we've worked with all of the

15   agencies to update all of our plans.  We've taken input

16   from all of the agencies in regards to what they wanted

17   to see occur as a result of the Site 2 collapse and what

18   they wanted to see included in our plans.  We've worked

19   with them.  That's why it took an additional year to get

20   a fish escape plan out because we kicked that back and

21   forth, worked on their suggestions with Department of

22   Ecology and Department of Fish & Wildlife.

23           The pollution prevention plans, we have worked

24   with them to update those plans and make corrections

25   that they wanted to see and additional precautions being



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**FOURTH KNUTSEN DECLARATION - 132**

```
 1    taken.  We believe we're doing everything possible.

 2              Is there a possibility that something could

 3    occur again?  There's always a possibility that

 4    something occurs again.  We believe it's a significantly

 5    lower risk than ever before.

 6              (Deposition Exhibits No. 27 & 28 marked

 7              for identification.)

 8         Q    (By Ms. Comerford) Mr. Parsons, have you ever

 9    seen Exhibit 28 before?  That's the one we just handed

10    you.

11         A.   Yes.

12         Q.   And what is this?

13         A.   This is a notice to Kevin Bright, the

14    aquaculture permit coordinator, on January 30th of 2017

15    regarding penalty, Notice of Penalty to Cooke

16    Aquaculture for violations of provisions of the RCWs and

17    WAC and the NPDES permit.

18         Q.   And Cooke is challenging this penalty --

19         A.   Yes.

20         Q.   -- in court; correct?

21         A.   Yes.

22         Q.   Is Cooke challenging the negligence, the

23    finding that Cooke acted negligently with regards to the

24    Cypress Site 2 collapse?

25              MS. MEYERS:  I'm going to object on the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q    (By Ms. Comerford) Did any of the fish escape

 2   during the July 2017 mooring incident?

 3        A.   No.

 4        Q.   How does Cooke know that?  What's your factual

 5   basis for that?

 6        A.   There were no breaches of the nets.  There

 7   were no fish observed outside of the cage system.  There

 8   were no increased incidence of predators.  Once the nets

 9   were repositioned, normal feeding behavior was assumed

10   by the fish.  That would tell us that the inventory was

11   intact.  The divers were able to dive all the nets once

12   it was back in place and observed that there were no

13   breaches of the containment system.

14        Q.   Did Cooke count the fish after the July

15   incident in the net pen?

16        A.   No.

17        Q.   Did Cooke consider counting the fish after the

18   incident?

19        A.   No.  There was no reason to.

20        Q.   Did Cooke consider harvesting the fish after

21   the July incident?

22        A.   The decision was made not to harvest because,

23   as I think we pointed out yesterday, everything that

24   Cooke had done to reposition and resecure the facility

25   led us to the conclusion that it would be safe moving
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   forward.  Obviously, once again, hindsight is 20-20.

2   But there would be -- there would absolutely be no

3   reason for Cooke to suspect that the system might fail

4   again and leave the fish in the net pen.  So that would

5   be a complete business disaster for them to consider as

6   we've seen it was a business disaster now, afterwards.

7        Q.   I believe you testified yesterday that Cooke

8   replaced the entire mooring system after the July

9   incident.

10           MS. MEYERS:  Object to the form.

11           Go ahead.

12      A.   Yesterday I told you that Cooke replaced all

13  of the pad eyes and some of the mooring components

14  including anchors and lines.

15      Q    (By Ms. Comerford) Did Cooke replace all of

16  the anchors after the July incident?

17      A.   No.

18      Q.   Did Cooke replace all of the lines after the

19  July incident?

20      A.   No.

21      Q.   It replaced some of them?

22      A.   Yes.

23      Q.   Some of the anchors and some of the lines and

24  then all of the pad eyes?

25      A.   Yes.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 135

1      Q.    Did Cooke consult with an engineer during the

2   July incident response regarding the fixes that it was

3   making at the time?

4      A.    I believe I've answered that, that we were

5   relying on the combined knowledge of folks that likely

6   had more experience in mooring offshore cage systems

7   than any engineer in the Pacific Northwest would have.

8      Q.    Sure.  I guess I'm getting -- I just want to

9   make sure we're getting at both.  I'm asking both with

10  regards to, during mooring failure, was there an

11  engineer on site providing or available in any way

12  providing any kind of input or review of what was going

13  on?  Then I'm also talking about after, after the fixes

14  were made and after Cooke had determined the structure

15  was stabilized, did Cooke have an engineer review what

16  Cooke had done to make sure the structure was sound?

17     A.    I think we've answered that.

18     Q.    It's a negative for both of those questions?

19     A.    Right.  With the caveat that the folks that

20  were working on the net pens have an extreme amount of

21  combined knowledge, internationally.

22     Q.    Who are those folks?

23     A.    That would be Mike Szemerda, Ted Weir, Innes

24  Weir, no relation.  And previously, when the sites were

25  installed, Alan Cook.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   information is available certainly.

 2            MR. KNUTSEN:  Let me take a five-minute break

 3   and hopefully wrap it up pretty quickly.

 4            MS. MEYERS:  Sure.

 5            (Recess taken.)

 6            MR. KNUTSEN:  Mr. Parsons, I don't have any

 7   further questions today.  We appreciate your time in the

 8   last two days.

 9            Ms. Meyers, do you have any questions for the

10   witness?

11            MS. MEYERS:  I don't believe I have any

12   questions for the witness.

13            MR. KNUTSEN:  Again, thank you for your

14   patience the last couple days.

15            We do reserve our right to ask the Court to

16   reopen this deposition due to the witness's inability to

17   answer several questions noticed.

18            But we certainly appreciate your time the last

19   two days.

20            THE WITNESS:  Just for the record, I believe I

21   answered all the questions that were noticed.

22       Q   (By Mr. Knutsen) I'm sorry.  Can we ask one

23   more question before we go off the record?

24       A   Absolutely.

25       Q   You were going to look at an ap, I believe.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 137

```
 1        A.   Yes.  It's called Windy, W-I-N-D-Y.

 2             MR. KNUTSEN:  With that, I think we'll be

 3   done.

 4             (Signature was reserved.)

