THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY, | CASE NO. C17-1708-JCC |
| Plaintiff, | ORDER |
| v. | |
| COOKE AQUACULTURE PACIFIC LLC, | |
| Defendant. | |

This matter comes before the Court on Plaintiff's motion for partial summary judgment (Dkt. No. 29). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons explained herein.

I. **BACKGROUND**

Defendant Cooke Aquaculture farms Atlantic salmon at net pen facilities located throughout Puget Sound. (*See* Dkt. No. 15 at 2.) The Clean Water Act ("CWA") requires any entity that discharges pollutants into the waters of the United States to hold and comply with the terms of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1342. Pursuant to the CWA, authorized state agencies may issue NPDES permits; in Washington, the Department of Ecology performs the functions necessary to "meet the requirements" of the CWA, including issuing permits. *See* 33 § U.S.C. 1342(b); Wash. Rev.

Code. § 90.48.260. A NPDES permit holder must prepare and implement certain plans to minimize and monitor the release of pollutants. *Id.* at § 1342(a)(2). Defendant operates its facilities pursuant to NPDES permits, which require, among other things, the preparation of a Pollution Prevention Plan and a Release Prevention and Monitoring Plan ("Release Prevention Plan") (together, "the plans") that satisfy the conditions of its permits. (*See* Dkt. No. 29-2 at 11–12.)

Defendant operated eight net pen facilities across Puget Sound until the collapse of its Cypress Site 2 ("Cypress 2") facility on or about August 20, 2017. (*See* Dkt. No. 1 at 9–10.) The collapse resulted in the release of thousands of Atlantic salmon into Puget Sound. (*Id.*) While Cypress 2 is no longer operational, Defendant continues to operate its other seven net pen facilities under its NPDES permits.[1] On August 24, 2017, Plaintiff sent Defendant a "Notice of Intent to Sue Under the Clean Water Act" letter ("notice letter") and sent a supplemental notice letter on September 6, 2017. (*Id.* at 22, 30.) On November 13, 2017, Plaintiff filed a complaint against Defendant asserting several CWA violations, including that Defendant's plans are facially noncompliant with their respective permits. (*See id.* at 2.) Plaintiff's motion for partial summary judgment asks the Court to find that Defendant's plans violated Conditions S6 and S7 of their NPDES permits. (Dkt. No. 29 at 5–6.)

## II.   DISCUSSION

### A.   Legal Standards

1. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[1] The Court does not address whether Cypress 2's plans violated the conditions of its permit in this order. Defendant asserts in its cross-motion for partial summary judgment that Plaintiff's alleged violations with respect to its permit for Cypress 2 are not ongoing or are moot. (*See* Dkt. No. 41 at 4.) In the interest of judicial economy, this order applies to all of Defendant's facilities except Cypress 2, which the Court will discuss in a separate order addressing Defendant's cross-motion for summary judgment.

Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### 2. Clean Water Act

The CWA's purpose is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Private citizens may initiate actions against alleged violators of the CWA's requirements, including violations of permit conditions. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002). In order to bring a CWA citizen suit, a plaintiff must satisfy the procedural requirement of providing notice to: (1) the alleged violator; (2) the Environmental Protection Agency ("EPA"); and (3) the state agency tasked with enforcing the CWA where the alleged violation occurred. *See* 33 U.S.C. § 1365(b). The CWA "authorizes citizens to enforce all permit conditions." *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995).

As a threshold matter, a plaintiff must have statutory and Article III standing to bring a CWA claim. *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 998 (9th Cir. 2000). A citizen has statutory standing to bring an enforcement action under the CWA for "ongoing" violations. *Id.* A citizen plaintiff can prove ongoing violations by demonstrating that either the violations continue on or after the complaint is filed, or that a reasonable trier of fact "could find

a continued likelihood of a recurrence in intermittent or sporadic violations." *Id.* To establish Article III standing, a plaintiff must demonstrate that: (1) he or she has suffered a concrete injury; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that the injury can be redressed by prevailing in the case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).[2]

