UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

                Plaintiff,

      v.

COOKE AQUACULTURE PACIFIC, LLC,

                Defendant.

CASE NO. C17-1708-JCC

ORDER

This matter comes before the Court on Defendant's motion for partial summary judgment (Dkt. No. 41), motion to amend its answer (Dkt. No. 64), and motion to seal (Dkt. No. 34). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for summary judgment (Dkt. No. 41), GRANTS in part and DENIES in part the motion to amend (Dkt. No. 64), and GRANTS the motion to seal (Dkt. No. 34) for the reasons explained herein.

## I.    BACKGROUND

This lawsuit arises out of the 2017 collapse of one of Defendant Cooke Aquaculture Pacific LLC's Atlantic salmon net-pen facilities ("Cypress 2") in Deepwater Bay off of Cypress Island, Washington. (*See* Dkt. No. 1 at 9–10.) The Clean Water Act ("CWA") prohibits discharges of pollutants into the waters of the United States, except pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1342. As provided by

the CWA, authorized state agencies may issue NPDES permits and enforce permit requirements. *See* 33 § U.S.C. 1342(b). In Washington, the Department of Ecology ("Ecology") performs the functions necessary to "meet the requirements" of the CWA, including issuing NPDES permits. Wash. Rev. Code. § 90.48.260.

Prior to the collapse of Cypress 2, Defendant operated eight Atlantic salmon net-pen facilities across Puget Sound pursuant to separate NPDES permits issued by Ecology. (*See* Dkt. Nos. 29-2 at 7–62, 44 at 4–33.)[1] Defendant's NPDES permits imposed numerous requirements for minimizing the discharge of pollutants from the facilities, which the Court discusses in greater detail *infra*. (*See* Dkt. No. 44 at 8–21.); *see* Part II.B Defendant's NPDES permit for Cypress 2 was issued in October 2007 and was in force at all times relevant to this lawsuit. (Dkt. Nos. 42 at 5, 14; 44 at 1.)[2] Defendant operated Cypress 2 on submerged lands leased from the Washington State Department of Natural Resources ("DNR"). (Dkt. No. 52-1 at 37–69.) The lease began in January 2008 and was scheduled to run until December 2023. (*Id*. at 39.)[3]

On August 19, 2017, Cypress 2 experienced mooring failures during very strong tidal currents. (Dkt. No. 42 at 2.) These mooring failures progressed over the following days and resulted in the facility's collapse and eventual destruction. (*Id*. at 2–3.) The catastrophic collapse of Cypress 2 resulted in the estimated release of more than 200,000 Atlantic salmon into Puget Sound. (Dkt. No. 29-2 at 200.) The collapse also resulted in the release of other debris from the facility into Puget Sound. (*Id*. at 211–212.) On August 24, 2017, Plaintiff sent Defendant a "Notice of Intent to Sue Under the Clean Water Act" letter ("notice letter"), and sent a supplemental notice letter on September 6, 2017. (Dkt. No. 1 at 22, 30.) On November 13, 2017, Plaintiff filed a complaint against Defendant asserting several CWA violations related to the Cypress 2 collapse, as

---

[1] The permits for all of Defendant's eight net-pen facilities were substantively identical. (*See* Dkt. Nos. 29-2 at 7–62, 44 at 4–33.)

[2] Although scheduled to expire in 2012, the Cypress 2 permit was administratively extended multiple times. (Dkt. Nos. 42 at 9, 44 at 4.).

[3] The lease applied to Defendant's three net-pen facilities in Deepwater Bay ("Cypress 1, 2, and 3"). (Dkt. No. 52-1 at 34–69.)

well as violations at Defendant's seven other Puget Sound net-pen facilities. (*See generally id.*)

On August 25, 2017, DNR notified Defendant that it had defaulted on its obligations under the parties' lease and demanded that Defendant remove all damaged materials from the Cypress 2 site. (Dkt. No. 52-1 at 145.) DNR stated that it may terminate the lease if Defendant did not cure the default by September 24, 2017. (*Id.*) In a letter to DNR dated September 1, 2017, Defendant stated that it had "been implementing its Fish Escape Prevention Plan" and "reserve[d] all rights with respect to the Lease . . . ." (*Id.* at 149.) Defendant proceeded to conduct cleanup, salvage, and remediation at and around the Cypress 2 site throughout the rest of 2017 and into 2018. (*See* Dkt. Nos. 42, at 3–4, 29-2 at 210–12.)

On January 30, 2018, Ecology issued a $332,000 administrative penalty against Defendant arising from the Cypress 2 collapse. (Dkt. No. 52-1 at 160–66.) Ecology concluded that Defendant violated its NPDES permit by negligently allowing the release of farmed salmon, failing to inspect anchoring components deeper than 100 feet, and by not adequately cleaning the facility's nets. (*Id.* at 163–64.) On March 1, 2018, Defendant appealed Ecology's penalty to the Washington State Pollution Control Hearings Board. (Dkt. Nos. 42 at 4, 52-1 at 169); *see also* Wash. Rev. Code §§ 43.21B.010, 43.21B.110.

On February 2, 2018, DNR terminated Defendant's lease for Cypress 2. (Dkt. No. 42 at 4.) Defendant responded on March 1, 2018 by filing a complaint in Thurston County Superior Court challenging DNR's termination of the lease. (Dkt. No. 52-1 at 11–32.) Among other relief, Defendant sought a declaratory judgment that DNR was not "entitled to withhold its consent to [Defendant's] reconstruction of [Cypress] 2 . . . and that it is entitled to restock [Cypress] 2 as soon as it has been rebuilt." (*Id.* at 28.)

On March 22, 2018, Washington's governor signed legislation that prohibits DNR from either granting new leases of aquatic lands for non-native finfish aquaculture projects or renewing or extending a lease in existence as of June 7, 2018 that includes non-native finfish aquaculture. *See* Wash. Rev. Code § 79.105.170; *see also* H.B. 2957, 65th Leg., Reg. Sess.

(Wash. 2018). On December 21, 2018, Defendant requested that Ecology terminate its NPDES permit for Cypress 2. (Dkt. No. 42 at 14.) Ecology has not terminated the permit. (*Id*. at 4.)

On April 24, 2019, Defendant and Ecology entered a consent decree to resolve Defendant's liability related to the Cypress 2 collapse and the corresponding violations identified by Ecology in its notice of administrative penalty. (*See* Dkt. No. 74-1 at 4–11.) On April 25, 2019, the Pollution Control Board, pursuant to the consent decree, dismissed Defendant's appeal of Ecology's administrative penalty. (*Id*. at 18.) Defendant has not conducted net-pen operations at Cypress 2 since its collapse in August 2017. (Dkt. No. 43 at 3.) In fact, the Cypress 2 facility no longer exists, and its remains were ultimately salvaged and removed from the site following the collapse. (*Id*.; *see* Dkt. No. 29-2 at 210–212.) Defendant states that it has no intention of rebuilding Cypress 2. (Dkt. No. 43 at 3.)

Defendant moves for summary judgment on all of Plaintiff's claims related to Cypress 2. (*See* Dkt. No. 41.) Defendant raises two primary arguments. (*Id*. at 4.) First, Defendant argues that when Plaintiff filed its complaint in November 2017, there were no ongoing CWA violations at Cypress 2. (*Id*. at 17.) Second, Defendant argues that Plaintiff's CWA claims were mooted by the involuntary closure of Cypress 2 and subsequent administrative and legislative actions that prevent Defendant from resuming operations at the facility. (*Id*. at 19.) Plaintiff opposes Defendant's motion on both grounds. (*See* Dkt. No. 52.)

## II. DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that no genuine dispute of material fact exists and that the Court can enter a judgment in favor of the moving party as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial burden to demonstrate that no genuine dispute of material fact exists. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of proof at trial, then it can demonstrate the absence of a dispute of material fact by either (1) producing evidence to negate an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party lacks evidence to meet its ultimate burden at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its initial burden of production, then the burden shifts to the nonmoving party to adduce evidence that could reasonably lead a factfinder to find in favor of the nonmoving party, creating a genuine dispute of material fact. *Celotex*, 477 U.S. at 1187.

### 2. Ongoing Violations

A CWA citizen suit must allege violations that are "ongoing" at the time the complaint was filed. *Sierra Club v. Union Oil Co. of California*, 853 F.2d 667, 669 (9th Cir. 1988) (citing *Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987)). As such, a citizen suit may not be premised upon "wholly past violations," and district courts only have jurisdiction over complaints that allege, in good faith, continuing or intermittent violations. *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 999–1001 (9th Cir. 2000).

At trial, a citizen plaintiff must prove ongoing violations by either (1) demonstrating that violations continued on or after the date of the complaint, or (2) by adducing evidence that would allow a reasonable factfinder to find a "continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club*, 853 F.2d at 671. Such intermittent or sporadic violations are ongoing unless "no real likelihood of repetition" exists and "the risk of defendant's continued violation has been completely eradicated when the citizen-plaintiffs filed suit." *Id.* To determine whether ongoing violations exist, the Court may consider whether the defendant took remedial actions to cure its violations, what probability exists that the remedial actions will cure the violations, or other evidence that shows whether the continued violation had been "completely eradicated" when the plaintiff filed its lawsuit. *Id.*

### 3. Mootness

To establish mootness, a defendant must show that the district court cannot order any effective relief. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *Sierra Club*, 853 F.2d at 669 )("The burden of proving that the case is moot is on the defendant."). The seminal case analyzing mootness in the context of a CWA citizen suit is *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000). In *Laidlaw*, the Supreme Court reversed the Fourth Circuit's holding that a citizen suit seeking civil penalties was moot because the alleged CWA violations had ceased. *Id.* at 174. The Supreme Court noted that the cessation of illegal conduct following the commencement of suit "ordinarily does not suffice to moot a case" because civil penalties still serve as a deterrent to future violations. *Id.*

The Supreme Court reached this conclusion even though the polluting facility at issue had been "permanently closed, dismantled, and put up for sale, and all discharges from the facility had permanently ceased." *Id.* at 179. The Supreme Court held that only when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" will events following the commencement of a suit moot a claim for civil penalties. *Id.* at 189. The Ninth Circuit has followed the Supreme Court's decision in *Laidlaw* by placing a heavy burden on CWA defendants to prove that a citizen suit is truly moot. *See, e.g.*, *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002) (holding citizen suit seeking monetary penalties not moot where the defendant had sold the polluting facility); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) (holding that citizen suit seeking monetary penalties was not mooted by implementation of a new NPEDES permit).

### B. Ongoing Violations

Defendant first argues that it is entitled to summary judgment on Plaintiff's claims regarding Cypress 2 because Plaintiff has not alleged facts demonstrating that any ongoing CWA violations existed at the time it filed its complaint. (Dkt. No. 41 at 5.) Applying the framework

adopted in *Sierra Club v. Union Oil*, the Court examines each claim to determine if there are genuine disputes of material fact regarding whether, as of November 13, 2017, violations were actually occurring at Cypress 2, or whether there was a reasonable likelihood of a recurrence of sporadic or intermittent violations. 853 F.2d at 671.[4]

### 1. Section 301(a) of the CWA

Plaintiff alleges that Defendant violated Section 301(a) of the CWA because the collapse of Cypress 2 resulted in "massive discharges of various pollutants into Puget Sound, including but not limited to, non-native Atlantic salmon, debris, solid and liquid wastes, nets, feed, machinery, equipment, walkways, moorings and other structures, fuels, greases, oils, and other petroleum products." (Dkt. No. 1 at 11.) "Section 301(a) of the [Clean Water Act] prohibits the 'discharge of any pollutant' from any 'point source' into 'navigable waters' unless the discharge complies with certain other sections of the CWA." *Natural Res. Def. Council, Inc. v. Cnty. of L.A.*, 725 F.3d 1194, 1198 (9th Cir. 2013) (citing 33 U.S.C. § 1311(a)). A defendant with an NPDES permit is generally shielded from liability from the CWA's prohibition on discharging pollutants so long as they are expressly authorized by the permit. *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014).

Defendant argues that none of the discharges identified by Plaintiff were actually occurring at Cypress 2 when Plaintiff filed its complaint because the facility was destroyed and no longer operational. (Dkt. No. 41 at 17–19.) Essentially, Defendant argues that once Cypress 2 was destroyed it was no longer functioning as a "point source" that was discharging "pollutants" into Puget Sound. (*Id.*)[5] Plaintiff argues that there was an ongoing violation of Section 301(a) in November 2017 because debris from Cypress 2 remained scattered in Puget Sound. (Dkt. No. 52 at 17.) Plaintiff points out that Defendant continued to conduct cleanup and salvage operations at

---

[4] The Court reiterates that its analysis, and Defendant's motion, are limited to Plaintiff's claims and allegations regarding Cypress 2 and Defendant's NPDES permit for that facility.

[5] Defendant does not appear to dispute that the materials identified by Plaintiff, including debris from Cypress 2 and non-native Atlantic salmon, qualify as "pollutants" under the CWA.

the Cypress 2 site into 2018. (Dkt. No. 29-2 at 211–12.) Plaintiff directs the Court to out-of-circuit caselaw standing for the proposition that a discharged pollutant can provide the basis for an ongoing Section 301(a) violation until it is removed from the navigable waters at issue. (Dkt. No. 52 at 17) (citing *Atl. States Legal Found., Inc. v. Hamelin*, 182 F. Supp. 2d 235, 248 n. 20 (N.D.N.Y. 2001) (collecting cases)).

The Court disagrees with Plaintiff's theory of continuing violations. Section 301(a) specifically prohibits the unpermitted discharges of pollutants from point sources—it does not govern the failure to clean up pollutants after they have been discharged from a point source. *See* 33 U.S.C. § 1311(a). Plaintiff does not point to any Ninth Circuit case law to support its theory that debris from Cypress 2 that remained in Puget Sound when the complaint was filed amounted to an ongoing violation of Section 301(a). Thus, Plaintiff has not presented evidence that any of the debris represented a "point source," or that the debris was causing ongoing discharges of pollutants into Puget Sound.

Although Plaintiff has not established that a continuing violation of Section 301(a) existed when the complaint was filed, it also argues that it has adduced evidence that shows a likelihood of recurrent or sporadic violations. (Dkt. No. 52 at 13–14.) Plaintiff asserts that at the time it filed its complaint, Defendant had not "eradicated the likelihood of future sporadic violations." (*Id.* at 14.) Plaintiff emphasizes that DNR did not terminate the Cypress 2 lease until months after Plaintiff filed suit against Defendant. (Dkt. No. 42 at 4.) Defendant challenged DNR's lease decision in state court, and expressly asserted its right to rebuild Cypress 2. (Dkt. No. 52-1 at 11–33.)[6] That litigation remains ongoing. (Dkt. No. 42 at 4.) Prior to Cypress 2 being destroyed, Defendant planned to rebuild the facility. (Dkt. No. 52-1 at 71–76.) Following its

---

[6] In its reply, Defendant filed an excerpt from a hearing in front of the Thurston County Superior Court, in an effort to show this Court that it has no intention of re-opening Cypress 2. (Dkt. No. 56 at 4–6.) The Court will not consider this material because Defendant did not include the entire hearing transcript. (*See id.*) Moreover, its representations directly conflict with the allegations in its complaint in that lawsuit. (*Compare* Dkt. No. 52-1 at 30–31, *with* Dkt. No. 56 at 4–6.)

collapse, Defendant also represented to DNR that it intended to rebuild Cypress 2. (*Id.* at 26–31.) Plaintiff also points to historical data showing that Defendant's facilities have experienced at least four fish escapement events since 1996 as the result of "catastrophic events," with the most recent occurring in 2005. (*Id.* at 9.) Defendant counters that it has no intention of rebuilding Cypress 2. (*See* Dkt. Nos. 42, 43.) Defendant further argues that DNR's termination of the lease prevents it from ever rebuilding Cypress 2. (*Id.*) Defendant also argues that the Washington law passed in March 2018 also precludes it from ever operating Cypress 2 again. (*Id.*)

Viewed in the light most favorable to Plaintiff, the Court finds that there is a genuine dispute of material fact regarding whether, at the time Plaintiff filed suit in November 2017, there was a likelihood for sporadic or recurrent violations of Section 301(a) at Cypress 2 arising from the release of non-native Atlantic salmon. This dispute of fact is based on Defendant's shifting positions regarding its intentions to rebuild Cypress 2, Defendant's actual ability to rebuild and re-stock Cypress 2, evidence of prior fish escapements from Defendant's facilities, and the continued validity of the Cypress 2 NPDES permit. The Court places specific emphasis on the fact that many of the events that Defendant cites occurred well after Plaintiff filed its complaint.

Conversely, the Court does not find a dispute of genuine fact regarding the other pollutants supporting Plaintiff's Section 301(a) claim. Plaintiff has not presented any evidence that Defendant's facilities previously discharged any pollutants other than non-native Atlantic salmon, such that there is a reasonable likelihood of recurring violations at Cypress 2. Therefore, Plaintiff may proceed to trial on its claim that Defendant violated Section 301(a) only based on its release of non-native Atlantic salmon.

### 2. Permit Condition S1

Plaintiff alleges that Defendant violated Condition S1 of its NPDES permit when it allowed thousands of Atlantic salmon to be released from Cypress 2. (Dkt. No. 1 at 11.) Condition 1 of the Cypress 2 NPDES permit prohibits the "intentional or negligent release of

Atlantic salmon" from the facility. (Dkt. No. 44 at 8.) Similar to its position regarding Section 301(a) violations, Defendant argues that there were no ongoing Condition S1 violations when Plaintiff filed its complaint because Atlantic salmon were no longer being released from Cypress 2 at that time. (Dkt. No. 41 at 17–19.) Plaintiff points to past incidents of fish escapements, as well as Ecology's notice of administrative penalty that concluded that "[t]he release of Atlantic salmon was the result of [Defendant's] negligent maintenance of its net pen facility." (Dkt. No. 52-1 at 163.) Plaintiff also asserts that Defendant did not attempt to determine the cause of Cypress 2's collapse. (*See id.* at 88–96; Dkt. No. 52-2 at 3–6.)

Viewed in the light most favorable to Plaintiff, the Court finds that there is a genuine dispute of material fact regarding whether, at the time Plaintiff filed suit in November 2017, there was a likelihood for sporadic or recurrent violations of Condition S1 arising from Defendant's negligent or intentional release of non-native Atlantic salmon. Therefore, Defendant's motion for summary judgment is DENIED as to this claim.

### 3. Permit Condition S5

Plaintiff alleges that Defendant violated multiple provisions of Condition S5 based on the discharge of various materials into Puget Sound following the collapse of Cypress 2. (Dkt. No. 1 at 11–12.) Under Condition S5, Defendant was required to:

- Collect and store fish carcasses in leakproof containers. Carcasses could not be disposed of in surface waters.

- Store and dispose of fish mortalities, harvest blood, and leachate from these materials in a manner which prevents such materials from entering waters of the state.

- Dispose of accumulated solids and attached marine growth contained within or on the net pen in a manner which prevents to the maximum extent practical these materials from reentering waters of the state.

- Not discharge accumulated solids and marine growth removed from the finfish rearing units into waters of the state without prior treatment.

- Not discharge sanitary waste, floating solids, visible foam other than in trace amounts, or oily wastes which produce sheen on the surface of the receiving water.

(Dkt. No. 44 at 17–18) (Permit Conditions S5.A.7–10, 12) Defendant argues that there were no ongoing violations of Condition S5 when Plaintiff filed its complaint because no prohibited materials were being discharged from Cypress 2 at that time. (Dkt. No. 41 at 17–19.) Plaintiff has not produced any evidence demonstrating that Defendant was violating the relevant Condition S5 requirements in November 2017. For example, there is no evidence that Cypress 2, which was non-operational in November 2017, continued to discharge "accumulated solids" or "sanitary waste." (*See* Dkt. No. 44 at 17–18.)

Nor has Plaintiff presented evidence that there was a continuing likelihood of a recurrence in intermittent or sporadic violations in November 2017. Plaintiff has not produced any evidence that, prior to the collapse of Cypress 2, Defendant committed violations of the Condition S5 provisions it identifies in its complaint. Without any evidence of a history of past violations of the Condition S5 provisions at issue, Plaintiff has not met its burden to show a continuing likelihood of future violations. Therefore, Plaintiff has not met its burden to demonstrate that violations of Permit Condition S5 were ongoing when it filed this lawsuit. Defendant's motion for summary judgment is GRANTED as to these claims.

### 4.    Permit Conditions S2 and S4

Plaintiff alleges that Defendant violated Conditions S2 and S4 by failing to conduct mandatory procedures regarding the closure of Cypress 2. (*See* Dkt. No. 1 at 15–16.) Condition S2.B.4 requires Defendant to "conduct [c]losure [m]onitoring in areas where the previous [sediment impact zone] was established but is no longer in effect," whenever its net pens are "moved or removed." (Dkt. No. 44 at 10.) That Condition also requires Defendant to submit a sediment sampling and analysis plan ("SAP") to Ecology for review and approval "at least thirty (30) days prior to [the] anticipated site closure or significant move." (*Id.*) Condition S4 similarly requires Defendant to submit a SAP to Ecology "at least 60 days before any planned closure." (*Id.* at 16.)

Plaintiff alleges that Defendant failed to follow these procedures prior to closing the

Cypress 2 site, and specifically failed to submit an SAP to Ecology within 30 days of the facility's closure. (Dkt. No. 1 at 16.) Plaintiff further states that "Defendant has not provided any evidence supporting its request for summary judgment that suggests [the Condition S2] violations were not continuing when the complaint was filed." (Dkt. No. 52 at 16.) Plaintiff points out that Defendant was continuing to conduct salvage operations at the time the complaint was filed. (*Id*.)

Defendant asserts that it complied with the Condition S2 closure requirements and that Plaintiff has not produced any evidence to the contrary. (Dkt. No. 55 at 6.) Defendant's NPDES coordinator, Kevin Bright, provided a declaration stating that in conjunction with requesting that Ecology terminate the Cypress 2 permit, Defendant has had a third party complete various environmental monitoring activities at the site. (Dkt. No. 41 at 5.) Mr. Bright further states that "once Ecology is satisfied that the site closure testing results meet environmental standards, the permit will be terminated indefinitely." (*Id*.)

Viewed in the light most favorable to Plaintiff, the Court finds that there is a genuine dispute of material fact regarding whether at the time Plaintiff filed suit in November 2017 Defendant continued to violate Conditions S2 and S4 by failing to comply with Cypress 2's closure requirements. Disputed facts include whether Cypress 2 was "closed" in November 2017, given that it was no longer operational but its NPDES permit was still in effect. It is also unclear from the record when Defendant completed the closure monitoring—such as submission of an SAP report to Ecology—that it asserts satisfied its obligations under Conditions S2 and S4. Therefore, Defendant's motion for summary judgment is DENIED as to this claim.

5.    Permit Conditions S6 and S7

Conditions S6 and S7 of Defendant's NPDES permit require the preparation and implementation of a Pollution Prevention Plan and a Release Prevention and Monitoring Plan ("Release Prevention Plan") (collectively the "Plans"). (*See* Dkt. 44 at 19–22.) The Plans are intended to implement many of the NPDES permit provisions for minimizing the discharge of

pollutants from Defendant's facilities. (*See id.* at 39–40.) Relevant provisions include: required procedures for storing and disposing of disease control chemicals, solid wastes, fish mortalities, and blood from harvesting operations; inspection requirements for the facility's components, such as anchors; and mandatory procedures for minimizing and tracking the number of fish lost to escapement, predation, and mortality. (*Id.*)

In a prior order, the Court ruled that Defendant's Plans for its seven net-pen facilities other than Cypress 2 facially violated various provisions of Conditions S6 and S7. (*See* Dkt. No. 68.)[7] With respect to Defendant's other facilities, the Court found that (1) notice was sufficient for the Court to have jurisdiction over the alleged violations, except for one alleged violation of Condition S7, and (2) that Defendant's plans were facially non-compliant with Conditions S6.E, S6.D, S6.F, and S7.6 of its permits. (*Id.* at 5–12.) As previously mentioned, the NPDES permit for Cypress 2 was substantively identical to the NDPDES permits for Defendant's other facilities. *See supra* Part I.

Defendant asserts that the Plans were not violating Cypress 2's NPDES permit in November 2017 because the facility was destroyed and no longer operational. (Dkt. No. 41 at 18.) Defendant argues that following the collapse, its obligations under the Plans were voided by the general contract doctrine of impossibility. (Dkt. No. 55 at 6.) To the extent Defendant argues that it no longer had to maintain compliant Plans once Cypress 2 was destroyed, the Court disagrees. Defendant does not point to any language in the NPDES permit that relieves it from having compliant Plans in the event that a facility becomes non-operational. Nor does Defendant provide any legal authority for the proposition that once Cypress 2 was destroyed, Defendant no longer had to maintain Plans in accordance with its NPDES permit. *See* 40 C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action"); *see also Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986

---

[7] The Court specifically abstained from ruling on permit violations regarding Cypress 2 because Defendant's motion for summary judgment was pending. (*See* Dkt. No. 68 at 2.)

(9th Cir. 1995) (noting that "[t]he plain language of [the CWA citizen suit provision] authorizes citizens to enforce all permit conditions.").

Defendant's position is also factually unsupported. It is undisputed that the Cypress 2 NPDES permit was still in effect when Plaintiff filed its complaint in November 2017. (Dkt. No. 42 at 5, 14.) Indeed, Defendant did not even request that Ecology terminate the permit until December 2018. (*Id*. at 14.) Moreover, even after the Cypress 2 collapse, Defendant remained onsite to conduct salvage and cleanup efforts. (*Id*. at 3–4.) Defendant itself told DNR on September 1, 2017 that it had "been implementing its Fish Escape Prevention Plan" regarding Cypress 2. (Dkt. No. 52-1 at 149.) There is simply no legal or factual basis to support Defendant's contention that Cypress 2's collapse absolved it from maintaining Plans that complied with its NPDES permit requirements. *See Sw. Marine*, 236 F.3d at 999 (holding that the defendant's post-filing failure to implement a compliant plan constituted an ongoing violation.)

However, to the extent Defendant argues that there were no ongoing violations regarding the implementation of the Plans at the time Plaintiff filed its complaint, the Court agrees. Condition S6 requires Defendant "to operate [Cypress 2] in accordance with" its relevant sub-provisions—for example, the storage and collection of disease control chemicals and solid waste. (Dkt. No. 44 at 19.) Defendant argues that it could not have been violating these Plan conditions in November 2017 because Cypress 2 was no longer operational—in other words, Defendant was no longer storing or disposing of disease control chemicals or solid waste at Cypress 2. Plaintiff has not produced evidence to demonstrate that actual violations of Conditions S6 and S7 continued on or after November 13, 2017. Nor has Plaintiff produced evidence that there is a likelihood of recurrent or sporadic violations. For example, Plaintiff has not provided any evidence that Defendant committed prior violations of Conditions S6 and S7.

Therefore, Plaintiff has demonstrated ongoing violations of Conditions S6 and S7 with regard to the preparation of a Pollution Prevention Plan and Fish Release Plan that comply with

its NPDES permit. Defendant's motion for summary judgment as to those claims is DENIED. Conversely, Plaintiff has not demonstrated ongoing violations of permit Conditions S6 and S7 with regard to the implementation of Defendant's Pollution Prevention Plan and Fish Release Plan. Defendant's motion for summary judgment as to those claims is GRANTED.

### C. Mootness

In addition to its argument that violations at Cypress 2 were not ongoing, Defendant argues that Plaintiff's claims are moot. (Dkt. No. 41 at 20.) Defendant's mootness argument closely tracks its argument that Plaintiff cannot prove ongoing violations at the time the complaint was filed—that Cypress 2 was no longer operational in November 2017, Defendant does not intend to rebuild the facility, and even if it did so intend, it has been legally and administratively precluded from doing so. (*Id.*) Defendant also asks the Court to adopt out-of-circuit case law that would shift the burden to Plaintiff to prove its claims are no longer moot because the events that brought about the cessation of violations at Cypress 2 were involuntary. (*See* Dkt. No. 41 at 20.)[8]

The Court agrees with Defendant that any injunctive relief Plaintiff seeks regarding Cypress 2 is now moot. *See San Francisco BayKeeper*, 309 F.3d at 1160 ("Post-commencement compliance may moot claims for injunctive relief, but district courts can still impose civil penalties for violations that have already taken place."). Cypress 2 was destroyed and is no longer operational, so it is unclear how the Court could craft injunctive relief to prevent future violations regarding that facility.

---

[8] The Court declines to adopt Defendant's burden-shifting argument based on a distinction between voluntary and non-voluntary cessation. The Ninth Circuit has not made such a distinction regarding mootness in the CWA context, and this Court will not do so here. *See Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 430 F. Supp. 2d 996, 1003 (N.D. Cal. 2006) (citing *Tinoqui–Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States DOE*, 232 F.3d 1300, 1303–04 (9th Cir. 2000)) ("[E]ven in cases where an agency's regulatory action may have mooted a suit, the Ninth Circuit applies the standard that the party asserting mootness bears the heavy burden of persuading the court that the case is moot.").

However, the Court finds that it can still provide Plaintiff effective relief in the form of civil penalties. *See Laidlaw*, 528 U.S. at 193 ("Denial of injunctive relief does not necessarily mean that the district court has concluded there is no prospect of future violations for civil penalties to deter."). At this stage, Defendant has not met its heavy burden to demonstrate that it is "absolutely clear" that Plaintiff's alleged violations at Cypress 2 "could not reasonably be expected to recur." *Id*. at 189. As the Court has previously explained, there are disputes of fact regarding Defendant's intentions and ability to rebuild Cypress 2. *See supra* Part II. It is undisputed that Defendant's NPDES permit for Cypress 2 has not been terminated by Ecology. Moreover, Defendant continues to operate its other seven net-pen facilities in Puget Sound under identical NPDES permits and has taken steps to continue its operations at those sites. (*See* Dkt. No. 52-1 at 177–185.) Finally, the Court does not agree with Defendant that the intervening change in Washington law regarding finfish farming necessarily eliminates the possibility of future violations. Therefore, Defendant's motion for summary judgment on the issue of mootness is DENIED without prejudice.

### D. Motion to Amend

Defendant seeks leave to amend its answer to add the affirmative defenses of diligent prosecution and *res judicata*. (Dkt. No. 64.) Plaintiff objects, arguing that Defendant has not demonstrated good cause to allow its untimely amendment, and that even if the Court found good cause, the amendments should be denied as either futile or unduly prejudicial to Plaintiff. (Dkt. No. 71 at 6.)

Under Federal Rule of Civil Procedure 15(a), a district court should freely grant leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Ninth Circuit has made clear that Rule 15 favors pleading amendments and should be applied liberally. *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989). However, the Rule 15 standard does not apply when a party seeks to amend its pleading after the court-ordered deadline for filing amendments has passed. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d

604, 607 (9th Cir. 1992).

Instead, untimely motions to amend are analyzed under the "good cause" standard established by Rule 16. *See* Fed. R. Civ. P. 16(b)(4); *Mammoth Recreations, Inc.*, 975 F.2d at 608. The Rule 16(b) good cause standard "primarily considers the diligence of the party seeking the amendment." *Mammoth Recreations, Inc.*, 975 F.2d at 609. A district court may amend its scheduling order "if it cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* If the moving party "was not diligent, the [good cause] inquiry should end." *Id.*

Here, the Court ordered that all pleading amendments be filed no later than January 18, 2019. (Dkt. No. 20.) Defendant did not file its motion for leave to amend its answer until April 18, 2019. (*See* Dkt. No. 64.)[9] Therefore, Defendant's motion for leave to amend is untimely, and the Court must first determine whether Defendant has met its burden to show that good cause exists for the Court to consider its proposed amendment. *See Mammoth Recreations, Inc.*, 975 F.2d at 607.

Defendant asserts that there is good cause for its untimely amendment because "the facts underlying [its] res judicata and diligent prosecution defenses did not exist before its pending settlement with Ecology." (Dkt. No. 64 at 3.)[10] Defendant further asserts that the settlement agreement "between [Defendant] and Ecology will resolve all substantive claims between [Defendant] and Ecology related to Ecology's enforcement of the Clean Water Act provisions against [Defendant] for the August 19, 2017 failure of Cypress Site 2." (*Id.* at 2.) Plaintiff argues

---

[9] Defendant originally filed its motion to amend on April 4, 2019, but withdrew the motion because it failed to address the operative good cause standard. (*See* Dkt. No. 64 at 3.)

[10] Defendant's proposed amended answer is vague about the specific theories that support its *res judicata* and diligent prosecution affirmative defenses. (*See* Dkt. No. 64 at 19) (asserting only that "Plaintiff's claims are barred by res judicata" and "Plaintiff's claims are barred by the doctrine of diligent prosecution."). Given the lack of facts supporting these proposed affirmative defenses, Defendant's statement that it "could not have asserted the defenses under either the 'fair notice' standard elaborated in *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979), or the "plausibility" standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570," is curious. It is debatable that the proposed affirmative defenses, in their current form, would survive either standard.

ORDER
C17-1708-JCC
PAGE - 17

that Defendant was on notice of the facts that gave rise to their proposed affirmative defenses because Ecology had assessed the relevant administrative penalty against Defendant in January 2018—more than 15 months before Defendant sought leave to amend. (Dkt. No. 71 at 7.) Therefore, Plaintiff argues that Defendant was not diligent in pleading these affirmative defenses. (*Id.*)

Defendant has demonstrated good cause for the Court to consider its proposed affirmative defenses. The triggering event for Defendant to assert its defenses of *res judicata* and diligent prosecution was its entry into a consent decree with Ecology. The doctrine of *res judicata*, also referred to as claim preclusion, serves as an affirmative defense where a party can demonstrate that in the two cases at issue, there are "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917–18 (9th Cir. 2012) (citations omitted). Although Ecology had issued its notice of penalty in January 2018, that notice was not the type of final, non-appealable order that would have allowed Defendant to sufficiently assert *res judicata* or diligent prosecution. *See* 33 U.S.C. § 1319(g)(6)(A)(iii) (requiring state to have issued "a final order not subject to further judicial review" for diligent prosecution bar to apply). Therefore, even with the exercise of diligence, Defendant could not have asserted these affirmative defenses prior to entry into the consent order in April 2019.

Notwithstanding the Court's finding of good cause, Defendant's proposed diligent prosecution defense is futile. An amendment is futile when "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (quoting *Miller v. Rykoff– Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)). Granting or denying leave to amend rests in the sound discretion of the trial court and will be reversed only for abuse of discretion. *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).

The CWA includes four statutory bars that prohibit a citizen suit in cases where the state

or federal government pursues enforcement actions with respect to the same alleged violations. *See* 33 U.S.C. §§ 1319(g)(6)(A)(i)–(iii), 1365(b)(1)(B); *see also California Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 873 (9th Cir. 2013). None of the diligent prosecution bars are satisfied by Defendant's consent decree with Ecology. Because the Environmental Protection Agency was not involved in Ecology's enforcement action, neither § 1319(g)(6)(A)(i) or § 1365(b)(1)(B) apply. Nor does § 1319(g)(6)(A)(ii) provide a basis for Defendant's diligent prosecution defense because the Ninth Circuit has interpreted that provision as requiring that the government be diligently prosecuting its parallel action "at the time when the citizen filed his or her complaint." *California Sportfishing Prot. All.*, 728 F.3d at 873. Here, Ecology did not commence its action against Defendant until months after Plaintiff had filed its citizen suit. (*See* Dkt. No. 52-1 at 166.)

The only statutory bar that could conceivably apply to Ecology's enforcement action is § 1319(g)(6)(A)(iii). That provision bars citizen suit actions where a state agency "has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law." 33 U.S.C. § 1319(g)(6)(A)(iii). Courts in the Ninth Circuit have taken a restrictive view of § 1319(g)(6)(A)(iii). *See, e.g.*, *Citizens For a Better Environment–California v. Union Oil Co. of California*, 83 F.3d 1111, 1118 (9th Cir. 1996) (finding that a penalty imposed under California's regulatory scheme was not imposed pursuant to a "comparable" state law); *Save Our Bays and Beaches v. Honolulu*, 904 F.Supp. 1098, 1129–31 (D. Haw. 1994) (finding that Hawaii's regulatory scheme does not afford the public sufficient rights of participation to constitute a "comparable" state law).

This Court has previously ruled that the Washington statute underlying Ecology's enforcement action against Defendant is not a "comparable" state law to § 1319(g) because it does not share the same "public participation features" as its federal counterpart. *See Waste Action Project v. Atlas Foundry & Mach. Co.*, Case No. C97-5082-JCC, Dkt. No. 109 (W.D. Wash. 1998). In *Waste Action Project*, the Court held that Ecology's action was not imposed

under a comparable state law "[b]ecause the Washington regulatory scheme pursuant to which the penalty was imposed in this case does not 'contain mandatory safeguards of public participation and notice comparable to § 1319(g).'" *Id*. Therefore, the Court finds that Defendant's proposed diligent prosecution defense is futile.

In contrast, the Court finds that Defendant's proposed *res judicata* defense is not futile. There appears to be identity between Ecology's claims resolved in the consent decree and Plaintiff's claims in this lawsuit. (*Compare* Dkt. No. 74-1, *with* Dkt. No. 1) (each alleging violations of identical provisions of Defendant's NPDES permit). When state agencies prosecute environmental lawsuits against private actors, district courts presume that "the state will adequately represent the position of its citizens." *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773 (9th Cir. 1994) (affirming district court's determination that recreational fishermen were in privity with state government when the government entered a consent decree resolving various environmental claims). Here, the Court applies a presumption that Plaintiff's interests were represented by Ecology in entering the consent decree. Plaintiff has not demonstrated that Defendant's *res judicata* defense would be futile for lack of privity. *Miller*, 845 F.2d at 214. Lastly, the Ninth Circuit has held that consent decrees entered by a state government on behalf of its citizens can have a preclusive effect as to claims seeking to protect the same public resources. *See Alaska Sport Fishing Ass'n*, 34 F.3d at 773; *see also United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1002 (9th Cir. 1980) (noting that Clean Water Act did not abrogate the doctrine of *res judicata*).

Any prejudice caused by allowing Defendant to amend its answer is mitigated by the fact that Plaintiff has additional time to conduct discovery into Defendant's *res judicata* defense. Therefore, Defendant's motion for leave to amend its complaint is GRANTED as to its *res judicata* defense and DENIED as to its diligent prosecution defense.

### E.    Motion to Seal

Defendant asks the Court to maintain under seal a declaration submitted in support of its

response to Plaintiff's motion for partial summary judgment. (Dkt. No. 34.) In general, there is a strong presumption in favor of public access to the court's files. *See Kamakana v. City and Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); W.D. Wash. Local Civ. R. 5(g). A party seeking to seal a document attached to a dispositive motion must provide compelling reasons "that outweigh the general history of access and the public policies favoring disclosure . . . ." *Kamakana*, 447 F.3d at 1179.

Here, Defendant asks the Court to maintain under seal a declaration and attached exhibits that discuss confidential and proprietary information regarding Defendant's business operations. (Dkt. No. 34 at 3.) Having reviewed the exhibits, the Court FINDS that Defendant's interest in keeping this information confidential is a compelling reason to maintain the documents under seal. Therefore, Defendant's motion to seal (Dkt. No. 34) is GRANTED.

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary judgment (Dkt. No. 41) is GRANTED in part and DENIED in part, Defendant's motion for leave to amend (Dkt. No. 64) is GRANTED in part and DENIED in part, and Defendant's motion to seal (Dkt. No. 34) is GRANTED. In accordance with the Court's order:

1.   Defendant's motion for summary judgment is DENIED as to Plaintiff's claims pursuant to CWA Section 301(a) and Condition S1.

2.   Defendant's motion for summary judgment is GRANTED as to Plaintiff's claims pursuant to Condition S5.

3.   Defendant's motion for summary judgment is DENIED as to Plaintiff's claims pursuant to Conditions S2 and S4.

4.   Defendant's motion for summary judgment is GRANTED in part and DENIED in part as to Plaintiff's claims regarding Conditions S6 and S7. The motion is DENIED with regard to Defendant's preparation of a compliant Pollution Prevention Plan and Fish Release Plan, and GRANTED with regard to Defendant's implementation of its Pollution Prevention Plan and Fish

Release Plan at Cypress 2.

    5.      Defendant's motion for summary judgment on the basis of mootness is DENIED
without prejudice as to all claims.

    6.      Defendant's motion for leave to amended (Dkt. No. 64) is GRANTED in part and
DENIED in part. Within 14 days of the issuance of this order, Defendant shall file a copy of its
proposed amended answer (Dkt. No. 64 at 8–21). Defendant's amended answer shall comply
with the Court's rulings contained in this order.

    7.      Defendant's motion to seal (Dkt. No. 34) is GRANTED. The Clerk is
DIRECTED to maintain Document Number 38 under seal until further order of the Court.

    DATED this 26th day of June 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE