THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,                          CASE NO. C17-1708-JCC

                         Plaintiff,             ORDER

            v.

COOKE AQUACULTURE PACIFIC LLC,

                         Defendant.

        This matter comes before the Court on Defendant's motion to exclude expert opinions

(Dkt. No. 82), Plaintiff's motion for partial summary judgment (Dkt. No. 79), and Defendant's

motion for partial summary judgment (Dkt. No. 84). Having thoroughly considered the parties'

briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES

Defendant's motion to exclude expert opinions (Dkt. No. 82), GRANTS in part and DENIES in

part Plaintiff's motion for partial summary judgment (Dkt. No. 79), and DENIES Defendant's

motion for partial summary judgment (Dkt. No. 84) for the reasons explained herein.

## I.      BACKGROUND

        This lawsuit arises out of the 2017 collapse of one of Defendant Cooke Aquaculture

Pacific LLC's Atlantic salmon net-pen facilities ("Cypress 2") in Deepwater Bay off Cypress

Island, Washington. (*See* Dkt. No. 1 at 9–10.) The Clean Water Act ("CWA") prohibits

discharges of pollutants into the waters of the United States, except pursuant to a National

Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1342. As provided by the CWA, authorized state agencies may issue NPDES permits and enforce permit requirements. *See* 33 § U.S.C. 1342(b). In Washington, the Department of Ecology ("Ecology") performs the functions necessary to "meet the requirements" of the CWA, including issuing NPDES permits. Wash. Rev. Code § 90.48.260.

Prior to the collapse of Cypress 2, Defendant operated eight Atlantic salmon net-pen facilities across Puget Sound pursuant to separate NPDES permits issued by Ecology. (*See* Dkt. Nos. 29-2 at 7–62, 44 at 4–33.) The net pens are floating facilities into which Defendant transfers Atlantic salmon smolts from its freshwater hatchery to be reared to a marketable size. (Dkt. No. 15 at 4.) The pens are made of metal walkways from which nets are hung. (Dkt. No. 29-2 at 70–73.) The net pens are held in place by a mooring system comprised of mooring chains or ropes attached to anchors. (*Id.* at 70–71, 87–88.) Defendant's NPDES permits impose numerous requirements for minimizing the discharge of pollutants from the facilities. (*See* Dkt. No. 44 at 8–21.) Defendant's NPDES permit for Cypress 2 was issued in October 2007 and was in force at all times relevant to this lawsuit. (Dkt. Nos. 42 at 5, 14; 44 at 1.)[1] Defendant operates its facilities on lands leased from the Washington State Department of Natural Resources ("DNR"). (*E.g.*, Dkt. No. 52-1 at 37–69.)

On August 19, 2017, Cypress 2 experienced mooring failures during very strong tidal currents. (Dkt. No. 42 at 2.) These mooring failures progressed over the following days and resulted in the facility's collapse and eventual destruction. (*Id.* at 2–3.) The catastrophic collapse of Cypress 2 resulted in the estimated release of more than 200,000 Atlantic salmon into Puget Sound. (Dkt. No. 29-2 at 200.) The collapse also resulted in the release of other debris from the facility into Puget Sound. (*Id.* at 211–12.) On August 24, 2017, Plaintiff sent Defendant a "Notice of Intent to Sue Under the Clean Water Act" letter ("notice letter") and sent a supplemental notice

---

[1] Although scheduled to expire in 2012, the Cypress 2 permit was administratively extended multiple times. (Dkt. Nos. 42 at 9, 44 at 4.).

letter on September 6, 2017. (Dkt. No. 1 at 22, 30.) On the same dates, Plaintiff mailed copies of the notice letter to the Administrator of the Environmental Protection Agency ("EPA"), the Regional Administrator of Region 10 of the EPA, and the Director of Ecology. (Dkt. No. 1 at 2–3.) On November 13, 2017, Plaintiff filed a complaint against Defendant asserting several CWA violations related to the Cypress 2 collapse, as well as violations at Defendant's seven other Puget Sound net-pen facilities. (*See generally id.*)

On August 25, 2017, DNR notified Defendant that it had defaulted on its obligations under the parties' lease and demanded that Defendant remove all damaged materials from the Cypress 2 site. (Dkt. No. 52-1 at 145.) DNR stated that it may terminate the lease if Defendant did not cure the default by September 24, 2017. (*Id.*) In a letter to DNR dated September 1, 2017, Defendant stated that it had "been implementing its Fish Escape Prevention Plan" and "reserve[d] all rights with respect to the Lease." (*Id.* at 149.) Defendant proceeded to conduct cleanup, salvage, and remediation at and around the Cypress 2 site throughout the rest of 2017 and into 2018. (*See* Dkt. Nos. 42, at 3–4, 29-2 at 210–12.)

On January 30, 2018, Ecology issued a $332,000 administrative penalty against Defendant arising from the Cypress 2 collapse. (Dkt. No. 52-1 at 160–66.) Ecology concluded that Defendant violated its NPDES permit by negligently allowing the release of farmed salmon, failing to inspect anchoring components deeper than 100 feet, and not adequately cleaning the facility's nets. (*Id.* at 163–64.) On March 1, 2018, Defendant appealed Ecology's penalty to the Washington State Pollution Control Hearings Board. (Dkt. Nos. 42 at 4, 52-1 at 169); *see also* Wash. Rev. Code §§ 43.21B.010, 43.21B.110.

On February 2, 2018, DNR terminated Defendant's lease for Cypress 2. (Dkt. No. 42 at 4.) Defendant responded on March 1, 2018, by filing a complaint in Thurston County Superior Court challenging DNR's termination of the lease. (Dkt. No. 52-1 at 11–32.) Among other relief, Defendant sought a declaratory judgment that DNR was not "entitled to withhold its consent to [Defendant's] reconstruction of [Cypress] 2 . . . and that it is entitled to restock [Cypress] 2 as

soon as it has been rebuilt." (*Id.* at 28.)

On March 22, 2018, Washington's governor signed legislation that prohibits DNR from either granting new leases of aquatic lands for non-native finfish aquaculture projects or renewing or extending a lease in existence as of June 7, 2018, that includes non-native finfish aquaculture. *See* Wash. Rev. Code § 79.105.170; *see also* H.B. 2957, 65th Leg., Reg. Sess. (Wash. 2018).

On April 24, 2019, Defendant and Ecology entered a consent decree to resolve Defendant's liability related to the Cypress 2 collapse and the corresponding violations identified by Ecology in its notice of administrative penalty. (*See* Dkt. No. 74-1 at 4–11.) On April 25, 2019, the Pollution Control Board, pursuant to the consent decree, dismissed Defendant's appeal of Ecology's administrative penalty. (*Id.* at 18.) Defendant has not conducted net-pen operations at Cypress 2 since its collapse in August 2017. (Dkt. No. 43 at 3.) In fact, the Cypress 2 facility no longer exists, and its remains were ultimately salvaged and removed from the site following the collapse. (*Id.*; *see* Dkt. No. 29-2 at 210–12.) Defendant states that it has no intention of rebuilding Cypress 2. (Dkt. No. 43 at 3.) On December 21, 2018, Defendant requested that Ecology terminate the permit for Cypress 2. (Dkt. No. 86 at 4.) On August 29, 2019, Ecology informed Defendant that it had completed its closure monitoring of Cypress 2 and that the permit would be terminated as of September 28, 2019. (See Dkt. No. 86 at 6.) Defendant has represented that it has not appealed the decision. (*See* Dkt. No. 84 at 9.) Defendant continues to operate its other seven net pen facilities under its NPDES permits. (*See* Dkt. Nos. 29-2 at 7–62, 44 at 4–33.)

Defendant now moves to exclude Plaintiff's expert opinions on risk of failure (Dkt. No. 82), Plaintiff moves for partial summary judgment on multiple claims (Dkt. No. 79), and Defendant moves for partial summary judgment on the grounds of *res judicata* and mootness (Dkt. No. 84).

//

## II.   DISCUSSION

### A.   Legal Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B.   Defendant's *Daubert* Motion to Exclude Dr. Tobias Dewhurst's Expert Opinions Regarding Risk of Failure

The trial court has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993). A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably

applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

In *Daubert*, the Supreme Court rejected the rigid "general acceptance" test for the admissibility of scientific evidence. 509 U.S. at 596. The Court reasoned that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* When determining admissibility, the text is "a flexible one," with a focus on principles and methodology. *Id.* at 595. Rule 702 is generally construed liberally. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). And in determining the admissibility of expert testimony, "there is less danger that a trial court will be 'unduly impressed by the expert's testimony or opinion' in a bench trial.*" FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014).

Dr. Tobias Dewhurst is a marine engineering expert retained by Plaintiff to evaluate the safety of Defendant's net pens. (Dkt. No. 83-1 at 6.) To establish predicted environmental conditions at the net pens, Dewhurst used an international standard, the Norwegian Aquaculture Standard 9415 ("NS9415"), to analyze data on local environmental conditions as measured by TerraSond, a company Defendant has retained. (*Id.* at 21–22.) Dewhurst used these predicted conditions to calculate the loading forces exerted on the net pets. (*Id.* at 27–28.) Dewhurst then compared the net pen manufacturer specifications with the predicted environmental conditions for each site. (Dkt. No. 79-3 at 11–12.) Defendant argues that the Court should exclude from trial Dewhurst's opinion that each of Defendant's current net pen facilities are "at risk of failure." (Dkt. No. 82.) Defendant offers three reasons to exclude Dewhurst's testimony as unreliable under Rule 702. (*See id.*)

First, Defendant argues that Dewhurst should have performed analytical modeling to quantify the risk of failure. (*Id.* at 10–12.) This criticism is not an attack on the reliability of the expert's methodology, but instead an argument as to how to weigh the opinion. Thus, it is not a ground to exclude the testimony under *Daubert. See* 509 U.S. at 595–96. Defendant cites an out-of-circuit case in which the district court exercised its discretion to exclude an opinion in which

an expert offered an opinion on the degree of risk posed by contamination. (*See* Dkt. No. 82 at 13.) But that court concluded the expert opinion lacked a sufficient basis in facts or data under Rule 702, not that the expert's methodology was unreliable. *See Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 702–03 (W.D.N.Y. 2011) (noting that the expert conceded further investigation was required to determine the extent of the contamination).

Second, Defendant contends that Dewhurst's opinion should be excluded because he equates the net pen manufacturer specifications with the net pen's safe operating limits. Defendant argues that manufacturer specifications are too conservative a basis for determining whether the net pen operations are safe, arguing that a non-compliant net pen could still be shown to be safe based on an engineer's analysis. (Dkt. Nos. 82 at 13–14, 104 at 3–7.) But it is hard to see how Defendant could seriously contend that a manufacturer's product specifications are not at least relevant to the safe operations of a product. Indeed, Defendant's own expert conducted a similar analysis of predicted environmental conditions compared to conditions allowed by the manufacturer. (Dkt. No. 83-1 at 22.) Thus, Defendant's assertion that a non-compliant net pen *might* still be safe likewise goes to the weight, not reliability, of Dewhurst's testimony. *Daubert*. *See* 509 U.S. at 595–96.

Third, Defendant argues that Dewhurst's opinion should be excluded because he does not quantify the degree of risk of failure for each net pen site and has not differentiated as to whether there is a low or high risk of failure for each site. (Dkt. No. 82 at 14–15.) Once again, this is an attack on weight, not reliability, of the expert opinion. *Daubert*. *See* 509 U.S. at 595–96.

Thus, Defendant has not raised any serious challenge to the reliability of the principles or methodology supporting Dewhurst's expert opinion. *See* Fed. R. Evid. 702. Defendant remains free to challenge the expert opinion through "[v]igorous cross-examination" and "presentation of contrary evidence." *See Daubert*, 509 U.S. at 596. Therefore, Defendant's motion to exclude Dewhurst's risk of failure testimony is DENIED on these grounds.

//

## C. Plaintiff's Motion for Partial Summary Judgment

### 1. Plaintiff's Request to Strike

In a summary judgment ruling, a trial court may consider only evidence which could be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007). Plaintiff requests that the Court strike several items of evidence that Defendant has submitted in opposition to Plaintiff's motion for partial summary judgment. (*See* Dkt. No. 95 at 5–7.) The Court considers each request in turn.

#### a. *Declarations of Stephen Weatherford and Bill French*

Federal Rule of Civil Procedure 26(a) requires that parties disclose the names of "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). A party must supplement its disclosure "in a timely manner if the party learns that . . . the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made know to the other parties during the discovery process or in writing." Fed. R. Civ. P 26(e)(1)(A). Where a party fails to disclose its intent to rely on a witness either without substantial justification or where the nondisclosure was not harmless, Rule 37(c)(1) provides that the party is "not allowed to use that information or witness" at trial. Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

In opposition to Plaintiff's motion for partial summary judgment, Defendant submitted the declarations of Stephen Weatherford and Bill French. (Dkt. Nos. 90, 91.) Their declarations primarily concern the inspections Defendant performed of anchoring components. (*See id.*) Defendant did not previously disclose its intent to rely on these witnesses to Plaintiff. (*See* Dkt. No. 95-1 at 4–7.) Weatherford and French are Defendant's employees, and it appears there is no justification for failing to timely identify these witnesses. This omission is not harmless because Plaintiff has repeatedly sought discovery of information on Defendant's inspections of anchoring

systems. Because the failure to disclose is neither substantially justified nor harmless, Defendants may not introduce these witnesses. *See* Fed. R. Civ. P. 37(c)(1). *Yeti by Molly, Ltd.*, 259 F.3d at 1106. Therefore, the Court GRANTS Plaintiff's request to strike the declarations of Stephen Weatherford and Bill French on this ground.

### b. *Sham affidavit rule*

Under the "sham affidavit rule," a party cannot create an issue of fact with an affidavit contradicting prior statements that the party made under oath. *Yeager v. Bowlin*, 693 F.3d 1076, 1079–80 (9th Cir. 2012); *see Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 980 (9th Cir. 2006). The rule applies to "clear and unambiguous" contradictions that cannot be resolved with "a reasonable explanation." *Yeager*, 693 F.3d at 1080–81 (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07 (1999)). However, the rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* at 1080. "[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit. *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

Plaintiff requests to strike under the sham affidavit rule portions of declarations by James Parsons and Randy Hodgin that assert Defendant conducted mooring inspections for which records do not exist. (Dkt. No. 95 at 5.) Defendant designated Parsons as its representative for a 30(b)(6) deposition on the topics of Defendant's inspections of the net pen anchoring components, including how the inspections were documented. (*See* Dkt. No. 46-1 at 11, 21, 70.) At his deposition, Parsons stated that he was prepared to testify on these topics. (*See, e.g.*, Dkt. 46-1 at 70.) Parsons repeatedly testified that the information Plaintiff sought is contained in the

records.[2] (Dkt. No. 46-1 at 156–59, 178–79.) For example, in response to Plaintiff's inquiry as to the names of the divers who conducted mooring inspections of Cypress 1 in 2016, Parsons stated, "[i]t would have been any member of the dive team." (*Id.* at 156–57.) And when asked for the dates of when those inspections occurred, Parsons stated, "[t]hey would be available in the dive logs and daily records." (Dkt. No. 46-1 at 156–57.)

In its opposition to Plaintiff's motion to compel a second 30(b)(6) deposition, Defendant represented to the Court that, with respect to "specific details regarding the names, dates, and locations of routinely conducted mooring inspections. . . . [a]ll of the information sought by Plaintiff was contained in the tens of thousands of pages of business records produced to [Plaintiff] before deposition, and all of the information could have been obtained by [Plaintiff] simply by reviewing those documents."[3] (Dkt. No. 49 at 2.) Defendant stated that the records of "which [] employee conducted which inspection on which day at which site—were provided to Plaintiff many times in a variety of ways." (*Id.* at 3.)

The Court allowed Plaintiff to depose Defendant for one additional day. (Dkt. No. 66 at 6.) At that deposition, Parsons testified that it was likely that not all inspections were reflected in the records, (Dkt. No. 79-1 at 215), that just "[b]ecause the records may not exist doesn't mean that it wasn't done," (*id.* at 217), that the daily logs and dive logs are incomplete for Cypress, (*id.* at 220), that "we have good records that [inspections] were occurring at all of the other sites," (*id.* at 220), and that additional information could be obtained from current and former employees, (*e.g.*, *id.* at 132, 258). Thus, Defendant has changed its answer about its practice of recording mooring system inspections: while Defendant initially maintained that all such

---

[2] In its order on Plaintiff's motion to compel, the Court evaluated Parson's responses at length and found them evasive. (*See* Dkt. No. 66 at 3–5.) The Court found this evasiveness, combined with Defendant's last-minute disclosure of over 30,000 documents days before deposition, frustrated Plaintiff's ability to develop testimony on the topic of mooring system inspections. (Dkt. No. 66 at 5–6.)

[3] A court has discretion to consider whether a statement of fact contained in a brief may be considered an admission *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988).

information was in its records, Defendant now maintains that not all inspections were logged in the records, and further information can be obtained from its employees.

Plaintiff argues that Defendant's change in position amounts to a clear contradiction of its own sworn testimony that *all* of the information on mooring inspections is contained in the records. (Dkt. 95 at 5–6.) Defendant's misleading initial testimony frustrated Plaintiff's ability to develop testimony on the topic of mooring systems inspections. (Dkt. No. 66 at 5–6.) Defendant has not attempted to reconcile the difference in its initial position by explaining the discrepancy as an honest mistake or caused by newly discovered evidence.[4] (*See* Dkt. No. 87 at 19.) But Defendant's new position is arguably an elaboration or clarification of Defendant's prior evasive testimony. *See Messick*, 62 F.3d at 1231. Especially given the Ninth's Circuit caution to avoid credibility determinations at summary judgment, Defendant's discrepancy is not such a clear and unambiguous contradiction as to require striking Parsons's and Hodgin's declarations under the sham affidavit rule. *See Yeager*, 693 F.3d at 1080–81. Therefore, the Court DENIES Plaintiff's request to strike Parsons's and Hodgin's declarations.

### c. *Parsons declaration and Defendant's interrogatory responses*

Plaintiff requests that the Court strike portions of the Parsons declaration that Plaintiff asserts lacks foundation and are based on hearsay. (Dkt. No. 95 at 6.) Plaintiff also requests the Court strike Defendant's interrogatory responses attached to the declaration of Douglas Steding. (*See id.* at 7.) The Court recognizes that assertions in conclusory, self-serving affidavits are insufficient, standing alone, to create a genuine issue of material fact. *Nilsson*, 503 F.3d at 952 n.2.

### d. *Mott MacDonald Report*

Plaintiff requests that the Court strike the Mott MacDonald reports attached to James

---

[4] Instead, Defendant blames Plaintiff for failing to conduct fact witness depositions based on Defendant's roster of over 200 employees and its response to Interrogatory No. 5. (*See* Dkt. No. 87 at 19.)

Parsons's declaration. (Dkt. No. 95 at 6.) Plaintiff argues that these unsworn reports constitute inadmissible hearsay and that Parsons is not competent to testify as to the expert opinions the reports contain. (*Id.*) Plaintiff does not dispute the authenticity of these reports that Mott MacDonald prepared for DNR. (*See id.*) Indeed, Plaintiff appears to have submitted at least two of the same reports in support of its motions. (*Compare* Dkt. No. 79-2 at 81, 87, *with* Dkt. No. 94 at 25, 32.) Given the likelihood that the material in the reports could ultimately "be presented in a form that would be admissible in evidence" at trial, the Court declines to strike them. *See* Fed. R. Civ. P. 56(c)(2).

### 2. Implementation of Technology to Minimize Fish Escapement

Condition S7.1 of the permits requires that Defendant identify and implement technology that will minimize fish escapements. (Dkt. No. 29-2 at 12.) In its enforcement of NPDES permits, Ecology incorporates Washington's "AKART" standard, which requires "all known, available, and reasonable methods of treatment" to minimize water pollution. *See* Wash. Admin. Code § 173-220-130(1)(a); *see also Snohomish County v. Pollution Control Hearings Bd*., 386 P.3d 1064, 1067 (Wash. 2016).

#### a. *Pre-suit notice of violation of Condition S7.1*

For district courts to have jurisdiction over CWA citizen suits, a plaintiff must provide notice to the alleged violator that contains "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated," and "the activity alleged to constitute a violation." U.S.C. § 1365(b); 40 C.F.R. § 135.3(a). "The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." *Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 916 (9th Cir. 2004) (citing *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002)).

Defendant contends that Plaintiff failed to provide notice regarding these claims because its notice letter did not cite NS9415 or specifically allege Plaintiff's contention that Defendant

needs to conduct further engineering analyses of the cages. (Dkt. No. 87 at 17.) Plaintiff's notice letter specifically lists Condition S7.1 and contains the language at issue for this claim. (Dkt. No. 1 at 25–26.) The letter alleged that Defendant violated permit requirements "at all eight of its Puget Sound net pen facilities by failing to identify and implement technology that will minimize fish escapements." (*Id.*) Thus, Defendant could have reasonably identified Plaintiff's claims that Defendant failed to implement technology to minimize fish escapes. Therefore, the Court FINDS that Plaintiff's notice letter provided reasonably specific notice to allow Defendant to identify the alleged violations under Condition S7.1.

> b. *Technology necessary to evaluate suitability of salmon farms for their locations*

Plaintiff argues that the Washington's AKART standard for technology requires Defendant to reevaluate whether its salmon farm systems and configurations are suitable for the local environmental conditions at each site. (Dkt. No. 79 at 11–13.) Plaintiff relies on Dewhurst's opinion stating that since 2006, aquaculture standards including NS9415 have been available for conducting a current analysis to determine whether Defendant's net pen systems were suitable for those locations. (*Id.* at 12.) Plaintiff argues that following promulgation of the NS9415 standard, Defendant should have studied its equipment then in use and subsequently installed to determine whether it could withstand the local conditions. (*Id.* at 11–13.) Plaintiff argues Defendant's failure to conduct theses analyses violated Condition S7.1. (*Id.*)

Defendant argues that it has complied with Condition S7.1 by providing Release Prevention Plans that appropriately describe new cage systems as technology that has been or would be implemented. (Dkt. No. 87 at 12.) Defendant argues that it is standard industry practice to make suitability determinations at the time of installation or when making substantial changes to the facility, and thus the standard that Dewhurst cites, NS9415, should not come into play. (Dkt. No. 87 at 13.) It argues that AKART standards for technology are fully addressed during permit issuance. (*Id.* at 14.) Defendant contends that the relevant AKART standard is set forth in a different section of the Washington Administrative Code, § 173- 221A. (*Id.* at 15.) Finally,

Defendant contends that it would not be reasonable under the AKART standard to require replacement of the net pens prior to the end of their useful life. (*Id.*)

Thus, material issues of fact remain as whether Condition S7.1 requires Defendant to undertake a suitability analysis of its net pen systems. Therefore, Plaintiff's motion for summary judgment is DENIED on this ground.

c. *Improvement to net pen structures*

In Defendant's Release Prevention Plans, Defendant has identified improved cage systems to be implemented in the future. (Dkt. No. 29-2 at 136.) Plaintiff argues that these plans required Defendant to undertake replacement of existing net pens. (Dkt. No. 79 at 13–14.) Plaintiff further contends that the current net pens are at risk of failure because they do not comply with manufacturer recommendations and because there has not been adequate independent analysis of the suitability of the systems. (Dkt. No. 79 at 14.). Plaintiff relies on Dewhurst's expert opinions that conclude the systems are at risk of failure. (*Id.*)

Defendant does not contest that its Release Prevention Plans required it to implement new cage systems. (*See* Dkt. No. 87 at 15–17.) However, Defendant argues that its net pens are safe and are not at risk of failure. (*Id.*) Defendant relies on Dean Steinke's expert testimony that the manufacturer ratings are guidelines but do not indicate the true limits of the net pens. (*Id.* at 16–17.) Steinke asserts that the ratings lack detail and cannot be compared to NS9415 values. (Dkt. No. 92 at 4–8.) Steinke also argues that Dewhurst's calculations of drag force are flawed because they fail to account for net deflection that reduces projected surface area. (*Id.*)

Thus, material issues of fact remain as whether Defendant's net pen structures violate Condition S7.1. Therefore, Plaintiff's motion for summary judgment is DENIED on this ground.

3. Annual Inspection of Anchoring Components

Condition S6.F of Defendant's NPDES permit requires the preparation and implementation of a Pollution Prevention Plan that provides for at least annual inspections of the anchoring components above and below the water line. (*See* Dkt. 44 at 19–20.) Plaintiff argues

that Defendant has violated this requirement by failing to annually inspect all underwater

mooring components, and Plaintiff further argues that Defendant's violations of this requirement

are ongoing because they have recurred since the complaint was filed. (*See* Dkt. No. 79 at 17.)

a. *Cypress Sites 1 and 3 (2013–2016)*

Altogether, Defendant's Cypress sites had a total of 71 anchor lines: Cypress 1 has 25

lines, Cypress 2 had 19 lines, and Cypress 3 has 27 anchoring lines. (Dkt. No. 46-1 at 147, 163,

173.) Defendant's records indicate that in 2013, one dive may have inspected two or three anchor

lines and seven additional dives might have involved work on up to 14 anchor lines. (*Id.* at 251–

53.) In 2014, one dive may have involved an inspection of a Cypress anchor line, and four dives

may have involved work on up to eight Cypress anchor lines. (*Id.* at 236–39.) In 2015, Defendant

performed work on two anchor chains at Cypress 2 and three anchor chains at Cypress 3, and

some surface inspections occurred. (*Id.* at 223–25, 232.) In 2016, records show Defendant may

have inspected the uppermost chain components plus one anchor chain. (Dkt. No. 79-1 at 193,

198–200, 211–13.) Thus, Plaintiff has made a showing that Defendant made spotty inspections

of its mooring systems and thus failed to complete the required annual inspections of the 25

mooring lines at Cypress 1 and 27 mooring lines at Cypress 3 in 2013, 2014, 2015, and 2016.

In opposition to Plaintiff's motion, Defendant does not point to a single additional record

to demonstrate that it conducted a below-water inspection of these mooring systems. (*See* Dkt.

No. 87 at 20–21.) Defendant relies instead on its responses to Interrogatory Topic No. 5 and the

Rule 30(b)(6) deposition of Defendant in which Parsons testified. (*Id.* at 18–20.) In the responses

and deposition, Defendant stated that it conducted the required annual inspections. (*See* Dkt.

Nos. 93 at 24–26, 94 at 301–320.) But self-serving declarations not based upon personal

knowledge are insufficient to demonstrate a factual dispute. *Nilsson*, 503 F.3d at 952 n.2.

Parsons testified that he was prepared to testify as to record-keeping practices and that all

inspections were in the records. (Dkt. No. 46-1 at 70, 156–59, 178–78.) Parsons later testified at

his second deposition that the absence of an inspection record does not necessarily mean that an

inspection did not occur. (Dkt. No. 79-1 at 217.) Defendant has admitted that the records collected in response to Interrogatory No. 5 "mostly only tangentially contained evidence of anchor inspections." (Dkt. No. 87 at 20.) Defendant now argues that "the absence of a non-mandatory record does not entitle [Plaintiff] to an inference that the inspections did not occur." (*Id.* at 17.)

On a summary judgment motion, credibility determinations are not appropriate, and a court must draw all justifiable inferences in the light most favorable to the nonmoving party. *See Liberty Lobby*, 477 U.S. at 255. A reasonable trier of fact could infer that the absence of non-mandatory anchor inspection records does not prove that Defendant failed to make the anchor inspections. Thus, material issues of fact remain as to whether anchor inspections occurred at Cypress 1 and 3 between 2013 and 2016. Therefore, Plaintiff's motion for summary judgment is DENIED on this ground.

b. *Anchoring components deeper than 100 feet*

Five of Defendant's sites have mooring components deeper than 100 feet: Orchard Rocks, Clam Bay, Port Angeles, and Cypress 1 and 3. (Dkt. No. 46-1 at 68, 110–11, 136, 147, 173.) The Permits unambiguously require inspections of the entire mooring components, not only those above 100 feet. (Dkt. 29-2 at 11.) Defendant's employees may not dive deeper than 100 feet. (*See* Dkt. No. 25-1 at 63.) Until 2017, Defendant conducted visual inspections only of the shallower components of these systems, but Defendant contends that it "inspected" the deeper components by examining the condition of the shallower components and by checking line tension or pulling up anchors. (*See* Dkt No. 46-1 at 61, 87 at 22, 89 at 2–3.) Ecology concluded that this form of examination does not meet permit requirements for "inspection." (Dkt. No. 52-1 at 163–64.)

A court shall interpret an NPDES permit like any other contract. *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204–05 (9th Cir. 2013). If the language is plain, the court construes its meaning. *Id.* If the language is ambiguous, the court "may turn to extrinsic

evidence to interpret its terms." *Id.* As the agency charged with enforcing NPDES permits, Ecology's interpretation of the ambiguous term "inspection" is entitled to substantial deference. *See Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir. 1998) (holding that the district court properly deferred to the agency authorized to enforce NPDES permits); *Nat. Res. Def. Council, Inc.*, 725 F.3d at 1205. Thus, Plaintiff has shown that Defendant violated the permits by not inspecting mooring components deeper than 100 feet at Orchard Rocks, Clam Bay, Port Angeles, and Cypress 1 and 3 in 2012, 2013, 2014, 2015, and 2016. Therefore, Plaintiff's motion for summary judgment is GRANTED on this ground.

c. *Cypress 1 and 3 (2018) and Port Angeles (2017)*

Defendant's Pollution Prevention Plan that went into effect in October 2017 required it to use either a contracted dive service or a remotely operated vehicle to conduct inspections of its moorings below the employee diver depth limit of 100 feet. (Dkt. No. 29-2 at 11, 131.) The plan further required Defendant to document its visual inspection of each anchoring line and identify maintenance concerns. (*Id.* at 131, 134.) The permits require Defendant to operate its facilities in accordance with the plan. (*E.g.*, *id.* at 11.)

As part of DNR's investigation of Defendant following the collapse of Cypress 2, DNR hired Mott MacDonald and its subcontractor Collins Engineers. (Dkt. No. 79-2 at 631–34.) Mott MacDonald evaluated Cypress 1 and 3 in 2018 and Port Angeles in 2017. Defendant relies on the inspections that Mott MacDonald performed to fulfill its anchor inspection requirements for Cypress 1 and 3 in 2018 and Port Angeles in 2017. (Dkt. Nos. 46-1 at 333–34, 89 at 24–25.)

But the report was prepared for use by DNR and other state agencies; it was "limited in scope" and "[d]etailed inspection and physical material sampling were not performed," and the report did not make repair or maintenance recommendations. (Dkt. No. 79-2 at 632.) Defendant reviewed the report's conclusion but did not undertake additional steps to determine whether maintenance work was needed. (*See* Dkt. No. 79-2 at 147–53.) Parsons testified that Defendant's employees did inspect the mooring systems at Port Angeles in 2017, but he admits that the

mooring lines and anchors were not inspected below 100 feet. (*See* Dkt. No. 79-1 at 185–90.)
Thus, Plaintiff has demonstrated that Defendant violated the permits by failing to inspect
mooring components at Cypress 1 and 3 in 2018 and at Port Angeles in 2017 in the manner
required by the permits and the October 2017 Pollution Prevention Plan. Therefore, Plaintiff's
motion for summary judgment is GRANTED on this ground.

### d. *Completion of inspection forms (2017–2018)*

Defendant's October 2017 Pollution Prevention Plan also required it to complete an
Annual Below Surface Visual Inspection form "to record the condition of the mooring
components and identify specific maintenance concerns." (Dkt. 29-2 at 131–32, 134.) The form
requires a detailed assessment of the mooring system, including an assessment of (1) each
component of each mooring line, (2) whether routine or immediate repairs are needed, (3) the
dates when repairs were identified and completed, (4) a description of the repair, (5) the name of
the person completing the repair, (6) the name of the person completing the inspection form, and
(6) the date the form was completed. (*Id.* at 134.) As mentioned above, the permits require
Defendant to operate in accordance with the plan. (*E.g.*, Dkt. 29-2 at 11.)

It is undisputed that Defendant completed the form for its Hope Island site in 2017 and
2018. (*See* Dkt. Nos. 79 at 25, 79-1 at 142–45, 274–77.) It is likewise undisputed that Defendant
failed to complete the form for the remainder of its sites. (*See generally* Dkt. Nos. 79, 87, 95.)[5]
Under the Clean Water Act, Defendant is strictly liable for failure to use the required form. *See*
*Sierra Club v. Union Oil of Cal.*, 813 F.2d 1480, 1490–91 (9th Cir. 1987). Thus, Plaintiff has
demonstrated that Defendant violated the permits by failing to complete the required Annual
Below Surface Visual Inspection forms for Cypress 1 and 3, Port Angeles, Orchard Rocks, Fort
Ward, and Clam Bay in 2017 and 2018. Therefore, Plaintiff's motion for summary judgment is

---

[5] Defendant observes that the Court has already found that the 2017 Pollution Prevention
Plans were deficient, (Dkt. No. 68), and suggests that "if any violation exists here, it is at most a
failure to implement a plan that the Court already has determined was insufficient." (Dkt. No.
87.)

GRANTED on this ground.

4. Reporting of Fish Escapement and Tracking Fish Numbers

The permits require Defendant provide in its Release Prevention Plan "[p]rocedures for routinely tracking the number of fish within the pens, the number of fish lost due to predation and mortality, and the number of fish lost due to escapement." (Dkt. No. 29-2 at 12.) The permits further require Defendant to submit an Annual Fish Release Report by January 30 of each year, which "must include, to the extent possible, all fish released or escaped to state waters, including all Significant Fish Releases (see S8)." (*Id.* at 12.) Condition S8 defines a release as "significant" when it involves "1,500 or more fish whose average weight exceeds 1 kilogram (kg) or 3,000 or more fish whose average weight is equal to or less than 1 kg." (*Id.* at 13.) Such releases must be reported within 24 hours. (*Id.*) Thus, the permits require immediate reporting of significant fish escapes and annual reporting of all fish escapes. (*Id.* at 12–13.)

Defendant tracks its fish using a software program called FishTalk. (Dkt. No. 79-1 at 428–29.) First, Defendant uses electronic counters to count the number of fish it places into trucks for transport to its pens. (*Id.* at 296–97, 431.) Then Defendant assumes (without verification) a loss during transport of five percent and enters this revised number into FishTalk. (*Id.* at 297–98, 315.) While fish are rearing in the pens, there may be further losses through mortality or removal for other reasons; Defendant states that these are entered into FishTalk. (*Id.* at 300–01, 429.) Finally, Defendant counts the fish with electronic counters again when they are harvested. (*Id.* at 306–07.) Defendant states that its electronic counters are accurate to plus or minus two percent. (*Id.* at 297, 307.)

Defendant has represented in its Annual Fish Release Reports that it has lost no fish through escapement. (Dkt. No. 79-2 at 584, 589, 593, 597, 601, 604, 609.) From 2012 to 2015, Defendant reported that there were no "significant" fish escapes. (*Id.* at 585, 589, 593, 597.) In the subsequent years, Defendant reported that there were no fish escapes. (*Id.* 601, 604, 609.) However, Defendant's data shows that there have been downward variations every year between

the number of fish it puts in its pens and the number of fish it removes and harvests. (*See id.* at 615–28.) The parties disagree as to whether this data shows that Defendant failed to report fish escapes or whether these discrepancies are within an acceptable range of error.

Plaintiff argues that Defendant's fish inventory data should be evaluated based on variations within each individual pen. (Dkt. No. 79 at 27–29, 95 at 16.) This analysis shows that there were negative deviations of more than four percent and up to 17 percent in numerous pens (called "Units" in the data), including Unit 111 at Cypress 1 in January 2016; Unit F12 at Fort Ward in May 2016, Unit R08 at Orchard Rocks in June 2016, Unit 10 at Hope Island in August 2016, Unit 06 at Port Angeles in December 2016, Units 121 and 124 at Cypress 1 in January 2018, and Units 315 and 324 at Cypress 3 in January 2018. (*See* Dkt. No. 79-2 at 619–25.) Plaintiff contends that because these deviations in 2016 and 2018 were too large to explain by a four percent margin of error, Defendant violated the requirement to report fish escapements. (Dkt. No. 79 at 29.)

In contrast, Defendant argues that its fish inventory data should be evaluated based on variations within each facility, not each pen. (Dkt. Nos. 26–27.) In support of this argument, Defendant points to its expert report by Cormac O'Sullivan. (*Id.*) O'Sullivan states that it is standard industry practice to "look at the entire farm, not the individual pens." (Dkt. No. 88 at 6.) O'Sullivan calculates that, across all eight farms, there was an average site variance of -2.65 percent, which is below the Best Aquaculture Practices Standards ("BAP") of three percent for accuracy of inventory tracking. (*Id.*) O'Sullivan therefore concludes that there is "no indication" of either "large escape events from *any* of the sites or leakage from the sites." (*Id.* at 5–6.) Additionally, O'Sullivan applies the BAP standard to conclude that Defendant's fish tracking practices generally comply with best practices for accurate tracking. (Dkt. No. 88 at 4.)

The language of the NPDES permit is plain that Defendant must report all fish escapes "to the extent possible." It was possible for Defendant to identify in its data that there were downward variations that exceeded three percent per pen in 2016 and 2018. (*See* Dkt. No. 79-2

at 615–28.) Extrinsic evidence of industry standards does not alter the plain meaning of the permit. *Nat. Res. Def. Council*, 725 F.3d at 1204–05. Because the permits also require accurate fish tracking, Defendant cannot avoid this requirement by arguing that human error explains the variation. A failure to accurately track is likewise a violation of the permits. (Dkt. No. 29-2 at 12.) Furthermore, in the years 2012–2015, Defendant reported only whether there were "significant releases." (*See* Dkt. No. 79-1 at 585, 589, 593, 597.) This violates the Permits' requirement to report "all fish releases or escaped," and not only "significant" releases. (*E.g.*, Dkt. No. 29-2 at 12.) Thus, Plaintiff has demonstrated that in 2012–2015, 2016 and 2018, Defendant violated the permit requirement to track the number of fish in its net pens and report all fish escapements. Therefore, Plaintiff's motion for summary judgment is GRANTED on this ground.

### D.     Defendant's Motion for Partial Summary Judgment

Defendant moves for partial summary judgment on Plaintiff's claims relating to Defendant's Cypress 2 facility, arguing that the S1 claims are barred by *res judicata* and all the Cypress 2 claims are moot. (*See* Dkt. No. 84 at 5.)

### 1.     *Res Judicata and Plaintiff's S1 Claims*

"Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). The common-law principle of *res judicata*, also known as claim preclusion, is generally presumed to apply to administrative decisions. *See Littlejohn v. United States*, 321 F.3d 915, 921–22 (9th Cir. 2003). Courts, however, do not "have free rein to impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand." *Astoria,* 501 U.S. at 108. When "a statutory purpose to the contrary is evident," then the statutory claim preclusion bar applies instead of common law *res judicata*. *See id.*; *Littlejohn*, 321 F.3d at 921–22.

In its 1987 amendments to the Clean Water Act, Congress added a provision that specifies when claims for civil penalties are precluded by state or federal enforcement actions.

*See* 33 U.S.C. § 1319(g)(6)(A). Claims for civil penalties are barred for any violation

    (i)      with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

    (ii)     with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

    (iii)    for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law

*See* 33 U.S.C. § 1319(g)(6)(A).

At the same time, Congress created an exception to the statutory bar for citizen suits in which the plaintiffs, prior to the enforcement action, either (1) filed suit or (2) provided notice to the Environmental Protection Agency or to the state with respect to the alleged violation. *See* 33 U.S.C. § 1319(g)(6)(B); *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986, 991 (11th Cir. 2008) (holding that the prior-filed citizen suit exception to the civil penalties bar applies in both state and federal enforcement actions); *Thiebaut v. Colo. Springs Utils.*, 2007 WL 2491853 at *5 (D. Colo. Aug. 29, 2007) (concluding that the prior-commenced exception limits the applicability of *res judicata*), *aff'd*, 455 F. App'x 795 (10th Cir. 2011). Congress's intent to create an exception to the statutory bar is evident in § 1319(g)(6) of the Clean Water Act; for that reason, there is no "legislative default" to common-law claim preclusion principles. *See Astoria*, 501 U.S. at 110. By creating this exception, "Congress reiterated its commitment to citizen suits, which a Senate Report described as 'a proven enforcement tool.'" *Black Warrior Riverkeeper, Inc.*, 548 F.3d at 988 (quoting the legislative record). The Clean Water Act thus alters the ordinary *res judicata* rule to allow a prior-commenced citizen suit to pursue a claim for civil penalties, even after a federal or state enforcement action related to the same violation has been resolved. *See id*.

This prior-commenced exception for citizen suits applies here.[6] On August 24, 2017,

---

[6] In a prior order, the Court found that the only Clean Water Act statutory bar to citizen suits that "could conceivably apply" to Ecology's enforcement action is § 1319(g)(6)(A)(iii), which bars citizen suits in which a state agency has issued a final order under the Clean Water Act, or comparable state law, and the violator has paid the penalty assessed. (*See* Dkt. No. 76 at 19.)

Plaintiff notified the EPA and Ecology of its intent to sue Defendant, and Plaintiff provided a supplemental notice letter on September 6, 2017. (Dkt. No. 1 at 22, 30.) On November 13, 2017, Plaintiff filed its complaint against Defendant asserting several CWA violations related to the Cypress 2 collapse and violations at Defendant's seven other Puget Sound net-pen facilities. (*See* Dkt. No. 1.) Ecology issued its notice of penalty on January 30, 2018. (Dkt. No. 52-1 at 160–66.) On April 24, 2019, Defendant and Ecology entered into a consent decree regarding the Cypress 2 collapse, and on April 25, 2019, the Pollution Control Board, pursuant to the consent decree, dismissed Defendant's appeal of Ecology's administrative penalty. (*See* Dkt. No. 74-1 at 4–11, 18.) Because Plaintiff commenced its action before Ecology, the entry of the consent decree between Defendant and Ecology cannot preclude its enforcement action. *See* 33 U.S.C. § 1319(g)(6)(A)–(B).

Defendant argues that, notwithstanding § 1319(g)(6), the common-law principle of *res judicata* precludes Plaintiff's S1 claims because there is a final order in Ecology's state enforcement action on the identical CWA violations. (*See* Dkt. No. 103 at 2–4.) Defendant relies on a pre-*Astoria* case in which the Ninth Circuit concluded that the 1972 amendments to the Clean Water Act did not modify "the normal rules of preclusion." (Dkt. No. 103 at 4 (citing *United States v. IIT Rayonier, Inc.*, 627 F.2d 996 (9th Cir. 1980).) But *IIT Rayonier* did not interpret Congress's 1984 amendments to the Clean Water Act, nor did it apply the principles that the Supreme Court announced in *Astoria*. *See IIT Rayonier, Inc.*, 627 F.2d at 1000–02. Defendant also argues that a Ninth Circuit case involving a class action of sport fishers alleging state law violations demonstrates that § 1319(g)(6) did not alter normal claim preclusion rules. (*See* Dkt. No. 103 at 11 (citing *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769 (9th Cir. 1994).) But the parties in that case did not argue, and the court of appeals did not consider, that § 1319(g)(6) created a specific statutory preclusion rule for citizen suits. *See Alaska Sport Fishing Ass'n.*, 34 F.3d at 773–74.

Defendant's interpretation would render meaningless the prior-commenced citizen suit

exception. "If the statutory language is plain, [a court] must enforce it according to its terms." *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Accordingly, the Court begins and ends its analysis with the plain language of the statute, which clearly permits prior-commenced citizen suits to proceed notwithstanding a final order in a state-initiated administrative enforcement proceeding. *See Burwell*, 135 S. Ct. at 2489. Thus, Plaintiff's S1 claims are not barred by *res judicata*, and Defendant's motion for partial summary judgment is DENIED on this ground.

2.    Mootness

To establish mootness, a defendant must show that the district court cannot order any effective relief. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *Sierra Club*, 853 F.2d at 669 ) ("The burden of proving that the case is moot is on the defendant."). The cessation of illegal conduct following the commencement of a suit "ordinarily does not suffice to moot a case" because civil penalties still serve as a deterrent to future violations. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 193 (2000) (holding that a citizen suit was not moot where the polluting facility at issue had been "permanently closed, dismantled, and put up for sale, and all discharges from the facility had permanently ceased."). "Only when it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur' will events following the commencement of a suit moot a claim for civil penalties." *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002) (quoting *Laidlaw*, 528 U.S. at 189). This is because civil penalties under the Clean Water Act serve "to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation." *Laidlaw*, 528 U.S. at 174. The deterrent effect of civil penalties is no less potent when the defendant no longer operates or owns the polluting facility. *See San Francisco BayKeeper*, 309 F.3d at 1160. "Allowing polluters to escape liability for civil penalties for their past violations by selling their polluting assets would undermine the enforcement mechanisms established by the Clean Water Act." *Id.*

Here, Defendant argues that Plaintiff's claim for civil penalties for violations at Cypress 2

should be dismissed as moot. (Dkt. No. 84 at 17.) [7] Cypress 2 was destroyed and is no longer operational. (*See* Dkt. Nos. 29-2 at 210–212, 43 at 3.) Ecology completed its closure monitoring of the site, and Defendant has represented that the Cypress 2 permit has been terminated as of September 28, 2019. (*See* Dkt. No. 86 at 6.) But in its previous order, the Court found that it could still provide Plaintiff effective relief in the form of civil penalties because it was not absolutely clear whether the site could be rebuilt and because Defendant continued to operate its other seven net-pen facilities in Puget Sound under identical permits. (*See* Dkt. No. 76 at 16.) Now, it seems clear that Cypress 2 is permanently closed, but Defendant continues its operations in Puget Sound. Thus, civil penalties still serve to deter future Clean Water Act violations. *See Laidlaw*, 528 U.S. at 193; *San Francisco BayKeeper*, 309 F.3d at 1160. Therefore, Defendant's motion for partial summary judgment in DENIED on this ground.

## III.    CONCLUSION

For the foregoing reasons, Defendant's motion to exclude expert opinions (Dkt. No. 82) is DENIED. Plaintiff's motion for partial summary judgment (Dkt. No. 79) GRANTED in part and DENIED in part as follows:

1. Plaintiff's request to strike the declarations of Stephen Weatherford and Bill French is GRANTED, and Plaintiff's request to strike Parsons's and Hodgin's declarations is DENIED;

2. Plaintiff's motion for summary judgment its Condition S7.1 claim is DENIED;

3. Plaintiff's motion for summary judgment on its S6.F claim is:

    a.  DENIED as to Cypress 1 and 3 between 2013 and 2016,

    b.  GRANTED as to inspections of anchoring components deeper than 100 feet at Orchard Rocks, Clam Bay, Port Angeles, and Cypress 1 and 3 in 2012, 2013, 2014, 2015, and 2016. 2012 to 2016;

---

[7] The Court previously dismissed as moot Plaintiff's claims for injunctive relief at Cypress 2. (Dkt. No. 76 at 15.)

c. GRANTED as to Cypress Island Sites 1 and 3 (2018) and Port Angeles
           (2017); and

        d. GRANTED as to completion of the Annual Below Surface Visual Inspection
           forms for Cypress Island Sites 1 and 3, Port Angeles, Orchard Rocks, Fort
           Ward, and Clam Bay in 2017 and 2018.

    4. Plaintiff's motion for summary judgment is GRANTED as to its claim that in 2012–
       2015, 2016 and 2018, Defendant violated the permit requirement to report all fish
       escapements and track the number of fish in its net pens.

Defendant's motion for partial summary judgment (Dkt. No. 84) is DENIED.


        DATED this 25th day of November 2019.


                                            John C. Coughenour
                                            UNITED STATES DISTRICT JUDGE