 5             (Deposition concluded at 4:11 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FOURTH KNUTSEN DECLARATION - 138

```
 1              REPORTER'S CERTIFICATE

 2          I, JACQUELINE L. BELLOWS, the undersigned

 3   Certified Court Reporter pursuant to RCW 5.28.010 authorized

 4   to administer oaths and affirmations in and for the State of

 5   Washington, do hereby certify that the sworn testimony

 6   and/or proceedings, a transcript of which is attached, was

 7   given before me at the time and place stated therein; that

 8   any and/or all witness(es)were duly sworn to testify to the

 9   truth; that the sworn testimony and/or proceedings were by

10   me stenographically recorded and transcribed under my

11   supervision, to the best of my ability; that the foregoing

12   transcript contains a full, true, and accurate record of all

13   the sworn testimony and/or proceedings given and occurring

14   at the time and place stated in the transcript; that a

15   review of which was requested; that I am in no way related

16   to any party to the matter, nor to any counsel, nor do I

17   have any financial interest in the event of the cause.

18              WITNESS MY HAND AND DIGITAL SIGNATURE this

19   11th day of March, 2019.

20

21

22   _____

23   Jacqueline L. Bellows
     Washington State Certified Court Reporter, No. 2297
24   jbellows@yomreporting.com

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

**FOURTH KNUTSEN DECLARATION - 139**

# EXHIBIT 6

Douglas J. Steding
dsteding@nwresourcelaw.com
206.971.1567



NORTHWEST RESOURCE
— LAW PLLC —

December 18, 2017

Via Email:   rdoe461@ecy.wa.gov

Rich Doenges
Department of Ecology
P.O. Box 47775
Olympia, WA 98504-7775

**Re: Response to Administrative Order, Docket No. 15422**

Dear Mr. Doenges:

I write in response to the Department of Ecology's letter, dated December 8, 2017, regarding
Cooke Aquaculture's response to Administrative Order, Docket No. 15422.

  i.   The information submitted is not what was requested. Ecology again requests the
       original engineering design of the Cypress Island Site 2 facility, if available.

              **Response:** All the drawings in Cooke Aquaculture Pacific's possession have
              been produced.

 ii.   Response complete.

              **Response:** Completeness acknowledged.

iii.   The request for documentation of all inspections, maintenance, and repairs on the
       Cypress Island Site 2 facility was not fulfilled. Missing information:
       a.   Documentation of anchor inspections.
       b.   Records of net cleaning.
       c.   Records of maintenance performed by divers.
       d.   Structural maintenance and/or repairs.

              **Response:** Additional responsive documents accompany this letter.

 iv.   Missing information:
       a.   Daily inspection logs missing: August 2017, September 2016, August 2016, July
            2016 (what is labeled as July 2016 is actually July 2015).

              **Response:** The August 2017 log book reportedly was on the facility at the time
              of collapse and has yet to be located. The other log books have not been located.

       b.   Maintenance logs lack detail for weekly and monthly maintenance conducted.

<center>101 Yesler Way, Suite 205, Seattle, WA 98104</center>

COOKE052177

COOKE_CWA_00121503

Rich Doenges
December 18, 2017
Page 2

> **Response:** Additional responsive documents accompany this letter.

c.    No schedules or policies related to standard structural maintenance.

> **Response:** Additional responsive documents accompany this letter.

v.    Missing information:
    a.    Specific anchor points that broke or failed for July and August incidents.

> **Response:** To the best of Cooke Aquaculture Pacific's understanding, in July, mooring points 1, 2, 3, 4, and 17 through 22 all failed at the pad eye. In August, moorings 3 and 4 failed, along with the rope, which had been newly installed after the July incident. Moorings 1 and 15 had detached from the cages but were still connected by the safety chain, and the end cap walkway on the southern end of the farm at cages 225 and 215 had separated from the main walkway, with hinges pulled out of the steel box section. Anchor 8 also detached from the cage system, breaking the pad eye, the safety chain wrapped around the cleat nearby, and the cross-walkway safety chain.

    b.    Detailed description of anchor/moorage failure, which points broke, which anchors dragged.

> **Response:** The mooring points which failed in August are discussed above. To the best of Cooke Aquaculture Pacific's knowledge, the initial anchors that dragged were 6, 5, and 2, followed with 1 at a later time.

vi.    Missing information:
    a.    Causal analysis regarding July 2017 incident. No causal analysis provided.

> **Response:** As mentioned in the prior response, no causal analysis has been performed for the July 2017 incident at this time.

    b.    Please provide any additional photos of July incident.

> **Response:** Additional photographs will be produced.

vii.    Missing information:
    a.    Explanation of "safety chains:" this term has not been found in any supporting documents.

> **Response:** Safety chains were the chains installed after the July incident as part of reinforcing the cage system, and were stretched across from anchor point to anchor point on the walkways, and, in places, attached from the anchor chain and shackle to available cleats.

<center>101 Yesler Way, Suite 205, Seattle, WA 98104</center>

COOKE052178

**FOURTH KNUTSEN DECLARATION - 142**

COOKE_CWA_00121504

Rich Doenges
December 18, 2017
Page 3

      b.     Explanation of work to strengthen walkway areas: in what ways and in what locations were walkway areas strengthened.

           **Response:** Safety chains, as discussed above, were installed. And, significant reinforcing using three-inch box steel was installed at points throughout the structure.

      c.     Specifications of original and replacement structural components employed.

           **Response:** The invoice for the replacement structural components will be provided. These were acquired by Cooke Aquaculture Pacific in late 2016 in anticipation of regular mooring maintenance at all its facilities, and was the inventory drawn on to do the mooring replacement work in July.

      d.     Descriptions to go along with photos provided.

           **Response:** Additional photographs are being produced today, and a photo log with description of all photographs will be produced.

viii.    Missing information: No causal analysis provided.

           **Response:** As mentioned in the prior response, no causal analysis has been performed for the August 2017 incident at this time.

As discussed, a supplemental production is in process and will be produced by Wednesday December 20, 2017. This will include additional responsive documents and documents containing redacted, confidential information. If, at that time, your office would like a matrix corresponding numbering of those documents to categories of requests for ease of reviewing, please let me know.

                   Very truly yours,

                   Douglas J. Steding

cc:    Kessina Lee (via email kessina.lee@ecy.wa.gov)

101 Yesler Way, Suite 205, Seattle, WA 98104

COOKE052179

COOKE_CWA_00121505

# EXHIBIT 7



**DEPARTMENT OF
NATURAL RESOURCES**

**OLYMPIC REGION**
411 TILLICUM LANE
FORKS, WA 98331

**360-374-2800**
OLYMPIC.REGION@DNR.WA.GOV
WWW.DNR.WA.GOV

August 25, 2017

Innes Weir, General Manager                         **CERTIFIED MAIL**
Cooke Aquaculture Pacific, LLC              9414-7102-0088-3548-5855-61
4019 21st Ave W
Seattle, WA  98199

Subject:     Notice of Default Under Lease No. 20-B12517

Dear Mr. Weir:

This letter provides you with formal notice that Cooke Aquaculture Pacific, LLC (Cooke) is in
default of its obligations under Aquatic Lands Lease No. 20-B12517 (Lease). Specifically, the
Washington Department of Natural Resources (DNR) has determined that Cooke is not in
compliance with Section 11.2 of the Lease.

Section 11.2 of the Lease requires Cooke to "keep and maintain the [leasehold] and all
improvements . . . in good order and repair, in a clean, attractive, and safe condition." In
violation of this provision, several moorings failed at Site 2 of the Cooke net pen leasehold
located off Cypress Island in Skagit County, WA, on August 19, 2017, resulting in significant
structural damage to the Site 2 net pen and in fish escapement.

To cure the default listed above, on or before September 24, 2017, Cooke must remove all
damaged structures related to Site 2 from the water, ensure that the leasehold sustained no
permanent damage, and perform all measures for recovery of escaped fish required by the
Washington Department of Fish and Wildlife, including but not limited to those measures listed
in Cooke's 2017 Fish Escape Prevention Plan.

DNR expects Cooke to cure the default listed above as expeditiously as possible. However, if
Cooke fails to cure the default by September 24, 2017, DNR will declare an event of default
under Section 14(b) of the Lease, and in addition to any other remedies available to it, may
terminate the Lease.

By providing this notice, DNR does not waive its right to declare a default or event of default for
any existing or future breach of your obligations under the Lease. DNR reserves its right to
pursue any remedies available to it for all existing or future defaults, regardless of whether such
defaults are identified in this notice.

**FOURTH KNUTSEN DECLARATION - 145**

COOKE051835

COOKE_CWA_00121161

Innes Weir
August 25, 2017
Page 2 of 2

If you have any questions regarding this notice, please contact me at 360-732-7411.

Sincerely,

Sean Carlson, Land Manager
Aquatic Resources Division, Orca-Straits District

c:      Kevin Bright, Permit Coordinator, Cooke Aquaculture Pacific, LLC
        District File; TRO File; 20-B12517

**COOKE051836**

COOKE_CWA_00121162

# EXHIBIT 8



MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW

Pier 70
2801 Alaskan Way, Suite 300
Seattle, Washington 98121

OFFICE 206.624.8300
FAX 206.340.9599

Douglas J. Steding, Ph.D., P.C.
doug.steding@millernash.com
206.777.7552 direct line

September 1, 2017

**VIA E-MAIL**
**SEAN.CARLSON@DNR.WA.GOV**
**AND CERTIFIED MAIL**

Sean Carlson, Land Manager
Aquatic Resources Division, Orca-Straits District
Department of Natural Resources
Olympic Region
411 Tillicum Land
Forks, WA 98331

Subject:      Notice of Default Under Lease No. 20-B12517

Dear Mr. Carlson:

We represent Cooke Aquaculture Pacific, LLC, the recipient of your Notice of Default under Lease No. 20-B12517 dated August 25, 2017 (the "Lease"). This letter is intended to provide a response to the issues raised in the Notice of Default, but should not be interpreted as agreeing with any of the conclusions drawn by the Department of Natural Resources with respect to Cooke Aquaculture Pacific LLC's compliance with the terms of Lease No. 20-B12517.

Since the failure of the Site 2 that began on August 19, 2017, Cooke Aquaculture Pacific has dedicated all of its resources to stabilizing the site, preventing the release of additional fish from that site, and recapturing fish escaped from the site. Those efforts have been extensive, and are ongoing, with updates being provided to your agency on a daily basis through Cooke's coordination with the Unified Incident Command in Anacortes (the "UIC").

Pending the appropriate regulatory approvals to do so, Cooke Aquaculture Pacific does plan on removing the damaged structures from the water at Site 2 as expeditiously as possible, while maintaining its commitment to the safety of its employees, contractors, and the public. Cooke Aquaculture Pacific acknowledges DNR's request to

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA

MILLERNASH.COM

4845-2911-4446.2

COOKE051840

COOKE_CWA_00121166



MILLER
NASH | GRAHAM
      | & DUNN LLP
        ATTORNEYS AT LAW

Sean Carlson, Land Manager
Aquatic Resources Division, Orca-Straits District
Department of Natural Resources
September 1, 2017
Page 2

remove the damaged structures on or before September 24, 2017, and appreciates the
support and coordination of the UIC in accomplishing this task. Without the
cooperation of the UIC (of which DNR is a member) the ability of Cooke Aquaculture
Pacific to meet the demands of DNR as set forth in its Notice of Default will be greatly
diminished.

Once that damaged equipment is removed, Cooke Aquaculture Pacific will survey
the leasehold to ensure there is no damage to state-owned land. Throughout this
process, Cooke Aquaculture Pacific has been implementing its Fish Escape Prevention
Plan and is in the process of coordinating with others that have responded to the escape
of fish from the Site 2 facility.

Just as DNR reserves all rights under the Lease in its August 25, 2017 letter,
Cooke Aquaculture Pacific reserves all rights with respect to the Lease, and this letter
should not be construed as an admission of any facts nor agreement to set aside any of
the terms of the Lease. It is important to note that Section 12 of the Lease obligates
Cooke Aquaculture Pacific, in the event of damage or destruction of its "improvements"[1]
to "promptly reconstruct, repair, or replace" such improvements, not remove them.
DNR's request delivered in its Notice of Default is therefore at odds with the
requirements of the Lease, and we will need to work together to reconcile that
inconsistency. However, Cooke Aquaculture Pacific takes its obligations as a tenant of
DNR quite seriously, and will continue to dedicate all of its resources to respond to the
failure of the Site 2 facility.

The response to this emergency situation needs to be one based in
communication, cooperation, and support by your agency and others as Cooke
Aquaculture Pacific works through its activities at Site 2. Cooke Aquaculture Pacific is
sincerely dedicated to working closely with the UIC and DNR, and hopes that DNR
shares that sentiment.

---

[1] "Improvements" are defined in the Lease to include the Site 2 facilities.

Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA                                                          4845-2911-4446.2

MILLERNASH.COM

COOKE051841

COOKE_CWA_00121167



**MILLER NASH** | **GRAHAM & DUNN** LLP
ATTORNEYS AT LAW

Sean Carlson, Land Manager
Aquatic Resources Division, Orca-Straits District
Department of Natural Resources
September 1, 2017
Page 3


Again, as stated above, DNR is receiving daily reports from Cooke Aquaculture
Pacific through the UIC. But, if you need any additional information, do not hesitate to
contact me.

Very truly yours,

Douglas J. Steding, Ph.D.


cc:    Kevin Bright


Portland, OR
Seattle, WA
Vancouver, WA
Long Beach, CA
MILLERNASH.COM

4845-2911-4446.2

COOKE051842

COOKE_CWA_00121168

**FOURTH KNUTSEN DECLARATION - 150**

# EXHIBIT 9



STATE OF WASHINGTON

# DEPARTMENT OF ECOLOGY

*PO Box 47600 ∘ Olympia, WA 98504-7600 ∘ 360-407-6000*
*711 for Washington Relay Service ∘ Persons with a speech disability can call 877-833-6341*

September 15, 2017

Innis Weir
Cooke Aquaculture Pacific, LLC
P.O. Box 79003
Seattle, WA 98119

| Order Docket # | 15422 |
|---|---|
| Site Location | Cypress Island Site 2, Deepwater Bay |

Re:     Administrative Order

Dear Innis Weir:

The Department of Ecology (Ecology) has issued the enclosed Administrative Order (Order) requiring Cooke Aquaculture Pacific, LLC to comply with:

- Chapter 90.48 Revised Code of Washington (RCW) – Water Pollution Control
- Chapter 173-201A Washington Administrative Code (WAC) – Water Quality Standards for the Surface Waters of the State of Washington
- Chapter 173-220 WAC – National Pollutant Discharge Elimination System Permit Program
- NPDES Permit No. WA-003157-7

If you have questions please contact Kessina Lee at 360-407-7666 or kessina.lee@ecy.wa.gov.

Sincerely,

Richard Doenges
Southwest Region Manager
Water Quality Program

Enclosures:     Administrative Order Docket #15422

By certified mail: 91 7199 9991 7036 8716 6068

cc: Doug J. Steding, Partner, Environmental & Natural Resources Co-Team Leader

WQ – Order (8/2014)

STATE OF WASHINGTON
DEPARTMENT OF ECOLOGY

| | | |
|---|---|---|
| IN THE MATTER OF AN | ) | AGREED ORDER |
| ADMINISTRATIVE ORDER | ) | DOCKET #15422 |
| AGAINST | ) | |
| Cooke Aquaculture Pacific, LLC | ) | |
| Innis Weir | ) | |

To:    Innis Weir
       Cooke Aquaculture Pacific, LLC
       P.O. Box 79003, Seattle WA 98119

| Order Docket # | 15422 |
|---|---|
| Site Location | Cypress Island Site 2, Deepwater Bay |

The Department of Ecology (Ecology) has issued this Administrative Order (Order) requiring Cooke Aquaculture Pacific, LLC, to comply with:

- Chapter 90.48 Revised Code of Washington (RCW) – Water Pollution Control
- Chapter 173-201A Washington Administrative Code (WAC) – Water Quality Standards for the Surface Waters of the State of Washington
- Chapter 173-220 WAC – National Pollutant Discharge Elimination System Permit Program
- NPDES Permit No. WA-003157-7

This Agreed Order is issued pursuant to the authority vested in Ecology by the Federal Water Pollution Control Act (FWPCS), 33 U.S.C. sec 1311, et seq. and Chapter 90.48 RCW.)

RCW 90.48.030 provides that Ecology shall have the jurisdiction to control and prevent the pollution of streams, lakes, rivers, ponds, inland waters, salt waters, water courses, other surface and underground waters of the state of Washington.

RCW 90.48.120 RCW authorizes Ecology to issue administrative orders requiring compliance whenever it determines that a person has violated or created a substantial potential to violate any provision of Chapter 90.48 RCW or fails to control the polluting content of waste to be discharged to waters of the state.

Cooke Aquaculture Pacific, LLC (Cooke Aquaculture), agrees to undertake all actions required of it by the terms and conditions of this Agreed Order and not to contest Ecology's jurisdiction and authority to administer this Agreed Order. Cooke Aquaculture agrees not to contest this order.

Administrative Order #15422
September 15, 2017
Page 2

Nothing in this Agreed Order shall in any way relieve Cooke Aquaculture of its obligations to comply with the requirements of its Permit. Nor shall anything in this Agreed Order limit Ecology's authority to enforce the provisions of the aforementioned Permit.

## FINDINGS OF FACT

**Ecology's determination that a violation/violations has/have occurred is based on the following facts:**

Cooke Aquaculture's Cypress Island Site facility is covered under NPDES Permit number WA0031577. Permit condition S1 establishes that the discharge of pollutants that cause facilities to discharge at a level in excess of that identified and authorized by the permit shall constitute a violation of the terms and conditions of the permit. Permit condition S1 also states that the intentional or negligent release of Atlantic salmon to the receiving waters beyond the confines of the net pens is prohibited.

Escaped Atlantic salmon are pollutants.

Permit condition G10 states that the Permittee shall submit to Ecology, within a reasonable time, all information which Ecology may request to determine whether cause exists for modifying, revoking and reissuing, or terminating this permit or to determine compliance with this permit. The Permittee shall also submit to Ecology upon request, copies of records required to be kept by this permit.

On July 26, 2017, Cooke Aquaculture notified Ecology that tidal conditions on July 25 caused one or more mooring points to break at Cypress Island Site 2. Cooke Aquaculture reported that the tide and current were significant enough to drag anchors and actually shift the facility. They reported no fish escapes and no spills, and indicated they were working to get the anchors moved back into place and get the lines reattached.

On July 27, 2017, Cooke Aquaculture reported to Ecology that the Cypress Island Site 2 facility was back in its original position, and that anchor lines were being reattached and tensioned up. They reported that divers had been in the water checking the pens, and saw no signs of fish escapes and that mortalities appeared low.

On August 19, 2017, the Cooke Aquaculture facility Cypress Island Site 2, experienced a net pen failure that led to the release of Atlantic salmon. They stated that all equipment had been removed from the site and no fuel or oil spills had occurred. Cooke Aquaculture initially reported the incident to Ecology on August 20, 2017, within 24 hours of becoming aware of the release, related to NPDES permit condition S8. Cooke Aquaculture's initial estimate of the fish release was a minimum of 4,000 to 5,000 fish.

Administrative Order #15422
September 15, 2017
Page 3

On August 21, 2017, Cooke Aquaculture submitted an Accidental Fish Release Report to
Ecology stating that upwards of 4,000 fish may have escaped, but that the final number could not
be determined until after the remaining fish were removed from the cages. The report indicated
that the fish were adults weighing eight to ten pounds, and that medicated feed was last used at
the site on July 23, 2016. The cause of release was reported as "structural damage to pens
brought on by the extraordinary strong tidal currents."

On August 21 and 22, 2017, Cooke reported staff had pumped out 5,166 fish into their harvest
vessel, transferred the fish to another tender and transported them to a processing plant. No more
attempts had been made to pump fish out due to safety concerns about tying the harvest vessel to
the structure.

On August 23, 2017, Cooke reported that staff worked on further fish containment efforts of the
remaining structures by attaching netting to the accessible areas around the surface of the
structure. Lines, floats, and any other small debris that had become dislodged or floating during
the day had been removed from the water for proper disposal. The report stated that company
personnel were able to attach three anchor lines on the flood side of the cages and one anchor on
the shore side to further secure the structure. A Foss tug was on standby and expected to remain
on standby until August 25, 2017. Cooke reported that they had retained the services of the
professional underwater salvage company, Global Diving and Salvage.

On August 23, 2017, representatives of Ecology's Water Quality Program and Spills Program
visited Cypress Island Site 2, accompanied by a representative of Department of Natural
Resources, and photographed the site.

Violation(s) description:
- The release of Atlantic salmon into state waters is a violation of RCW 90.48.080:
  Discharge of polluting matter in waters prohibited.
  It shall be unlawful for any person to throw, drain, run, or otherwise discharge
  into any of the waters of this state, or to cause, permit or suffer to be thrown, run,
  drained, allowed to seep or otherwise discharged into such waters any organic or
  inorganic matter that shall cause or tend to cause pollution of such waters
  according to the determination of the department, as provided for in this chapter.
  The release of Atlantic salmon into state waters is a violation of RCW 90.48.080.
- The intentional or negligent release of Atlantic salmon to the receiving waters
  beyond the confines of the net pens is prohibited (NPDES Permit #WA0031577
  section S1). Cooke's release of Atlantic salmon into waters of the state is a
  violation of Cooke's NPDES Permit.

Administrative Order #15422
September 15, 2017
Page 4

Corrective actions required:

For these reasons and in accordance with RCW 90.48.120(2) it is ordered that Cooke Aquaculture take the following actions. These actions are required at the location known as Cypress Island Site 2.

Request for Information and Facility Records

On or before October 30, 2017, Cooke Aquaculture must submit the following to Ecology:

i. The original engineering design of the Cypress Island Site 2 facility, including all calculations and modeling of environmental conditions used in the engineering of the facility. The design must address all requirements of Chapter 173-240 of the Washington Administrative Code.

ii. Chronology of structural changes/modifications and relocation/reposition of the facility as well as rationales for each change.

iii. Documentations of all inspections, maintenance, and repairs on the Cypress Island Site 2 facility.

iv. Any maintenance policies, procedures, or schedules that applied to Cypress Island Site 2.

v. A detailed timeline of the incident at Site 2, including both the July 2017 and August 2017 incidents.

vi. An investigation report and design information regarding the July 2017 incident at the Cypress Island Site 2 facility, including a detailed description of the incident, the sequence of events, notification and response procedures activated and a detailed incident causal analysis.

vii. Any remedial measures implemented after the July 2017 incident, including but not limited to structural/mooring system modifications, pen relocation/repositioning, modifications of the operation/maintenance procedures and specifications of the original and replacement structural components employed.

viii. An investigation report and design information regarding the August 2017 incident at the Cypress Island Site 2 facility, including a detailed description of the incident, the sequence of events, notification and response procedures activated and a detailed incident causal analysis, as well as any correlation between the July 2017 and the August 2017 incident.

ix. An inventory of which cages within Site 2 were found breached, and a description of the breaches.

x. A cage by cage inventory of the number of fish lost due to escapement during the August 2017 incident.

xi. A statement as to whether any fish escaped from Site 2 during the July 2017 incident.

These actions are in addition to any follow-up reporting required in the NPDES permit.

Administrative Order #15422
September 15, 2017
Page 5

This order replaces the request made by Kessina Lee of Ecology's Water Quality Program to Kevin Bright, Cooke Aquaculture Permit Coordinator, via email on August 25, 2017, with a due date of October 13, 2017.

## FAILURE TO COMPLY WITH THIS ORDER

Failure to comply with this Order may result in the issuance of civil penalties or other actions, whether administrative or judicial, to enforce the terms of this Order.

## YOUR RIGHT TO APPEAL

You have a right to appeal this Order to the Pollution Control Hearing Board (PCHB) within 30 days of the date of receipt of this Order. The appeal process is governed by Chapter 43.21B RCW and Chapter 371-08 WAC. "Date of receipt" is defined in RCW 43.21B.001(2).

To appeal you must do both of the following within 30 days of the date of receipt of this Order:

- File your appeal and a copy of this Order with the PCHB (see addresses below). Filing means actual receipt by the PCHB during regular business hours.
- Serve a copy of your appeal and this Order on Ecology in paper form - by mail or in person. (See addresses below.) E-mail is not accepted.

You must also comply with other applicable requirements in Chapter 43.21B RCW and Chapter 371-08 WAC.

Your appeal alone will not stay the effectiveness of this Order. Stay requests must be submitted in accordance with RCW 43.21B.320.

## ADDRESS AND LOCATION INFORMATION

| Street Addresses | Mailing Addresses |
| --- | --- |
| **Department of Ecology**<br>Attn: Appeals Processing Desk<br>300 Desmond Drive SE<br>Lacey, WA 98503 | **Department of Ecology**<br>Attn: Appeals Processing Desk<br>PO Box 47608<br>Olympia, WA 98504-7608 |
| **Pollution Control Hearings Board**<br>1111 Israel Road SW<br>STE 301<br>Tumwater, WA 98501 | **Pollution Control Hearings Board**<br>PO Box 40903<br>Olympia, WA 98504-0903 |

Administrative Order #15422
September 15, 2017
Page 6

## CONTACT INFORMATION

Please direct all questions about this Order to:

Kessina Lee
Department of Ecology
Southwest Regional Office
PO Box 47775
Olympia, WA 98504-7775

Phone: 360-407-7666
Email: kessina.lee@ecy.wa.gov

## MORE INFORMATION

- Pollution Control Hearings Board Website
  www.eho.wa.gov/Boards_PCHB.aspx
- Chapter 43.21B RCW - Environmental and Land Use Hearings Office – Pollution
  Control Hearings Board
  http://app.leg.wa.gov/RCW/default.aspx?cite=43.21B
- **Chapter 371-08 WAC – Practice And Procedure**
  http://app.leg.wa.gov/WAC/default.aspx?cite=371-08
- **Chapter 34.05 RCW – Administrative Procedure Act**
  http://app.leg.wa.gov/RCW/default.aspx?cite=34.05
- **Laws:** www.ecy.wa.gov/laws-rules/ecyrcw.html
- **Rules:** www.ecy.wa.gov/laws-rules/ecywac.html

## SIGNATURE

_____          _____9/15/17_____
Richard Doenges                         Date
Southwest Region Manager
Water Quality Program

# EXHIBIT 10



STATE OF WASHINGTON

# DEPARTMENT OF ECOLOGY

*PO Box 47775 • Olympia, Washington 98504-7775 • (360) 407-6300*
*711 for Washington Relay Service • Persons with a speech disability can call 877-833-6341*

January 30, 2018

Mr. Kevin Bright, Aquaculture Permit Coordinator
Cooke Aquaculture Pacific, LLC
PO Box 669
Anacortes, WA  98221

| Notice of Penalty Docket # | 15669 |
|---|---|
| Site Location | Deepwater Bay, Bellingham Channel |
| Penalty Amount | $332,000.00 |
| Due Date | Within 30 days after receiving this Notice of Penalty. |

Re:     Notice of Penalty

Dear Mr. Bright:

The Department of Ecology (Ecology) has issued the enclosed Notice of Penalty to Cooke Aquaculture Pacific, LLC for violating provisions of:

- Chapter 90.48.080 Revised Code of Washington (RCW) - Discharge of polluting matter in waters prohibited.

- Chapter 173-220 Washington Administrative Code (WAC) - National Pollutant Discharge Elimination System permit program.

- National Pollutant Discharge Elimination System Permit WA0031577.

Please read the enclosed Notice of Penalty describing the violation(s) and options for responding to the penalty.

Notice of Penalty Docket # 15669
January 30, 2018
Page 2


If you have questions please contact Kessina Lee at kessina.lee@ecy.wa.gov or (360) 407-7666
or contact Marc Pacifico at marc.pacifico@ecy.wa.gov or (360) 407-6282.

Sincerely,

Heather R. Bartlett,
Water Quality Program Manager

Enclosure:      Notice of Penalty Docket #15669

cc:      Rich Doenges, Ecology
         Kessina Lee, Ecology
         Mike Lynch, Ecology
         Marc Pacifico, Ecology
         Fiscal-Penalty Desk, Ecology

**By certified mail: 91 7199 9991 7037 7474 5312**

**FOURTH KNUTSEN DECLARATION - 161**

STATE OF WASHINGTON
DEPARTMENT OF ECOLOGY

| | | |
|---|---|---|
| IN THE MATTER OF PENALTY | ) | NOTICE OF PENALTY |
| ASSESSMENT AGAINST | ) | INCURRED AND DUE |
| Cooke Aquaculture Pacific, LLC | ) | PENALTY DOCKET #15669 |
| Kevin Bright | ) | |

To:    Kevin Bright, Aquaculture Permit Coordinator
       Cooke Aquaculture Pacific, LLC
       P.O. Box 669
       Anacortes, WA  98221

| | |
|---|---|
| **Notice of Penalty Docket #** | 15669 |
| **Site Location** | Deepwater Bay, Bellingham Channel |
| **Penalty Amount** | $332,000.00 |
| **Due Date** | Within 30 days after receiving this Notice of Penalty. |

The Department of Ecology (Ecology) has assessed a penalty against Cooke Aquaculture Pacific, LLC in the amount of $332,000.00 for violating provisions of:

- Chapter 90.48.080 Revised Code of Washington (RCW) - Discharge of polluting matter in waters prohibited.

- Chapter 173-220 Washington Administrative Code (WAC) - National Pollutant Discharge Elimination System permit program.

- National Pollutant Discharge Elimination System Permit WA0031577.

Ecology has authority to issue this penalty under RCW 90.48.144 and is basing the penalties on the violations listed in this notice.

## DETERMINATION OF VIOLATION(S)

**Ecology's determination that violations have occurred is based on the violations listed below:**

Cooke Aquaculture LLC operates several Atlantic salmon farms in Washington State waters. One of those farms, Cooke Aquaculture LLC, Deepwater Bay, Site 2 is covered by National Pollutant Discharge Elimination System (NPDES) permit WA0031577.  Discharges from Cooke Aquaculture LLC, Deepwater Bay, Site 2 are subject to the limits, terms, and conditions of the NPDES Permit.  On August 19, 2017, Cooke Aquaculture LLC experienced a failure of its Deepwater Bay, Site 2, Atlantic salmon farm's net pen structure and pens.  This allowed the release of a minimum of 242,959 Atlantic salmon, as well as an undetermined amount of fish feed, to Puget Sound, Washington State waters.

Notice of Penalty Docket # 15669
January 30, 2018
Page 2

Three state agencies have regulatory and proprietary responsibilities over net pen operations:
Department of Ecology (water quality), Department of Fish & Wildlife (fish health), and
Department of Natural Resources (land leasing).  These agencies formed an Incident
Investigation Review Panel which investigated the failure. The Panel's findings are documented
in the 2017 Cypress Island Atlantic Salmon Net Pen Failure: An investigation and review
document.

The 2017 Cypress Island Atlantic Salmon Net Pen Failure: An investigation and review
document determined: ***"The probable cause of both the July incident and the August failure
was the failure of Cooke to adequately clean the nets containing the fish."***

- Insufficient cleaning, termed "net hygiene," led to excessive biofouling by mussels and
  other marine organisms.
- Breakdowns in the net cleaning machines contributed to this condition.
- The excessive biofouling significantly increased the drag (force) on the net pen array
  from tidal currents.
- The increased drag exceeded the holding power of the mooring system in both the July
  incident and August failure.
- On July 24-25, the mooring system experienced both anchor dragging and breaking of
  attachment points between the moorings and the net pen.
- On August 19, some combination of anchor dragging, failure of mooring attachment
  points, and failure of structural members of the net pen framing resulted in the collapse of
  the net pen.
- Failure to address the biofouling effectively after the July incident directly contributed to
  the August failure.

Based on these findings the Department of Ecology determined that Cooke Aquaculture LLC's
August 2017 net pen failure violated the following conditions of NPDES permit WA0031577:

- Permit condition S1. States: "The intentional or negligent release of Atlantic salmon to the
  receiving waters beyond the confines of the net pens is prohibited." The release of Atlantic
  salmon was the result of Cooke's negligent maintenance of its net pen facility.

- Permit condition S6.B. Requires Cooke Aquaculture to prepare and submit a Pollution
  Prevention Plan that in part must address: "How net cleaning will be conducted in order to
  minimize the discharge of accumulated solids and attached marine growth." Cooke
  Aquaculture did not follow their Pollution Prevention Plan (updated April 2017) which states
  that "Nets will be frequently rinsed..." This was not taking place when the net washers were
  down.

- Permit condition S6.F. requires: "The Permittee shall routinely, at least weekly, conduct
  visual inspections of exposed surface lines, shackles, and mooring points. Any defective

Notice of Penalty Docket # 15669
January 30, 2018
Page 3

components are to be repaired or replaced promptly.  At least once per year, conduct an inspection of the main cage structure and anchoring components above and below the water line.  Document any problems and maintain all components to prevent failure that could lead to fish escapements.

The Permittee shall conduct inspections after any major storm event or physical accident involving the pen structures or moorings, and make any repairs necessary".  This was not taking place for anchors located in water greater than 100 feet deep.

- Permit condition G8. Requires Reduced Production for Compliance. "The Permittee, in order to maintain compliance with its permit, shall control production and/or all discharges upon reduction, loss, failure, or bypass of the treatment facility until the facility is restored or an alternative method of treatment is provided. This requirement applies in the situation where, among other things, the primary source of power of the treatment facility is reduced, lost, or fails." Cooke Aquaculture did not reduce production from its Deepwater Bay Site 2 farm after the mooring failure in July. Instead the decision was made to continue feeding the fish until the planned harvest date later in the year.

Cooke Aquaculture LLC also violated Chapter 173-201A-260(20(b) of the Washington Administrative Code (WAC) which states "Aesthetic values must not be impaired by the presence of materials or their effects, excluding those of natural origin, which offend the senses of sight, smell, touch, or taste…" The presence of spilled fish feed and Atlantic salmon in Waters of the State is a violation of aesthetic values.

## ELIGIBILITY FOR PAPERWORK VIOLATION WAIVER AND OPPORTUNITY TO CORRECT

Under RCW 34.05.110, small businesses are eligible for a waiver of a first-time paperwork violation and an opportunity to correct other violations.  We have made no determination as to whether you meet the definition of a "small business" under this section.  However, we have determined that the requirements of RCW 34.05.110 do not apply to the violation(s) due to a conflict with federal law or program requirements, including federal requirements that are a prescribed condition to the allocation of federal funds to the state.

## FAILURE TO COMPLY WITH THIS NOTICE OF PENALTY

Continued failure to correct the violations listed in this Notice of Penalty may result in additional, escalated penalties.

## OPTIONS FOR RESPONDING TO A NOTICE OF PENALTY

**Option 1:    Pay the penalty within 30 days after receiving the Notice of Penalty.**

Make your payment payable to the *Department of Ecology*.  Please include the penalty docket number on your payment.

**FOURTH KNUTSEN DECLARATION - 164**

Notice of Penalty Docket # 15669
January 30, 2018
Page 4

**Mail payment to:**

> Department of Ecology
> Cashiering Unit
> PO Box 47611
> Olympia, WA  98504-7611

Note: Ecology may take legal action to collect the penalty if you have not paid 30 days after receiving the Notice of Penalty, and have not appealed.

| Option 2: | Appeal to the PCHB and serve Ecology within 30 days after the date of receipt of the Notice of Penalty. |
|---|---|

The appeal process is governed by Chapter 43.21B RCW and Chapter 371-08 WAC. "Date of receipt" is defined in RCW 43.21B.001(2).

To appeal you must do both of the following within 30 days after the date of receipt of this Notice of Penalty:

- File your appeal and a copy of this Notice of Penalty with the Pollution Control Hearings Board (PCHB) during regular business hours.
- Serve a copy of your appeal and this Notice of Penalty on Ecology in paper form, by mail or in person.  E-mail is not accepted.

You must also comply with other applicable requirements in Chapter 43.21B RCW and Chapter 371-08 WAC.

## ADDRESS AND LOCATION INFORMATION

| Street Addresses | Mailing Addresses |
|---|---|
| **Department of Ecology**<br>Attn: Appeals Processing Desk<br>300 Desmond Drive SE<br>Lacey, WA  98503 | **Department of Ecology**<br>Attn: Appeals Processing Desk<br>PO Box 47608<br>Olympia, WA  98504-7608 |
| **Pollution Control Hearings Board**<br>1111 Israel Road SW<br>STE 301<br>Tumwater, WA 98501 | **Pollution Control Hearings Board**<br>PO Box 40903<br>Olympia, WA  98504-0903 |

## CONTACT INFORMATION

Please direct all questions about this Notice of Penalty to:

**FOURTH KNUTSEN DECLARATION - 165**

Notice of Penalty Docket # 15669
January 30, 2018
Page 5

Kessina Lee
Department of Ecology
Southwest Regional Office
Water Quality Program
P.O. Box 47775
Olympia, WA  98504-7775

Phone: 360-407-7666
Email: kessina.lee@ecy.wa.gov

Marc Pacifico
Department of Ecology
Southwest Regional Office
Water Quality Program
P.O. Box 47775
Olympia, WA  98504-7775

Phone: 360-407-6282
Email: marc.pacifico@ecy.wa.gov

## MORE INFORMATION

- **Pollution Control Hearings Board:**
  www.eho.wa.gov/Boards_PCHB.aspx
- **Chapter 43.21B RCW - Environmental and Land Use Hearings Office –**
  **Pollution Control Hearings Board**
  http://app.leg.wa.gov/RCW/default.aspx?cite=43.21B
- **Chapter 371-08 WAC – Practice and Procedure**
  http://app.leg.wa.gov/WAC/default.aspx?cite=371-08
- **Chapter 34.05 RCW – Administrative Procedure Act**
  http://app.leg.wa.gov/RCW/default.aspx?cite=34.05

## SIGNATURE

Heather Bartlett, Water Quality Program Manager
Department of Ecology

1/29/18
Date

# EXHIBIT 11



ENVIRONMENTAL HEARINGS
Pollution Control Hearings Board
Shorelines Hearings Board

Telephone: (360) 664-9160
FAX: (360) 586-2253
Email: eluho@eluho.wa.gov
Website: www.eluho.wa.gov

**STATE OF WASHINGTON**

## ENVIRONMENTAL AND LAND USE HEARINGS OFFICE

*Mailing Address: PO Box 40903, Olympia, WA 98504-0903 •*
*Physical Address: 1111 Israel Rd SW, Suite 301, Tumwater, WA 98501 •*

January 15, 2019

**Sent by Email and US Mail**

Douglas J. Steding
Elaine L. Spencer
Diane Meyers
Madeline Engel
Northwest Resource Law PLLC
101 Yesler Way Ste 205
Seattle WA 98104

Ronald Lavigne
Senior Counsel
Attorney General of Washington
PO Box 40117
Olympia WA 98504

Re:   **PCHB No. 18-018**
      **COOKE AQUACULTURE PACIFIC LLC v. STATE OF WASHINGTON,**
      **DEPARTMENT OF ECOLOGY**

Dear Parties:

Enclosed is a Fourth Amended Prehearing Order in the above matter.  Please read over the Order carefully for filing dates and requirements.

The hearing in this matter is currently scheduled for April 22- May 1, 2019.  With only Legal Issues 8, 9, 10 remaining, please indicate by **February 15, 2019**, how many days of hearing will be needed.

If you have any questions, please feel free to contact the staff at the Environmental and Land Use Hearings Office at 360-664-9160.

Sincerely,

Neil L. Wise, Presiding

NLW/le/P18-018
Encl.

**CERTIFICATION**
On this day, I forwarded a true and accurate copy of
the documents to which this certificate is affixed via
United States Postal Service postage prepaid or via delivery through
State Consolidated Mail Services to the attorneys of record herein.
I certify under penalty of perjury under the laws of the
state of Washington that the foregoing is true and correct.
DATED 1 | 15 | 19            , at Tumwater, WA.



**FOURTH KNUTSEN DECLARATION - 168**

**POLLUTION CONTROL HEARINGS BOARD**
**STATE OF WASHINGTON**

| | |
|---|---|
| COOKE AQUACULTURE PACIFIC LLC, | |
| Appellant, | PCHB No. 18-018 |
| v. | FOURTH AMENDED PREHEARING ORDER |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | |
| Respondent. | |

    Appellant Cooke Aquaculture Pacific LLC (Cooke) filed an appeal with the Pollution Control Hearings Board (Board) on March 1, 2018, challenging Notice of Penalty Docket Number 15669 in the amount of $332,000.

    A prehearing conference was held on March 19, 2018.  Neil L. Wise presided for the Board.  Attorneys Diane M. Meyers, Douglas J. Steding, and David Bechtold appeared on behalf of Cooke.  Senior Counsel Ronald L. Lavigne appeared on behalf of Ecology.  Based on the conference, the Board entered a Prehearing Order on March 20, 2018.  Subsequently, the parties conferred and submitted a consolidated list of legal issues and a request to extend the discovery deadline. Based on these submittals, the Board issued an Amended Prehearing Order on March 27, 2018.

    On August 20, 2018, the Board issued a Second Amended Prehearing Order, granting the parties' request of a continuance of the currently scheduled hearing dates and an extension of the discovery deadline to complete depositions.

FOURTH AMENDED PREHEARING ORDER
PCHB No. 18-018

1

**FOURTH KNUTSEN DECLARATION - 169**

1    On November 2, 2018, the Board received the parties' joint letter agreeing to an

2  extension of the present discovery deadline and issued a Third Amended Prehearing Order on

3  November 6, 2018.

4    On January 11, 2019, the Board received Appellant Cooke Aquaculture Pacific LLC's

5  Motion for Dismissal of Various Legal Issues, requesting the Board dismiss Legal Issues 1, 2, 3,

6  4, 5, 6, and 7 from the appeal.  Cooke has indicated that Ecology does not oppose the motion.

7  Therefore, the motion is **GRANTED**.  Based on the request, the Board enters the following

8  Fourth Amended Prehearing Order:

9    **I.    HEARING**

10    The hearing in this matter is set for **April 22 – May 1, 2019,** commencing at **9:00 a.m.,**

11  at the Board's office in Tumwater, Washington.  As there are now only three issues remaining

12  for hearing, the Parties shall notify the Board of any change in the estimated amount of time

13  needed for hearing by **February 15, 2019**.

14    The Presiding Officer will conduct a final Prehearing Conference on **April 15, 2019, at**

15  **10:00 a.m.** to discuss the conduct of the hearing.  To participate in this Prehearing Conference

16  you will need to call the following telephone number and enter the pin code on the specified date

17  and time above:

18    **Telephone Number   1-800-704-9804**
    **Pin Code                    7518834#**

19

20

21

FOURTH AMENDED PREHEARING ORDER
PCHB No. 18-018

2

**FOURTH KNUTSEN DECLARATION - 170**

## II.    MEDIATION AND SETTLEMENT

The parties are encouraged to undertake settlement efforts.  The parties shall notify the Board jointly by **January 15, 2019,** of the settlement possibilities in the case.  The parties were informed that the Environmental and Land Use Hearings Office offers no-cost mediation services.  If the parties desire to use these services they should telephone or send a written request to the Environmental and Land Use Hearings Office.

## III.    ISSUES

The legal issues listed below will govern the case.

8.  Did the August 2017 release of an alleged 242,959 Atlantic salmon exceeding 1 kilogram constitute a single "significant" fish release under permit WA0031577 or 162 separate significant fish releases for purposes of penalty calculation?

9.  Is a penalty of $332,000.00 reasonable?

10. Are Ecology's conclusions regarding the number of Atlantic salmon that were released from Cypress Island Site 2 in the August 2017 arbitrary, capricious, or otherwise unlawful?

## IV.    MOTIONS

1.  <u>Non-Dispositive Motions</u>:  **Responses** to any non-dispositive motion shall be filed and served **five business days from receipt of the motion** by the non-moving party.  The moving party shall then have **three business days from receipt of the response to file and serve a reply**.  For non-dispositive motions, responses, and replies, **an original and one (1) copy** of the pleading and supporting documents shall be filed with the Presiding Officer.  **All copies and attachments shall be three-hole punched.**

3. <u>Oral Argument Not Required</u>.  Motions will be decided based on the written record, unless oral argument is requested by a party and granted by the Presiding Officer.

## V.   WITNESSES AND EXHIBITS

The parties submitted preliminary witness and exhibit lists.

A. <u>Final Witness List:</u>  Final lists of witnesses shall be served on the parties and filed with the Board by **April 8, 2019.  An original and three (3) copies** shall be filed. Any witness listed in final lists may be called by any party.  The party calling a witness has the responsibility to ensure his/her attendance at the hearing.  A witness's expertise shall be established by resume offered as an exhibit.

B. <u>Final Exhibit List and Exhibit Exchange:</u>  By **April 1, 2019**, the parties shall exchange lists of the exhibits intended to be used at the hearing.  Parties shall then provide copies of the exhibits to the other parties (if requested) in 2 working days, confer, try to reach agreement on exhibits' authenticity and admissibility, and eliminate duplicate exhibits.  Final exhibit lists shall also be filed with the Board and served on the other parties by **April 8, 2019.** An **original and three (3) copies** shall be filed.  All exhibits must be introduced in connection with a witness' testimony, unless stipulated to and admitted by the presiding officer.  Parties are asked to submit into evidence only those portions of voluminous documents actually being referred to or relied upon by a witness.

When meeting with the Presiding Officer prior to the commencement of the hearing, each party shall have available an **original and three (3) copies** of its exhibits and an index of the exhibits which shall identify those stipulated to by the parties, and spaces for indicating whether

1   each exhibit was offered, admitted, or excluded.  Each exhibit shall be pre-marked by tab for

2   identification (A-1, A-2, etc., for appellant; R-1, R-2, etc., for respondent), and so identified on

3   the exhibit lists. All oversized exhibits shall be marked with the case number.  The number given

4   to an exhibit does not limit the order of its introduction at hearing.  Any exhibit listed by one

5   party may be introduced by another party.  **All exhibits shall be three-hole punched and the**

6   **Board requests that tabbed exhibits be placed in binders if possible. In any event,**

7   **voluminous exhibits (over 100 pages) must be placed in binders for the convenience of the**

8   **Board.**

9      **ELECTRONIC EXHIBITS**.  The parties were informed of the Board's option for using

10  electronic exhibits at the hearing.  Should the parties decide to do so, presentation shall be in the

11  form as outlined on the Electronic Exhibit Guidelines provided to the parties with this Order.

12  Any party wanting to use electronic exhibits will inform the Board by **March 25, 2019,** of their

13  intent to do so.

14                          **VI.   DISCOVERY**

15      A.  Completion of Discovery:  As requested, the discovery deadline is **January 31, 2019**.

16  If formal discovery is pursued, parties should pay particular attention to the time requirements of

17  the superior court civil rules with regard to interrogatories, depositions, etc.  Discovery requests

18  shall be served sufficiently ahead of the discovery deadline so that the opposing party has the

19  response time allowed by these rules.  (For example, responses to interrogatories are typically

20  due thirty (30) days after service. See CR 33.) Depositions, interrogatories, requests for

21  production or inspection, requests for admission and the responses shall not be filed with the

FOURTH AMENDED PREHEARING ORDER
PCHB No. 18-018

**FOURTH KNUTSEN DECLARATION - 173**

1  Board.  It is the initiating party's responsibility to maintain the original together with answers to

2  interrogatories and to make them available for the proceedings, as necessary.

3       B.  <u>Discovery Disputes</u>:  The parties shall endeavor to resolve any discovery disputes

4  without involving the Board.  An original and one (1) copy of discovery motions and supporting

5  documents must be filed with the Presiding Officer.  Any party filing a discovery motion shall

6  also file a proposed order and shall accompany such filing with an affidavit reciting efforts to

7  resolve the discovery dispute.

8  <div align="center">**VII.  <u>BRIEFS</u>**</div>

9       Prehearing Briefs shall be filed and served no later than **April 15, 2019**, with an **original**

10  **and three (3) copies** for the Board (<u>copies to be filed the same day the brief is filed</u>).  Briefs are

11  limited to **fifteen (15) pages** absent an order granting a motion to lengthen.

12  <div align="center">**VIII. <u>COMMUNICATION</u>**</div>

13       **COMMUNICATION/CONTACT:**  All correspondence and filings with the Board shall

14  be sent to the attention of the Presiding Officer with copies sent at the same time to all other

15  parties. There shall be no *ex parte* contact (contact by one party in the absence of the other party)

16  with the Presiding Officer or other member of the Board.

17       The Board does not accept e-mail correspondence directed to the presiding officer.

18       **FAX**:  Telefax may be used to communicate with the Board for single copies only and

19  limited to ten (10) pages in length, provided paper copies are mailed the same day.

20       **E-FILING**:  Parties may file pleadings and other papers in this case with the Board by

21  electronic mail, if the original and any required number of copies are mailed the same day.

FOURTH AMENDED PREHEARING ORDER
PCHB No. 18-018

<div align="center">6</div>

**FOURTH KNUTSEN DECLARATION - 174**

1  Please include attachments and exhibits with the hard copy, rather than the e-mail filing.  The

2  following additional conditions apply to e-filings:

3      1.    The date of "filing" will be the date/time email filings are received by the Board.  E-filings received by the Board after 5:00 p.m. on a business day will

4  be considered filed on the next business day.  Please note that e-mail is not always received immediately.  There may be a significant delay between the

5  time you send your e-mail, and the time the Board receives it.  The office has experienced delays of up to two hours, so please plan accordingly.

6      2.    The email address for e-filing is eluho@eluho.wa.gov.
    3.    The subject line of any email containing documents you wish to e-file must

7  include the following: "E-filing for PCHB No. 18-018" and may also include additional descriptors (e.g., Summary Judgment Motion).

8  The Board does not accept e-mail correspondence directed to the presiding officer.

9    **E-SERVICE**:  The parties have agreed to use of electronic service among the parties,

10  with hard copy to be mailed the same day for any party who requests the same.

11  <center>IX.   **MISCELLANEOUS**</center>

12    **All original filings shall be one-sided and contain no staples.**

13    **"Filed"** means the date received by the Board.

14  <center>**ORDER**</center>

15    **This order shall govern the proceedings, unless subsequently modified by order of**

16  **the Board for good cause upon a party's motion or the Board's volition**.

17    SO ORDERED this 15th day of January, 2019.

18  <div style="text-align:right">**POLLUTION CONTROL HEARINGS BOARD**</div>

19

20                                    NEIL L. WISE, Presiding

21

FOURTH AMENDED PREHEARING ORDER
PCHB No. 18-018
<center>7</center>

**FOURTH KNUTSEN DECLARATION - 175**

# EXHIBIT 12

**To:**     'kenneth.warheit@dfw.wa.gov'[kenneth.warheit@dfw.wa.gov];
'eric.kinne@dfw.wa.gov'[eric.kinne@dfw.wa.gov]
**Cc:**     Jim Parsons[Jim.Parsons@cookeaqua.com]
**From:**    Kevin J. Bright
**Sent:**    Thur 2/7/2019 8:55:55 PM
**Subject:**   Cooke Aquaculture Pacific Plans of Operation for Finfish Permit with Correction to Recodified WAC 220-76-100
Cooke Aquaculture Pacific Aquaculture Plan of Operation Atlantic salmon_Revised 01_18_2019 corrected WAC.pdf
Cooke Aquaculture Pacific Aquaculture Plan of Operation Rainbow trout_Revised 01_18_2019 Corrected WAC.pdf

Ken-

Please find the Cooke Aquaculture plans of operation for both Atlantic salmon and Rainbow trout with corrections to the WAC number that was referenced in section D., of the previously submitted January 18, 2019 documents. Thank you for pointing out that WAC 220-76-100 was recodified to WAC 220-370-100. No other changes were made to these plans other than correcting the WAC number referenced in Section D. Please let me know if you need any further information.
Sincerely, Kevin


Kevin Bright, Permit Coordinator
Cooke Aquaculture Pacific
Kevin.Bright@CookeAqua.com
(360) 391-2409



COOKE_CWA_00240039

# EXHIBIT 13

# Cooke Aquaculture Pacific, LLC

## Finfish Aquaculture Permit- Plan of Operation
## Atlantic Salmon (Salmo salar) Rearing

### Revised January 18, 2019

**Overview of the Existing Cooke Aquaculture Pacific Atlantic Salmon Farm Operations**

Cooke Aquaculture Pacific, LLC is a Washington aquaculture company with marine net pen operations located in Clallam, King, Kitsap and Skagit County and freshwater hatcheries located in Thurston County. The company's aquaculture facilities have been raising salmon in the Puget Sound region since the 1970's. Private aquaculture operations like these are an important source of locally produced seafood, rural employment and help sustain working waterfront communities.

The company operates two freshwater hatcheries that produce juvenile salmonids which are subsequently planted in the marine net pen facilities. Only captive brood fish are used to produce the next generation of fish to be reared at the Cooke marine net pen facilities. The brood fish are reared their entire life cycle on regulated pathogen free ground water and are maintained in bio-secure facilities that undergo routine health screenings throughout the growth cycle. At spawning, brood fish are again screened for regulated fish pathogens and the brood facilities used by Cooke Aquaculture Pacific all have established negative histories for regulated finfish pathogens.  After fertilization, eggs are hatched and grown to smolt size before being transferred from the hatchery to the marine net pen facilities where they are then grown to market sized fish. The production fish are then harvested, processed, packaged and shipped out fresh to seafood customers located throughout the United States. Cooke Aquaculture Pacific is dedicated to producing high quality seafood in a sustainable and environmentally sound manner.

## I.     PLAN OF OPERATION FOR WASHINGTON NET PEN FACILITIES

### A.  Species, Stock and Race of Cultured Fish

Cooke Aquaculture Pacific currently raises Atlantic salmon (_Salmo salar_) at their freshwater hatcheries and at the marine net pen sites. The company will continue to grow Atlantic salmon at the marine sites and is seeking renewal of the existing WDFW Finfish Aquaculture Permit to raise Atlantic salmon at these facilities. As of the date of this application for the Finfish Permit renewal, Cooke is currently rearing Atlantic salmon at the Clam Bay, Port Angeles, Orchard Rocks and Hope Island marine net pen facilities.

### B.  Fish Health Certifications and Screenings

The hatcheries used to supply the eggs and smolt to the marine net pen sites operate on regulated pathogen-free ground water. Prior to transport to the marine net pens, the lot of fish will be sampled at the 5% APPL level for regulated finfish pathogens. Results from the health screening will be sent to DFW with a new Fish Transport Permit application for approval to transfer the smolts to the marine net pens. Over the past 35 years of disease screenings and fish health certifications performed at the Cooke freshwater hatcheries, there has never been a positive identification for any regulated fish pathogen.

Finfish Aquaculture Permit-Plan of Operation- Atlantic salmon

### C. Otolith Marking

Cooke otolith marks all the Atlantic salmon it rears at the hatchery that are subsequently transferred to the marine sites. All Atlantic salmon fry undergo a marking procedure developed in conjunction with WDFW personnel. Fry at the hatchery will receive the same treatment each year that uniquely imprints the otoliths and identifies these fish as originating from Cooke Aquaculture Pacific facilities. Reference samples are sent in each year to WDFW for their identification records. This marking methodology has been successfully carried out at the Cooke hatchery facility since 2003 in cooperation with WDFW staff.

### D. Transgenic Fish Prohibited by WAC 220-370-100

Transgenic fish, as defined by WAC 220-370-100 will not be used at any of the Cooke Aquaculture Pacific marine net pen facilities.

### E. Operational Procedures for Escape Prevention, Reporting and Recapture

Copies of the updated **2018 Cooke Aquaculture Pacific, LLC Fish Escape Prevention, Response and Reporting Plan** are included with this Finfish Permit application. The plans were updated on October 12, 2018 in cooperation with both the Washington Department of Ecology and the Washington Department of Fish and Wildlife. Copies of these plans have been sent to the appropriate agencies and have been posted at all of the Cooke Aquaculture Pacific marine net pen sites.

Updated versions of the **2018 Cooke Aquaculture Pacific, LLC Regulated Finfish Pathogen Reporting Plan** are also included with this Finfish Permit renewal application. These plans were recently updated in November. They have been sent to the appropriate agency contacts and posted at all of the Cooke Aquaculture Pacific marine net pen sites.

### Cooke Aquaculture Pacific Marine Net Pen Facility Information

| Facility Name | DFW Aquatic Farm # | DOE NPDES # | Facility Location/County |
|---|---|---|---|
| Port Angeles | 8225-01 | 004089-4 | Port Angeles Harbor/Clallam |
| Fort Ward | 8530-01 | 003153-4 | Rich Passage/Kitsap |
| Orchard Rocks | 8530-01 | 003154-2 | Rich Passage/Kitsap |
| Clam Bay | 8530-01 | 003152-6 | Rich Passage/Kitsap |
| Site 1 | 8218-02 | 003156-9 | Deepwater Bay/Skagit |
| Site 3 | 8723-01 | 003158-5 | Deepwater Bay/Skagit |
| Site 4 | 8218-04 | 003159-3 | Skagit Bay/Skagit |

Finfish Aquaculture Permit-Plan of Operation- Atlantic salmon

# EXHIBIT 14

# Cooke Aquaculture Pacific, LLC

## Fin Fish Aquaculture Permit- Plan of Operation
## All-female Triploid Rainbow Trout (Oncorhynchus mykiss)

**Updated: January 18, 2019**

**Overview of the Existing Cooke Aquaculture Pacific Farm Operations**

Cooke Aquaculture Pacific, LLC is a Washington aquaculture company with marine net pen operations located in Clallam, King, Kitsap and Skagit County and freshwater hatcheries located in Thurston County. The company's aquaculture facilities have been raising salmon in the Puget Sound region since the 1970's. Private aquaculture operations like these are an important source of locally produced seafood, rural employment and help sustain working waterfront communities.

The company operates two freshwater hatcheries that produce juvenile salmonids which are subsequently planted in the marine net pen facilities. Only captive brood fish are used to produce the next generation of fish to be reared at the Cooke marine net pen facilities. The brood fish are reared their entire life cycle on regulated pathogen free ground water and are maintained in bio-secure facilities that undergo routine health screenings throughout the growth cycle. At spawning, brood fish are again screened for regulated finfish pathogens. The brood and ova production facilities used by Cooke Aquaculture Pacific all have established negative histories for the occurrence of regulated finfish pathogens. After fertilization, eggs are hatched and grown to smolt size before being transferred from the hatchery to the marine net pen facilities where they are then grown to market sized fish. The production fish are then harvested, processed, packaged and shipped out fresh to seafood customers located throughout the United States. Cooke Aquaculture Pacific is dedicated to producing high quality seafood in a sustainable and environmentally sound manner.

## I.   PLAN OF OPERATION FOR WASHINGTON NET PEN FACILITIES

### A.  Species, Stock and Race of Cultured Fish

Cooke Aquaculture Pacific currently raises Atlantic salmon (*Salmo salar*) at the marine net pen sites. The company will continue to grow the current cohort of Atlantic salmon at some of the marine sites, while beginning to transition to the production of native finfish at the marine net pens over the next several years. In order to achieve this, Cooke proposes to begin performance trials in the net pens using domesticated stocks of all-female triploid Rainbow trout (*Oncorhynchus mykiss*). The company is seeking approval of a Finfish Aquaculture Permit to raise sterile all-female triploid Rainbow trout at the marine net pen sites starting in the spring of 2019.

All-female triploid Rainbow trout (AF3n) are widely used in both public and private aquaculture operations because of their improved growth, increased uniformity, lower maturation rates and overall efficiency in production. Triploidy prevents the fish from maturation that can reduce growth rates and final meat quality at harvest. Seawater production protocols for Rainbow trout

Finfish Aquaculture Permit-Plan of Operation- Rainbow trout

are very similar to the culturing techniques used for Atlantic salmon aquaculture. Maximum cage density levels would be the same ($15 - 20$ kg/m$^3$), resulting in a comparable biomass level for each pen. Depending upon size at harvest (mean weight of $3.5 - 5.5$ kg) cohort population sizes at each site would also be similar to current stocking levels for farming Atlantic salmon. Commercial feed diets and composition is also very similar, with the major component difference being lower lipid (maximum 24% lipid) levels in grow-out feed for trout in comparison to salmon diets. All net pen support structures, stock nets, and predator nets are the same as used for Atlantic salmon farming.

Triploid trout are hormonally and functionally sterile which effectively eliminates the risk of genetic interference to native populations. Additionally, the risk of any escaped fish from establishing naturalized populations is further reduced because the cultivated population would be only female fish. Commercial fish growers benefit from this technology because AF3n trout do not undergo sexual maturation and can thereby achieve significantly better growth rates than diploid populations which lose growth due to maturation. The feminization and triploiding of Rainbow trout are well known technologies that have been researched, trialed and tested in private commercial as well as public production facilities for many years. Commercial triploid trout ova production facilities typically achieve over a 99% induction rate for the triploid process and routinely conduct ploidy analysis for verification of triploidy and quality control purposes.

**Triploid and all-female Rainbow Trout Source and Ova Production**
The source for the Rainbow trout eggs will be Troutlodge, a Washington-based company that has been producing rainbow trout eggs for sale to both public and private aquaculture operations throughout the world since 1945. Troutlodge rears several different lines of Rainbow trout, each with distinct breeding nuclei, under pathogen-free conditions. Troutlodge utilizes a comprehensive health testing regimen at all facilities to assure health security and all lines are produced following rigid genetic guidelines and breeding programs. Cooke will utilize eggs derived from the "November" and "February" Troutlodge production lines, thought to have been initially derived from Puget Sound steelhead brood stock many years ago. It should be noted that the Troutlodge stocks have been reared in captivity for over 40 years and subjected to intensive selection for production-related traits. Full pedigrees exist for each line since 1998 and additional informative genetic data (single nucleotide polymorphism data on 57K SNP chips) since late 2000's. There is little reason to suspect that these lines still resemble the progenitor stocks after this intensive domestication process.

**All-female Breeding Population**
Monosex (all-female) production began in the mid-1990's through a proprietary process. Briefly, first round gynogenesis (all-maternal inheritance) was achieved using UV-irradiated sperm for fertilization followed by disruption of the second meiotic cell division in the resulting zygote using high hydrostatic pressure. The resulting all-female progeny are then sex-reversed at an early stage during development using a testosterone analog, resulting in phenotypic males that produce only X-chromosome bearing sperm. The X-only sperm is then used to fertilize eggs from the production females which results in an entirely female brood stock population. Successive all-female egg production simply utilizes the testosterone analog treatment on selected female brood fish without the use of gynogenesis. All use of the testosterone analog is accomplished under the supervision of the US Food and Drug Administration through an Investigative New Animal Drug permit.

Finfish Aquaculture Permit-Plan of Operation- Rainbow trout

3

**Triploid Production Methods**
Triploidy is achieved through a proprietary method of pressure shock. Briefly, a high-pressure hydrostatic shock is applied to the newly fertilized eggs at a specified time point post-fertilization for a specified period. Pressure is then released, and the eggs are allowed to continue development. Ploidy is confirmed using a fluorescent nucleic acid label on either embryo or blood tissue using a flow cytometer at the Washington State University School of Veterinary Medicine. Testing results of Troutlodge triploid fish and eggs for the last five (5) years demonstrate a high rate of success in triploid induction (99.84%, 3,039/3,044).

The Troutlodge hatcheries operate on regulated pathogen-free ground water for both the brood fish rearing facilities and the egg incubation. The necessary fish health information is submitted to DFW for review with the Fish Transfer Permit applications for approval of the movement of eggs and/or fish to other facilities. Cooke's freshwater hatcheries utilize regulated pathogen-free ground water sources to incubate eggs and raise the young fish prior to their transfer to the marine net pen facilities. Strict compartmentalization and bio-security measures are incorporated that separate each lot of fish being raised at the hatcheries. Prior to transport to the marine net pens, the lot of fish will be sampled at the 5% APPL level for regulated finfish pathogens. Results from the health screening will be sent to DFW with a new Fish Transport Permit application for approval to transfer the Rainbow trout smolts to the marine net pens.

### B. Fish Health Certifications and Screenings

The Troutlodge facilities used to supply the AFn3 Rainbow Trout eggs/fry to the Cooke freshwater hatchery and/or smolt to the marine net pen facilities are certified disease free by an independent process that meets and exceeds OIE standards. Health examinations, sampling, and testing frequencies are in accordance with procedures outlined and methodologies described in the OIE Diagnostic Manual of Aquatic Animal Disease, Seventh Edition, 2016, and the Fish Health Blue Book of the American Fisheries Society. Over the past 35 years of disease screenings and fish health certifications performed at the Cooke freshwater hatcheries, there has never been a positive identification for any regulated fish pathogen.

### C. Rainbow Trout Otolith Marking and Adipose Fin Clipping

**Otolith Marking**
Cooke currently uses an otolith marking method at the hatchery on the Atlantic salmon that it plants at the marine sites. The company is proposing to continue this marking technique also on the Rainbow trout production. All fish hatched would undergo the same marking procedures developed in conjunction with WDFW personnel. The AFn3 Rainbow trout fry at the hatchery will receive the same treatment each year that uniquely imprints the otoliths and identifies these fish as Cooke Aquaculture Pacific production stocks. Reference samples would be sent in each year to WDFW for their identification records. This marking methodology has been successfully implemented at the Cooke hatchery facilities since 2003 in cooperation with WDFW staff.

**Adipose Fin Clipping**
In addition to the otolith marking, the company is proposing to adipose fin clip the all-female triploid Rainbow trout that are destined to go to the marine net pen sites as a means of externally marking the fish for further identification.

Finfish Aquaculture Permit-Plan of Operation- Rainbow trout

### D.  Transgenic Fish Prohibited by WAC 220-370-100

Transgenic fish, as defined by WAC 220-370-100 will not be used at any of the Cooke Aquaculture Pacific marine net pen facilities.

### E.  Operational Procedures for Escape Prevention, Reporting and Recapture

Copies of the updated **2018 Cooke Aquaculture Pacific, LLC Fish Escape Prevention, Response and Reporting Plan** are included with this Finfish Permit renewal application. The plans were updated on October 12, 2018 in cooperation with both the Washington Department of Ecology and the Washington Department of Fish and Wildlife. Copies of these plans have been sent to the appropriate agencies and have been posted at all of the Cooke Aquaculture Pacific marine net pen sites.

Updated versions of the **2018 Cooke Aquaculture Pacific, LLC Regulated Finfish Pathogen Reporting Plan** are also included with this Finfish Permit renewal application. These plans were recently updated in November of 2018 and have been sent to the appropriate agency contacts and posted at all of the Cooke Aquaculture Pacific marine net pen sites.

## Cooke Aquaculture Pacific Marine Net Pen Facility Information

| Facility Name | DFW Aquatic Farm # | DOE NPDES # | Facility Location/County |
|---|---|---|---|
| Port Angeles | 8225-01 | 004089-4 | Port Angeles Harbor/Clallam |
| Fort Ward | 8530-01 | 003153-4 | Rich Passage/Kitsap |
| Orchard Rocks | 8530-01 | 003154-2 | Rich Passage/Kitsap |
| Clam Bay | 8530-01 | 003152-6 | Rich Passage/Kitsap |
| Site 1 | 8218-02 | 003156-9 | Deepwater Bay/Skagit |
| Site 3 | 8723-01 | 003158-5 | Deepwater Bay/Skagit |
| Site 4 | 8218-04 | 003159-3 | Skagit Bay/Skagit |

Finfish Aquaculture Permit-Plan of Operation- Rainbow trout

# EXHIBIT 15

STATE OF WASHINGTON
## DEPARTMENT OF ECOLOGY

*PO Box 47775 • Olympia, Washington 98504-7775 • (360) 407-6300*
*711 for Washington Relay Service • Persons with a speech disability can call 877-833-6341*

December 12, 2017

Mr. Kevin Bright
Environmental Permit Coordinator
Cooke Aquaculture Pacific, LLC
P.O Box 669
Anacortes, WA 98221

Re:   Administrative Order and Notice of Penalty

| | |
|---|---|
| **Administrative Order Docket #** | 15560 |
| **Notice of Penalty Docket #** | 15561 |
| **Site Location** | Administrative Order:   All Cooke Aquaculture facilities in Washington State<br><br>Notice of Penalty:   Cooke Aquaculture Rich Passage Net Pen Operation Dock Near Fort Ward, Bainbridge Island |
| **Penalty Amount** | $8,000 |
| **Due Date** | Within thirty (30) days after receiving this Administrative Order and Notice of Penalty. |

Dear Mr. Bright:

The Department of Ecology (Ecology) has issued the enclosed Administrative Order Docket # 15560 and Notice of Penalty Docket # 15561 to Cooke Aquaculture Pacific, LLC for violating provisions of:

- Chapter 90.48 Revised Code of Washington (RCW) – Water Pollution Control

- Chapter 173-220 Washington Administrative Code (WAC) - National Pollutant Discharge Elimination System (NPDES) Permit Program

Please read the following enclosures:

- **Administrative Order**: Provides a description of the required corrective actions and options for responding to the Order.

COOKE_CWA_00135051

Mr. Kevin Bright
December 12, 2017
Page 2

- **Notice of Penalty:** Describes the violation(s) and the options for responding to the penalty.

If you have questions please contact Marc Pacifico at (360) 407-6282 or by email at marc.pacifico@ecy.wa.gov.

Sincerely,

Richard Doenges
Southwest Regional Manager
Water Quality Program

RD:MP:cc
Enclosures:     Administrative Order Docket #15560
                Notice of Penalty Docket #15561

By certified mail: 91 7199 9991 7037 7474 5220

cc:     Fiscal-Penalty Desk, Ecology
        Kessina Lee, Ecology

COOKE_CWA_00135052

STATE OF WASHINGTON
DEPARTMENT OF ECOLOGY

IN THE MATTER OF AN                         )
ADMINISTRATIVE ORDER                        )      ADMINISTRATIVE ORDER
AGAINST                                     )      DOCKET #15560
Cooke Aquaculture Pacific, LLC              )
Kevin Bright                                )

To:     Mr. Kevin Bright
        Environmental Permit Coordinator
        Cooke Aquaculture Pacific, LLC
        P.O Box 669
        Anacortes, WA  98221

| Order Docket # | 15560 |
|---|---|
| Site Location | All Cooke Aquaculture Facilities in Washington State |

The Department of Ecology (Ecology) has issued this Administrative Order (Order) requiring
Cooke Aquaculture Pacific, LLC to comply with:

- Chapter 90.48 Revised Code of Washington (RCW) – Water Pollution Control

- Chapter 173-220 Washington Administrative Code (WAC) - National Pollutant
  Discharge Elimination System (NPDES) Permit Program

Ecology has the authority to issue this Order under RCW 90.48.120(1).

This Order follows a Notice of Violation Docket #14303 Ecology issued to Cooke Aquaculture
Pacific, LLC on August 24, 2017.

Ecology received a response to the Notice of Violation on October 5, 2017 [eight (8) days late],
and considered your response when administering this Order.

### FACTS

Ecology has received citizen complaints about the Cooke Aquaculture Rich Passage net pen
operation near Fort Ward, Bainbridge Island, for unpermitted discharges of pressure washing
wastewater to Waters of the state of Washington.  The facility has a NPDES Permit Number
WA0031534 for its Net Pens off Fort Ward, however, that permit does not authorize discharges
of pressure washing wastewater.  These are illicit discharges and are violations of Chapter
90.48.080 and Chapter 90.48.160 RCW.

> RCW90.48.080: "**Discharge of polluting matter in waters prohibited.**  It shall be
> unlawful for any person to throw, drain, run, or otherwise discharge into any of the

COOKE_CWA_00135053

Administrative Order Docket #15560
December 12, 2017
Page 2

waters of this state, or to cause, permit or suffer to be thrown, run, drained, allowed to
seep or otherwise discharged into such waters any organic or inorganic matter that shall
cause or tend to cause pollution of such waters according to the determination of the
department, as provided for in this chapter."

RCW 90.48.160: "Any person who conducts a commercial or industrial operation of any
type which results in the disposal of solid or liquid waste material into the waters of the
state, including commercial or industrial operators discharging solid or liquid waste
material into sewerage systems operated by municipalities or public entities which
discharge into public waters of the state, shall procure a permit…"

On August 25, 2016, Ecology sent a Warning Letter for these violations to Mr. Kevin Bright,
Cooke Aquaculture Environmental Permit Coordinator. Another Warning Letter was sent to
Mr. Bright on July 24, 2017, for the same violations. Ecology staff Biniam Zelelow, Kessina
Lee, and Marc Pacifico have all warned Mr. Bright about the violations verbally during
telephone conversations.

Despite two (2) written warning letters and several telephone conversations, the violations
continued. One (1) complaint included a video showing workers pressure washing a boat on a
dock on August 1, 2017, allowing the pressure washing wastewater to enter Waters of the State
without the required permits, and with no treatment.

Ecology's Warning Letter, dated July 24, 2017, warned that: "Discharges of pressure washing
wastewater from cleaning equipment, boats, nets, docks, vehicles, etc. are violations and subject
to an enforcement action by Ecology that could include penalties of up to $10,000 per violation,
per day. Over water vehicle and equipment repair is also prohibited." The July 24, 2017, letter
directed Cooke Aquaculture to Ecology's Vehicle and Equipment Washwater Discharges Best
Management Practices Manual
https://fortress.wa.gov/ecy/publications/SummaryPages/95056.html as guidance for managing
pressure washing wastewater. These requirements apply to all Cooke Aquaculture facilities in
Washington State.

On August 24, 2017, Ecology issued Notice of Violation (NOV) # 14303 to Cooke Aquaculture.
Cooke Aquaculture received the NOV on August 28, 2017. The NOV required Cooke
Aquaculture to file a full report with Ecology, no later than September 27, 2017, stating:

1.    What steps HAVE BEEN taken to control such waste or pollution to otherwise comply
      with this determination of Ecology.

2.    What steps ARE BEING taken to control such waste or pollution to otherwise comply
      with this determination of Ecology.

After the NOV was issued, Ecology received additional complaints and photographs showing
workers on the Cooke Aquaculture dock performing over water equipment work on a boat
engine on September 13th or 14th, 2017, and workers cleaning a boat bottom on the dock, over

COOKE_CWA_00135054

Administrative Order Docket #15560
December 12, 2017
Page 3

the water, on September 13th or 14th, 2017.

The report required by the NOV was received from Cooke Aquaculture on October 5, 2017, eight (8) days after it was due. The report stated the following:

> "First, Cooke had already reminded its employees to not pressure wash vessel hulls on the dock at the Fort Ward facility. Instead, Cooke has implemented a practice of hand scraping those hulls and collecting the materials produced by that scraping in plastic totes for transport and disposal at an upland facility. In response to the NOV, Cooke has further instructed employees that no pressure washing of any type will be authorized at the Fort Ward dock.
>
> Second, in response to concerns raised by Ecology during our telephone conference, we can confirm that maintenance of outboard engines will not occur on the dock at Fort Ward. Instead, the vessels will be trailered to an upland area and maintenance will occur with appropriate secondary containment."



Photos from September 13th or 14th, 2017, showing a worker scraping a boat bottom on the dock. Note the material on the dock in the third photograph. All of the material removed from the boat hull must be captured and contained, scraping into totes is not effective in preventing this material from falling on the dock and into waters of the state.



Photos from September 13th or 14th, 2107, showing workers conducting maintenance work (oil change) on an outboard engine on the dock.

COOKE_CWA_00135055

Administrative Order Docket #15560
December 12, 2017
Page 4

## ORDER TO COMPLY

For these reasons, and in accordance with RCW 90.48.120(1), it is ordered that Cooke
Aquaculture Pacific, LLC immediately take the following actions at all Cooke Aquaculture
facilities in Washington State.

- Immediately cease all discharges of pressure washing wastewater from cleaning
  equipment, boats, nets, docks, vehicles, etc. to Waters of the State, both surface water and
  to the ground.

- Immediately cease all over water, and in water boat bottom scraping and cleaning.

- Immediately cease all over water vehicle and equipment repair.

## ELIGIBILITY FOR PAPERWORK VIOLATION WAIVER AND OPPORTUNITY TO CORRECT

Under RCW 34.05.110, small businesses are eligible for a waiver of a first-time paperwork
violation and an opportunity to correct other violations. We have made no determination as to
whether you meet the definition of a "small business" under this section. However, we have
determined that the requirements of RCW 34.05.110 do not apply to the violation(s) due to a
conflict with federal law or program requirements, including federal requirements that are a
prescribed condition to the allocation of federal funds to the state.

## FAILURE TO COMPLY WITH THIS ORDER

Failure to comply with this Order may result in the issuance of civil penalties or other actions,
whether administrative or judicial, to enforce the terms of this Order.

## YOUR RIGHT TO APPEAL

You have a right to appeal this Order to the Pollution Control Hearing Board (PCHB) within
thirty (30) days of the date of receipt of this Order. The appeal process is governed by Chapter
43.21B RCW and Chapter 371-08 WAC. "Date of receipt" is defined in RCW 43.21B.001(2).

To appeal you must do both of the following within thirty (30) days of the date of receipt of this
Order:

- File your appeal and a copy of this Order with the PCHB (see addresses below). Filing
  means actual receipt by the PCHB during regular business hours.

- Serve a copy of your appeal and this Order on Ecology in paper form - by mail or in
  person. (See addresses below.) E-mail is not accepted.

You must also comply with other applicable requirements in Chapter 43.21B RCW and Chapter
371-08 WAC.

Your appeal alone will not stay the effectiveness of this Order. Stay requests must be submitted
in accordance with RCW 43.21B.320.

COOKE_CWA_00135056

Administrative Order Docket #15560
December 12, 2017
Page 5

## ADDRESS AND LOCATION INFORMATION

| Street Addresses | Mailing Addresses |
|---|---|
| **Department of Ecology**<br>Attn: Appeals Processing Desk<br>300 Desmond Drive Southeast<br>Lacey, Washington 98503 | **Department of Ecology**<br>Attn: Appeals Processing Desk<br>P.O. Box 47608<br>Olympia, Washington 98504-7608 |
| **Pollution Control Hearings Board**<br>1111 Israel Road Southwest, Suite 301<br>Tumwater, Washington 98501 | **Pollution Control Hearings Board**<br>P.O. Box 40903<br>Olympia, Washington 98504-0903 |

## CONTACT INFORMATION

Please direct all questions about this Order to:

Marc Pacifico
Department of Ecology
Southwest Regional Office
Water Quality Program
P.O. Box 47775
Olympia, Washington 98504-7775

Phone: 360-407-6282
Email: marc.pacifico@ecy.wa.gov

## MORE INFORMATION

- **Pollution Control Hearings Board Website**
  www.eho.wa.gov/Boards_PCHB.aspx

- **Chapter 43.21B RCW - Environmental and Land Use Hearings Office – Pollution Control Hearings Board**
  http://app.leg.wa.gov/RCW/default.aspx?cite=43.21B

- **Chapter 371-08 WAC – Practice And Procedure**
  http://app.leg.wa.gov/WAC/default.aspx?cite=371-08

- **Chapter 34.05 RCW – Administrative Procedure Act**
  http://app.leg.wa.gov/RCW/default.aspx?cite=34.05

- **Laws:** www.ecy.wa.gov/laws-rules/ecyrcw.html

COOKE_CWA_00135057

Administrative Order Docket #15560
December 12, 2017
Page 6

- **Rules:** www.ecy.wa.gov/laws-rules/ecywac.html

## SIGNATURE

Richard Doenges
Southwest Regional Manager
Water Quality Program

12/12/17
Date

COOKE_CWA_00135058

STATE OF WASHINGTON
DEPARTMENT OF ECOLOGY

| | |
|---|---|
| IN THE MATTER OF PENALTY | )   NOTICE OF PENALTY |
| ASSESSMENT AGAINST | )   INCURRED AND DUE |
| Cooke Aquaculture Pacific, LLC | )   PENALTY DOCKET #15561 |
| Kevin Bright | ) |

To:    Mr. Kevin Bright
       Environmental Permit Coordinator
       Cooke Aquaculture Pacific, LLC
       P.O Box 669
       Anacortes, WA  98221

| Notice of Penalty Docket # | 15561 |
|---|---|
| Site Location | Cooke Aquaculture Rich Passage Net Pen Operation Dock Near Fort Ward, Bainbridge Island |
| Penalty Amount | $8,000 |
| Due Date | Within thirty (30) days after receiving this Notice of Penalty. |

The Department of Ecology (Ecology) has assessed a penalty against Cooke Aquaculture Pacific, LLC in the amount of $8,000 for violating provisions of:

- Chapter 90.48 Revised Code of Washington (RCW) – Water Pollution Control

- Chapter 173-220 Washington Administrative Code (WAC) - National Pollutant Discharge Elimination System (NPDES) permit program

Ecology has authority to issue this penalty under RCW 90.48.144 and is basing the penalties on the violations listed in this notice.

## DETERMINATION OF VIOLATION(S)

**Ecology's determination that violations have occurred is based on the violations listed below.**

Ecology has received citizen complaints about the Cooke Aquaculture Rich Passage net pen operation near Fort Ward, Bainbridge Island, for unpermitted discharges of pressure washing wastewater to Waters of the state of Washington.  The facility has a NPDES Permit Number WA0031534 for its Net Pens off Fort Ward, however, that permit does not authorize discharges of pressure washing wastewater.  These are illicit discharges and are violations of Chapter 90.48.080 and Chapter 90.48.160 RCW.

COOKE_CWA_00135059

Notice of Penalty Docket # 15561
December 12, 2017
Page 2

> RCW90.48.080: **"Discharge of polluting matter in waters prohibited.** It shall be unlawful for any person to throw, drain, run, or otherwise discharge into any of the waters of this state, or to cause, permit or suffer to be thrown, run, drained, allowed to seep or otherwise discharged into such waters any organic or inorganic matter that shall cause or tend to cause pollution of such waters according to the determination of the department, as provided for in this chapter."

> RCW 90.48.160: "Any person who conducts a commercial or industrial operation of any type which results in the disposal of solid or liquid waste material into the waters of the state, including commercial or industrial operators discharging solid or liquid waste material into sewerage systems operated by municipalities or public entities which discharge into public waters of the state, shall procure a permit…"

On August 25, 2016, Ecology sent a Warning Letter for these violations to Mr. Kevin Bright, Cooke Aquaculture Environmental Permit Coordinator. Another Warning Letter was sent to Mr. Bright on July 24, 2017, for the same violations. Ecology staff Biniam Zelelow, Kessina Lee, and Marc Pacifico have all warned Mr. Bright about the violations verbally during telephone conversations.

Despite two (2) written warning letters and several telephone conversations, the violations continued. One (1) complaint included a video showing workers pressure washing a boat on a dock on August 1, 2017, allowing the pressure washing wastewater to enter Waters of the State without the required permits, and with no treatment.

Ecology's Warning Letter, dated July 24, 2017, warned that: "Discharges of pressure washing wastewater from cleaning equipment, boats, nets, docks, vehicles, etc. are violations and subject to an enforcement action by Ecology that could include penalties of up to $10,000 per violation, per day. Over water vehicle and equipment repair is also prohibited." The July 24, 2017, letter directed Cooke Aquaculture to Ecology's Vehicle and Equipment Washwater Discharges Best Management Practices Manual https://fortress.wa.gov/ecy/publications/SummaryPages/95056.html as guidance for managing pressure washing wastewater. These requirements apply to all Cooke Aquaculture facilities in Washington State.

On August 24, 2017, Ecology issued Notice of Violation (NOV) # 14303 to Cooke Aquaculture. Cooke Aquaculture received the NOV on August 28, 2017. The NOV required Cooke Aquaculture to file a full report with Ecology, no later than September 27, 2017, stating:

1.   What steps HAVE BEEN taken to control such waste or pollution to otherwise comply with this determination of Ecology.

2.   What steps ARE BEING taken to control such waste or pollution to otherwise comply with this determination of Ecology.

COOKE_CWA_00135060

Notice of Penalty Docket # 15561
December 12, 2017
Page 3

After the NOV was issued, Ecology received additional complaints and photographs showing workers on the Cooke Aquaculture dock performing over water equipment work on a boat engine on September 13th or 14th, 2017, and workers cleaning a boat bottom on the dock, over the water, on September 13th or 14th, 2017.

The report required by the NOV was received from Cooke Aquaculture on October 5, 2017, eight (8) days after it was due. The report stated the following:

"First, Cooke had already reminded its employees to not pressure wash vessel hulls on the dock at the Fort Ward facility. Instead, Cooke has implemented a practice of hand scraping those hulls and collecting the materials produced by that scraping in plastic totes for transport and disposal at an upland facility. In response to the NOV, Cooke has further instructed employees that no pressure washing of any type will be authorized at the Fort Ward dock.

Second, in response to concerns raised by Ecology during our telephone conference, we can confirm that maintenance of outboard engines will not occur on the dock at Fort Ward. Instead, the vessels will be trailered to an upland area and maintenance will occur with appropriate secondary containment."



Photos from September 13th or 14th, 2017, showing a worker scraping a boat bottom on the dock. Note the material on the dock in the third photograph. All of the material removed from the boat hull must be captured and contained, scraping into totes is not effective in preventing this material from falling on the dock and into waters of the state.



COOKE_CWA_00135061

Notice of Penalty Docket # 15561
December 12, 2017
Page 4

> Photos from September 13th or 14th, 2107, showing workers conducting maintenance work (oil change) on an outboard engine on the dock.

## ELIGIBILITY FOR PAPERWORK VIOLATION WAIVER AND OPPORTUNITY TO CORRECT

Under RCW 34.05.110, small businesses are eligible for a waiver of a first-time paperwork violation and an opportunity to correct other violations. We have made no determination as to whether you meet the definition of a "small business" under this section. However, we have determined that the requirements of RCW 34.05.110 do not apply to the violation(s) due to a conflict with federal law or program requirements, including federal requirements that are a prescribed condition to the allocation of federal funds to the state.

## FAILURE TO COMPLY WITH THIS NOTICE OF PENALTY

Continued failure to correct the violations listed in this Notice of Penalty may result in additional, escalated penalties.

## OPTIONS FOR RESPONDING TO A NOTICE OF PENALTY

**Option 1:** **Pay the penalty within thirty (30) days after receiving the Notice of Penalty.**

Make your payment payable to the *Department of Ecology*. Please include the penalty docket number on your payment.

**Mail payment to:**

Department of Ecology
Cashiering Unit
P.O. Box 47611
Olympia, Washington 98504-7611

Note: Ecology may take legal action to collect the penalty if you have not paid thirty (30) days after receiving the Notice of Penalty, and have not appealed.

**Option 2:** **Appeal to the PCHB and serve Ecology within thirty (30) days after the date of receipt of the Notice of Penalty.**

The appeal process is governed by Chapter 43.21B RCW and Chapter 371-08 WAC. "Date of receipt" is defined in RCW 43.21B.001(2).

To appeal you must do both of the following within thirty (30) days after the date of receipt of this Notice of Penalty:

- File your appeal and a copy of this Notice of Penalty with the Pollution Control Hearings Board (PCHB) during regular business hours.

COOKE_CWA_00135062

Notice of Penalty Docket # 15561
December 12, 2017
Page 5

- Serve a copy of your appeal and this Notice of Penalty on Ecology in paper form, by mail or in person. E-mail is not accepted.

You must also comply with other applicable requirements in Chapter 43.21B RCW and Chapter 371-08 WAC.

## ADDRESS AND LOCATION INFORMATION

| Street Addresses | Mailing Addresses |
|---|---|
| **Department of Ecology**<br>Attn: Appeals Processing Desk<br>300 Desmond Drive Southeast<br>Lacey, Washington 98503 | **Department of Ecology**<br>Attn: Appeals Processing Desk<br>P.O. Box 47608<br>Olympia, Washington 98504-7608 |
| **Pollution Control Hearings Board**<br>1111 Israel Road Southwest, Suite 301<br>Tumwater, Washington 98501 | **Pollution Control Hearings Board**<br>P.O. Box 40903<br>Olympia, Washington 98504-0903 |

## CONTACT INFORMATION

Please direct all questions about this Notice of Penalty to:

Marc Pacifico
Department of Ecology
Southwest Regional Office
Water Quality Program
P.O. Box 47775
Olympia, Washington 98504-7775

Phone: 360-407-6282
Email: marc.pacifico@ecy.wa.gov

## MORE INFORMATION

- **Pollution Control Hearings Board:**
  www.eho.wa.gov/Boards_PCHB.aspx

- **Chapter 43.21B RCW - Environmental and Land Use Hearings Office – Pollution Control Hearings Board**
  http://app.leg.wa.gov/RCW/default.aspx?cite=43.21B

- **Chapter 371-08 WAC – Practice and Procedure**
  http://app.leg.wa.gov/WAC/default.aspx?cite=371-08

COOKE_CWA_00135063

Notice of Penalty Docket # 15561
December 12, 2017
Page 6

- **Chapter 34.05 RCW – Administrative Procedure Act**
  http://app.leg.wa.gov/RCW/default.aspx?cite=34.05

- **Laws:** www.ecy.wa.gov/laws-rules/ecyrcw.html

- **Rules:** www.ecy.wa.gov/laws-rules/ecywac.html

**SIGNATURE**

Richard Doenges
Southwest Regional Manager
Water Quality Program

12/12/17
Date

COOKE_CWA_00135064