### B. Sufficiency of Plaintiff's 60-day Notice Letter

Plaintiff asserts that Defendant's Pollution Prevention Plans violate Conditions S6.F, S6.D, and S6.E of its permits, and that its Release Prevention Plans violate Condition S7.6 and the general requirements of Condition S7 of its permits.[3] (*See* Dkt. No. 1 at 23–26). Defendant argues that Plaintiff's notice letter was insufficient with respect to alleged violations of Conditions S6.D, S6.E, and S7, such that the Court lacks jurisdiction over the alleged violations. (Dkt. No. 36 at 18.)[4]

For district courts to have jurisdiction over CWA citizen suits, a plaintiff must provide notice to the alleged violator that contains "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated," and "the activity alleged to constitute a violation." U.S.C. § 1365(b); 40 C.F.R. § 135.3(a). The Ninth Circuit requires that a plaintiff's 60-day notice letter includes "reasonably specific" information, so that the alleged violator will be able to "take corrective actions [to] avert a lawsuit." *Sw.*

---

[2] Defendant does not dispute and the Court finds that Plaintiff has representational standing to sue on behalf of its members because: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (quoting *Hunt v. Wash. State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)).

[3] The permits for all of Defendant's seven net pen facilities were substantively identical. (*See* Dkt. No. 29-2 at 7–62.) Therefore, the Court's analysis of Plaintiff's claims applies to all of Defendant's facilities, except for Cypress 2 as previously explained. *See supra*, footnote 1.

[4] Defendant concedes that Plaintiff provided proper notice for alleged violations of Conditions S6.F and S7.6. (*Id.*)

ORDER
C17-1708-JCC
PAGE - 4

*Marine*, 236 F.3d at 996; *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002). If a plaintiff fails to provide reasonably specific notice of an alleged violation, then the Court lacks jurisdiction over the claim. *Sw. Marine*, 236 F.3d at 997.

The Ninth Circuit does not require a citizen plaintiff to "list every specific aspect or detail of every violation" in its notice letter, as long as it "is reasonably specific" and gives an alleged violator the "opportunity to correct the problem." *Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917 (9th Cir. 2004). "The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." *Id.* at 916 (citing *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002)).

1. Conditions S6.D and S6.E

Plaintiff's notice letter stated that Defendant was in violation of its permits for failing to "prepare a Pollution Prevention Plan for each net pen facility that addresses 'operations, spill prevention, spill response, solid waste, and storm water discharge practices which will prevent or minimize the release of pollutants from the facility to waters of the state.' Condition S6." (Dkt. No. 29-2 at 11.) Condition S6.D requires that Defendant's plans address "practices for the storage and, if necessary, disposal of disease control chemicals." (*Id*.) Condition S6.E requires that Defendant's plans address "how solid and biological wastes are collected, stored, and ultimately disposed. Among the solid wastes of concern are . . . blood from harvesting operations." (*Id.*) Plaintiff alleges that Defendant's plans failed to account for the storage and disposal of medicated feed, iodine, and the anesthetic MS-222, and that its plans contained no mention of the collection, storage, or disposal of harvest blood, in violation of Conditions S6.D and S6.E. (Dkt. No. 29 at 15.) Defendant argues that Plaintiff's notice letter was inadequate because it did not specifically identify Conditions S6.D or S6.E as alleged violations. (Dkt. No. 36 at 13.)

Although plaintiff's notice letter did not specifically list Conditions S6.D and S6.E, it

provided sufficient information for Defendant to identify and correct the alleged violations. Condition S6 requires that Defendant's plans address "solid waste" and practices to "prevent or minimize the release of pollutants from the facility" into the state's waters. (Dkt. No. 29-2 at 11.) By specifically referencing that language, Plaintiff gave Defendant notice that it was allegedly in violation of sub-conditions dealing with the handling of pollutants—disease control chemicals and solid waste from harvest blood. (*See* Dkt. No. 1 at 25.) Condition S6 specifically lists substances which are pollutants, including harvest blood and disease control chemicals. (Dkt. No. 29-2 at 11.) The Plans also identify blood from harvesting operations under the category of "solid wastes of concern." (*Id*.) By reading the language of Condition S6 in conjunction with its sub-conditions, Defendant could have reasonably identified that Plaintiff was alleging violations of Defendant's plans' provisions for disease control chemicals, harvest blood, or other pollutants and solid wastes listed under Condition S6.

Therefore, Plaintiff's notice letter provided reasonably specific notice to allow Defendant to identify alleged violations under Conditions S6.D and S6.E.

2. Condition S7's "Best Management Practices" Requirement

Plaintiff's notice letter alleged that Defendant failed "to identify and implement technology that will minimize fish escapes" under a heading titled "Violations of the Fish Release Prevention & Monitoring Plan." (Dkt. No. 1 at 4–5.) Condition S7 requires, *inter alia*, that Defendant's Release Prevention Plan include "identification and implementation of technology . . . [and] [r]outine procedures and best management practices used" to minimize the risk of fish escapements. (Dkt. No. 29-2 at 12.)

Plaintiff asserts that Defendant's mooring inspection intervals are not best management practices, as required by Condition S7, based on the annual mooring inspection requirement in Condition S6. (*See* Dkt. No. 29 at 19.) Specifically, Plaintiff argues that Defendant's 2012 and 2014 Release Prevention Plans violated its permits' requirements by providing for inspections of the high-current-end moorings every three years and for other moorings to be inspected every six

years. (*Id.*) Plaintiff also asserts that Defendant's 2017 Release Prevention Plan provides for high-current-end moorings inspections every three years and does not address inspection intervals for the other moorings. (*Id.*) Condition S7 does not require specific inspection periods. (*See* Dkt. No. 29-2 at 11.)

Defendant could not have reasonably identified Plaintiff's claim that Defendant was in violation of Condition S7 based on an inspection regime imposed by Condition S6. This section of the notice letter was clearly intended to address the Release Prevention Plans, which are governed by Condition S7, not Condition S6. (*See* Dkt. No. 29-2 at 11–12.) Moreover, Condition S7 does not require specific inspection intervals. (*See id.* at 12.) Plaintiff did not provide notice that would allow Defendant to identify what alleged violation that it needed to cure in order to avoid a lawsuit. As such, the Court cannot exercise jurisdiction over this claim. *See Sw. Marine*, 236 F.3d at 996.

The Court finds that Plaintiff's notice letter did not provide Defendant with sufficient notice as to this claim. Therefore, Plaintiff's motion for partial summary judgment is DENIED as to the alleged permit violations of Condition S7.

### C. Permit Requirements and Defendant's Plans

The Court has jurisdiction over Plaintiff's claims regarding Conditions S6.D, S6.E, S6.F, and S7.6.[5] The Court next considers whether Plaintiff has demonstrated that no dispute of material fact exists as to whether Defendant's plans violated these permit conditions.

#### 1. Condition S6.F

Condition S6.F requires that the plans include that Defendant will "[a]t least once per

---

[5] Plaintiff alleges that the permit violations in Defendant's October 2017 Pollution Prevention Plan and the 2017 Release Prevention Plan are also present in Defendant's prior plans during the five-year statute of limitations period. (Dkt. No. 29 at 7, 12.) Because violations in the prior plans can give rise to daily penalties, this order discusses alleged violations with regard to all of Defendant's plans during the relevant statute of limitations period. *See Borden Ranch P'ship v. U.S. Army Corps of Engineers*, 261 F.3d 810, 817 (9th Cir. 2001), *aff'd*, 537 U.S. 99 (2002).

year, conduct an inspection of the main cage structure and anchoring components above and below the water line." (Dkt. No 29-2 at 11.) Plaintiff alleges that Defendant's Pollution Prevention Plans violate Condition S6.F by failing to include adequate procedures for annual inspections of its main cage structure. (Dkt. No. 29 at 13.) Specifically, Plaintiff asserts that Defendant's 2012, 2015, and April 2017 Pollution Prevention Plans do not contain any main cage inspection requirements and that Defendant's October 2017 plan only requires inspection of the "cage system" as a whole after "a major storm event or any physical accident involving the farm site." (*Id.*; Dkt. No. 29-2 at 131.)

Defendant does not dispute that its plans prior to October 2017 were non-compliant with Condition S6.F, but argues that its updated October 2017 plan provides for, across various sections, at least annual inspections of the components of the main cage structure. (*See* Dkt. No. 36 at 18–21.) Defendant states that the "main cage structure" includes: (1) the cage system's floating walkway; (2) the stock (fish containment) nets; and (3) the predator nets. (*Id.* at 19–20.) Defendant asserts that its "Weekly Surface Inspection Sheet," which is attached to the October 2017 plan, provides for weekly inspection of the floating walkway, in satisfaction of Condition S6.F. (Dkt. No. 29-2 at 131.) The Weekly Surface Inspection Sheet requires Defendant to visually inspect the system mooring points; surface shackles, thimbles, and hardware; mooring lines; surface chain connections; walkway hinge points; and walkway grading condition. (*Id.* at 133.) The Weekly Surface Inspection Sheet does not include inspection of the floatation devices that support the walkway, which Plaintiff argues are part of the "below the water line" main cage structure. (*Id.*; Dkt. No. 29 at 14.)

With respect to the fish and predation nets, Defendant argues that the October 2017 plan's provisions for cleaning and repairing its nets satisfy Condition S6.F. (Dkt. No. 36 at 19.) Defendant's plan states that fish containment nets are "typically pulled to the surface once per year" and that fish containment nets and predator nets are removed at the end of a growing cycle for repair and cleaning. (Dkt. No. 29-2 at 129.) However, the plan's net cleaning procedures,

included under the section titled "Net Washing Practices," do not provide for annual inspection of the fish or predator nets, only that the nets are "to be pulled from the water and transported to a land based cleaning and repair facility" after a growing cycle. (*Id.*) Defendant's plan does not specify how often a growing cycle ends, or whether the cleaning and repair of nets represent the inspection that is required by Condition S6.F. (*See id.*) Facially, it appears that Defendant's net washing provisions are intended to satisfy the permit's requirement to include net cleaning procedures, not for annual "inspection of the main cage structure and anchoring components above and below the water line." (*Id.* at 11.)

The Court finds that Defendant's 2012, 2015, April 2017, and October 2017 Pollution Prevention plans failed to include annual inspection of the main cage system as required by Condition S6.F. Therefore, Plaintiff's motion for partial summary judgment is GRANTED as to Defendant's permit violations of Condition S6.F.

2. Condition S6.D

Condition S6.D requires that the plan address "[p]ractices for storage, and if necessary, disposal of disease control chemicals." (Dkt. No. 29-2 at 11.) Plaintiff argues that Defendant failed to include provisions to store and dispose of disease control chemicals in its 2012, 2015, April 2017, and October 2017 Pollution Prevention Plans. (Dkt. No. 29 at 15–16.) Plaintiff asserts that Defendant used medicated fish feed, iodine, and the anesthetic MS-222 as disease control chemicals, which its plans do not properly address. (*Id.*)

With respect to medicated fish feed, Plaintiff asserts that while Defendant's 2012 and 2015 Pollution Prevention Plans provided that the feed must be stored in leak proof containers, the plans failed to account for the disposal of medicated feed. (*Id.*) Defendant's 2012 and 2015 plans provide that "[a]ny medicated feed will be clearly marked on the label . . . [and] stored in leak-proof containers while at the facility." (Dkt. No. 29-2 at 113, 121.) Defendant's plans do not account for the disposal of medicated feed, which is required by Condition S6.D. (*See id.* at 11, 113, 121.) Defendant's April and October 2017 Pollution Prevention Plans discuss medicated

feed under the section "Disease Control Chemicals." (*See id.* at 125, 130.) Defendant's April and October 2017 plans provide that "any unused medicated feed that remains after the treatment period ends will be removed from the net pen site and transported back to an upland facility for covered storage" and that expired feed "will be disposed of at a solid waste facility." (*Id.*) Defendant's 2017 plans provided for storage of the feed *after* it is no longer at the facility, but do not address how it is stored when it is used to treat the fish at the facility.

Defendant argues that iodine and MS-222 are not disease control chemicals and therefore do not need to be addressed in its plans. (Dkt. No. 36 at 25.) With respect to iodine, Defendant states that "[i]odine is used as a disinfectant, primarily of boots." (*Id.*) Defendant's 2012, 2015, and April 2017, and October 2017 Pollution Prevention Plans list "disinfectants used for footbaths, dive nets, and other equipment" under the heading of "Disease Control Chemicals." (Dkt. No. 29-2 at 113, 121, 125, 130.) In response to an interrogatory asking it to "[d]escribe all efforts to treat, reduce, and/or prevent diseases . . . including the method and/or substances used," Defendant responded by stating, "[a]s with all biosecurity measures at the net pens, the mortality extraction bags used to collect the dead fish are disinfected after each use, using a 24 hour soak in an iodine solution." (*Id.* at 258–261.) Additionally, Defendant listed iodine and MS-222 on the 2016 "Annual Disease Control Chemical Use Report" required by its permits. (*Id.* at 247–55.) None of Defendant's Pollution Prevention Plans include procedures for the storage of iodine. (*See id.* at 113, 121, 125, 130.) Defendant's 2012 and 2015 plans addressed the disposal of iodine, but Defendant's April and October 2017 plans do not. (*See id.*) Defendant's plans do not mention MS-222. (*See id.*)

The Court finds that Defendant failed to address the storage and disposal of disease control chemicals in its 2012, 2015, April 2017, and October 2017 Pollution Prevention Plans. Therefore, Plaintiff's motion for partial summary judgment is GRANTED as to Defendant's permit violations of Condition S6.D.

        3. <u>Condition S6.E</u>

Condition S6.E requires that the Pollution Prevention Plans address "[h]ow solid and biological wastes are collected, stored, and ultimately disposed. (Dkt. No. 29-2 at 11.) Plaintiff argues that Defendant's Pollution Prevention Plans fail to account for the collection, storage, and disposal of harvest blood. (Dkt. No. 29 at 16–17.) Defendant claims that its plan "adequately addresses how harvest blood is collected, stored, and disposed" because it does not bleed fish at the facilities. (Dkt. No. 36 at 26.) Defendant's plans do not address how it collects, stores, and disposes of harvest blood. (*See id.* at 113, 121, 125, 130.) Even if Defendant does not bleed fish at its facilities, its plans still had to address procedures for blood generated from harvesting operations. (Dkt. No. 29-2 at 11.) The plans' complete silence on this issue places it in facial violation of the permits. Therefore, Plaintiff's motion for partial summary judgment is GRANTED as to Defendant's permit violations of Condition S6.E.

    4. <u>Condition S7.6</u>

Condition S7.6 requires that Defendant's plans include procedures for "routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement." (Dkt. No. 29-2 at 12.) Plaintiff argues that Defendant's plans fail to address procedures to routinely track the number of fish lost to predation or escapement. (Dkt. No. 29 at 17–18.) Defendant argues that its plans provide for routine tracking of mortalities in a variety of systems and that "[p]redation losses are simply a variety of mortalities at the site." (Dkt. No. 36 at 22.)

Defendant's 2012, 2014, and 2017 Release Prevention Plans state under the heading "Procedures for Routinely Tracking the Number of Fish" that fish are observed from the surface and that mortalities are removed and accounted for in a database (2012), log books (2014 plan), or an inventory system (2017 plan) after removal. (Dkt. No. 29-2 at 142, 157, 187.) Even if Defendant does track predation and escapement routinely, its permits state that the plan "must include . . . the following elements . . . "[p]rocedures for routinely tracking . . . the number of fish lost due to predation and mortality and the number of fish lost due to escapement." (*Id.* at

12.) Defendant's Release Prevention Plans fail to provide for such tracking. (*See id.* at 142, 157, 187.) Thus, Defendant's argument is based on what it was allegedly doing in practice, not what was included in the plans.

The Court finds that Defendant's 2012, 2014, and 2017 Release Prevention Plans did not satisfy Condition S7.6 of the permits. Therefore, Plaintiff's motion for partial summary judgment is GRANTED as to Defendant's permit violations of Condition S7.6.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Dkt. No. 29) is:

(1) GRANTED as to permit violations relating to Condition S6.F;

(2) GRANTED as to permit violations relating to Condition S6.D for Defendant's 2012, 2015, April 2017, and October 2017 Pollution Prevention Plans;

(3) GRANTED as to permit violations relating to Condition S6.E for Defendant's 2012, 2015, April 2017, and October 2017 Pollution Prevention Plans;

(4) GRANTED as to permit violations relating to Condition S7.6 for Defendant's 2012, 2014, and 2017, and Release Prevention Plans; and

(5) DENIED as to permit violations relating to Condition S7.

DATED this 26th day of April 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE